LARRY JOHN LITTLE, JR.

NAME

P-82205

PRISON NUMBER

P. O. BOX 4000 / 08-211-U

CURRENT ADDRESS OR PLACE OF CONFINEMENT

VACAVILLE, CA 95696-4000

CITY, STATE, ZIP CODE

**ORIGINAL**

**FILED**

JUN 1 2 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ___ DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

LARRY JOHN LITTLE, JR.

(FULL NAME OF PETITIONER)

**PETITIONER**

v.

D. K. SISTO, Warden

(NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER [E.G., DIRECTOR OF THE
CALIFORNIA DEPARTMENT OF CORRECTIONS])

**RESPONDENT**

and

JERRY BROWN

The Attorney General of the State of
California, Additional Respondent.

'08 CV 1043 JM PCL

Civil No _____

(TO BE FILLED IN BY CLERK OF U.S. DISTRICT COURT)

**PETITION FOR WRIT OF HABEAS CORPUS**

UNDER 28 U.S.C. § 2254
BY A PERSON IN STATE CUSTODY

1. Name and location of the court that entered the judgment of conviction under attack: _____ Superior Court of San Diego Co., 220 West Broadway; San Diego, CA 92101

2. Date of judgment of conviction: May 3, 2000

3. Trial court case number of the judgment of conviction being challenged: Superior Court No.: SCE - 198946

4. Length of sentence: Indeterminate term of Fifteen years to life; CSX Three years.

CIV 68 (Rev. Jan. 2006)

cv

5. Sentence start date and projected release date: __Never! under California's BPT practices.__

6. Offense(s) for which you were convicted or pleaded guilty (all counts): __Second degree murder with use of a deadly with use of a deadly and dangerous weapon, two years.__

7. What was your plea? (CHECK ONE)
   (a) Not guilty        ☒
   (b) Guilty            ☐
   (c) Nolo contendere   ☐

8. If you pleaded not guilty, what kind of trial did you have? (CHECK ONE)
   (a) Jury        ☒
   (b) Judge only  ☐

9. Did you testify at the trial?
   ☒ Yes  ☐ No

## DIRECT APPEAL

10. Did you appeal from the judgment of conviction in the **California Court of Appeal**?
    ☒ Yes  ☐ No

11. If you appealed in the **California Court of Appeal**, answer the following:
    (a) Result: __Affirmed__
    (b) Date of result (if known): __October 21, 2001__
    (c) Case number and citation (if known): __SCE - 198946;    D047468__
    (d) Names of Judges participating in case (if known) __Huffman, Haller, and McDonald.__
    (e) Grounds raised on direct appeal: __Trial court erred in failing to instruct the jury pursuant to CALJIC 3.37, court prejudicially erred in instructing the jury, pursuant to the 1996 version of CALJIC No. 8.40.  Court erred in admitting testimony of an informant.__

12. If you sought further direct review of the decision on appeal by the **California Supreme Court** (e.g., a Petition for Review), please answer the following:
    (a) Result: __Review denied.__
    (b) Date of result (if known): __December 19, 2001.__
    (c) Case number and citation (if known): __SCE - 198946.__
    __Trial court erred in failing to instruct the jury pursuant to CALJIC 3.37.__
    (d) Grounds raised: __Trial court erred in failing to instruct the jury pursuant to CALJIC 3.37.  Court prejudicially erred in instructing the jury pursuant to the 1996 version of CALJIC No. 8.40 and Court erred in admitting testimony of an informant.__

**13.** If you filed a petition for certiorari in the **United States Supreme Court**, please answer the following with respect to that petition:

    (a)  Result: _____

    (b)  Date of result (if known): _____

    (c)  Case number and citation (if known): _____

    _____

    (d)  Grounds raised: _____

    _____

    _____

    _____

    _____


## COLLATERAL REVIEW IN STATE COURT

**14.** Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Superior Court**?
☒ Yes ☐ No

**15.** If your answer to #14 was "Yes," give the following information:

    (a)  **California Superior Court** Case Number (if known): SCE 198946

    (b)  Nature of proceeding: Order to show cause hearing on a petition for writ habeas corpus.

    (c)  Grounds raised: Ineffective Assistance of Counsel; failure to investigate, and trial counsel did not provide adequate proffessional assistance during trial.

    _____

    (d)  Did you receive an evidentiary hearing on your petition, application or motion?
    ☒ Yes ☐ No

    (e)  Result: Denied relief under prejudice prong of Strickland.

    (f)  Date of result (if known): August 8, 2004

**16.** Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Court of Appeal**?
☒ Yes ☐ No

17. If your answer to #16 was "Yes," give the following information:

    (a) **California Court of Appeal** Case Number (if known): SCE 198946; D035850

    (b) Nature of proceeding: Order to show cause hearing on a petition for writ of habeas corpus.

    (c) Names of Judges participating in case (if known)

    (d) Grounds raised: Ineffective assistance of counsel; failure to investigate; trail counsel did not provide adequate professional assistance during trial.

    (e) Did you receive an evidentiary hearing on your petition, application or motion?
      ☒ Yes ☐ No

    (f) Result: Summarily denied under prejudice prong of Strickland.

    (g) Date of result (if known): January 16, 2008.

18. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Supreme Court**?
☒ Yes ☐ No

19. If your answer to #18 was "Yes," give the following information:

    (a) **California Supreme Court** Case Number (if known): SCE 198946; S160332

    (b) Nature of proceeding: Petition for review.

    (c) Grounds raised: Ineffective assistance of counsel; failure to investigate; Trial counsel did not provide adequate proffessional assistance during trial.

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
      ☐ Yes ☒ No

    (e) Result: Denied

    (f) Date of result (if known): March12, 2008

20.  If you did **not** file a petition, application or motion (e.g., a Petition for Review or a Petition for Writ of Habeas Corpus) with the **California Supreme Court**, containing the grounds raised in this federal Petition, explain briefly why you did not:

_____

_____

_____

_____

## COLLATERAL REVIEW IN FEDERAL COURT

21.  Is this your **first** federal petition for writ of habeas corpus challenging this conviction?
☑ Yes ☐ No     (IF "YES" SKIP TO #22)
(a)  If no, in what federal court was the prior action filed? _____
   (i)  What was the prior case number? _____
   (ii) Was the prior action (CHECK ONE):
       ☐ Denied on the merits?
       ☐ Dismissed for procedural reasons?
  (iii) Date of decision: _____
(b)  Were any of the issues in this current petition also raised in the prior federal petition?
    ☐ Yes ☐ No

(c)  If the prior case was denied on the merits, has the Ninth Circuit Court of Appeals given you permission to file this second or successive petition?
    ☐ Yes ☐ No

<u>CAUTION:</u>
- **Exhaustion of State Court Remedies:**  In order to proceed in federal court you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court.  This means that even if you have exhausted some grounds by raising them before the California Supreme Court, you must first present **all** other grounds to the California Supreme Court before raising them in your federal Petition.

- **Single Petition:**  If you fail to set forth all grounds in this Petition challenging a specific judgment, you may be barred from presenting additional grounds challenging the same judgment at a later date.

- **Factual Specificity:**  You must state facts, not conclusions, in support of your grounds.  For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do.  A rule of thumb to follow is — state who did exactly what to violate your federal constitutional rights at what time or place.

## GROUNDS FOR RELIEF

22. **State *concisely* every ground on which you claim that you are being held in violation of the constitution, law or treaties of the United States. Summarize *briefly* the facts supporting each ground. (e.g. what happened during the state proceedings that you contend resulted in a violation of the constitution, law or treaties of the United States.) If necessary, you may attach pages stating additional grounds and/or facts supporting each ground.**

(a) **GROUND ONE**: Ineffective assistance of counsel at trial in violation of petitioner's right to effective assistance of counsel, as guaranteed by U.S. Constitution, and the Fifth, Fourteenth, and Sixth Amendments.

**Supporting FACTS**: Case Authority: Strickland v. Washington, 466 U.S. 668 (1984).

Counsel failed to investigate, prepare, or mount any mental defenses to the charges, and failed to present favorable evidence.

(b) **GROUND TWO**: Ineffective Assistance of Counsel: Failure to Investigate Wiggins v. Smith, 123 S.Ct. 2527, 539 U.S. 510 (U.S. 2003).

Trial counsel failed to conduct an investigation that would have revealed a background of active mental illness. Trial counsel failed to do an investigation to support his decision not to introduce mitigating evidence. State appelate court's decision to summarily deny petitioner's ineffective assistance of counsel claim on the "prejudice prong" of Strickland was an unreasonable application of federal law.

Did you raise **GROUNDS ONE** and **TWO** in the <u>California Supreme Court</u>?

☒ Yes ☐ No.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition): Petition for review

(2) Case number or citation: Case No. D047468, S160332

(3) Result (attach a copy of the court's opinion or order if available): Denied

(App. No. 1 Exhibit H)

**(c)** **GROUND THREE:** Effective assistance of counsel, fair trial

**Supporting FACTS:** Nix v. Whiteside, 475 U.S. 157 (1986). Trial counsel's failure to call on experts regarding petitioner's post traumatic stress disorder, counsel's failure to cause an adequate argument under evidence code 352 to exclude informant's testimony, failure to investigate and secure evidence and witnesses for trial, not having the correct jury instructions presented to the jury, trial counsel's trying to coerce petitioner into pleading to second degree and the withdrawal of a potentially meritorious defense of Imperfect Defense, trial counsel unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect.

**(d)** **GROUND FOUR:** Ineffectiveness of Counsel on Appeal, Smith v. Robbins, 528 U.S. 529 (2000). Appelate counsel denied petitioner an adequate appeal by failing to file a writ of habeas corpus for matters outside of the record, not utilizing a Rule 24 motion to correct a mis-statement of fact, and not including federal constitutional basis in the issues raised.

**Did you raise** **GROUNDS THREE** and **FOUR** in the **California Supreme Court?**

☒ Yes ☐ No.

    If yes, answer the following:

    (1)  Nature of proceeding (i.e., petition for review, habeas petition): Petition for Review

    (2)  Case number or citation: S160332

    (3)  Result (attach a copy of the court's opinion or order if available): Denied

                      (App. No. 1 Exhibit H)

**(e) GROUND FIVE:**   Jury Instruction Improperly Shifted Burden of Proof

**Supporting FACTS:** Sandstrom v. Montana, 442 U.S. 510 (1979).   Petitioner was denied full and fair hearing in the state court by ineffective assistance of council in failing to cause an adequate argument under evidence code section 352 to exclude Teal's testimony.

The trial court prejudicially violated petitioner's federal constitutional rights of due process and ineffective assistance of counsel further denied petitioner his right to a fair trial and due process.  Both issues were the question of applicability of CALJIC 3.37 where defendant has physical impairment (see U.S. Const. Amend. V and XIV; Failure to instruct jury pursuant to CALJIC 3.37).  The prejudicial effect of former CALJIC 8.40 Instructing the jury must find an intent to kill in order to find defendant guilty of lesser offense of voluntary manslaughter.  The jury was not instructed on involuntary manslaughter and the erroneous instruction on voluntary manslaughter was prejudicial, under the instructions given the only option was to convict petitioner of second degree murder if they found the killing was unintentional.

**Did you raise GROUND FIVE in the California Supreme Court?**

☒ Yes ☐ No.

    If yes, answer the following:

    (1)   Nature of proceeding (i.e., petition for review, habeas petition): Petition for Review

    (2)   Case number or citation: S160322

    (3)   Result (attach a copy of the court's opinion or order if available): Denied

                                                      (App. No. 1 Exhibit H)

**(f,g,h) GROUNDS SIX, SEVEN, & EIGHT:** Jury instructions lightened the prosecution's burden of proof (Francis v. Franklin, 471 U.S. 307 (1985)); conviction on less than proof beyond a reasonable doubt of every element of the charged crime (In Re Winship, 397 U.S. 358 (1970)); and federal review as constitutional rights to due process and fair trial (Arizona v. Fulminate, 499 U.S. 279 (1991).

**Supporting FACTS:** Counsel's failure to take involuntary manslaughter instruction when offered, trial judge's failure to give involuntary manslaughter instruction sua sponte, trial counsel's failure to cause an adequate argument under Evidence Code 352 to exclude informant testimony. Trial court's failure to instruct the jury pursuant to CALJIC 3.37 Physical Impairment Instruction. Trial counsel denied petitioner his right to fair trial and due process; both issues were the question of applicability of CALJIC 3.37 Physical Impairment (See U.S. Const., Amend. V and XIV); the prejudicial effect of former CALJIC 8.40 instructing the jury must find an intent to kill in order to find defendant guilty of lesser offense of voluntary manslaughter. The jury was not instructed on involuntary manslaughter and the erroneous instruction on voluntary manslaughter was prejudicial. Under the instructions given, the only option was to convict petitioner of second degree murder if they found the killing was unintentional.

**Did you raise GROUNDS SIX, SEVEN, and EIGHT in the California Supreme Court?**
    ☒ Yes ☐ No.

If yes, answer the following:

    (1)   Nature of proceeding (i.e., petition for review, habeas petition): Petition for Review

    (2)   Case number or citation: S16332

    (3)   Result (attach a copy of the court's opinion or order if available): Denied
                                                                (App. No. 1 Exhibit H)

23. Do you have any petition or appeal **now pending** in any court, either state or federal, pertaining to the judgment under attack?
☐ Yes   ☒ No

24. If your answer to #23 is "Yes," give the following information:

   (a) Name of Court: _____

   (b) Case Number: _____

   (c) Date action filed: _____

   (d) Nature of proceeding: _____

   _____

   (e) Name(s) of judges (if known): _____

   (f) Grounds raised: _____

   _____

   _____

   _____

   _____

   _____

   (g) Did you receive an evidentiary hearing on your petition, application or motion?
   ☐ Yes  ☐ No

25. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
   (a) At preliminary hearing: _Ed Peckham, 10994 Cudahay #308, San Diego, California  92101_

   (b) At arraignment and plea: _Ed Peckham_

   (c) At trial: _Ed Peckham_

   (d) At sentencing: _Ed Peckham_

   (e) On appeal: _Martha McGill, 732 North Highway 101, Ste. B, Encinitas, California  92024_

   (f) In any post-conviction proceeding: _Allan Williams, 180 Rea Avenue, El Cajon, CA 92020_

   (g) On appeal from any adverse ruling in a post-conviction proceeding: _Athena Shudde,_
   _1762 Columbia Street, San Diego, CA  92101-2504_

CIV-68 (Rev. Jan. 2006)                          -10-                                cv

26. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
☑ Yes  ☐ No

27. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
☐ Yes  ☑ No

    (a) If so, give name and location of court that imposed sentence to be served in the future:

    _____

    (b) Give date and length of the future sentence: _____

    _____

    (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
    ☐ Yes  ☐ No

28. Consent to Magistrate Judge Jurisdiction

In order to insure the just, speedy and inexpensive determination of Section 2254 habeas cases filed in this district, the parties may waive their right to proceed before a district judge and consent to magistrate judge jurisdiction. Upon consent of all the parties under 28 U.S.C. § 636(c) to such jurisdiction, the magistrate judge will conduct all proceedings including the entry of final judgment. The parties are free to withhold consent without adverse substantive consequences.

The Court encourages parties to consent to a magistrate judge as it will likely result in an earlier resolution of this matter. If you request that a district judge be designated to decide dispositive matters, a magistrate judge will nevertheless hear and decide all non-dispositive matters and will hear and issue a recommendation to the district judge as to all dispositive matters.

·You may consent to have a magistrate judge conduct any and all further proceedings in this case, including the entry of final judgment, by indicating your consent below.

Choose only one of the following:

☐ Plaintiff consents to magistrate judge jurisdiction as set forth above.

**OR**

☑ ·Plaintiff requests that a district judge be designated to decide dispositive matters and trial in this case.

**29.** Date you are mailing (or handing to a correctional officer) this Petition to this court: _____

June 7, 2008

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

_____
SIGNATURE OF ATTORNEY (IF ANY)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

6-7-08                          Larry John Little Jr.
(DATE)                          SIGNATURE OF PETITIONER

CIV 68 (Rev. Jan. 2006)                    -12-                                    cv

Larry John little, Jr.
P82205        08-210-U
CSP- Solano
P O Box 40000
Vacaville, CA 95696-4000

In pro per

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

**LARRY JOHN LITTLE, JR.,**                    Case No. _____

               Petitioner,

**v.**

**D. K. SISTO,** Warden,                    CA Superior Ct.No. SCE 198946

             Respondent.        /       Petition for Writ of Habeas
Corpus under 28 U.S.C. ß2254
By Person in State Custody

---

**COVER**

---

# TOPICAL INDEX

PAGE

PETITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

VERIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . .32

    I.    HABEAS CORPUS IS THE PROPER PROCEDURE
          FOR THE PRESENTATION OF PETITIONER'S CLAIM .32

    II.    PETITIONER WAS DEPRIVED OF THE EFFECTIVE
          ASSISTANCE OF COUNSEL BY HIS COUNSEL'S
          FAILURE TO PURSUE INQUIRY INTO, AND
          PRESENT, A VIABLE PTSD AND ASSOCIATED
          DISORDER DEFENSE IN VIOLATION OF STATE
          AND FEDERAL CONSTITUTIONS . . . . . . . . . . . . . . . .33

        A.    Relevant Procedural Background

        B.    Petitioner's Contentions.

        C.    Standard of Review for Habeas
            Corpus and Ineffective Assistance of
            Counsel.

        D.    Defense Counsel's Performance Was Objectively
            Unreasonable Under Prevailing Professional
            Norms

        E.    Prejudice.

    III.    Petitioner can and will meet his burden of
          proving by preponderance of the evidence
          that he was denied effective assistance of
          counsel under state and federal constitutions.68

INDEX

IV.    Defense counsel discussed presenting Petitioner's
       Post Tramatic Stress Disorder and agreed it was
       viable and promised Petitioner to investigate
       and Subpoena the required witness and matters
       for trial in support thereof in violation of
       Petitioner's due process and fair trial rights
       guaranteed under the Fifth, Sixth, and Fourteenth
       Amendment of the United States Constitution.         72

V.     Defense counsel denied Petitioner his only defense
       of having acted in an imperfect self-defense,
            based in part on Post Tramatic Stress Dis-
       order by not supporting Petitioner's version and
       testimony with available evidence and Rabatores
       action in violation of the Fifth, Sixth, and
       Fourteenth Amendment of the United States
       Constitution.                                        76

VI.    Defense counsel's acts and omissions were so
       ineffective and numerous they must be weighed
       in their totality:                                   80

       (A)   Defense counsel's attempt to coerce
             Petitioner to plead guilty to Second Degree
             Murder demonstrated counsel did not plan
             on effectively representing Petitioner to
             obtain a manslaughter conviction.

       (B)   Defense counsel did not know the law and
             failed to put forth evidence to prevent
             the judge from excluding Petitioner from
             testifying about the state of mind regarding
             being stabbed in the eye.

       (C)   Defense counsel intentionly withheld from
             the jury the important element of an im-
             perfect self-defense, Post Tramatic Stress
             Disorder.

       (D)   Defense counsel's failure to secure avail-
             able evidence of Rabatore's threats and
             dislike of Petitioner and violence.

       (E)   Defense counsel failed to secure available
             evidence that the apartment was a drug
             apartment.

       (F)   Defense counsel promised to investigate
             and obtain available evidence of:

INDEX

Page

(G)  Defense counsel promised then failed to
     have the following testify:

(H)  Ineffective assistance of counsel con-
     clusion

VII.    Petitioner was denied a full and fair hearing
        in state court by ineffective assistance of
        counsel in failing to cause an adequate argu-
        ment under California Penal Code §352, to
        exclude Teel's testimony in allowing the court
        to not exercise it's discretion in violation of
        a fair trial and due process under the Fifth,
        and Fourteenth Amendments of the United States
        Counsritutions.                                    88

VIII.   The trial court prejudicially violated Peti-
        tioner's state and federal constitutional rights
        of due process and ineffectual assistance of
        counsel further denied Petitioner his right  to
        a fair trial and due process, both issues were
        the question of (1) Applicability of CALJIC 3.37,
        where a defendant has a physical impairment (see
        U. S. Const. Amend. V and XIV; Cal. Const., Art 1,
        §§ 7, subd. (a), 15.)                              91

        A. Trial Court:

        B.  Ineffective assistance of Counsel:

IX.     APPELLATE COUNSEL DENIED PETITIONER AN ADEQUATE
        appeal by failing to file a Writ of Habeas Corpus
        for matters outside the record;  not utilizing a Rule
        Rule 24 Motion to Correct Miss-statement of fact;  and
        and not including Federal Constitutional basis
        in the issues raised;  all under the Fifth and
        Fourteenth Amendment under the United States
        Constitution:                                      95

        A.  Failing to file a writ of habeas corpus
            for all the matters outside the record
        B.  Failing to utilize a Rule 24 Motion to
            correctthe court's Opinion of a mis-
            statement of fact.
        C.  Federal Constitutional Error Assignment.

INDEX

Page

X.      Direct appeal of (1) the applicability of
        CALJIC 3.37 where a defendant has a physical
        impairment and (2) the prejudicial effect of
        former CALJIC 8.40, instructing the jury must
        find an intent to kill in order to find a
        defendant guilty of the lesser offense of
        voluntary manslaughterdenied Petitioner of his
        rights under the Fifth and Fourteenth Amendment
        to the United States Constitution.                    98
        A.  Exhausting and Cumulative Error


XI.     The failure to instruct the jury pursuant to
        CALJIC 3.37 that the reasonableness of Peti-
        tioner's belief in the need for self-defense
        should be measured by the standard of a "reason-
        able person" with Petitioner's visual
        impairment violated Petitioner's Fifth, Sixth,
        and Fourteenth Amendment Rights under the United
        States Constitution.                                  101

        A.    Prejudice

        B.    Exhaustion and Cumulative Error

XII.    The erroneous instruction on voluntary man-
        slaughter was prejudical: under the instructions
        given, the jury's only option was to convict
        Petitioner of Second Degree Murder if they found
        the killing was unintentional, but unlawful
        in violation of the Fifth , Sixth, and Fourteenth
        Amendment to the United States Constitution.   111

        A.  Exhaustion and Cumulative Error

XIII.   State appellate courts decision to summarily
        deny Petitioner's ineffective assistance of
        counsel claim on the "prejudice prong" of
        Strickland was an unreasonable application of
        federal law in violation of the Fifth, Sixth,
        and Fourteenth Amendments to the United States
        Constitution.                                         116

Larry John Little, Jr.
P82205, 8-211U
CSP Solano
P.O. Box 4000
Vacaville, CA  95696

In Pro Per


UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


Larry John Little, Jr.                    Case No. DO47468
      Petitioner

v.

D.K. Sisto, Warden                        Petition for Writ of Habeas Corpus
      Respondant                          Under 28 U.S.C. §2254
                                  /       By Person in State Custody
_____
PEOPLE OF THE STATE OF CALIFORNIA

            Real Party of Interest /
_____


_____

STATEMENT OF FACTS

_____

13

## I.

Petitioner currently is in custody of D. K. Sisto, Warden of California State Prison - Solano, in Solano County, under the supervision of James Tilton, Director of the Department of Corrections and Rehabilitation, pursuant to a judgment originally pronounced by the San Diegp Superior Court on June 8m 2000, in case no.: SCE198946.

## II.

Petitioner was charged in case no. SCE198946 with murder and use of a dealy weapon.  Two prior prison terms also were alleged. (Pen. Code,[1/] SS 187, 12022, subd. (b)(1), 667.5, subd. (b).) App. 1, Exhibit A, attached hereto, is a true and correct copy of the information filed in the San Diego Superior Court on December 14, 1999, in case no. SCE198946, and is incorporated herein by reference as if set forth full as if set forth in full at this point.)[2]

## III.

On May 3, 2000, a jury found petitioner guilty of second degree murder and made a true finding he used a deadly weapon.  In bifurcated proceedings,  the trial court made true findings on two prison term allegations. App. 1, Exhibit B,  the minute order of May 3, 1999, in case no. SCE198946.)  On June 8, 2000, petitioner was sentenced to prison for 15 years to life for murder, plus one year for the weapon-use allegation, all of which was enhanced by two years in prison terms. App. 1, Exhibit B, the Abstract of Judgment filed June 8, 2000, in case no. SCE198946.

1/      Unspecified statutory references are to the Penal Code.

2/    Unless otherwise stated, all referenced exhibits are true and correct copies of the documents they purport to be and all are attached hereto and incorporated herein by reference as if set forth in full at the point where they are cited.

## IV.

Petitioner filed a timely notice of appeal on June 15, 2000. See App. No. 1, Exhibit C, (the notice of appeal filed June 15, 2000.) The direct appeal from the judgment was assigned case no. D035850, and on October 10, 2001, the opinion affirmed the judgment in full. See App. No. 1, Exhibit D, the opinion in D035850, filed October 10, 2001, in case no. D035850.

## IV.

Petitioner's counsel on the direct appeal filed a timely petition for review (S102149) on November 16, 2001. The petition was denied on December 12, 2001. (http://appellatecases.courtinfo. ca.gov/search/case/dockets.cfm.)

## V.

On December 10, 2002, petitioner filed a petitioner for writ of habeas corpus in the San Diego Superior Court. (No. EHC388.) HE alleged, inter alia, that he received ineffective assistance of counsel based on defense counsel's pre-trial failure to investigate and/or seek an evaluation for the existence of Post-Traumatic Stress Disorder (PTSD) and the failure to advance a PTSD defense at trial. On February 19, 2003, the superior court issued an order to show cause why the requested relief should not be granted. (Resp. Informal response to Petn. filed June 20, 2006, p. 3.)

15

## VI

On August 26, 2004, the habeas corpus petition was denied by the Honorable Louis Hanoian, Judge of the Superior Court. App. 1, Exhibit E, minute order of the superior court dated Aug. 26, 2004; See, App. 1, Exh. F, Aug. 26, 2005; EHC388] 337-348, the findings of the superior court after hearing.)

## VI.

On November 3, 2005, petitioner filed a petition for writ of habeas corpus in this court, asserting various grounds constituting ineffective assistance of counsel, including the claim his trial counsel, including the claim his trial counsel failed to investigate and present a defense of PSTD. (See Exhibit F, petitioner's form habeas corpus petition.)  After ordering and obtaining an informal response and reply by the parties, on August 3, 2006, this Court issued an order to show cause why the requested relief should not be granted, limiting the issue to whether trial counsel rendered ineffective assistence by failing to investigate a PTSD defense, and therefore appointed counsel for petitioner.  Appellate counsel was then ordered byythe court to do a supplementation for a writ of habeas corpus only on the viableness of a post traumatic stress disorder defense.  By and through petitioner's appointed counsel, Athena Shudde, the supplemental petition for a writ of habeas corpus was filed on March 20, 2007.

Directing the superior court of California, County of San Diego, to set aside the verdicts and finding in case no. SCE198946.

On January 16, 2008, the petition  was denied.  The court of

16

appeal concluded defense counsel was ineffective in failing to invest-
igate PTSD and ineffective in failing and presentation of such a defense
could have changed the outcome.  However, the court of appeal concluded
such a defense would not have changed the outcome in light of the con-
vencing nature of the prosecution's case (See APP. 1, Exhibit G.)

### VII

On January 24, 2008, petitioner's appointed appellate counsel,
Athena Shudde, filed a Petition for Review in the California Supreme
Court.  On February 19, 2008, petitioner sent a supplement to petition
to the California Supreme Court to safely present all facts to the
highest state court for exhaustion in case appointed appellate counsel
did not present all the facts to the California Supreme Court.   On
March 20, 2008, petitioner received in the mail, the denial to the
petition fo review in the State Supreme Court filed March 12, 2008  (See
(App. 1, Exhibit H).  So by the petition for a writ of habeas corpus,
petitioner alleges he suffers from 'illegal restraint' because petitione R
was improperly convicted and sentenced as a result.

Via this petition for writ of habeas corpus, petitioner alleges he suffers
from illegal restraint because petitioner was improperly convicted and
sentenced as a result of the ineffective assistance of petitioner's
trial counsel pursuant to the Sixth Amendment of the United States
Constitution and Article I, section 15, of the California Constitution,
resulting in a denial of a fair trial as more fully described below.

### VIII

Viewed in the light most favorable to the verdict, the facts of
the case adduced at trial revealed the following:

17

On June 15, 1999, petitioner was in the El Cajon apartment shared by Eddy Rabatore and his mother, Joyce Roesch. Some time after 6 p.m., Roesch asked appellant to leave after a contentious day involving an argument over cigarettes and a second argument where petitioner called Rabatore a "punk-ass bitch," picked up a glass object that may have been a methampphetamine pipe and threw it at Rabatore. When Petitioner refused to leave, Roesch directed Rabatore to call a friend to help remove petitioner from the apartment. Rabatore complied and, as Roesch was readying to leave the apartment, petitioner told her not to cross him, as he would call people to back him up and turn it into a riot or a bloodbath. Roesch then left, leaving petitioner, Rabatore, and Alysen Brooks, a friend of Rabatore, in the apartment.

Petitioner began rummaging around the apartment to gather belongings, placing them in a backpack. Once he finished, petitioner entered the dinning room where Rabatore and Brooks were seated drinking and talking. Appellant threatened to get even with the people who crossed him, picked up his backpack and appeared ready to leave. Instead, he put down the backpack, grabbed a glass figurine from a table and threw it at Rabatore. Rabatore leaned back in his chair and put up his hands to deflect the object. Petitioner moved toward Rabatore, appearing to punch him, and hitting him in the right shoulder. Rabatore cried out in pain and leaned further back in his chair. Appellant then stabbed Rabatore in the chest with a wooden-handled steak knife, picked up his backpack and ran out the door.

//

//

Rabatore died as a result of the stab wound to his chest, the knife having pierced Rabatore's aorta.

The next day, the knife was found in a backyard across the street street from Roesch's apartment. Petitioner also was arrested. He had shaved his mustache before the arrest. ...

While in custody, petitioner talked with fellow inmate Robert Teal about the incident. Among other things, petitioner told Teal he and Rabatore had gotten into an argument about petitioner leaving the apartment Rabatore shared with his mother, Roesch. Rabatore was angry about petitioner's possession and sales of drugs in the apartment. Petitioner said he told the police that Rabatore picked up an ash tray and tried to hit him and petitioner stabbed Rabatore in self defense. He told Teal this was a fabrication and also said something about getting rid of the woman who observed the incident. (See, App. , Exhibit E, pp. 2-6.

### IX.

Relaying on the testimony of the eyewitness, the statement by the informant, petitioner's extrajudicial statements and the forensic evidence, as indicated in paragraph VIII, *anti*, the prosecution's theory of the case was that petitioner committed nothing less than second degree murder and the evidence supported first degree murder. (6 RT [D035850] 784-788, 790-793.)[3] The defense theory of the case was self-defense or imperfect self-defense based on petitioner's testimony and his blindness in one eye. (See App. , Exhibit L, a true and correct copy of the testimony of Edward John Peckham, petitioner's defense

---

[3]  In a separate motion filed simultaneously with this petition, petitioner has asked this Court to take judicial notice of its files and records in case no. D035850. Unless otherwise specified, the clerk and the reporter's transcript entries refer to that case.

counsel, on Aug. 25, 2004 [EHC388] pp. 263-264.)  To that end, petitioner

presented evidence that he lost his eye in a stabbing incident in 1994

and, as a result was nervous and jumpy and reacted to threats of in

jury to him and hisremaining eye.  (See, trial transcripts at  4 RT [D035-

850] 551-552.)  An opthamologogist verified petitioner's loss of the

eye and the detiorated vision (20/200) in his right eye without glasses.

The opthamologist further testified petitioner had poor depth pre-

ception.  (See, trial transcripts at  6 RT [D035850] 741-743, 752.)  Tes-

timony on his own behalf, petitioner went on to deny fabrication of a

defense or any intent to harm the eyewitness.  He explained that he

had collected his belongings and was ready to leave the apartment when

Rabatore told him not to go anywhere, picked up an ash tray and lunged

at petitioner.  Petitioner picked up a knife from a table, jabbed at

Rabatore twice with the knife and ran out the door.  He did not know

he had actually stabbed Rabatore until some time later and had not

attempted the change his appearance.  Although he claimed he had not

used methamphetamine on the day of the stabbing, a witness believed

petitioner was under the influence of drugs and had been acting agres-

sively towards Rabatore before the incident.  (See App. 1, Exhibit D

pp. 6-7.)  No expert testimony was presented on any mental state de-

fense, including PTSD or methamphetamine psychosis.

## X.

Based on the pretrial evidence in the case, defense counsel

admitted under oath during the superior court proceedings (EHC388),

that he considered PTSD based on the fact the current case involved

## X.

Despite the uncontroverted evidence that petitioner lost his Left eye in a traumatic  stabbing event before the charged crime, had not received any psychological or psychiatric treatment therefor- before the charged crime, and had suffered behavioral changes and suffered from methamphetamine addiction, at no time before, during, or after did defense counsel competent and/or properly investigate, explore or evaluate the  possibility petitioner suffered from PTSD  or PTSD with methamphetamine psychosis at the time of the stabbing, thereby resulting in an uniformed tactical decision devoid of reason. (See, App. 1 , Exhibit L, RT [EHC388] Aug. 25, 2004, 236-242; and Exhibit O, pp. 3-4;  Exhibit P, pp. 6-8.)  As a further result of this ommission defense counsel failed to advance any evidence that petitioner suf- fered from PTSD or PTSD with methamphetamine psychosis as relevant to his credibility and his mental state,  Providing substantial evidence of imperfect self-defense.  These acts and omissions cannot be explained by any knowledgeable or reasonable choice of tactics by defense counsel.  (See, App. 1 ,  Exhibit O, pp. 4-5;  Exhibit P, pp. 6-9.)

## XI.

Moreover,  despite defense counsel's admission that evidence of PTSD was present in petitioner's case,  defense counsel attempted to advance a defense of self-defense or imperfect self-defense at trial with a total failure of substantial evidence to support tis theory.  See, App. 1 ,  Exhibit L, pp. 263-264.)  Consequently, defense counsel only advanced an argument that petitioner's testimony was truthful and his visual impairment affected his behavior.  See App. 1,

21

involved a stabbing and petitioner previously was stabbed in, and
lost, an eye.  He admitted that he had been advised of petitioner's
behavioral changes following the incident,  the lack of psychological
or psychiatric treatment following the injury and petitioner's in-
creased use of methamphetamine.  (See App. 1 ; Exhibit I, RT [EHC388]
pp. 6-11; AND Exhibit J, RT [EHC388] pp. 30-36.)  However, defense
counsel did not have petitioner evaluated for PTSD because petitioner
denied his behavior was affected by any PTSD, petitioner continuously
claimed self-defense,  defense counsel believed petitioner did not suf-
fer from PTSD and defense counsel's belief that PTSD,  even if suffered
by petitioner, provided no defense in the case.  (See, App. 1 , Exhibit
L, pp. 236-242, 244, 251, 260-261.)

## XI.

Petitioner alleges that any reasonablely competent criminal
defense trial attorney acting as a diligent advocate knows or should
know that,  notwithstanding a client's disclosures and beliefs, where
he is aware that a psychological defect may exist,  he has a duty to
investigate,  explore,  and pursue the assistance of professionals in
light of the facts and the potential defenses before making a tactical
decision to cease investigation and/or discard such a defense.  (See,
App. 1 , Exhibit P, Declaration of petitioner's counsel, pp. 6-7.)
Further,  any reasonablly competent criminal defense trial attorney
knows or should know that a personal and unilateral assessment of a
client's statement and/or veracity where evidence of PTSD exists
cannot lead to an informed decision without further investigation.
(See,  App. 1 , Exhibit O, pp. 3-4; Exhibit P, pp. 7-8.)

Exhibit  ,  (6RT [D035850] 819-321.))  Petitioner alleges this argu-
was not viable absent any expert evidence of PTSD or PTSD with meth-
amphetamine psychosis to explain petitioner's behavioral and mental
processes tomitigate the charged crime and the theory of the prose-
cution.  These acts and omissions cannot be explained by any knowledge
able or reasonable choice of tactics by defense counsel and literally
left petitioner with no defense.  (See, App. 1 , Exhibits  O & P.)

## XII.

Petitioner alleges that any reasonably competent criminal de-
fense trial attorney knows the elements of the offenses charged against
his client and identifies, explores and advances the defense/affirm-
ative evidence identified in paragraph X, ante, knowing that peti-
tioner's mental state was critical to a finding of a potential PTSD
defense, and knowinf, or in the exercise of diligence should have
known, that substantial evidence was needed to support any type of
defense at petitioner's trial. (See, App. 1 , Exhibit P.)

## XIII.

Petitioner alleges that any reasonably competent criminal de-
fensde trial attorney acting as a diligent advocate explores, pursues,
prepares, and presents the best defense possible and available in
light of the facts and the expected evidence and,  knowing the law and
the jury instructions likely to be given in a case,  does not present
a defense which has no support in the evidense which has no support in
in the evidence and is emasculated by the instructions, thereby assur-
ing the client's conviction.  (See, App. 1 ,  Exhibit P)

//

//

23

## XIV.

Petitioner alleges that had defense counsel reasonably, dili-
gently, and conscientiously investigated, explored, and pursued ex-
pert assistance,  he would have discovered that the defense of PTSD or
PTSD with associated disorders was a viable defense as relevant to
petitioner's mental state,  credibility, and as substantial evidence
in support of a defense of self-defense or imperfect self-defense.
(See,  App. 1 , Exhibits M, N, O, & P.)

## XV.

Petitioner did not consent to or authorize any and all of the
acts or omissions of trial counsel in failing to investigate, explore,
or advance a PTSD theory of defense at trial.  (See, App.), Exhibit K.)
Such acts and omissions, wholly outside the scope of the preformance
of a reasonably diligent advocate and without the consent and authority
of petitioner,  exceeded and violated defense counsel's duty to make
reasonably informed tactical decisions relating to the trial of the
cause and otherwise prejudicially violated petitioner's right to funda-
mental fairness and due process.  See,  App. 1 , Exhibit P.)

## XVI.

Petitioner alleges by this verified petition, the attached
points and authorities in support thereof,  the papers and records
on file,  the attached exhibites and declarations that trial counsel
was ineffective for the following reasons,  but not limited thereto,
to investigate the facts of the case, he failed to interview the wit-
ness prior to trial to demonstrate the imperfect self-defense, whom

24

were more than willing to assist the defense with the truth.  Counsel

failed to interview and subpoena the mother of the victim.  Joyce

Margarita-Rita Roesch and many others witnesses whom would demonstrate

drug abuse usage by all,  the apartment being a drug and drinking

house with violence,  threats and fighting by the victim and his

mother,  Roesch,  which directly effected petitioner's state of mind

in line with the merits of imperfect self-defense.  Counsel told pet-

itioner not to mention these items.  Counsel promised petitioner to

have certain witnesses for trial and for varying reasons of incom-

petence failed to secure same.  Petitioner alleges that since counsel

unsuccessfully tried to coerce petitioner into pleading guilty to

second degree murder,  that he intentionally assured petitioner did

not receive a lesser included conviction by failing to act competently.

Jury instructions:  abuse by the trial court involuntary manslaughter;

(See,  App. 2, Exhibit G, 14-22,  also relevant discussions regarding

homicide instructions.)  also deprived petitioner of his constitutional

rights.  For these reasons and the facts in the attached points and

authorities petitioner was denied effective assistance of counsel,  due

process and a fair trial in this case.


## XVII.

Petitioner filed a timely notice of appeal on June 15, 2000.

(See,  App. 1 , Exhibit C ,  CT 211.)  The appeal was affirmed by the

Fourth Appellate District,  Division One,  on October 10, 2001, where-

in appellate counsel declined to raise these collateral issues present-

ed here as they would have to be pursued by writ of habeas corpus be-

fore the trial court initially.  A petition for review was filed before the California Supreme Court; raising:  1.  The applicability of CALJIC 3.37 where a defendant has a physical impairment and the prejudicial effect of former CALJIC 8.40,  instructing the jury it must find an intent to kill in order to find a defendant guilty of the lesser included offense of voluntary manslaughter.  2.  The jury should have been instructed, pursuant to CALJIC 3.37,  that the reasonableness of petitioner's belief is in the need for self-defense should be measured by the standard of a "reasonable person"  with petitioner's visual impairment.  3.  The erroneous instruction on involuntary manslaughter was prejudicial;  under the instruction given,  the jury's only option was to convict petitioner of second degree murder if they found the killing was unintentional,  but unlawful.  Appellate counsel was ineffective by allowing the Court of appeal to mistakenly believe an involuntary manslaughter was given in its opinion,  and failing to raise the three issues under the federal constitution to preserve federal review.

## XVIII.

State appellate  court's decision to summarily deny (See, App. 1,  Exhibit G)  petitioner's ineffective assistance of coumel claim on the "prejudice prong"  of the **Strickland** rule was an unreasonable application of federal law in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

## XIX.

Defense counsel's acts and omissions as set forth herein can not be explained or justified as a knowledgeable, reasonable or in-

formed choice of tactics and rendered petitioner's trial fundament-
ally unfair and but for defense counsel's acts and omissions an out-
come more favorable to petitioner would have resulted.


### XX.

Petitioner has no other plain, speedy, or adequate remedy at
law, in that petitioner is challenging his Fifth, Sixth, and Four-
teenth Amendments and the California Constitutional Rights to the
effective counsel.

### XXI.

By this petition, petitioner, who has been incarcerated con-
tinuously since his arrest, seeks a writ of habeas corpus or an
alternative order granting an evidentiary hearing  to determine the
merits of the issues presented herein.

### XXII.

Petitioner remains indigent and requests appointment of
counsel.

**PRAYER**

WHEREAS, petitioner prays that this Court issue a writ of habeas corpus or in the alternative:

1)      Take notice of the records in case no. D035850 (San Diego County Superior Court Case no. SCE198946)  which is referred to herein ro support and clarify petitioner's positions;

2)      Take judicial notice of the records and files in the Superior Court Writ Proceedings in EHC388;

3)      Issue a Writ of Habeas Corpus ordering the Superior Court of San Diego County to vacate its judgment;

4)      Issue an order to show cause as to why the relief prayed for should not be granted;

5)      For sush other and further relief as this Court may deem just.


DATED: 6-7-08

28

## VERIFICATION

I, LARRY JOHN LITTLE, JR., DECLARES AS FOLLOWS:

1.  I am the Petitioner in this action;

2.  I have read the petition and declare that the foregoing factsfacts as stated are true and correct as stated therein;

3.  I further declare that the exhibits attached thereto are and accurate copies of the documnets they allege to be representing;

I declare under the penalty of perjury that the foregoing is true and correct and of my personal knowledge;

That this Petition for Writ of Habeas Corpus was executed in the County of Solano, California on:

Dated: 6-7-08

LARRY JOHN LITTLE, JR.
Declarant / Petitioner
In propria persona

//

//

//

//

//

//

//

29

Larry John Little, Jr.
P82205, 8-211U
CSP-Solano
P.O. Box 4000
Vacaville, CA  95696


In Pro Per


# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA


Larry John Little, Jr.,                    Case No. D047468
        Petitioner


v.


D.K. Sisto, Warden,                  Petition for a Writ of Habeas Corpus
        Respondant          /        Under 28 U.S.C. §2254
_____   By Person in State Custody
PEOPLE OF THE STATE OF CALIFORNIA

        Real Party in Interest       /
_____


_____

## MEMORANDUM OF POINTS AND AUTHORITIES

_____

## INTRODUCTION

Petitioner, Larry John Little, Jr., is confined by an order of the Superior Court of California in San Diego, California to an indeterminate term of Fifteen years to Life for Second Degree Murder, a felony under Penal Code §187(a). Petitioner is confined within the jurisdiction of the State of California at the California State Prison - Solano, by respondent D. K. SISTO, warden. The crux of petitioner's claim is the issue addressed herein is trial counsel's ineffectiveness based on his subjective assessment of petitioner's mental state at the time of the offense, which provided the impetus for his failure to investigate, explore and/or advance a defense based on a psychological defense, namely, PTSD, and any associated disorders, thereby depriving hisself of the ability to make an informed tactical decision. The errors and omissions resulted in patent prejurdice to petitioner.

As part of this petition, a separate volume contains the ~~Exhi~~ Exhibits in support of petitioner's claims.

31

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### HABEAS CORPUS IS THE PROPER PROCEDURE FOR THE PRESENTATION OF PETITIONER'S CLAIM

The claim asserted in this petition is that petitioner was deprived of the effective assistance of counsel and concomitantly the right to due process. These constitutional claims cannot be adequately presented on appeal because, aside from the procedural posture of this case, their factual basis rests on evidence outside of the appellate record. These matters, therefore, are not completely contained in the record on appeal nor in the record of the habeas corpus proceedings in the superior court. (See *In re Hochberg* (1970) 2 Cal.3d 870, 875.)

"[H]abeas corpus is an extraordinary and collateral action that lies to review a claim of denial of substantive constitutional rights that may have affected the integrity of the fact finding process." (*In re Coughlin* (1976) 16 Cal.3d 52, 55.) Further, the remedy of habeas corpus "permits the examination not only of the actual evidence introduced at petitioner's trial but of any necessary additional evidence bearing upon the infringement of petitioner's constitutional rights." (*In re Bell* (1942) 19 Cal.2d 488, 501, citations omitted.)

The right to effective assistance of counsel in a criminal case is guaranteed by the Sixth Amendment to the Constitution of the United States and by article I, section 15, of the California Constitution. (*People v. Frierson* (1979) 25 Cal.3d 142, 162, *People v. Pope* (1979) 23 Cal.3d 412, 422.) In cases in which trial counsel's reasons for acts or omissions are not clear from the record on direct appeal, habeas corpus is an appropriate vehicle to raise those issues. (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) Denial of the right to a fair trial is a claim cognizable on habeas corpus whether or not it was raised on appeal. (*In re Ferguson* (1971) 5 Cal.3d 525.)

For all these reasons, habeas corpus is the proper procedure for resolution of the claims included herein.


## II.

### PETITIONER WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL BY HIS COUNSEL'S FAILURE TO PURSUE INQUIRY INTO, AND PRESENT, A VIABLE PTSD AND ASSOCIATED DISORDER DEFENSE IN VIOLATION OF STATE AND FEDERAL CONSTITUTIONS

A.    Relevant Procedural Background.

Petitioner was originally tried and convicted of second degree murder in the June 15, 1999, stabbing death of one Eddy Rabatore. Petitioner was

sentenced to one year consecutive to 15 years to life for the offense (with added punishment for prior prison terms). (App. No. 1 Exhibit D, p. 1.)

The offense occurred in an apartment where Rabatore lived with his mother, Joyce Roesch, and where petitioner temporarily resided. After an interchange between petitioner and Roesch, wherein petitioner was told, but refused, to leave the apartment, and a subsequent interchange between Rabatore and petitioner, involving some threats by petitioner, petitioner gathered his belongings and appeared as if he was going to leave the apartment. Instead, he made an additional threatening remark and threw something at Rabatore, who was seated at a table. Rabatore leaned back in the chair and attempted to deflect the object. When he did so, petitioner stepped forward and appeared to punch Rabatore. In reality, the "punch" was a stab, which was followed by a second stabbing motion, this time to Rabatore's chest. (App. No. 1 Exhibit D, pp. 2-7.)

The theory of the prosecution was that petitioner was guilty of first degree murder, as evidenced by eyewitness testimony, petitioner's statements and actions and the forensic evidence. (6 RT [D035850] 784-788, 790-793.)

The defense presented was self-defense, or imperfect self-defense, based on petitioner's testimony and the testimony of a doctor regarding petitioner's blindness in one eye. (App. 1 Exhibit L, pp. 263-264) Aside from this doctor, no expert psychological or psychiatric testimony was presented. Rather, defense

counsel argued his theory of the case by relying almost exclusively on the testimony of petitioner, wherein petitioner testified he was "jumpy" because of the loss of his eye and Rabatore lunged at him with an ashtray. (6 RT [D035850] 819-821.) His theory was rejected when the jury returned a verdict of second degree murder. (App. No. 1 Exhibit B.)

Following affirmance of the conviction on direct appeal (App.1 Exhibit D.) and rejection of review by the California Supreme Court, petitioner filed a pro se petition for habeas corpus relief. Although numerous grounds were raised, the subsequent evidentiary hearing focused on petitioner's ineffectiveness claims regarding an instructional error and his trial counsel's failure to consider and investigate PTSD and advance a PTSD defense. At the hearing, expert testimony was presented that petitioner likely suffered from a form of PTSD. (RT [EHC388] pp. 142-212.) No expert testimony was presented on the application of PTSD to the case.

Applying the two-prong test set forth in *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*), the bench officer concluded that, under the first prong, a reasonably competent attorney would have sought an evaluation, but, under the second prong, the failure to do so was not prejudicial. It concluded a PTSD diagnosis was not relevant to the defense and defense counsel, who had reached a similar conclusion without any PTSD evaluation, made a reasonable tactical decision in not having

petitioner examined as the examination would not have been beneficial to the

defense.  (App. No. 1 Exhibit G, pp. 343-347)

B.    <u>Petitioner's Contentions</u>.

Petitioner contends that PTSD was not only relevant, but critical, as

psychological evidence in mitigation of his mental state, as substantive evidence

in support of the components of a defense of imperfect self-defense and as

evidence indispensable to his credibility.   Further, trial counsel was aware of

the existence of facts giving rise to PTSD, yet relied on what he perceived or

assumed was petitioner's psychologically unencumbered view of the event,

thereby engaging in a series of faulty assumptions which deprived him of any

ability to make an informed tactical decision.  As a result, defense counsel's

failure to initiate any investigation into a psychological defense, specifically

PTSD and any associated disorders, and his failure to advance this defense at

trial through an expert and petitioner's testimony constituted ineffective

assistance of counsel and deprived petitioner of his due process right to a fair

trial. (U.S. Const., 5th, 6th, & 14th Amends., Calif. Const., art. I, §§ 7, 15, &

24.)

C.   Standard of Review for Habeas Corpus and Ineffective Assistance of Counsel.

"When a prisoner seeks a writ of habeas corpus, [a reviewing court] presume[s] that the trial court convicted and sentenced the petitioner fairly, accurately and in reliance upon truthful evidence. (Citation.) The petitioning prisoner therefore bears the burden of alleging and proving by a preponderance of the evidence the facts upon which he seeks relief. (Citation.)" (*In re Rocha* (2005) 135 Cal.App.4th 252, 256-257; *In re Andrews* 2002) 28 Cal.4th 1234, 1252-1253; *In re Cudjo* (1999) 20 Cal.4th 673, 687; *In re Gay* (1998) 19 Cal.4th 771, 790.)

Where a habeas corpus petition is filed in the appellate court after a superior court has denied habeas corpus relief following an evidentiary hearing on an earlier petition, the appellate court is not bound by the superior court proceedings. Rather, the appellate court independently reviews the superior court's resolution of legal issues and mixed questions of law and fact. (*In re Resendiz* (2001) 25 Cal.4th 230, 249; *In re Cudjo, supra*, 20 Cal.4th at pp. 687-688.) While reviewing courts ordinarily do not reconsider the merits of issues raised and determined in prior habeas corpus proceedings, this rule is inapplicable where there is a change in the facts or law substantially affecting the rights of the petitioner. (*In re Clark* (1993) 5 Cal.4th 750, 769.)

A claim of ineffective assistance requires a showing that: (1) trial counsel's representation fell below an objective standard of reasonableness; and (2) but for counsel's acts and omissions there is a reasonable probability that a more favorable determination would have resulted. (*People v. Ledesma, supra,* 43 Cal.3d at pp. 215-218; *Strickland v. Washington, supra,* 466 U.S. at p. 687; *People v. Benavides* (2005) 35 Cal.4th 69, 92-93; *People v. McDermott* (2002) 28 Cal.4th 946, 988; *People v. Boyette* (2002) 29 Cal.4th 381, 430; *In re Jones* (1996) 13 Cal.4th 552, 561.)

Counsel owes a duty to his client that includes diligent and active participation in the full and effective preparation of the client's case, and an affirmative responsibility to investigate carefully all defenses of law or fact that may be available before making any tactical decisions. (*People v. Ledesma, supra,* 43 Cal.3d at pp. 217-218; *Strickland, supra,* 466 U.S. at pp. 684, 690; *In re Rocha, supra,* 135 Cal.App.4th at p. 258.) This duty includes the obtaining of a psychiatric or psychological examination in an appropriate case. (*People v. Frierson, supra,* 25 Cal.3d at p. 161; *People v. Pope, supra,* 23 Cal.3d at pp. 424-425.) "If counsel's failure to perform these obligations results in the withdrawal of a crucial or potentially meritorious defense, '" the defendant has not had the assistance to which he is entitled."' [Citation.]" (*People v. Pope, supra,* 23 Cal.3d at p. 425, fn. omitted.)

38

"[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (*Strickland, supra,* 466 U.S. at p. 691; *Bell v. Cone* (2002) 535 U.S. 685, 698 [122 S.Ct. 1843, 1852, 152 L.Ed.2d 914].)    A "court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." (*Id.* at pp. 688, 690.)  "[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." (*Wiggins v. Smith* (2003) 539 U.S. 510, 527 [123 S.Ct. 2527, 156 L.Ed.2d 471]; ABA Stds. for Crim. Justice (3d ed.1993) std. 4-4.1, p. 181.)

While the decisions of trial counsel are accorded great deference upon review (*People v. Weaver* (2001) 26 Cal.4th 876, 925), deferential scrutiny "must never be used to insulate counsel's performance from meaningful scrutiny and, thereby, automatically validate challenged acts or omissions" (*In re Cordero* (1988) 46 Cal.3d 161, 180.)  Because "[r]epresentation of an accused murderer is a mammoth responsibility," the "seriousness of the charges against the defendant is a factor that must be considered in assessing counsel's performance," (*In re Jones, supra,* 13 Cal.4th at p. 566, quoting *In re Hall* (1981) 30 Cal.3d 408, 434 and *Proffitt v. Wainwright* (11th Cir. 1982) 685 F.2d 1227, 1247, internal citations omitted.)

Under these standards, defense counsel was ineffective and petitioner was harmed by defense counsel's failure to investigate whether petitioner, who defense counsel knew had suffered the traumatic loss of his eye via a stabbing, had undergone significant behavioral changes following the event, apparently obtained no psychological or psychiatric treatment following the event, and whose methamphetamine became an all-consuming activity, suffered from PTSD. Further, once having conducted a proper investigation, defense counsel was ineffective in failing to advance a PTSD-related defense.

Further, this issue is subject to full consideration herein in light of the additional materials and law presented, none of which was presented to the bench officer for decision on the writ petition adjudicated in the superior court.

**D.** <u>Defense Counsel's Performance Was Objectively Unreasonable Under Prevailing Professional Norms</u>

Here, "eliminating the distorting effects of hindsight" (*People v. Mendoza* (2000) 24 Cal.4th 130, 158), and engaging in meaningful scrutiny from counsel's perspective and knowledge at the time (*Strickland, supra*, 466 U.S. at p. 690), defense counsel's performance fell below an objective standard of reasonableness that undermines any presumption that his trial strategy was sound (*People v. Mendoza, supra*, 24 Cal.4th at p. 158) or justified (*In re Saunders* (1970) 2 Cal.3d 1033, 1042, fn. 7).

It is well settled that the right to assistance of counsel also guarantees

the right to effective representation, not just to some bare assistance.

(*McMann v. Richardson* (1970) 397 U.S. 759 [90 S.Ct. 1441, 25 L.Ed.2d 763];

*People v. Ledesma, supra,* 43 Cal.3d at p. 215.)  Because an attorney must make

a "rational and informed decision on strategy and tactics found upon adequate

investigation and preparation" before undertaking an act, (*In re Gay, supra,* 19

Cal.4th at p. 790), the reasonableness of a tactical decision depends upon

whether it was preceded by adequate investigation and preparation. (*In re*

*Jones, supra,* 13 Cal.4th at pp.564-565; *In re Saunders, supra,* 2 Cal.3d at p.

1042, fn. 7.)   When "the knowledge necessary to an informed tactical or

strategic decision is absent because of counsel's ineptitude or lack of industry,

no such ground of justification is possible." (*Id,* at p. 1042, italics in original.)

"Strategic choices made after less than complete investigation are

reasonable precisely to the extent that reasonable professional judgments

support the limitations on investigation." (*In re Jones, supra,* 13 Cal.4[th] at pp.

564-565, quoting *Strickland, supra,* 466 U.S. at pp. 690-691.) "In other words,

counsel has a duty to make reasonable investigations or to make a reasonable

decision that makes particular investigations unnecessary." (*Strickland, supra,*

466 U.S. at pp. 690-691.)  Otherwise, counsel's tactical decision cannot be said

to have been an "informed" one. (*In re Jones, supra,* 13 Cal.4th at pp. 564-565.)

Where counsel's "failure [to undertake such careful inquiries and

investigations] results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he is entitled." (*In re Saunders, supra,* 2 Cal.3d at p. 1042; *In re Hall, supra,* 30 Cal.3d at pp. 430-434.)

Under circumstances controlling here, the court in *In re Saunders, supra,* 2 Cal.3d at p. 1049, concluded that reversal was required for ineffectiveness of counsel where defense counsel failed to investigate potential mental defenses. Saunders was charged and convicted of capital murder, robbery, and assault with intent to commit murder for his part in acting as a lookout and driving the getaway car. During the guilt and penalty phases of the trial, defense counsel presented no evidence, despite pre-existing knowledge that Saunders had suffered from severe head injuries, causing brain damage which required extended psychotherapy and chemotherapy. Instead, defense counsel's efforts at trial were directed solely toward excluding two extrajudicial admissions by Saunders which implicated him in the crimes. (*Id.* at pp. 1035-1038.) In an ancillary petition for a writ of habeas corpus, Saunder's contended that his counsel was ineffective for failing to consider, investigate, and present evidence of petitioner's brain damage. (*Id.* at p. 1043.)

In the return, defense counsel averred that he was aware that evidence existed which would support a diminished capacity defense and aware that such a defense was relevant to negate Saunder's specific intent. (*Id.* at p. 1044.) Nevertheless, he did not pursue any type of psychological evaluation because

42

he believed any psychological evaluation would be irrelevant since the entire defense strategy at trial was to keep Saunder's out-of-court admissions from the jury, and Saunders admissions to a psychologist would be part of the expert testimony and thus inconsistent with this defense.  Defense counsel also declared that he did not believe Saunders "had a mental or physical condition which had any bearing on the crimes with which he was charged."  (*Id.* at p. 1045.)

In finding Saunders was denied the effective assistance of counsel, the court held that: "Although counsel's decision not to raise the defense of diminished capacity on petitioner's behalf was made for 'tactical' and 'strategic' reasons sufficient in counsel's judgment to support it, in the circumstances of this case the failure of counsel to avail himself of information relevant to the defense removed all rational support from that decision." (*Saunders, supra,* 2 Cal.3d at p. 1049.)

Similarly, here, like *Saunders*, trial counsel did not undertake the inquiries and investigations necessary to an informed tactical or strategical approach to petitioner's case.  Defense counsel conceded that he was aware of the traumatic eye injury suffered by petitioner, petitioner's denial of post-event treatment, petitioner's denial of current symptoms associated with the trauma, petitioner's post-event behavioral changes, and petitioner's all-consuming use of methamphetamine.  Based on this information, defense counsel conceded he

43

was aware of the possibility of PTSD, and, like *Saunders*, he took no steps to have petitioner evaluated for such purpose as he did not believe PTSD was related to the case or consistent with the facts of the case and petitioner's claim of self-defense.  (App. 1 Exhibit L, pp. 235-241, 243-245.)    The record confirms that petitioner's only evaluation was by an opthamologist prior to his trial. (6 RT [D035850] 738-740.)

Despite defense counsel's claims of some expertise in PTSD (App. 1 Exhibit L, pp. 231-235), any reasonably competent criminal defense attorney, faced with the information conveyed by petitioner and other sources, would not have unilaterally concluded that he had sufficient knowledge and expertise to decide that petitioner did not suffer from PTSD or, of equal importance, any other independent or associated mental deficit and that PTSD did not contribute to petitioner's behavior.  Rather, any reasonably competent criminal defense trial attorney would have had petitioner examined by a professional before reaching such a conclusion.   Indeed, without any investigation whatsoever, defense counsel concluded that petitioner's statements essentially dictated his failure to investigate any psychological or mental defenses and the eventual defense used at trial.  (App. No. 1, Exhibit L, p.246)

Counsel's decision cannot be justified as a reasonable tactical decision, as reasonableness cannot be ascribed to a decision unsupported by proper investigation and preparation and grounded in faulty assumptions.

Here, defense counsel presumed his familiarity with PTSD and his questioning of petitioner was sufficient for him to make a decision without further investigation. (App. 1 Exhibit L, pp. 235-241, 243-245.) Defense counsel could not have been more wrong.

PTSD "is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual . . . serious injury. . .." (Am. Psychiatric Assn., DSM-IV-TR (2005) p. 463 (DSM); see also Exhibit N, p. 8.) The person's response to the event must involve intense fear or horror. Characteristic symptoms resulting from the trauma include persistent reexperiencing of the event and avoidance of stimuli associated with the trauma. (DSM at p. 463; Exhibit N, p. 8.) Reexperiencing the event can occur in various ways, including flashbacks or intense psychological distress. (DSM, p. 464.) The affected person "commonly makes deliberate efforts to avoid thoughts, feelings, or conversations about the traumatic event." (*Ibid.*) The individual may have "diminished responsiveness" to the outside world, feel detached or estranged from other people and have persistent symptoms of anxiety, hypervigilance, and exaggerated startle response. "Some individuals report irritability or outbursts of anger . . ." (*Ibid.*) PTSD is associated with substance-related disorders, a change in personality characteristics, self-destructive and impulsive behavior, hostility and social withdrawal. (*Id.* at p. 465.)

45

Any reasonably competent criminal defense attorney acting as a diligent advocate, and particularly an attorney who recognized the possibility of PTSD, could have reviewed the foregoing criteria for a PTSD diagnosis in the DSM-IV-TR. Given even this modicum of effort, a reasonably competent defense attorney would have realized the applicability of the definition to petitioner and would have realized the information provided, and denied, by petitioner, was not inconsistent with PTSD and required investigation and an evaluation. Any reasonably competent criminal defense attorney, always vigilant for mental defenses, would have realized that the existence of the disorder may have explained petitioner's actions, explained why he believed he was being accosted and why he uncompromisingly believed he acted in self-defense, in addition to providing counsel with the information sufficient to make a fully informed decision against introducing evidence of petitioner's mental state. (See, App. No. 1 Exhibits O & P.)

Even without reference to the readily accessible DSM-IV-TR manual, any reasonably competent criminal defense attorney acting as a diligent advocate would have comprehended and appreciated the nature of the information provided to him by petitioner and petitioner's family and, despite any familiarity with PTSD, would not have concluded he possessed the background and expertise to diagnose petitioner and determine PTSD had no relationship to the case.

As indicated in Exhibit N, the evaluation by Dr. Abrams, defense counsel's suspicion that petitioner suffered from PTSD, but his conclusion it had no relationship to the case (unsupported by investigation or adequate preparation) was incorrect. Petitioner met the diagnostic criteria for PTSD at the time of the offense. This conclusion was supported by evidence, aside from petitioner's statements, which confirmed that petitioner experienced episodes of increased arousal, hyperexaggerated responses to misperceived threats, episodes of detachment and amnesia, and behavioral disinhibition after the traumatic event which resulted in the loss of his vision in one eye. The documentary evidence further established that petitioner had been diagnosed with PTSD by prison authorities following a commitment to prison after the traumatic injury and before the charged homicide. (App. 1 Exhibit N, 1, 3-9.) According to the materials examined by Dr. Abrams in the formation of his opinion, other factors associated with the existence of PTSD also were present, including substance abuse and major depression. In addition, there was an indication petitioner may have suffered a brain injury at an early age which may or may not have affected petitioner's behavior. (App. 1 Exhibit N, p. 9.)

Even assuming it was reasonable at the outset for defense counsel to forego a psychological or psychiatric examination for PTSD, defense counsel unreasonably and faultily assumed that the combination of factors known to defense counsel required no investigation whatsoever and would not have led

47

to any evidence usable at trial.  Defense counsel knew about the incident

resulting in petitioner's loss of vision.  (App. 1 Exhibit L, pp. 235-236.) Defense

counsel also knew that petitioner denied any psychological or psychiatric

treatment for the event.  (App. 1 Exhibit L, pp. 240-241.) Methamphetamine or other

drug use was apparent from the case.  (App. 1 Exhibit D, pp., 6-7.) Beyond that, the

information told defense counsel petitioner had been to prison -- and more

than once.  (App. 1 Exhibit A, p. 2.) Based on this Information, any reasonably

competent criminal defense attorney would have collected the medical reports

of the mayhem and the police reports of the incident. (App. 1 Exhibit P.) Similarly, a

reasonably competent criminal defense attorney acting as a diligent advocate

would have obtained records of petitioner's medical and behavioral history

from the prison authority.  (Exhibit P.)  Even if petitioner did not want to

cooperate with a mental defense, a reasonably competent defense attorney also

would have asked petitioner about any civilian medical records related to

petitioner's drug-use and abuse and any acts of misconduct before the charged

offense.  Had defense counsel obtained and reviewed these records, defense

counsel would have found, at a minimum that, during petitioner's

imprisonment at times relevant to the traumatic injury he suffered, prison

psychiatrists and psychologists diagnosed petitioner with PTSD and depression;

he was prescribed certain medications in prison; he engaged in conduct or

misconduct consistent with PTSD; and displayed a hyper-accentuated response

to events.  Added to this was a significant history of drug addiction. (App. 1 Exhibit N, pp. 3-9.)  A reasonably competent criminal defense attorney, acting as a diligent advocate in possession of this information, would have concluded that expert evaluation of petitioner was required -- for both PTSD and methamphetamine psychosis and any relationship between the two.  Hence, defense counsel's failure to obtain and review even the readily available records of the traumatic injury and the records held by prison officials fell below a reasonable level of performance.  (See *Rompilla v. Beard* (2005) 545 U.S. 384, 385-386 [125 U.S. 2456, 2464-2467; 162 L.Ed.2d 360]; *In re Gay, supra*, 19 Cal.4th at pp. 812-813.)

Further, defense counsel assumed petitioner's self-proclaimed defense of self-defense was strong and imperfect self-defense was available based on petitioner's vision problem -- even though petitioner's testimony would be problematical in light of his record, the testimony of the lone eyewitness and the testimony of the confidential informant who claimed petitioner admitted his culpability and fabricated a defense.  (App. 1 Exhibit L. Pp. 263-264.) Given these circumstances, no competent criminal defense counsel would have unilaterally accepted the "truth" of petitioner's statements and failed to investigate a potential defense going to petitioner's state of mind and his credibility.  Experienced criminal defense attorneys do not automatically and unquestioningly believe everything a client says and do not automatically and

unquestioningly agree to a defense proffered by a client. (App. No. 1 Exhibits O & P.)
Further, any reasonably competent criminal defense attorney knows the duty to
investigate exists regardless of a defendant's admissions or statements to the
lawyer. (1 ABA Stds. for Crim. J. 4-4.1 (2d ed. 1982 Supp.).) By ignoring that
duty here, defense counsel was left with a weak defense based on a theory that
lacked plausibility when a far more viable defense was available. (cf. *Sanders v.
Ratelle* (9th Cir. 1994) 21 F.3d 1446, 1460.) Hence, like *Saunders*, defense
counsel substituted his personal judgment for that of professionals and his
failure to avail himself of information relevant to a PTSD defense removed all
rational support from his decision. (*People v. Saunders, supra*, 2 Cal.3d at p.
1049.)

The hazards of an attorney substituting his personal judgment in the
place of professionals, where there is evidence warranting professional
assistance also is found in *People v. Corona* (1978) 80 Cal.App.3d 684
(*Corona*), where defense counsel was ineffective for failing to investigate the
defendant's mental condition before deciding not to use a defense based on
that condition and not to seek a competency hearing. (*Id.* at pp. 715-716.) As
relevant here, the *Corona* court found it especially significant that counsel's
decision not to plead his client guilty by reason of insanity was based solely on
his conversations with the defendant and his own judgment. In sum, defense
counsel had "acted as the sole determiner of Corona's mental state without the

advice and help of experts." (*Corona, supra,* 80 Cal.App.3d at p. 715.)

Similarly, in *Harris ex rel. Ramseyer v. Blodgett* (1994) 853 F.Supp. 239 (*Harris*), trial counsel was ineffective in a capital case for relying on the defendant's admission of guilt rather than adequately investigating and presenting evidence in his defense. (*Id.* at pp.1259-1261.) The court found that in failing to investigate a potential defense, "Counsel erroneously substituted his personal judgment of Harris's competency and mental state for the expertise of mental health professionals." (*Id.* at p. 1260.)

The *Saunders, Corona,* and *Harris* cases are all consistent: the duty to investigate exists regardless of an accused's view of the case and does not permit counsel to substitute his own judgment for that of mental professionals. (See also, ABA Rules of Prof. Conduct, Standard 4-4.1, Duty to Investigate.) Moreover, this duty is not affected by the possibility that discovery in the case indicated petitioner had fabricated a defense or exaggerated its effects. (*Seidel v. Merkle* (9th Cir. 1998) 146 F.3d 750, 756.) Thus, as here, where defense counsel had some rudimentary understanding of PTSD, but had never tried a criminal case involving PTSD (App. 1 Exhibit L, p. 237. and petitioner denied it had any effect of his behavior, it was all the more critical that he obtain some professional assistance on the subject.

Moreover, such duty is not satisfied by pedestrian efforts and cursory evaluation of material. In *Wiggins v. Smith, supra,* 539 U.S. at p. 510, a death

51

penalty case, trial counsel made only a minimal investigation of Wiggins'

background, gaining information solely from Department of Social Services

reports, a pre-sentence investigation report, and some preliminary testing done

by a psychologist. Though there were findings that suggested Wiggins had

been abused as a child, counsel did not pursue any further investigation on

these leads to ascertain the extent of Wiggins' background and the possibility

that further evidence might develop to assist in the penalty phase of Wiggins'

trial. As it turned out, Wiggins had a background of sexual and physical abuse,

disturbing experiences while in foster care, and was borderline mentally

retarded. (*Wiggins v. Smith, supra,* 539 U.S. at pp. 527-530.) The United

States Supreme Court found that Wiggins was denied effective assistance of

counsel because his trial attorney failed to conduct an investigation that would

have revealed this abusive background. The court explained its focus in

reviewing a claim based on ineffective assistance of counsel as follows:

> "[O]ur principal concern in deciding
> whether [Wiggins' trial counsel] exercised
> 'reasonable professional judgment,' is not
> whether counsel should have presented a
> mitigation case. Rather, we focus on whether
> the investigation supporting counsel's decision
> not to introduce mitigating evidence of
> Wiggins' background was itself reasonable."
> (*Wiggins, supra*, 539 U.S. at pp. 522-523,
> internal citation omitted.)

52

The court further found that trial counsel's decision not to expand the investigation beyond the reports fell below professional standards. The high court noted that "any reasonably competent attorney" would have pursued such leads in order to make an informed choice among possible defenses. (*Wiggins, supra*, 539 U.S. at p. 525.) The court went on to state that: "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." (*Id.* at p. 527.) As a result, the Court found that counsel had chosen to abandon the investigation at an unreasonable juncture, and thus had made a fully informed decision with respect to sentencing strategy "impossible." (*Ibid.*)

Similarly, here, defense counsel knew petitioner's state of mind was critical to the case, admitted that he suspected petitioner suffered from PTSD, but unilaterally concluded PTSD had no relevancy to state of mind as petitioner denied he suffered from PTSD and maintained he acted in self defense. (App. No. 1 (Exhibit L.) Counsel could not have made an informed decision to abandon a PTSD-related defense until he had hired an expert to conduct an evaluation of petitioner to ascertain the viability of such a defense -- despite petitioner's assertions and defense counsel's self-proclaimed expertise. Instead, similar to

53

*Wiggins*, counsel chose to abandon a PTSD-driven line of investigation at an unreasonable juncture, and thus made a fully informed decision with respect to a defense strategy "impossible." (*Ibid.*)  In sum, defense counsel's inaction, deliberate or otherwise, deprived him of any reasonable bases upon which to reach an informed tactical and strategic decision. (*People v. Frierson, supra,* 25 Cal.3d at pp. 162-164.)

The case of *People v. Frierson, supra,* 25 Cal.3d 142 is particularly apropos herein.  In *Frierson*, the court noted the defendant's counsel presented an "undeveloped theory of diminished capacity," by offering evidence that on the day of the murder the defendant had ingested mind-altering drugs. (*People v. Frierson, supra,* 25 Cal.3d at p. 159.)  The defendant never took the stand, but two witnesses testified that he had taken Quaaludes and angel dust the day of the murder, and that he appeared dazed or "spaced out." (*Ibid.*)  However, neither witness testified extensively regarding either the quantity or the effect of the drugs upon the defendant's mental state or his ability to form the requisite specific intent.  Before trial, counsel had not consulted any experts, nor had the defendant been examined to explore a diminished capacity defense, and, at trial, no experts were offered to assist the jury in understanding the potential impact of the drugs on the defendant's mental capacity.  The court's conclusion is instructive here:

"Although, [] counsel here did attempt to assert
a diminished capacity defense, nevertheless it was
doomed to failure in the absence of any competent
evidence supporting it.  By his inaction, deliberate or
otherwise, counsel deprived himself of the reasonable
bases upon which to reach informed tactical and
strategic trial decisions.  Most importantly, the defense
of diminished capacity was certainly crucial, for it
represented defendant's sole defense to the serious,
indeed ultimate, crimes with which he was charged."
(*Id.* at p. 163.)

The same is true here.  Without substantial evidence, defense counsel was

impaired at every turn to argue a mental state defense or a defense which

adequately explained how PTSD may have affected petitioner's perception of

Rabatore as a threat and his belief that he needed to defend himself.  (6 RT

[D035850] 809-824.)  In short, counsel's self-defense and imperfect self-defense

claims were "doomed to failure in the absence of any competent evidence

supporting it." (*Ibid.*)   As this Court noted in its opinion, "there clearly was no

*actual* belief in the need for self-defense" and "the only relevance of

[petitioner's] impaired vision was that he did not inflict fatal damage with his

first blow, and was able to perceive well enough to try again . . ."  (App. 1 Exhibit D, p.

12 & fn. 7, emphasis in original; p. 15.)  This Court further concluded that all of

the evidence in the case (apart from [petitioner's fabricated claim of having been

attacked by Rabatore and thus, he asserts, having killed Rabatore because of a

perceived need for self-defense) overwhelmingly demonstrates [petitioner's]

intent to kill." (App. 1 Exhibit D, pp. 15-16.) As Dr. Abram's evaluation indicates, This state of the evidence and this court's view of the evidence did not have to occur -- as petitioner's conduct was consistent with the characteristics of PTSD and most certainly driven, at a minimum, by the disorder, and at the maximum, by the disorder and the other related symptoms. (App. No. 1 Exhibit N, p. 3-10.)

Without this type of evidence, the jury, and indeed, this court in its original decision (D035850), was left to believe that petitioner fabricated a defense using the loss of an eye as an excuse to garner sympathy. Absent any defense involving PTSD, the jury had no choice but to convict petitioner in the manner it did.

Consequently, defense counsel's representation fell below an objective standard of reasonableness and his tactical reasoning was without rational support. (*Saunders, supra*, 2 Cal.3d at p. 1049.)

E.    Prejudice.

Further, defense counsel's tactical error of judgment prejudiced petitioner so as to deprive him of a fair trial.

The second aspect of *Strickland* involves the issue of prejudice, namely, whether there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland, supra*, 466 U.S. at p. 687; *People v. Ledesma, supra*, 43 Cal.3d at pp.

217-218.) A defendant is denied the effective assistance of counsel if, by reason of counsel's failure to perform according to the standards imposed (as by inadequate pretrial preparation), defendant is deprived of an adjudication of a crucial or potentially meritorious defense. A defendant need not establish that the adjudication would necessarily be in his favor. A crucial defense is not necessarily one that, if presented, would result in defendant's acquittal. (*People v. Farley* (1979) 90 Cal.App.3d 851, 865.)

The superior court denied petitioner's pro se habeas on the grounds no prejudice had been shown as the superior court, like defense counsel, could see no relevancy of PTSD to the facts of the case. (App. 1 Exhibit F, pp. 344-348.) The fallacy in this conclusion is that it presumes the legitimacy of defense counsel's unfounded approach to the defense, when, in fact, had defense counsel not provided ineffective assistance of counsel, psychiatric and medical testimony would have enabled trial counsel to identify petitioner's PTSD as an explanation for why petitioner perceived Rabatore as a threat and believed that he needed to defend himself, whether he had the required mental state for the crime, and whether his testimony had any credibility. Without such testimony, the jury was left with no explanation apart from defense counsel's bare assertion that the incident occurred in the manner described by petitioner.

Here, petitioner was charged with murder and the trial court instructed the jury on first and second degree murder, voluntary manslaughter under the

theory of imperfect self-defense, and self-defense (1 CT [D035850] 103-110, 111-112, 115.)  It did not instruct on involuntary manslaughter.[4]

"Murder is defined as an unlawful killing committed with malice aforethought." (*People v. Robertson* (2004) 34 Cal.4th 156, 164; § 187, subd. (a).) It is divided into degrees.  Second degree murder is an unlawful killing with malice aforethought.  First degree murder is an unlawful killing with malice aforethought with the added elements that is perpetrated in certain specified ways or is willful, deliberate and premeditated.  (*Robertson, supra*, at p. 164; § 189.)  Malice may be express or implied.  It is express "when there is manifested a deliberate intention" to take the life of another.  It is implied where the killing results from an intentional act that is dangerous to human life and the act is committed with conscious disregard for life.  (*Robertson, supra*, 34 Cal.4th at p. 164.)

"An unlawful killing may constitute [voluntary] manslaughter rather than murder even in the presence of intent to kill or conscious disregard for life . . . if the defendant killed under provocation or in an unreasonable but good faith belief in the need to act in self defense." (*Id.* at pp. 164-165; *People v. Lujan* (2001) 92 Cal.App.4th 1389, 1410-1411; see . App. 1 Exhibit D, pp. 13-14 [the law on voluntary manslaughter changed one month after jury deliberations in

---

[4]The decision of the court of appeal on the direct appeal [D035850] erroneously states the trial court instructed the jury on involuntary manslaughter as a lesser offense of murder.  (App. 1 Exhibit D, pp. 14-15. ) no such Instruction was given

petitioner's case in *People v. Lasko* (2000) 23 Cal.4th 101, 104; *People v. Blakeley* (2000) 23 Cal.4th 82].) Such circumstances are deemed to negate the element of malice that otherwise is present in murder. (*Lujan, supra,* 92 Cal.App.4th at p. 1411.) Involuntary manslaughter is the unintentional killing of a human being without malice "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b); *People v. Greenberger* (1997) 58 Cal.App.4th 298, 380 CALCRIM No. 581.)

Here, the evidence of PTSD was relevant on a variety of material issues and provided various defenses to murder, defenses which would have reduced the murder to voluntary or involuntary manslaughter.

Under circumstances controlling herein, the California Supreme Court, in *People v. Humphrey* (1996) 13 Cal.4th 1073 (*Humphrey*), determined the purposes for which battered woman's syndrome (BWS) evidence is relevant in murder cases. BWS, not unlike the forces at work in PTSD, is a pattern of psychological responses and symptoms characteristic of women who have been subjected to continuous physical of psychological abuse by their mates. (*Id.* at p. 1083-1084.)

*Humphrey* found that BWS evidence is relevant in murder cases in three areas: First, in general, such testimony is relevant to a defendant's credibility because it assists "'the jury in objectively analyzing [the defendant's] claim of

59

self-defense by dispelling many of the commonly held misconceptions about battered women.'" (*Id.* at p. 1087; see also *People v. Jaspar* (2002) 98 Cal.App.4th 99, 107; *People v. Morgan* (1997) 58 Cal.App.4th 1210, 1216; *People v. Erickson* (1997) 57 Cal.App.4th 1291, 1299; *People v. Bledsoe* (1984) 36 Cal.3d 236, 247-248 [rape trauma syndrome evidence]; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 [child sexual abuse accommodation syndrome]; Evid. Code, § 801.)    Second, evidence of BWS is relevant as to both the subjective and objective components of self-defense. (*Humphrey, supra,* at pp. 1088-1089.)    The subjective elements of self-defense and imperfect self-defense are the same. Under each theory, the defendant must actually believe in the need to defend himself against imminent peril or great bodily injury.  To defend against charges of murder on the grounds of self-defense, "the defendant must actually and reasonably believe in the need to defend," i.e., the belief must be subjectively and objectively reasonable.  (*People v. Humphrey, supra,* 13 Cal.4th at p. 1082.) Where the "belief subjectively exists but is objectively unreasonable, there is "imperfect self-defense," subjecting a defendant to conviction of manslaughter. (*Id.* at p. 1082.)    Applying these general rules, the *Humphrey* court concluded: "Although the ultimate test of reasonableness is objective, in determining whether a reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which [the] defendant found herself." (*Id.* at p. 1083.)  Consequently, the *Humphrey*

60

court held that BWS was relevant to prove the defendant honestly believed she needed to defend against imminent death or great bodily injury. (*Id.* at p. 1086.) It was also relevant to decide the "reasonableness as well as the existence of defendant's belief that killing was necessary." (*Id.* at pp. 1076-1077.)

Although not specifically decided in *Humphrey*, evidence of BWS is likewise admissible in a murder case of a theory of diminished actuality, as it well settled that a jury generally may consider evidence of mental condition in deciding whether a defendant actually has the required mental state, i.e., intent to kill, for the crime. (*People v. Coffman* (2004) 34 Cal.4th 1, 81 (*Coffman*); *People v. Steele* (2002) 27 Cal.4th 1230, 1253.)

The purposes for which *Humphrey* and *Coffman* deemed BWS evidence relevant in murder cases are equally controlling herein. PTSD, like BWS, is a recognized psychiatric condition much like BWS, and "[e]xpert testimony on BWS and PTSD is routinely admitted in criminal trials in California and other states." (*Doe v. Superior Court (People)* 39 Cal.App.4th 538, 541, fn. 2; and see., e.g., *People v. Gadlin* (2000) 78 Cal App.4th 587, 592; *People v. Babbitt* (1988) 45 Cal.3d 660, 686-688; *People v. Steele, supra*, 27 Cal.4th at p. 1253]; Evid. Code, §§ 210, 351, 801.) By analogy, then, *Humphrey* provides the controlling model upon which evidence of PTSD was admissible in petitioner's case.

In convicting petitioner of second degree murder, the jury herein obviously disbelieved petitioner's defense that the shooting was in self-defense or

imperfect self-defense. The jury also disbelieved petitioner's claim that he had no intent to kill. At the same time, the jury also rejected the prosecution's view of the evidence, that the shooting had to be premeditated murder. The only thing it apparently believed was that petitioner's conducted lacked premeditation and deliberation. (6 RT [D035850] 784-788, 790-793; (App. No.1 Exhibit B, Exhibit L, pp. 263-264.)

Had the jury considered petitioner's testimony in conjunction with expert testimony as to the effects of PTSD, the jury might well have found that the stabbing was the result of petitioner's genuine, and potentially reasonable, fear for his imminent safety. It equally may have concluded that petitioner retrieved the knife and exhibited it in a "rude, angry, or threatening manner" (§ 417, subd. (a)(1)) and then acted "without due caution and circumspection" in a manner which caused death (§ 192, subd. (b)).

Dr. Abrams' report explains that persons suffering from PTSD often misperceive events, enter dissociative states, have an overexaggerated startle response to events and, in petitioner's case, these types of reactions have been documented apart from any statements made by petitioner. Dr. Abrams' report also makes clear that petitioner is hypervigilent due to the loss of one eye and the overarching need to protect the remaining eye. Added to this incontrovertible evidence of PTSD, Dr. Abrams' report reflects that petitioner had symptoms commonly associated with PTSD, including major depression and

drug psychosis.  (App. No. 1 Exhibit N, pp. 3-10)

Given the available expert testimony, evidence of PTSD would have been relevant to both the subjective and objective components of self-defense and imperfect self defense, as well as being relevant to his state of mind and his credibility.  (*Humphrey, supra*, 1076-1077, 1086.)  The jury would have heard evidence that petitioner suffered from a recognized and unassailable mental disorder at the time he committed the offense.  The disorder would have explained why petitioner perceived Rabatore as a threat, why it was imminent, why he needed to defend himself and why he unfailingly claimed he acted in self-defense.  (See *People v. Brown* (2004) 33 Cal.4th 892, 902 [expert testimony on BWS "admissible to explain how the victim's experiences as a battered woman affected her perceptions of danger and its imminence, and what actions were necessary to protect herself"].)  It also would have provided strong support for petitioner's account of the events, namely, that petitioner, suffering from PTSD and likely suffering from drug or alcohol abuse, thought Rabatore was trying to kill him because he believed, albeit mistakenly, that Rabatore was throwing something at him.  The PTSD evidence also may have demonstrated that petitioner was incapable of forming the intent requisite to second degree murder.  Since all these claims ultimately hinged on petitioner's credibility, evidence of PTSD would have provided the stepping stone for the jury to

63

understand and believe what he said had occurred and why he insisted he acted in self-defense.

This is precisely the decision the court reached in *Seidel v. Merkle, supra,* 146 F.3d. at p. 757 under circumstances virtually on point herein. In *Seidel*, the defendant was charged with murder by use of a knife. He had stabbed a friend's husband outside his vehicle in what he described as self-defense. In statements to police, Seidel said he was scared and never meant to hurt the decedent. Despite evidence Seidel suffered from PTSD, his attorney did not investigate the claim, Seidel did not testify at trial and he was convicted of second-degree murder. In writ proceedings in the Ninth Circuit Court of Appeals, the Court found Seidel's counsel was ineffective for failure to investigate Seidel's psychological history of multiple trauma. It concluded: "[I]f counsel had introduced [the expert's] evaluation at trial, which documented both "clear symptoms of PTSD" and "chronic brain damage," along with other evidence in the record of Seidel's mental illness, the jury in all likelihood would have returned a verdict of manslaughter instead of murder." (*Id.* at p. 757.)

Similarly here, if evidence of the "clear symptoms of PTSD" had been admitted, along with evidence of the associated symptoms displayed by petitioner, it is reasonably likely the jury would have returned a verdict of manslaughter -- either voluntary or involuntary -- and not murder.

This conclusion is not affected by evidence at trial indicating petitioner told an informant he contrived a defense of self-defense. (App. 1 Exhibit D, pp. 5-6.) Even assuming petitioner made such assertion, he did not contrive his PTSD. To the contrary, he repeatedly told his trial attorney that PTSD had nothing to do with his case. (App. 1 Exhibit L, p. 238-240.) Moreover, this is not a case where PTSD and any associated disorders could be considered contrived. Unlike those cases involving expert opinion based solely on the statements of the defendant, Dr. Abrams did not rely merely on the statements of petitioner in the formation of his opinion. (Cf. *People v. Lucero* (2000) 23 Cal.4th 692, 719-721.) Instead, he had a wealth of information before him, contained in documents generated before the charged offense and over which petitioner had no control. Nor was this a case where the records upon which Dr. Abrams relied concluded that petitioner had no mental defects despite the suffered trauma. (Cf. *People v. Webster* (1991) 54 Cal.3d 54 Cal.3d 311, 458-460.) Most importantly, this is not a case where the defendant "invented" his PTSD after his conviction. (Cf. *People v. Payton* (1992) 3 Cal.4th 1050, 1078-1079.) Instead, the evidence relied upon by Dr. Abrams to support his opinion indicated that petitioner had suffered the loss of an eye in a traumatic stabbing event; the trauma was not addressed via the conventions of psychology and/or psychiatry; petitioner was involved, before the charged offense, in other behavior inside and outside prison which coincided with the characteristics of a person suffering from PTSD; petitioner had been

diagnosed by prison authorities as suffering from PTSD (and other associated disorders); and, under the documented circumstances and Dr. Abrams' expert evaluation, likely was suffering from PTSD (and other associated disorders) at the time of the offense. (App. No. 1 Exhibit N, pp. 3-10.)

Nor is petitioner's claim of prejudice affected by the trial itself, wherein petitioner testified, explained he was "jumpy" under certain circumstances, an expert testified regarding the state of petitioner's vision and the jury was instructed on self-defense and imperfect self-defense. (App. 1 Exhibit D, pp. 6-7, 13-15.) This testimony and these instructions were meaningless where no expert was available to give context to the event or infuse petitioner's testimony with credibility. Had expert testimony regarding PTSD and its effects, and the associated disorders, been introduced at petitioner's trial, a properly instructed jury would have been told that the People had to prove beyond a reasonable doubt that petitioner intentionally and unlawfully killed Rabatore and did not do so in the actual, even if unreasonable, belief it was necessary to defend himself against imminent peril to his life or great bodily injury. Petitioner also would have been entitled to an instruction that the expert testimony of PTSD should be considered in determining whether petitioner actually believed in the necessity to use force to defend himself and whether such a belief was reasonable or unreasonable. (*People v. Jaspar, supra*, 98 Cal.App.4th at p. 111, fn. 6; cf. *People v. Brown, supra*, 33 Cal.4th at p. 902.) With the expert testimony and the proper

66

supporting instructions, murder was not a foregone conclusion. Instead, manslaughter, either voluntary or involuntary, was a more than viable outcome.

Thus, the jury herein did not receive all the available and relevant evidence on petitioner's behalf that might have made affected the outcome of his trial.  Defense counsel's decision to pursue a weak defense, based on petitioner's testimony and a theory petitioner's acts were caused by his impaired vision, was unreasonable and fatal to any claim of self-defense, whether perfect or imperfect, and fatal to any state of mind defense, as a "far more plausible defense" of PTSD with the associated disorders was available.  (*Sanders v. Ratelle, supra,* 21 F.3d at p. 1460.)  Had the jury been able to consider the overwhelming evidence of PTSD, and the associated disorders, to support petitioner's account of the events, and even considering the state of the prosecution case and the state of the forensic evidence, it is reasonably likely the jury's verdict, at the worst, would have been manslaughter, and not murder. Consequently, in this case, there is a reasonable probability the outcome would have been different. (*Strickland, supra,* 466 U.S. at p. 687.)

In short, petitioner was deprived of the core principles upon which a trial is based, the right to effective assistance and the right to a fair adversarial test to assure that his jury reached an honest determination in the search for the truth. Accordingly, petitioner should be granted relief from his conviction.

III

PETITIONER CAN AND WILL MEET HIS BURDEN OF
PROVING , BY A PREPONDERANCE OF THE EVIDENCE
THAT HE WAS DENIED EFFECTIVE ASSISTANCE OF
COUNSEL UNDER THE STATE AND FEDERAL
CONSTITUTIONS

"A Constitutionally adequate assistance of counsel must be
determined be a standard bottomed on the Sixth Amendment to the United
States Constitution and Article I, Section 15 of the California Con-
stitution." PEOPLE v POPE, (1979) 152 Cal.Rptr. 732, 737, 590 P.2d
859, 23 CAl. 412.

Since POWELL v ALABAMA (1932) the United States Supreme Court
has "concluded that the right to counsel is so precious that it cannot
be denied without violating those fundamentaL principles of liberty
and justice which lie at the base of all our civil and political insti-
tutions." Id. at 287 U.S. 45, 67, 53 S.Ct. 55, 63, 77 L.Ed. 158.

A habeas corpus petitioner bears the burden of establishing
that the judgment under which he or she is restrained is invalid. To
do so, he or she must prove, be a preponderance of the evidence, facts
that establish a basis for relief on habeas corpus. See, IN RE
VISCOIOTTI, (1996) 14 Cal. 4th 325, 351.

Respondent has the burden of rebutting this prima facie showing
by filing a written return to the writ showing sufficient basis to
sustain the order. COY v SUPERIOR COURT, (1962) 58 Cal.2d 210, 221.

By this verified petition, the attached declarations and ex-
hibits, petitioner has meet (sic) his burden of establishing a prima
fecie case showing which [does] not require that this Court issue an
order to show cause requiring respondent to show cause and file a
return.

Under the California Constitution and the Sixth Amendment of the

United States Counstitution, the law is clear:

> "When the basis of a challenge to the validity of a judgment
> is constitutionally ineffective assistance by trial counsel,
> the petitioner must establish either: (1) As a result of
> counsel's preformance, the prosecution's was not subjected
> to meaningful adversarial testing, in which case there is a
> presumption that the result is unreliable and prejudice need
> not be affirmatively shown (Citations); or (2) Counsel's
> preformance under prevailing professional norms, and there
> is a reasonable probability that, but for counsel's unpro-
> fessional errors and/or omissions, the trial would have re-
> sulted in a more favorable outcome. STRICKLAND v WASHINGTON,
> [(1984)' 466 U.S. [668,] 694, [80 L.Ed.2d at pp. 667-698]:
> [Citation].)  In demonstrating prejudice, however, the
> Petitioner must establish that as a result of counsel's
> failures the trial was unreliable or fundamentally unfair.
> [Citation.]  'The benchmark for drudging any claim of inef-
> fectiveness must be whether counsel's conduct so undermined
> the proper functioning of the adversarial process that the
> trial cannot be relied on as having produced a just result.'"
> (STRICKLAND v WASHINGTON, supra, 466 U.S. at p.686 [80 L.Ed.2d
> at pp. 662-693]; IN RE VISCIOTTI, supra, 14 Cal.4th 325,
> 351-352; As cited in IN RE CUDJO, (June 7, 1999) California
> Supreme Court, 1999 Daily Journal, D.A.R. 5537.)

As will be shown, Mr. Peckham's failure to conduct adequate pre-

trial investigation, to interview necessary witnesses, to fulfill his

promises to his client, to call any experts on prtitioners state of

mind regarding Post Traumatic Stress Disorder, and most importantly,

to have withdrawn petitioner's sole defense of imperfect self-defense

fell below any reasonable competency, fundamental, or fairness, and

does not justify reliance on the outcome or test the adversarial pro-

cess as petitioner had no advocate in his behalf.

Petitioner "must show that trial counsel failed to act in a

manner to be expected of reasonably competent attorneys acting as dili-

gent advocates."  Neither, the Prosecutor or this Court, if charged

with a crime, would allow their defense counsel to not be prepared by

promising petitioner to investigate and secure the evidence and witnesses

of allthe violations,  threatening and arguing transpiring between

Rabatore and his mother and Rabatore and at Petitioner and failing
to follow through on these promises, defense counsel trying to coerce
Petitioner into pleading to Second Degree and then sandbagging Peti-
tioner's sole defense of imperfect self-defense by failing to inves-
gattigate and secure evidence and witnesses for trial and not having
correct jury  instructions presented to the jury, trying to secure
evidence in the middle of trial is not allowed by the court due to the
bungling of counsel; not putting on an expert witness that available
to testify regarding Petitioner's 'Post Traumatic Stress Disorder' was
and the other failings of counsel in securing Petitioner does not get
a manslaughter conviction versus first or second degree murder.

In addition, Petitioner "must establish that counsel's acts or
omissions resulted in the withdrawal of a potentially meritorious de-
fense." **PEOPLE v POPE, supra,** 152 Cal. Rptr. 732, 739-740, 23 Cal.
3d 412.  In the case at bar, defense counsel never even presented
Petitioner's Post Traumatic Stress Disorder and all that transpired
for the imperfect self-defense and as will be shown was withdrawn by
counsel.

"The essence of an ineffective assistance claim is that coun-
sel's unprofessional errors so upset the adversarial balance between
defense and prosecution that the trial was rendered unfair and the
verdict rendered suspect." **NIX v WHITESIDE** (1986) 475 U.S. 157, 175,
106 S.Ct 988, 89 L.Ed.2d 123.  The Supreme Court has defined a fair
trial and simply put, this trial was anything but fair.  Again, Peti-
tioner challenges the Court and Prosecutor to sit in his shoes as
defense counsel did nothing to prepare for trial,  defend his client

or put on a defense.  "Thus, a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceedings."  STRICKLAND v WASHINGTON, supra, 446 U.S. at 685, 104 S.Ct at 2063.  There was no adversarial testing of Petitioner's imperfect self-defense which Mr. Peckham [failed] to investigate, research, or present to the jury.  As Petitioner "must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense" he will meet this burden by an analysis of the facts, evidence and record showing that any reasonably competent attorney would have been put on notice on demonstrating Petitioner's claim of imperfect self-defense in the argument(s) following.  As no real imperfect self-defense was presented, that was available, investigated or even researched - "it is clear that a defendant is denied a fair a fair trial where the actions of his or her attorney 'precluded the fact-finder from indepenently judging the merits of the case'"  UNITED STATES v CAMPBELL, 616 F.2d 1151, 1152 (9th Cir. 1980, cert denied, 447 U.S. 910, 100 S.Ct 1988, 64 L.Ed.2d 861 (1980).

Although, there is a natrual tendancy for reviewing courts to give some difference to trial attorney's tactical decisions at trial, where as here, there is a total lack of preparation, investigation, consultation and presentation of an imperfect self-defense - there cannot be an abandonment of the constitutional guarantees of effective ccounsel.  "[D]eference is not abdication" [citation];  it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions."  IN RE

71

CORDERO (1988) 46 Cal.3d 180, quoting PEOPLE v LEDESMA (1987) 43
Cal.3d 216, 217.

As the court in EWING v WILLIAMS noted, "[C]ourt may find
unfairness - and thus prejudice - from the totality of counsel's
errors and omissions.  595 F.2d 391, 396, (9th Cir. 1979).  As will be
amply demonstrated, the totality of the errors and omissions of de-
fense counsel denied Petitioner effective assistance of counsel.

IV

DEFENSE COUNSEL DISCUSSED PRESENTING PETITIONER'S
POST-TRAUMATIC STRESS DISORDER AND AGREED IT WAS
VIALABLE (SIC) AND PROMISED PETITIONER TO INVES-
TIGATE AND SUBPENA (sic) REQUIRED WITNESSES AND
MATTERS FOR TRIAL IN SUPPORT THEREOF IN VIOLATION
PETITIONER'S DUE PROCESS AND FAIR TRIAL RIGHTS
GUARANTEED UNDER THE 6th AND 14th AMENDMENT
OF THE UNITED STATES CONSTITUTION.

See, App. 2; Exhibit A;  Petitioner's declaration amply demon-
strates there was no pretrial investigation or a few last minute
attempts at trial to investigate and present Petitioner State-of-Mind
and version at the events leading up to Rabatore's demise. Id. at I-xi.

Defense counsel did not consult, interview, not subpoena two
expert doctors, i.e., Dr. Weiss and Dr. Aykroid, regarding Petitioner's
Post Traumatic Stress Disorder and violating his eye injury and state-
of-mind.  See, App. 2, Exhibit A: iv and viii; and Exhibit B, and Exhibi
C..

Defense counsel did not interview seven lay and unbiased
witnesses after discussing it with Petitioner and promising to, and
subpoena some for trial.  See, Exhibit A: viii-xi.

Defense counsel was adamant prior to trial to have Petitioner

to plead guilty to second degree murder saying it was the best they could do.  Petitioner countered by saying he would only do up to twenty years with a 15 years to life term.  Counsel agreed.  Then Petitioner stated he was willing to plead guilty with a straight 25 years,  which with the 80% would cause Petitioner to do approximately 20 years. Counsel agreed this made sense and told Petitioner he would get back to him and never did.  See,  App. 2, Exhibit A: 4 and App. 1, Exhibit K,  pp. 81-84.  Counsel went further and asked Petitioner's father, Mr. Little, Sr. to talk to his son to plea guilty to second degree murder.  See,  App. 1, Exhibit J, pp. 37, 38, and App. 2, Exhibit C. Couple this with counsel promising to investigate and subpoena witnesses to establish the Post Traumatic Stress Disorder.

Even though Petitioner told counsel all the facts of the day regarding Rabatore's demise, (See,  App. 1, Exhibit K: pp. 77-79 and App. 2, Exhibit A: iiii, iv).Rabatore's threats a&k dislike of Pet-itioner, See App. 2, Exhibits A, H,  prior acts of arguing,  threats and violence involving Rabatore and his mother,  See, App. 2 Exhibit A: v,  Roesch,  prior drug use,  See App. 2, Exhibit A: v-vi,  available evidence of impeachment and Post Traumatic Stress Disorder,  See App. 2, Exhibits A: vi-viii,  that were relevant and material to Petitioner's state-of-mind and the imperfect self-defense stemming from Post Trau-matic Stress Disorder,  See App. 1, Exhibits N, O, P, andApp. 2, Exhibit Exhibits A, B, and C.

Counsel, in his wisdom to deny Petitioner the opportunity to obtain anything less the 2nd degree murder, convinced Petitioner it would be best not to testify about being drunk nor operating on

73

a lack of sleep.  See, App. 2, Exhibit A: viii, and App. 1 Exhibit K: pp. 70-75.

Counsel knew of Joyce Roesch and Tony Slater's relationship and failed to present same.  See, App. 2, Exhibit A: ix.

Counsel failed to impeach Ms. Brooks with matters in the re-cord.  One example is the lie that Petitioner was lying on the couch for an hour prior to Rabatore's demise and the last argument, when , infact the phone calls by I. Ackemon demonstrated the arguing was no later than 10 minutes prior to Rabatore's demise.  See, App. 2, Exhibit A:.ix and App. 1, Exhibit K: pp. 124, 125.

Petitioner submits that a paper, thorough and diligent pre-trial investigation would have substantiated Petitioner's state-of-mind caused by the Post Traumatic Stress Disorder.  Ms. Weiss would have testified about Petitioner's actions on the day in question stemming from all that was transpiring that was skillfully withheld from the jury by counsel.  Ms. Roesch was present all day, inter-acting, and involvedin most of the arguing and violence transpiring, drug abusing and so forth, including the last few minutes of Rabatore's demise.  Petitioner incorporates all the other facts of various witness[es] set forth herein.  All would have enhanced the imperfect self-defense and found the jury returning a lower included verdict.

As the United States Supreme Court has held since 1932, "[T]he right to counsel is so precious that it cannot be denied without violating those fundamental principles of liberty and justice..." POWELL v ALABAMA, ID.

"Pretrial investigation and preparation are the keys to effective representation of counsel. RUMMELL v ESTELL, (5th Cir. 1979) 590 F.2d 103, 104. As stated by the California Supreme Court in PEOPLE v POPE, supra, "Indeed, a substantial portion of the obligation counsel owes is not directly connected with the trial but involves investigation and advice at pretrial and posttrial stages." (Id., 152 Cal. Rptr. 152, 738.) As stated by the state's highest Court:

> "Generally, the Sixth Amendment and Article I, Section 15 require counsel's diligence and active participation in the full and effective preparation of his client's case." [Citation.] Criminal defense attorneys have a "duty to investigate carefully all defenses of fact and of law that mey be available to the defendant..." [Citation] This obligation includes conferring with the client "without undue delay and as often as necessary ... to elicit matters to preform these obligations results in the withdrawal of a crucial or potentially meritorious defense," the defendant has not had the assistance to which he is entitled.'" Id. , 152 Cal. Rptr. 152, 739.

Federal courts have held the same position - "The principle is so fundamental that the failure to conduct a reasonable pretrial investigation may in itself amount to ineffective assistance of counsel. UNITED STATES v TUCKER, (9th Cir. 1983) 716 F.2d 576, fn. 16). In Tucker, defense counsel failed to interview "[A] single government witness prior to trial" as herein and the conviction was reversed. But, in Tucker, defense counsel spect hours with his client conducting pretrial investigation. "The most able and competent lawyer in the world cannot render effective assistance in the defense of his client if his lack of preparation for trial, results in his

failure to learn of readily available facts which might have afforded his client a legitimate justiciable defense.  **Tucker**, at p. 583.  As the court stated in **MC QUEEN v SWENSON**:  "Yet it is precisely in such circumstances as these ... that outside investigation is absolutely crucial.  In no other fashion can the truth of the defendant's version of events be corroborated." (498 F.2d 207, 217).

Where there is no tactical reason for not calling witnesses the case must be reversed.  **GILLIS v UNITED STATES**, 586 A.2d 726 (D.C. App. 1997).  What possible explanation can defense counsel have for not calling Dr. Weiss to demonstrate Petitioner's Post Traumatic Stress Disorder and how Petitioner's lack of sleep, drinking, arguing and violent atmospere, and Rabatore's actions of that day that lead to Mr. Rabatore's demise in which would support Petitioner's imperfect self-defense.  Also, Roesch's testimony and the other seven witnesses?  See,  App. 1, Exhibits K, N, O, P, and App. 2, Exhibits A, B, C, and H.

"Where the record shows that counsel has failed to research the law or investigate the facts in the manner of a diligent and conscientious advocate the conviction should be reversed since the defendant has been deprived of adequate assistance of counsel."  **PEOPLE v McDONWELL** (1968) 69 Cal. 2d 737, 740-741, 73 Cal. Rptr. 1, 447 P.2d 97.

## V.

DEFENSE COUNSEL DENIED PETITIONER HIS ONLY
DEFENSE OF HAVING ACTED IN AN IMPERFECT SELF
DEFENSE, BASED IN PART ON POST TRAUMATIC STRESS

DISORDER BY NOT SUPPORTING PETITIONER'S
VERSION AND TESTIMONY WITH AVAILABLE
EVIDENCE AND RABATORE'S ACTION IN VIOLA-
TION OF THE SIXTH AND FOURTEENTH AMEND-
MENTS OF THE UNITED STATES CONSTITUTION

Defense counsel put forth a weak and ineffectual self de-
fense based only on Petitioner's testimony that he suffered being
blind in his left eye; he lost the eye as a result of a stabbing in
1994. See 4 RT 551; 6 rt 740.) The stabbing very quickly; he was
stabbed five times in a split second. (4 RT 552). As a result he
has become nervous and jumpy, and he reacts to threats to injury.
(4 RT 516, 552.) He is nearsighted and has astigmatism in his right
eye. (6 RT 752.) Without glasses, the vision in his right eye is
20/2000, he is able to distinguish faces within a distance of four
to five feet. (6 Rt 741-742, 752.) Because he has vision in only
one eye, he does not have good depth preception. (6 RT 742-743.)
He has no vision on his left side. (6 RT 743.) He has a little
more than fifty per cent of a normal person's vision. (6 RT 743.)
Couple this with CALJIC 3.37, regarding a defendant's physical im-
pairment, must be given. Here the jury was instructed on the defense
of self-defense and the lesser offense of voluntary manslaughter
(based on unreasonable self-defense). both of which raises an issue
regarding the reasonableness of Petitioner's conduct and belief in
the need for self-defense. (CT 108-109, 111-112, 114-116; 6 RT
776-779.) Petitioner presented evidence of a significant visual
impairment (*even though some evidence of the visual impairment was
presented, defense counsel failed to present available expert testi-
mony to show the state-of-mind, i.e., Post Traumatic Stress Dis-

77

order, which is the facts of another argument also.)  and contended

the jury should consider his impairment in evaluating the reason-

ableness of his conduct.  (6 RT 820-822.)  Petitioner asked the court

to give **CALJIC 3.37**, informing the jury they could consider his

visual impairment in evaluating the reasonableness of his conduct,

but the trial court refused to give the instruction.  (CT 70-71;

5 RT 721-724;  6 RT 734.)  Further, the denial of involuntary man-

slaughter made it probable the jury would only find 2nd degree and

not manslaughter.    See, App. 2, Exhibit G, pp. 14-22.  Petitioner

hereby incorporates the three arguments presented on direct appeal

as if presented here, which is further proof of prejudice.  Counsel

was ineffective in presenting the jury with all the facts of this being

being a drug house with arguing, violence, threats, Rabatore's

threats to Petitioner and dislike of Petitioner, and most important,

the Post Traumatic Stress Disorder, lack of sleep and drinking

evidence deprived by counsel that would clearly show credibility to

the jury.  See, App. 1, Exhibits K, N, O, and P;  App. 2, Exhibits

A, B, C, and H.

Petitioner believes there is a substantial likelihood the

jury would reach a manslaughter verdict if it received proof that

Petitioner acted in an imperfect self defense.

"Certain defense strategies may be so ill-chosen that they

may render counsel representation constitutionally defective."

> "Defense strategy and tactics which lawyers of ordinary
> training and skill in the criminal law would not consider
> competent deny a criminal defendant the effective assist-
> ance of counsel, if some other action would have better
> protected a defendant and was reasonably foreseeable as
> such before trial."

BEASLEY v UNITED STATES, (6th Cir. 1974) 491 F.2d 687, 696.

Simply put, defense counsel's actions and omissions "precluded the fact-finder from independently judging the merits of the case. UNITED STATES v CAMPBELL, 616 F.2d 1151, 1152 (9th Cir. 1980), cert. denied, 447 U.S. 910, 100 S.Ct 2998, 64 L.Ed.2d 861 (1980). Counsel effectively denied his client a defense to the charges.

Petitioner has clearly shown what his defense would have been and states that defense counsel failed to support Petitioner's version of the events and Petitioner's state-of-mind, i.e., Post Traumatic Stress Disorder. Only an evidentiary hearing will bring all the matters to certainty.

As stated by the United States Supreme Court:

"If there is only one plausible line of defense, the court concluded, counsel must conduct a reasonably substantial investigation" into that line of defense, since there can be no strtigic choice that renders such an investigation unnecessary. [Citation] The same duty exist if counsel relies at trial on only one line of defense, although others are available. In either case, the investigation need not be exhaustive. It must include "'an independent examination of the facts, circumstances, pleedings and law involved.'"

STRICKLAND v WASHINGTON, supra, 104 S.Ct 2052, 2061.

Counsel "must" conduct a "reasonable substantial investigation.: In that context of "must" do what counsel did not do here - a reversal is required. For "Counsel also has a duty to bring to bear such skills and knowledge as will render the trial a **reliable adversarial testing precess."** POWELL v ALABAMA, supra, 287 U.S. at 68-69, 53 S.Ct 63-64; **emphasis added.** There was no "reliable adversarial testing process" and to argue that there was would

be absurd in light of defense counsel's failure to even put on

any evidence of Post Traumatic Stress Disorder - imperfect self -

defense.  The conviction must be reversed,  new counsel appointed

and the issueproperly investigated and presented to an impartial

jury.

## VI.

### DEFENSE COUNSEL'S ACTS AND OMISSIONS WERE SO INEFFECTIVE AND NUMEROUS THEY MUST BE WEIGHED IN TOTALITY

This court "may find unfairness' and thus prejudice'

from the totality of counsel's errors and omissions."  EWING v

WILLIAMS, supra, 595 F.2d 391, 396 (9th Cir. 1979).

Not only for the aforementioned reasons should this

conviction be reversed for ineffective assistance of counsel, but

for the numerous incidental acts and omissions of defense counsel

as will be itemized as follows:

### (A)

### DEFENSE COUNSEL'S ATTEMPT TO COERCE PETITIONER TO PLEAD GUILTY TO 2ND DEGREE MURDER DEMONSTRATED COUNSEL DID NOT PLAN ON EFFECTIVELY REPRESENTING PETITIONER TO OBTAIN A MANSLAUGHTER CONVICTION

Mr. Peckham tried to coerce Petitioner into taking a

15 year to life sentence on multiple occasions and said he would

only do about  twenty (20) years.  Petitioner countered by saying he

waswilling to take a straight twenty-five (25) years, which would

also cause Petitioner to do twenty (20) years.  Further, Petitioner

explained that he was not guilty of murder adn rather be acquitted

than plea guilty to something he was not guilty of.  Peckham fur-

ther, explained he could get him less than 1st degree murder, i.e.,

2nd degree with a 15 to life top was the best Petitioner could get.

Petitioner did not realize that this was a sign that Peckham was

not planning on representing him to the best of his ability.    Then

Peckham said he would extent the trial to investigate all new facts

including Alan Coton to find overdorf Martin Carvolas, Maty Ross,

Ken Kempe and Joyce Roesch and then failed to do just that.    Peti-

tioner did not understand why he was saying new facts when this

wasall in the police reports and Petitioner had previously told

Peckham these facvts.

Proceeding paragraph coupled with defense counsel's lack of

investigating intentionally withdrew Post Traumatic Stress Disorder,

eye doctor, and all the other matters left Petitioner unable to

prove manslaughter versus 2nd degree.

**(B)**

**DEFENSE COUNSEL DID NOT KNOW THE LAW AND FAILED
TO PUT FORTH EVIDENCE TO PREVENT THE JUDGE FROM
EXCLUDING PETITIONER FROM TESTIFYING ABOUT HIS
STATE OF MIND REGARDING BEING STABBED IN THE EYE.**

Petitioner was stabbed five (5) times in the left eye, See 4 RT

551-552;  6 RT 748. and as a result left Petitioner nervous, jumpy

and reacting to threats of injury.  See, 4 RT 516, 552.  Without

glasses,  Petitioner's visionis 20/2000 in his right eye and left

eye is blind, allowing no ability to distinguish faces four (4) to

five (5) feet away.  See,  6 RT 741-742, 752.  The trial judge did

not allow the Petitioner to discuss his state of mind regarding the

details of his being stabbed in the eye ruled that Petitioner needed

to subpoena some witnesses that knew Rabatore threatened Petitioner,

See,  4 RT 551; and App. 2, Exhibit H.  Couple this with (C) fol-

lowing and all the rest and it is clear Petitioner suffered an injustice.

### (C)

**DEFENSE COUNSEL INTENTIONALLY WITHHELD FROM THE JURY THE IMPORTANT ELEMENT OF AN IMPERFECT SELF DEFENSE, POST TRAUMATIC STRESS DISORDER.**

Sharon Little's Psychologist Dr. Dina K. Weiss advised Sharon on her feelings regarding Petitioner's predicament and suggested that he suffered from Post Traumatic Stress Disorder. Sharon had many discussions with Dr. Weiss whom offered her services. Mr. Peckham rejected Dr. Weiss's offer to testify. See, Sharon Little's declaration as, App. # 2 Exhibit B.

Ken Woo was interviewed by Mr. Peckham for Woo to testify about his having witnessed Petitioner being stabbed and well aware of Petitioner being jumpy and nervous over anything. Peckham said hhe would call Woo to testify to counterthe District Attorney challenging Petitioner's claim of **jumpiness** and **nervousness**.

Mr. Peckham being well aware of Dr. Aykroid treating Petitioner in the past was going to call the Doctor to testify and half way through trial realized he had not subpoenaed Dr. Aykroid. Mr. Peckham had Petitioner's father go and pick up the Doctor's report. See, Little, Sr's. declaration as, App. # 1 Exhibit B, and 6 RT 747:14. Mr. Peckham did not understand how to argue the proof requested by the judge. See, 6 RT 749. Mr. Peckham failed to make a showing of Petitioner's jumpiness and being afraid of injury and it not being a figment of Petitioner's mind.

### (D)

**DEFENSE COUNSEL'S FAILURE TO SECURE AVAILABLE**

82

### EVIDENCE OF RABATORE'S THREATS AND DISLIKE OF PETITIONER AND VIOLENCE.

When Petitioner told Deanne and Tina they had to leave, Rabatore got mad at Petitioner and threatened Petitioner due to Tina and Deanne leaving.  Tina could testify to this fact in addition to Rabatore saying that Petitioner had stole his Mom and that Petitioner had stated he was crazy.  Him (AKA Jimbo) would testify that when Rabatore came over to his house and was confronted by Jim for stealing something of his, Rabatore had threatened Petitioner by telling Petitioner that he "better watch out."  Peckham knew all this,  promised to investigate and call them as witnesses and present same to the jury, but failed.  See, App. 2, Exhibit A.

The first night Petitioner was at the apartment Rabatore and Joyce got in a fight with Rabatore throwing a glass object at her, which flew over Petitioner's head and hit the refrigerator.  See, App. 2,  Exhibit A:     .

Joyce and Tina got violent with each other and someone called the police whom came out and ended up arresting Toby for possession of meth.  See, App. 1, Exhibit A:

When Scotty Rummel would come over, Rabatore who did not like him would chase Scotty with a knife and throw things at Scotty. See,  App. 2, Exhibit A:      .

One day when Petitioner and Scotty had come back from having a couple of beers they found Joyce on the phone with the police. After she hung up her and Rabatore told Petitioner and Scotty that they were being investigated for murder ... they saw a bloody tee-shirt in Rabatore's room the morning it happened.

Three days prior to Rabatore's demise, Petitioner saw Joyce thrown to the ground by Rabatore and threatened by Rabatore.

### (E)

#### DEFENSE COUNSEL FAILED TO SECURE AVAILABLE EVIDENCE THAT THE APARTMENT WAS A DRUG APARTMENT.

Tina would testified that she came over to Joyce's apartment to buy dope, that Joyce and Rabatore physically fought over drugs. Joyce flipped out on another occasion and started dumping pills down her throat when Tina went to pry her mouth open, Joyce bit Tina's finger. Joyce, Rabatore and herself, at another time tried to get Petitioner to sell a bunch of downers (Vikodin), and the night of 06/14/02, Joyce, Tina, Rabatore, and Deanne were there doing drugs and Petitioner was not indulging.

Martin CArvolas (AKA Crazy) would testify that Rabatore would come back and forth from the dope house, were Rabatore was planning on moving. Crazy was there with Mary, Brooks, and Joyce when they said they were going to get some beer, food, and dope and would be right back in an hour or so two. When they got back, Mary got Ted to go get dope since they couldn'e find any.

Bob Teal was not questioned about all the smoking of dope an hour prior to Rabatore's demise.

Ms. Brooks testified the glass object Petitioner threw at Rabatore was not a pipe. See, 2 RT 154-155, 3 RT 251, and there is available evidence to impeach it, including crime scene photographs counsel failed to use. Ms. Brooks testified

84

the gals went all the way over to Cheers & Beers and no drugs were involved in that trip, when in fact multiple witnesses would testify that drugs were involved in that trip. The importance being to establish that Rabatore was in fact flying on drugs as everyone else was. One witness is Deny whom petitioner saw in the county jail. After the preliminary hearing and said that the gals had called him for drugs and he drove drugs by Joyce's apartment. but the cops were their (sic) so he kept on driving.

Joyce Roesch would testify that her and Ms. Brooks did dope with Rabatore in the back room while petitioner drank beer in the living room. Joyce would also testify that her and Tina got violent, someone called the police and Toby had gotten arrested for meth.

Toby Slater would testify he knew where petitioner could stay and took petitioner to Joyce's apartment and bought drugs from her and Rabatore while Tina waited in the car on 06/10/99 (All of above contained in petitioner's declaration as App. 1, Exhibit A.

## (F)

### DEFENSE COUNSEL PROMISED TO INVESTIGATE AND OBTAIN AVAILABLE EVIDENCE OF:

a)  Impeachment evidence; See, App. No. 1, Exhibit K, pp. 124-125; and App. No. 2, Exhibit A, at p. vi.

b)  Post Traumatic Stress Disorder; See, App. No. 1, Exhibit N, and App. No. 2, Exhibit

c)  Peckham telling petitioner not to testify about being drunk nor lacking sleep. See, App. No. 2, Exhibit A at pp. viii-ix, and App. No. 1, Exhibit K, pp. 70-75.

d)  Joyce Roesch and Toby Slater and impeachment evidence in the record to impeach Ms. Brooks . See, App. No. 2, Exhibit A at p. ix.

e)    Failure to get an involuntary manslaughter instruction as
      evidenced by the direct appeal finding on page 14 of the
      Opinion, and App. No. 2, Exhibit G, pp. 14-22.

Petitioner incorporates the direct appeal arguments and involuntary

manslaughter instruction argument as presented herein.

The Direct Appeal Opinion on page 14 says the jury would convict

of involuntary manslaughter if they found there was no intent. This

instruction was never given. Page 14 quoted, "if jury believed Little

unintentionally killed Rabatore in an honest belief he was in peril, it

would have concluded it could not convict him of murder because he

lacked the intent to kill. A jury thus situated would have convicted

Little only of involuntary manslaughter, a lesser offense included in

the crime of murder, on which the jury was also instructed." This is

untrue.

## (G)

### DEFENSE COUNSEL PROMISED THEN FAILED
### TO HAVE THE FOLLOWING TESTIFY:

a)    Scott Rummel; (See, App. No. 2, Exhibit A at page ix.)
b)    Martin Carvolas  (See, App. No. 2, Exhibit A at page x.)
c)    Tina.           (See, App. No. 2, Exhibit A at page x.)
d)    Joyce Roesch. (See, App. No. 2, Exhibit A at page x.)
e)    Toby Slater.  (See, App. No. 2, Exhibit A at page xi.)
f)    Scott Stefes. (See, App. No. 2, Exhibit A at page xi.)
g)    Jim (AKA Jimbo) (See, App. No. 2, Exhibit A at page xi.)
h)    Ken Kempe (AKA Ted).  (See, App. No. 2, Exhibits A and H.)

### (H)
### INEFFECTIVE ASSISTANCE OF COUNSEL CONCLUSION

Based on the foregoing, it is abundantly clear that petitioner was denied

effective assistance of counsel in violation of the Sixth Amendment of

the United States Constitution, and Article I, section 15 of the California

Constitution.

This Court should issue an order to show cause directed to the Dis-

trict Attorney of San Diego County, hold an evidentiary hearing to determine and establish the merits of the case and should then reverse the conviction accordingly.

Petitioner has been denied a fair adversarial testing of the facts his defense and all the witnesses before an imparatial jury by defense counsel's acts and omissions. Under state and federal law a reversal is required.

87

VII

PETITIONER WAS DENIED A FULL AND FAIR HEARING IN THE
STATE COURTBY INEFFECTIVE ASSISTANCE OF COUNSEL IN
FAILING TO CAUSE AN ADEQUATE ARGUMENT UNDER EVIDENCE 352
TO EXCLUDE TEAL'S TESTIMONY IN ALLOWING THE COURT TO NOT
EXERCISE ITS DISCRETION IN VIOLATION OF A FAIR TRIAL AND
DUE PROCESS UNDER THE 6TH AND 14TH AMENDMENTS OF THE
UNITED STATES CONSTITUTION

Petitioner contends he was denied a full and fair hearing in

the state court on the admission of the informant's testimony (i.e.,

(Robert Teal's) pursuant to evidence code section 352.

Petitioner moved to preclude the testimony on grounds it was

(1) inherently unreasonable and (2) unduly prejudicial.  See, App.

No. 1, Exhibit D.  See Also Direct Appeal Opinion at p. 16.

> "At the pretrial hearing, on the point of unreliability,
> counsel for Little represented he had been told by Teal he
> had only contacted the district attorney's office in order
> to divert attention from his son, who (for no reason ever
> made clear) was assertedly being questioned by by district
> attorney's office about the Rabatoreehomicide.  The district
> attorney who had been handling the case from the begining
> denied any such matter had ever taken place.  The district
> attorney further stated he had provided no benefits to Teal,
> that Teal knew details of the homicide know only to Little
> and Brooks, and Teal had no connection to Brooks.  Based on
> these matters, the court tentatively rejected the assertion
> Teal's testimony was inherently unrealiable, the rule Teal
> would be examined by both counsels out  of the presents of
> the jury before he testified.  ¶ Prior to having Teal testify
> before the jury, he was examined out of the jury's presence.
> The trial judge found that Teal's testimony was not reliable
> because "I don't see any coercion there.  If he wants to
> testify, he should testify."  ¶Little now argues the trial
> judge erred in not setting out reasons for admitting the
> testimony as to evidence code §352 argument,  cited in the
> papers but never raised in court by counsel.  Little argues
> that becasue "the record is devoid of any indication the
> trial court fulfilled its responsibility to weigh the pro-
> bative value of Teal's testimony, against its prejudicial
> effect.,"  we must reverse'".  See

Direct Appeal Opinion at App. No. 1, Exhibit D, pp. 16-17.

The court goes on to say the argument was not presented nor

preserved for appeal.  The opinion found nothing in the record of an

objection or motion to exclude, that was timely with specific grounds. Thus finds no abuse.  App. No. 1, Exhibit D at page 18.

Petitioner contends there was available evidence that defense counsel was advised of by petitioner prior to trial,. Defense counsel agreed to investigate it and utilize it at trial.  Counsel clearly failed to do that.

These matters of importance are as follows:

Bob Teal encounters petitioner in the prison at Donavan State Prison. 3 RT 336-337.  Teal told petitioner that he got busted for auto theft but petitioner learned Teal was never convicted.  Teal talked to Overdorf after seeing petitioner in prison.  Id at 3 RT 345.  Petitioner contends that Teal got his story from Overdorf as petitioner never said the things Teal said he did.

Overdorf called Joyce and Brooks while petitioner was with Overdorf from the gym at the prison and then Teal was in the gym at the gym with Overdorf.  Overdorf is a friends with Joyce and Brooks.  **Id**. at  3 RT 331.  Joyce and Brooks visited Overdorf at the jail and Joyce visited Overdorf at the prison.  Overdorf was busted while driving Ms. Brooks car with alot (sie) of drugs.

Sony Clark could testify that Teal stole the car while he was at the ranch.

Defense counsel never asked for an evidentiary hearing to determine if Teal's first letter to the D.A. (sic) was in fact lawfully blacked out.  See App. 2, Exhibit E.  The same goes for the transcription of Teal's conversation with the D.A. investigator Saraceni.  See App. 2, Exhibit F.

Clearly, if this evidence was submitted to the court, then Teal's testimony would not have been allowed.

At a minimum, an evidentiary hearing should be held as this clearly violates petitioner's constitutional rights.

VIII

**THE TRIAL COURT PREJUDICIALLY VIOLATED PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS OF DUE PROCESS AND INEFFECTIVE ASSISTANCE OF COUNSEL FURTHER DENIED PETITIONER HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS, BOTH ISSUES WERE THE QUESTION OF (1) APPLICABILITY OF CALJIC 3.37 WHERE A DEFENDANT HAS A PHYSICAL IMPAIRMENT (SEE U.S.CONST. AMEND. VI AND XIV, CAL. CONST., ART. 1 §§ 7, SUBD. (a), 15.**

**A.** TRIAL COURT:

What circumstances warrant CALJIC 3.37, regarding a defendant's physical impairment, must be given? In this case the jury was instructed on the defense of self-defense and the lesser offer of voluntary manslaughter (based on unreasonable self-defense), both of which raised an issue regarding the reasonableness of petitioner's conduct and belief in the need for self-defense. See CT 108, 109, 111-112, 114-116; and 6 RT 776-779.

Petitioner presented evidence of a significant visual impairment and contended the jury should consider his impairment in evaluating the reasonableness of his conduct. See 6 RT 820-822. Petitioner asked the court to give CALJIC 3.37, informing the jury they could consider his visual impairment in evaluating the reasonableness of his conduct, but the trial court refused to give the instruction. See, at CR 70-71; 5 RT 721-724; and 6 RT 734.

In affirming petitioner's conviction, the court of appeal suggested CALJIC might not be applicable, where the issue of reasonableness relates to a defense rather than an element of the charged offense. App. No. 1, Exhibit D, p. 10. However, as recognized in the comment to CALJIC 3.37, the instruction

is applicable whenever the reasonableness of the defendant's conduct
is in issue. (Comment to CALJIC 3.37.) It makes no difference
whether the issue of reasonableness arises as an element of the
charged offense, or as a matter of defense. Where, as here, a def-
endant's physical impairment directly effects what he knew or should
have know as a reasonable person, the instruction should be given.
**PEOPLE v MATHEWS** (1984) 25 Cal.App.4th 89, 99. Show cause should
issue to define the circumstance in which CALJIC 3.37 should be given.

The Court of Appeal also suggested CALJIC 3.37 might constitute
an improper and argumentive "pinpoint" instruction, directing the
jury's attention to a particular piece of evidence. See App. _l_,
Exhibit _D_ at App. A, p. 11, fn 6. However, CALJIC 3.37 merely in-
forms the jury, in non-argumentive language, that a defendant's
physical impairment is a factor it may consider in evaluating the
reasonableness of his conduct. (CALJIC 3.37) For this reason, it
is an appropriate "pinpoint" instruction regarding the defendant's
theory of the case, to which a defenant is entitled on request.
**PEOPLE v SAILLE** (1991) 54 Cal.3d 1103, 1119. Show cause should issue
to confirm the appropriatness of CALJIC 3.37.

Petitioner does not contend that the self-defense instructions,
as given, were an incorrect statement of the law. Rather, peti-
tioner's argument is that the instructions should have been broadened
to expressly include, as requested, petitioner's physical impairment,
which was proven.

In **PEOPLE v HUMPHREY** (1996) 13 Cal.4th 1073, the California
Supreme Court held that evidence of battered women's syndrome may

reduce a murder to justifiable homicide on the bases if reasonable-
self-defense.  In reaching that conclusion,  the Court stated:

"Although the ultimate test of reasonableness is objective,  in
determining whether a reasonable person in defendant's position
would have believed in the need to defend,  the jury must consider
all the relevant circumstances in which the defendant found herself."
Id. at p. 1083.  In quoting from PEOPLE v SMITH (1907) 151 Cal. 619,
628,  The HUMPHREY court discribed this principle as well settled:
"As we stated long ago,  '...a defendant is entitled to have a jury
take into consideration all the elements in the case which might
be  expected to operate on his mind...' [citation]."  PEOPLE v
HUMPHREY, supra, at p. 1083.  In PEOPLE v DAVIS (1965) 63 Cal.2d 648,
the case relied on by the trial court to admit evidence of the
victim's violence toward third persons, the court held that a def-
endant "was entitled to cooroborate his testimony that he was in
fear of his life, by proving the reasonabless of such fear."  Id.
at p. 656;  See. PEOPLE v MINIFLE (1996) 13 Cal.4th 1055, 1065,
quoting PEOPLE v DAVIS; supra;  PEOPLE v PENA (1984)-151 Cal. App.
3d 462.

Above is taken from PEOPLE v SPENCER (1997) 51 Cal.App.4th 208,
which held it was error in refusal to instruct jury that it could
consider defendant's knowledge of victim's prior threats and acts
of physical violance perpetrated against third parties when deter-
mining imminent danger at the time of shooting.  This illustrated
the importance of the following:

93

B.    **INEFFECTIVE ASSISTANCE OF COUNSEL.**

Defense counsel was made of elements of defenses of which much was available, and promised petitioner to investigate and present at trial as follows:

1.    Petitioner's eye injury;

2.    Counsel's plea coercion giving incentive to deprive petitioner;

3.    Rabatore's threats and dislike of petitioner;

4.    Rabatore and his mom's murder investigation by police with bloody clothing in the room;

5.    Prior acts of arguing, threats and violence by Rabatore and Joyce (his mom);

6.    Prior drug use;

7.    Available evidence of impeachment;

8.    Petitioner's Post Traumatic Stress Disorder;

9.    Counsel telling petitioner not testify regarding being drunk and having lack of sleep;

10.   Joyce Roesch and Toby Slater;

11.   Counsel's failure to have testimony from Scotty Rummel, Martin Carvolas (AKA Crazy), Joyce Roesch, Toby Slater, Scott Stefes, and Jim (AKA Jimbo), and Mary Ross and Ken Kempe (AKA Ted);

12.   Bob Teal's encounters with petitioner in prison; See Petitioner's declaration Exhibit A under App. No. 2.

It should be unquestionable that counsel failed to honor his promises to petitioner a solid and sole defense to the charge so as to scure a manslaughter conviction verses to a 2nd degree murder.

Therefore prejudice should be found by the record and these matters.

## IX

APPELLATE COUNSEL DENIED PETITIONER AN
ADEQUATE APPEAL BY FAILING TO FILE A WRIT OF
HABEAS CORPUS FOR MATTERS OUTSIDE OF THE RECORD;
NOT UTILIZING A RULE 24 MOTION TO CORRECT MISSTATEMENT
OF FACT;   AND NOT INCLUDING FEDERAL CONSTITUTIONAL BASIS
IN THE ISSUES RAISED;   ALL UNDER THE SIXTH AND
FOURTEENTH AMENDMENT UNDER THE U.S. CONSTITUTION

A.   FAILING TO FILE A WRIT OF HABEAS CORPUS FOR ALL THE
MATTERS OUTSIDE OF THE RECORD:

Petitioner, via Sharon Little, and himself (sic) requested

Martha L. McGill ("McGill")  to investigate and raise issues that

in part rely on facts that are outside of the record.  (See App. No.

**2** Petitioner's declaration as Exhibit A and Sharon Little's

declaration as Exhibit B, both attached hereto.)

The issues requested are regarding ineffective assistance of

trial counsel in failing to investigate, interview witness(s) prepare

for trial,  subpeona witnesses, marshall facts, which is not con-

clusive.

Petitioner contends that McGill failing to raise meritourous

issues on direct appeal has denied petitioner a fundamental consti-

tutional federal right.

B.   FAILING TO UTILIZE A RULE 24 MOTION TO CORRECT THE
COURT'S OPINION OF A MISSTATEMENT OF FACT.

The opinion filed October 10, 2001 by Justices Huffman, J.,

Haller and McDonald, J., misstated a fact that is part of the

reasoning in denying an instruction argument in their section II,

which is the instruction on intent to kill as an element of man-

slaughter.  If the correct fact is considered then the Court would

change its finding.  The misstated fact can be found (App. No. 1,

Exhibit D on pp. 14-15 starting on paragraph three of page 14 of the opinion which states as follows:

> "as the people note, if the jury believed Little unintentionally killed Rabatore in an honest belief he was in peril, it would have concluded it could not convict him of murder because he killed in self-defense, and also could not convict him of voluntary manslaughter because he lacked the inte intent to kill. A jury thus situated would have convicted Little only of involuntary manslaughter, a lesser included included offense of murder, on which the jury was also instructed. Instead, the jury convicted Little of second degree murder, thus demonstrating it did not believe the killing was committed in self-defense."

Thus the Appellate Court relied on the fact that an involuntary manslaughter instruction was given in this case. Petitioner respectfully disagrees as evidenced by CALJIC 5.17 and 8.75 See trial transcripts at CT 115 and 121-123. These two instructions have involuntary manslaughter stricken out.

If the jury considered involuntary manslaughter, then it would have been inclined to find petitioner acted in self-defense.

McGill failed to timely utilize Rule 24 motion to correct this misstatement of fact. But, instead raised the misstatement in the Petition for Review, buried in Argument three on pages 26 and 27. Review is not the remedy for this misstatement and this denied petitioner his right to a full and fair hearign in the state court on this issue.

C.    FEDERAL CONSTITUTIONAL ERROR ASSIGNMENT:

THE ASSIGNED ERRORS IN THE DIRECT APPEAL ARE OF AN INSTRUCTIONAL error that let the prosecution have a lower standard of guilt to prove.

Petitioner has asked McGill via Sharon Little to include federal

constitutional errors raised.  See App. No. 2, Exhibit B;  Declar-
ationof Shaon Little attached   Also see McGill's response letter
hereto attached.  See App. NO. 2, Exhibit D.

The law is clear that a jury instructional error is subject to
Federal review as a federal constitutional violation under the due
process clause.  **COUNTY COURT v ALLEN**, 442 U.S. 140, 156 (1979);
**SANDSTROM v MONTANA**, 442 U.S. 510, 515 (1979);  **COLEMAN v BUTLER**,
816 E.2d 1046, 1048 (5th Cir, 1987); and the **UNITED STATES CONSTI-
TUTIONAL DUE PROCESS CLAUSE.**

Therefore, petitioner is re-raising those three issues following
this issue for exhaustion purposes.  Further, petitioner incorporates
all other facts and issues raised within this petition as if raised
for each issue for the purpose of prejudice.

## X.

### DIRECT APPEAL MIS-INTERPRETATION OF THE LAW ALLOWED MISAPPLICATION OF (1) THE APPLICABILITY OF CALJIC 3.37 WHERE A DEFENDANT HAS A PHYSICAL IMPAIRMENT AND (2) THE PREJUDICIAL EFFECT OF FORMER CALJIC 8.40, INSTRUCTING THE JURY IT MUST FIND AN INTENT TO KILL IN ORDER TO FIND A DEFENDAT GUILTY OF THE LESSER OFFENSE OF VOLUNTARY MANSLAUGHTER DENIED PETITIONER OF HIS RIGHTS UNDER THE 6TH AND 14 TH AMENDMENTS OF THE UNITED STATES CONSTITUTION

The California Supreme Court failed "to secure uniformity of decision or the settlement of important questions of law." (Cal. Rules of Court, Rule 29(a)(1)). This case raises two important legal issues which were not resolved leaving justice denied under the 6th and 14th Amendments of the United States Constitution.

First, this case raises an important issue about the circumstances in which CALJIC 3.37, regarding a defendant's physical impairment, must be given. Here, the jury was instructed on the defense of self-defense and the lesser offense of voluntary manalaughter based on unreasonable self-defense, both of which raised an issue regarding the reasonableness of petitioner's conduct and belief in the need for self-defense. See, at CT 108 - 109, 111 - 112, 114 - 116, and 6 RT 776-779. Petitioner presented evidence of a significant visual impairment--/ and contended the jury should consider his impairment in evaluating the reasobableness of his conduct. See at RT 820-822.

Petitioner asked the court to give CALJIC 3.37, informing the jury they could consider his visual impairment in evaluating the reasonableness of his conduct, but the trial court refused to give the instruction. See, at CT 70-71; 5 RT 721 - 724; and 6 RT 734.

_____/ EVEN THOUGH SOME EVIDENCE OF THE VISUAL IMPAIRMENT WAS PRESENTED, DEFENSE COUNSEL FAILED TO present available expert testimony to show the stat of mind which is facts of another argument.

In affirming petitioner's conviction, the Court of Appeal suggested CALJIC 3.37 might not be applicable, where the issue of reasobableness relates to a defense rather than an element of the charged offense.  App. _1_, Exhibit D, (Direct Appeal Opinion at p. 10.)  However, as recognized in the comment to CALJIC 3.37,  the instruction is applicable whenever the reasonableness of the defendant's conduct is in issue.  See Comment to CALJIC 3.37.  It make no difference whether the issue of reason-ableness as an element of the charged offense or as a matter of defense. Where, as here, a defendant's physical impairment directly affects what he knew or should have known as a reasonable person,  the instruc-tion should be given.  PEOPLE v MATTHEWS (1994) 25 Cal.App.4th 89, 99. Show cause should be granted to define the circumstances in which CALJIC 3.37 should be given.

The Court of Appeal also suggested CALJIC 3.37 might constitute an improppr and argumentive "pinpoint" instruction,  direct the jury attention to a particular piece of evidence.  See App. 1, Exhibit D, (Direct Appeal Opinion at p. 11, fn 6).  However, CALJIC 3.37 merely informs the jury,  in nonargumentative language, that a defendant's physical impairment is a factor it may consider in evaluating the reasonableness of his conduct.  See CALJIC 3.37.  For this reason, it is an appropriate "pinpoint" instruction regarding the defendant's theory of the case,  to which a defendant is entitled on request. PEOPLE v SAILLE (1991) 54 Cal.3d 1103, 1119.  Show Cause should be granted to confirm the appropriateness of CALJIC 3.37.

Second, the trial court instructed the jury, pursuant to former CALJIC 8.40, that it must find petitioner had the intent to kill, in order to convict him of the lesser offense of voluntary manslaughter. See, at CT 108;

6. while acknowledging that the instruction was not in conformity with PEOPLE v BLAKELY (2000) 23 Cal.4th 82 and PEOPLE v LASKO (2000) 23 Cal.4th 101, the Court of Appeal concluded that the instructional error was not prejudicial. See App. 1, Exhibit D, (Direct Appeal Opinion pp. 13-16). Show cause should be granted to address the proper standard for evaluating prejudice from such an instructional error.

B.    EXHAUSTION AND CUMULATIVE ERROR:

This argument is being added for exhaustion and cumulative error purpose. Petitioner's direct appeal attorney, not conclusively, failed to exhaust this issue for Federal Review. Therefore, petitioners is raising this issue for federalreview as his constitutional rights to due process and jury trial were violated.

Federal errors, not conclusively, are as follows: ARIZONA v FULMINATE (1991) 499 U.S. 279, 309, 111 S.CT 124, 113 L.ed.2d 302 (Fundamental constitutional errors that "defy analysis by 'harmless error' standards...most constitutional error can be harmless." 499 U.S.279, 309, 111 S.Ct. at 1246.; BRECHT v ABRAHMSON 113 S.Ct. 1710 (error affects entire trial process.); CAARELLA v CALIFORNIA (1980) 491 U.S. 263, 105 L.Ed.2d 2218, 109 S.Ct. 2419; IN RE WINSHIP (1997) 397 U.S. 358, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368; FRACIS v FRANKLIN (1985) 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 394; SANDSTROM v MONTANA (1979)

442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39; Separately petitioner

alleges a Miscarriage of Justice violation.

Petitioner hereby incorporates the arguments and facts as

raised in **PEOPLE v LITTLE**, SCE 198946 in the San Diego Superior

Court and D035850 in the Court of Appeal as raised herein.


## XI

**THE FAILUR TO INSTRUCT THE JURY PURSUANT TO CALJIC 3.37 THAT THE REASONABLENESS OF PETITIONER'S BELIEF IN THE NEED FOR SELF-DEFENSE SHOULD BE MEASURED BY THE STANDARD OF "REASONABLE PERSON" WITH PETITIONER'S VISUAL IMPAIRMENT VIOLATED PETITIONER'S 6TH AND 14TH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION**

At trial, petitioner presented evidence of a significant

visual impairment. He has vision in only one eye, having lost

his left eye as a result of a stabbing. SEE, at 4 RT 551, and

6 RT 740.

Petitioner does not have normal depth perception, because

he has only one eye. at 6 RT 742-743.

He has astigmatism and nearsightedness in his right eye;

the uncorrected vision in that eye is 20/200. See, 6 RT 741-742; 752.

Petitioner was not wearing glasses at the time of the

stabbing in the case. See, at 4 RT 562-563, 568-569.

Based on this evidence, petitioner asked the trial court

to instruct the jury regarding physical impairment, pursuant to

CALJIC 3.37. See, at CT 70-71; and at 5 RT 721-724; and 6 RT 734.

The trial court refused.

The court's refusal to give CALJIC 3.37 was erroneous and the Court

of Appeal's misinterpretation (please go to next page)

---

/ The requested instruction reads as follows:

The amount of knowledge a reasonable person with impaired physical faculties should possess. under particular circumstances is the knowledge which a person of ordinary prudence with similarly impaired faculties would have under circumstances similar to those shown by evidence. See at CT 71; CALJIC 3.37.

of the law violated petitioner's 6th and 14th Amendment Rights under the United States Constitution.

CALJIC 3.37 reflects the principle, developed in tort law, that when the reasonableness of an individual's conduct is in issue, his or her physical impairments, if any, should be taken into consideration in evaluating reasonableness. PEOPLE v MATHEWS, supra, 25 Ca.App.4th at 99. This principle is applicable in both civil and criminal cases, where the reasonableness of a person's conduct is an issue. (Ibid). Where the defendant has a physical disability, the applicable "reasonable person" standard is that of a reasonable person with a similar disability. (Ibid).

PEOPLE v MATHEWS, supra, 25 Cal.App.4th 89, demonstrates the application of this principle in a crucial case. There the defendant had significant visual and hearing impairments. (Id. at 95, fn 1) Like petitioner, the defendant had only one eye, and the vision in his remaining eye was impaired. (Ibid). He also suffered from hearing loss in both ears. (Ibid). Police came to the defendant's home to exercise a search warrant and to search for controlled substances, which they believed the defendant's son was selling from the residence. After knocking and announcing their presence, they broke in the door and entered. The defendant was standing in a bedroom door, intending to frighten the intruders by displaying a shotgun. The defendant testified he did not hear the officer's announcements and did not know they were police officers. Amoung the issues presented to the jury was whether the defendant reasonably should have known the intruders were police officers. The defendant asked the court to instruct the jury it couldconsider his physical impairments in determining what he should have known.

102

The trial court refused to give the instruction.  The jury convicted
the defendant of exhibiting a firearm in the presence of a peace
officer,  in violation of Penal Code, section 417, subdivision (c).
The Court of Appeal concluded the failure to instruct on the defend-
ant's sensory impairments was erroneous, explaining, "It make no
sence, either in law or in logic, to hold appellant to the standard
of a reasonable person with normal eyesight and hearing." (Id. at 99,
(emphasis in original).

Similarily, here, the jury was asked to evaluate petitioner's
actions based on a "reasonable person" standard,  both in respect to
defense of self-defense and the determination whether the killing was
murder or manslaughter.  With respect to self-defense,  the jury was
instructed,  in relevant part:  "To justify taking the life of another
in self-defense,  the circumstances must be such as would excite the
fears of a reasonable person placed in a similar position...."  See,
at CT  111;  and  at  6  RT  277;  and  at  CALJIC  5.12.

The jury was also told it should apply the the reasonable
person standard in determining whether the killing was murder or man-
slaughter:

> a person, who kills another person in the actual but unreasonable
> belief in the **necessity** to defend against imminent peril to life
> or great bodily injury, kills unlawfully,  but does not harbor
> malice aforethought and is not guilty of murder. This would
> be so even though a reasonable person in the same situation
> seeing and knowing the same facts would not have the same
> belief.  See at CT 115; 6 RT 778, and CALJIC 5.12.

In order for the jury to apply the "reasonable person" standard cor-
rectly in this case,  it was necessary for the jury to be told the

103

the applicable standard was that of a reasonable person with a dis-
ability similar to appellant's.  PEOPLE v MATHEWS, supra, 25 Cal.4th
at 99.  The trial court's failure to do so was erroneous.

Petitioner's visual impairments were also relevant to the jury's
determinaton as to the subjective element of reasonable and unreason-
able self-defense;  whether petitioner actually believed in the nec-
essity for self-defense.  In order to find petitioner acted in self-
defense,  either reasonably or unreasonably,  the jury was required
to find petitioner believed in the need for self-defense.  See PEOPLE v
BLAKELEY, supra, 23 Cal.4th at 88;  IN RE CHRISTIAN S. (1994) 7 Cal.
4th 768, 773, 783;  CALJIC 5.12, 5.13, 5.17, 8.40.  Petitioner's
limited ability to see Rabatore's actions in the moments leading up
to the stabbing was directly relevant to whether he subjectively be-
liaved he was in danger from Rabatore.  In addition, petitioner was
acutely sensitive to actions he perceived as threatening,  because of
his past experience of having been stabbed quickly and without warning,
which resulted in the loss of his eye.  See,  trial transcripts  at
4 RT 516, 552, 558-559; __ at 5 RT 651-652.  Adding to the perceived
threat,  Rabatore had been using methamphetamine and was acting unpre-
dictably and belligerently.  See, trial transcripts   at 4 RT 527,
551-552, 558;  and __ at 5 RT 651-652.

The trial court's stated reason for refusing to give CALJIC 3.37
was that, in the court's opinion, the instruction was applicable only
in cases where criminal negligence was involved.

__ at 5 RT 723-724; and __ 6 RT 734.  The Court of Appeal seemingly

agreed.  See, App. No. **4**, Exhibit D (Direct Appeal Opinion at p. 10).
In addition,  the Court of Appeal questioned whether the instruction
was required in this case , where reasonableness was an element of a
defense,  instead of an element of the charged offense.  See, App. No.
**1**,  Exhibit D, (Direct Appeal Opinion at p. 10).  However, the app-
licability of CALJIC 3.37 is not limited to cases in which criminal
negligence is an element of the offense charged.  In **PEOPLE v MATHEWS,
supra,** 25 Cal.App.4th 89, on which the instruction is based, criminal
was not in issue;  the issue was whether the defendant was a reason-
able person should have known the persons who entered his home were
police officers.  (**Id.** at 98-99).  Consistent with the holding of
**PEOPLE v MATHEWS, supra,** 25 Cal.App.4th 89,  the Comment to CALJIC
3.37.  Thus the decisive factor in determining whether CALJIC 3.37
should be given is not whether the case involves criminal neglgence,
or whether the issue of reasonableness is relevant to the charged
offense or a defense,  but whether the physically impaired defendant's
conduct is being measured by the "reasonable person"  standard.
**PEOPLE v MATHEWS, supra,** 25 Cal.App. 4th 89, and this case demonstrate
a defendant's conduct may be subject to the "reasonable person" stand-
ard,  even where the offensees charged do not involve criminal negli-
gence.  Here, the jury decided on the defense of self-defense and the
lesser included offense of voluntary manslaughter.  Under the circum=
stances,  CALJIC 3.37 should have been given.

The Court of Appeal also concluded it was not necessary for the
trial court to give CALJIC 3.37,  because the same information was
conveyed to the jury by other instructions, specifically, CALJIC 5.12

105

and 5.13. See at CT 111-112; and __ at 6 RT 777-778. App. No. 1, Exhibit D (Direct Appeal Opinion at p. 10-11). However, contrary to the court's conclusion, these instructions only told the jury they should consider the circumstances from the point of view of a reasonable person in petitioner's position; they did not tell the jury they should consider petitioner's visual impairment in evaluating those circumstances. Nor is it reasonable to presume the jury inferred, from these instructions, that petitioner's visual impairment was one of the factors they could consider in evaluating the reasonableness of petitioner's conduct, particularly in view of the prosecutor's argument that it was not a relevant factor. See, at 6 RT 825 - 826.

The Court of Appeal also suggested CALJIC 3.37 might have been an improper "pinpoint" instruction, unduly emphasizing petitioner's theory of the case. App. No. 1, Exhibit D (Direct Appeal Opinion at p. 11, fn 6). However, as noted above, the information conveyed by CALJIC 3.37 - that the jury was permitted to consider petitioner's visual impairment in evaluating the reasonableness of his conduct - was not specifically conveyed to the jury by the other instructions given. For this reason, CALJIC 3.37 would not have unduly emphasized the issue of petitioner's visual impairment. In addition, contrary to the court's suggestion, CALJIC 3.37 was not an argumentative instruction; it did not pinpoint specific evidence instead of petitioner's theory of the case. (E.g., **PEOPLE v GARCEAU** (1993) 6 Cal. 4th 140, 192.) Far from Arguing the significance of a special piece of evidence and inviting the jury to draw certain inferences from it, CALJIC 3.37 would merely have told the jury, in non-argumentative

language, that it was permitted to consider petitioner's visual
impairment in assessing his actions. Such an instruction is a
proper "pinpoint" instruction about the crux of the defense, to
which a defendant is entitled on request. See, PEOPLE v SAILLE,
**supra**, 54 Cal.3d at 1119.


### A.   PREJUDICE:

The Court of Appeal concluded that the failure to instruct the
jury that it should consider petitioner's visual impairment in apply-
ing the "reasonable person" standard was not prejudicial. See, App.
No. 1, Exhibit D (Direct Appeal Opinion at, pp. 11-12). However,
without such an instruction, a lay jury would not know, and could
not be expected to know, that it should consider petitioner's visual
impairment in determining whether his belief in the need for self-
defense was reasonable. Although evidence of petitioner's visual
impairment was presented, and petitioner's counsel was permitted to
argue its effects(See, at 6 RT 820 -- 822, such
evidence and argument would likely have little impact on the jury's
determinination, in the absence of an appropriate instruction.
"[I]nstruction by the trial court would weigh more than a thousand
words from the most eloquent defense counsel." PEOPLE v mathews,
**supra**, 25 Cal.4th at 99. Moreover, the prosecutor took full advan-
tage of the trial court's refusal to give CALJIC 3.37, by affirma-
tively arguing petitioner's visual impairment was irrelevant to the
jury's determination of reasonableness, and the applicable legal
standard was not that of a reasonablr person with the same visual

impairment.  See, at 6 RT 825-826.  The
omission of CALJIC 3.37 also permitted the prosecutor to argue,
incorrectly, that petitioner's counsel had misstated the law when
he urged the jury to consider petitioner's visual impairment when
applying the "reasonable person" standard.  See, at  6 RT  825 - 826.

Petitioner's principle defense was self-defense,
an essential element of which is an objectively reasonable belief
in the need for self-defense,  measured by the "reasonable person"
standard.  See,  at  CT 111;  at  CALJIC  5.12,  5.13,  5.17.

Without an instruction explaining petitioner
should be held to the standard of a reasonable person with a similar
visual impairment,  it is likely the jury held petitioner to the
standard of a reasonable person with normal vision.  However, "[w]hat
is 'apparent' to a reasonable person who can see and hear is not
'apparent'  to a person who is blind and hearing impaired." PEOPLE v
MATHEWS, supra, 25 Cal.4th at 100.  Under these circumstances, it is
reasonably probable the omission of CALJIC 3.37 caused the jury to
determine reasonableness based on an erroneous legal standard.

In finding the failure to give CALJIC 3.37 was not prejudicial,
the Court of Appeal also relied on other evidence (primarily, the
testimony of the informant, Teal.) which,  in the court's view, sup-
ported the jury's verdict.  See App. No. 1, Exhibit D (Direct Appeal
Opinion, at p. 12.  However, Teal's testimony about petitioner's al-
leged statements was inconsistent in several important respects with
the testimony of Alysen Brooks and other witnesses,  and with the
physical evidence.  For example,  Ms. Brooks testified petitioner

reached across Rabatore's body to stab him in the right shoulder, while Teal testified petitioner said he had reached across the woman to stab Rabatore, and he thought he had stabbed her. See Trail Transcripts at 3 RT 236-239, 342-344, 368. Similarly, Teal testified petitioner stated he came out of the bedroom wearing only one sock, and after the stabbing, he cleaned off the knife, got his shoes and left the apartment, but Ms. Brooks did not mention any of these details when she described the stabbing. See, Trial Transcripts at 2 RT 165-166; at __ 3 RT 273-275; 342-343, 367-368. In addition, when the knife was found, it had blood on it and did not appear to have been wiped. See, at 4 RT 428, 433, 435.

Teal also testified that petitioner stated he left his belonging in the apartment after the stabbing, while Ms. Brooks testified petitioner took his backpack when he left.

See, at 2 RT 165-166; __ at 3 RT 273-274, 343, 368. Finally, according to Teal, petitioner said he had gotten rid of the knife in a place where it could not be found, but the knife was found in plain sight in the back yard of a nearby residence. See, at 3 RT349; and at 4 4 RT 403 - 404, 417 - 418, 434. In addition, the physical evidence and the testimony of other witnesses supported petitioner's account of the stabbing, in several respects. Consistent with petitioner's testimony that Rabatore was standing, the medical examiner testified the direction of the chest wound was upwards, indicating that Rabatore was standing. See, Trial Transcripts at 2 RT 157, 160-161; __ at 3 RT 236-239; __ at 4 RT 483, 563-564. Rabatore had called his friend, Israel Ackman, to secure

his assistance in removing petitioner from the apartment, telling petitioner that his friends were going to beat up petitioner. See, at 2 RT 131 - 132; at 4 RT 559 - 561, 602.

Joshua Roberts testified that Rabatore had used methamphedamine et earlier in the day, and had been acting belligerently, screaming, and making threats, and methaphetamine and amphetamine were found in Rabatore's blood after his death. See, Trial Transcripts, at 4 RT526-528, 538-539; __ at 5 RT 651-652. In view of this evi= dence, if the jury had been permitted, under a proper instuction, to evaluate petitioner's testimony about the stabbing in light of the evidence of visual impairment.it is reasonablely probable the jury would have concluded petitioner both actually and reasonably believed in the need for self-defense. For these reasons, the failure to give CALJIC 3.37 was prejudicial, and the judgment should be reversed.


B.    EXHAUSTION AND CUMULATIVE ERROR.

This argument is being added for exhaustion and culumative error purposes.

Petitioner's direct appeal attorney, not conclusively, failed to exhasut this issue for federal review. Therefore, petitioner is raising this issue for federal review as his constitutional rights to due process and jury trial were violated.

Federal errors, not conclusively, are as follows: ARIZONA v FULMINATE (1991) 499 U.S. 279, 309, 11.1 S.Ct. 124, 113 L.Ed.2d 302 (fundamental constitutional errors that "defy analysis by !harmless error' standards ... most constitutional errors can be harmless." 499 U.S. 279, 309, 111 S.Ct. at 1246.); BRECHT v ABRAHMSON 113 S.Ct.

110

1710 (error affects entire trial process.);  CARELLA v CALIFORNIA

(1980) 491 U.S. 263, 105 L.Ed.2d 2218, 109 S.Ct. 2419;  IN RE WINSHIP

(1997) 397 U.S. 358, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368; SANDSTROM

v MONTANA (1979) 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39.  Separ-

ately petitioner alleges a Miscarrage of Justice violation.

Petitioner hereby incorporates the arguments the and facts as

raise in PEOPLE v LITTLE, SCE198946 in the San Diego Superior Court

and DO35850 in the Court of Appeal as if raised herein.


### XII

**THE ERRONEOUS INSTRUCTION ON VOLUNTARY MANSLAUGHTER
WAS PERJUDICIAL:  UNDER THE INSTRUCTIONS GIVEN
THE JURY'S ONLY OPTION WAS TO CONVICT PETITIONER OF
SECOND DEGREE MURDER IF THEY FOUND THE KILLING WAS
UNINTENTIONAL,  BUT UNLAWFUL IN VIOLATION OF THE 6TH AND
14TH AMENDMENTS UNDER THE UNITED STATES CONSTITUTION**


The Court instructed the jury on voluntary manalaughter as a

lesser included offense of murder.  2 CT 108,  109,  115,  119; 6 RT

776.                            Instructing on the elements of vol-

untary manslaughter,  the court gave former CALJIC 8.40.  See

Trial Transcripts  at CT 108; __ 6 RT 776.  This instruction told

the jury that in order to convict petitioner of voluntary manslaughter,

it must find the killing was done with the intent to kill.—/  The

Court of Appeal recognized the instruction did not conform to the

holdings og PEOPLE v BLAKELEY, supra,  23 Cal.4th 82 and  PEOPLE v

LASKO, supra, 23 Cal.4th 101,  that an intent to kill is not a nec-

essary element of voluntary manslaughter.  See, App. No. 1, Exhibit

D (Direct Appeal Opinion, at pp. 13-14.  The Court of Appeal never-

theless concluded the instructional error was not prejudicial.  See,

111

App. No. 1, Exhibit D (Direct Appeal Opinion at pp. 14-16.

In finding the instructional error non-prejudicial, the court reasoned another instruction, CALJIC 8.50, gave the jury the option of convicting petitioner of voluntary manslaughter, even if they found he did not have the intent to kill. See, App. No. 1, Exhibit D, (Direct Appeal Opinion, at pp. 14-15. CALJIC 8.50 reads, in relevant part:

> When the act causing the death, though unlawful, is done in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, the offense in manslaughter. In that case, even if an intent to kill exists, the law is that malice, which is an essential element of murder, is absent.

> To establish that a killing is murder and not manslaughter, the burden is on the prosecution to prove beyond a reasonable doubt each element of murder and that the act which caused the death was not done in the actual even though unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury.
> at CT 109; __ at CALJIC 8.50, ¶¶ 2, 3.

---

_/ The instruction given reads as follows:

> Every person who unlawfully kills another human being without malice aforethought but with an intent to kill, is guilty of voluntary manslaughter in violation of Penal Code section 192(a).

> There is no malice aforethought if the killing occurred (in the honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury.

> In order to prove this crime, each of the following elements must be proved:

> 1. A human being was killed;

> 2. The killing was unlawful; and

> 3. The killing was done with the intent to kill.
>    [A killing is unlawful, if it was [neither] [justifiable] [nor] [excusable]. See, at 2 CT 108 and 6 RT 776. __

112

However, even assuming arguendo this instruction informs the
jury that malice is absent when a killing is done in unreasonable
self-defense, it does not tell the jury what offense (if any) is
committed when an unintentional killing is committed in unreason-
able self-defense. The Court of Appeal also reasoned that the jury's
rejection of the option of involuntary manslaughter indicates the
both found an intent to kill and did not believe the killing was in
self-defense. See, App. No. 2, Exhibit D (Direct Appeal Opinion,
at pp. 14-15.) However, jury was not instructed on involuntary
manslaughter and thus could not have rejected the option. See, App.
No. 2, Exhibit G at pp. 14-22 and 6 RT 674. Under these
circumstances, if the jury found the killing was unlawful
but unintentional, only one option was available under the jury
instructions given: second degree implied malice murder.

The Court of Appeal found any error in the instruction on
voluntary manslaughter was not prejudicial, concluding the evidence
strongly suggested an intent to kill. See, App. No. 1, Exhibit D
(Direct Appeal Opinion, at pp. 15-16). However, there was ample
evidence from which the jury could have concluded, and likely did
conclude, the killing was unintentional. Alysen Brooks' account
of an unprovoked stabbing of Rabatore while he was seated was not
supported by the physical evidence, which indicated Rabatore was
standing at the time, and the direction of the stab wound was up-
ward See, at RT 157, 160 - 161; and at 4 RT 483.

Shortly before the stabbing, Rabatore called his friend,
Israel Ackerman, to come over and assist him in removing petitioner

113

from the apartment, but when petitioner started to leave, Rabatore told him he was not going anywhere until Rabatore's mother, Joyce Roesch, returned to the apartment. See, Trial Transcripts __ at 2 RT 131-133; __ at 3 RT 297-299, 301; __ at 4 RT 659-662. Rabatore had used methamphetamine that day and was acting in a threatenong manner. See at 4 RT 529-527, 558; __ at 5 RT 651-652. He was blocking petitioner's path to the apartment's front door. See, at 4 RT 586, 589, 592.

Even assuming arguendo the jury rejected petitioner's defense of self-defense, it could have found, based on this evidense, that petitioner did not intended (sic) to kill Rabatore, but merely intended to injure him, in order to effect his departure from the apartment. Yet, if the jury found the killing was unlawful, but unintentional, it could not convict petitioner of voluntary manslaughter under the instructions given. In these circumstances, the instructions gave the jury only one option: second degree implied malice murder. Because it is reasonably probable a correctly-instructed jury would have convicted petitioner of voluntary manslaughter, the judgment should be reversed.


A.    EXHAUSTION AND CUMULATIVE ERROR.

This argument is being added for exhaustion and cumulative error purposes.

Petitioner's direct appeal attorney, not conclusively, failed to exhaust this issue for federal review. Therefore, petitioner is raising this issue for federal review as his constitutional rights to due process and jury trial were violated.

114

Federal errors, not conclusively, are as follows:   ARIZONA v
FULMINATE (1991) 499 U.S. 279, 309, 111 S.Ct. 124, 113 L.Ed.2d 302 ("Fun-
damental constitutional errors that "defy analysis by harmless."   499 U.S. 279,
309, 111 S.Ct. at 1246.);   BRECHT v ABRAHMSON 113 S.CT. 1710 (Error affects
entire trial process.);   CARELLA v CALIFORNIA (1980) 491 U.S. 263, 105 L.Ed.2d
2218, 109 S.Ct. 2419;   IN RE WINSHIP (1997) 397 U.S. 358, 90 S.Ct. 1068, 1072,
25 L.Ed.2d 368;   SANDSTROM v MONTANA (1979) 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.
2d 39.  Separately, petitioner alleges a Miscarrage of Justice violation.

Petitioner hereby incorporates the arguments and facts as
raised in PEOPLE v LITTLE, SCE198946 in the San Diego Superior Court
and D035850 in the Court of Appeal as if raised herein.

## XIII

STATE APPELLATE COURT'S DECISION TO SUMMARILY
DENY PETITIONER'S INEFFECTIVE ASSISTANCE  OF COUNSEL
CLAIM ON THE PREJUDICE PRONG OF STRICKLAND WAS
AN UNREASONABLE APPLICATION OF FEDERAL LAW IN
VIOLATION OF THE FIFTH, SIXTH, AND FOURTEENTH
AMENDMENTS OF THE UNITED STATES CONSTITUTION.

Petitioner was appointed State Appellate Counsel, Athena Shudde,

by the Court of Appeal, Fourth District, Division One, for the State

of California on an order to show cause.  Appellate Counsel had been

ordered to only address viableness of a Post Traumatic Stress Disorder

(P.T.S.D.) defense and nothing else in the original writ of habeas

corpus filed in state appellate court.  Petitioner's counsel clearly

shows with (See, e.g., Supp. Ptn. , App. No. 1, Exhibits M-P, in the

state appellate Court), that there is a reasonable probability that

the outcome would have been different, at the worst, manslaughter.

STRICKLAND, supra, 466 U.S. at p. 687.  Appellate Counsel brought forth

and did exactly what the Appellate Court asked her to do.  Because

the appellate court used the prosecution's case as a reason for deny-

ing petitioner's writ of habeas corpus .  See, App. No. 1, Exhibit G,

(the disposition):

> at 19 - "Because we issued the order to show cause
> solely on whether Little was denied effective assist-
> ance of counsel because his [trial] counsel dis not
> investigate a PTSD Defense, we summarily deny.
> Without any substantive discussion of the other
> contentions raised by Little in the petition.

The state appellate court did not directly deal with the consti-

tutional issue of the facts that the trial counsel failed to investi-

gate to support his decision not to introduce mitigating  evidence.

Instead, the state appellate court used evidence aduced from the trial

transcript not directly related to the side question of whether pet-

itioner was denied effective assistance of counsel because his trial

116

counsel did not investigate a PTSD defense which was the only issue appointed counsel was allowed to address.  By the appellate court not having any substantive discussion of the of the grounds raised by petitioner, in his petition, petitioner and petitioner's counsel were denied a fair opportunity to argue and bring forth mitigating evidence to rebut against the set of facts that the state appellate court mis-applied on the prejudice prong of Strickland and rebut with (grounds ⃑ - 8, of this petition filed in the United States District Court, for the Southern District of California.  It is clear to see that the re-sult of the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Petitioner's case is clearly indistingishable from SEIDEL v MERKLE, 146 F.3d 750 (9th Cir, 1998), by the state appellate court's refusal to acknoledge (SEIDEL).  This would show that the state appellate court had no intention of addressing the trial counsel's complete failure to investigate potentual mitigating evidence.  Petitioner would contend that he was denied his right to present the facts.  Petitioner would ask the court to properly exercise its power to hear the facts of the constitutional issue presented under the unreasonable application prong of §2254(d)(1).    Counsel's ineffective assistance and deficient performance prejudice the defense.  Becuase the record clearly and convincingly shows that counsel failed to investigate at all, or that counsel had no reasonable tatical basis for decisions made because of deficient investigation. (See, e.g., WIGGINS v SMITH, 123 S.Ct. 2527 (2003).  Trial counsels performance violated petitioners Sixth Amendment right to effective assistance of counsel.  The Amendment

117

to 28 U.S.C. §2254, section provides §2254(d)(1)(2); **STRICKLAND v WASHINGTON**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and the Fifth and Fourteenth Amendments to the United States Constitution. Petitioner respectfully requests the Court to grant his Petition for Writ of Habeas Corpus.

DATED: 6 - 7 - 08

_Larry John Little_
LARRY JOHN LITTLE
Petitioner, in propria
personum

118

APPENDIX NO: 1 – EXHIBIT INDEX

EXHIBIT NO:                          DESCRIPTION

A.     Information filed December 14, 1999, in SCE198946.

B.     Minute Order of Verdict and Abstract of Judgment in case
       No.: SCE198946.

C.     Notice of Appeal filed June 15, 2000 in SCE198946.

D.     Court of Appeal Opinion in D035850 (Suoer.Ct. No. SCE198946
       filed October 10, 2001.

E.     Minute Order of August 26, 2004, Decision after Hearing
       and partial transcript of Oral Proceedings of Court Order
       on hearingon Order to Show CAuse re: Habeas Corpus in No.
       EHC388 (SCE198946).

F.     Petition for Writ of Habeas Corpus form filed in Court of
       Appeal, Divison One, on November 3, 2005.

G.     Partial transcript of a summary denial of Petition filed on
       January 16, 2008, in Court of Appeal, Fourth Appellate
       District, Division One, on Order to Show Causere: Habeas
       Corpus in case No. EHC388 (SCE198946).

H.     Petition for Review filed in the California Supreme Court
       by Petitioner's Court Appointed Attorney  and a Supplement
       Petitioner submitted by Petitioner to exhaust all Facts in
       the State's Highest Court and Petition for Review denied by
       Same on March 12, 2008.

I.     Partial transcript of oral proceedings of hearing on Order
       to Show Cause, re: Habeas Corpus in case no: EHC388
       (SCE198946).

## APPENDIX NO 1 – EXHIBIT INDEX con't

**EXHIBITS NO.**                                    **DISCRIPTION**

Witness:   Sharon Little.

J.          Partial transcript of oral proceedings of Hearing on Order

to Show Cause re: Habeas Corpus in case no: EHC388

(SCE198946)

Witness:   Larry Little, Sr.

K.          Partial transcript of oral proceedings of Hearing on Order

to Show Cause re: Habeas Corpus in case no: EHC388

(SCE198946)

Witness:   Petitioner

L.          Partial transcript of oral proceedings of Hearing on Order

to Show Cause re: Habeas Corpus in case no. EHC388

(SCE198946).

Witness:   Edward J. Peckham (Petitioner's Trial Attorney).

M.          Declaration of Alan A. Abrams, M.D., J.D.

N.          Letter report of Alan A. Abrams, M.D., J.D., dated February

10, 2007.

O.          Declaration of Inge Brauer, Esquire

P.          Declaration of petitioner's counsel

//

//

//

## APPENDIX NO: 2 – EXHIBIT INDEX

**EXHIBITS**                              **DESCRIPTION**

A.          Declaration of Larry John Littl, Jr.

B.          Declaration of Sharon Little re: Evidence withheld at trial

C.          Declaration of Larry Little, Sr.

D.          Marth L. McGill dated June 19, 2001.

E.          Robert Teal Letter.

F.          Robert Teal transcript.

G.          Supplemental application to Petitioner's Denial to

            People's return on Petition for Writ of Habeas Corpus and

            Order to Show Cause, with Points and Authorities.

H           Declaration of Ken Kimpe, re: Evidence withheld at trial.

DECLARATION AND PROOF OF SERVICE BY MAIL

    I, Larry Little    , declare under the penalty of perjury that I am over the age of 18 years, (   ) and not a party, or (   ) am a party to this action, and reside in Solano County, at P.O. Box 4000, Cell # 8-211   ) Vacaville, California. 95696-4000.

    That on June   , 7   , 2008. I submitted to custody officials for inspection, sealing and depositing in the United States Mail, consistent with the "Mailbox Rule"; Houston v. Lack, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) at the California State Prison-Solano, Vacaville, California. 95696-4000 a copy of the attached hereof: petition for writ of habeas corpus united states District court Southern District of california

in a fully prepaid envelope, addressed to: United States District court, Room 4290, 880 Front Street San Diego, CA, 92101-8900.

    I declare under the penalty of perjury that the foregoing is true and correct. This declaration was executed on this June   , 7   , 2008, at CSP-Solano, Vacaville, California. 95696-4000.

Larry John Little Jr.
DECLARANT

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

**FILING FEE PAID**

**IFP MOTION FILED**    Yes    No

**COPIES SENT TO**

Court    Pro Se

Larry John Little Jr.

**DEFENDANTS**

Sisto, et al

**FILED**

**JUN 1 2 2008**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**(b) COUNTY OF RESIDENCE OF FIRST LISTED** Solano
**PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Larry John Little Jr.
PO Box 4000
Vacaville, CA 95696
P-82205

**ATTORNEYS (IF KNOWN)**

'08 CV 1043 JM PCL

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
**(For Diversity Cases Only)    FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

## 28 U.S.C. 2254

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | **SOCIAL SECURITY** | |
| | | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC |
| ☐ Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☒ 530 General | ☐ 791 Empl. Ret. Inc. | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ Security Act | | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 950 Constitutionality of State |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding    ☐ 2 Removal from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judgment

| **VII. REQUESTED IN COMPLAINT:** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 | DEMAND $ | Check YES only if demanded in complaint: JURY DEMAND: ☐ YES ☐ NO |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY (See Instructions):**    JUDGE _____    Docket Number _____

DATE    6/12/2008    SIGNATURE OF ATTORNEY OF RECORD    R. Miller



ORIGINAL FILED

JUN 1 2 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Larry John Little, Jr.
    Petitioner.

v.

D.K. Sisto, Warden of California
State Prison-Solano County,
    Respondant

_____

PEOPLE OF THE STATE OF CALIFORNIA

    Real Party in Interest    /

_____

CASE NO. **08 CV 1043 JM PCL**

CA SUPREME CT NO.  D047468

CT. OF APP. NO.  D035850
SUPERIOR CT NO.  SCE 198946

_____

**EXHIBITS TO**

**PETITION FOR WRIT OF HABEAS CORPUS**

_____

Larry John Little, Jr.
P-82205, 8-211U
CSP-Solano, P.O. Box 4000
Vacaville, CA  95696

In Pro Persona



## APPENDIX NO: 1 - EXHIBIT INDEX

EXHIBIT NO:                           DESCRIPTION

A.      Information filed December 14, 1999, in SCE198946.

B.      Minute Order of Verdict and Abstract of Judgment in case
        No.: SCE198946.

C.      Notice of Appeal filed June 15, 2000 in SCE198946.

D.      Court of Appeal Opinion in D035850 (Suoer.Ct. No. SCE198946
        filed October 10, 2001.

E.      Minute Order of August 26, 2004, Decision after Hearing
        and partial transcript of Oral Proceedings of Court Order
        on hearingon Order to Show CAuse re: Habeas Corpus in No.
        EHC388 (SCE198946).

F.      Petition for Writ of Habeas Corpus form filed in Court of
        Appeal, Divison One, on November 3, 2005.

G.      Partial transcript of a summary denial of Petition filed on
        January 16, 2008, in Court of Appeal, Fourth Appellate
        District, Division One, on Order to Show Causere: Habeas
        Corpus in case No. EHC388 (SCE198946).

H.      Petition for Review filed in the California Supreme Court
        by Petitioner's Court Appointed Attorney  and a Supplement
        Petitioner submitted by Petitioner to exhaust all Facts in
        the State's Highest Court and Petition for Review denied by
        Same on March 12, 2008.

I.      Partial transcript of oral proceedings of hearing on Order
        to Show Cause, re: Habeas Corpus in case no: EHC388
        (SCE198946).

APPENDIX NO 1 - EXHIBIT INDEX con't

<u>EXHIBITS NO.</u>                          <u>DISCRIPTION</u>

Witness:   Sharon Little.

J.        Partial transcript of oral proceedings of Hearing on Order
          to Show Cause re: Habeas Corpus in case no: EHC388
          (SCE198946)

          Witness:   Larry Little, Sr.

K.        Partial transcript of oral proceedings of Hearing on Order
          to Show Cause re: Habeas Corpus in case no: EHC388
          (SCE198946)

          Witness:   Petitioner

L.        Partial transcript of oral proceedings of Hearing on Order
          to Show Cause re: Habeas Corpus in case no. EHC388
          (SCE198946).

          Witness:   Edward J. Peckham (Petitioner's Trial Attorney).

M.        Declaration of Alan A. Abrams, M.D., J.D.

N.        Letter report of Alan A. Abrams, M.D., J.D., dated February
          10, 2007.

O.        Declaration of Inge Brauer, Esquire

P.        Declaration of petitioner's counsel

          //

          //

          //

## APPENDIX NO: 2 - EXHIBIT INDEX

**EXHIBITS**                                    **DESCRIPTION**

A.          Declaration of Larry John Littl, Jr.

B.          Declaration of Sharon Little re: Evidence withheld at trial

C.          Declaration of Larry Little, Sr.

D.          Marth L. McGill dated June 19, 2001.

E.          Robert Teal Letter.

F.          Robert Teal transcript.

G.          Supplemental application to Petitioner's Denial to

            People's return on Petition for Writ of Habeas Corpus and

            Order to Show Cause, with Points and Authorities.

H           Declaration of Ken Kimpe, re: Evidence withheld at trial.

# APPENDIX No. 1

# EXHIBIT A

0001

# IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | CT No. SCE198946 |
| Plaintiff, | DA No. PD002614 |
| v. | INFORMATION |
| LARRY JOHN LITTLE, | |
| *dob 01/03/65;* | |
| Defendant | |

F I L E D

STEPHEN THUNBERG
Clerk of the Superior Court

DEC 1 4 1999

By: L. ARCHIBEQUE, Deputy

## CHARGE SUMMARY

| Count | Charge | Issue Type | Sentence Range | Special Allegations | Allegation Effect |
|---|---|---|---|---|---|
| 1 | PC187(a) | Felony | 25 Yrs-Life | | |
| | LITTLE, LARRY JOHN | | | PC12022(b)(1) | +1 Yr |

The District Attorney of the County of San Diego, State of California, accuses the Defendant(s) of committing, in the County of San Diego, State of California, the following crime(s):

## CHARGES

### COUNT 1 - MURDER

On or about June 15, 1999, LARRY JOHN LITTLE did unlawfully murder Edward Rabatore, a human being, in violation of PENAL CODE SECTION 187(a).

And it is further alleged that in the commission and attempted commission of the above offense, the said defendant, LARRY JOHN LITTLE, personally used a deadly and dangerous weapon, to wit: a knife, within the meaning of PENAL CODE SECTION 12022(b)(1).

# EXHIBIT A

# PRIORS



*LARRY JOHN LITTLE:*

## FIRST PRISON PRIOR

And it is further alleged that said defendant, LARRY JOHN LITTLE served a separate prison term for such offense(s), which under California law is punishable by imprisonment in state prison whether in California or elsewhere, and that he has not remained free of prison custody and free of the commission of an offense resulting in a felony(ies) conviction for five years subsequent to his release from prison for the felony(ies) below, within the meaning of PENAL CODE SECTION 667.5(b) AND 668.

| Charge | Date of Conviction | Court Number | Court | County | State |
|--------|--------------------|--------------|-------|--------|-------|
| HS11378 | 07/07/1987 | CR88412 | Superior Court | San Diego | CA |

## SECOND PRISON PRIOR

And it is further alleged that said defendant, LARRY JOHN LITTLE served a separate prison term for such offense(s), which under California law is punishable by imprisonment in state prison whether in California or elsewhere, and that he has not remained free of prison custody and free of the commission of an offense resulting in a felony(ies) conviction for five years subsequent to his release from prison for the felony(ies) below, within the meaning of PENAL CODE SECTION 667.5(b) AND 668.

| Charge | Date of Conviction | Court Number | Court | County | State |
|--------|--------------------|--------------|-------|--------|-------|
| PC496(A) | 07/20/1995 | ECR11693 | Superior Court | San Diego | CA |

THIS INFORMATION, NUMBERED SSCE198946, CONSISTS OF 1 COUNT.

Paul J. Pfingst
District Attorney
County of San Diego
State of California
by:

12 DEC. '99
_____
Date

_____
Deputy District Attorney

APPENDIX No. 1

# EXHIBIT  B

0239

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SAN DIEGO**
El Cajon Branch

DATE: MAY 03, 2000    DEPT: 9          REPORTER: LORI KOWALSKI          CSR#: 10810

PRESENT HON.  MICHAEL B. HARRIS       REPORTER:                          CSR#:
                              JUDGE
CLERK:  M. C. del TORO

BAILIFF:  CONNIE LEHAN                 REPORTERS' ADDRESS: P.O. 128
                                       SAN DIEGO, CA  92112-4104

---

SCE198946    PEOPLE OF THE STATE OF CALIFORNIA,   BY:  MARNIE STEIN, DDA
DA#PD002614                              Plaintiff,

             vs.

             LARRY JOHN LITTLE, JR.,
                                       BY: EDWARD J. PECKHAM, PCC
                                Defendant.

---

9:00 a.m.  This being the time previously set for **FURTHER JURY TRIAL** in the above entitled matter having been continued from May 02, 2000, the jurors are escorted to the jury deliberations room by the sworn bailiff to resume deliberations.

10:05 a.m.  The bailiff notifies the Court that the jury has reached a verdict. Counsel and the alternate jurors are notified to return to court forthwith. The jurors are admonished and excused for recess until 10:37 a.m. at which time court convenes with counsel as previously noted and the defendant present. The jurors are escorted into the courtroom by the sworn bailiff. The alternate jurors are present. Upon the Court's inquiry, the presiding juror states that the jury has reached a verdict. **TRIAL RESUMES** when, at the direction of the Court, the clerk reads the verdicts, copies of which are attached hereto and incorporated herein.  Counsel waive polling of the jury on the not guilty verdict on the first degree murder but defense counsel requests polling of the jury on the guilty verdict on the second degree murder.  The jury is polled with the following results to the question, "Is this your verdict, 12 Yes 0 No.  At the direction of the Court, the verdicts are recorded. The jurors are thanked for their participation, released from the admonishment and excused to return to the jury lounge for release. All jurors leave the courtroom. As to the court trial on the priors, the People request additional time to get the priors.

10:50 a.m.  Court is in recess.

11:14 a.m.  Court reconvenes with counsel as previously noted and the defendant present. The defendant having previously waived a trial by jury on the alleged priors, the Court proceeds to hear the matter.

11:15 a.m.  **CHRISTOPHER STARKOVSKY** is sworn and examined on behalf of the People. The following court's exhibits have been previously marked for identification on behalf of the People and are received in evidence:

**COURT'S EXHIBIT 35 -- 3 page documents consisting of booking sheet and face card**

**EXHIBIT  B**

SCE198946          PEOPLE vs. LARRY J. LITTLE, JR.          PAGE 2          0240
05-03-00

COURT'S EXHIBIT 36 – 2 page documents consisting of booking sheet and fingerprint card
COURT'S EXHIBIT 37 – 10 print fingerprint card for defendant dated 01-19-83
COURT'S EXHIBIT 38 - Certified copies of prison packets on cases CR88412 and ECR11693
COURT'S EXHIBIT 33 - Certified copies consisting of 10 pages on case CR88412
COURT'S EXHIBIT 34 - Certified copies consisting of 7 pages on case ECR11693

11:30 a.m.  Court is in recess.
11:45 a.m.  Court is again in session with counsel as previously noted and the defendant present.
The Court makes a true finding as to the following allegations of priors:

First Prison Prior pursuant to PC667.5(b)
Second Prison Prior pursuant to PC667.5(b)

A referral is made to the Probation Department for a pre-sentence report.  Defendant waives time and
PROBATION HEARING AND SENTENCING IS SET FOR FRIDAY, JUNE 02, 2000 AT 1:30 P.M. IN
DEPARTMENT 9.  The defendant is remanded into the custody of the Sheriff with no bail set.
11:50 a.m.  Court is adjourned in this matter.

-mcdt-

CLERK'S NOTE:  Due to attorney Peckham, at the Court's request, having to be in the
courthouse all morning while the jurors were deliberating due to any questions the jurors
might have, the Court orders that Mr. Peckham be paid for a full day of services.

CR-292

STEPHEN THUNBERG
Clerk of the Superior Court

JUN 0 8 2000

By M.C. del TORO, Deputy

| | | |
|---|---|---|
| ☒ SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | | |
| ☐ MUNICIPAL BRANCH OR JUDICIAL DISTRICT  EL CAJON | 0209 | |

PEOPLE OF THE STATE OF CALIFORNIA vs.
DEFENDANT: LARRY JOHN LITTLE, JR.    DOB: 01-03-65

AKA: PIRATE

397485

...NG #: 99161824A    ☐ NOT PRESENT

COMMITMENT TO STATE PRISON
ABSTRACT OF JUDGMENT    ☐ AMENDED ABSTRACT

| | | | |
|---|---|---|---|
| | | SCE198946 | -A |
| | | | -B |
| | | | -C |
| | | | -D |

| DATE OF HEARING | DEPT. NO. | JUDGE |
|---|---|---|
| 06-08-00 | 9 | M. B. HARRIS |

| CLERK | REPORTER | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|
| C. del TORO | C. CAMERON | F. AVILA |

| COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | ☒ APPTD. |
|---|---|---|
| M. STEIN | E. PECKHAM | |

1. Defendant was convicted of the commission of the following felonies:
   ☐ Additional counts are listed on attachment
   ___ (number of pages attached)

| CNT. | CODE | SECTION NO. | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION (MO./DATE/YEAR) | CONVICTED BY | | | CONCURRENT | CONSECUTIVE | 654 STAY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | JURY | COURT | PLEA | | | |
| 1 | PC | 187(a)** | MURDER 2ND DEGREE | 99 | 05-03-00 | X | | | | | |
| | | | | | - - | | | | | | |
| | | | | | - - | | | | | | |
| | | | | | - - | | | | | | |
| | | | | | - - | | | | | | |

ENHANCEMENTS charged and found to be true TIED TO SPECIFIC COUNTS (mainly in the PC 12022 series). List each count enhancement horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST enhancements stricken under PC 1385.

| CNT. | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12022(b)(1) | 1 | | | | | | | 1 | 0 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

ENHANCEMENTS charged and found to be true FOR PRIOR CONVICTION OR PRISON TERMS (mainly in the PC 667 series). List all enhancements horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST enhancements stricken under PC 1385.

| ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|
| 667.5(b) | 1 | 667.5(b) | 1 | | | | | 2 | 0 |
| | | | | | | | | | |
| | | | | | | | | | |

Defendant was sentenced to State Prison for an INDETERMINATE TERM:
☐ For LIFE WITHOUT THE POSSIBILITY OF PAROLE on counts
☐ For LIFE WITH POSSIBILITY OF PAROLE on counts
☒ For **15** years to life, WITH POSSIBILITY OF PAROLE on counts 1 PLUS enhancement time shown above.
☐ Additional determinate term (see CR-290).
Defendant was sentenced pursuant to ☐ PC 667(b)-(i) or PC 1170.12    ☐ PC 667.61    ☐ PC667.7    ☐ PC 667.9
☐ other *(specify):*

's form is prescribed under PC 1213.5 to satisfy the requirements of PC 1213 for indeterminate sentences. Attachments may be used but must be referred to in this document.

*(Continued on reverse)*

...d by the
...ouncil of California
...-292 (Rev. January 1, 1999)

**ABSTRACT OF JUDGMENT – PRISON COMMITMENT – INDETERMINATE**
*[NOT VALID WITHOUT COMPLETED PAGE TWO OF CR-292 ATTACHED]*

Penal Code
§§ 1213, 1213.5

# EXHIBIT

PEOPLE OF THE STATE OF CALIFORNIA vs.
DEFENDANT: LARRY J. LITTLE JR.

| SCE198946 | -A | | -B | | -C | 0210 | -D |
|---|---|---|---|---|---|---|---|

9. FINANCIAL OBLIGATIONS (including any applicable penalty assessments):
    RESTITUTION FINE of: $3600 per PC 1202.4(b) forthwith per PC 2085.5.
    RESTITUTION FINE of: $3600 per PC 1202.45 suspended unless parole is revoked.
    c.  RESTITUTION of: $TBD per PC 1202.4(f) to ☒ victim(s)*    ☐ Restitution Fund
    (*List victim name(s) if known and amount breakdown in item 11, below.)
        (1) ☒ Amount to be determined.
        (2) ☐ Interest rate of: __% (not to exceed 10% per PC 1202.4(f)(3)(F)).
    d.  ☐ LAB FEE of: $____ for counts: _____ per H&SC 11372.5(a).
    e.  ☐ DRUG PROGRAM FEE of $150 per H&SC 11372.7(a).
    f.  ☐ FINE of $___ per PC 1202.5.

10. TESTING
    a.  ☐ AIDS pursuant to    ☐ PC 1202.1    ☐ other (specify):
    b.  ☐ DNA pursuant to     ☐ PC 290.2     ☐ other (specify):

11. Other orders (specify):

12. Execution of sentence imposed
    a.  ☒ at initial sentencing hearing. 06-08-00        d.  ☐ at resentencing per recall of commitment. (PC 1170(d).)
    b.  ☐ at resentencing per decision on appeal.        e.  ☐ other (specify):
    c.  ☐ after revocation of probation.

13. CREDIT FOR TIME SERVED

| CASE NUMBER | | TOTAL CREDITS | ACTUAL | LOCAL CONDUCT | |
|---|---|---|---|---|---|
| SCE198946 | -A | 314 | 314 | 0 | ☐ 4019 ☒ 2933.1 |
| | -B | | | | ☐ 4019 ☐ 2933.1 |
| | -C | | | | ☐ 4019 ☐ 2933.1 |
| | -D | | | | ☐ 4019 ☐ 2933.1 |

| DATE SENTENCE PRONOUNCED: 06-08-00 | SERVED TIME IN STATE INSTITUTION: ☐ DMH | ☐ CDC | ☐ CRC |
|---|---|---|---|

14. The defendant is remanded to the custody of the sheriff    ☒ forthwith    ☐ after 48 hours excluding Saturdays, Sundays, and holidays.

    To be delivered to    ☒ the reception center designated by the director of the California Department of Corrections.
                          ☐ other (specify):

---

**CLERK OF THE COURT**

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

| DEPUTY'S SIGNATURE | DATE |
|---|---|
| M. del TORO        M. Del Toro (signature) | 06-08-00 |

(Rev. January 1, 1999)    **ABSTRACT OF JUDGMENT – PRISON COMMITMENT – INDETERMINATE**    Page Two

APPENDIX No. 1

# EXHIBIT   C

0211

EDWARD J. PECKHAM, ESQ.  (86609)
LAW OFFICES OF EDWARD J. PECKHAM
BRISTOL SQUARE
185 WEST "F" STREET, SUITE 700
San Diego, CA 92101
Telephone 619/231-9101

Trial Counsel for Defendant

F I L E D
STEPHEN THUNBERG
Clerk of the Superior Court

JUN 1 5 2000

By: J. ARELLANO, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

EL CAJON JUDICIAL DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, ) ) )<br>Plaintiff, ) ) )<br>v. ) )<br>LARRY JOHN LITTLE, ) ) )<br>Defendant. ) | NO. SCE 198946<br><br>NOTICE OF APPEAL |

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

NOTICE IS HEREBY GIVEN that defendant appeals from the judgment of this Court entered on June 8, 2000 in action No. SCE 198946. Defendant, being indigent, hereby requests appointment of counsel on appeal.

Dated:  6-14-00

*Edward J. Peckham*
Edward J. Peckham, Trial
Counsel for Defendant

EXHIBIT

1

NOTICE OF APPEAL AND REQUEST
FOR APPOINTMENT OF COUNSEL

APPENDIX No. 1

# E X H I B I T    D

RECEIVED OCT 1 1 2001

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA F I L E D

Stephen M. Kelly, Clerk

OCT 1 0 2001

Court of Appeal Fourth District

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LARRY JOHN LITTLE,<br><br>Defendant and Appellant. | D035850<br><br>(Super. Ct. No. SCE 198946) |

APPEAL from a judgment of the Superior Court of San Diego County, Michael B. Harris, Judge.  Affirmed.

A jury convicted Larry John Little of second degree murder with a true finding he used a deadly and dangerous weapon, and true findings by the court of two prison priors. He appeals, arguing (1) the trial court erred in failing to instruct the jury pursuant to CALJIC No. 3.37 on the standard of knowledge of a person with physical impairment, (2) the court also erred prejudicially in instructing the jury, pursuant to the 1996 version of CALJIC No. 8.40 that an intent to kill was an element of voluntary manslaughter, and (3) the court erred in admitting the testimony of an informant.  We disagree, and affirm.

**EXHIBIT**

# FACTUAL BACKGROUND

## A. June 15, 1999 - Roesch, Rabatore, Brooks and Little

In June of 1999, Eddy Rabatore and his mother, Joyce Roesch, lived in El Cajon in an apartment on First Street. Some time around noon on June 15, 1999, Alysen Brooks, a friend of Rabatore, came to the apartment with another woman, Mary Ross. The women were there to meet with Joyce Roesch, who was planning to move into another apartment, with Mary Ross. There were then between six and eight people present at the Rabatore apartment, including Little, who was arguing with someone over cigarettes. Brooks went outside and waited in her car for Ross and Roesch.

The three women ran a few errands, and then returned to the apartment later in the afternoon. Roesch had asked Little to get everyone out of the apartment, and the group moved into the parking lot, again arguing. After the others left, Brooks remained at the apartment with Roesch, Little and Rabatore. Some time after six in the evening, another argument began. Behaving in a belligerent manner, Little called Rabatore a "punk-ass bitch," picked up a glass object, and threw it at Rabatore.

At this point, Roesch told Little that she wanted him to leave. Little refused, and said that he was tired and was going to lie on the couch and try to sleep, which he did. Roesch then told Rabatore she wanted Little to leave, and asked her son to call a friend to help remove Little from the apartment. Rabatore called his friend, Israel Ackerman, and Ackerman agreed to come over if Rabatore would pick him up. Rabatore called again in a few minutes and said he would pick up Ackerman, but he never did. During both of the

2

telephone conversations with Rabatore, Ackerman could hear arguments going on in the background.

After Rabatore had called Ackerman, Roesch left the apartment, and only Brooks, Little and Rabatore remained. Before Roesch left, however, Little told her and Rabatore: "You don't want to cross me. If you want to do this, fine. We'll do it that way. But it will be a bloodbath. Because if you have your friends come over, then I'll call my brother Woods and the Martel brothers out in the Lakeside, and we'll make this into a riot, into a bloodbath. That's up to you." Little then began gathering his belongings and putting them into a backpack.

While Little was gathering his belongings, Rabatore went to the kitchen and got a steak knife, which he put in his pocket. Rabatore showed the steak knife to Brooks, who told him to get rid of it because it would only cause trouble. While Little was in the bathroom, Rabatore put the steak knife on a sewing machine cabinet in his mother's room. Rabatore and Brooks then sat down at the dining room table and had cocktails, while Little went rummaging from room to room in the apartment, looking for his possessions.

### B. The Stabbing of Rabatore

While Rabatore and Brooks were sitting at the dining room table, Little came into the dining room and made a threat about getting even with people who cross him. Little first picked up his backpack as if preparing to leave, but then he put the backpack down, picked up a glass figurine from a table, and threw the figurine at Rabatore. Brooks saw Rabatore lean back in his chair, attempting to deflect the thrown object with his hands. Little then stepped forward and struck at Rabatore, appearing to Brooks to attempt to punch Rabatore

3

in the face, but hitting him in the arm. At this point Rabatore yelled out "Oh, my God." As Rabatore leaned back in his chair, Brooks could see blood coming out of Rabatore's arm.

Little then, standing over Rabatore, plunged a wooden-handled steak knife directly into Rabatore's chest. Little then picked up his backpack, looked coldly at Brooks, and ran out of the apartment door. Rabatore screamed that he had been stabbed, stood up, took two steps, and then fell back onto a table and collapsed. Brooks, a registered nurse, called 911 and then tried to put pressure on Rabatore's wound. Rabatore stopped breathing, Brooks performed CPR upon him, and later Rabatore stopped breathing again and his heart stopped. Paramedics then arrived at the apartment, and they took Rabatore to the hospital. Rabatore was, however, pronounced dead 40 minutes later, after attempts to resuscitate him at the hospital were unsuccessful.

### C. The Autopsy of Rabatore

An autopsy revealed that the stab wound on Rabatore's arm was over two inches long and two and a half inches deep. The chest wound was about two and a half inches long, and about five inches deep. Little had pushed the knife through Rabatore's second and third ribs (cutting the third rib), through the right lobe of Rabatore's lung, through the pericardial sac, and on through the right atrium of Rabatore's heart, until the knife pierced Rabatore's aorta. The direction of the chest wound was from right to left, and slightly upward. Little had to have pushed the entire length of the knife blade into Rabatore's chest in order to reach as far as his aorta.

### D. Subsequent Events - Little at Donovan State Prison

The day after Rabatore's murder, police arrested Little. Although he had been wearing a mustache at the time he stabbed Rabatore, Little had shaved it off at the time of his arrest. That same day, a neighbor who lived across the street from Roesch and Rabatore found the knife used in the murder in his back yard. The knife was bent, and had Rabatore's blood upon it.

Little was sent to Donovan State Prison in July of 1999, where he was housed with an acquaintance, Robert Teal.[1] After Rabatore's murder, Teal got a message that Little wanted to see him. In Donovan, Teal asked Little why he sent the message. Little said he had stabbed someone and had wanted Teal to get him out of town. Over the next days, Little spoke at length with Teal and others about the murder.

Little explained to Teal that he had been staying with a woman and her son, Ed, and Ed, who was unhappy with Little's selling and possessing drugs, had been nagging Little to leave. Little said that just before the murder, there had been another argument, and after he gathered up his belongings, he went to the room where Ed and a woman were sitting, then went into the kitchen and got a knife, and went back to the room where Ed and the woman were, reached across the woman, and stabbed. Little told Teal that because the woman screamed, he thought he might have stabbed her, and so he stabbed again, this time striking

---

[1]      The testimony of Teal is the subject of Little's third assertion of error.

Ed in the chest. Little said he left and took the knife with him, discarding it where he thought it would not be found.

Little went on to point out to his audiences at Donovan, including Teal, there had been only one witness to the murder, and "if this broad would just get knocked off or just get taken out of here until this was over, I'd walk free." Little mentioned that Brooks was a nurse, and in many conversations referred to having "this bitch knocked off." Little was also forthcoming about his planned trial defense. He stated he had told the police that Rabatore had picked up an ashtray and attempted to hit Little with it, and that his stabbing of Little was a mere reflexive (self-defense) action. Little also admitted to Teal that this story upon which he planned to rely was wholly fabricated.[2]

### E. The Defense Case

Little testified and admitted prior convictions for receiving stolen property and possessing drugs for sale, but stated he had not tried to fabricate a defense and he never wanted Brooks to be "knocked off." Little told the jury he had been stabbed in the eye at an earlier time, which left him blind in that eye and "jumpy." Little went on to say that on June 15, 1999, everyone at the apartment but him had been using methamphetamine. Little testified that Rabatore used some methamphetamine and became hyperactive and aggressive. Little also said Rabatore called friends to come beat Little, and told Little he would be "wiped out by some guys." Little did not credit these statements, and so did not

---

2      Little also told Teal that although Rabatore had threatened to call someone to come over and help him get Little out of the apartment, he was never concerned that this might actually happen.

leave. Little claimed he realized Rabatore was serious when he heard Rabatore tell his mother to wait outside for his friends.

The core of Little's testimony was that after he had collected his belongings and prepared to leave, Rabatore had then told him not to go anywhere, picked up an ashtray and blocked Little's egress from the apartment. At this point, Little said, he picked up a knife from a table, and when Rabatore lunged at him with the ashtray, Little made two jabs with the knife and ran out the door. Little claimed at this point Rabatore was standing, and Little was unaware he had actually stabbed Rabatore until he was told so in prison. Little said he did not contact police because he had been unaware he had killed Rabatore, and he had not attempted to change his appearance. Little admitted, however, that he did not see Rabatore with a knife that evening.

### F. Rebuttal

A witness who had earlier corroborated Little's claim he had not been using drugs on the day of the murder also told police he believed Little was under the influence of drugs that day. The witness also told police that Little had been acting aggressively towards Rabatore that day, and this had made him so uncomfortable that he had left the apartment.

### PROCEDURAL BACKGROUND

By information filed December 14, 1999, the San Diego District Attorney accused Little of murder, in violation of Penal Code[3] section 187, subdivision (a). It was also alleged Little used a knife in the commission of the murder, as proscribed by section 12022,

---

3    Subsequent unattributed statutory citations are to this Code.

subdivision (b)(1), and had two prior prison terms, within the meaning of section 667.5, subdivision (b).

Jury trial on the murder and weapon use charges began April 25, 2000. On May 3, 2000, the jury found Little guilty of second degree murder and use of a deadly weapon. The court thereafter found the prior prison term allegations true.

On June 8, 2000, Little was sentenced to a term of 18 years to life in state prison. Timely notice of appeal was thereafter filed.

## STANDARD OF REVIEW

We review the assertions of instructional error under an independent review or de novo standard (*People v. Waidla* (2000) 22 Cal.4th 690, 733), but we review the court's determinations on admission of evidence for abuse of discretion only. (*Id.* at p. 724.)

## DISCUSSION

### I

### *FAILURE TO GIVE CALJIC NO. 3.37*

Little first argues it was error for the trial judge to have refused his request the jury be instructed pursuant to CALJIC No. 3.37, which provides: "The amount of knowledge a reasonable person with impaired physical faculties should possess under particular circumstances is the knowledge which a person of ordinary prudence with similarly impaired faculties would have under circumstances similar to those shown by the evidence." This principle, derived from tort law, had prior to 1994 only been cited in dicta in a criminal law context. (See, e.g., *People v. Castillo* (1987) 193 Cal.App.3d 119, 124, [physical disability can be considered in defining reasonable person standard].)

8

It has however been held, in a case involving criminal negligence, that failure to give such an instruction was prejudicial error. The instruction is derived from the single case of *People v. Mathews* (1994) 25 Cal.App.4th 89 (*Mathews*). In that case, involving a blind and hearing impaired man convicted of exhibiting a firearm in the presence of a peace officer, it was held that an instruction such as the one cited above should have been given on the point of whether the defendant should reasonably have known the persons entering his house were peace officers. (*Id.* at pp. 98-100.)[4] The precise holding of the court was that the above principle "may be utilized as a theory of defense to exhibiting a firearm in the presence of a peace officer. We give the handicapped defendant the benefit of the doubt as to the proper interpretation of the 'reasonably should know' requirement . . . ." (*Id.* at p. 99.)

In this case, counsel for Little requested the jury be instructed with CALJIC No. 3.37, and the judge found this requested instruction (and two related ones which were not requested, CALJIC Nos. 3.35 [concurrence of act and criminal negligence] and 3.36 [gross or criminal negligence defined]) to be "limited to the few offenses where criminal negligence and not intent is involved. And since that is not the element here, that simply is not appropriate. And I would deny [the defense request to instruct pursuant to] 3.37." Little now argues, as in *Mathews, supra,* 25 Cal.App.4th 89, this instruction should have been given. He urges the failure to give it was error "both with respect to the defense of self-defense and the determination whether the killing was murder or manslaughter."

---

4       *Mathews, supra,* 25 Cal.App.4th 89 has been cited only once, and then in the civil context of whether mental illness was a defense to a negligence action. (*Bashi v. Wodarz* (1996) 45 Cal.App.4th 1314, 1324.) No reported criminal cases have cited the point.

9

While we do not disagree with the general principle expressed, and the question is an interesting one on the abstract, because there is no possibility whatsoever that refusal of the instruction contributed to the verdict herein, we decline to hold, as a matter of law, either that we agree with *Mathews, supra,* 25 Cal.App.4th 89 or that the instruction was required in this case.

The rule is, as the trial court noted, borrowed from tort law, i.e., BAJI No. 3.36 (8th ed. 1994), and is, as the trial court noted, generally applicable to cases of criminal negligence, rather than intentional criminal acts. In this case, because the question of reasonableness is an element of a *defense* to the charges, rather than an element of the charged *offense* itself, as was the case in *Mathews, supra,* 25 Cal.App.4th 89, it is not at all clear the giving of the requested instruction was required.

One reason for rejecting the instruction immediately appears and that is the jury was effectively given the substance of the proposed point under other instructions. As to self-defense, the jury in this case was told, pursuant to CALJIC No. 5.12, that for self-defense to obtain, "the circumstances must be such as would excite the fears of a reasonable person *placed in a similar position . . . .*"[5] The "similar position" Little occupied was that of a man blind in one eye, as his counsel argued to the jury. The fact that Little's physical impediment was sufficiently set out by this instruction militates against the possibility of

---

5    See also CALJIC No. 5.13, read to the jury, providing that for self-defense "[a] person may act on appearances whether the danger is real or merely apparent." In this case, the question to be resolved was what could have been "apparent" to Little, necessarily including accounting for his physical impediment.

any prejudice, even assuming error, as to the trial judge's refusing to instruct pursuant to CALJIC No. 3.37.

Further, as the People point out and counsel for Little discusses, the jury was also told, pursuant to CALJIC No. 5.17, concerning an actual, although unreasonable, belief in the need for self-defense, that an actual belief in the need for self-defense would rebut malice, and thus preclude conviction of murder, even though "a reasonable person *in the same situation seeing and knowing the same facts* would not have had the same belief."

That is, with respect to this defense, the jury was told to evaluate it from Little's situation, which was that of a man who was blind in one eye. An "imminent peril" was further defined in this instruction as one that would "so *appear at the time to the slayer*," again referring the jury to Little's situation, which necessarily includes, as his counsel properly argued, his physical impediments, as a standard for evaluating his conduct in determining whether it were murder or manslaughter.

From the verdicts, it is quite clear the jury was repeatedly told to consider the case from (literally) how it appeared to Little, that is, through one eye alone. The point was repeatedly made, and it can thus be argued that the giving of CALJIC No. 3.37, on the particular facts of this case, might constitute an impermissible emphasis[6] of a matter whose factual underpinning (that is, in either point he argues, there is a requirement that there be an

---

6    That is, CALJIC No. 3.37 may be viewed, on this record, as an impermissible "pinpoint" instruction. (See, e.g., *People v. Garceau* (1993) 6 Cal.4th 140, 192.)

honest belief in the need for self-defense, a point which must be gotten through before "reasonableness" of any kind is required) is so largely in question.

In another part of this opinion, we reject the assertion that the informant's testimony of his conversations with Little, to the effect that Little admitted he had felt no need whatsoever for self-defense that night, but had given that story to the police so as to preserve a defense, was improperly admitted. That properly admitted testimony, which fully corroborates that of the surviving percipient witness apart from Little, fully supports the jury's necessary finding that, in this case, Little acted not out of fear, but of anger, and the offense thus was not any kind of manslaughter, but murder. This amply supported conclusion of the jury precludes any possibility that Little can have been prejudiced by the trial court's refusal to instruct pursuant to CALJIC No. 3.37.

Because there can have been no prejudice in this case, where there clearly was no *actual* belief in the need for self-defense, to reach and determine the question of whether or not further jury instruction was required on reasonableness would be sheer dicta, and without relevance to the result.[7] For all of the above reasons, no prejudicial error in the court's refusing to give CALJIC 3.37 occurred, and we reject the contrary assertion.

---

[7]    On the facts before us, the only relevance of Little's impaired vision was that he did not inflict fatal damage with his first blow, and was able to perceive well enough to try again, this time using the full length of the knife blade to sever the aorta. This sort of "manner of killing" (inflicting a wound likely to be fatal) has been held appropriately to support a verdict of first degree murder. (See, e.g., *People v. Welch* (1999) 20 Cal.4th 701, 759; and *People v. Thomas* (1992) 2 Cal.4th 489, 518.) That the jury returned a verdict of second degree murder in this case is thus another reason this should not be found to be a matter in which Little suffered prejudice.

12

II

*INSTRUCTION ON INTENT TO KILL AS ELEMENT OF MANSLAUGHTER*

As relevant here, the trial court gave the jury the then-standard instruction on the elements of voluntary manslaughter (CALJIC No. 8.40): "Every person who unlawfully kills another human being without malice aforethought but with an intent to kill, is guilty of voluntary manslaughter in violation of Penal Code section 192, subdivision (a). [¶] There is no malice aforethought if the killing occurred in the honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury. [¶] In order to prove such crime, each of the following elements must be proved: [¶] 1. A human being was killed, [¶] 2. The killing was unlawful, and [¶] 3. *The killing was done with the intent to kill.* [¶] A killing is unlawful, if it was neither justifiable nor excusable." (Italics added.)

Little argues that the jury instruction was improper because intent to kill, as our Supreme Court has held after the trial of this cause, is not (despite numerous previous opinions suggesting the contrary) a necessary element of voluntary manslaughter. He is of course correct, but the now-discerned error was not prejudicial to Little.

Precisely one month after the jury began deliberations in this case, our Supreme Court held that apart from the traditional legal rule ("[w]hen a killer intentionally but unlawfully kills in a sudden quarrel or heat of passion, the killer lacks malice and is guilty only of voluntary manslaughter") it was also a correct principle of law "that this is also true of a killer who, acting with conscious disregard for life and knowing that the conduct endangers the life of another, *unintentionally* but unlawfully kills in a sudden quarrel or heat of passion." (*People v. Lasko* (2000) 23 Cal.4th 101, 104 (italics added); see also *People v.*

13

*Blakeley* (2000) 23 Cal.4th 82.)  The jury instructions in this case, of course, did not conform to the cited holdings.

Here, in addition to erroneous instruction to the jury that voluntary manslaughter requires an intent to kill, the court gave CALJIC No. 8.50, a standard instruction explaining the difference between murder and manslaughter.  This instruction stated in part:  "When the act causing the death, though unlawful, is done in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury the offense is manslaughter.  In that case, even if an intent to kill exists, the law is that malice, which is an essential element of murder, is absent.  [¶] To establish that a killing is murder and not manslaughter, the burden is on the prosecution to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done in the actual even though unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury."  Thus, the jury was told that regardless of whether killing Rabatore was intentional or unintentional, Little could not be convicted of murder unless the prosecution proved that, at the time of the killing, Little did not actually believe he was acting in self-defense.  (See *People v. Lasko*, *supra*, 23 Cal.4th at pp. 111-112.)

As the People note, if the jury believed Little unintentionally killed Rabatore in an honest belief he was in peril, it would have concluded it could not convict him of murder because he killed in self-defense, and also could not convict him of voluntary manslaughter, because he lacked the intent to kill.  A jury thus situated would have convicted Little only of involuntary manslaughter, a lesser offense included in the crime of murder, on which the

14

jury was also instructed. Instead, the jury convicted Little of second degree murder, thus

demonstrating it did not believe the killing was committed in self-defense.

The further observations of the *Lasko* court, in a case whose operative facts are quite

congruent to the present ones, are also of relevance in this case:

> "Moreover, the evidence strongly suggested an intent to kill. [The
> manner of killing, there a baseball bat to the head, here a knife to the
> heart, supports intent to kill.] There was also evidence that defendant
> had threatened to kill [the victim] [immediately] before the killing.
> Furthermore, defendant's actions after striking the fatal blow were not
> those of an unintentional killer: he did not call an ambulance [and] he
> tried to obscure evidence of the killing . . . Given the strength of the
> evidence indicating that the killing was not only intentional but
> premeditated, defendant could have been, but was not, convicted of
> first degree murder. Instead, the jury found him guilty of second
> degree murder. Under the circumstances, it is not reasonably probable
> that a properly instructed jury would have convicted defendant of the
> lesser offense of voluntary manslaughter. [Citation.]" (*People v.
> Lasko, supra,* 23 Cal.4th at pp. 112-113.)

Because the jury clearly found, under proper instructions, that the killing was not

done in self-defense, and because the evidence strongly supports an intentional killing, there

is under the standard of review just set forth no reasonable probability Little was prejudiced

by the instructional error in this case. As we observed with respect to Little's first

assignment of error, and as the *Lasko* court noted with respect to its facts, the "defendant

could have been, but was not, convicted of first degree murder."

The jury's finding Little guilty of second degree murder precludes the possibility of

prejudicial error having occurred by reason of the trial judge's having instructed the jury

pursuant to a now-incorrect manslaughter instruction. As we have noted, all of the evidence

in this case (apart from Little's fabricated claim of having been attacked by Rabatore and

15

thus, he asserts, having killed Rabatore because of a perceived need for self-defense) overwhelmingly demonstrates Little's intent to kill, and the jury necessarily found such to exist. This conclusion of the jury, amply supported by the evidence which was received at the trial, rebuts any claim of prejudicial error

III

*ADMISSION OF THE INFORMANT'S TESTIMONY*

Little last argues the court failed to exercise its discretion pursuant to Evidence Code section 352[8] when it determined to admit the testimony of Robert Teal on the subject of various admissions made by Little at Donovan. We cannot agree.

Before admitting this evidence, the trial judge held a hearing during which he considered and resolved various of the parties' written motions. Among the questions addressed was Little's motion to exclude the testimony of Robert Teal, characterized by counsel for Little as a "jailhouse informer." Little moved to preclude the testimony on grounds it was (1) inherently unreliable and (2) unduly prejudicial.

At the pretrial hearing, on the point of unreliability, counsel for Little represented he had been told by Teal he had only contacted the district attorney's office in order to divert attention from his son, who (for no reason ever made clear) was assertedly being questioned by the district attorney's office about the Rabatore homicide. The district attorney who had

---

[8]     Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

been handling the case from the beginning denied any such matter had ever taken place. The district attorney further stated he had provided no benefits to Teal, that Teal knew details of the homicide known only to Little and Brooks, and Teal had no connection to Brooks. Based on these matters, the court tentatively rejected the assertion Teal's testimony was inherently unreliable, and ruled Teal would be examined by both counsel out of the presence of the jury before he testified. Counsel for Teal never mentioned the question of undue prejudice.[9]

Prior to having Teal testify before the jury, he was examined out of the jury's presence. The trial judge found that Teal's testimony was not unreliable because "I don't see any coercion there. If he wants to testify, he should testify."

Little now argues the trial judge erred in not setting out reasons for admitting the testimony as to the Evidence Code section 352 argument, cited in papers but never raised in court by counsel. Little argues that because "the record is devoid of any indication the trial court fulfilled its responsibility to weigh the probative value of Teal's testimony against its prejudicial effect," we must reverse.

First, we doubt whether the mere citation of the code section in moving papers with no mention of it thereafter in court is adequate to preserve the issue for appellate review. (See, e.g., Evid. Code, § 353, requiring in pertinent part that "[a] verdict or finding shall not be set aside . . . by reason of erroneous admission of evidence unless . . . there appears of

---

[9]    At other points in the pretrial hearings, counsel for Little demonstrated his ability to argue the "undue prejudice versus probative value" question when necessary.

17

record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection . . . .") Second, even were the point preserved for review, Little's assertion of error-by-silence is not well taken, as the law is clearly to the contrary. (*People v. Waidla, supra*, 22 Cal.4th at p. 724, fn. 6.) The fact the trial judge ruled that Teal's testimony was to be admissible is satisfactory evidence of his finding on the issue now raised.

Given the care with which the judge treated the evidence, we see no abuse of discretion in the trial judge's necessarily implied conclusion that the probative value of Teal's testimony was not substantially outweighed by the danger of undue prejudice. The evidence of Little's statements was not inflammatory, and there was no risk of confusion. Furthermore, the statements were not remote nor did evidence about these statements consume much time at trial. The statements were also highly probative. Accordingly, admission of the evidence of the statements made by Little to Teal and others was not an abuse of discretion.

As has been often noted, we will not overturn or disturb a trial court's exercise of its discretion under Evidence Code section 352 in the absence of manifest abuse, upon a finding that its decision was palpably arbitrary, capricious and patently absurd. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.) No such manifest abuse of discretion, or indeed any abuse at all, appears in this case.

18

## DISPOSITION

The judgment is affirmed.

_____
HUFFMAN, Acting P. J.

WE CONCUR:

_____
HALLER, J.

_____
McDONALD, J.

19

APPENDIX No. 1

# E X H I B I T    E

# SUPERIOR COURT OF CALIFORNIA
## EAST COUNTY DISTRICT
## COUNTY OF SAN DIEGO

DATE: August 26, 2004                 DEPT: 9      Reporter: K. Langgle, CSR#8637

PRESENT HON. LOUIS R. HANOIAN
                    JUDGE

CLERK: V. Pendleton

BAILIFF: B. Randall

REPORTER'S ADDRESS: P.O. BOX 128
SAN DIEGO, CA 92112-4104

---

| EHC388<br>SCE198946 | People of the State of California,<br>(Respondent) | Plaintiff | by Patricia Mallen |
| | VS<br>LARRY LITTLE, JR.<br>(Petitioner) | Defendant | by Al Williams, PCC |

At 2:04pm case is called for continuing **OSC HEARING RE WRIT OF HABEAS CORPUS** having been trailed from August 25, 2004.  Petitioner is personally present, in custody, with court appointed counsel Al Williams.  Respondent is present by Deputy District Attorney Patricia Mallen.

The Court makes the following findings:

Relief cannot be granted for ineffective assistance of Appellate counsel as no evidence was presented on this issue.

Court finds no convincing or believeable factual support for the following allegations regarding ineffective assistance of trial counsel: (1) trial counsel failed to investigate facts of case; (2) Failed to interview witnesses; (3) failed to develop the environment of a drug house to support imperfect self defense; (4) counsel failed to interview and call the victim's mother as a witness; (5) counsel promised to call certain witnesses at trial and reneged; and (6) counsel tried to hide his lack of preparation by coercing a plea. Relief cannot be granted on the basis of those allegations.

As to the issue of ineffective assistance of counsel for failure to request involuntary manslaughter instruction, Court finds that trial counsel's decision that the instruction was not warranted did not fall below the level of a reasonably competent attorney defending his client and was not prejudicial to the defendant.

As to the issue of ineffective assistance of counsel for failure to have defendant evaluated for post traumatic stress disorder (PTSD), Court finds that a reasonably competent attorney would have had defendant evaluated and explored any relationship of PTSD to this case, but that the failure was not prejudicial to the defendant as PTSD does not fit the facts of this case.

MISCELLANEOUS & TRIAL MINUTES
(CONTINUED ON REVERSE – THIS DATE ONLY)

SUPCT 13


EXHIBIT

tion for writ of habeas corpus is denied.  Defendant is remanded to the custody of the Department of Corrections to continue serving sentence imposed on June 8, 2000.

Court's exhibit #1 remains in the custody of the clerk and is placed in the court's vault.

At 2:20pm court is in recess in this matter.

vjp

EL CAJON, CALIFORNIA, AUGUST 26, 2004, 1:30 P.M.

--000--

THE COURT:  THIS IS IN RE: LARRY JOHN LITTLE

JUNIOR ON A HABEAS CORPUS, EHC388.  THE RECORD WILL

REFLECT THE PRESENCE OF MR. LITTLE, WITH COUNSEL, THE

DISTRICT ATTORNEY IS PRESENT.

AT THIS TIME, I'M GOING TO BE BASICALLY

ANNOUNCING THE COURT'S RULING WITH REGARD TO THE PETITION

FOR WRIT OF HABEAS CORPUS.  PRIOR TO -- TO THIS TIME, THE

COURT HAS FAMILIARIZED ITSELF WITH THE HISTORY OF THE

CASE, I HAVE READ THE CASE FILE IN THIS CASE, I HAVE READ

THE CASE FILE IN THE UNDERLYING TRIAL.  I HAVE READ THE

PETITION AND THE EXHIBITS THAT WERE ATTACHED TO THE

PETITION.

I'VE READ THE RETURN, AND I HAVE COMPLETED

READING THE -- THE EXHIBITS THAT WERE ATTACHED TO THE

RETURN AND ALL OTHER TRANSCRIPTS AND DOCUMENTS THAT WERE

LODGED IN CONNECTION WITH THE -- WITH THE HABEAS CORPUS

HEARING.  I'VE READ THE REPLY THAT WAS FILED BY

MR. WILLIAMS, I HAVE READ THE COURT OF APPEAL OPINION IN

THE CASE.  I HAVE READ ALL OF THE -- ALL OF THE PLEADINGS

THAT WERE HERE TO -- THAT WERE HERE TO READ.

THE SUPERIOR COURT ISSUED A ORDER TO SHOW

CAUSE ON THE 19TH OF FEBRUARY, 2003, TO ALLOW THE PEOPLE

TO SHOW CAUSE WHY RELIEF SHOULD NOT BE GRANTED.  A -- A

RETURN WAS FILED ON THE 18TH OF JUNE OF 2003.  A DENIAL

WAS THEREAFTER FILED ON THE 18TH OF NOVEMBER OF 2003.  AND

ON DECEMBER 11TH OF 2003, AN EVIDENTIARY HEARING WAS

**EXHIBIT**

1    ORDERED TO DETERMINE IF PETITIONER WAS ENTITLED TO RELIEF

2    ON THE CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL.

3            INITIALLY, THE PETITION CONTAINED SEVERAL

4    CLAIMS THAT WERE NOT INEFFECTIVE ASSISTANCE OF COUNSEL.

5    AT THE TIME, THE COURT ENTERED ITS ORDER TO SHOW CAUSE.

6    IT DENIED ALL CLAIMS THAT WERE NOT INEFFECTIVE ASSISTANCE

7    OF COUNSEL.  WE'VE HELD AN EVIDENTIARY HEARING IN THIS

8    DEPARTMENT STARTING ON TUESDAY, WE TOOK EVIDENCE ON

9    TUESDAY AND WEDNESDAY.  THE COURT HEARD ARGUMENT

10   YESTERDAY, WEDNESDAY, AND I HAVE CONSIDERED ALL OF THE

11   EVIDENCE, ALL OF THE ARGUMENT AND ALL OF THE PLEADINGS

12   PRIOR TO MAKING THE DECISION AT THIS TIME.

13            I WANT TO THANK COUNSEL FOR THEIR

14   SUBMISSIONS AND THEIR REPRESENTATION IN THIS CASE.  IT IS

15   A GREAT DEAL OF HELP TO THE COURT WHEN THEY HAVE COUNSEL

16   THAT ARE PROVIDING REAL ASSISTANCE, AND THIS CASE WAS

17   NOT -- WAS NOT A PARTICULARLY EASY CASE, BUT I GUESS ANY

18   TIME THERE IS AN ORDER TO SHOW CAUSE ISSUED, THAT THERE IS

19   SOMETHING THAT NEEDS TO BE LITIGATED.

20            AS TO THE PETITIONER'S CLAIM OF INEFFECTIVE

21   ASSISTANCE OF COUNSEL, IT ENCOMPASSED A NUMBER OF ISSUES,

22   MOST OF WHICH WERE NOT DEVELOPED AT THE EVIDENTIARY

23   HEARING.  AS FAR AS THERE WAS A CLAIM OF INEFFECTIVE

24   ASSISTANCE OF APPELLATE COUNSEL; THERE WAS NOTHING THAT

25   WAS PRESENTED AT THE EVIDENTIARY HEARING THAT RELATES TO

26   INEFFECTIVE ASSISTANCE BY APPELLATE COUNSEL.

27   CONSEQUENTLY, RELIEF CANNOT BE GRANTED ON THE BASIS OF

28   THOSE ALLEGATIONS.

1          ALSO, THERE WERE A NUMBER OF CLAIMS

2     RELATING TO TRIAL COUNSEL, WHEREIN PETITIONER ALLEGED THAT

3     COUNSEL FAILED TO INVESTIGATE THE FACTS OF THE CASE.

4     NUMBER TWO, COUNSEL FAILED TO INTERVIEW CERTAIN WITNESSES.

5     NUMBER THREE, COUNSEL FAILED TO DEVELOP THE ENVIRONMENT OF

6     A DRUG HOUSE TO SUPPORT ONE OF THE DEFENSES.  FOUR, THAT

7     COUNSEL FAILED TO INTERVIEW AND CALL THE VICTIMS'S MOTHER

8     AS A WITNESS.  FIVE, COUNSEL PROMISED TO CALL CERTAIN

9     WITNESSES AT TRIAL AND RENIGGED ON THE PROMISE.  SIX,

10    TRIAL COUNSEL TRIED TO HIDE HIS LACK OF PREPARATION BY --

11    IN THE PLEA.

12          AS TO EACH ONE OF THOSE CLAIMS THAT I JUST

13    NAMED, THERE IS NO FACTUAL SUPPORT FOR ANY OF THOSE

14    ALLEGATIONS; AT LEAST NO FACTUAL SUPPORT THAT I FIND TO BE

15    CONVINCING OR BELIEVABLE.  AND CONSEQUENTLY, THE RELIEF

16    WILL NOT BE GRANTED AND CANNOT BE GRANTED ON THE BASIS OF

17    THOSE ALLEGATIONS, WHICH LEADS US TO WHAT THIS HEARING WAS

18    ALL ABOUT.  THAT IS THE TWO CLAIMS OF INEFFECTIVE

19    ASSISTANCE OF COUNSEL; ONE OF WHICH RELATES TO THE FAILURE

20    OF DEFENSE COUNSEL TO REQUEST AN INSTRUCTION ON

21    INVOLUNTARY MANSLAUGHTER.  IN PARTICULAR, INSTRUCTION

22    NUMBER 8.45, 8.46 ON THE CALJIC INSTRUCTIONS THAT WERE

23    OF -- THAT WERE IN EXISTENCE AT THE TIME.

24          THE SECOND ISSUE IS WHETHER OR NOT COUNSEL

25    WAS INEFFECTIVE BECAUSE HE FAILED TO CONSULT WITH AN

26    EXPERT ON POSTTRAUMATIC STRESS DISORDER, OR FAILED TO HAVE

27    THE DEFENDANT EXAMINED BY AN EXPERT RELATING TO

28    POSTTRAUMATIC STRESS DISORDER, AND THEREBY WITHDREW A

1    POTENTIAL AND MERITORIOUS DEFENSE.  NOW, THOSE CLAIMS WERE

2    LEGITIMATE CLAIMS THAT WERE MADE BY THE -- BY THE

3    PETITIONER.  AND WE TOOK EVIDENCE ON IT AND THE -- THE

4    VAST MAJORITY OF THE EVIDENCE RELATED DIRECTLY TO THOSE

5    CLAIMS.

6                IN CONNECTION WITH THE FAILURE TO HAVE THE

7    DEFENDANT EXAMINED, WE HEARD FROM AN EXPERT, DR. ABRAMS, A

8    VERY QUALIFIED PSYCHIATRIST IN THE FIELD, WHO ALSO HAPPENS

9    TO HAVE A LAW DEGREE AND A LICENSE TO PRACTICE LAW.  AND

10   FOR HIS UNIQUE PERSPECTIVE ON DEFENDANT'S -- DEFENSE

11   COUNSEL'S PERFORMANCE AND DEFENSE COUNSEL'S DECISION NOT

12   TO GO FORWARD WITH A PTSD-TYPE OF DEFENSE, BUT I'M GOING

13   TO DEAL WITH THAT SECOND.  I'M GOING TO DEAL FIRST OF ALL

14   WITH THE FAILURE TO GIVE THE INVOLUNTARY MANSLAUGHTER

15   INSTRUCTION, OR FAILURE TO REQUEST IT.

16               FIRST, FROM THE TESTIMONY HERE AT THE

17   EVIDENTIARY HEARING, IT'S EVIDENT THAT INVOLUNTARY

18   MANSLAUGHTER INSTRUCTION WAS CONSIDERED.  MR. PECKHAM SAID

19   THAT HE THOUGHT ABOUT INVOLUNTARY MANSLAUGHTER, IT WAS --

20   IT CAME UP IN THE INSTRUCTION, IN THE CHAMBERS CONFERENCE.

21   IT WAS NOT ULTIMATELY REQUESTED BECAUSE, IN MR. PECKHAM'S

22   OPINION, THE INSTRUCTION WAS NOT WARRANTED BY THE EVIDENCE

23   IN THE CASE.  AND HAVING REVIEWED THE -- AND SO THE

24   QUESTION BECOMES WHETHER OR NOT THAT DECISION NOT TO

25   REQUEST IT FALLS BELOW THE STANDARD OF A REASONABLY

26   COMPETENT ATTORNEY REPRESENTING HIS CLIENT.  I FIND IT

27   DOES NOT.

28               IT WAS A DECISION THAT WAS MADE WITH

1    KNOWLEDGE OF THE STATE OF THE LAW AT THE TIME, WITH

2    KNOWLEDGE OF WHAT THE INSTRUCTION CALLED FOR AT THE TIME,

3    AND THE PARTICULAR INSTRUCTION CALJIC 8.45, BASED UPON THE

4    FACTS OF THAT CASE, I THINK MR. PECKHAM'S DECISION THAT HE

5    WOULD NOT ASK FOR IT, BECAUSE HE DID NOT BELIEVE IT WOULD

6    APPLY WAS A CORRECT DECISION.  BUT MOREOVER, HE DIDN'T

7    JUST STOP TO -- STOP THINKING THAT THE QUESTION WHETHER OR

8    NOT IT WAS A CORRECT STATEMENT OF LAW, BUT WHETHER OR NOT

9    IT MIGHT HAVE SOME IMPACT THAT COULD BE NEGATIVE ON THOSE

10   DEFENSES THAT HE WAS GOING TO BE PRESENTING TO THE JURY.

11              AND THAT DURING THE TRIAL, AND I BELIEVE

12   WHAT HE SAID WAS THAT IT WOULD -- IT WOULD HAVE CREATED

13   A -- ANOTHER LEVEL OF LIABILITY OR CULPABILITY FOR THE

14   DEFENDANT, BUT IF HE CURED THE DAY WITH THE THEORY THAT HE

15   WANTED, THE DEFENDANT WOULD HAVE BEEN FOUND NOT GUILTY OF

16   EVERYTHING AND WALKED OUT THE DOOR.  IT WAS THE

17   SELF-DEFENSE, THE ACTUAL SELF-DEFENSE WAS THE STRONGEST

18   DEFENSE THAT HE HAD, AND AN INVOLUNTARY MANSLAUGHTER

19   INSTRUCTION DOESN'T ASSIST THAT AT ALL.

20              IT MAY CONFUSE THE ISSUES, AND

21   CONSEQUENTLY, I DON'T BELIEVE IT WAS BELOW THE STANDARD TO

22   NOT REQUEST IT, EVEN IF IT WAS A MISTAKE THAT FELL BELOW

23   THE STANDARD FOR HIM NOT TO REQUEST 8.45.  THERE IS NO

24   PREJUDICE TO THE DEFENDANT BECAUSE, NUMBER ONE, THE TRIAL

25   JUDGE WOULD HAVE GIVEN IT.  NUMBER TWO, IF IT WAS AN

26   APPROPRIATE INSTRUCTION UNDER THE FACTS OF THE CASE, THE

27   TRIAL JUDGE HAD A SUA SPONTE DUTY TO GIVE THAT

28   INSTRUCTION, WHICH HE DID NOT.  AND THIRDLY, IN TERMS OF

1   NO PREJUDICE, THE FACT THAT THE JURY RETURNED A VERDICT

2   FOR SECOND DEGREE MURDER MEANS THAT THEY NEVER WOULD HAVE

3   GOT TO THE QUESTION OF WHETHER OR NOT HE'S GUILTY OR NOT

4   GUILTY OF INVOLUNTARY MANSLAUGHTER.  BECAUSE TO MAKE A

5   DECISION ON THAT WOULD HAVE REQUIRED THEM TO HAVE FOUND

6   THE DEFENDANT NOT GUILTY OF SECOND DEGREE MURDER.  AND

7   BASED ON WHAT WAS STATED IN TERMS OF THE FACTS AS NOTED IN

8   THE COURT OF APPEAL OPINION, I DON'T THINK THERE IS ANY

9   QUESTION ABOUT THE FACT THAT THE -- THERE WAS EXTREMELY

10  STRONG EVIDENCE THAT WAS PRESENTED TO THE JURY ABOUT

11  INTENT TO KILL.  AND THAT THE -- THE THRUST THAT WERE DONE

12  IN THIS PARTICULAR CASE WERE IN FACT AN INTENT TO KILL.

13  AND AN INVOLUNTARY MANSLAUGHTER INSTRUCTION WOULD HAVE

14  BEEN OF NO BENEFIT.  SO RELIEF IS NOT GRANTED AS TO THAT

15  ISSUE.

16            NOW, THE QUESTION THAT REMAINS IS PTSD,

17  POSTTRAUMATIC STRESS DISORDER.  AND THERE IS NO QUESTION

18  THAT MR. PECKHAM DID NOT GET AN EXPERT TO EVALUATE

19  MR. LITTLE FOR POSTTRAUMATIC STRESS DISORDER.  MR. PECKHAM

20  WAS AWARE OF POSTTRAUMATIC STRESS DISORDER.  MR. PECKHAM

21  TESTIFIED THAT HE BELIEVED THAT THE DEFENDANT, MR. LITTLE,

22  SUFFERED FROM POSTTRAUMATIC STRESS DISORDER.  AND KNOWING

23  THOSE TWO THINGS, HE STILL DIDN'T GO OUT AND GET AN

24  EVALUATION, CONSULT WITH A PSYCHIATRIC PROFESSIONAL ABOUT

25  POSTTRAUMATIC STRESS DISORDER.

26            NOW THE QUESTION, FIRST QUESTION, OF

27  COURSE, IS WHETHER OR NOT THAT FAILURE DEMONSTRATES A -- A

28  LACK OF DILIGENCE, SUCH THAT WOULD SHOW REPRESENTATION

1    BELOW THE STANDARD.  THAT IS A CLOSE CALL.  ON THE ONE

2    HAND, IT IS VERY CLEAR TO THE COURT THAT MR. PECKHAM

3    CONSIDERED POSTTRAUMATIC STRESS DISORDER.  HE HAD A PRETTY

4    GOOD WORKING IDEA OF WHAT IT WAS.  AND COMPARING HIS

5    THOUGHT PROCESS WITH THE DESCRIPTION OF THE DISORDER BY

6    DR. ABRAMS, YOU KNOW, I'M SURE THAT MR. PECKHAM UNDERSTOOD

7    WHAT IT WAS.  WHETHER OR NOT HE'S CAPABLE OF DIAGNOSING IT

8    OR KNOWING WHAT TRIGGERS IT, AND KNOWING ALL THE DETAILS

9    ABOUT IT, I DON'T BELIEVE HE DID.

10              AND I THINK THAT HE -- I KNOW HE WOULD HAVE

11   BENEFITED FROM AN EXAMINATION OF THE DEFENDANT AND A

12   CONSULTATION WITH THE EXPERT ABOUT POSTTRAUMATIC STRESS

13   DISORDER.  WHETHER OR NOT THE DEFENDANT SUFFERS FROM IT

14   AND WHETHER OR NOT IT HAS ANY APPLICATION TO THE CASE, HE

15   MADE A DECISION NOT TO -- NOT TO SEEK THE -- NOT TO SEEK

16   THE EXAMINATION.  THAT COULD BE DESCRIBED AS A TACTICAL

17   DECISION OR STRATEGIC DECISION, BECAUSE HE KNEW ABOUT

18   THE -- THE POSSIBLE CONDITION, AND HE KNEW IT MIGHT HAVE

19   SOMEWHAT OF AN IMPACT ON THE CASE.  BUT I -- I CAN'T, FOR

20   THE LIFE OF ME, THINK OF A GOOD REASON NOT TO CONFIRM HIS

21   SUSPICIONS AND CONSULT WITH AN EXPERT TO SEE WHETHER OR

22   NOT HE -- TO CONFIRM THAT HE'S RIGHT, THAT THE -- THERE IS

23   NOTHING TO BE GAINED FROM A DIAGNOSIS OF POSTTRAUMATIC

24   STRESS DISORDER.  SO I THINK THAT A -- A REASONABLY

25   COMPETENT ATTORNEY WOULD HAVE GOTTEN AN EXAMINATION, WOULD

26   HAVE SOUGHT AN EXAMINATION, WHICH SATISFIES PRONG NUMBER

27   1.

28              PRONG NUMBER 2 IS A DIFFERENT STORY.  AND

1    THAT IS WHETHER OR NOT -- WELL, I GUESS THE ISSUE CAN BE

2    COUCHED IN A COUPLE OF DIFFERENT WAYS; ONE OF WHICH IS TO

3    GIVE A EXAMINATION AND DIAGNOSIS.  OKAY, SO WE HAVE A

4    DIAGNOSIS.  IF HE HAD THE DIAGNOSIS BEFORE, AND ACCORDING

5    TO MR. PECKHAM HE DIDN'T BELIEVE THE FACTS OF THE CASE

6    SUPPORTED A DEFENSE THAT WAS BASED ON POSTTRAUMATIC STRESS

7    DISORDER, SO THAT -- THAT'S THE REASON WHY HE DIDN'T SEEK

8    THE EXAMINATION.  HE WAS LACKING FOR THOSE THINGS.  HE

9    DIDN'T FIND THEM.  AND HE ASKED THE DEFENDANT SPECIFICALLY

10   AND REPEATEDLY ABOUT THAT PARTICULAR TOPIC, AND I BELIEVE

11   HE WAS SINCERE IN HIS WISH AND DESIRE THAT THE DEFENDANT

12   PROVIDE A DESCRIPTION OF THE EVENTS THAT WOULD SUPPORT

13   THAT PARTICULAR DEFENSE, BUT HE WAS NOT GOING TO PUT THE

14   WORDS IN THE DEFENDANT'S MOUTH.

15              AND -- AND IN HIS OPINION, NOTHING THAT WAS

16   SAID BY THE DEFENDANT WOULD HAVE BEEN USEFUL IN DEVELOPING

17   A DEFENSE BASED UPON PTSD.  SO AT THAT POINT, THEN, IF --

18   IF THE ISSUE IS COUCHED AS THE FAILURE TO GET AN

19   EXAMINATION, IT DOESN'T MEAN -- IT DOESN'T MAKE A

20   DIFFERENCE; THERE IS NO PREJUDICE, BECAUSE EVEN IF THERE

21   HAD BEEN AN EXAMINATION, IT WOULDN'T HAVE BEEN USED

22   BECAUSE IT DIDN'T FIT FACTUALLY, AND THAT WAS A STRATEGIC

23   CHOICE THAT WAS MADE.  MAYBE THE -- MAYBE THE BETTER

24   QUESTION IS WHETHER OR NOT THE FAILURE TO ACTUALLY PRESENT

25   THAT AS A DEFENSE IN SOME WAY PREJUDICED THE DEFENDANT.

26   SO IT'S NOT JUST THE -- HE FAILED TO GET THE EXAMINATION,

27   BUT HE FAILED TO USE THE RESULTS OF THE EXAMINATION TO THE

28   BENEFIT OF THE DEFENDANT.

1           NOW, THAT PRESUPPOSES A COUPLE OF THINGS,

2     ONE OF WHICH THE DIAGNOSIS WOULD HAVE COME IN WITH PTSD.

3     DR. ABRAMS THOUGHT IT WOULD.  MR. PECKHAM WAS CERTAIN THAT

4     IT WOULD, BUT IT'S MR. PECKHAM, NOT DR. PECKHAM.  SO HIS

5     DIAGNOSIS, IT DOESN'T CARRY ANY MORE WEIGHT THAN THE

6     DOCTOR'S DOES, BUT I'M GOING TO ASSUME FOR PURPOSES OF

7     THIS PARTICULAR ISSUE THAT THE -- THE -- AN EXAMINATION

8     WOULD HAVE SHOWN THAT THE DEFENDANT SUFFERED FROM PTSD.

9           SO THEN HAVING SUFFERED FROM PTSD, WAS IT

10    INEFFECTIVE ASSISTANCE OF COUNSEL TO PRESENT A DEFENSE

11    BASED UPON THAT FINDING?  AND THAT IS WHERE I FIND THERE

12    WAS NO PREJUDICE TO THE DEFENDANT, BECAUSE PTSD, AS

13    MR. PECKHAM TESTIFIED, AND AS THE DESCRIPTION OF THE

14    OFFENSE, WAS LAID OUT IN THE -- AT THE TRIAL AND LAID OUT

15    BY THE COURT OF APPEAL.  AND EVERYTHING THAT I -- THAT

16    I'VE LEARNED IN CONNECTION WITH THE EVIDENTIARY HEARING,

17    PTSD WOULD NOT HAVE ASSISTED THE DEFENDANT, DID NOT

18    PRODUCE PREJUDICE, ACCORDING TO *STRICKLAND*, AND THAT'S THE

19    BOTTOM LINE HERE.  AND THAT'S THE BOTTOM LINE HERE,

20    WHETHER OR NOT IT WAS PREJUDICIAL AND IT WAS NOT.

21          AND IT WAS NOT BECAUSE OF A NUMBER OF

22    REASONS, ONE OF WHICH IS A PSYCHIATRIC DEFENSE, WHEN IT IS

23    THE ONLY DEFENSE THAT'S PRESENTED, MAY BE A POWERFUL TOOL,

24    MAY BE A TOOL OF DESPERATION, BUT YOU KNOW IT IS WHEN,

25    STANDING ALONE, SOMETHING THAT A JURY CAN LOOK AT AND

26    EVALUATE AND -- AND ACCEPT, YOU KNOW, EXPERIENCE HAS

27    TAUGHT THIS COURT THAT PSYCHIATRIC DEFENSES DO NOT PLAY

28    WELL TO JURIES AS A GENERAL PROPOSITION.  THAT DOESN'T

1   MEAN THAT THEY SHOULDN'T BE PURSUED, AND THEY ESPECIALLY

2   WON'T PLAY WELL WHEN THERE IS SOME OTHER EXPLANATION FOR

3   THE CONDUCT OF THE DEFENDANT.

4           HERE, MR. PECKHAM WAS FACED WITH OF A

5   VARIETY OF OPTIONS.  OPTION NUMBER ONE WAS DEFENDANT'S

6   TESTIMONY; DEFENDANT'S TESTIMONY THAT HE ACTED IN

7   SELF-DEFENSE.  IT WAS TRULY SELF-DEFENSE.  OBJECTIVELY

8   REASONABLE THAT ANYBODY WOULD BELIEVE THAT HE WAS IN

9   DANGER AND THAT HE USED FORCE THAT WAS APPROPRIATE TO

10  THE -- TO THE NATURE OF THE ATTACK THAT WAS BEING MADE ON

11  HIM.  AND THAT WAS THE FACTUAL UNDERPINNINGS OF THE

12  PERFECT SELF-DEFENSE.  MR. PECKHAM WAS STUCK WITH THOSE,

13  IF YOU WILL.  AND THOSE WERE THE THINGS; DEFENDANT WASN'T

14  CHANGING HIS STORY, AND HE ACTED IN SELF-DEFENSE.  HE

15  BELIEVED IT PERSONALLY, SUBJECTIVELY, AND MR. PECKHAM

16  BELIEVED THAT HE MIGHT BE ABLE TO PERSUADE THE JURORS THAT

17  IT WAS OBJECTIVELY REASONABLE AS WELL.  ALTHOUGH, HE SURE

18  WOULD HAVE LIKED TO HAVE HAD THAT KNIFE IN MR. RABITOR'S

19  HAND, BUT THAT WASN'T THERE.  SO, WE HAVE AN EXPLANATION,

20  AN EXPLANATION THAT RISES TO A DEFENSE IF IT IS BELIEVED

21  BY THE JURY.  IT IS NOT ONLY A DEFENSE TO THE CHARGED

22  OFFENSES, IT IS A DEFENSE TO ALL UNDERLYING AND LESSER

23  INCLUDED OFFENSES TO; THAT'S WHAT MR. PECKHAM IS GOING TO

24  GO WITH.

25           SECONDARILY, HE HAD A -- A NOT INCONSISTENT

26  IMPERFECT SELF-DEFENSE.  YOU KNOW, OFTENTIMES WHEN -- WHEN

27  ALTERNATE DEFENSES ARE PRESENTED, THEY ARE INCONSISTENT

28  WITH ONE ANOTHER.  AND IN THIS CASE, IT WAS NOT

1    INCONSISTENCY, BECAUSE THE IMPERFECT SELF-DEFENSE WOULD BE

2    BASED UPON THE SUBJECTIVE THOUGHTS OF MR. LITTLE.  AND IT

3    WOULD BE SUPPORTED BY THE DEMONSTRABLE LACK OF PERCEPTION

4    THAT MR. LITTLE HAD AS A RESULT OF THE LIMITED EYESIGHT,

5    THE LOSS IN ONE EYE OF TOTAL SIGHT, AND REDUCED SIGHT IN

6    THE SECOND EYE.  AND HAD AN EXPERT WITNESS COME IN AND

7    TESTIFIED TO THOSE THINGS, AND -- AND WAS IN A POSITION TO

8    BE ABLE TO ARGUE, THAT EVEN IF YOU DON'T BELIEVE

9    OBJECTIVELY THAT THIS WAS A SITUATION WHERE HE WAS BEING

10    ATTACKED, SUBJECTIVELY HE BELIEVED IT.  AND HE BELIEVED IT

11    BECAUSE HE COULDN'T SEE AS WELL AS YOU AND I.  AND -- AND

12    MAYBE HE WAS MISPERCEIVING EVERYTHING IN THE HEAT OF THE

13    MOMENT BECAUSE OF THE NATURE OF THE ENVIRONMENT THAT HE

14    WAS IN, BECAUSE THE ENVIRONMENT WAS PART OF THIS CASE.  IT

15    WAS PRESENTED, WHAT KIND OF A MILIEU THAT THIS WHOLE THING

16    TOOK PLACE IN.  AND UNDER THOSE CIRCUMSTANCES, IMPERFECT

17    SELF-DEFENSE WAS SOMETHING TO BE OFFERED.

18            IF ONE PLACES INTO THAT PARTICULAR CONTEXT,

19    THE NOTION OF POSTTRAUMATIC STRESS DISORDER, WHICH IS

20    ESSENTIALLY A COMPLETE AND TOTAL MISPERCEPTION OF WHAT IT

21    IS THAT IS GOING ON IN A COMPLETELY UNREASONABLE REACTION

22    TO THE STRESSORS THAT ARE PRESENTED HERE, I DON'T THINK

23    THAT THAT'S OF ANY BENEFIT TO THE DEFENDANT'S STRATEGY AT

24    THIS TIME.  I THINK THAT THAT WAS SOMETHING THAT COULD BE

25    CONSIDERED BY MR. PECKHAM, AND I BELIEVE IT WAS CONSIDERED

26    BY MR. PECKHAM WHEN HE DECIDED NOT TO GET HIM EXAMINED,

27    BECAUSE IT WASN'T GOING TO BE A BENEFIT.  AND THAT THAT

28    STRATEGIC AND TACTICAL DECISION WAS REASONABLE, AND IT IS

1    NOT THE SUBJECT OF -- OF HINDSIGHT TO OVERTURN A JUDGMENT

2    IN THIS CASE.   CONSEQUENTLY, THE PETITION FOR WRIT OF

3    HABEAS CORPUS IS DENIED.

4              MS. MALLEN:   THANK YOU, YOUR HONOR.

5              MR. WILLIAMS:   THANK YOU.

6              THE COURT:   THAT'S IT.   THANK YOU.

7              (PROCEEDINGS ADJOURNED FOR THE DAY.)

8                        --OOO--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# APPENDIX No. 1

# EXHIBIT    F

MC-275

Name **Larry John Little**

'dress **R.J.D F3 B13**

**PO Box 799003**

**San Diego, CA 92179**

CDC or ID Number **P-82205**

COPY

F I L E D
Stephen M. Kelly, Clerk
NOV – 3 2005
Court of Appeal Fourth District

## COURT OF APPEALS, STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT, DIVISION ONE
*(Court)*

**LARRY JOHN LITTLE**

Petitioner

vs.

**ROBERT J. HERNANDEZ**

Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. _____

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS — READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. January 1, 1999]
PETITION FOR WRIT OF HABEAS CORPUS    WEST GROUP Official Publisher    Penal Code, § 1473 et seq.; Cal. Rules of Court, rules 56.5, 201(h)

## EXHIBIT

This petition concerns:

- [X] A conviction
- [ ] A sentence
- [ ] Jail or prison conditions
- [ ] Parole
- [ ] Credits
- [ ] Prison discipline
- [ ] Other (specify): _____

1. Your name: __LARRY JOHN LITTLE__

2. Where are you incarcerated? __DONAVAN, CORRECTIONAL FACILITY__

3. Why are you in custody? [X] Criminal Conviction  [ ] Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   2nd Degree murder with use of deadly & Dangerous weapon, 2 priors

b. Penal or other code sections: __187(b) 12022 (b)(1) 667.5 (b) of cal penal code__

c. Name and location of sentencing or committing court: __Superior Court of San Diego County__

   220 West Broadway, San Diego, CA 92101

d. Case number: __Superior court No: SCE-198946__

e. Date convicted or committed: __MAY 3, 2000__

f. Date sentenced: __June 8, 2000__

g. Length of sentence: __INDETERMINATE TERM OF FIFTEEN YEARS TO LIFE, CSX 3 years__

h. When do you expect to be released? __Never under California BPT practices__

i. Were you represented by counsel in the trial court? [X] Yes.  [ ] No. If yes, state the attorney's name and address:

   Edward Peckham, 10994 Cudahay # 308 San Diego, CA

4. What was the LAST plea you entered? *(check one)*

   [XX] Not guilty  [ ] Guilty  [ ] Nolo Contendere  [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

6. GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

**See Attached Arguments petition**

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

**See Attached arguments petition**

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

**See attached Arguments Petition**

7. **Ground 2 or Ground** _____ (*if applicable*):

See attached Arguments Petition

a. Supporting facts:

See attached Arguments Petition

b. Supporting cases, rules, or other authority:

See attached Arguments Petition

8. Did you appeal from the conviction, sentence, or commitment?  ☒ Yes.  ☐ No.    If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

**Court of appeal-fourth appellate District, Division one**

b. Result: **Affirmed**          c. Date of decision: **October, 10, 2001**

d. Case number or citation of opinion, if known:  **D035850**

e. Issues raised: (1)  **Caljic No. 3.37 Jury instruction error;**

(2)  **Caljic 8.40 1996 Version Jury instruction; and**

(3)  **Error of admitting the testimony of informant.**

f. Were you represented by counsel on appeal?  ☒ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:

**Martha L. McGill, 732 North Hwy. 101, suite B, Encinitas, CA 92024**

9. Did you seek review in the California Supreme Court?  ☒ Yes.  ☐ No.    If yes, give the following information:

a. Result:  **Review Denied**          b. Date of decision: **December 19, 2001**

c. Case number or citation of opinion, if known:  **S102149**

d. Issues raised: (1) **Applicability of Caljic 3.37 W/ Defendant physical impairment;**
**prejudical   effect of former Caljic 8.40**
(2)  **Caljic 3.37 Reasonableness for self-defense re visual impairment; and**

(3)  **Erroneous instruction on Voluntary Manslaughter was perjudical**

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

**Due to ineffective assistance of trial and appellate counsel as plaintiff**

**has continously expressed these matters as stated herein. trial counsel**

**failed to investigate and fell short of presenting sole defense with-drawing**

11. Administrative Review **same**

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

**N/A**

b. Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
*Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☒ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

a. (1) Name of court: San Diego County Superior court, EL Cajon

(2) Nature of proceeding (for example, "habeas corpus petition"): Habeas Corpus

(3) Issues raised: (a) Ineffective assistance of Counsel, Failure to investigate

(b) Trial counsel did not provide adequate professional assistance during the trial

(4) Result (Attach order or explain why unavailable): Order to show cause: Lawyer failed to send me the transcripts

(5) Date of decision: 8-28-2004

b. (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
Cal Superior court of EL Cajon, Showcause hearing of writ of habeas corpus
IAC Denied relief under second prong of Strictland

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
No unreasonable delay, attorney failed to contact me in a timely matter and send me hearing transcripts, county custody to state custody-transfer time and obstruction of prison lockdowns and program interruptions aug. to Nov. 05 Legal property confiscated

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

_____

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

under the California constitution this court has jurisdiction

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 8-26-05  11-1-05    ▶ Larry Little
                                    (SIGNATURE OF PETITIONER)

APPENDIX No. 1

# E X H I B I T    G

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL - FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

F I L E D
Stephen M. Kelly, Clerk

JAN 16 2008

Court of Appeal Fourth District

| | |
|---|---|
| In re LARRY JOHN LITTLE | D047468 |
| on | (San Diego County Super. Ct. No. SCE198946) |
| Habeas Corpus. | |

Petition for writ of habeas corpus challenging a judgment of the Superior Court of San Diego County, Michael B. Harris, Judge. Petition denied.

Larry John Little filed a petition for writ of habeas corpus challenging the judgment entered after a jury convicted him of the second degree murder of Eddy Rabatore. His petition asserts that because his trial counsel did not investigate the existence of, and present evidence on, posttraumatic stress disorder (PTSD), he was denied his constitutional right to effective assistance of counsel. Although the performance of Little's trial counsel was below the applicable standard of objective reasonableness, we conclude that, based on the record in this case, his counsel's deficient performance was not prejudicial.

## EXHIBIT

# APPENDIX No. 1

# EXHIBIT    H

Supreme Court No. _____

## IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

In re

**LARRY JOHN LITTLE,**

on Habeas Corpus.

No. D047468

Superior Court
No. SCE198946
(San Diego County)

---

## PETITION FOR REVIEW TO EXHAUST STATE REMEDIES AFTER THE UNPUBLISHED OPINION OF THE COURT OF APPEAL, FOURTH APPELLATE DISTRICT

---

Athena Shudde (SBN 80667)
Attorney at Law
1762 Columbia Street
San Diego, California 92101
Telephone: 619-234-2266
Facsimile: 619-234-2645

Attorney for Petitioner

By Appointment of the Court of
Appeal Under the
Appellate Defenders, Inc.
Independent-Case System

**EXHIBIT**

Supreme Court No. _____

## IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

In re

**LARRY JOHN LITTLE,**

      on Habeas Corpus.

No. D047468

Superior Court
No. SCE198946
(San Diego County)

---

**PETITION FOR REVIEW TO EXHAUST STATE REMEDIES
AFTER THE UNPUBLISHED OPINION OF THE
COURT OF APPEAL, FOURTH APPELLATE DISTRICT**

---

TO:  THE HONORABLE RONALD M. GEORGE, CHIEF JUSTICE,
AND THE HONORABLE ASSOCIATE JUSTICES OF THE
SUPREME COURT OF CALIFORNIA:

Pursuant to rule 8.508 of the California Rules of Court, petitioner Larry

John Little respectfully files this petition for review to exhaust his state

remedies for federal habeas corpus purposes following the January 16, 2007,

unpublished decision of the Court of Appeal, Fourth Appellate District,

denying his petition for writ of habeas corpus.  The petition presents no

grounds for review under rule 8.500(b) of the California Rules of Court.  A

copy of the Court of Appeal opinion is attached hereto as an appendix.



MARY JAMESON
AUTOMATIC APPEALS SUPERVISOR

JORGE NAVARRETE
SUPERVISING DEPUTY CLERK

SAN FRANCISCO

—

NATALIE ROBINSON
SUPERVISING DEPUTY CLERK

LOS ANGELES

SAN FRANCISCO 94102
EARL WARREN BUILDING
350 McALLISTER STREET
(415) 865-7000

—

☐   LOS ANGELES 90013
RONALD REAGAN BUILDING
300 SOUTH SPRING STREET
(213) 830-7570

## Supreme Court of California

FREDERICK K. OHLRICH
COURT ADMINISTRATOR AND
CLERK OF THE SUPREME COURT

February 21, 2008

Mr. Larry John Little
P-82205
P. O. Box 4000
Vacaville, CA 95696-4000

> **Re:    S160332 - In re Larry John Little on Habeas Corpus**

Dear Mr. Little:

Returned unfiled is your "Supplement to Petition", which we received on February 21, 2008.  Our records indicate that you have the above-referenced petition for review pending with this court, and there is no provision in the Rules of Court to supplement such a petition.  A copy of that decision will be mailed to you the same day it is filed.

Very truly yours,

FREDERICK K. OHLRICH
Court Administrator and
Clerk of the Supreme Court

By:  C. Thompson, Deputy Clerk

2-19-08

S160332

Dear: Honorable California Supreme court I Larry John Little Jr. already have a petition for Review filed in your court on 1-24-08 no. D047468 my previous court apointed appelate council AThena Shudde filed The one Issue out of my original writ She was apointed to work on. She filed The petition with out my Know-ledge and Before I was even notified That The court of appeal forth appelate District Division one had Sumarily Denied my writ on a order Show cause. So here Is my original writ put in form of Suppliment to petition for filing in your court with in 30 days of State appelate courts Decision. filing the rest of Issues from my original writ IS proper exhaustion of all The Issues In The State court Before I go to The federal courts,

Thank You

Court of Appeal, Fourth Appellate District, Div. 1 - No. D047468
S160332

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

In re LARRY JOHN LITTLE on Habeas Corpus

The petition for review is denied.

> SUPREME COURT
> **FILED**
>
> MAR 1 2 2008
>
> Frederick K. Ohlrich Clerk
>
> _____
> Deputy

Moreno, J., was absent and did not participate.

_Chief Justice_

not denied his constitutional right to effective assistance of counsel. (*Strickland, supra,* at pp. 687, 691-692; *Ledesma, supra,* at pp. 216-217.)[19]

## DISPOSITION

The petition is denied.

_____
McDONALD, Acting P. J.

WE CONCUR:

_____
AARON, J.

_____
IRION, J.

---

19     Because we issued the OSC solely on the question of whether Little was denied effective assistance of counsel because his trial counsel did not investigate a PTSD defense, we summarily deny, without any substantive discussion of, the other contentions raised by Little in the Petition.

APPENDIX No. 1

# EXHIBIT   I

1  OPINION.  I HAVE NOT READ ALL OF THE EXHIBITS, WHICH IS I

2  THINK THIS ONE RIGHT OVER HERE, THIS WHOLE THING.

3  (INDICATING.)  I'VE READ SOME OF THEM; I HAVEN'T GOTTEN

4  THROUGH ALL OF THEM, BUT I THINK I HAVE A FAIRLY GOOD IDEA

5  OF WHAT THE ISSUES ARE.  I'VE READ THE -- I'VE READ THE

6  PREVIOUS ORDERS ON THE HABEAS AS WELL, SO I UNDERSTAND

7  WHAT THE ORDER TO SHOW CAUSE IS RELATING TO.

8              IT'S NOT RELATING TO EVERYTHING IN THE

9  PETITION, BUT ONLY THE INEFFECTIVE ASSISTANCE OF COUNSEL

10  CLAIMS AS TO BOTH TRIAL AND APPEAL.  I DON'T RECALL

11  READING A WHOLE LOT ABOUT THE APPELLATE STUFF, BUT ANYWAY,

12  THE BALL IS YOUR IN COURT MR. WILLIAMS; YOU HAVE THE

13  LABORING OAR HERE, SO --

14              MR. WILLIAMS:  I CALL SHARON LITTLE.  I'LL GO

15  GET HER.

16

17                  **SHARON LITTLE,**

18  CALLED AS A WITNESS ON BEHALF OF THE DEFENDANT, HAVING

19  BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

20

21                  **DIRECT EXAMINATION**

22  BY MR. WILLIAMS:

23      Q.    STATE YOUR NAME AND SPELL YOUR LAST NAME FOR THE

24  RECORD, PLEASE, MA'AM?

25      A.    SHARON LITTLE.  AND MY LAST NAME IS L-I-T-T-L-E.

26      Q.    ARE YOU RELATED TO THE PETITIONER AND DEFENDANT,

27  LARRY LITTLE JUNIOR?

28      A.    YES.

**EXHIBIT | 1**

1      Q.    HOW ARE YOU RELATED TO HIM?

2      A.    I'M HIS SISTER.

3      Q.    ARE YOU OLDER OR YOUNGER THAN HIM?

4      A.    YOUNGER.

5      Q.    DO YOU RECALL AN INCIDENT THAT OCCURRED IN

6  LARRY'S LIFE, APPROXIMATELY 1993, WHEN HE WAS STABBED?

7      A.    YES.

8      Q.    WHAT HAPPENED TO HIM?  I MEAN, DON'T GO INTO THE

9  ENTIRE DETAIL, BUT DID HE SUSTAIN ANY INJURIES?

10     A.    YES, HE WAS STABBED IN HIS LEFT EYE.

11     Q.    AND AS A RESULT OF THAT, WHAT HAPPENED TO HIS

12  LEFT EYE?

13     A.    HE'S BLIND.

14     Q.    DID HE LOSE THE EYE ITSELF?

15     A.    YES.

16     Q.    AND SO HE HAS A PROSTHETIC?

17     A.    YES.

18     Q.    OR A GLASS EYE?

19     A.    UH-HUH.

20     Q.    PRIOR TO THAT, HAD YOU BEEN CLOSE TO LARRY?

21     A.    YES.

22     Q.    DID YOU NOTICE ANY CHANGE IN HIM?

23     A.    YOU MEAN AFTER THE ACCIDENT?

24     Q.    YES, MA'AM.

25     A.    DEFINITELY.

26     Q.    WHAT?

27     A.    HE BECAME MORE PARANOID, A LITTLE MORE -- LIKE

28  IF YOU APPROACHED HIM, HE WAS A LITTLE MORE PANICKY ABOUT

1    SOMEBODY COMING UP BEHIND HIM.

2        Q.    DID YOU EVER WITNESS HIM IN ANY OF THESE PANIC

3    ATTACKS?

4        A.    NOT REALLY.

5        Q.    HAVE THERE BEEN OTHER INJURIES PRIOR TO THAT, TO

6    YOUR KNOWLEDGE, GROWING UP WITH HIM?

7        A.    YES.

8        Q.    WHAT WAS THAT?

9        A.    HE HAD A BICYCLE ACCIDENT WHEN HE WAS 12.

10       Q.    WHAT HAPPENED TO HIM?

11       A.    HE WAS GOING DOWN A DIRT HILL AND HE LOST

12   CONTROL AND HE PLUNGED FACE FIRST INTO A BIG BOLDER.

13       Q.    DID HE GO TO THE HOSPITAL FOR THAT?

14       A.    YES.

15       Q.    HOW LONG DID HE STAY IN THE HOSPITAL?

16       A.    I THINK HE WAS THERE ABOUT A WEEK OR TWO.

17       Q.    SO HE HAD A HEAD INJURY?

18       A.    YES, MAJOR.

19       Q.    HOW OLD WERE YOU WHEN THAT HAPPENED?

20       A.    I WAS ABOUT 10 OR 11.

21       Q.    SO YOU GUYS ARE PRETTY CLOSE IN AGE?

22       A.    YES.

23       Q.    WAS THERE ANY CHANGE IN HIM AFTER THAT?

24       A.    YES.

25       Q.    WHAT WAS THAT?

26       A.    WELL, BEFORE THE ACCIDENT, HE WAS PRETTY POPULAR

27   IN SCHOOL AND VERY WELL LIKED BY EVERYBODY.  I MEAN, HE'S

28   ALWAYS BEEN WELL LIKED, BUT HIS PERSONALITY CHANGED.  HE

1  JUST STARTED TO -- HE USED TO BE A LOT MORE -- HOW DO I

2  SAY, OUTGOING, INTO A LOT OF SPORTS.  AND THEN AFTER THE

3  ACCIDENT, HE JUST KIND OF -- HE HAD A DIFFERENT

4  PERSONALITY.

5      Q.   BETWEEN THAT TIME AND THE TIME HE WAS STABBED IN

6  THE KNIFE IN 1993 -- STABBED IN THE KNIFE, STABBED IN THE

7  EYE WITH A KNIFE IN 1993, WERE THERE ANY OTHER SIGNIFICANT

8  INJURIES TO HIM THAT YOU WERE PERSONALLY AWARE OF?

9      A.   NOT THAT I'M AWARE OF.

10     Q.   OKAY.  NOW WERE YOU AWARE OF LARRY'S ABUSE OF

11 DRUGS?

12     A.   YES.

13     Q.   WHEN DID THAT START?

14     A.   AFTER HE HAD THE BICYCLE ACCIDENT, HE STARTED TO

15 TRY MARIJUANA, AND THAT'S PRETTY MUCH ALL HE DID

16 THROUGHOUT HIGH SCHOOL.  AND THEN AFTER HIGH SCHOOL, HE

17 WAS INTO CRYSTAL METH.

18     Q.   WERE YOU LIVING WITH HIM AT THE TIME WHEN HE WAS

19 INTO CRYSTAL METH?

20     A.   I THINK IT STARTED PRETTY MUCH RIGHT AFTER I

21 MOVED WITH MY MOM TO A CONDO.  WE ALL LIVED IN A HOUSE

22 TOGETHER, THIS WAS IN 1993, AND MY MOTHER AND I MOVED TO A

23 CONDO.  I REMEMBER IT WAS MY SENIOR YEAR IN HIGH SCHOOL

24 AND HE WAS WITH MY DAD, SO I THINK IT STARTED AROUND THAT

25 TIME.

26     Q.   OKAY, DID YOU SEE HIM DURING THAT TIME

27 FREQUENTLY?

28     A.   YES.

1      Q.    DID HE HAVE DIFFICULTIES WITH THE LAW AND

2    THINGS?

3      A.    OH, YES.

4      Q.    BECAUSE OF HIS DRUG ABUSE?

5      A.    YES.

6      Q.    NOW, AS A RESULT OF THE EYE INJURY TO YOUR

7    BROTHER, DID THAT HAVE ANY AFFECT ON YOU?

8      A.    YES.

9      Q.    WHAT AFFECT?

10     A.    I WAS DEVASTATED, SO --

11     Q.    TAKE YOUR TIME, MS. LITTLE.   THERE'S WATER AND

12   TISSUES UP THERE.

13     A.    WHEN IT HAPPENED, I JUST DEALT WITH IT BECAUSE I

14   DIDN'T REALLY KNOW HOW TO DEAL WITH IT.   IT ACTUALLY TOOK

15   ME ABOUT FIVE YEARS BEFORE I FULLY WENT TO A PSYCHOLOGIST

16   TO KIND OF HELP ME WITH IT.

17     Q.    OKAY, SO IT -- WAS IT A DEPRESSION?

18     A.    IT AFFECTS THE FAMILY.

19     Q.    OKAY.

20     A.    YES, IT IS.

21     Q.    DEPRESSION?

22     A.    YES.

23     Q.    SO YOU DID GO TO A PSYCHOLOGIST?

24     A.    YES.

25     Q.    WHO IS THAT PSYCHOLOGIST?

26     A.    DIANA KAY WEISS.

27     Q.    OKAY.   NOW, SO YOU RELATED TO DR. WEISS,

28   OBVIOUSLY, PROBLEMS WITH YOUR BROTHER?

8

```
 1          A.   YES.

 2          Q.   YOUR BROTHER'S INJURY?

 3          A.   YES.

 4          Q.   OKAY.   NOW IN 1999 YOUR BROTHER WAS ARRESTED FOR

 5    MURDER, CORRECT?

 6          A.   YES.

 7          Q.   DID YOU MEET HIS ATTORNEY, MR. PECKHAM?

 8          A.   YES.

 9          Q.   HOW MANY TIMES DID YOU MEET HIS ATTORNEY,

10    MR. PECKHAM?

11          A.   THE PRELIMINARY HEARING.

12          Q.   OKAY.

13          A.   AND DURING THE TRIAL.

14          Q.   OKAY.   DO YOU SEE MR. PECKHAM IN THE COURTROOM

15    TODAY?

16          A.   YES.

17          Q.   HE'S THE GUY -- NICE LOOKING GUY IN THE SUIT

18    BACK THERE, RIGHT?

19          A.   YES.

20          Q.   DID YOU EVER RELATE TO MR. PECKHAM ANYTHING

21    ABOUT LARRY'S INJURIES?

22          A.   I TRIED TO RELATE EVERYTHING I KNEW ABOUT LARRY

23    TO HIM.

24          Q.   WHAT DID YOU RELATE TO HIM?   JUST WHAT YOU CAN

25    RECALL.

26          A.   JUST -- WELL, I TRIED TO RELATE HIS WHOLE, YOU

27    KNOW, FROM THE BEGINNING WHEN HE HAD HIS HEAD INJURY, FROM

28    WHEN HE HAD THE STABBING, I JUST FIGURED THAT ALL THAT YOU
```

9

1     CAN CONTRIBUTE TO.HIM BEING A LITTLE MORE PARANOID THAN A

2     REASONABLE PERSON.

3         Q.    AND DID MR. -- DID MR. PECKHAM RESPOND TO THIS?

4         A.    HE WAS VERY COMPASSIONATE.  I MEAN, I REALLY

5     FELT HE WAS LOOKING FOR THE BEST INTEREST OF MY BROTHER.

6         Q.    DID YOU EVER OFFER TO HAVE ANY TESTING DONE OF

7     YOUR BROTHER?

8         A.    YES.

9         Q.    WHEN DID YOU DO THAT?

10        A.    IT WAS DURING THE TRIAL, I WAS STILL SEEING MY

11    PSYCHOLOGIST.  AND SHE SAID THAT, YOU KNOW, FROM TALKING

12    WITH ME, SHE SAID SHE FELT MY BROTHER MAY SUFFER FROM

13    POSTTRAUMATIC, I THINK IT'S DISTRESS DISORDER.  AND SHE

14    SAID THAT SHE TESTIFIED AT A LOT OF TRIALS FOR THE SAME

15    THING AND THAT SHE WOULD OFFER HER SERVICES FOR FREE TO

16    TESTIFY FOR HIM.

17        Q.    ALL RIGHT, JUST TESTIFY, RIGHT?

18        A.    JUST TO TALK ABOUT IT, NOT TO TALK ABOUT HIM

19    BECAUSE SHE DOESN'T KNOW HIM, BUT JUST TO TALK ABOUT THE

20    THINGS THAT IT CAN CAUSE.

21        Q.    OKAY, AND WHAT DID MR. PECKHAM RESPOND -- HOW

22    DID HE RESPOND?

23        A.    I DON'T REALLY RECALL HOW HE RESPONDED; I JUST

24    GAVE HIM THE INFORMATION AND I -- I DON'T KNOW ACTUALLY IF

25    HE EVEN WENT TO THE JUDGE WITH IT OR TRIED TO BRING IT IN.

26    I JUST KNOW NOTHING EVER HAPPENED AND I WAS TOLD THAT WE

27    DIDN'T NEED HER.

28        Q.    OKAY.  DID YOU TESTIFY IN THE TRIAL?

1      A.   NO.

2      Q.   NOW YOUR PSYCHOLOGIST OBVIOUSLY DID NOT SEE

3  LARRY LITTLE, RIGHT?

4      A.   CORRECT.

5      Q.   BUT SHE TOLD YOU THAT HE MIGHT EXHIBIT SYMPTOMS

6  OF --

7      A.   SHE FELT SURE HE DID, BECAUSE OF THE TYPE -- I

8  MEAN TO HAVE YOUR EYE STABBED OUT, THAT'S PRETTY

9  TRAUMATIC.

10      Q.   DID YOU GIVE HER ANY OTHER HISTORY ABOUT LARRY

11  BESIDES HAVING HIS EYE STABBED OUT?

12      A.   I JUST TOLD HER HOW -- BEFORE HE HAD HIS HEAD

13  INJURY AS A KID, YOU KNOW, HE WAS QUITE DIFFERENT.  I

14  MEAN, IT WAS AFTER THAT.

15      Q.   SO YOU WEREN'T AWARE OF ANY ASSAULTS THAT

16  OCCURRED AFTER 1999, CORRECT?

17      A.   HE MAY HAVE BEEN JUMPED OR SOMETHING WHEN HE WAS

18  INCARCERATED, BUT I DON'T REALLY KNOW HOW MANY TIMES OR

19  WHO.

20      Q.   OKAY, THE QUESTION IS DID YOU RELATE ANYTHING TO

21  THE PSYCHOLOGIST OR MR. PECKHAM?  LET'S START WITH THE

22  PSYCHOLOGIST.  DID YOU RELATE ANYTHING TO THE PSYCHOLOGIST

23  ABOUT ANY INCIDENT AFTER 1993?

24      A.   THE -- IN --

25      Q.   AFTER THE EYE?  AFTER THE EYE, I'M SORRY?

26      A.   NO.

27      Q.   DID YOU RELAY ANYTHING TO MR. PECKHAM ABOUT

28  INJURIES AFTER THE EYE?

1    A.    NO.

2         MR. WILLIAMS:  I'M SORRY I CONFUSED YOU.

3              NOTHING FURTHER.

4         THE COURT:  MS. MALLEN?

5         MS. MALLEN:  THANK YOU.

6

7                    **CROSS-EXAMINATION**

8    BY MS. MALLEN:

9    Q.    LET'S START A LITTLE BIT WITH THE BIKE ACCIDENT

10   THAT HAPPENED AT THE AGE OF 12.  WHERE WERE YOU LIVING AT

11   THAT TIME?

12   A.    I WAS LIVING IN MIRA MESA.

13   Q.    WHERE WAS LARRY LIVING?

14   A.    MIRA MESA.

15   Q.    WAS THE FAMILY TOGETHER, BASICALLY MOTHER,

16   FATHER, YOU AND LARRY?

17   A.    YES.

18   Q.    OKAY.  WAS LARRY USING MARIJUANA BEFORE THE BIKE

19   ACCIDENT, AS FAR AS YOU KNOW?

20   A.    NO.

21   Q.    HOW SOON AFTER THE BIKE ACCIDENT DID HE START

22   USING MARIJUANA?

23   A.    WELL, I'M NOT QUITE SURE EXACTLY WHEN THE BIKE

24   ACCIDENT WAS, YOU KNOW, IN THE CALENDAR YEAR, BUT IT'S

25   PROBABLY THE SUMMERTIME, I WOULD IMAGINE, AFTER THE BIKE

26   ACCIDENT.

27   Q.    OKAY.  DID THE BIKE ACCIDENT HAPPEN IN THE

28   SUMMER?

1          A.    THAT'S WHAT I -- IT'S SO LONG AGO, I REALLY

2    DON'T REMEMBER --

3          Q.    OKAY.

4          A.    -- WHEN IT WAS.

5          Q.    DID LARRY DRINK ALCOHOL AT THAT TIME?

6          A.    NO.

7          Q.    YOU'RE SURE?

8          A.    POSITIVE.

9          Q.    YOU SPENT A LOT OF TIME WITH HIM?

10         A.    YES.

11         Q.    WENT TO PARTIES WITH HIM?

12         A.    WE WERE 12 -- I MEAN, I WAS 11 AND HE WAS 12; WE

13   DIDN'T GO TO PARTIES.

14         Q.    HAVE THE SAME FRIENDS?

15         A.    PRETTY MUCH.

16         Q.    OKAY.  AND DID HIS FRIENDS ALL SMOKE MARIJUANA

17   TOO?

18         A.    NOT THAT I KNEW OF AT THAT TIME.  LIKE I SAID,

19   THEY WERE 12.

20         Q.    OKAY.

21         A.    I THINK IT STARTED PROBABLY ABOUT 13.

22         Q.    WAS HE USING ANYTHING ELSE BESIDES MARIJUANA?

23         A.    NO.

24         Q.    AS FAR AS YOU KNOW?

25         A.    YES.

26         Q.    DID YOU TALK TO HIM ABOUT IT?

27         A.    OH, YEAH, WE WERE VERY CLOSE.  WE TALKED ABOUT

28   EVERYTHING.

1     Q.    DID YOU SMOKE MARIJUANA TOO?

2     A.    I TRIED IT.

3     Q.    OKAY.

4     A.    I WAS PROBABLY 13 WHEN I TRIED IT.

5     Q.    DID LARRY START SPENDING TIME WITH OTHER PEOPLE

6  WHO SMOKED MARIJUANA?

7     A.    I WOULDN'T PUT IT THAT WAY.  I WOULD SAY HE HAD

8  FRIENDS AND THEY ALL KIND OF EXPERIMENTED WITH IT AT THE

9  SAME TIME.

10     Q.    OKAY.  SO HE WAS WITH A GROUP THEN THAT DID

11  THAT?

12     A.    RIGHT.

13     Q.    DO YOU KNOW ANYTHING ABOUT WHAT KIND OF INJURIES

14  LARRY HAD WHEN HE HIT HIS HEAD ON THE ROCK?

15     A.    YES, HE HAD A MAJOR --

16     Q.    IS THAT BECAUSE YOU TALKED TO A DOCTOR?

17     A.    WELL, I WAS AT THE HOSPITAL WITH MY MOTHER AND I

18  STOOD BY HER WHILE SHE TALKED TO THE DOCTOR.

19     Q.    OKAY, AND SO WHAT DID YOU HEAR THE DOCTOR SAY?

20     A.    HE HAD A MAJOR CONCUSSION.

21     Q.    WHAT KIND OF TREATMENT DID HE HAVE?

22     A.    THEY JUST HAD HIM IN THE HOSPITAL BED.  I DON'T

23  KNOW EXACTLY WHAT THEY WERE DOING.  THEY DIDN'T HAVE CAT

24  SCANS THEN, SO THEY COULDN'T REALLY SEE HOW -- HOW BAD THE

25  INJURY WAS, BUT IT WAS QUITE BAD BECAUSE HIS WHOLE HEAD

26  WAS SWOLLEN.

27     Q.    OKAY.  AND WAS HE RELEASED AFTER TWO WEEKS?

28     A.    I WOULD SAY ABOUT THAT.

1     Q.   OKAY.  DID HE HAVE -- DID HE GO TO DOCTORS AFTER

2  THAT FOR THE HEAD?

3     A.   I BELIEVE HE WENT TO CHECK-UPS.

4     Q.   OKAY.  AND THEN AS FAR AS THE EYE INJURY, THAT

5  WAS IN WHAT YEAR?

6     A.   '93.

7     Q.   OKAY, WERE YOU LIVING WITH LARRY AT THE TIME?

8     A.   NO.

9     Q.   WHERE WAS HE LIVING?

10     A.   I DON'T REALLY KNOW AT THAT TIME.  HE MAY HAVE

11  BEEN LIVING WITH MY FATHER.

12     Q.   BUT YOU'RE NOT SURE?

13     A.   HE LIVED AT DIFFERENT PLACES.

14     Q.   OKAY.  HE'D BEEN IN PRISON BEFORE THEN, HADN'T

15  HE?

16     A.   I DON'T KNOW ABOUT PRISON; I KNOW HE'D BEEN IN

17  JAIL BEFORE.

18     Q.   OKAY.  SO WHEN -- WHAT WAS THE LAST ADDRESS THAT

19  YOU KNEW LARRY HAD?

20     A.   HILGER STREET.

21     Q.   AND WHEN WAS THAT?

22     A.   PROBABLY AROUND '93.  I JUST DON'T KNOW EXACTLY

23  WHEN HE MOVED THERE AND WHEN HE MOVED OUT; I DIDN'T PAY

24  ATTENTION TO --

25     Q.   WHERE WAS THE LAST PLACE THAT YOU VISITED LARRY

26  WHERE HE LIVED?

27     A.   HILGER STREET.

28     Q.   WAS THAT AN APARTMENT?

1    A.    IT -- HE LIVED WITH MY FATHER; IT WAS A DUPLEX.

2    Q.    OKAY.  SO THAT'S WHERE YOUR FATHER LIVED?

3    A.    YES.

4    Q.    OKAY.  BUT DID YOU VISIT LARRY AT HIS OWN

5    APARTMENT OR DID HE LIVE OUT ON THE STREET OR WAS HE WITH

6    FRIENDS OR --

7    A.    HE MAINLY LIVED WITH MY FATHER, BUT SOMETIMES HE

8    WOULD, YOU KNOW, DISAPPEAR AND BE WITH FRIENDS.

9    Q.    OKAY.  WERE YOU PRESENT WHEN HE WAS STABBED IN

10    THE EYE?

11    A.    WAS I THERE?

12    Q.    YES.

13    A.    NO.

14    Q.    WHO DID YOU GET YOUR INFORMATION FROM ABOUT WHAT

15    HAPPENED?

16    A.    MY MOTHER CALLED ME.

17    Q.    AND --

18    A.    AT WORK.

19    Q.    WAS YOUR MOTHER THERE?

20    A.    MY MOTHER WAS NOT THERE.

21    Q.    WHO DID SHE GET THE INFORMATION FROM?  DO YOU

22    KNOW?

23    A.    EITHER MY FATHER OR A POLICEMAN, I DON'T RECALL.

24    Q.    OKAY.  DID YOU EVER TALK TO LARRY ABOUT WHAT

25    HAPPENED?

26    A.    YES.

27    Q.    AND DID HE TELL YOU HOW IT HAPPENED?

28    A.    YES.

1        Q.    HOW DID IT HAPPEN?

2        A.    HE WAS IN A CAR WITH HIS FRIEND IN THE MIDWAY

3   DISTRICT AND HE AND HIS FRIEND HAD BEEN DRINKING.    THEY

4   PICKED UP A COUPLE OF WOMEN AND WERE IN THE CAR WITH THEM

5   PARKED, AND ONE OF THE WOMEN WAS TRYING TO ROB MY BROTHER.

6        Q.    AND SHE WAS A PROSTITUTE, RIGHT?

7        A.    AS FAR AS I KNOW.

8        Q.    OKAY.   ALL RIGHT.   DID LARRY TELL YOU THAT HE'D

9   BEEN USING DRUGS THAT NIGHT AS WELL?

10       A.    NO.

11       Q.    DID YOU ASK HIM ABOUT THAT?

12       A.    NO.

13       Q.    WHEN DID LARRY START -- WELL, YOU KNEW LARRY HAD

14  A DRINKING PROBLEM, RIGHT?

15       A.    I NEVER THOUGHT HE HAD A DRINKING PROBLEM.    I

16  KNEW HE HAD A DRUG PROBLEM, BUT I NEVER SAW A MAJOR

17  DRINKING PROBLEM.   I KNEW HE COULDN'T REALLY HANDLE

18  ALCOHOL IF HE DRANK TOO MUCH OF IT, BUT I WOULDN'T CALL

19  HIM AN ALCOHOLIC.

20       Q.    OKAY, SO HIS MAIN PROBLEM WAS IN DRUGS?

21       A.    CRYSTAL METH.

22       Q.    ANYTHING ELSE BESIDES METH THAT YOU WERE AWARE

23  OF?

24       A.    NO.

25       Q.    AND THEN WHEN HE -- OF HE WAS STABBED IN THE

26  EYE, WHERE DID LARRY LIVE?

27       A.    HE WAS LIVING WITH MY FATHER.

28       Q.    SO AS FAR AS YOU KNEW HE HAD GONE BACK TO LIVE

```
 1   WITH YOUR FATHER?

 2        A.   YES.

 3        Q.   WHERE WERE YOU LIVING?

 4        A.   LET'S -- I WAS LIVING IN A CONDO IN RANCHO

 5   BERNARDO.

 6        Q.   HAVE YOU --

 7        A.   WITH MY MOTHER.

 8        Q.   HAVE YOU EVER LIVED OUTSIDE OF SAN DIEGO COUNTY?

 9        A.   YES.

10        Q.   WHEN --

11        A.   WELL, I DON'T KNOW, UNLESS YOU CONSIDER

12   ESCONDIDO OUTSIDE OF SAN DIEGO COUNTY.  ESCONDIDO.

13        Q.   YOU'VE STAYED BASICALLY IN THE LOCAL AREA?

14        A.   YES.

15        Q.   AND YOU SAID YOU MOVED WITH YOUR MOTHER TO THE

16   CONDOMINIUM IN 1993?

17        A.   YES.

18        Q.   THAT'S THE LAST TIME YOU LIVED WITH LARRY?

19        A.   NO, I DIDN'T LIVE WITH LARRY THEN.

20        Q.   BEFORE THAT IS THE LAST TIME YOU LIVED WITH

21   LARRY?

22        A.   THE LAST TIME I LIVED WITH LARRY WAS 1983.

23        Q.   OKAY.  AND AT THAT POINT THE FAMILY SEPARATED

24   BASICALLY?

25        A.   PRETTY MUCH.

26        Q.   WAS THAT AN UPSETTING THING FOR YOU?

27        A.   OF COURSE.

28        Q.   WAS IT A DIVORCE?
```

1      A.   NO, IT WAS A SEPARATION.

2      Q.   OKAY.  DID YOUR PARENTS EVER GET DIVORCED?

3      A.   NO.

4      Q.   DID YOU HAVE -- WELL, DID IT UPSET YOU WHEN THE

5  FAMILY SPLIT LIKE THAT?

6      A.   YES.

7      Q.   DID YOU GO TO A PSYCHIATRIST TO DEAL WITH THAT

8  ISSUE?

9      A.   YOU MEAN AFTER IT HAPPENED OR --

10     Q.   AFTER IT HAPPENED?

11     A.   NO.

12     Q.   NOW YOU MENTIONED THAT YOU WENT TO THIS DIANA

13 WEISS?

14     A.   WEISS, W-E-I-S-S.

15     Q.   AND WHEN DID YOU START SEEING HER?

16     A.   I STARTED SEEING HER IN LIKE ABOUT NOVEMBER --

17 LET'S SEE, OCTOBER OF '99.

18     Q.   SO YOU STARTED SEEING DR. WEISS AFTER LARRY

19 KILLED THE GENTLEMAN?

20     A.   YES, YES.

21     Q.   UP UNTIL THAT POINT HAD YOU SEEN A PSYCHIATRIST

22 OR A PSYCHOLOGIST AT ALL?

23     A.   YES.

24     Q.   YOU'D SEEN SOMEONE DIFFERENT?

25     A.   YES.

26     Q.   OKAY, AND WHEN WAS -- DID YOU -- ABOUT WHAT TIME

27 DID YOU SEE THE FIRST PSYCHIATRIST?

28     A.   I WOULD SAY IT WAS 1992.

1    Q.   AND HOW LONG DID YOU SEE THAT ONE?

2    A.   PROBABLY ONLY FOUR OR FIVE MONTHS.

3    Q.   OKAY.  AND THAT HAD NOTHING TO DO WITH LARRY,

4  RIGHT?

5    A.   IT HAD JUST EVERYTHING TO DO WITH MY WHOLE LIFE,

6  JUST MY -- ALL MY FAMILY.

7    Q.   OKAY.  NOW WHY DID YOU START SEEING DR. WEISS?

8    A.   BECAUSE I WAS HAVING A VERY HARD TIME DEALING

9  WITH THE FACT THAT MY BROTHER WAS ACCUSED OF MURDER.

10    Q.   AND HAD YOU TALKED TO LARRY ABOUT WHAT HAPPENED?

11    A.   OF COURSE.

12    Q.   HE DESCRIBED TO YOU THE KILLING?

13    A.   YES.

14    Q.   HOW LONG DID YOU SEE DR. WEISS?

15    A.   I SAW HER FOR APPROXIMATELY SIX MONTHS.

16    Q.   NOW DR. WEISS IS A STRESS EXPERT, RIGHT?

17    A.   CARDIAC PSYCHOLOGIST.

18    Q.   OKAY.  HOW -- WHAT BACKGROUND DID SHE TELL YOU

19  SHE HAD IN POSTTRAUMATIC STRESS DISORDER?

20    A.   SHE JUST SAID THAT SHE HAD TESTIFIED AT MANY

21  TRIALS ABOUT THE SUBJECT, SO I ASSUMED SHE HAD SOME

22  EXPERIENCE.

23    Q.   DID SHE GIVE YOU ANY DETAILS OF THAT?

24    A.   NO.

25    Q.   HOW MANY SESSIONS HAD YOU HAD WITH HER WHEN SHE

26  BROUGHT THIS UP TO YOU?

27    A.   I WAS SEEING HER WEEKLY.

28    Q.   AND ABOUT WHEN DID SHE TALK TO YOU ABOUT THIS?

1    A.    IT WAS RIGHT AROUND WHEN MY BROTHER'S TRIAL WAS

2  GOING TO START.    COULD HAVE BEEN ACTUALLY DURING THE

3  TRIAL.

4    Q.    SO YOU CONTINUED TO SEE HER DURING THE TRIAL?

5    A.    YES.

6    Q.    OKAY.

7    A.    IT MAY HAVE BEEN LIKE A DAY THAT I SAW HER, LIKE

8  RIGHT BEFORE IT STARTED OR RIGHT AFTER IT ENDED, I -- IT

9  WAS RIGHT -- IT WAS ACTUALLY RIGHT BEFORE IT STARTED WHEN

10  SHE OFFERED HER SERVICES.

11    Q.    WHEN YOU DESCRIBED -- WHAT INFORMATION DID SHE

12  HAVE ABOUT LARRY WHEN SHE SAID SHE THOUGHT IT SOUNDED LIKE

13  HE MIGHT HAVE POSTTRAUMATIC STRESS DISORDER?

14    A.    SHE -- JUST LISTENING TO ME TALK ABOUT HIM AND

15  TALK ABOUT THE STABBING WHICH WAS VERY TRAUMATIC.

16    Q.    TO YOU?

17    A.    YES.

18    Q.    OKAY.    HAD SHE -- DID SHE EVER TALK TO LARRY?

19    A.    NO, BUT SHE SAID IF HE HAD NEVER HAD ANY

20  PROFESSIONAL COUNSELING, THAT -- THAT HE PROBABLY WAS

21  SUFFERING FROM SOME SORT OF DISORDER OF SOME KIND.

22    Q.    SO SHE THOUGHT HE MUST HAVE HAD SOMETHING WRONG,

23  BUT SHE WASN'T --

24    A.    SHE JUST THOUGHT HE MIGHT BE A LITTLE MORE

25  PARANOID THAN THE AVERAGE PERSON.

26    Q.    SO SHE'S THE ONE WHO SUGGESTED THAT THAT WOULD

27  BE A SYMPTOM TO LOOK FOR?

28    A.    YES.

1    Q.    AND DID YOU START THEN LOOKING FOR THAT SYMPTOM?

2    A.    YES.

3    Q.    AND DID YOU SEE IT?

4    A.    WELL, I ALWAYS THOUGHT THERE WAS SOME KIND --

5 SOMETHING LIKE THAT WRONG BECAUSE HE'D BEEN THROUGH SO

6 MANY THINGS AND NEVER DEALT WITH THEM, SO I DIDN'T KNOW

7 HOW THAT COULD NOT AFFECT HIM.

8    Q.    OKAY.  HOW ARE YOU EMPLOYED?

9    A.    I'M AN EXECUTIVE ASSISTANT.

10   Q.    DO YOU HAVE ANY MEDICAL BACKGROUND AT ALL?

11   A.    NO.

12   Q.    DID YOU TAKE ANY OTHER FAMILY MEMBERS TO SEE

13 DR. WEISS?

14   A.    NO.

15   Q.    DID SHE EVER ASK TO MEET ANY OF THEM?

16   A.    NO.

17   Q.    DID YOU EVER HAVE ANY GROUP MEETINGS WITH OTHER

18 PEOPLE BESIDES THE DOCTOR OR WERE THEY ALL SEPARATE

19 SESSIONS?

20   A.    SEPARATE, ONE-ON-ONE SESSIONS.

21   Q.    AT THE TIME THAT DR. WEISS BROUGHT UP

22 POSTTRAUMATIC DISTRESS DISORDER, DID YOU KNOW WHAT THAT

23 WAS?

24   A.    YES.

25   Q.    HOW?

26   A.    BECAUSE WHEN I WAS IN COLLEGE, I TOOK PSYCHOLOGY

27 AND THEY TALKED ABOUT DIFFERENT TYPES OF ILLNESSES.

28   Q.    OKAY.  DID YOU TALK TO LARRY WHEN YOU WERE IN

1    COLLEGE ABOUT POSTTRAUMATIC STRESS DISORDER?

2         A.    NO.

3         Q.    LET'S TALK A LITTLE BIT ABOUT LARRY.

4         A.    OKAY.

5         Q.    WHEN -- DID YOU EVER CONDUCT ANY OBSERVATIONS OF

6    HIM IN ANY MEDICAL SENSE?

7         A.    WELL, I ALWAYS THOUGHT HE PROBABLY SUFFERED FROM

8    SOME SORT OF BRAIN DAMAGE WHEN HE HAD THE BIKE ACCIDENT,

9    BECAUSE HIS HEAD WAS SO SWOLLEN UP AND I -- HE WASN'T THE

10   SAME AFTER THAT.

11        Q.    ALL RIGHT.  DO YOU KNOW WHETHER HIS DIFFERENCE

12   IN ACTIONS WERE CAUSED BY THE DRUGS THAT HE USED OR BY THE

13   BRAIN INJURY?

14        A.    I'D SAY BOTH.

15        Q.    DO YOU HAVE ANY MEDICAL INFORMATION ABOUT HOW

16   DRUG USE WOULD AFFECT A BRAIN INJURED PERSON?

17        A.    NO.

18        Q.    DO YOU HAVE ANY IDEA -- WHEN DID LARRY START

19   USING CRYSTAL METH AS FAR AS YOU KNOW?

20        A.    AS FAR AS I KNOW, IT WAS IN HIGH SCHOOL,

21   PROBABLY ABOUT THE AGE OF 17.

22        Q.    WAS HE DRINKING AT THE SAME TIME?

23        A.    YES.

24        Q.    WHEN DID HE START DRINKING?

25        A.    PROBABLY ABOUT THAT AGE.

26        Q.    OKAY.  AND WAS IT -- DID YOU SEE ANY OTHER

27   FURTHER CHANGING IN HIS BEHAVIOR AFTER HE STARTED USING

28   CRYSTAL METH AND DRINKING?

1      A.   WELL, I NEVER REALLY NOTICED HIM DRINKING MUCH,

2   BUT I NOTICED THAT HE WAS ALWAYS USING CRYSTAL METH.

3      Q.   HOW DID THAT MAKE HIM BEHAVE DIFFERENTLY?

4      A.   WIRED, PANICKY, TALKED A LOT.   I GUESS ANY WAY

5   THAT IT WOULD AFFECT ANYBODY WHO USED IT.

6      Q.   A LITTLE PARANOID PERHAPS?

7      A.   YES.

8      Q.   DO YOU HAVE ANY IDEA HOW MUCH HE WAS USING?

9      A.   NO.

10     Q.   OKAY.   WERE YOUR CONCERNS BASICALLY, THEN, THAT

11  YOU THOUGHT SOMETHING MUST BE WRONG WITH LARRY AND

12  SOMEBODY SHOULD FIND OUT ABOUT IT, BASICALLY?

13     A.   AT WHAT TIME FRAME ARE WE TALKING ABOUT HERE?

14     Q.   OKAY, WHEN YOU TALKED -- WELL, LET'S GO BACK TO

15  TALKING TO ED PECKHAM.   WHEN DID YOU TALK TO ED PECKHAM

16  ABOUT YOUR CONCERNS?   OR DID YOU?

17     A.   THROUGHOUT THE TRIAL, THROUGHOUT THE PRELIMINARY

18  HEARING, ANY TIME THAT WE COULD SPEND SOME TIME WITH HIM

19  AND JUST GO OVER IT.

20     Q.   AND HOW MANY TIMES WAS THAT?

21     A.   MAYBE FIVE TIMES.

22     Q.   AND WERE THEY LONG CONVERSATIONS OR

23  CONVERSATIONS IN THE HALLWAY OR WHAT KIND OF

24  CONVERSATIONS?

25     A.   WE'D GONE TO LUNCH WITH HIM ONCE, WE WENT TO A

26  AIRPLANE MUSEUM ONCE.

27     Q.   AND DID YOU TELL MR. PECKHAM THAT YOU THOUGHT

28  SOMETHING WAS WRONG WITH LARRY MENTALLY, I GUESS?

1    A.    I JUST FELT THAT HE MIGHT -- THAT HIS BIKE

2  ACCIDENT MAY HAVE CONTRIBUTED A LITTLE BIT SOMEWHAT TO

3  CONTRIBUTING TO BEING PARANOID AND THAT THE DRUG USE

4  DEFINITELY.

5    Q.    AND WHEN DID YOU FIRST BRING UP DR. WEISS?

6    A.    I BROUGHT HER UP -- I MEAN, I CAN'T BE EXACTLY

7  SURE WHAT DAY, BUT IT WAS RIGHT BEFORE THE TRIAL BEGAN

8  BECAUSE SHE OFFERED HER SERVICES.

9    Q.    DID SHE GIVE YOU A CARD TO GIVE TO MR. PECKHAM?

10    A.    NO.

11    Q.    DID SHE GIVE YOU ANY KIND OF LETTER TO GIVE TO

12  MR. PECKHAM?

13    A.    NO.

14    Q.    DID SHE -- DID YOU PASS ON A PHONE NUMBER?

15    A.    NO.  SHE WAS GOING THROUGH ME.

16    Q.    OKAY.  DID YOU PASS ON A RESUMÉ OF HERS WITH ANY

17  INFORMATION ABOUT WHO SHE WAS?

18    A.    NO.

19    Q.    DID YOU TELL ED THAT THIS WAS YOUR PSYCHOLOGIST?

20    A.    YES.

21    Q.    AND THAT YOU HAD TALKED TO HER ABOUT LARRY IN A

22  GENERAL WAY?

23    A.    YES, I WAS -- I TOLD HIM I WAS GOING TO THE

24  PSYCHOLOGIST TO DEAL WITH ALL OF THE PROBLEMS THAT WERE

25  UPSETTING ME IN MY LIFE AND MY BROTHER WAS ONE OF MY MAIN

26  CONCERNS.  I WAS HURTING MAJOR FOR HIM AND SHE WAS THE ONE

27  THAT SUGGESTED, YOU KNOW, THAT HE MAY SUFFER FROM THIS AND

28  SHE COULD -- OFFERED HER SERVICES.

1       Q.   OKAY, DID YOU TALK TO DR. WEISS ANYMORE ABOUT IT

2  OTHER THAN THAT ONE TIME?

3       A.   I BELIEVE I JUST TOLD HER THAT HE SAID SHE

4  WASN'T NEEDED.

5       Q.   OKAY.  THANK YOU.

6  BY MR. WILLIAMS:

7       Q.   MS. LITTLE --

8           THE COURT:  ARE YOU DONE?

9           MR. WILLIAMS:  OH, I -- I'M SORRY, I'M SORRY.

10  THANK YOU, YOUR HONOR.

11  BY MS. MALLEN:

12       Q.   ARE YOU UPSET THAT YOUR BROTHER IS STILL IN

13  JAIL?

14       A.   YES.

15       Q.   DO YOU WANT TO SEE HIM OUT?

16       A.   YES.

17       Q.   AND DO YOU WANT TO HELP HIM AS MUCH AS YOU CAN?

18       A.   YES.

19       Q.   HAVE YOU TALKED TO HIM ABOUT THIS LEGAL

20  PROCEEDING?

21       A.   NO.

22       Q.   HAVE YOU TALKED TO HIM ABOUT POSTTRAUMATIC

23  STRESS DISORDER?

24       A.   I DON'T RECALL.

25       Q.   HAVE YOU TALKED TO HIM ABOUT HOW HE FELT THAT --

26  THE DAY THAT HE KILLED THE PERSON?

27       A.   WHAT DO YOU MEAN HOW HE FELT?  BEFORE OR AFTER

28  OR --

1    Q.   DID YOU TALK TO HIM ABOUT WHEN IT HAPPENED?

2    A.   YES.

3    Q.   AND DID YOU ASK HIM HOW HE WAS FEELING AT THAT

4    TIME?

5    A.   YES.

6    Q.   AND DID YOU TALK TO HIM ABOUT WHETHER HE WAS

7    PARANOID OR NOT?

8    A.   YES.

9    Q.   AND DID HE -- DID YOU TALK TO HIM ABOUT SOME OF

10   THE OTHER SYMPTOMS THAT YOU'D LEARNED THAT GO WITH

11   P.T.S.D.?

12   A.   NO.

13   Q.   WHAT DID YOU TALK TO HIM ABOUT?

14   A.   I JUST TALKED TO HIM ABOUT -- I JUST ASKED HIM

15   IF HE HAD BEEN DOING DRUGS OR WHAT WAS GOING ON.  WHAT WAS

16   THE EVENTS THAT LED HIM TO DO WHAT HE DID AND HE FELT

17   THREATENED.

18   Q.   DID HE TELL YOU THAT HE'D BEEN USING DRUGS THAT

19   DAY?

20   A.   NO.

21   Q.   SO HE DENIED THAT?  THAT'S FINE, I DON'T MEAN TO

22   IMPLY, BUT DID HE TELL YOU THAT HE HAD NOT BEEN USING

23   DRUGS THEN?

24   A.   YES.

25   Q.   AND DID HE TELL YOU THAT HE HAD FELT THREATENED?

26   A.   YES.

27   Q.   BY THE VICTIM?

28   A.   THE VICTIM AND SOMEBODY HE HAD CALLED ON THE

1    PHONE.

2        Q.   ALL RIGHT.   DID HE TELL YOU THAT HE ACTED AS HE

3    DID BASICALLY TO STOP THE VICTIM?

4        A.   YES, HE THOUGHT HE WAS -- HE SAW SOMETHING

5    COMING UP BEHIND HIM AND HE THOUGHT HE WAS GOING TO HIT

6    HIM WITH SOMETHING.

7        Q.   DID LARRY TELL YOU THAT THE VICTIM WAS BEHIND

8    HIM AT THE TIME THAT HE STABBED HIM?

9        A.   NO, HE JUST SAW SOMETHING COMING TOWARDS HIM.

10       Q.   SO HE WAS TALKING ABOUT WHAT WAS IN FRONT OF

11   HIM?

12       A.   I DON'T REALLY KNOW, I WASN'T THERE.

13       Q.   OKAY.   AND LARRY WAS NOT CLEAR, THEN, ABOUT WHAT

14   HE WAS TELLING YOU OR --

15       A.   HE DIDN'T EXACTLY SPECIFY.   HE JUST SAID THAT HE

16   WAS GOING TO THROW SOMETHING AT HIM AND HE WAS DEFENDING

17   HIMSELF.

18       Q.   OKAY.   SO BASICALLY HE TOLD YOU THAT HE THOUGHT

19   THAT HE HAD ACTED IN SELF-DEFENSE?

20       A.   EXACTLY.

21       Q.   AND LARRY NEVER CHANGED FROM THAT, DID HE?

22       A.   NO.

23           MS. MALLEN:   OKAY, THANK YOU.   NOTHING FURTHER.

24           THE COURT:   NOW, MR. WILLIAMS.

25           MR. WILLIAMS:   THANK YOU.

26

27

28

REDIRECT EXAMINATION

BY MR. WILLIAMS:

    Q.   MS. MALLEN ASKED YOU ABOUT WHY YOU FELT THAT HE

MIGHT HAVE SOME PROBLEMS AND YOU MENTIONED THE BIKE

INJURY, THE DRINKING AND -- NOT SO MUCH THE DRINKING, BUT

THE METHAMPHETAMINE ABUSE WAS ALSO PART OF THAT, THE

STABBING IN THE EYE?

    A.   ABSOLUTELY.

    Q.   THE BLINDING OF YOUR BROTHER?

    A.   THAT WAS THE MOST TRAUMATIC.

    Q.   NOW, WHEN LARRY -- YOU SAID YOU TALKED TO LARRY

IN THE JAIL, I PRESUME AFTER HE WAS ARRESTED?

    A.   OR ON THE PHONE, WE TALK ON THE PHONE A LOT.

    Q.   BUT HE WAS IN CUSTODY?

    A.   YES.

    Q.   AND YOU SAID YOU TALKED TO HIM ABOUT THE

KILLING?

    A.   YES.

    Q.   DID HE EVER MENTION THAT HE HAD BEEN DRINKING

THAT NIGHT?

    A.   YES.

    Q.   HE TOLD YOU HE HAD BEEN DRINKING?

    A.   YES.

    Q.   DID YOU EVER RELATE THAT TO MR. PECKHAM THAT

LARRY WAS DRINKING THAT DAY, IF YOU RECALL?

    A.   I DON'T RECALL.

    Q.   OKAY.  DID YOU RELAY THE SUBSTANCE OF YOUR

CONVERSATIONS WITH LARRY TO MR. PECKHAM?  DO YOU

1  UNDERSTAND MY QUESTION?

2       A.   NO.

3       Q.   DID YOU TELL MR. PECKHAM WHAT YOU AND LARRY

4  TALKED ABOUT?

5       A.   NO.

6       Q.   OKAY.  YOU FIGURED IT WAS BETWEEN YOU AND LARRY,

7  RIGHT?

8       A.   RIGHT.

9            MR. WILLIAMS:  OKAY.  NOTHING FURTHER.

10           THE COURT:  MS. MALLEN?

11           MS. MALLEN:  NOTHING FURTHER.

12           THE COURT:  THANK YOU, YOU'RE EXCUSED.

13           THE WITNESS:  THANK YOU.

14           MR. WILLIAMS:  PETITIONER CALLS LARRY LITTLE

15  SENIOR.

16

17                    **LARRY LITTLE SENIOR,**

18  CALLED AS A WITNESS ON BEHALF OF THE DEFENDANT, HAVING

19  BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

20

21           THE CLERK:  WOULD YOU STEP UP HERE AND HAVE A

22  SEAT IN THE WITNESS STAND.

23           MR. WILLIAMS:  YOUR HONOR, MS. LITTLE HAD ASKED

24  THE BAILIFF WHETHER SHE CAN REMAIN; I THINK IF THE COURT

25  EXCUSED --

26           THE COURT:  I DID.

27           MR. WILLIAMS:  AND WE DECIDED NOT TO EXCLUDE

28  PEOPLE ANYWAY.  THANK YOU, YOUR HONOR.

APPENDIX No. 1

# E X H I B I T    J

1   UNDERSTAND MY QUESTION?

2       A.   NO.

3       Q.   DID YOU TELL MR. PECKHAM WHAT YOU AND LARRY

4   TALKED ABOUT?

5       A.   NO.

6       Q.   OKAY.   YOU FIGURED IT WAS BETWEEN YOU AND LARRY,

7   RIGHT?

8       A.   RIGHT.

9           MR. WILLIAMS:  OKAY.  NOTHING FURTHER.

10          THE COURT:  MS. MALLEN?

11          MS. MALLEN:  NOTHING FURTHER.

12          THE COURT:  THANK YOU, YOU'RE EXCUSED.

13          THE WITNESS:  THANK YOU.

14          MR. WILLIAMS:  PETITIONER CALLS LARRY LITTLE

15   SENIOR.

16

17                    **LARRY LITTLE SENIOR,**

18   CALLED AS A WITNESS ON BEHALF OF THE DEFENDANT, HAVING

19   BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

20

21          THE CLERK:  WOULD YOU STEP UP HERE AND HAVE A

22   SEAT IN THE WITNESS STAND.

23          MR. WILLIAMS:  YOUR HONOR, MS. LITTLE HAD ASKED

24   THE BAILIFF WHETHER SHE CAN REMAIN; I THINK IF THE COURT

25   EXCUSED --

26          THE COURT:  I DID.

27          MR. WILLIAMS:  AND WE DECIDED NOT TO EXCLUDE

28   PEOPLE ANYWAY.  THANK YOU, YOUR HONOR.

## EXHIBIT J

1

2                        **DIRECT EXAMINATION**

3    BY MR. WILLIAMS:

4         Q.    STATE YOUR NAME AND SPELL YOUR LAST NAME FOR THE

5    RECORD PLEASE, SIR.

6         A.    LARRY JOHN LITTLE.  L-I-T-T-L-E.

7         Q.    AND ARE YOU RELATED TO THE PETITIONER AND

8    DEFENDANT, LARRY LITTLE JUNIOR?

9         A.    YES, I AM.  I'M HIS FATHER.

10        Q.    AND DID LARRY RESIDE WITH YOU MOST OF HIS LIFE,

11   HIS TEENAGE LIFE?

12        A.    YES, HE DID.

13        Q.    HOW LONG DID HE LIVE WITH YOU?

14        A.    WELL, UNTIL 1998.

15        Q.    SO OFF -- HE WAS USUALLY RESIDING IN YOUR HOUSE?

16        A.    YEAH, MOST OF THE TIME, EXCEPT WHEN I WOULD BOOT

17   HIM OUT ONCE IN A WHILE, WHEN HE WOULD BE ON THAT STUFF,

18   YOU KNOW.

19        Q.    OKAY, SO YOU MEAN CRYSTAL METHAMPHETAMINE?

20        A.    YES, SIR, I DO.

21        Q.    WHEN HE WAS USING DRUGS, YOU KICKED HIM OUT?

22        A.    YEAH.

23        Q.    OKAY.  NOW ALSO DURING THIS TIME HE WENT TO

24   PRISON A COUPLE OF TIMES, RIGHT?

25        A.    YES, SIR.

26        Q.    SO HE WASN'T LIVING WITH YOU THEN?

27        A.    NO.

28        Q.    OKAY.  BUT WHEN HE WOULD GET PAROLED, HE WOULD

1   COME BACK TO YOU?

2        A.   YES.

3        Q.   NOW YOUR DAUGHTER SHARON JUST TESTIFIED, RIGHT?

4        A.   YES, SIR.

5        Q.   AND YOU WERE IN THE COURTROOM, YOU HEARD HER?

6        A.   YES, SIR.

7        Q.   DO YOU RECALL THE BICYCLE ACCIDENT THAT YOUR SON

8   WAS INVOLVED IN WHEN HE WAS APPROXIMATELY 12 YEARS OLD?

9        A.   THE WHAT?

10       Q.   WHEN HE WAS APPROXIMATELY 12, LARRY'S BIKE

11  ACCIDENT; DO YOU RECALL?

12       A.   YEAH, HE WAS 13.

13       Q.   13, OKAY.

14       A.   1978, IN MAY.

15       Q.   HOW LONG -- DO YOU RECALL HOW LONG HE WAS IN THE

16  HOSPITAL?

17       A.   I BELIEVE IT WAS ABOUT FOUR OR FIVE DAYS, YOU

18  KNOW, BUT HIS HEAD SWOLE UP LIKE THE PLANET OF THE APES,

19  THAT'S WHAT HE LOOKED LIKE.  KNOCKED HIS FRONT TEETH OUT

20  AND THEY HAD TO CUT HIS MOUTH OPEN AND STICK THEM BACK IN

21  WITH NO ANESTHETIC OR ANYTHING.

22       Q.   WAS LARRY -- WAS THERE A CHANGE IN LARRY AFTER

23  THE BIKE ACCIDENT?  I DON'T MEAN PHYSICALLY, BUT IN THE

24  WAY HE ACTED?

25       A.   YES, THERE WAS.

26       Q.   WHAT WAS THAT, SIR?

27       A.   WELL, SHORTLY AFTER THAT, HIM AND HIS BUDDY THAT

28  SUMMER GOT A HOLD OF A BOTTLE OF WHISKEY SOMEWHERE, A HALF

1  GALLON, AND HE GOT ARRESTED FOR THAT, A BUDDY OF HIS

2  TAKING THE KID'S BICYCLE OR SOMETHING, AND HE WAS FINALLY

3  RELEASED, BUT I FOUND HIM IN THE GARAGE ONE TIME HAVING

4  ONE OF -- ONE OF THESE DRINKING EPISODES WITH THAT HALF

5  GALLON WHISKEY, HANGING OUTSIDE IN THE GARAGE, ABOUT TO

6  DIE.  I HAD TO PUT HIM IN THE SHOWER AND HE HAD A DRINKING

7  PROBLEM RIGHT THEN.

8      Q.    DID THIS DRINKING CONTINUE THROUGHOUT HIS

9  TEENAGE YEARS?

10      A.    YEAH.

11      Q.    YOU SAW THIS, RIGHT?

12      A.    YES, I DID.

13      Q.    BUT YOUR -- YOU WERE SEPARATED FROM YOUR WIFE

14  AND YOUR DAUGHTER WAS LIVING WITH HER?

15      A.    YEAH.

16      Q.    SO THEY DIDN'T SEE IT?

17      A.    YEAH, THEY DIDN'T SEE IT.

18      Q.    WHAT DID YOU DO ABOUT THAT, BESIDES --

19      A.    WELL, WHEN IT GOT TOO BAD, I WOULD BOOT HIM OUT.

20  AFTER HE DRIED OUT AND COME BACK A MONTH OR SO, I WOULD

21  LET HIM BACK IN.

22      Q.    WAS HE GOING TO HIGH SCHOOL DURING THIS TIME?

23      A.    WELL, IT WASN'T SO BAD -- YEAH, HE WAS DOING

24  THAT IN HIGH SCHOOL WHEN HE DID THIS, BUT HE DIDN'T DO IT

25  DURING THE SCHOOL DAY.  I THINK IT WAS ON THE WEEKEND WHEN

26  THIS INCIDENT HAPPENED.

27      Q.    NOW, WHEN YOU STARTED BOOTING HIM OUT, WAS HE

28  OUT OF HIGH SCHOOL?

1    A.    OH, YEAH.

2    Q.    OKAY.  HOW OLD WAS HE?

3    A.    HE WAS PROBABLY 18.

4    Q.    NOW, DO YOU RECALL IN 1993 WHEN LARRY LOST HIS

5    EYE?

6    A.    YES, SIR, I DO.

7    Q.    WHICH EYE DID HE LOSE?

8    A.    HIS LEFT EYE.

9    Q.    DID YOU GO VISIT HIM IN THE HOSPITAL?

10   A.    YES, SIR.

11   Q.    AND HE TOLD YOU WHAT HAPPENED?

12   A.    WELL, WHAT HAPPENED, I WAS OUT OF TOWN FOR THREE

13   OR FOUR DAYS THAT WEEKEND --

14         THE COURT:  THAT'S NOT THE QUESTION, SIR, THE

15   QUESTION IS DID HE TELL YOU WHAT HAPPENED?

16         THE WITNESS:  DID HE TELL ME WHAT HAPPENED?

17   BY MR. WILLIAMS:

18   Q.    YES, SIR.

19   A.    I WENT TO THE HOSPITAL AND SEEN WHAT HAPPENED.

20   Q.    YOU SAW THE RESULT OF IT?

21   A.    YES.

22   Q.    LARRY TOLD YOU WHAT HAPPENED THAT DAY HE LOST

23   HIS EYE?

24   A.    NO, IT WAS A LADY STANDING THERE THAT TOLD ME.

25   Q.    OKAY.  SO AFTER HE LOST HIS EYE, HE CAME BACK TO

26   LIVE WITH YOU?

27   A.    YES.

28   Q.    DID YOU NOTICE ANY CHANGE IN HIM AFTER THE LOSS

1  OF THE EYE?

2      A.   YES, I DID.

3      Q.   WHAT WAS THAT, SIR?

4      A.   WELL, I COME IN FROM WORK AND I WALKED -- HE'D

5  BE IN THE KITCHEN, I'D WALK UP BEHIND HIM AND HE WOULD

6  JUMP LIKE, YOU KNOW, LIKE HE WAS -- HE WAS REAL JUMPY, YOU

7  KNOW.  HE DIDN'T WANT YOU WALKING UP BEHIND HIM.

8      Q.   THIS WAS JUST AFTER LOSING THE EYE?

9      A.   YEAH.

10     Q.   DID THIS CONTINUE?

11     A.   YES.

12     Q.   UNTIL WHEN?

13     A.   PRETTY MUCH ALL THE TIME HE WAS ALWAYS JUMPY.

14     Q.   SO TO YOUR KNOWLEDGE, DID IT EVER GO AWAY WHEN

15  HE WAS IN YOUR PRESENCE?  IN OTHER WORDS --

16     A.   WELL, YOU KNOW, IF YOU MAKE A LOT OF NOISE WHEN

17  YOU COME IN, HE WASN'T SO BAD, YOU KNOW.

18     Q.   OKAY, BUT --

19     A.   HE DIDN'T WANT YOU TO BE QUIET AND WALK UP

20  BEHIND HIM BECAUSE HE WOULD FREAK OUT.

21     Q.   HE WOULD FREAK OUT.  WAS THAT -- DO YOU KNOW

22  WHETHER THAT WAS BECAUSE OF THE METHAMPHETAMINE?  DO YOU

23  KNOW WHETHER HE WAS HIGH OR NOT?

24     A.   I DON'T KNOW WHETHER IT WAS BECAUSE OF THAT OR

25  BECAUSE OF THE EYE.

26     Q.   NOW HE WENT AWAY TO PRISON A COUPLE OF TIMES,

27  RIGHT?

28     A.   YES.

1       Q.    AND WHEN HE CAME BACK, DID HE RELATE TO YOU

2   ANYTHING THAT HAD HAPPENED IN PRISON, PHYSICAL THREATS OR

3   THINGS TO HIM?

4       A.    YEAH, HE HAD SOME PROBLEM IN CALIPATRIA.

5       Q.    AND DID YOU NOTICE ANY DIFFERENCE AFTER

6   CALIPATRIA?

7       A.    YEAH, HE --

8       Q.    THAT WAS AN UNFAIR QUESTION.  DID YOU NOTICE ANY

9   DIFFERENCE IN THE JUMPINESS AND THINGS LIKE THAT AFTER

10  CALIPATRIA?

11      A.    NO, HE WAS STILL JUMPY.

12      Q.    OKAY, BUT WAS IT MORE PRONOUNCED?  WAS HE MORE

13  JUMPY OR --

14      A.    IT'S REALLY HARD TO SAY.

15      Q.    OKAY.  THAT'S FINE.  NOW, WHEN HE WAS ARRESTED

16  FOR MURDER --

17      A.    YES, SIR.

18      Q.    DID YOU MEET HIS ATTORNEY?

19      A.    YES, SIR.

20      Q.    PARDON?

21      A.    YES, SIR.

22      Q.    AND MR. PECKHAM IS THE GUY IN THE BACK IN THE

23  SUIT?

24      A.    YES, SIR.

25      Q.    SEATED NEXT TO YOUR DAUGHTER?

26      A.    YES.

27      Q.    DID YOU TELL HIM ABOUT LARRY'S HEAD INJURY?

28      A.    ABOUT WHAT?

1    Q.    LARRY'S HEAD INJURY?

2    A.    I DON'T BELIEVE I TOLD HIM ABOUT THE HEAD

3    INJURY, NO.

4    Q.    DID YOU TELL HIM ABOUT LARRY'S JUMPINESS?

5    A.    YES.

6    Q.    WHEN DID YOU TELL HIM ABOUT THAT?

7    A.    WHEN WE WERE TALKING TO HIM OUT HERE, OUTSIDE

8    THIS COURTROOM HERE ABOUT THE PSYCHIATRIST, MAYBE GETTING

9    THE PSYCHIATRIST TO TALK TO HIM, THAT'S WHEN I TOLD HIM.

10    Q.    OKAY, BUT YOU NEVER TOLD HIM AT THE PRELIM?

11    A.    NO.

12    Q.    YOU NEVER TOLD HIM -- YOU WENT TO LUNCH WITH

13    HIM?

14    A.    YEAH, THAT WAS AFTER THE PRELIM.  THAT WAS WHEN

15    WE WERE IN TRIAL, I BELIEVE.

16    Q.    BUT DID YOU TELL HIM ABOUT LARRY'S JUMPINESS

17    THEN?

18    A.    I DON'T BELIEVE I DID, NO.

19    Q.    AND YOU WENT TO THE MUSEUM, THE AEROSPACE

20    MUSEUM?

21    A.    YEAH.

22    Q.    DID YOU TELL HIM ABOUT LARRY'S JUMPINESS THEN?

23    A.    NO.

24    Q.    THE FIRST TIME YOU BROUGHT UP TO MR. PECKHAM

25    THAT LARRY WAS ACTING STRANGE BECAUSE OF BEING JUMPY WAS

26    DURING THE TRIAL?

27    A.    WELL, YEAH, I THINK WHEN IT FIRST STARTED, YOU

28    KNOW.

1    Q.   WHAT DID MR. PECKHAM RESPOND, IF YOU RECALL?

2    A.   HE SAID HE DIDN'T BELIEVE THAT WE NEEDED HER

3    RIGHT NOW.

4    Q.   OKAY.  AT ANY TIME, DID YOU REQUEST OF

5    MR. PECKHAM TO HAVE YOUR SON EVALUATED?

6    A.   WITH MY DAUGHTER, OUT IN THE HALLWAY.

7    Q.   AND THAT WAS DURING THE TRIAL?

8    A.   YES, JUST WHEN IT STARTED.

9    Q.   BUT NO TIME PRIOR?

10   A.   NO, NOT THAT I RECALL.

11   Q.   DID YOU EVER HAVE A CONVERSATION WITH

12   MR. PECKHAM ABOUT -- I WANT TO SAY DISPOSITION, BUT THAT'S

13   VAGUE, ABOUT A PLEA BARGAIN IN YOUR SON'S CASE?

14   A.   YES, SIR.

15   Q.   WHEN WAS THAT?

16   A.   BEFORE THE -- THIS -- MOST ALL OF THIS STARTED,

17   HE CALLED ME AT MY HOUSE UP IN CALIFORNIA CITY AND ASKED

18   ME IF I -- HE TALKED TO ME AND SAID LARRY CAN GET FIRST

19   DEGREE MURDER, AND IF I COULDN'T TALK TO HIM AND SEE IF HE

20   COULDN'T PLEAD TO A SECOND.

21   Q.   OKAY.  WHEN WAS THIS?

22   A.   I THINK IT WAS BEFORE THE PRELIMINARY EVEN OR

23   MAYBE IT WAS AFTER THE PRELIMINARY, I DON'T REMEMBER.  I

24   THINK THE PRELIMINARY WAS IN DECEMBER AND TRIAL WENT

25   AROUND TO THE NEXT YEAR IN JUNE OR SOMETHING, IF I

26   REMEMBER RIGHT.

27   Q.   WAS IT REAL CLOSE TO A TRIAL DATE OR --

28   A.   NO, IT WAS BEFORE THE TRIAL DATE.

```
1       Q.   HOW CLOSE -- HOW FAR?

2       A.   I REALLY DON'T KNOW.  IT WAS BETWEEN DECEMBER

3   AND JUNE.

4       Q.   OKAY.  THAT'S --

5       A.   IT WASN'T THE TRIAL DATE.

6       Q.   OKAY.

7       A.   SOMEWHERE BETWEEN.

8       Q.   OKAY, DID YOU TALK TO LARRY ABOUT THAT?

9       A.   YES.

10      Q.   AND LARRY REFUSED?

11      A.   ABSOLUTELY.

12      Q.   DID YOU TALK TO LARRY ABOUT THE KILLING?

13      A.   YES.

14      Q.   DID HE TELL YOU WHAT HAPPENED?

15      A.   YES.

16      Q.   DID HE TELL YOU HOW HE FELT?

17      A.   YES, HE -- HE FELT THAT THEY WERE GOING TO JUMP

18  HIM.

19      Q.   THAT THEY -- HE MEANS THE PEOPLE -- WHO DO YOU

20  MEAN?

21      A.   WELL, HE WAS IN THAT SITUATION AND THEY CALLED

22  TO GET SOME OTHER BUNCH OF PEOPLE TO COME OVER AND BEAT

23  HIM UP.

24      Q.   HE TOLD YOU THAT?

25      A.   YES.

26      Q.   DID YOU TELL MR. PECKHAM THAT?

27      A.   YOU KNOW, I DON'T RECALL.  I THINK I DID, BUT I

28  DON'T RECALL.  I CAN'T SAY FOR POSITIVE.
```

1    Q.    WE ONLY WANT WHAT YOU REALLY KNOW.

2    A.    OKAY.

3    Q.    DON'T GUESS.  DID YOU TELL MR. PECKHAM WHAT YOUR

4    SON HAD TOLD YOU?

5    A.    REGARDING WHAT?

6    Q.    YOU TALKED TO YOUR SON ABOUT THE KILLING, RIGHT?

7    A.    YES.

8    Q.    DID YOU TELL MR. PECKHAM WHAT YOUR SON HAD TOLD

9    YOU ABOUT THE KILLING?

10    A.    YOU KNOW, I BELIEVE I DID, BUT I'M SURE I TALKED

11    TO HIM ABOUT IT, YOU KNOW.

12    Q.    OKAY.  THAT'S FINE.  BUT YOU HAD SEVERAL

13    CONVERSATIONS WITH MR. PECKHAM?

14    A.    YES, WE TALKED ABOUT IT.

15    Q.    IN FACT, MR. PECKHAM, LET'S BE HONEST, SPENT A

16    LOT OF TIME WITH YOU?

17    A.    YES.

18    Q.    AND SHARON ON THIS CASE?

19    A.    YES.

20    Q.    TO YOUR KNOWLEDGE, OUTSIDE OF THE STATE PRISON

21    SYSTEM, HAS YOUR SON EVER BEEN EVALUATED BY A PSYCHOLOGIST

22    OR BY A PSYCHIATRIST?

23    A.    NO.

24    Q.    SO NEVER WHEN HE WAS AT JUVENILE COURT?

25    A.    NO.

26    Q.    AND YOU WERE THE CUSTODIAL PARENT, RIGHT?

27    A.    YES.

28    Q.    DID YOU EVER --

1    A.    WHEN HE GOT HIS EYE STABBED OUT, I RECOMMENDED

2    IT TO HIM, BUT I COULDN'T GET HIM TO DO IT.    AFTER HE

3    STARTED BEING ALL JUMPY, RIGHT AFTER HE GOT HIS EYE

4    STABBED, I SAID, YOU REALLY SHOULD GO SEE SOMEBODY AND

5    TALK ABOUT THAT, BUT HE DIDN'T DO IT.

6        MR. WILLIAMS:    THANK YOU.    NOTHING FURTHER.

7        THE COURT:    MS. MALLEN?

8        MS. MALLEN:    THANK YOU.

9

10                    **CROSS-EXAMINATION**

11   BY MS. MALLEN:

12    Q.    DO YOU HAVE A LEGAL BACKGROUND OF ANY KIND?

13    A.    NO.    NO, MA'AM.

14    Q.    OKAY.    ARE YOU SORRY YOUR SON IS IN JAIL?

15    A.    OF COURSE.

16    Q.    YOU'D LIKE TO SEE HIM OUT?

17    A.    OF COURSE.

18    Q.    LET'S START WITH, YOU TALKED ABOUT THE BIKE

19   ACCIDENT THAT MR. LITTLE, YOUR SON, HAD WHEN HE WAS 13.

20   IS THAT THE POINT WHEN -- AND YOU SAID THAT'S THE POINT

21   WHEN YOU SAW HIM START TO DRINK AS IN A PROBLEM SORT OF

22   WAY?

23    A.    YES, AFTER THAT.

24    Q.    DID YOU KNOW HE WAS USING MARIJUANA AS WELL?

25    A.    NOT RIGHT AWAY.    WHEN HE WAS ABOUT 14 OR 15 I

26   SEEN THAT COMING ON.

27    Q.    OKAY.    SO YOU KNEW THAT HE HAD STARTED USING

28   MARIJUANA AT 14 OR 15?

1    A.    YEAH.

2    Q.    DID YOU TRY TO GET HIM INTO ANY KIND OF

3  TREATMENT?

4    A.    NO, I DIDN'T.

5    Q.    DID YOU TAKE HIM TO SEE ANY KIND OF A COUNSELOR

6  OR A THERAPIST OR ANYTHING?

7    A.    NO.

8    Q.    AS FAR AS YOU KNEW, THEN, LARRY DIDN'T SEE

9  ANYBODY AT THAT POINT?

10    A.    SEE WHAT?

11    Q.    A DOCTOR, A THERAPIST OR ANYTHING?

12    A.    NO.

13    Q.    OKAY.  IN 1993 WHEN LARRY WAS STABBED IN HIS EYE

14  AND YOU VISITED HIM AT THE HOSPITAL, WHO WAS THE LADY WHO

15  TOLD YOU WHAT HAPPENED?

16    A.    SHE'S A FRIEND OF MINE FOR YEARS.

17    Q.    OH, SO SHE WAS VISITING LARRY AS WELL?

18    A.    NO, BUT SHE WENT UP THERE FOR ME BECAUSE I WAS

19  OUT OF TOWN FOR THREE DAYS.

20    Q.    SO YOU SENT A FRIEND TO SEE WHAT HAD HAPPENED?

21    A.    I DIDN'T SEND A FRIEND, SHE WENT UP THERE AND

22  THEN WHEN -- I WAS GONE TWO OR THREE DAYS.  WHEN I GOT

23  BACK, SHE CAME OVER AND TOLD ME WHAT WAS GOING ON.

24    Q.    DID YOU EVER TALK TO LARRY ABOUT WHAT HAPPENED

25  TO HIMSELF?

26    A.    YES, I DID.

27    Q.    OKAY, AND DID LARRY TELL YOU BASICALLY THAT HE

28  HAD BEEN DRINKING THAT NIGHT?

1    A.   YES, HE WAS -- YES, HE WAS DRINKING, I COULD

2    TELL.  HE LEFT A EMPTY BOTTLE OF WHISKEY ON MY KITCHEN

3    TABLE.

4    Q.   OH, SO YOU KNEW THAT ALREADY?

5    A.   YES.

6    Q.   AND YOU KNEW THAT HE HAD -- SOME WOMAN HAD

7    STABBED HIM IN THE EYE, A PROSTITUTE HE PICKED UP?

8    A.   THAT'S WHAT I WAS TOLD, YES.

9    Q.   BY LARRY?

10    A.   YEAH.

11    Q.   DID LARRY -- HOW LONG WAS HE IN THE HOSPITAL?

12    A.   FOR THE EYE?

13    Q.   FOR THE EYE?

14    A.   YOU KNOW, I DON'T RECALL THAT, TO BE HONEST WITH

15    YOU.

16    Q.   DO YOU THINK IT WAS MORE THAN A FEW DAYS OR DO

17    YOU KNOW?

18    A.   YEAH, IT WAS -- IT WAS A WHILE, PROBABLY FOUR OR

19    FIVE DAYS.

20    Q.   AND DID YOU KNOW THAT LARRY WAS USING CRYSTAL

21    METH AT THAT TIME?

22    A.   YES.

23    Q.   WHEN DID HE START USING CRYSTAL METH AS FAR AS

24    YOU KNEW?

25    A.   WELL, I THINK HE STARTED WAY BACK THERE WHEN HE

26    WAS 15 OR 16.  I NEVER CAUGHT HIM WITH ANY ON HIM, BUT I

27    COULD TELL THE WAY HE WAS ACTING HE WAS PROBABLY DOING IT.

28    Q.   HOW WAS HE ACTING?  WHAT WERE YOU NOTICING THAT

1    LED YOU TO THINK THAT?

2         A.   WELL, HE WAS A LITTLE BIT OUT OF CONTROL, YOU

3    KNOW.

4         Q.   OKAY.

5         A.   LIKE I HAD TO COME HOME FROM WORK A COUPLE TIMES

6    AND STRAIGHTEN OUT SOME STUFF AT SCHOOL.

7         Q.   OKAY.

8         A.   WHICH HE NEVER HAD THOSE PROBLEMS BEFORE.

9         Q.   OKAY.  WAS HE -- IF YOU NOTICED, WAS HE PARANOID

10   AND JUMPY WHEN HE WAS USING THE METH?

11        A.   YEAH, YEAH, I THINK HE WAS.

12        Q.   OKAY.

13        A.   PARANOID, REALLY.

14        Q.   AS FAR AS YOU KNOW, DID HE EVER GO FOR ANY KIND

15   OF TREATMENT, DRUG TREATMENT THAT YOU KNEW ABOUT?  DID YOU

16   SEND HIM TO ANY OR GO WITH HIM TO ANY?

17        A.   NO, I DIDN'T SEND HIM TO ANY, BUT I THINK HIS

18   PROBATION OFFICER SENT HIM TO SOMETHING, I'M NOT POSITIVE

19   ABOUT IT, BUT I THINK THEY SENT HIM TO SOME PLACE DOWN ON

20   EIGHTH STREET IN NATIONAL CITY.

21        Q.   OKAY.

22        A.   OR BY THE JAIL DOWN THERE I MEAN.

23        Q.   WELL, YOU KNEW HE WAS SUPPOSED TO AS PART OF HIS

24   PROBATION, RIGHT?

25        A.   YES.

26        Q.   DO YOU KNOW WHETHER HE ACTUALLY WENT OR NOT?

27        A.   WELL, I TOOK HIM A COUPLE TIMES.

28        Q.   DO YOU KNOW WHETHER HE ACTUALLY SPENT TIME?

44

1    A.   I SEEN HIM GO IN THERE; I DON'T KNOW IF HE WENT

2  OUT THE BACK DOOR.

3    Q.   YOU WEREN'T THERE?

4    A.   YEAH.

5    Q.   OKAY, ALL RIGHT.  NOW, WHEN YOU TALKED TO LARRY

6  ABOUT THE PLEA BARGAIN, WHAT DID MR. PECKHAM TELL YOU THAT

7  HE WANTED YOU TO TALK TO LARRY ABOUT?

8    A.   WELL, HE WAS AFRAID HE WAS GOING TO GET A FIRST

9  DEGREE AND HE WANTED ME TO TALK TO HIM, SEE IF HE WOULD

10  AGREE TO PLEA TO A SECOND DEGREE.

11    Q.   ALL RIGHT.  DID HE FORCE YOU TO TALK TO LARRY OR

12  THREATEN YOU IN ANY WAY?

13    A.   NO, OF COURSE NOT.  HE DIDN'T THREATEN ME.

14    Q.   OKAY.  SOMETIMES I HAVE TO ASK WHAT APPEARS TO

15  BE OBVIOUS.

16    A.   I DID TRY TO TELL HIM MAYBE YOU SHOULD OR

17  SOMETHING, BECAUSE IT WAS THE FIRST DEGREE THING AND I WAS

18  WORRIED ABOUT THAT, BUT HE ABSOLUTELY REFUSED WHEN I

19  TALKED TO HIM.

20    Q.   SO DID YOU THINK MR. PECKHAM MADE SENSE WHEN HE

21  TALKED TO YOU ABOUT THE PLEA BARGAIN?

22    A.   WELL, IT SEEMED LIKE THE SECOND WOULD BE BETTER

23  THAN THE FIRST.

24    Q.   OKAY.

25    A.   I MEAN, I'M NOT A LEGAL PERSON, SO I DON'T

26  REALLY KNOW.

27    Q.   OKAY.  AND LARRY REFUSED TO DISCUSS IT AT ALL?

28    A.   YEAH, HE DIDN'T FEEL THAT HE WAS -- HE DESERVED

45

1    IT.

2        Q.    OKAY.  DID LARRY OR THE DEFENDANT, YOUR SON, DID

3    HE TALK TO YOU ABOUT THE KILLING WITH THE KNIFE?

4        A.    YES.

5        Q.    DID HE TELL YOU THAT HE THOUGHT THAT HE WAS

6    ACTING IN SELF-DEFENSE?

7        A.    YES.

8        Q.    WAS HE VERY STRONG ABOUT THAT?

9        A.    YES.

10       Q.    DID HE EVER BRING UP ANYTHING ELSE OTHER THAN

11   THAT HE THOUGHT THAT HE WAS GOING TO BE ATTACKED?

12       A.    NO.

13       Q.    OKAY.

14       A.    HE DID SAY THAT THE GUY CAME AT HIM; HE DID SAY

15   THAT.

16       Q.    OKAY, SO THE GUY --

17       A.    HE WAS UP AND COMING AT HIM.

18       Q.    ALL RIGHT.  AND HE WAS REACTING TO WHAT HE SAW?

19       A.    YES.

20       Q.    NOW YOU MENTIONED THAT YOU HAD MOVED OUT OF

21   SOUTHERN CALIFORNIA, OUT OF SAN DIEGO.  WHEN DID YOU

22   MOVE -- WHERE DID YOU MOVE TO?

23       A.    MOVED TO CALIFORNIA CITY.

24       Q.    AND WHEN DID YOU MOVE THERE?

25       A.    JUNE OR JULY -- JULY OF 1998.

26       Q.    SO THAT WAS BEFORE THIS INCIDENT HAPPENED?

27       A.    YES.

28       Q.    DID YOU MOVE BY YOURSELF?

1        A.    YES.

2        Q.    WHERE WAS LARRY LIVING AT THE TIME?

3        A.    I DON'T KNOW.

4        Q.    WHEN WAS THE LAST --

5        A.    HE WAS WITH ME, BUT WHEN I MOVED, HE DIDN'T GO

6    WITH ME.  HE WAS LIVING WITH ME WHEN I LEFT, BUT WHEN I

7    WENT UP THERE, HE STAYED HERE.

8        Q.    OKAY.  NOW YOU HAVE MENTIONED IN YOUR

9    DECLARATION SOMETHING ABOUT A DR. AKRID(PH).  WHO IS

10   DR. AKRID?

11       A.    DR. AKRID?

12       Q.    YES.

13       A.    I THINK HE MIGHT BE THE EYE DOCTOR.

14       Q.    WHOSE EYE DOCTOR?

15       A.    LARRY'S.

16       Q.    WHEN DID LARRY GO TO THIS EYE DOCTOR?

17       A.    I CAN'T REMEMBER THE DATE THAT I TOOK HIM THERE.

18   I TOOK HIM THERE TO GET SOME GLASSES AND HAVE AN

19   EXAMINATION.  I'M NOT SURE IF THAT DOCTOR -- I'M NOT SURE

20   IF THE -- IF AKRID IS THAT ONE OR THE DOCTOR HE WENT TO

21   LATER, YOU KNOW, OVER HERE IN SPRING VALLEY.  I'M NOT SURE

22   WHAT THE NAME OF THE DOCTOR WAS.

23       Q.    OKAY.  DID YOU -- WELL, LET'S -- HE WAS -- LET'S

24   ASSUME HE'S AN EYE DOCTOR, OKAY?  WHEN DID YOU TAKE LARRY

25   TO AN EYE DOCTOR FOR GLASSES?  WHEN DID YOU FIRST TAKE

26   HIM?

27       A.    I DON'T REMEMBER.  I'M GOING TO SAY '94 OR '95,

28   SOMEWHERE IN THERE.

1    Q.    WAS THAT AFTER THE STABBING?

2    A.    AFTER, YEAH.

3    Q.    OKAY.  AND DID YOU TALK TO THE EYE DOCTOR ABOUT

4    WHAT HE WAS DOING WITH LARRY?

5    A.    NO, I DIDN'T.

6    Q.    OKAY.

7    A.    I TOOK HIM IN AND LET HIM EXAMINE HIM AND GIVE

8    HIM THE PRESCRIPTION OR WHATEVER.

9    Q.    DID HE PRESCRIBE EYEGLASSES FOR YOUR SON?

10   A.    YES.

11   Q.    DID HE MAKE GLASSES FOR YOUR SON?

12   A.    YES.

13   Q.    DID YOU PAY FOR THEM?

14   A.    YES.

15   Q.    OKAY.  AND DID HE DISCUSS ANYTHING ELSE WITH YOU

16   OTHER THAN GIVING LARRY, YOUR SON, EYEGLASSES?

17   A.    NO.

18   Q.    DID YOU TALK TO MR. PECKHAM ABOUT RECORDS FROM

19   AN EYE DOCTOR?

20   A.    YES.

21   Q.    WHAT DID YOU TALK TO HIM ABOUT?

22   A.    WELL, I DIDN'T TALK TO HIM, HE WANTED ME TO GET

23   THE RECORDS FROM THE DOCTOR IN CLAIREMONT.  I DON'T KNOW

24   IF IT'S AKRID, IT PROBABLY IS AKRID.  I DON'T REMEMBER THE

25   NAMES.

26   Q.    OKAY.

27   A.    BUT THE DOCTORS IN CLAIREMONT ON CLAIREMONT

28   DRIVE -- CLAIREMONT MESA BOULEVARD I MEAN.

1    Q.    ALL RIGHT.  AND DID YOU DO THAT?

2    A.    YEAH, I WENT AND GOT THEM.  HE REQUESTED I GO

3  AND GET THOSE RECORDS FOR HIM, AND SO I WENT AND GOT THEM.

4    Q.    WAS THERE A PROBLEM WITH YOU GETTING THE

5  RECORDS?

6    A.    NO.

7    Q.    DID -- DID MR. PECKHAM ASK YOU TO DO SOMETHING

8  THAT YOU DIDN'T UNDERSTAND?

9    A.    NO, JUST ASKED ME TO GO GET THE RECORDS AND I

10  DID.

11    Q.    OKAY, DID YOU KNOW WHY HE WAS GETTING THE

12  RECORDS?

13    A.    I -- I ASSUMED TO GET THEM TO USE THEM IN COURT

14  TO VERIFY HIS -- FOR HIM TO SEE.

15    Q.    DID YOU ASK MR. PECKHAM ABOUT WHY HE WAS GETTING

16  THE RECORDS?

17    A.    NO, I JUST -- AGAIN, I ASSUMED HE WAS GOING TO

18  USE THEM IN THE TRIAL.

19    Q.    DID -- AS FAR AS YOU KNOW, WAS THERE SOME KIND

20  OF PROBLEM WITH THOSE RECORDS?

21    A.    NO, THE DOCTOR HANDED THEM TO ME AND I BROUGHT

22  THEM DOWN THERE.

23    Q.    OKAY.  DID MR. PECKHAM EVER TELL YOU THAT HE HAD

24  DONE SOMETHING WRONG WITH THOSE RECORDS?

25    A.    THAT WHO HAD DONE SOMETHING WRONG?

26    Q.    MR. PECKHAM.  DID HE EVER TELL YOU THAT HE HAD

27  HANDLED SOMETHING -- THERE WAS A PROBLEM WITH THE RECORDS

28  OR SOMETHING HAD GONE WRONG WITH THEM?

1    A.    NO.    THE LADY IN COURT SAID THAT I COULD HAVE

2    MADE THE RECORDS MYSELF, THOUGH.    WHEN I FINALLY DID GET

3    INTO COURT, I COULDN'T GET IN THERE AND GET THE RECORDS

4    DOWN.    SHE ACCUSED ME OF MAKING THEM MYSELF.

5    Q.    WHO DID?

6    A.    WELL, THE PROSECUTOR.

7    Q.    OH, SO THE PROSECUTOR SAID SOMETHING ABOUT THE

8    WAY THAT YOU DID THE RECORDS THAT --

9    A.    NO, SHE SAID HE CAN GO MAKE THESE HISSELF.

10    Q.    OKAY, AND YOU DIDN'T THOUGH, RIGHT?

11    A.    WELL, I'M A PLUMBER, I'M NOT AN OPTOMETRIST.    I

12    WOULDN'T HAVE ANY IDEA HOW TO MAKE A RECORD LIKE THAT.

13    Q.    SO MR. PECKHAM ASKED YOU TO DO SOMETHING AND YOU

14    DID IT?

15    A.    YES.

16        MS. MALLEN:    OKAY, THANK YOU.    NOTHING FURTHER.

17        THE COURT:    MR. WILLIAMS?

18

19            **REDIRECT EXAMINATION**

20    BY MR. WILLIAMS:

21    Q.    WHEN YOU SAID YOU WENT TO COURT AND THE LADY --

22    THE PROSECUTOR I ASSUME YOU MEAN, MS. STEIN?

23    A.    YES.

24    Q.    MARNIE STEIN?

25    A.    YES.

26    Q.    DID SHE SAY TO YOU YOU COULD HAVE MADE THESE

27    YOURSELF OR --

28    A.    THAT'S WHAT I HEARD HER SAY.

1    Q.    OKAY.

2    A.    HOW DID WE KNOW HE DIDN'T MAKE THESE HISSELF?

3    Q.    SO THE RECORDS WERE NOT ADMITTED INTO EVIDENCE;

4    IS THAT YOUR UNDERSTANDING?

5    A.    I GUESS, I DON'T KNOW.

6    Q.    YOU DON'T --

7    A.    I DON'T KNOW.

8    MR. WILLIAMS:  OKAY, THANK YOU.  I HAVE NOTHING

9    FURTHER.

10    THE COURT:  ANYTHING ELSE?

11    MS. MALLEN:  NO, THANK YOU.

12    THE COURT:  THANK YOU, MR. LITTLE.  YOU MAY STEP

13    DOWN.

14    THE WITNESS:  THANK YOU.

15    THE COURT:  WE'LL TAKE -- LET'S TAKE 15 MINUTES.

16    MS. MALLEN:  OKAY, THANK YOU.

17    THE COURT:  WE'LL BE IN RECESS UNTIL 10:30.

18    (RECESS.)

19

20    THE COURT:  PETITIONER AND COUNSEL ARE ALL

21    PRESENT.

22    MR. WILLIAMS.

23    MR. WILLIAMS:  THANK YOU, YOUR HONOR.  WE'LL

24    CALL THE PETITIONER, LARRY LITTLE, JR.

25

26    LARRY LITTLE, JR.,

27    CALLED AS A WITNESS ON BEHALF OF THE DEFENDANT, HAVING

28    BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

APPENDIX No. 1

# EXHIBIT    L

1      **EL CAJON, CALIFORNIA, AUGUST 25, 2004, 1:30 P.M.**

2                             --oOo--

3              THE COURT:  THE PARTIES AND ATTORNEYS ARE

4      PRESENT.

5                   MS. MALLEN, YOU MAY PRESENT YOUR FIRST

6      WITNESS.

7              MS. MALLEN:  THANK YOU.  WE WOULD CALL

8      MR. PECKHAM TO THE STAND.

9

10                     **EDWARD JOHN PECKHAM,**

11     CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, HAVING

12     BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

13

14                   THE CLERK:  TAKE THE STAND, PLEASE.

15

16                       **DIRECT EXAMINATION**

17     BY MS. MALLEN:

18         Q.   PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

19     NAME.

20         A.   MY FULL NAME IS EDWARD JOHN PECKHAM.  LAST NAME

21     IS SPELLED P-E-C-K-H-A-M.

22         Q.   HOW ARE YOU CURRENTLY EMPLOYED?

23         A.   I'M EMPLOYED -- I'M SELF-EMPLOYED ACTUALLY BY

24     THE LAW OFFICES OF EDWARD J. PECKHAM.

25         Q.   DOES THAT MEAN YOU'RE A LAWYER?

26         A.   I'M A LAWYER.

27         Q.   AND APPROXIMATELY HOW LONG HAVE YOU PRACTICED

28     LAW?

**EXHIBIT L**

1    A.    I PASSED THE BAR IN 1979, AND SO ABOUT COMING UP

2    ON 25 YEARS THIS FALL.

3    Q.    HAVE YOU HANDLED -- WELL, LET ME ASK YOU FIRST:

4    DO YOU RECOGNIZE THE PERSON IN COURT SEATED TO MY RIGHT

5    WEARING GREEN BY THE NAME OF MR. LITTLE?

6    A.    YES, I DO.

7    Q.    DID YOU REPRESENT MR. LITTLE?

8    A.    YES, I DID.

9    Q.    HAVE YOU HANDLED MURDER CASES OTHER THAN THE ONE

10    FOR MR. LITTLE?

11    A.    I HANDLED ONE MURDER CASE PRIOR TO MR. LITTLE'S,

12    AND I HANDLED TWO HOMICIDE CASES PRIOR TO THIS CASE, BOTH

13    OF WHICH WERE VEHICULAR HOMICIDE.   ONE WAS CHARGED AS A

14    MURDER, BUT SETTLED AS A MANSLAUGHTER.

15    Q.    HAVE YOU HANDLED OTHER CASES INVOLVING DEATHS?

16    A.    YES.  I HANDLED A WRONGFUL DEATH CASE IN FEDERAL

17    COURT; I THINK IT WAS PRIOR TO MR. LITTLE'S CASE.   IT WAS

18    A CIVIL CASE IN WHICH A CLIENT WAS KILLED BY A CUSTOMS

19    AGENT, IN WHAT THEY THOUGHT WAS A PROSTITUTION/RAPE CASE.

20    Q.    HAVE YOU HANDLED OTHER CRIMINAL CASES?

21    A.    YES.

22    Q.    AND HOW LONG HAVE YOU BEEN PRACTICING CRIMINAL

23    LAW?

24    A.    I STARTED PRACTICING CRIMINAL LAW IN THE EARLY

25    '80'S WITH TWO LAW PARTNERS.   THE THREE OF US HAD A

26    MISDEMEANOR CONTRACT WITH THE COUNTY OF SAN DIEGO AND WE

27    DID CRIMINAL INDIGENT WORK ON THAT CONTRACT FOR ABOUT FIVE

28    YEARS.   THEN ONE OF THE PARTNERS LEFT AND WE PICKED UP

1   ANOTHER PARTNER AND GOT ANOTHER CONTRACT FOR CLASS -- WHAT

2   THEY CALL CLASS 3 FELONIES, AND WITH THE COUNTY OF

3   SAN DIEGO, WHICH WE DID IN VOLUME.  AND I'M THINKING FOR

4   ANOTHER FIVE TO SEVEN YEARS, I'M NOT EXACTLY SURE OF THE

5   DATES, BUT IN 19 -- ABOUT '88 I WENT OFF -- NO, 19 -- IT

6   WAS ABOUT 1988, I THINK, I WENT OFF ON MY OWN.  ACTUALLY,

7   I WENT TO WORK FOR A SMALL CIVIL LAW FIRM FOR A SHORT

8   PERIOD OF TIME.  AND IN ABOUT 1990 I WENT BACK OUT

9   PRACTICING AS A SOLE PRACTITIONER, DOING PRIMARILY

10  CRIMINAL LAW, BUT A FAIR AMOUNT OF CIVIL LAW AS WELL.

11       Q.    APPROXIMATELY HOW MANY TRIALS, CRIMINAL TRIALS

12  WOULD YOU SAY YOU'VE DONE?

13       A.    THE LAST COUNT, SEVERAL YEARS AGO I HAD WELL

14  OVER 100 CRIMINAL JURY TRIALS.

15       Q.    DO YOU ATTEND TRAINING IN THE AREA OF CRIMINAL

16  LEGAL DEFENSE?

17       A.    YES.

18       Q.    AND DO YOU DO THAT ON A REGULAR BASIS?

19       A.    YES.  AS A PART OF OUR CONTRACT WITH THE PRIVATE

20  CONFLICTS COUNSEL, WE ARE REQUIRED TO ATTEND A MINIMUM OF

21  12 HOURS OF LEGAL TRAINING WITH AN EMPHASIS IN CRIMINAL

22  LAW EVERY YEAR.  AND I OFTEN GET OTHER TRAINING AS WELL

23  THAT'S NOT RELATED TO THE CRIMINAL PRACTICE.

24       Q.    HAVE YOU RECEIVED TRAINING IN THE AREA OF --

25  WELL, LET ME REPHRASE THAT.  DO YOU BELONG TO THE LOCAL

26  BAR ASSOCIATION?

27       A.    YES.  I BELONG TO THE COUNTY BAR OF SAN DIEGO.

28       Q.    AND DO YOU BELONG TO THE STATE BAR ASSOCIATION

1    AS WELL?

2          A.    YES.    I'M A MEMBER OF THE STATE BAR AS WELL.

3          Q.    YOU MENTIONED THAT YOU WORK FOR THE CONFLICTS

4    PANEL?

5          A.    YES.    THERE IS A ORGANIZATION OF ATTORNEYS WHO

6    APPLY FOR AND ARE APPOINTED UNDER PRIVATE CONFLICTS.    IT'S

7    A THIRD LEVEL APPOINTMENT AFTER THE PUBLIC DEFENDER, AND

8    THEN YOU HAVE ALTERNATE PUBLIC DEFENDER, AND THEN CASES

9    WHICH ARE EITHER CONFLICTED WITH ONE OF THOSE TWO

10   ORGANIZATIONS.    OR IF THERE'S MULTIPLE DEFENDANTS, THEY

11   WILL THEN GO OUT TO PRIVATE CONFLICTS.    YOU HAVE TO

12   QUALIFY AS A CLASS IN PRIVATE CONFLICTS OR UP TO A CLASS,

13   THEY HAVE SIX CLASSES, CLASS SIX BEING DEATH PENALTY

14   CASES.    CLASS 5 IS EVERYTHING BELOW THAT.    CLASS 4 IS

15   CERTAIN VIOLENT FELONIES.    3, ET CETERA, TO LESSER

16   FELONIES.

17         Q.    AND WHAT CLASS ARE YOU QUALIFIED?

18         A.    I'M QUALIFIED AS A CLASS 5 LAWYER.    I'VE NEVER

19   APPLIED FOR A CLASS 6; I JUST DON'T CARE TO DO THOSE

20   CASES.

21         Q.    WERE YOU APPOINTED TO REPRESENT MR. LITTLE AS

22   PART OF YOUR WORK WITH THE PRIVATE CONFLICTS PANEL?

23         A.    YES, I WAS.

24         Q.    NOW, HAVE ANY OF THE CASES THAT YOU'VE BEEN

25   INVOLVED IN UP TO THE POINT WHERE YOU WERE APPOINTED TO

26   WORK WITH MR. LITTLE, DID ANY OF THEM INVOLVE

27   POSTTRAUMATIC STRESS DISORDER?

28         A.    I HAD A CIVIL CASE THAT DID INVOLVE A CLIENT WHO

1  WAS BEATEN BY WHAT HE CLAIMED TO BE HIGHWAY PATROL

2  OFFICERS, AFTER THEY DETAINED HIM ON A DRUNK DRIVING.  AND

3  HE CLAIMED THAT HE WAS SUFFERING FROM POSTTRAUMATIC STRESS

4  SYNDROME.

5      Q.   AS PART OF THAT CIVIL CASE, DID YOU CONSULT WITH

6  EXPERTS IN THAT AREA?

7      A.   YES.

8      Q.   DID YOU DO RESEARCH IN THAT AREA?

9      A.   YES.

10     Q.   DID YOU INTERVIEW THE CLIENT ON THAT ISSUE?

11     A.   YES.

12     Q.   AND DID YOU SEND THE CLIENT FOR FURTHER

13  EVALUATION?

14     A.   YES.

15     Q.   DID YOU REVIEW THE EVALUATION DOCUMENTS THAT

16  WERE RETURNED?

17     A.   YES.

18     Q.   ARE YOU AWARE OF VARIOUS PSYCHOLOGICAL DEFENSES

19  AS THEY MIGHT PERTAIN TO CRIMINAL DEFENSE AND CIVIL CASES?

20     A.   YES.  IN THE CIVIL CASE, IT WAS MORE OF A CLAIM

21  FOR DAMAGES BECAUSE HE WAS SUFFERING AS A RESULT OF THE

22  BEATING IN HIS PERSONAL LIFE WITH RECURRING NIGHTMARES AND

23  RELIVING THE SITUATION.  AND HE WAS ALSO FEARFUL OF

24  CERTAIN SITUATIONS THAT OCCURRED INVOLVING POLICE

25  OFFICERS.  AND ALL THOSE WERE APPARENT.  AND, OF COURSE,

26  WE DISCUSSED THOSE AS FAR AS CRIMINAL DEFENSE GOES.  THEN,

27  OF COURSE, YOU KIND OF TAKE THE OTHER SIDE.  YOU LOOK AT

28  IT AS A POTENTIAL DEFENSE TO A -- AS THE DOCTOR WAS

1    POINTING OUT TODAY, HIS STATE OF MIND, OR MENS REA.

2         Q.   AND DO YOU HAVE A PARTICULAR INTEREST IN THE

3    AREA OF PSYCHOLOGY?

4         A.   WELL, ACTUALLY, I WAS -- I WAS AT ONE TIME

5    MARRIED TO A WOMAN THAT I PUT THROUGH MEDICAL SCHOOL AND

6    SHE BECAME A PSYCHIATRIST.  AND IT WAS CONCURRENTLY WITH

7    THAT PERIOD WHEN SHE WAS IN TRAINING, AND THEN WHEN SHE

8    OPENED HER -- HER MEDICAL OFFICE THAT I WAS DOING A FAIR

9    AMOUNT OF WORK IN THE COUNTY ON APPOINTMENT TO REPRESENT

10   PERSONS THAT WERE SUBJECT TO CONSERVATORSHIP.  THEY HAD TO

11   HAVE A LAWYER APPOINTED, SO I GOT AN OPPORTUNITY TO TRAVEL

12   AROUND TO MANY OF THE MENTAL INSTITUTIONS AND HOSPITALS

13   AND BOARD AND CARE HOMES IN SAN DIEGO, TALKED TO PATIENTS,

14   REVIEWED MEDICAL AND PSYCHIATRIC RECORDS, SO I DEVELOPED

15   QUITE AN INTEREST IN IT AT THE TIME.

16        Q.   AND ABOUT HOW LONG DID YOU DO COUNTY WORK IN

17   CONJUNCTION WITH CONSERVATORSHIPS?

18        A.   I THINK I DID THAT FOR ABOUT TWO OR THREE YEARS.

19   THEY PAID SO POORLY, AND THE WORK THAT YOU HAD TO DO WITH

20   IT WAS QUITE EXTENSIVE.  SO IT DIDN'T REALLY PAY OFF TOO

21   WELL.

22        Q.   BUT DURING THAT TIME PERIOD, YOU BECAME FAMILIAR

23   WITH VARIOUS MEDICAL RECORDS?

24        A.   YES.

25        Q.   YOU BECAME FAMILIAR WITH VARIOUS DOCTOR'S

26   REPORTS?

27        A.   YES.

28        Q.   AND YOU TALKED TO VARIOUS PEOPLE CONCERNING

1   PSYCHOLOGICAL ISSUES?

2        A.   MANY CASES INVOLVED, OF COURSE, PSYCHOLOGICAL

3   ISSUES THAT WERE DEBILITATING TO THE CLIENT THAT WAS IN

4   ESSENCE CAUSING THEM TO BE PLACED ON A CONSERVATORSHIP.

5   THEIR PSYCHOLOGICAL DISEASE WAS SO BAD THAT THEY COULDN'T

6   FUNCTION, THEY COULDN'T PROVIDE FOR THEIR OWN FOOD,

7   CLOTHING, OR SHELTER, SO THEY WERE PLACED ON A

8   CONSERVATORSHIP.

9        Q.   DID THE ISSUE EVER ARISE WHERE THERE WAS A

10   QUESTION ABOUT WHETHER A CONSERVATORSHIP WAS CALLED FOR OR

11   NOT BASED ON PSYCHOLOGICAL PROBLEMS?

12        A.   YES.

13        Q.   AND DID YOU HAVE TO EVALUATE OR OBTAIN

14   INFORMATION TO EVALUATE WHETHER A PERSON WAS -- HAD

15   PSYCHIATRIC PROBLEMS THAT WOULD COMPROMISE THEM THAT MUCH?

16        A.   YES.  AND I TRIED CASES IN FRONT OF JURIES ON

17   PSYCHOLOGICAL ISSUES WHERE THE CLIENT WAS CLAIMING THAT HE

18   OR SHE WAS COMPETENT TO TAKE CARE OF HIS OWN NEEDS AND A

19   PUBLIC CONSERVATOR WAS TRYING TO PLACE THE PERSON ON A

20   CONSERVATORSHIP.  SO THOSE ISSUES WERE PRESENTED IN TRIAL,

21   EXPERTS WERE CALLED TO TESTIFY.  AND SO I WAS FAMILIAR

22   WITH THEM AND HAD -- HAD BEEN INVOLVED IN PSYCHIATRIC

23   ISSUES QUITE A LOT.

24        Q.   THANK YOU.  NOW, WHEN YOU BECAME INVOLVED WITH

25   MR. LITTLE'S CASE, THE DEFENDANT, WAS THAT BECAUSE YOU

26   WERE APPOINTED TO REPRESENT HIM FOR ALL PURPOSES IN THE

27   CRIMINAL CASE INVOLVING A STABBING THAT OCCURRED WITH A

28   MR. RABITOR?

1      A.    THAT'S CORRECT, YES.

2      Q.    NOW, DID YOU HAVE A CONVERSATION WITH THE

3  DEFENDANT?

4      A.    I DID.  MANY CONVERSATIONS WITH HIM.

5      Q.    DID HE MAKE YOU AWARE THAT HE WAS -- HE HAD A

6  LOSS OF AN EYE?

7      A.    YES.

8      Q.    DID HE TELL YOU HOW THAT OCCURRED?

9      A.    YES, HE DID.

10     Q.    DID HE TELL YOU THAT HE HAD BEEN STABBED IN THE

11 EYE IN 1993 OR '94?

12     A.    YES.

13     Q.    DID YOU DISCUSS THIS WITH THE DEFENDANT?

14     A.    I DID.

15     Q.    AND DID YOU INVESTIGATE THAT LOSS OF THE EYE ANY

16 FURTHER, THAN DISCUSSIONS WITH THE DEFENDANT?

17     A.    WELL, I TALKED TO HIS FAMILY MEMBERS AND THEY

18 CONFIRMED THAT THAT INCIDENT HAD OCCURRED.  HE DID HAVE A

19 LOT OF DETAILS ABOUT IT.  AND HE INDICATED THAT THERE WAS

20 A CRIMINAL CASE AND HE WAS INVOLVED IN THAT.  AND SO BASED

21 UPON THAT, I WOULDN'T DO ANY EXTENSIVE INVESTIGATION TO

22 CONFIRM THAT HE LOST HIS EYE THAT WAY, NO.

23     Q.    BUT YOU DID TALK TO HIS FAMILY?

24     A.    YES.

25     Q.    TALKED TO HIS FATHER?

26     A.    YES.

27     Q.    AND WAS HIS FATHER ABLE TO CONFIRM A VISIT TO A

28 HOSPITAL, ET CETERA?

1  A. YES.

2  Q. DID YOU TALK TO MR. LITTLE ABOUT TREATMENT THAT

3 HE RECEIVED, MEDICAL TREATMENT FIRST OF ALL, IN RELATION

4 TO THE LOSS OF THE EYE?

5  A. ONLY AS IT RELATED TO THE CRIMINAL CASE THAT HE

6 WENT TO THE HOSPITAL.  HIS EYE HAD BEEN DAMAGED BEYOND

7 REPAIR, AND THEY REMOVED IT.  AND THE FACTS THAT

8 SURROUNDED IT.  WE DISCUSSED THAT, AS HE TESTIFIED IN

9 COURT, I THINK IT WAS YESTERDAY, THAT HE HAD BEEN STABBED

10 BY THIS PROSTITUTE AND --

11  Q. DID HE TELL YOU BASICALLY THE SAME THINGS THAT

12 HE TOLD THE COURT HERE TODAY?

13  A. YES.

14  Q. AND YOU WERE PRESENT AND HEARD HIM TESTIFY IN

15 COURT?

16  A. YES.  I ACTUALLY DIDN'T LEARN ANYTHING NEW,

17 EXCEPT I THINK HE SAID THEY WERE OUTSIDE PACERS, AND I'M

18 NOT SURE THAT I KNEW THAT.

19  Q. OKAY.  NOW, WHEN YOU HEARD FROM MR. LITTLE ABOUT

20 THE EYE, DID THAT RAISE ANY KIND OF A FLAG FOR YOU IN

21 TERMS OF A PSYCHOLOGICAL CONCERN?

22  A. YES.

23  Q. TELL US ABOUT THAT.

24  A. WELL, I RECOGNIZE THIS IS A VERY TRAUMATIC EVENT

25 THAT HE HAD SUSTAINED, AND I WANTED TO DEVELOP FURTHER

26 INFORMATION ABOUT IT.  SO AFTER I LEARNED ABOUT IT, I

27 STARTED ASKING HIM QUESTIONS THAT WOULD HELP US IN THE

28 DEFENSE OF HIS CASE, BECAUSE HE WAS INVOLVED IN A

1    STABBING.  SO I IMMEDIATELY SAW THAT THERE WOULD BE A --

2    POTENTIALLY A BIG CONNECTION WITH THE TWO EVENTS.

3        Q.    AND ARE YOU FAMILIAR WITH FULL SYNDROME

4    POSTTRAUMATIC STRESS DISORDER?

5        A.    YES.

6        Q.    HAVE YOU EVER HEARD OF OR HAVE ANY INFORMATION

7    ABOUT PARTIAL SYNDROME, POSTTRAUMATIC STRESS DISORDER?

8        A.    NO.  THAT WAS THE FIRST I HEARD ABOUT IT WAS

9    THIS MORNING.

10       Q.    AND HAVE YOU -- YOU MENTIONED THAT YOU'VE

11   HANDLED A CIVIL CASE WITH POSTTRAUMATIC STRESS DISORDER.

12   IN RELATION TO THAT, YOU MENTIONED TO TALKING TO

13   SPECIALISTS.  AND DURING THAT CIVIL CASE, DID YOU RESEARCH

14   VARIOUS ISSUES IN P.T.S.D.?

15       A.    WELL, I BECAME QUITE FAMILIAR WITH POSTTRAUMATIC

16   STRESS SYNDROME, BOTH READING DSM-4 AND ALSO DISCUSSING

17   THE SYNDROME WITH MY EXPERT WITNESS HAKLESH CARION.  I MET

18   WITH HIM ON SEVERAL OCCASIONS, SPOKE WITH HIM ON THE PHONE

19   AND THEN BROUGHT MY CLIENT TO HIS OFFICE TO BE EVALUATED,

20   AND THEN HAD DISCUSSIONS WITH HIM AFTER THE EVALUATION WAS

21   COMPLETED.

22       Q.    IN THIS CASE, WHAT DID YOU -- CAN YOU DESCRIBE

23   FOR US SOME OF YOUR EFFORTS TO EVALUATE WHETHER IT EXISTED

24   OR NOT WITH MR. LITTLE?

25       A.    YES.

26       Q.    DID YOU TALK TO THE DEFENDANT?

27       A.    YES.

28       Q.    AND DID YOU GET DETAILS WITH THE EYE INJURY FROM

1   HIM AS MUCH AS POSSIBLE?

2       A.   YES.

3       Q.   DID YOU LOOK TO SEE WHETHER THERE WAS ANY

4   OTHER -- ANY INDICATORS THAT WOULD SUGGEST POSTTRAUMATIC

5   STRESS DISORDER EXISTED?

6       A.   WELL, THAT'S EXACTLY WHAT I WAS LOOKING FOR,

7   WERE SOMETHING THAT MIGHT ASSIST US IN HIS DEFENSE IN THIS

8   CASE.  SO I STARTED ASKING LARRY -- EXCUSE ME, MR. LITTLE

9   WHETHER OR NOT THIS EVENT, THIS STABBING IN HIS FACE

10  CAUSED HIM TO HAVE ANY KIND OF NIGHTMARES, IF HE HAD

11  FLASHBACKS, IF HE HAD FEARS ABOUT BEING IN PLACES, OR WAS

12  HE AFRAID OF PEOPLE OR ANYTHING LIKE THAT THAT -- THAT WE

13  COULD ATTRIBUTE TO HIS REACTION IN THIS CASE.  AND HE

14  CONSISTENTLY INDICATED TO ME THAT HE HAD NO FEARS; THAT HE

15  DIDN'T HAVE ANY NIGHTMARES.  THAT THERE WASN'T ANYTHING

16  ABOUT WHAT HAPPENED BACK THEN THAT HAD ANYTHING TO DO WITH

17  WHAT WENT ON WITH MR. RABITOR.

18           I SPECIFICALLY RECALL HAVING A CONVERSATION

19  WITH HIM WHERE WE WERE REVIEWING PHOTOGRAPHS, AND WE

20  NOTICED THAT MR. RABITOR -- HIS BODY WAS LYING ON THE

21  LIVING ROOM.  AND WHEN THEY REMOVED IT, THERE WERE OTHER

22  PHOTOGRAPHS OF BLOOD STAINS, ET CETERA, IN THE AREA.  AND

23  I NOTICED THAT THERE WAS A KNIFE LYING ON THE FLOOR, WHICH

24  APPARENTLY HAD BEEN HIDDEN BY MR. RABITOR'S BODY.  AND I

25  PRACTICALLY JUMPED OUT OF MY SKIN WHEN I SAW THAT.  AND I

26  ASKED MR. LITTLE IF HE WAS ATTACKED OR THOUGHT HE WAS

27  ATTACKED BY MR. RABITOR BEARING THE KNIFE.  AND HE SAID,

28  "NO, HE CAME AT ME WITH AN ASHTRAY."

1          AND I SAID, "WELL, YOU SEE THIS KNIFE?

2  THERE'S A KNIFE LAYING ON THE FLOOR.  ARE YOU SURE THAT HE

3  DIDN'T TRY TO GET YOU WITH THIS KNIFE?"  HE SAYS, "NO, NO,

4  NO, NO.  THERE WAS NO KNIFE; IT WAS AN ASHTRAY."  AND I

5  WAS HOPING BEYOND HOPE THAT HE WOULD TELL ME THAT EDDIE

6  RABITOR CAME AFTER HIM WITH A KNIFE.

7          Q.   WERE YOU ASKING VARIOUS QUESTIONS DESIGNED TO

8  ELICIT ANY -- ANYTHING THAT THE DEFENDANT COULD DESCRIBE

9  TO YOU THAT MIGHT POINT TO P.T.S.D.?

10         A.   YES.

11         Q.   DID YOU HAVE MORE THAN ONE CONVERSATION LIKE

12 THAT?

13         A.   I HAD -- I PROBABLY HAD TWO OR THREE

14 CONVERSATIONS WITH HIM ABOUT WHAT WENT THROUGH HIS MIND AT

15 THE TIME.  AND I TRIED TO EVEN GET HIM TO TELL ME THAT HE

16 FELT LIKE HE WAS UNDER ATTACK, LIKE HE HAD BEEN BEFORE

17 FROM THIS HOOKER THAT WENT AFTER HIM.  I TRIED TO GET HIM

18 TO SAY THAT, WITHOUT PUTTING THOSE WORDS IN HIS MOUTH.  I

19 KEPT ASKING HIM AND INQUIRING OF HIM, DID THIS HAVE

20 ANYTHING TO DO WITH WHAT HAPPENED BEFORE?  DID YOU FEEL

21 LIKE YOU WERE BEING ATTACKED BY THIS WOMAN?  NO, IT WAS

22 COMPLETELY SEPARATE; DIDN'T HAVE ANYTHING TO DO WITH IT

23 WAS HIS RESPONSE.

24         Q.   AND WAS THE DEFENDANT CONSISTENT IN HIS

25 RESPONSES TO YOU IN THAT AREA?

26         A.   HE WAS ALWAYS INSISTENT THAT OUR DEFENSE WAS A

27 SELF-DEFENSE.  HE FELT THAT HE WAS JUSTIFIED IN JABBING

28 THIS OBJECT AT MR. RABITOR BECAUSE HE -- HE THOUGHT HE WAS

1    COMING AFTER HIM WITH AN ASHTRAY.  HE THOUGHT HE WAS GOING

2    TO HIT HIM WITH AN ASHTRAY.  AND HE WAS VERY CONCERNED,

3    VERY CONCERNED ABOUT LOSING ANOTHER EYE.  AND THAT WAS

4    HIS -- HIS PRINCIPAL FOCUS.  HE DIDN'T WANT TO GET HIT IN

5    THE FACE WITH AN ASHTRAY.

6        Q.    OKAY.  DID YOU ASK THE DEFENDANT ABOUT PRIOR

7    MENTAL -- ABOUT MENTAL HEALTH TREATMENT AFTER HE'D BEEN --

8    AFTER HE LOST HIS EYE?

9        A.    I INQUIRED WITH HIM AS TO ONE OF THE QUESTIONS:

10   HAVE YOU EVER SEEN A PSYCHIATRIST?  HIS ANSWER WAS NO.

11       Q.    AND WERE YOU EVER ABLE TO COME UP WITH ANYTHING

12   DIFFERENT THAT SHOWED ANY KIND OF PSYCHIATRIC TREATMENT?

13       A.    NO.

14       Q.    DID YOU SPECIFICALLY TALK TO THE DEFENDANT ABOUT

15   HIS REACTION TO THE EYE INJURY AND HOW IT AFFECTED HIS

16   FUNCTIONING AFTERWARDS?

17       A.    YEAH.  I ASKED HIM IF IT HAD ANY AFFECT ON

18   WHAT'S HAPPENED SINCE.

19       Q.    AND WHAT WAS HIS RESPONSE?

20       A.    IT WAS NO.

21       Q.    DID YOU TALK TO THE DEFENDANT ABOUT ANY

22   FOLLOW-UPS TO THE INJURY, ANYTHING THAT HE HAD DONE

23   SEEKING MEDICATION OR ANYTHING LIKE THAT?

24       A.    A LOT OF IT -- WHAT CAME OUT IN THE COURSE OF MY

25   REPRESENTATION OF HIM WAS THAT HE HAD DIFFICULTY SEEING.

26   WE HAD TO GET AN OPHTHALMOLOGICAL EXAM TO SHOW THAT HIS

27   EYESIGHT WAS -- BECAUSE I WAS TRYING TO SHOW THAT HE

28   COULDN'T SEE VERY WELL.  THAT THE THREAT WAS ONE THAT --

1  HE COULDN'T ACTUALLY SEE; HE DIDN'T KNOW EXACTLY WHAT WAS

2  HAPPENING.  SO THOSE ISSUES KIND OF CAME UP ABOUT HIS --

3  ABOUT HIS TREATMENT.  I FOUND OUT THAT HE DIDN'T HAVE A

4  PAIR OF GLASSES, OR IF HE -- IF HE DID, THEY WERE AT THE

5  CRIME SCENE.  THAT HE HADN'T BEEN GIVEN A PAIR IN JAIL.

6  HE DIDN'T HAVE A PROSTHESIS THAT HE WAS WEARING.  SO A LOT

7  OF DISCUSSION CAME ABOUT REGARDING THOSE ISSUES.

8      Q.   DID YOU EVER -- DID THE DEFENDANT EVER GIVE YOU

9  ANY INDICATORS OR ANY INDICATION THAT POSTTRAUMATIC STRESS

10 DISORDER HAD PLAYED A PART IN HIS ACTIONS INVOLVING THE

11 KILLING OF MR. RABITOR?

12     A.   NO, BUT THAT DIDN'T -- IT DIDN'T MEAN THAT I

13 DIDN'T THINK THAT HE HAD P.T.S.D.  I THOUGHT HE DID.  I

14 THOUGHT HE JUST -- HE HAD TO HAVE HAD IT.  HE HAD TO HAVE

15 BEEN SUFFERING FROM P.T.S.D., BUT, YOU KNOW, HE WASN'T

16 GIVING ME ANY HELP TALKING ABOUT HOW -- HIS REACTION TO IT

17 AND HOW IT AFFECTED HIS REACTION AND/OR CONDUCT IN THIS

18 CASE.

19     Q.   SO WERE YOU EVER ABLE TO CONNECT ANYTHING

20 INVOLVING P.T.S.D. WITH WHAT HE DID WHEN HE KILLED

21 MR. RABITOR?

22     A.   I COULDN'T SEE ANY CONNECTION.

23     Q.   OKAY.  AND DID YOU TALK TO HIS FAMILY TO TRY TO

24 GET INFORMATION AS WELL?

25     A.   WELL --

26     Q.   HIS FATHER AND HIS SISTER?

27     A.   I DID SPEAK TO MR. LITTLE AND TO SHARON LITTLE

28 AS WELL.  AND SHE DID OFFER THE ASSISTANCE OF A PERSON

1    THAT SHE WAS SEEING, AND SHE OBVIOUSLY KNEW THAT LARRY WAS

2    TRAUMATIZED AND -- BUT WHAT THEY DIDN'T UNDERSTAND WAS

3    THAT THERE WAS A LEGAL QUESTION THAT HAD TO BE ANSWERED

4    WITH RESPECT TO WHETHER OR NOT THERE WAS A DEFENSE.  AND

5    IN TALKING TO MR. LITTLE, IN TRYING TO EXPLORE THOSE

6    AREAS, I DID NOT FEEL THAT THERE WOULD BE ANYTHING THAT WE

7    COULD DO.  I WAS CONSIDERING HIRING A PSYCHIATRIST, BUT

8    FROM THE COMMENTS THAT HE MADE TO ME, I THOUGHT THAT THE

9    PSYCHIATRIST WOULD COME TO THE SAME CONCLUSION.  SURE, HE

10   HAD P.T.S.D., BUT DID IT AFFECT THE WAY HE RESPONDED THAT

11   DAY?  AND I WAS CONVINCED THAT THE PSYCHIATRIST WOULDN'T

12   BE ABLE TO SAY THAT HE DID.

13       Q.   NOW, YOU MENTIONED THAT THE SISTER TALKED ABOUT

14   A DR. WEISS.  AND YOU HEARD THE SISTER'S TESTIMONY IN

15   COURT?

16       A.   YES.

17       Q.   DID -- WAS THERE EVER ANY INDICATION THAT THE

18   DEFENDANT HAD BEEN TREATED BY DR. WEISS BEFORE THIS

19   KILLING?

20       A.   NO.

21       Q.   WAS THERE EVER ANY INDICATION THAT THIS

22   DR. WEISS HAD EVER SEEN THE DEFENDANT AT ALL?

23       A.   I DON'T BELIEVE SHE EVER HAD, NO.

24       Q.   AND YOU WERE AWARE THAT THIS DR. WEISS WAS THE

25   SISTER'S DOCTOR?

26       A.   YES.  I THINK SHE TOLD ME THAT SHE WAS A FAMILY

27   COUNSELOR AND MAYBE A PSYCHOLOGIST.

28       Q.   WERE YOU EVER CONTACTED BY THIS DR. WEISS?

1    A.    NO.

2    Q.    AND IN YOUR PROFESSIONAL OPINION, WOULD THERE

3  HAVE BEEN ANY RELEVANCE TO AN EXAMINATION BY THIS

4  DR. WEISS -- FIRST OF ALL, DID YOU KNOW THE CREDENTIALS OF

5  DR. WEISS?

6    A.    NO.

7    Q.    COULD YOU SEE ANY RELEVANCE TO AN EXAMINATION BY

8  THIS DOCTOR RIGHT BEFORE THE TRIAL?

9    A.    NO.  IF -- IF I WAS GOING TO HIRE A -- AN EXPERT

10  TO COME IN AND INTERVIEW LARRY, I WOULD HAVE CHOSEN A

11  PSYCHIATRIST RATHER THAN A PSYCHOLOGIST.  AND IT -- MAYBE

12  IT STEMS FROM MY PREJUDICE ACQUIRED THROUGH MY EX-WIFE,

13  WHO HAD LITTLE, IF ANYTHING, GOOD TO SAY ABOUT

14  PSYCHOLOGISTS.  PRIMARILY BECAUSE SHE WAS A MEDICAL DOCTOR

15  AND A PSYCHIATRIST, I THINK, BUT I PROBABLY WOULD HAVE

16  USED A PSYCHIATRIST, IF I DECIDED TO GO THAT ROUTE.

17    Q.    IN FACT, WHEN YOU WERE IN TRIAL, YOU ARRANGED TO

18  HAVE MR. LITTLE, HIS VISION TESTED BY AN OPTOMETRIST RIGHT

19  BEFORE TRIAL, DIDN'T YOU?

20    A.    CORRECT.

21    THE COURT:  I'M SORRY, WAS IT AN OPTOMETRIST OR

22  OPHTHALMOLOGIST?  I'LL ASK THAT OF YOU.

23    MS. MALLEN:  OH, DR. ZABER(PH).

24    THE WITNESS:  I THINK HE WAS AN OPHTHALMOLOGIST,

25  NOT OPTOMETRIST.

26    THE COURT:  SO HE WAS AN M.D. AS OPPOSED TO --

27    THE WITNESS:  YES.

28    THE COURT:  -- AN EYE DOCTOR?

1    BY MS. MALLEN:

2        Q.    WASN'T THERE A DISCUSSION WITH THE JUDGE ABOUT

3    WHETHER THAT WAS EVEN RELEVANT, THE VISION THING?

4        A.    YES.

5        Q.    BECAUSE IT WAS RIGHT BEFORE TRIAL?

6        A.    WELL, IT WASN'T BECAUSE IT WAS RIGHT BEFORE

7    TRIAL.  HE JUST DIDN'T THINK IT WAS RELEVANT.  AND I THINK

8    I EXPLAINED TO HIM THAT WAS ONE OF THE KEY ELEMENTS OF MY

9    CASE, WAS WHAT HE COULD SEE.  AND YOU PERCEIVE THINGS WITH

10    YOUR EYES AND YOU CAN'T SEE SOMETHING, THEN IT WOULD BE

11    RELEVANT.

12        Q.    OKAY.  LET'S GO BACK TO, WERE YOU TOLD OF ANY

13    OTHER INJURIES OF THE DEFENDANT THAT HAD ANY KIND OF

14    CONNECTION WITH P.T.S.D.?  DID MR. LITTLE TELL YOU ABOUT

15    ANYTHING ELSE THAT HE HAD A CONNECTION WITH P.T.S.D.?

16        A.    NO.  I WASN'T AWARE THAT HE HAD BEEN ATTACKED BY

17    ANYBODY.  I WASN'T AWARE THAT HE HAD EVER COMPLAINED ABOUT

18    LACK OF SLEEP, NONE OF THOSE THINGS.  AND I ASKED ABOUT

19    STUFF LIKE THAT.

20        Q.    AND MR. LITTLE DID NOT SHARE THOSE WITH YOU?

21        A.    HE DID NOT TELL ME ANYTHING ABOUT IT.

22        Q.    OKAY.  WERE YOU -- DID MR. LITTLE TELL YOU ABOUT

23    ANY TREATMENT FOR HEALTH PROBLEMS BEFORE 1999?

24        A.    YES.  I WAS AWARE THAT HE HAD BEEN INJURED IN A

25    BICYCLING ACCIDENT.  HIS FATHER AND SISTER ALSO TOLD ME

26    ABOUT THAT AS WELL.

27        Q.    AS FAR AS YOU COULD TELL, DID THAT HAVE ANY

28    BEARING ON POSTTRAUMATIC STRESS DISORDER IN RELATION TO

1    THIS CURRENT KILLING?

2        A.    NO.

3        Q.    NOW LET'S TALK A LITTLE BIT ABOUT THE -- A

4    POSSIBLE PLEA BARGAIN ISSUE.  AT -- WHEN YOU REPRESENTED

5    MR. LITTLE, AT SOME POINT DID YOU HAVE AN OFFER TO

6    CONSIDER BY THE PROSECUTION?

7        A.    YES.  SEVERAL TIMES DURING THE COURSE OF THE

8    PROCESS WE DISCUSSED SETTLEMENT.  AT ONE PARTICULAR

9    JUNCTURE, I THINK IT WAS AFTER THE PRELIM AND BEFORE THE

10   READINESS, I CONTACTED MARNIE STEIN AND ASKED TO SPEAK TO

11   HER BOSS, WHO I KNEW, GREG MC CLAIN.  GREG AND I HAD GONE

12   BACK QUITE A WAYS.  I FELT FAR MORE COMFORTABLE IN TALKING

13   TO AND BENDING HIS ARM AND HOLLERING AT HIM RATHER THAN

14   MARNIE STEIN, WHO I DIDN'T KNOW VERY WELL; I HAD NO

15   CONTACT WITH.  AND WE HAD A MEETING WITH MS. STEIN,

16   MR. MC CLAIN AND GEORGE -- HIS NAME ESCAPES ME NOW.

17       Q.    BENNETT?  BENNETT?

18       A.    GEORGE BENNETT.  I THINK IT'S GEORGE BENNETT,

19   WHO, AT THE TIME, WAS EITHER NUMBER ONE OR NUMBER TWO IN

20   CHARGE.  AND WE SAT UP IN THE CONFERENCE ROOM UP IN THE

21   D.A.'S OFFICE, AND I PITCHED MY CASE TO THEM AND I TOLD

22   THEM THAT I WAS GOING TO DEFENSE THEM, AND THEY WERE GOING

23   TO BE SORRY.  AND THEY BETTER TAKE MY MANSLAUGHTER OFFER

24   RIGHT NOW, OR THEY'D HAVE TO PAY FOR IT IN SPADES DOWN THE

25   ROAD.  AND THEN IT WAS AT THAT POINT THAT I WAS HANDED

26   SOME INFORMATION ABOUT A ROBERT TEAL.  AND PRIOR TO THAT,

27   I HADN'T KNOWN ABOUT MR. TEAL.

28       Q.    LET ME STOP YOU FOR A MINUTE NOW.  UP TO THIS

1   POINT, YOU'VE BEEN REPRESENTING THE DEFENDANT; YOU'VE BEEN

2   TALKING TO HIM AND HIS FAMILY.  HAD THE DEFENDANT BEEN

3   CONSISTENT IN HIS SELF-DEFENSE CLAIM?

4       A.   YES.

5       Q.   AND UP TO THAT POINT, DID YOU FEEL THAT THAT WAS

6   A VALID DEFENSE?

7       A.   I THOUGHT, YOU KNOW, FROM THE LOOKS OF IT, THE

8   WHOLE THING SURROUNDING THE HOME, THE HOUSE, WHAT WAS

9   GOING ON.  I WAS EVALUATING THE CREDITABILITY OF THE

10  WITNESSES, MR. LITTLE INCLUDED.  THE FACT THAT HE WAS

11  BLIND IN ONE EYE, THE FACT THAT THERE WERE KNIVES AND

12  STUFF GOING ON IN THE HOUSE, I THOUGHT, YES, I THOUGHT WE

13  HAD PRETTY GOOD SELF-DEFENSE CASE.

14      Q.   AND HAD YOU TALKED -- HAD YOU BEEN POSITIVE IN

15  YOUR DEALINGS WITH MR. LITTLE?

16      A.   I GENERALLY TOLD MR. LITTLE THAT WE HAD A STRONG

17  DEFENSE.  I FELT THAT WE COULD PREVAIL UNTIL I GOT THAT

18  INFORMATION.

19      Q.   NOW UP UNTIL YOU GOT THAT INFORMATION ABOUT

20  MR. TEAL, THE INFORMANT, HAD YOU TALKED TO THE DEFENDANT

21  ABOUT SETTLING THE CASE AT ALL?  AS FAR AS YOU RECALL?

22      A.   YES.

23      Q.   AND DID YOU --

24      A.   MR. LITTLE INDICATED TO ME, YOU KNOW, HE SORT OF

25  GAVE ME MARCHING ORDERS, HE DIDN'T WANT A LIFE CASE.  HE

26  WANTED A DETERMINATE SENTENCE, AND THAT'S ONE OF THE

27  PITCHES THAT I MADE TO MR. MC CLAIN; MY CLIENT WILL TAKE,

28  YOU KNOW, SOME YEARS IF THAT'S IN THE OFFING, RATHER THAN

1    AN INDETERMINATE SENTENCE.  THAT WAS SORT OF THE BOTTOM OF

2    WHERE WE WERE GOING TO GO, BUT IT WASN'T OFFERED.

3        Q.    AND WHEN YOU TALKED TO MR. LITTLE ABOUT SETTLING

4    THE CASE, DID YOU LISTEN TO WHAT HE HAD TO SAY?

5        A.    YES.

6        Q.    DID YOU EVER TRY TO FORCE HIM TO MAKE A PLEA

7    BARGAIN?

8        A.    NO.  I'M ONE OF THOSE LAWYERS THAT DOESN'T LIKE

9    TO DO THAT.  I'VE SEEN A LOT OF LAWYERS PUSH THEIR CLIENTS

10   INTO A RESOLUTION, AND I DON'T LIKE TO DO THAT.  I LIKE TO

11   LET THE CLIENT MAKE UP HIS OR HER MIND.  I TELL THEM, I

12   DON'T SOFT PEDAL IT.  I DON'T MILK, YOU KNOW, SUGAR COAT

13   IT.  I TRY TO TELL THEM, THIS IS WHAT YOU'RE FACING.  IF

14   YOU'RE CONVICTED OF THIS, THIS IS WHAT YOU FACE IF YOU DO

15   THIS.  THIS IS WHAT HAPPENS IF THIS HAPPENS, AND LET THEM

16   DECIDE.  AND I FOUND THROUGH THE COURSE OF MY PRACTICE OF

17   LAW THAT THAT PLAYS MUCH BETTER THAN ME TRYING TO TWIST

18   SOMEBODY'S ARM AND TAKE SOMETHING.  I VERY RARELY TOLD A

19   CLIENT, YOU'VE GOT TO TAKE THIS OR ELSE.

20       Q.    AND IN THIS CASE, WHEN MR. LITTLE TOLD YOU WHAT

21   HE WANTED, YOU TOOK THAT TO THE DISTRICT ATTORNEY TO ASK

22   FOR IT, DIDN'T YOU?

23       A.    I DID.

24       Q.    OKAY.  NOW, AT THIS MEETING THAT YOU'VE

25   DESCRIBED, YOU MENTIONED THAT YOU WERE GIVEN NEW

26   INFORMATION ABOUT MR. TEAL.  WHAT WAS THAT NEW

27   INFORMATION?  WHO WAS THAT PERSON?

28       A.    WELL, UP UNTIL THAT POINT, I DON'T BELIEVE I

1    KNEW ABOUT MR. TEAL.  AND SO I WAS A LITTLE BIT SHOCKED

2    WHEN I STARTED READING THE REPORTS; THAT MR. LITTLE HAD

3    BEEN INCARCERATED OVER AT DONOVAN FOR A PROBATION

4    VIOLATION, AND HE HAD BEEN TALKING ABOUT THE CASE, ABOUT

5    THIS TO ROBERT TEAL.

6        Q.   WHEN YOU WERE GIVEN INFORMATION ABOUT THE

7    DEFENDANT TALKING ABOUT THE CASE, DID THAT INFORMATION

8    INCLUDE THE DEFENDANT'S DISCUSSION OF HIS SELF-DEFENSE

9    CLAIM?

10       A.   YES.

11       Q.   DID IT INCLUDE A DISCUSSION OF WHAT THE

12   DEFENDANT HAD DONE AND THOUGHT AT THE TIME?

13       A.   YES.

14       Q.   AND WAS THAT INFORMATION BEING GIVEN TO YOU

15   DIFFERENT THAN WHAT THE DEFENDANT WAS TELLING YOU?

16       A.   YES.

17       Q.   DID THAT --

18       A.   WELL, LET ME PUT IT THIS WAY, IT WAS -- IT

19   APPEARED TO BE INFORMATION THAT A BUDDY WOULD GIVE TO A

20   BUDDY, TALKING ABOUT IT IN KIND OF A CASUAL WAY.  AND

21   BECAUSE OF THAT, IT APPEARED TO BE VERY BELIEVABLE THAT

22   LARRY OR MR. LITTLE WOULD HAVE SAID CERTAIN THINGS TO

23   MR. TEAL ABOUT HIS CASE AND WHAT HE WAS GOING TO DO WITH

24   IT, AND WHAT OUR DEFENSE WAS GOING TO BE.

25       Q.   AND DID THAT INFORMATION BASICALLY CONSIST OF

26   THE DEFENDANT SAYING HE WAS GOING TO MAKE UP A

27   SELF-DEFENSE CLAIM SO HE COULD GET OFF?

28       A.   HE SAID THAT HE WAS GOING TO USE A SELF-DEFENSE

1   CLAIM.  I'M NOT SURE IF HE SAID HE WAS GOING TO MAKE IT

2   UP, BUT IT CAME OFF THAT WAY.

3        Q.   WAS THIS NEW INFORMATION A CONCERN THAT YOU FELT

4   YOU HAD TO ADDRESS IN PRESENTING THE DEFENDANT'S CASE?

5        A.   YES.

6        Q.   AND DID THAT BECOME A FOCUS OF TRYING TO PRESENT

7   A STRONG CASE FOR THIS DEFENDANT?

8        A.   YES, IT DID.

9        Q.   LET ME GO BACK TO YOUR HANDLING OF THIS CASE.

10  LET'S START AT, ONCE YOU WERE APPOINTED TO THE CASE, DID

11  YOU RECEIVE DISCOVERY?

12       A.   YES.

13       Q.   AND DID YOU REVIEW THAT DISCOVERY?

14       A.   YES.

15       Q.   IN PREPARING THE CASE, YOU TALKED TO THE

16  DEFENDANT?

17       A.   YES.

18       Q.   TALKED TO HIS FAMILY?

19       A.   YES.

20       Q.   YOU TOOK YOUR DEFENSE OF THE DEFENDANT

21  SERIOUSLY?

22       A.   YES, OF COURSE.

23       Q.   AND DID YOU TALK TO THE DEFENDANT ABOUT THE

24  INFORMATION THAT WAS IN THOSE REPORTS?

25       A.   YES.

26       Q.   DID THE REPORTS THAT YOU WERE GIVEN AS

27  DISCOVERIES, WERE SOME OF THEM WITNESS STATEMENTS?

28       A.   YES.

1     Q.   WERE SOME OF THEM WITNESS STATEMENTS OF THE

2   PEOPLE THAT WERE TALKED ABOUT BY THE DEFENDANT AS HE

3   TESTIFIED HERE?

4     A.   YES.

5     Q.   AND DID YOU ASK THE DEFENDANT FOR ADDITIONAL

6   INFORMATION ABOUT THE PEOPLE THAT HE MENTIONED?

7     A.   YES.

8     Q.   DID YOU REVIEW THOSE INTERVIEWS OF POTENTIAL

9   WITNESSES TO EVALUATE THEIR -- WHETHER YOU COULD USE THEM

10   OR NOT?

11     A.   YES.

12     Q.   WHAT WAS YOUR -- NOW, YOU -- WE WENT THROUGH

13   WITH THE DEFENDANT A VARIETY OF PEOPLE AND WHAT THEIR USES

14   WOULD HAVE BEEN.  AND WERE YOU AWARE OF THE BACKGROUND

15   INFORMATION ABOUT THIS APARTMENT, THE DRUG USE, AND

16   LIFESTYLES?

17     A.   YES.

18     Q.   DID THE DEFENDANT TELL YOU ABOUT THOSE THINGS?

19     A.   YES, HE DID.

20     Q.   AND DID HE TELL YOU THAT -- MORE SPECIFICALLY

21   THAT DIFFERENT PEOPLE HAD BEEN IN THE APARTMENT THAT DAY

22   USING DRUGS?

23     A.   YES.

24     Q.   DID HE TELL YOU THOUGH THAT NO ONE ELSE WAS

25   THERE AT THE TIME OF THE KILLING, OTHER THAN HIM AND

26   ALLISON BROOKS?

27     A.   YES.

28     Q.   DID HE TELL YOU --

1     A.   AND THE DECEDENT, OF COURSE.

2     Q.   TRUE.   DID HE TELL YOU ABOUT HIS OWN DRUG AND

3  ALCOHOL USE?

4     A.   YES.

5     Q.   AND DID HE TELL YOU ABOUT THE PRIOR VIOLENCE

6  BETWEEN THE VICTIM AND THE VICTIM'S MOTHER?

7     A.   HE INDICATED THAT THEY HAD A LOT OF ARGUMENTS,

8  THAT THEY WERE -- THEY THREW THINGS AT EACH OTHER.   IT WAS

9  A VERY UNHAPPY HOUSEHOLD.

10    Q.   IN YOUR PROFESSIONAL OPINION, COULD YOU SEE A

11 WAY TO USE THE GENERAL LIFESTYLE INFORMATION IN SOME WAY

12 TO BOLSTER THE DEFENDANT'S SELF-DEFENSE CLAIM?

13    A.   YES.

14    Q.   AND HOW WAS THAT?

15    A.   WELL, IT SET UP A PATTERN -- A PATTERN OF

16 POTENTIAL EXPECTATION ON THE PART OF MR. LITTLE, WHAT

17 MIGHT HAPPEN, WHAT WAS GOING ON.   THERE WAS A LOT OF

18 SHOUTING, IT WAS AN INFLAMED KIND OF SITUATION.   SO IT WAS

19 IMPORTANT TO GET THAT INFORMATION IN FRONT OF THE JURY.

20    Q.   AND, IN FACT, YOU HAD THAT INFORMATION TESTIFIED

21 TO BY ONE OF YOUR WITNESSES, A MR. JOSHUA ROBBINS, DIDN'T

22 YOU?

23    A.   YES.

24    Q.   AND THE DEFENDANT HIMSELF TESTIFIED ABOUT THE

25 APARTMENT AND THE ATMOSPHERE, DIDN'T HE?

26    A.   HE DID.   AND I THOUGHT HE DID A GOOD JOB IN

27 EXPLAINING WHAT IT WAS LIKE OVER THERE.

28    Q.   NOW, THERE WAS SOME PEOPLE THAT THE DEFENDANT

1    SPECIFICALLY SAYS HE TALKED TO YOU ABOUT AND THAT YOU

2    PROMISED TO INTERVIEW THEM AND PROMISED TO USE AT TRIAL.

3    DID YOU, FIRST OF ALL, MAKE A PROMISE TO THIS DEFENDANT

4    THAT YOU WOULD INTERVIEW CERTAIN PEOPLE?

5        A.    WELL, I TOLD HIM THAT I WOULD INTERVIEW OR HAVE

6    INTERVIEWED INDIVIDUALS THAT HE HAD MENTIONED, AND I DID.

7        Q.    AND DID YOU DO SO?

8        A.    YES, I DID.

9        Q.    AND WHAT WAS YOUR RESULT OF YOUR INTERVIEWS WITH

10   THOSE PEOPLE?

11       A.    MY OPINION WAS THAT THEIR INFORMATION WAS NOT

12   WORTH WHILE TO ADD ANYTHING TO WHAT WE ALREADY KNEW, OR

13   THAT I COULD GET THE INFORMATION AND DIFFERENT -- THROUGH

14   A DIFFERENT, MORE CREDIBLE WITNESS.  BECAUSE A LOT OF

15   THESE PEOPLE WERE PRETTY FLAKY; THEY -- THEY WERE HARD TO

16   FIND.  THEY WERE NOT VERY COOPERATIVE.  THEY HAD POLICE

17   RECORDS, BEEN ARRESTED NUMEROUS TIMES.  AND I FELT THAT,

18   YOU KNOW, HE HAD WITNESSES THAT COULD TESTIFY AS TO WHAT I

19   THOUGHT WAS IMPORTANT AT THE SCENE.

20            SO THERE WAS ONE OTHER WITNESS, THIS

21   OVERDORF(PH) FELLA WHO WAS IN CUSTODY.  LARRY WAS

22   INSISTING THAT I BRING HIM IN AS A WITNESS, AND I SAID,

23   "WHY?"  HE SAID, "WELL, HE KNOWS STUFF ABOUT BOB TEAL."

24   AND I SAID, "WHAT DOES HE KNOW?"  AND HE SAID, "HE KNOWS

25   BOB TEAL WENT TO THE COPS BECAUSE HIS SON WAS ACCUSED, OR

26   IS A SUSPECT IN THIS CASE."  SO I WENT TO -- WHEN I

27   INTERVIEWED TEAL, TEAL ADMITTED TO ME THAT, YES, HIS SON

28   WAS CONSIDERED A SUSPECT.  SO I SAID, OKAY, IF HE'S GOING

1    TO SAY THAT, I DON'T NEED OVERDORF TO TELL ME.  SO A LOT

2    OF IT WAS SUPERFLUOUS TO BRING IN OTHER PEOPLE TO SAY THE

3    SAME THING THAT I WAS GOING TO GET OUT THROUGH OTHER

4    WITNESSES.

5        Q.   AND, IN FACT, MR. TEAL DID TESTIFY AT THE TRIAL

6    AND HE DID ADMIT OR TALK ABOUT HIS SON AND THE SUSPECT

7    THING?

8        A.   YES.

9        Q.   OKAY.

10       A.   AND I INTERVIEWED MR. TEAL WITH MY INVESTIGATOR,

11   ALLEN COTTON(PH), AND I -- AND I WOULD TRAVEL TO BAKER, I

12   THINK IT'S AVENAL STATE PRISON, JUST SO THAT I COULD

13   EVALUATE MR. TEAL AS A CREDIBLE OR NONCREDIBLE WITNESS.

14   AND DESPITE THE FACT THAT I DIDN'T CARE FOR THE MAN, I WAS

15   VERY, VERY CONCERNED, AFTER I HAD A CHANCE TO INTERVIEW

16   HIM, BELIEVING THAT HE WOULD BE A VERY CREDIBLE WITNESS.

17   SO I -- I PUT A LOT OF EFFORT IN TO TRY TO DESTROY, AS

18   MUCH AS I COULD, HIS TESTIMONY IN FRONT OF THAT JURY.

19       Q.   WAS THERE EVER A POINT THAT YOU REFUSED TO

20   CONSIDER INFORMATION FROM THE DEFENDANT?

21       A.   NO.  I ALWAYS THINK OF THE CLIENT AS THE

22   GREATEST SOURCE OF THE INFORMATION.  AND I LOVE IT WHEN

23   CLIENTS TELL ME THINGS ABOUT WHAT WENT ON.  THEY OFTEN

24   TIMES THINK THINGS ARE RELEVANT WHEN THEY'RE NOT, BUT I

25   LIKE TO HEAR WHAT THEY HAVE TO SAY, BECAUSE THEY DROP

26   HURLS OF WISDOM ACCIDENTALLY MANY, MANY, MANY TIMES.  AND

27   THEY DO NOT KNOW THEY'RE GIVING YOU THE BEST WHEN WE GIVE

28   IT TO THEM.

254

1    Q.   WAS THERE EVER ANYONE -- WELL, DID YOU EVER

2    PROMISE THE DEFENDANT THAT YOU WOULD PRESENT CERTAIN

3    PEOPLE AT THE TRIAL?

4        A.   NO.   I NEVER PROMISE THAT I'LL DO THAT.   OFTEN

5    TIMES IT'S OUT OF YOUR HANDS ANYWAY.   IF THE JUDGE DEEMS

6    THE INFORMATION TO BE NOT RELEVANT OR YOU -- YOU ASK A

7    QUESTION, AND IT'S OBJECTED TO, AND THE INFORMATION IS

8    KEPT OUT.   IT'S -- THERE'S NOTHING YOU CAN DO ABOUT IT.

9        Q.   DID YOU CONSIDER USING THE VICTIM'S MOTHER IN

10   SOME WAY IN YOUR CASE?

11       A.   AFTER I HEARD THAT 911 TAPE OF THE VICTIM'S

12   MOTHER, I WANTED TO KEEP HER AS FAR AWAY FROM THIS

13   COURTROOM AS I COULD.

14       Q.   WHY IS THAT?

15       A.   SHE WAS SO INCREDIBLY EMOTIONAL THAT GETTING HER

16   IN FRONT OF THAT JURY WOULD RAISE SUCH A ISSUE OF

17   SYMPATHY, AND I DIDN'T WANT HER IN THE COURTROOM.   SO I

18   THINK HER EMOTIONS OUTWEIGHED WHATEVER VALUE SHE COULD

19   CONTRIBUTE TO SETTING THE SCENE AT THE TIME OF THE

20   KILLING.

21       Q.   DID YOU FILE MOTIONS IN LIMINE TO RESTRICT

22   HARMFUL WITNESSES OR EVIDENCE?

23       A.   YES.

24       Q.   AND, IN FACT, YOU PREPARED SEVEN MOTIONS IN

25   LIMINE AND FILED THEM ON BEHALF OF THIS DEFENDANT; DIDN'T

26   YOU?

27       A.   YES, I DID.

28       Q.   WAS THERE EVER A TIME AFTER YOUR OFFER TO SETTLE

1    WAS REJECTED WHEN YOU TRIED TO GET THIS DEFENDANT, IN

2    LITTLE, TO SETTLE THE CASE AGAIN RIGHT BEFORE TRIAL?

3        A.   I DON'T BELIEVE THAT I TRIED TO GET HIM TO

4    SETTLE.  I MAY HAVE SAID TO HIM, YOU KNOW, ON THE EVE OF

5    TRIAL, WE STILL HAVE THE SAME OFFER IF YOU WANT TO TAKE

6    THAT, IT'S OPEN, BUT -- AND I DON'T HONESTLY RECALL HIS

7    DESCRIPTION OF OUR MEETING, WHERE I SAID, AS HE PUT IT,

8    THIS IS WHAT THE PROSECUTION HAS AND THIS IS WHAT WE HAVE.

9    IT'S PROBABLY SOMETHING I WOULD DO.  I MEAN, IF IT WERE

10   TRUE, I MIGHT DO THAT.  AND IN THIS CASE, THAT WAS

11   CERTAINLY THE TRUTH.  WE WERE OUTGUNNED AND, YOU KNOW,

12   THEY HAD A LOT OF EVIDENCE THAT WAS GOING TO BE VERY

13   DIFFICULT TO OVERCOME.  AND TO ADDRESS, AND HE -- HE

14   QUOTED ME CORRECTLY, WHEN I SAID I THOUGHT WE WOULD BE

15   LUCKY IF WE GOT A SECOND.

16       Q.   SO BASICALLY YOU WERE LOOKING AT A CASE WHERE

17   THE DEFENDANT HAD AN EYEWITNESS TO THE KILLING, RIGHT?

18       A.   YES.

19       Q.   AND THE DEFENDANT HAD ADMITTED DOING THE

20   KILLING?

21       A.   YES.

22       Q.   AND BASICALLY YOU WERE DEALING WITH TRYING TO

23   EXPLAIN HIS ACTIONS IN SOME WAY TO LESSON THE CULPABILITY?

24       A.   YES.

25       Q.   DID YOU INTEND TO TRY TO PRESENT AS STRONG A

26   DEFENSE AS YOU COULD?

27       A.   YES, I DID.

28       Q.   DID YOU PREPARE FOR TRIAL?

1     A.   YES.

2     Q.   AND IN DOING SO, DID YOU REVIEW DISCOVERY?

3     A.   YES.

4     Q.   DID YOU TALK TO THE DEFENDANT?

5     A.   YES, I DID.

6     Q.   DID YOU ARRANGE FOR AN EYE APPOINTMENT FOR THIS

7   DEFENDANT BEFORE THE TRIAL?

8     A.   YES.

9     Q.   AND WHY WAS THAT?

10    A.   WELL, I WANTED THE JURY TO UNDERSTAND FROM THE

11  WORDS OF AN EXPERT WITNESS WHAT HIS VISION WAS LIKE, AND

12  DISCUSS WHAT HE COULD SEE AND WHAT HE COULDN'T SEE.  AND

13  THE BEST WAY TO DO IT WAS TO HAVE SOMEBODY LOOK AT HIM

14  JUST A FEW MONTHS AFTER THE INCIDENT AND HOPEFULLY TO

15  TESTIFY WHAT HIS VISION WAS.  AND THEN I WAS GOING TO TRY

16  TO MAKE HAY WITH THAT IN FRONT OF THE JURY.

17    Q.   AND DID YOU ARRANGE FOR ADDITIONAL WITNESSES TO

18  TESTIFY AT THE TRIAL?

19    A.   YES.

20    Q.   DID YOU FILE A TRIAL BRIEF?

21    A.   YES.

22    Q.   AND DURING THIS TIME YOU HAD CONTACT WITH THE

23  DEFENDANT'S FAMILY AS WELL?

24    A.   I DID.

25    Q.   DID THE DEFENDANT EVER TELL YOU THAT THE

26  STABBING IN HIS EYE AFFECTED HIS DAILY FUNCTIONING IN ANY

27  WAY?

28    A.   NO.  I MEAN, OTHER THAN THE FACT THAT HE WAS

1   BLIND, I MEAN THAT -- THAT AFFECTED HIM.  AND HE DID SAY

2   THAT HE DIDN'T -- HE COULDN'T SEE ON THAT LEFT SIDE.  AND

3   HE DIDN'T LIKE PEOPLE COMING UP ON HIM THAT WAY, BECAUSE

4   HE COULDN'T SEE THEM.  AND HE WAS KEENLY AWARE THAT HE HAD

5   ONE EYE LEFT, AND HE WAS VERY PROTECTIVE OF THAT, BUT THE

6   TRAUMA OF THE INCIDENT, HE NEVER ELABORATED ON AS

7   AFFECTING HIM.

8        Q.   AND DID YOUR INVESTIGATION INTO WHETHER

9   POSTTRAUMATIC STRESS DISORDER PLAYED A PART IN HIS -- IN

10  THE -- IN THE KILLING THAT HE DID WITH MR. RABITOR, IN

11  YOUR INVESTIGATION INTO THAT ASPECT, IN YOUR PROFESSIONAL

12  JUDGMENT, WAS THERE A CONNECTION THAT YOU COULD SEE?

13       A.   NO.

14       Q.   AND DID YOU LOOK FOR THAT CONNECTION?

15       A.   YES, I DID.

16       Q.   NOW EVEN IF THERE HAD BEEN -- WELL, DID THE

17  DEFENDANT EVER SAY ANYTHING TO YOU THAT IMPLIED ANY -- ANY

18  THOUGHTS AT ALL BACK TO THE STABBING IN THE EYE?

19       A.   NO.  AND I LOOKED FOR IT, AND I SPECIFICALLY

20  ASKED HIM.

21       Q.   WAS HIS FOCUS MAINLY ON MR. RABITOR, THE CURRENT

22  VICTIM?

23       A.   YES.

24       Q.   AND WHAT MR. RABITOR WAS DOING AND HIS REACTIONS

25  TO THAT?

26       A.   YES.

27       Q.   AGAIN, WAS IT HIS UNDERSTANDING THAT HE WAS

28  DEFENDING HIMSELF AGAINST THIS VICTIM?

258

1     A.   YES.

2     Q.   DID YOU -- WERE YOU AWARE THAT THERE WAS A

3  DR. AKRID WHO WAS AN EYE DOCTOR OR AN OPTOMETRIST THAT

4  DEALT WITH THE DEFENDANT EARLIER?

5     A.   YES.

6     Q.   WERE YOU AWARE OR TOLD THAT HE HAD ANY KIND OF

7  EXPERTISE AT ALL IN POSTTRAUMATIC STRESS DISORDER?

8     A.   NO, I WAS NOT.

9     Q.   WERE YOU GIVEN ANY INFORMATION THAT HE HAD

10  SOMETHING TO ADD TO THE QUESTION OF POSTTRAUMATIC STRESS

11  DISORDER IN CONNECTION WITH THIS DEFENDANT?

12     A.   NO.

13     Q.   DID YOU CONTINUE TO VIGOROUSLY DEFEND THE

14  DEFENDANT DURING THE TRIAL?

15     A.   YES.

16     Q.   AND DID THAT INCLUDE FILING MOTIONS IN LIMINE?

17     A.   YES.

18     Q.   DID THAT INCLUDE CROSS-EXAMINING WITNESSES?

19     A.   YES.

20     Q.   DURING THE TRIAL, DID YOU DISCUSS WITH THE

21  DEFENDANT THE VARIOUS WITNESSES THAT WERE APPEARING?

22     A.   YES, I -- I THINK I DID.  AND IF HE HAD ANY

23  QUESTIONS, I ANSWERED THEM.  AND, OF COURSE, I PREPARED

24  HIM TO GO ON THE STAND.  WE HAD A MINI KIND OF MOCK

25  INTERVIEWS OF HIS TESTIMONY, AND I TRIED TO PREPARE HIM AS

26  BEST I COULD, GIVING HIM SOME CUES AS TO WHAT TO DO; TO

27  LOOK AT THE JURY.  WE ALWAYS TELL OUR CLIENTS TO LOOK AT

28  THE JURY, TO NOT GET IN AN ARGUMENT WITH THE D.A.   AND

259

1    NOT, YOU KNOW, BE BITTER OR ANGRY, JUST ANSWER THE

2    QUESTION THAT'S ASKED, THOSE KINDS OF THINGS.  AND, YOU

3    KNOW, WE DISCUSSED SOME SENSITIVE AREAS, YOU KNOW, AND I

4    TRIED -- BECAUSE I BELIEVED LARRY LITTLE.  I -- I TRIED TO

5    BRING OUT TO THE JURY WHAT I WAS SEEING OR WHAT I WAS

6    BELIEVING ABOUT WHAT HE HAD SEEN AND HEARD AND SAID AND

7    THOUGHT.  SO I TRIED TO -- I TRIED TO MAKE HIM AS HUMAN

8    AND AS PERSONABLE AS I COULD IN OUR PREPARATION FOR THE

9    TRIAL.

10        Q.    AND DURING THAT TRIAL, DID YOU END UP MAKING

11   VARIOUS OBJECTIONS WHEN APPROPRIATE?

12        A.    YES.

13        Q.    YOU PUT ON WITNESSES FOR THE DEFENSE IN ADDITION

14   TO THE DEFENDANT?

15        A.    YES.

16        Q.    PRESENTED YOUR INSTRUCTIONS?

17        A.    YES.

18        Q.    PRESENTED CLOSING ARGUMENT?

19        A.    YES.

20        Q.    AND, IN FACT, EVEN AT THE SENTENCING YOU

21   PRESENTED A STATEMENT IN MITIGATION?

22        A.    YES.

23        Q.    SO DID YOU MAKE A STRONG EFFORT THEN TO PRESENT

24   THE DEFENDANT'S CASE IN CLAIM OF SELF-DEFENSE TO THIS

25   JURY?

26        A.    YES, I DID.

27        Q.    WAS THE DEFENDANT CONSISTENT IN WHAT HAPPENED,

28   EVEN THROUGH YOUR MOCK INTERVIEWS AND PREPARATION FOR HIS

1   TESTIMONY?

2       A.   YES, HE WAS.

3       Q.   IN YOUR OPINION, HOW COULD -- EVEN ASSUMING THAT

4   THERE WAS SOME INDICATION OF POSTTRAUMATIC STRESS DISORDER

5   DISPLAYED BY THIS DEFENDANT, COULD YOU SEE ANY CONNECTION

6   TO WHAT HAPPENED AT -- WHEN MR. RABITOR WAS KILLED?

7       A.   I LOOKED FOR THE CONNECTION.  I TRIED TO GET HIM

8   TO TELL ME THAT THERE WAS A CONNECTION.  I PRACTICALLY PUT

9   WORDS IN HIS MOUTH.  I GOT TO THE POINT WHERE I FELT LIKE

10  I MAY BE CROSSING THE LINE AS A -- AS A LAWYER IN CREATING

11  SOMETHING THAT WASN'T THERE.  I WANTED IT SO BADLY THAT I

12  WANTED TO TELL HIM WHAT TO SAY, AND I DIDN'T.  AND I

13  DIDN'T FEEL LIKE I COULD UNLESS IT CAME FROM HIS MOUTH,

14  YOU KNOW, WHAT WAS GOING ON.

15           I ASKED AN OPEN ENDED QUESTION.  I TRIED TO

16  GET HIM TO TELL ME WHAT THE ANSWER WAS.  I DIDN'T TELL

17  HIM, NOW, LARRY, YOU SAW THIS GUY COMING AT YOU WITH A

18  KNIFE AND YOU THOUGHT IT WAS A BLACK WOMAN, RIGHT?  I

19  DIDN'T DO THAT, BUT I -- BECAUSE I WANTED HIM TO TELL ME

20  IT WAS THERE, SO THAT THEN I COULD ETHICALLY GO TO PRESENT

21  THAT EVIDENCE THROUGH EITHER AN EXPERT OR HIS OWN

22  TESTIMONY.

23      Q.   AND DID HE EVER PROVIDE YOU WITH A BASIS FOR

24  THAT --

25      A.   NO.

26      Q.   -- CONNECTION?

27      A.   NEVER.

28      Q.   DID MR. LITTLE CONTINUE TO FOCUS ON HIS CLAIM OF

1  SELF-DEFENSE?

2      A.   YES.

3      Q.   AND DID YOU EVER TELL THIS DEFENDANT THEN TO

4  LIE?

5      A.   NO.

6      Q.   DID YOU EVER TELL THIS DEFENDANT TO SAY OR NOT

7  SAY CERTAIN THINGS DURING HIS TESTIMONY, SUCH AS HE'D BEEN

8  DRINKING OR NOT DRINKING?

9      A.   NO.  I TOLD HIM -- HOW I COUCHED THINGS THAT

10  WERE DIFFICULT FOR US IN OUR DEFENSE, WE'RE TO EITHER

11  AVOID GOING INTO THAT AREA ON DIRECT AND/OR JUST ANSWERING

12  THE QUESTION THAT'S ASKED, IF IT'S ASKED ON CROSS, YES OR

13  NO.  I DIDN'T TELL HIM TO LIE.  I GAVE HIM STRATEGIES ON

14  HOW TO PRESENT HIS CASE, OUR CASE, THE BEST THAT WE COULD.

15      Q.   DURING YOUR INVESTIGATION IN THE TRIAL, DID YOU

16  EVER LEARN ABOUT ANY NEW EYEWITNESSES BESIDES THE

17  DEFENDANT AND MS. BROOKS TO THIS INCIDENT?

18      A.   NO.

19      Q.   NOW, IN YOUR EXPERIENCE AND WITH YOUR KNOWLEDGE

20  OF P.T.S.D., IT'S A DISORDER THAT HAS VARIOUS SYMPTOMS

21  DISPLAYED BY THE PERSON WHO -- WHO HAS THIS DISORDER,

22  RIGHT?

23      A.   IT'S MY UNDERSTANDING THAT A PERSON WHO SUFFERS

24  FROM P.T.S.D. WOULD HAVE CERTAIN FEATURES THAT ARE FAIRLY

25  RECOGNIZABLE, IF YOU ASK THEM THOSE KINDS OF QUESTIONS.

26      Q.   AND THOSE THINGS WOULD HAVE TO DO WITH THEIR

27  REACTION AND HELP TO EXPLAIN THEIR REACTION AT WHATEVER

28  INCIDENT IS THE FOCUS?

1    A.    YES.

2    Q.    DID YOU --

3    A.    LET ME CITE FOR AN EXAMPLE.  IN THIS CASE THAT I

4    HAD WHERE WE HAD A GENTLEMAN TOURIST THAT WAS BEATEN BY

5    THESE HIGHWAY PATROL OFFICERS, HE VOLUNTARILY, WITHOUT ANY

6    PROMPTING WHATSOEVER, INDICATED TO ME THAT WHENEVER HE SAW

7    A POLICE CAR, HE BECAME VERY ANXIOUS.  HE WOULD BREAK OUT

8    INTO A SWEAT, AND HE WOULD THINK ABOUT THE INCIDENT.  I

9    DIDN'T ASK HIM THIS IN MY INTERVIEW WITH HIM LATER; HE

10   BROUGHT THIS UP.  I IMMEDIATELY RECOGNIZED THAT WAS

11   P.T.S.D. AND I CONTACTED DR. CARION TO DO AN ANALYSIS.  I

12   COULDN'T GET ANYTHING LIKE THAT OUT OF LARRY.

13   Q.    IN THIS CASE, HOWEVER -- WELL, DID YOU EVER

14   CONSIDER FABRICATING A DEFENSE FOR MR. LITTLE WITHOUT ANY

15   BASIS?

16   A.    I THINK --

17        THE COURT:  THAT'S TWO QUESTIONS.

18        THE WITNESS:  I THINK I HAVE TO TAKE THE FIFTH.

19        THE COURT:  I DON'T THINK I WANT YOU TO ANSWER

20   EITHER ONE OF THOSE QUESTIONS.

21        MS. MALLEN:  LET ME REPHRASE THAT.

22        MR. WILLIAMS:  I'LL STIPULATE THAT HE'S NEVER

23   DONE THAT, ALL RIGHT, YOUR HONOR?

24        THE COURT:  NO, NO.

25        MS. MALLEN:  LET ME REPHRASE IT.

26   BY MS. MALLEN:

27   Q.    WOULD YOU CONSIDER MAKING UP A DEFENSE FOR A

28   DEFENDANT IF YOU DIDN'T THINK THERE WAS A BASIS THERE?

263

1    A.   NO.  I MEAN -- BUT YOU'RE TEMPTED TO DO THINGS

2  IN THESE KINDS OF CASES, WHERE THE LIABILITY IS SO HEAVY

3  AND THE RISK IS SO GREAT, YOU JUST WANT TO DO EVERYTHING

4  YOU CAN.  AND THERE WAS A TEMPTATION THERE TO SIT LARRY

5  DOWN AND WORK ON IT AND -- BUT I WASN'T GOING TO GO THERE.

6  I WASN'T GOING TO DO THAT.

7    Q.   DID YOU EVER TELL MR. LITTLE TO LIE ABOUT

8  THINGS?

9    A.   NO.

10    Q.   AND WHEN YOU -- AS PART OF YOUR TRIAL WORK, DO

11  YOU RECALL SUBMITTING JURY INSTRUCTION REQUESTS?

12    A.   YES, I DO.

13    Q.   WERE THEY BASED ON THE EVIDENCE THAT WAS

14  PRESENTED AT THE TRIAL TO THAT POINT?

15    A.   YES.

16    Q.   WERE THEY CHOSEN TO MATCH YOUR THEORY OF THE

17  CASE?

18    A.   YES.

19    Q.   AND WHAT WAS YOUR THEORY OF THE CASE?

20    A.   MY THEORY OF THE CASE WAS THAT THIS WAS EITHER A

21  SELF-DEFENSE CLAIM IN WHICH HE WOULD HAVE BEEN ACQUITTED

22  AND/OR AN IMPERFECT SELF-DEFENSE WHERE HE WOULD BE

23  POTENTIALLY CONVICTED OF MANSLAUGHTER.  CERTAINLY I DIDN'T

24  THINK IT WAS A FIRST DEGREE MURDER CASE BASED UPON THE

25  FACT THAT I DIDN'T THINK THERE WAS ANY PREMEDITATION OR

26  DELIBERATION.  AND FRANKLY, I THINK EVEN MS. STEIN

27  VIRTUALLY CONCEDED THAT THERE WASN'T, IN MY DISCUSSION

28  WITH HER IN AND AROUND THE COURTHOUSE.

264

```
 1              SO I ALSO SAW THAT THERE WERE SOME OTHER

 2    FEATURES REGARDING HIS FACT THAT HE WAS BLIND, AND WE HAD

 3    A TON OF THINGS TO DEAL WITH, HIS PRIOR RECORD AND HIS

 4    TESTIMONY AND OTHER WITNESSES COMING IN THAT HAD -- THAT

 5    WERE IN PRISON AND IN JAIL.  SO -- BUT I THOUGHT

 6    ULTIMATELY WE WOULD PREVAIL, EITHER ON ACQUITTAL; I FELT

 7    VERY STRONGLY THAT WE COULD PREVAIL ON ACQUITTAL, AND/OR

 8    AT WORST A MANSLAUGHTER CONVICTION.  AND THAT WAS -- I WAS

 9    VERY DISAPPOINTED THAT HE WAS CONVICTED OTHERWISE.

10         Q.   I'M GOING TO BE SHOWING YOU WHAT'S BEEN

11    PREVIOUSLY ALREADY GIVEN TO COUNSEL, LODGED WITH COUNSEL

12    AND THE COURT, WHICH IS THE MANSLAUGHTER INSTRUCTION FOR

13    INVOLUNTARY MANSLAUGHTER, 8.45 IN EXISTENCE AT THE TIME

14    THAT YOU WERE DOING THE JURY INSTRUCTIONS.  AND I'LL ASK

15    YOU TO TAKE A LOOK AT THIS.

16              DOES THAT INSTRUCTION LOOK FAMILIAR?

17         A.   ALL TOO FAMILIAR.

18         Q.   DO YOU BELIEVE THAT THAT'S THE INSTRUCTION THAT

19    YOU CONSIDERED WHEN THE INSTRUCTIONS WERE GIVEN?

20         A.   THIS IS ONE OF THE INSTRUCTIONS THAT I DID

21    CONSIDER.  I DIDN'T REQUEST IT.  THERE WAS SOME DISCUSSION

22    CONCERNING INVOLUNTARY MANSLAUGHTER IN THE COURSE OF OUR

23    DISCUSSIONS IN CHAMBERS PRIOR TO SELECTING THE JURY

24    INSTRUCTIONS, AND I -- AS I LOOK AT IT TODAY, I STILL HAVE

25    SOME DOUBT AS TO WHETHER OR NOT JUDGE HARRIS WOULD HAVE

26    PERMITTED IT.  HE WAS A STICKLER ON THE BLACK LETTER LAW.

27              I ATTEMPTED ON A COUPLE OF OCCASIONS TO

28    MAKE EVEN SOME GRAMMATICAL CHANGES IN SOME OF THE
```

1   INSTRUCTIONS.  I PULLED SOME INSTRUCTIONS OUT OF AREAS

2   THAT COULD FOCUS ON MR. LITTLE'S INJURY THAT HE REFUSED TO

3   GIVE.  AND I KEEP LOOKING BACK AT THIS INSTRUCTION, NO. 1

4   SAYS, "A KILLING IS UNLAWFUL WITHIN THE MEANING OF THIS

5   INSTRUCTION IF IT OCCURRED DURING THE COMMISSION OF AN

6   UNLAWFUL ACT NOT AMOUNTING TO A FELONY, WHICH IS DANGEROUS

7   TO HUMAN LIFE UNDER THE CIRCUMSTANCES, OR ITS COMMISSION."

8   AND I COULDN'T THINK OF ANYTHING THAT OCCURRED OTHER THAN

9   THE STABBING AS BEING THE UNLAWFUL ACT THAT WE COULD LOOK

10  TO.  AND CERTAINLY I WOULD BE PRESSED TO SAY THAT STABBING

11  SOMEBODY WITH A KNIFE WAS NOT A FELONY, THAT IT WAS

12  SOMEHOW A MISDEMEANOR.  SO I DIDN'T -- I DID NOT REQUEST

13  THIS INSTRUCTION.

14      Q.  NOW, LET ME -- LET ME ASK YOU.  AT THE TIME THAT

15  YOU DEALT WITH MR. LITTLE, DID YOU LIKE HIM?

16      A.  I DID LIKE, AND I STILL DO.  AND I HAVE, AND I

17  STILL HAVE SOME PRETTY SOUR FEELINGS ABOUT THE RESULT IN

18  HIS TRIAL.  AND I LIKE HIS FAMILY; I SPENT A LOT OF TIME

19  WITH HIS FATHER AND HIS SISTER.  I'M VERY FOND OF THEM.

20      Q.  DID YOU MAKE YOUR BEST POSSIBLE EFFORTS TO

21  PRESENT A DEFENSE FOR MR. LITTLE BASED ON THE FACTS YOU

22  WERE AWARE OF?

23      A.  YES, I DID.

24      Q.  DID YOU ATTEMPT TO FOLLOW-UP WHERE YOU THOUGHT

25  INFORMATION SUGGESTED THAT IT MIGHT LEAD TO SOMETHING SUCH

26  AS THE EYE DOCTOR?

27      A.  YES.

28      Q.  DID YOU ASSUME THAT THE DEFENDANT WAS TELLING

1   YOU THE TRUTH WHEN HE TOLD YOU THINGS?

2       A.    YES.   I -- I ALWAYS FELT THAT LARRY WAS VERY

3   CANDID WITH ME ABOUT THINGS, ANYTHING THAT I WOULD ASK

4   HIM.

5       Q.    WERE YOU COMFORTABLE PRESENTING THE DEFENDANT'S

6   IMPERFECT SELF-DEFENSE CLAIM BASED ON WHAT YOU HAD BEEN

7   TOLD AND WHAT YOU KNEW?

8       A.    YES.

9       Q.    AND WAS THE DEFENDANT VERY CONCRETE IN HIS

10  EXPLANATION IN THAT AREA?

11      A.    HE WAS.

12      Q.    NOW YOU'VE MENTIONED THAT THERE WERE SOME THINGS

13  THAT YOU WERE AWARE OF THAT CONTRIBUTED TO MR. LITTLE'S

14  STATE OF MIND AT THE TIME OF THIS KILLING.  ONE OF THEM

15  BEING HIS VISION PROBLEMS, AND YOU WERE AWARE OF THAT?

16      A.    YES.

17      Q.    AND YOU INVESTIGATED THAT BY ARRANGING AN EXTRA

18  EXAMINATION AND USING OLD RECORDS?

19      A.    YES.

20      Q.    AND, IN FACT, YOU HAD LARRY'S -- MR. LITTLE'S

21  FATHER TESTIFY TO HIS VISION PROBLEMS DURING THE TRIAL,

22  DIDN'T YOU?

23      A.    YES.

24      Q.    AND YOU IN FACT HAD MR. LITTLE TESTIFY TO THE

25  VISION PROBLEMS IN HIS TRIAL, DIDN'T YOU?

26      A.    YES.

27      Q.    NOW, YOU WERE ALSO AWARE THAT THERE WAS DRUG USE

28  AND VARIOUS ARGUMENTS AND THINGS OCCURRING IN THIS

1    APARTMENT AT THE TIME -- AT OR AROUND THE TIME OF THE

2    KILLING, WEREN'T YOU?

3        A.   YES.

4        Q.   AND YOU WERE ABLE TO BRING THAT INFORMATION OUT

5    THROUGH MR. ROBERTS DURING THE TRIAL?

6        A.   YES.

7        Q.   AND, IN FACT, THIS DEFENDANT TESTIFIED ABOUT

8    SOME OF THOSE ARGUMENTS AND THINGS DURING HIS CHANCE AT

9    TESTIFYING, DIDN'T HE?

10       A.   YES.

11       Q.   AND, IN FACT, THE DEFENDANT WAS ABLE TO TESTIFY

12   ABOUT BEING AFRAID AND ABOUT THE WAY THE VICTIM MOVED AND

13   DESCRIBED HIS STATE OF MIND, WASN'T HE?

14       A.   YES.  AND I THINK WE ALSO BROUGHT OUT THAT BASED

15   UPON THE PHYSICAL EVIDENCE, SOME OF THE WITNESSES,

16   MS. BROOKS SPECIFICALLY, WAS EITHER MISTAKEN OR FALSIFYING

17   HER TESTIMONY.  THE PHYSICAL WOUNDS THEMSELVES INDICATED

18   THAT THE STABBING OCCURRED WHEN MR. RABITOR WAS ON HIS

19   FEET.  AND I THINK WE BROUGHT THAT OUT WITH CONSIDERABLE

20   DETAIL DURING THE -- WHEN THE DOCTOR TESTIFIED IN

21   PERFORMING THE AUTOPSY.  AND I THINK WE DID A LOT OF

22   DAMAGE TO IMPEACH HER.  SHE WAS THE CHIEF WITNESS IN THIS

23   INSTANCE, AND I USED THOSE AND OTHER METHODS TO TRY TO SET

24   ASIDE OR PUT HER TESTIMONY IN BAD LIGHT.  SO, YOU KNOW,

25   EVERY ASPECT OF THE TRIAL, I THINK, THAT I DID THE BEST

26   THAT I COULD, BASED ON THE YEARS OF EXPERIENCE THAT I HAD.

27       Q.   DID YOU -- AS FAR AS YOU CAN RECALL, DID YOU

28   ATTEMPT OR DID YOU PRESENT AS AN EFFECTIVE DEFENSE OF

1   MR. LITTLE AS YOU COULD?

2       A.    THIS IS MONDAY MORNING.  YOU ALWAYS WALK OUT OF

3   A TRIAL THINKING, IF I ONLY HAD ASKED THAT QUESTION, IF

4   I'D ONLY MADE THAT ARGUMENT, IF I'D ONLY BROUGHT IN THAT

5   ONE LITTLE LAST PIECE OF EVIDENCE, IT WOULD HAVE MADE A

6   DIFFERENCE.  BUT WHEN YOU'RE IN THE HEAT OF IT AND YOU'RE

7   DOING THE BEST JOB THAT YOU POSSIBLY CAN, THEN YOU --

8   YOU'VE GOT TO GO WITH THAT EXAMINATION I DID -- I THINK I

9   DID.  I MEAN, I MADE MISTAKES IN THAT TRIAL, I KNOW I DID,

10  AND I COULD HAVE DONE THINGS DIFFERENTLY OR EVEN BETTER,

11  BUT AT THE TIME, I FELT LIKE I DID THE BEST JOB THAT I

12  COULD.

13          MS. MALLEN:  OKAY, THANK YOU.

14              NOTHING FURTHER.

15          THE COURT:  MR. WILLIAMS.

16          MR. WILLIAMS:  THANK YOU, JUDGE.

17

18                      **CROSS-EXAMINATION**

19  BY MR. WILLIAMS:

20      Q.    AT THE TIME THAT YOU TRIED THIS CASE, YOU SAID

21  YOU HAD HAD ONE PREVIOUS MURDER, A 187?

22      A.    YES, I HAD A MURDER TRIAL.  IT WAS A STABBING

23  CASE.

24      Q.    UH-HUH.

25      A.    IT WAS A SELF-DEFENSE CASE.  IT WAS TRIED WITH

26  BROWDER WILLIS, WHO IS NOW ON THE BENCH, WAS THE

27  PROSECUTOR.  AND LAURA HAMMES WAS THE JUDGE IN THAT CASE.

28      Q.    AND DID YOU RUN WHAT IS COMMONLY REFERRED TO AS

1    A FLANNEL DEFENSE IN THAT CASE?

2       A.    YES.

3       Q.    AND WERE YOU SUCCESSFUL?

4       A.    NO.

5       Q.    THEY FOUND FOR MURDER?

6       A.    THEY FOUND MURDER IN THE FIRST DEGREE.

7       Q.    OKAY.  SO THAT WAS THE ONLY MURDER TRIAL THAT

8    YOU HAD HAD, CORRECT?

9       A.    YES.

10      Q.    HAD YOU HANDLED ANY MURDERS OTHER THAN THAT?

11      A.    I HAD ONE CASE WHERE MY CLIENT WAS CHARGED WITH

12   A MURDER IN A DRUNK DRIVING.

13      Q.    THAT'S RIGHT, A WATSON --

14      A.    YES.

15      Q.    OKAY.

16      A.    AND THAT CASE EVENTUALLY SETTLED AS A

17   MANSLAUGHTER.

18      Q.    ANY OTHER HOMICIDES?

19      A.    HOMICIDE.  I HAD ONE VEHICULAR HOMICIDE CASE

20   WHERE KIDS WERE RACING ON MIRA MESA BOULEVARD AND A YOUNG

21   LADY WAS KILLED THEN.

22      Q.    SO IT'S FAIR TO SAY THAT, YOU KNOW, THIS IS ONE

23   OF YOUR FIRST MURDER CASES?

24      A.    YES.

25      Q.    NOW, YOU INDICATED TO MS. MALLEN AND TO US THAT

26   YOU DID REQUEST A LOT OF JURY INSTRUCTIONS?

27      A.    YES.

28      Q.    IN FACT, YOU PRINTED OUT OR YOU SUBMITTED TO THE

1    COURT ALL YOUR REQUESTED INSTRUCTIONS BY CALJIC NUMBERS,

2    AND EVEN SOME SPECIALS THAT YOU PROBABLY GOT FROM

3    FORESIGHT OR SOMETHING LIKE THAT?

4        A.    RIGHT.

5        Q.    DID YOU DO THAT PRIOR TO TRIAL OR AFTER TRIAL OR

6    DURING TRIAL?

7        A.    WELL --

8        Q.    AFTER TRIAL, I MEAN AFTER THE EVIDENCE WAS

9    CLOSED?  I'M SORRY.

10        A.    I PROBABLY DID IT AT THE CONCLUSION OF THE

11    EVIDENCE.

12        Q.    OKAY.

13        A.    ALTHOUGH, YOU KNOW, WHEN YOU TRY A CASE, YOU TRY

14    A CASE AND YOU -- WITH THOSE INSTRUCTIONS IN MIND, SO --

15        Q.    BUT YOU DID NOT EVER REQUEST 8.45 INVOLUNTARY

16    MANSLAUGHTER?

17        A.    I DID NOT.

18        Q.    AND ITS COMPANION 8.46, WHICH IS DUE CAUTION AND

19    CIRCUMSPECTION DEFINED; YOU DID NOT --

20        A.    THAT'S CORRECT.

21        Q.    DID IT EVER OCCUR TO YOU THAT THIS COULD BE AN

22    INVOLUNTARY MANSLAUGHTER?

23        A.    IT DID NOT AT THE TIME.

24        Q.    WHY?

25        A.    BECAUSE I BELIEVE THAT THERE -- IT DIDN'T FIT IN

26    THE -- WITHIN THE FOUR CORNERS OF THIS INSTRUCTION.

27        Q.    OKAY.  LET'S TALK ABOUT HOMICIDE.  PRIOR TO THIS

28    TRIAL, HAD YOU ATTENDED THE CALIFORNIA PUBLIC DEFENDERS

1    ASSOCIATION HOMICIDE SEMINAR?

2        A.    I ATTENDED THAT ON TWO OCCASIONS.  AND I'M NOT

3    SURE IF I ATTENDED IT BEFORE OR AFTER THIS TRIAL.

4        Q.    PRIOR TO THIS, HAD YOU ATTENDED THE C.A.C.J.

5    DEATH PENALTY SYMPOSIUM?

6        A.    I HAD NOT.

7        Q.    HAD YOU ATTENDED ANY TRAINING IN THE LAW OF

8    HOMICIDES?

9        A.    NOT SPECIFICALLY HOMICIDE, NO, OTHER THAN, LIKE

10   I SAID, I MAY HAVE ATTENDED -- THERE IS A SEMINAR GIVEN UP

11   IN SACRAMENTO OR IN THE SAN FRANCISCO AREA BY C.A.C.A.J.

12   ON HOMICIDES, AND I'VE BEEN TO THAT ON TWO OCCASIONS.  AND

13   ONE OF THOSE OCCASIONS MAY HAVE BEEN BEFORE THIS WENT TO

14   TRIAL.

15       Q.    OKAY.  WAS IT YOUR UNDERSTANDING OF THE LAW AT

16   THAT TIME THAT THE -- OF COURSE, WE CAN ONLY DEAL WITH

17   1999 OR 2000, THE TRIAL, THAT IF THERE'S ANY THEORY OR ANY

18   JUSTIFICATION AT ALL FOR A HOMICIDE THEORY, THAT THE

19   DEFENDANT IS ENTITLED TO AN INSTRUCTION?

20       A.    YES.

21       Q.    YOU KNEW THAT?

22       A.    YES.

23       Q.    AND THE LAW AT THAT TIME, IN FACT UNTIL ONE

24   MONTH AFTER THE TRIAL, WAS THAT VOLUNTARY MANSLAUGHTER

25   REQUIRED AN INTENT TO KILL?

26       A.    YES.

27       Q.    WAS THAT YOUR UNDERSTANDING?

28       A.    YES.

272

1    Q.    SECOND DEGREE MURDER DOES NOT REQUIRE AN INTENT

2  TO KILL, DOES IT?

3    A.    RIGHT.  IT SEEMS ILLOGICAL, I KNOW.

4    Q.    THEY CLEARED THAT UP, BUT THAT IS NOT YOUR

5  FAULT.  HOWEVER, INVOLUNTARY MANSLAUGHTER IS ALMOST LIKE

6  VOLUNTARY, IN THAT IT'S WITHOUT MALICE AND WITHOUT AN

7  INTENT TO KILL, RIGHT?

8    A.    RIGHT.

9    Q.    DID YOU THINK LARRY LITTLE INTENDED TO KILL

10  MR. RABITOR?

11    A.    NO, I -- I MEAN, I DON'T THINK HE HAD THE INTENT

12  TO KILL.  I THINK HIS CONDUCT WAS, YOU KNOW, IMPLIED, THE

13  MALICE WAS IMPLIED FROM THE CONDUCT.

14    Q.    YOU THOUGHT THERE WAS MALICE IMPLIED?

15    A.    YES.

16    Q.    MANSLAUGHTER REQUIRES AN ABSENCE OF MALICE,

17  RIGHT?

18    A.    MANSLAUGHTER REQUIRES AN ABSENCE OF MALICE.

19    Q.    BUT IF YOU THOUGHT THERE WAS MALICE?

20    A.    WELL, WHAT I THOUGHT -- WE'RE TALKING ABOUT TWO

21  DIFFERENT THINGS.  WE'RE TALKING ABOUT MY DEFENSE --

22    Q.    YES, SIR.

23    A.    -- OR WHAT THE EVIDENCE WAS?

24    Q.    BOTH.  IT WAS YOUR DEFENSE THAT HE DID NOT

25  INTEND TO KILL HIM AND HE DID IT WITHOUT MALICE?

26    A.    YES.

27    Q.    THAT'S INVOLUNTARY MANSLAUGHTER, ISN'T IT?

28    A.    NO, I THINK THAT IS AN ACQUITTAL.  I THINK

1    THAT'S A JUSTIFIABLE, YOU KNOW, HOMICIDE, IF HE'S DONE IT

2    IN SELF-DEFENSE.

3         Q.    OKAY.   SO YOUR THEORY WAS ALL OR NOTHING ON

4    THAT?

5         A.    ALL OR NOTHING.

6         Q.    AND, IN FACT, THE JUDGE SPECIFICALLY ASKED YOU,

7    "YOU'RE NOT REQUESTING ANY INSTRUCTIONS ON INVOLUNTARY

8    MANSLAUGHTER?"  AND YOU SAID, "NO"?

9         A.    RIGHT.

10        Q.    AND/OR VOLUNTARY INTOXICATION?

11        A.    RIGHT.

12        Q.    YOU DID NOT CONSIDER VOLUNTARY INTOXICATION A

13   DEFENSE?

14        A.    NOT BASED UPON WHAT I WAS TOLD BY LARRY LITTLE.

15        Q.    WERE YOU AWARE THAT HE WAS ALSO COMING DOWN FROM

16   METHAMPHETAMINE AT THE TIME?

17        A.    NO.

18        Q.    OKAY.   HE DIDN'T TELL YOU THAT?

19        A.    WELL, HE TOLD ME HE HAD USED IT A WEEK BEFORE,

20   AND I DIDN'T ASSUME THAT --

21        Q.    BUT YOU KNEW THIS WAS A EL CAJON DRUG HOUSE,

22   RIGHT?  I MEAN --

23        A.    EL CAJON HAS A REPUTATION.

24        Q.    I MEAN, THIS SPECIFIC HOUSE.  LET'S NOT SLANDER

25   ALL OF US, BUT THIS SPECIFIC HOUSE IN EL CAJON?

26        A.    YES.

27        Q.    OKAY.   WERE YOU AWARE THAT VOLUNTARY

28   INTOXICATION CAN NEGATE MALICE?

1    A.    YES.

2    Q.    WERE YOU AWARE THAT VOLUNTARY INTOXICATION CAN

3    GO TO THE SUBJECTIVE STANDARD OF REASONABLENESS IN PERFECT

4    SELF-DEFENSE IN THE INVOLUNTARY MANSLAUGHTER/FLANNEL?

5    A.    YES.

6    Q.    BUT YOU STILL DIDN'T WANT A VOLUNTARY

7    INTOXICATION INSTRUCTION?

8    A.    BECAUSE I DIDN'T THINK WE HAD ONE.  I DIDN'T

9    THINK THE FACTS LAID OUT TO INVOLUNTARY INTOXICATION TO

10    THE POINT WHERE IT WOULD MAKE SENSE TO ARGUE IN FRONT OF

11    THE JURY THAT MY CLIENT WAS SO DRUNK, HE DIDN'T KNOW WHAT

12    WAS GOING ON.  BECAUSE HE KNEW AND WAS KEENLY AWARE OF THE

13    SITUATION THERE.  AND HONESTLY --

14    Q.    GO AHEAD.

15    A.    YOU KNOW, I COULD SAY I PROBABLY SHOULD HAVE

16    REQUESTED THIS INSTRUCTION, BASED UPON THOSE THEORIES IN

17    CIRCUMSPECTION, IN LOOKING BACK, YES.

18    Q.    YOU'RE RIGHT, YOU SAID THIS IS MONDAY MORNING.

19    A.    THAT'S WHAT YOU WANT ME TO SAY.

20    Q.    NO, SIR.  YOU AND I ARE SUNDAY AFTERNOON

21    PLAYERS; WE'RE GOING TO LET THE MONDAY MORNING

22    QUARTERBACKS DO IT LATER, OKAY?

23            THE COURT:  IS THAT A REFERENCE TO ME?

24            MR. WILLIAMS:  NO.

25            THE COURT:  OH.

26            MR. WILLIAMS:  NO, IT'S NOT.  I DON'T LIKE TO BE

27    SECOND GUESSED EITHER.

28            THE COURT:  I'M GOING TO BE THE ONE WHO DECIDES

1    THIS.  IT'S GOING TO BE MONDAY WHEN I DO IT.

2                MR. WILLIAMS:  OKAY, FINE.  THAT'S FINE.

3    BY MR. WILLIAMS:

4        Q.   WAS THAT YOUR UNDERSTANDING, THE ONLY WAY YOU

5    COULD USE VOLUNTARY INTOXICATION WAS IF YOUR CLIENT WAS

6    TOO DRUNK TO KNOW WHAT WAS GOING ON?

7        A.   YES.

8        Q.   YOU WEREN'T AWARE YOU COULD USE VOLUNTARY

9    INTOXICATION TO SHOW HIS PERCEPTION MIGHT HAVE BEEN JUST A

10   LITTLE BIT SKEWED?

11       A.   WELL, IF IT WAS THERE, BUT HE WAS, YOU KNOW,

12   HE'S NOT TELLING ME THAT IT'S THAT WAY.

13       Q.   DIDN'T JOSH ROBERTS TESTIFY THAT LARRY HAD BEEN

14   DRINKING THAT DAY?

15       A.   YES.

16       Q.   AND YOU KNEW JOSHUA ROBERTS WAS A CRIMINAL,

17   RIGHT?  A FELON, RIGHT?

18       A.   HE WAS TESTIFYING IN HIS GREEN JUMP SUIT.

19       Q.   OKAY.  YOU SAID THAT YOU WENT AND TALKED TO BOB

20   TEAL, RIGHT?

21       A.   YES.

22       Q.   DID YOU HAVE MR. COTTON TESTIFY?

23       A.   WELL, WE GOT HIS RECORDS, AND, YOU KNOW, WE KNEW

24   KIND OF WHAT WAS GOING ON WITH HIM.  AND WE QUIZZED HIM

25   PRETTY CLOSELY ABOUT STUFF THAT HE HAD DONE AND WHY HE WAS

26   THERE.  AND HE REALLY DIDN'T WANT TO TALK TO US BECAUSE HE

27   DIDN'T WANT TO GET A SNITCH JACKET AND A LOT OF, YOU

28   KNOW --

1      Q.   DID THE DISTRICT ATTORNEY'S OFFICE EVER TELL YOU

2  THAT HE HAD EVER BEEN A SNITCH ON ANY OTHER OCCASIONS?

3      A.   NO.

4      Q.   WERE YOU ABLE TO DETERMINE THAT?

5      A.   NO.

6      Q.   THIS WAS A -- THIS WAS NOT A WHO DONE IT, RIGHT?

7      A.   CORRECT.

8      Q.   IT'S A WHAT IS IT WE CALL IT?

9      A.   YES.

10     Q.   AND A WHAT IS IT.  WOULD YOU AGREE, MR. PECKHAM,

11  AS THE CRIMINAL DEFENSE ATTORNEY, THE WHY IS IMPORTANT?

12     A.   YES.

13     Q.   WHY THE KILLING?  DID IT MAKE SENSE TO YOU THAT

14  MR. LITTLE WOULD JUST PICK UP A KNIFE AND STAB MR. RABITOR

15  FOR NO REASON?

16     A.   NO.

17     Q.   SO YOU DEFINITELY WERE LOOKING FOR WHY; IS THAT

18  CORRECT?

19     A.   YES.

20     Q.   NOW AFTER YOU TALKED TO LARRY AND HE TOLD YOU

21  ABOUT HIS EYE INJURY, DID YOU TALK TO ANY EXPERTS AT ALL?

22     A.   ABOUT THE EYE INJURY ITSELF?

23     Q.   YES, SIR.

24     A.   NO.

25     Q.   DID YOU TALK TO ANY OTHER LAWYERS ABOUT WHAT

26  YOUR COURSE SHOULD BE, KNOWING THAT YOUR CLIENT HAD HAD

27  HIS EYE STABBED?

28     A.   I GENERALLY TALK ABOUT MY CASES WITH OTHER

1  DEFENSE LAWYERS.  I PROBABLY DID.  I PROBABLY BROUGHT IT

2  UP AND DISCUSSED IT HERE AND THERE.

3     Q.   NO ONE EVER SUGGESTED THAT YOU GET A MENTAL

4  HEALTH EXPERT OR A MEDICAL DOCTOR TO DO A MENTAL STATUS

5  AND --

6     A.   THE -- I DIDN'T SEE ENOUGH OR I DIDN'T REALLY

7  SEE ANYTHING IN LARRY THAT WAS SUGGESTED.  I COULD HAVE

8  DONE IT, CERTAINLY.  AND AS DR. ABRAM SAID THIS MORNING,

9  YOU KNOW, INFORMATION IS HELPFUL AND CAN'T BE, YOU KNOW,

10  IT'S ALWAYS GOOD AND -- BUT I DIDN'T SEE -- LIKE I SAID

11  BEFORE, I DIDN'T SEE ANYTHING IN LARRY THAT WOULD SUGGEST

12  THAT I NEEDED A MENTAL STATUS AND --

13     Q.   BY THAT YOU MEAN TO SEE IF THERE WERE ANY

14  MENTAL -- I KNOW THERE WAS -- WHAT I MEAN IS DID YOU

15  CONSIDER GETTING ANYONE TO LOOK FOR ANY MENTAL DEFENSES?

16     A.   NO.

17     Q.   AT THAT POINT, WHEN YOU WERE HANDLING THIS CASE,

18  HAD YOUR TRAINING CONSISTED OR EVER TOLD YOU THAT IN ANY

19  HOMICIDE YOU SHOULD GET AN EXPERT TO EXPLORE MENTAL

20  DEFENSES?

21     A.   NO.

22     Q.   HAVE YOU SINCE LEARNED THAT?

23     A.   WELL, I'M GOING TO BE OBVIOUSLY A LOT MORE

24  CONCERNED.

25     Q.   I MEAN IN THE SEMINARS WERE YOU TOLD THAT?

26     A.   NO.  I DON'T THINK ANY SEMINAR THAT I EVER

27  ATTENDED SAID YOU AUTOMATICALLY GET A MENTAL HEALTH EXPERT

28  TO COME IN AND INTERVIEW YOUR CLIENT.  I THINK THERE HAS

1    TO BE SOMETHING THERE FOR YOU TO FOCUS ON TO DO THAT.

2         Q.    AND THE SOMETHING THERE IS -- WAS BASED UPON

3    YOUR EVALUATION, CORRECT?

4         A.    I'M THE ONLY ONE THAT IS SEEING HIM TO DO THAT

5    EVALUATION, SO YEAH.

6         Q.    BECAUSE YOUR CLIENT BASICALLY TOLD YOU HE HAD

7    P.T.S.D. IMMEDIATELY?

8         A.    HE DIDN'T MENTION THAT, BUT HE DID MENTION THAT

9    HE WAS HAVING NIGHTMARES.  AND WHENEVER HE CAME AROUND

10   POLICE OFFICERS, HE HAD THIS REACTION.  AND HE SAID HE WAS

11   RELIVING THE EVENTS.  HE COULD SEE HIMSELF LAYING ON THE

12   PAVEMENT BEING KICKED BY THESE POLICE OFFICERS.  HE WOULD

13   WAKE UP AT NIGHT WITH SWEAT.  YOU KNOW, IT WAS PRETTY

14   APPARENT THAT HIS LIFE WAS BEING AFFECTED BY WHAT HAD

15   HAPPENED.

16        Q.    IS THAT WHAT HAPPENED?  WERE YOU SUING THE

17   HIGHWAY PATROL OR SOMETHING?

18        A.    YES.

19        Q.    OKAY.  WAS HE TALKING ABOUT WHAT HAPPENED WITH

20   THE HIGHWAY PATROL OFFICERS?

21        A.    YES.

22        Q.    OKAY.  SO YOU WERE SUING FOR DAMAGES, RIGHT?

23        A.    CORRECT.

24        Q.    HE WAS A CIVIL PLAINTIFF?

25        A.    CORRECT.

26        Q.    IT WAS -- OBVIOUSLY I'M ASSUMING HE WAS OUT OF

27   CUSTODY?

28        A.    HE WAS THEN OUT OF CUSTODY.

1     Q.   OKAY.  AND WAS HE A VERY SOPHISTICATED GENTLEMAN

2  OR --

3     A.   NOT ESPECIALLY, NO.

4     Q.   WAS HE MORE SOPHISTICATED THAN MR. LITTLE?

5     A.   HE WAS MORE SOPHISTICATED THAN MR. LITTLE.

6     Q.   NOW, YOU SAID THAT AT ONE POINT YOU TOLD LARRY

7  IF YOU THOUGHT -- HE HAD TO HAVE HAD P.T.S.D., RIGHT?

8     A.   I BELIEVE HE DID, YEAH.

9     Q.   BUT DURING THE PENDENCY OF THIS CASE, YOU CAME

10  TO THAT CONCLUSION, RIGHT?

11     A.   YES.

12     Q.   BUT YOU NEEDED TO GET HIM SOME HELP; HE NEEDED

13  TO GET HELP, RIGHT?

14     A.   WELL, HE MENTIONED THAT I HAD SAID SOMETHING

15  ABOUT A FAMILY MEMBER OF MINE WHO HAD A TRAUMATIC EVENT IN

16  HIS LIFE, AND HE DEALT WITH IT IN THE '60'S.  AND I MAY

17  HAVE SAID SOMETHING TO LARRY ABOUT, YOU KNOW, YOU NEED TO

18  PROBABLY DEAL WITH THIS; IT MAY COME BACK TO HAUNT YOU ONE

19  DAY.

20     Q.   YOU DIDN'T THINK TO GET ANYBODY TO EVALUATE

21  LITTLE AS A POSSIBLE DEFENSE AT THAT TIME?

22     A.   I DIDN'T -- I MEAN, I THOUGHT ABOUT IT.  AND I

23  DIDN'T DO IT BECAUSE OF WHAT INFORMATION HE WAS GIVING TO

24  ME.

25     Q.   OKAY.  BUT WHY DID YOU THINK HE HAD P.T.S.D.,

26  BECAUSE OF AN EYE STABBING?

27     A.   YEAH.  JUST BECAUSE THERE WAS, YOU KNOW, A

28  HUGELY TRAUMATIC EVENT WHERE HE LOST AN EYE.  I THOUGHT

1    THAT ALONE WAS PROBABLY ENOUGH AS AN INDICATOR.

2        Q.    I DON'T MEAN TO BE COY, BUT YOU SAID THAT WAS AN

3    INDICATOR, AND THAT YOU WERE CONVINCED OF P.T.S.D.  WHAT

4    MORE DID YOU NEED?

5        A.    NOTHING.  I KNEW HE HAD IT, BUT I COULDN'T FIND

6    OUT, I COULDN'T PUT IT IN MY CASE.  THAT THAT WAS THE

7    PROBLEM THAT I WAS HAVING, IS FINDING A WAY TO GET IT IN

8    THE CASE.

9        Q.    NOW YOUR PREVIOUS MENTAL HEALTH EXPERIENCE AS A

10   LAWYER -- YOU ALSO HAD SOME AS A HUSBAND, RIGHT?  YOUR

11   WIFE WAS A --

12       A.    MORE THAN YOU KNOW.  IT'S MY EX-WIFE.

13       Q.    I PROMISE I WILL NOT -- BUT YOUR MENTAL HEALTH

14   LEGAL FIELD EXPERIENCE IS PRIMARILY THE AREA OF WHAT WE

15   COMMONLY REFER TO AS L.P.S., RIGHT?  THE LAN PENPETRO(PH)

16   SHORT CONSERVATORSHIP?

17       A.    YES.

18       Q.    AND THOSE PEOPLE -- CORRECT ME WHEN I MAKE A

19   MISTAKE.  THE BASIC QUESTION IN THAT CASE IS ARE THEY

20   SUFFERING FROM A MENTAL DISORDER, RIGHT?

21       A.    CORRECT.

22       Q.    AND TWO -- IS IT OF SUCH THAT IT MAKES THEM

23   EITHER A DANGER TO THEMSELVES OR OTHERS OR UNABLE TO

24   PROVIDE THE BASIC NEEDS?

25       A.    CORRECT.

26       Q.    SO THAT'S THE THRUST OF THEIR BASIC ABILITIES?

27       A.    CORRECT.

28       Q.    SO USUALLY GOING IN, THEY HAVE A DISABILITY?

1    A.    YES.

2    Q.    MAJOR QUESTION IS USUALLY THE SECOND ONE, RIGHT?

3    I MEAN, CAN THEY CARE FOR THEMSELVES, DESPITE THIS?

4    A.    RIGHT.

5    Q.    IN AN OUTSIDE LIVING SITUATION?

6    A.    RIGHT.

7    Q.    DID ANY OF THOSE PEOPLE HAVE P.T.S.D.?

8    A.    WELL --

9    Q.    WAIT A MINUTE, THAT'S AN UNFAIR QUESTION.  WERE

10   ANY OF THESE PEOPLE TO BE ALLEGED TO BE SUFFERING FROM

11   P.T.S.D.?

12   A.    THERE ARE -- WHEN I THINK BACK, THERE WAS A

13   COUPLE VIETNAM VETS.  THIS WAS BACK WHEN -- RIGHT AT THE

14   END OF THE WAR, THESE GUYS WERE COMING BACK.  AND I'M NOT

15   SURE IF THEY WERE TALKING ABOUT P.T.S.D. THEN, OR IF THEY

16   WERE TALKING --

17   Q.    COMBAT FATIGUE?

18   A.    YEAH.  AND THERE WERE A COUPLE GUYS, I REMEMBER,

19   THAT WERE HAVING A PROBLEM WITH IT.

20        THE COURT:  WOULD THIS BE A GOOD TIME TO BREAK

21   FOR THE BREAK?

22        MR. WILLIAMS:  SURE, YOUR HONOR.

23        THE COURT:  LET'S TAKE 15 MINUTES.  WE'LL BE IN

24   RECESS UNTIL 3:15.  THANK YOU..

25                    (RECESS.)

26

27        THE COURT:  ALL PARTIES ARE PRESENT.

28   MR. PECKHAM IS ON THE STAND.

1                    MR. WILLIAMS, YOU MAY CONTINUE TO

2   CROSS-EXAMINE.

3                    MR. WILLIAMS:  THANK YOU, YOUR HONOR.

4   BY MR. WILLIAMS:

5       Q.    MR. PECKHAM, YOU INDICATED ON YOUR DIRECT

6   EXAMINATION THAT A KEY ELEMENT OF YOUR CASE WAS THAT HE

7   COULD NOT PERCEIVE WITH HIS EYE; IS THAT CORRECT?

8       A.    YES.

9       Q.    DID YOU EVER CONSIDER THE PERCEPTION WITH THE

10  MIND IN THIS CASE?

11      A.    WELL, THE EYES ARE THE WINDOWS TO THE MIND.  SO

12  I THOUGHT THAT IF I COULD CONVINCE THE JURY THAT HE WASN'T

13  SEEING AS MUCH AS HE SHOULD HAVE OR COULD HAVE, THAT THAT

14  WOULD AFFECT HIS RESPONSE.

15      Q.    I MEAN, DID YOU EVER CONSIDER THAT THERE MIGHT

16  BE SOMETHING OTHER THAN A LACK OF VISION, LIKE SOME MENTAL

17  DIFFICULTIES?

18      A.    WELL, I KNEW THAT LARRY WAS SUFFERING FROM

19  P.T.S.D., SO -- BUT AGAIN, I -- I DID CONSIDER THOSE

20  THINGS, BUT I TRIED TO FIT THOSE INTO A PLACE IN THE CASE

21  THAT WOULD HELP US, AND I DIDN'T SEE A WAY TO DO THAT.

22      Q.    OKAY, SO AT THE TIME YOU COULD NOT SEE HOW THE

23  P.T.S.D. COULD BE USED TO NEGATE THE MALICE AND SHOW A

24  REASONABLE BELIEF OF SELF-DEFENSE?

25      A.    THAT'S CORRECT.

26      Q.    DID YOU THINK -- AND YOU ALSO DID NOT SEE HOW IT

27  COULD NEGATE THE INTENT TO KILL?

28      A.    RIGHT, BECAUSE OF THE SAME REASON.

1      Q.   NOW, YOU HEARD DR. ABRAMS, I THINK, TODAY

2  TESTIFY THAT P.T.S.D. SUFFERERS, OR PEOPLE WITH IT,

3  WHATEVER YOU WANT TO CALL THEM, ARE POOR HISTORIANS, ARE

4  POOR REPORTERS, OR SOMETHING LIKE THAT, RIGHT?

5      A.   YES, I WOULD SAY THAT.

6      Q.   WERE YOU AWARE OF THAT IN 1999?

7      A.   NO.

8      Q.   OKAY.  YOU'RE FAMILIAR WITH PRIVATE CONFLICTS

9  COUNSEL, OR P.C.C. PROCEDURES, CORRECT?

10     A.   CORRECT.

11     Q.   IN ORDER TO GET A PSYCHIATRIST OR A

12  PSYCHOLOGIST, WE JUST CALL AND GET AN AUTHORIZATION?

13     A.   CORRECT.

14     Q.   YOU HAVE TO JUSTIFY IT, OBVIOUSLY?

15     A.   YES.

16     Q.   THE MONEY DOESN'T COME OUT OF OUR -- BY "OUR," I

17  MEAN THE ATTORNEY'S POCKETS, RIGHT?

18     A.   CORRECT.

19     Q.   SO THERE WAS OBVIOUSLY NO PECUNIARY REASON NOT

20  TO GET IT?

21     A.   ABSOLUTELY NOT.

22        MR. WILLIAMS:  THANK YOU, YOUR HONOR.  I BELIEVE

23  I HAVE NOTHING FURTHER.

24        THE COURT:  MS. MALLEN?

25        MS. MALLEN:  NOTHING FURTHER.  THANK YOU.

26        THE COURT:  ALL RIGHT, MR. PECKHAM, I HAVE --

27  DON'T LEAVE.  I DO HAVE A COUPLE OF QUESTIONS.

28

284

BY THE COURT:

    Q.   IN CONNECTION WITH, WHEN YOU WERE EVALUATING THE DEFENSE AND THE IMPERFECT SELF-DEFENSE, AND YOU WERE ALSO EVALUATING A SELF-DEFENSE CLAIM; ISN'T THAT TRUE?

    A.   YES.

    Q.   AND THAT'S WHAT MR. LITTLE HAD TOLD YOU REPEATEDLY, THAT IT WAS IN FACT A REAL SELF-DEFENSE?

    A.   YES.

    Q.   BECAUSE MR. ROBERT RAN --

    A.   RABITOR.

    Q.   RABITOR, THAT'S THE GUY.  THAT MR. RABITOR WAS COMING AT HIM WITH AN OBJECT, AND MR. LITTLE WAS INSISTING THAT THAT OBJECT WAS A GLASS ASHTRAY?

    A.   YES.

    Q.   AND, OF COURSE, THEN YOU SAW THE KNIFE IN THE PHOTOGRAPHS UNDER THE BODY OF MR. RABITOR AND YOU WERE HOPING THAT THAT WAS THE OBJECT THAT HE CAME AT YOUR CLIENT WITH, CORRECT?

    A.   I WAS HOPING LIKE MAD.

    Q.   NOW, THAT WOULD HAVE -- THAT WOULD HAVE ASSISTED YOU NOT ONLY IN YOUR -- A CLAIM OF -- POTENTIAL CLAIM OF POSTTRAUMATIC STRESS DISORDER, BUT THAT WOULD HAVE BEEN A REAL BOON FOR YOUR TRUE SELF-DEFENSE CLAIM, WOULDN'T IT?

    A.   YES.

    Q.   NOW WHAT -- IN TERMS OF WHEN YOU'RE SITTING DOWN AND STRATEGIZING AND FIGURING OUT WHAT TO DO IN A CASE SUCH AS THIS, WHAT'S -- WHAT'S GENERALLY YOUR FEELING ABOUT INCONSISTENT DEFENSES?

1      A.   I DON'T LIKE TO PRESENT INCONSISTENT DEFENSES

2    BECAUSE I THINK IT CONFUSES THE JURY AS TO WHAT ARE YOUR

3    STRENGTHS, WHERE YOUR REAL DEFENSE IS GOING TO BE.   SO

4    I -- I HESITATE TO BRING IN INCONSISTENT DEFENSES.   I

5    THINK THE JURY DOESN'T LIKE THOSE; THEY TEND NOT TO ACCEPT

6    YOU AS A CREDIBLE PRESENTER OF THE FACTS WHEN YOU'RE

7    SAYING ONE THING ON ONE SIDE OF THE CASE, AND ANOTHER AND

8    ANOTHER.   SO I TEND NOT TO DO THAT IF THEY'RE TRULY

9    INCONSISTENT.

10      Q.   AND IF YOUR CLIENT IS GOING TO BE TESTIFYING TO

11    A -- A TRUE SELF-DEFENSE SITUATION?

12      A.   YES.

13      Q.   BASED UPON THE FACTS AS HE PERCEIVES THEM, WOULD

14    IT NOT BE INCONSISTENT THEN TO PRESENT SOME KIND OF

15    PSYCHIATRIC BASIS FOR MISPERCEPTION?

16      A.   YES.

17      Q.   AND DID YOU CONSIDER THAT WHEN YOU WERE MAKING

18    YOUR DECISION?

19      A.   THAT WAS PART OF WHAT I WAS CONSIDERING, SURE.

20      Q.   OKAY.   AND IS THAT ONE OF THE REASONS WHY YOU

21    DIDN'T SEEK OUT -- WELL, THAT -- I'M NOT GOING TO ASK THIS

22    QUESTION, BECAUSE YOU -- AS FAR AS THE -- THE JURY

23    INSTRUCTION, THE INVOLUNTARY MANSLAUGHTER INSTRUCTIONS,

24    YOU DIDN'T SEE ANYWAY WHERE THEY FIT IN THIS CASE?

25      A.   CORRECT.

26      Q.   AND APPARENTLY THERE WAS SOME DISCUSSION, AND

27    JUDGE HARRIS DIDN'T SEE ANY PLACE WHERE THEY FIT EITHER?

28      A.   RIGHT.

1    Q.    IF THEY REALLY DID FIT, THE JUDGE HAD A DUTY ON

2    HIS OWN TO GIVE THAT INSTRUCTION, RIGHT?

3    A.    SUA SPONTE, YES.

4    THE COURT:  RIGHT.  OKAY.

5    MS. MALLEN, ANYTHING ELSE?

6    MS. MALLEN:  NO, YOUR HONOR.

7    THE COURT:  MR. WILLIAMS, ANYTHING ELSE?

8

9                    **RECROSS-EXAMINATION**

10   BY MR. WILLIAMS:

11   Q.    YOU RAN A FLANNEL DEFENSE AND ASKED FOR

12   VOLUNTARY BASED UPON HIS LACK OF PERCEPTION VISUALLY,

13   CORRECT?

14   A.    AS A BACK UP.  IT WAS -- YOU KNOW, THE VOLUNTARY

15   WAS A BACK UP TO AN ACQUITTAL.  I DIDN'T WANT THE JURY

16   TO -- I WANTED TO GIVE THEM A CHOICE.

17   Q.    THE CHOICE --

18   A.    THE WORSE CASE SCENARIO WOULD HAVE BEEN

19   VOLUNTARY, IN MY OPINION, IN MY BELIEF.

20   Q.    SO YOU DIDN'T WANT TO GIVE HIM THE OTHER CHOICE

21   BECAUSE THAT WOULD HAVE REQUIRED A TOTALLY INCONSISTENT

22   DEFENSE?

23   A.    IT WAS INCONSISTENT WITH THE FACTS AS I SAW

24   THEM, AND IT DIDN'T -- AS THE FACTS THAT I HAD REALLY

25   DIDN'T SEEM TO FIT A VOLUNTARY.

26   Q.    WHAT WAS THEIR -- OKAY.  BY THE TIME THAT YOU

27   GOT TO TRIAL, THE KNIFE UNDER MR. RABITOR'S BODY WAS

28   BASICALLY OUT THE WINDOW, RIGHT?

1    A.    THE --

2    Q.    DO YOU UNDERSTAND MY QUESTION?

3    A.    IT WASN'T AVAILABLE, OR THE THEORY?

4    Q.    THAT -- WHAT I MEAN IS YOU FELT THAT THERE WAS

5    NO WAY THAT YOU COULD PROVE THAT RABITOR WAS ARMED WITH A

6    KNIFE AT THE TIME OF THE ASSAULT?

7    A.    OH, I KNEW HE WAS ARMED.

8    Q.    DO YOU THINK YOU COULD PROVE IT?

9    A.    YEAH.  I HAD A WITNESS THAT WOULD SAY THAT HE

10   WAS ARMED AND HE -- SHE SAW THE KNIFE, BUT HE --

11   MR. LITTLE NEVER SAW A KNIFE.  AND SO I THINK WE DID BRING

12   THAT OUT, THE FACT THAT HE SHOWED IT TO HER AND HE WENT

13   AND SAT DOWN.  AND I THINK THAT'S WHERE THE KNIFE CAME

14   FROM; HE WENT TO THE KITCHEN TO GET IT, BUT I DON'T THINK

15   LARRY, MR. LITTLE, KNEW HE HAD IT.

16   Q.    OKAY.

17   A.    I COULDN'T PROVE THAT.

18   Q.    BUT FAILING THAT, THEN YOU WOULD HAVE BEEN

19   DEFENDING A PERSON WITH AN ASHTRAY BEING STABBED TO DEATH,

20   RIGHT?

21   A.    THAT'S RIGHT.

22   Q.    DID YOU THINK THAT COULD SUCCEED AS A PERFECT

23   SELF-DEFENSE?

24   A.    WELL, BECAUSE OF THE FACT --

25   Q.    PERFECT --

26   A.    -- IMPERFECT.  BECAUSE OF THE FACT THAT AN

27   ASHTRAY CAN BE A WEAPON, AND IT CAN CAUSE INJURY, SERIOUS

28   BODILY INJURY, CERTAINLY IN MR. LITTLE'S CASE, BECAUSE HE

1    ONLY HAD ONE EYE LEFT AND/OR POTENTIALLY DEATH, I THINK

2    THAT CREDIBLY I COULD MAKE THE ARGUMENT TO THE JURY THAT

3    HE WAS DEFENDING HIMSELF FROM THOSE TWO POSSIBILITIES AND

4    HE HAD A RIGHT TO DO SO.

5        Q.    AND YOU DID NOT THINK THAT ANY EVIDENCE OF HIS

6    INTOXICATION WOULD HELP YOU IN THE FLANNEL DEFENSE, RIGHT?

7        A.    RIGHT.

8        Q.    AND YOU DIDN'T THINK ANY EVIDENCE OF ANY MENTAL

9    PROBLEMS -- BY "MENTAL PROBLEMS" I MEAN P.T.S.D. WOULD

10   HELP YOU IN THE VOL --

11       A.    WELL, HE EXPRESSED TO ME THAT -- THAT THIS WAS A

12   REACTION TO SOMETHING THAT HAPPENED; THAT HE WAS SUFFERING

13   AS A RESULT OF BEING STABBED, BEING STABBED IN THE EYE AND

14   THE TRAUMA THAT WENT ALONG WITH THAT, I PROBABLY WOULD

15   HAVE USED IT.

16           MR. WILLIAMS:   THANK YOU, MR. PECKHAM.

17                THANK YOU, YOUR HONOR.

18           THE COURT:   MS. MALLEN?

19           MS. MALLEN:   NOTHING.  THANK YOU, YOUR HONOR.

20           THE COURT:   I STILL HAVE A COUPLE MORE

21   QUESTIONS.

22   BY THE COURT:

23       Q.    WERE THERE TWO KNIVES?

24       A.    THERE WERE TWO KNIVES.

25       Q.    NOW, MS. -- IT WAS MS. BROOKS THAT TESTIFIED

26   THAT MR. RABITOR HAD THE KNIFE, CORRECT?

27       A.    CORRECT.

28       Q.    AND THAT HE SHOWED IT TO HER FROM HIS POCKET;

1   THIS IS FROM THE TESTIMONY AT TRIAL -- I THINK IT WAS THE

2   TRIAL, MAYBE AT THE PRELIMINARY HEARING, BUT HE SHOWED IT

3   TO HER AND SHE TOLD HIM TO GET RID OF IT, DIDN'T SHE?

4        A.   CORRECT.

5        Q.   AND DIDN'T SHE TESTIFY THAT I -- THAT HE PUT IT

6   ON THE -- ON A COUNTER OR ON SOME PLACE ELSE OR --

7        A.   HE PUT IT IN THE KITCHEN OR SOMETHING LIKE THAT.

8   I THINK THERE WAS TESTIMONY TO THAT AFFECT.

9        Q.   AND THAT'S NOT THE KNIFE, THOUGH, THAT

10  MR. LITTLE ENDED UP USING TO STAB MR. RABITOR?

11        A.   IT MAY HAVE BEEN, I DON'T KNOW.

12        Q.   WELL, IF IT WASN'T THE KNIFE THAT HE USED TO

13  STAB HIM, THEN MR. -- THEN MR. LITTLE BROUGHT IN A KNIFE

14  INTO THE -- INTO THE OTHER ROOM BEFORE THE ALTERCATION

15  EVEN BEGAN, RIGHT?  I MEAN, THERE'S NO TWO OTHER --

16  THERE'S NO OTHER POSSIBILITY, IS THERE?

17        A.   NOT THAT I CAN THINK OF.  I MEAN, IT HAD TO HAVE

18  COME FROM SOMEWHERE, AND I ASSUMED THAT THE KNIFE THAT WAS

19  UNDER THE BODY WAS THE ONE THAT MR. RABITOR HAD PUT IN HIS

20  POCKET.  AND HE PROBABLY NEVER ACTUALLY PUT IT DOWN

21  ANYWHERE, AND THAT THE ONE THAT MR. LITTLE PICKED UP WAS A

22  SECOND KNIFE.

23        Q.   AND, OF COURSE, IF MR. LITTLE BROUGHT A KNIFE

24  INTO THE ROOM FROM SOME OTHER LOCATION, THAT'S NOT A REAL

25  GOOD THING FOR THE SELF-DEFENSE POINT OF VIEW, IS IT?

26        A.   NO.

27              THE COURT:  ANYTHING ELSE, MR. WILLIAMS?

28

290

## RECROSS-EXAMINATION (RESUMED)

BY MR. WILLIAMS:

    Q.   MR. LITTLE TESTIFIED, THOUGH, THAT HE PICKED UP A KNIFE THAT WAS THERE; HE DIDN'T BRING ONE, RIGHT?

    A.   RIGHT.

    Q.   HE TESTIFIED -- I'M NOT SAYING -- OKAY, THAT'S ALL.

           THE COURT:  YES, THANK YOU.  YOU CAN STEP DOWN.

           MS. MALLEN:  WE HAVE NO FURTHER WITNESSES TO PRESENT, YOUR HONOR.

           THE COURT:  MR. WILLIAMS.

           MR. WILLIAMS:  CAN I TALK TO MS. MALLEN REAL QUICK?

           THE COURT:  SURE.

           MR. WILLIAMS:  RECALL MR. LITTLE.

           THE COURT:  WHICH MR. LITTLE?

           MR. WILLIAMS:  THIS MR. LITTLE.  THANK YOU, YOUR HONOR.

           THE COURT:  ALL RIGHT.  LET'S JUST HAVE HIM SIT RIGHT THERE.

           MR. WILLIAMS:  OKAY, FINE.

           THE COURT:  YOU DON'T HAVE TO MOVE HIM.

### LARRY LITTLE, JR.,

CALLED AS A WITNESS ON BEHALF OF THE DEFENDANT, HAVING BEEN PREVIOUSLY DULY SWORN, TESTIFIED FURTHER AS FOLLOWS:

APPENDIX No. 1

# E X H I B I T    M

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT, DIVISION ONE

| | |
|---|---|
| In re | No. D047468 |
| LARRY JOHN LITTLE, | |
| on Habeas Corpus | |
| | |
| LARRY JOHN LITTLE,<br>Petitioner, | Related Case:<br>No. D035850 |
| v. | Superior Court<br>Nos. SCE198946,<br>EHC388 |
| W. J. SULLIVAN (Warden of California<br>State Prison - Los Angeles County), | |
| Respondent. | |
| | DECLARATION OF<br>ALAN A. ABRAMS |
| PEOPLE OF THE STATE OF<br>CALIFORNIA, | |
| Real Party in Interest. | |

Alan A. Abrams declares as follows:

I am a medical doctor, licensed to practice in the State of California and in Washington D.C. My specialty is in psychiatry and I have a subspecialty in both forensic psychiatry and addiction psychiatry. I am also a member of the State Bar of California. My curriculum vitae is attached to this declaration in seven pages and incorporated by reference as if set forth in full at this point.

I was retained by W. Allan Williams in 2004 for the purpose of evaluating Larry John Little in connection with superior court habeas corpus

E X H I B I T    M                    1

proceedings. (EHC388.)  At that time, I reviewed a number of documents related to the case, including police reports, excerpts from the trial transcripts, the briefing in the Court of Appeal and the opinion of the Court of appeal.  I also reviewed the pleadings related to the petition for writ of habeas corpus filed in the superior court.  Also provided to me were some testing results done by another doctor and some mental health reports from the Department of Corrections.    Based on such materials, I rendered an opinion and testified thereto in August 25, 2004.

In August, 2006, petitioner's current counsel, Athena Shudde, contacted me and asked if I would be willing to reevaluate petitioner if additional background documentation became available.  She also asked if arrangements needed to be made for me to consult personally with petitioner again.  At that time, I indicated I remembered the case very well and, as is my practice, had taken, and maintained, extensive, copious notes at the time of the personal contact with, and evaluation of, petitioner.   I indicated I did not believe an additional personal contact with petitioner would be necessary and that I would be happy to do a supplemental evaluation with more complete background information.

In November, 2006, Ms. Shudde contacted me again and inquired whether I was still available and willing to undertake a supplemental evaluation

E X H I B I T    M                        2

of petitioner. I agreed to do so and she indicated she would send me the additional materials.

In December, 2006, Ms. Shudde sent me a package containing approximately 1500 pages of documents. I carefully reviewed them, in conjunction with my prior testimony and my original evaluation of petitioner, and prepared a letter directed to Ms. Shudde as my supplemental evaluation of petitioner. I understand that letter is attached as an exhibit (Exhibit N) to petitioner's supplemental petition.

I declare under penalty of perjury that the foregoing is true and correct and my letter to Ms. Shudde, dated February 10, 2007, is true and correct. If called to testify, I could and would competently testify to this declaration and the letter and its contents.

Executed this 14 day of _MARCH_, 2007, at _WASHINGTON D.C._.

ALAN A. ABRAMS, M.D., J.D., FCLM

E X H I B I T    M                    3

## ALAN A. ABRAMS, M.D., J.D., FCLM

## I. PERSONAL HISTORY:

**ADDRESS:**  St. Elizabeths Hospital,
Bldg. CT-3, Rm. 109,
2700 Martin Luther.King Jr. Blvd SE,
Washington D.C. 20032

202-645-5766 (voice)
202-645-8808 (fax)

**LICENSES:**  Calif. Physicians and Surgeons G30135
Washington D.C.  Medicine and Surgery MD035334
Calif. State Bar 163839
DEA AA6612293

**MEMBERSHIP:**
American Medical Association
American College of Legal Medicine
American Academy of Addiction Psychiatry
American Society of Addiction Medicine
American College of Forensic Psychiatry
American Bar Association
San Diego Psych-Law Society

## II. EDUCATIONAL HISTORY:

University of Rochester, Rochester, New York
1966-1970, B.A. with honors

University of California, San Diego, School of Medicine,
La Jolla, Ca., 1970-1974, M.D.

UCLA-Harbor General Hospital, Torrance, Ca., 1974-1975,
Internship

UCSD School of Medicine, Dept. of Psychiatry, 1975-1976,
Resident in Psychiatry

UCSD School of Medicine, Dept. of Psychiatry, 1976-1977,
Post-doctoral Fellowship in Psychopharmacology

1

UCSD School of Medicine, Dept. of Psychiatry, 1977-1978,
    Resident in Psychiatry

UCSD School of Medicine, Dept. of Psychiatry, 1978-1979,
    Chief Resident in Psychiatry

UC Berkeley, Boalt Hall School of Law, Berkeley, Ca., 1989 to
    1992, J.D.; graduated upper 10% of class.

## III. SCHOLARLY ACCOMPLISHMENTS:

Phi Beta Kappa, University of Rochester, 1970
Benjamin Graham Award in Psychiatry, 1974
Diplomate, American Board of Psychiatry and Neurology, 1981
Award for Volunteer Work, City of San Diego, 1983
Prosser Prize, Contracts, 1990
American Jurisprudence Award, Biomedical Ethics, 1992
Commendation for Outstanding Oral Performance in Moot
    Court, 1990
California Law Review, member 1990 to 1992, technical editor 1990
to 1992, associate editor 1991 to 1992.
Order of the Coif, U.C. Berkeley School of Law, 1992
Board Subspecialty Certification in Forensic Psychiatry, APBN, 1994
Recertified 2004
Board Certified Forensic Examiner, 1995
Diplomate, American Board of Forensic Medicine, 1996
Fellow, American College of Legal Medicine, 1996
Board Subspecialty Certification in Addiction
Psychiatry, APBN, 1998
Certified Correctional Health Professional 2002

## IV. TEACHING ACCOMPLISHMENTS:

Associate Clinical Professor of Psychiatry, UCSD School of
Medicine, 1979 to present
Outstanding Clinical Teacher Award, UCSD, 1984

Individual Supervision of Psychiatric Residents, UCSD 1979 to 1988;
1991 to 1997;

Formal Teaching:
Seminar in Forensic Psychiatry, September 2005 to present. A

2

weekly 90 minute seminar at St. Elizabeths involving readings in psychiatry and the law. Topics have included competency to stand trial, criminal responsibility, mental health issues in civil litigation, employment discrimination under ADA, psychiatric disability evaluations, mens rea defenses to crime, and the mentally ill in the criminal justice system. Participants in the seminar include medical students, psychiatry residents, psychiatry externs, psychology interns, and psychiatry faculty.

Issues in Psychopharmacology, July 2005 to present. A weekly 60 minute class for PGY1 Psychiatry Residents at St. Elizabeths. Topics have included psychopharmacologic treatment of Lewy Body Dementia, psychopharmacological approaches to impulsive aggression, selegine transdermal treatment of depression, uses of psychotropics in the pregnant patient.

Mentorship in Forensic Psychiatry, July 2005 to present. Individual mentorship of a PGY-IV Georgetown Psychiatry Resident in forensic psychiatry. The resident is involved in actual case workups, and preparation of scholarly articles.

Introduction to Forensic Psychiatry, July 2005 to present. A once monthly 60 minute presentation to Georgetown U. medical students doing their psychiatry rotation.

## V.  EMPLOYMENT HISTORY

Private practice of Psychiatry, 1979 to present. Practice includes expert testimony and evaluations in criminal, civil, disability, competency and worker's compensation cases; medical expert to Social Security Office of Hearings and Appeals; individual and group psychotherapy; teaching and supervision of medical students and residents.

Chief Psychiatrist, Centinela State Prison, 1997 to December 2003

Staff Psychiatrist, Parole Region IV, December 2003 to April 2005

Private practice of law, 1993 to 1997. Practice included personal injury litigation, family law, probate, employment and health law.

Associate Director Psychiatric Training, Saint Elizabeths Hospital, Washington D.C. Feb 2005 - present

Director, Georgetown University Forensic Psychiatry Fellowship
Program

## VI. ADMINISTRATIVE SERVICE:

Commissioner, San Diego County Juvenile Justice Commission, 1997 to
2003.

Physician Member, Diversion Evaluation Committee, Board of
Registered Nursing, State of California, 1999 - April 2005

Board Member, California-Nevada Chapter, American Correctional
Health Services Association, 2001 - 2003

President, San Diego Psych-Law Society 2000-2002

Medical Advisory Board, San Diego Chapter, National Alliance for the
Mentally Ill (NAMI) 2000 to 2005

Executive Board, San Diego Chapter, National Alliance for the Mentally
Ill (NAMI) 2003 to 2005

Member, Legal Process Subcommittee, San Diego Sex Offender
Management Council 2003

Psychiatric Expert Consultant to California Medical Board 2003 to
present

Examiner, Part II, National Boards, ABPN, Washington 2005

## VI: DEMONSTRATION OF SCHOLARLY ACTIVITY:

### PUBLICATIONS:

Abrams A, Treatment Issues in Prisons, Jails, and Correctional and
Forensic Settings, CME Bipolar Disorder and Impulse Disorder
Spectrum Letter, 10:3 August 2004

Abrams A, "Assessment of Criminal Competency", in B. Van Dorsten,
ed., Forensic Psychology: From Classroom to Courtroom Kluwer
Academic/Plenum Publishers, New York, 2002

4

Huey LY, Janowsky DS, Judd LL, Abrams A, Parker D, Clopton P. , Effects of lithium carbonate on methylphenidate-induced mood, behavior, and cognitive processes. Psychopharmacology (Berl). 1981;73(2):161-4.

Abrams AA, Braff DL. Lithium induced cogwheel rigidity: treatment with amantadine. Pharmakopsychiatr Neuropsychopharmakol. 1980 Jul;13(4):240-2.

Janowsky DS, Clopton PL, Leichner PP, Abrams AA, Judd LL, Pechnick R. Interpersonal effects of marijuana. A model for the study of interpersonal psychopharmacology. Arch Gen Psychiatry. 1979 Jul;36(7):781-5.

Janowsky DS, Abrams AA, Groom GP, Judd LL, Cloptin P. Lithium administration antagonizes cholinergic behavioral effects in rodents. Psychopharmacology (Berl). 1979 May 25;63(2):147-50.

Janowsky DS, Abrams AA, McCunney S,, Judd LL "Lithium and acetylcholine" in Nemeroff, C. ed Acetylcholine and Neuropsychiatric Disease Plenum Press New York 1979

Miley DP, Abrams AA, Atkinson JH, Janowsky DS Successful treatment of thalamic pain with apomorphine. Am J Psychiatry. 1978 Oct;135(10):1230-2.

Abrams A, Braff D, Janowsky D, Hall S, Segal D. Unresponsiveness of catatonic symptoms to naloxone. Pharmakopsychiatr Neuropsychopharmakol. 1978 Jul;11(4):177-9.

Janowsky DS, Segal DS, Abrams A, Bloom F, Guillemin R. Negative naloxone effects in schizophrenic patients. Psychopharmacology (Berl). 1977 Aug 16;53(3):295-7.

Janowsky DS, Segal DS, Bloom F, Abrams A, Guillemin R., Lack of effect on naloxone on schizophrenic symptoms. Am J Psychiatry. 1977 Aug;134(8):926-7.

**SCIENTIFIC PRESENTATIONS:**

Abrams, A, Muth, A, Patel, M., Soysal, N  "The Incompetent To Stand Trial Sexually Violent Offender" American College of Forensic Psychiatry, March 2006

Abrams A "Ganser Syndrome" Grand Rounds, Dept. of Psychiatry, Howard University, May 2005

Abrams, A "Risk Assessment of Sexual Offenders" U.S. Psychiatric Congress, San Diego, November 2004

Abrams, A "Involuntary Treatment in the Criminal Justice System" U.S. Psychiatric Congress, San Diego, November 2004

Abrams, A "Predicting Future Sexual Violence" Mental Health Conference, Patton State Hospital, September 2004

Abrams, A "Predicting Future Sexual Violence" American College of Forensic Psychiatry, March 2004

Abrams, A "Paraphilias" Orange County Psychiatric Society, November 2003

Abrams, A "Atkins v. Virginia: Mercy for the Mentally Retarded" American College of Forensic Psychiatry, April 2003

"Legal and Ethical Issues in Prescribing" panel presentation – Sept 28, 2002 San Diego Psychiatric Society, 2nd Annual Psychopharmacology Conference

Abrams A and Taylor C., "Deception in Disability Evaluations" - May 30, 2002 County of San Diego, Dept. of Mental Health

Abrams A. "Involuntary Treatment to Restore Competency" – April 11, 2002, American College of Forensic Psychiatry, 20th Annual Symposium, San Francisco

Abrams A. "Open Access: The Medical-Legal Challenges" – November 9, 2001, San Antonio, Strategy and Consulting Conference on Open Access.

"Frontal Lobe Functioning in a Prison Population" – March 15, 2000, Asilomar, Calif. Forensic Mental Health Assoc.,

Abrams A and Davis SJ. "Court Mandated Restrictions on Medicated Mentally Ill State Inmates in California Meeting the ADA" - March 30, 2000 San Diego, American College of Legal Medicine

6

TEACHING:

Forensic Psychiatry lecture, July 2005- ongoing; monthly lecture to Georgetown University Medical School third year students as part of Psychiatry didactics during their clerkship.

Seminar in Forensic Psychiatry, September 2005 - ongoing. 90 minute lecture and discussion series on forensic psychiatry, taught at St. Elizabeths Hospital for medical students, residents and psychiatrists.

Supervision of psychiatric residents 1979 to present at UCSD; 2005 at Georgetown U.

Lectures to medical students UCSD on correctional psychiatry 1997 to 2003

# APPENDIX No. 1

# EXHIBIT    N

ALAN A. ABRAMS, M.D., J.D., FCLM
1400 EAST CAPITOL STREET NE,
WASHINGTON, DC 20003
202-248-6416 (voice)
619-295-2987 (voice messaging)
aabrams@n2.net

February 10, 2007

Athena Shudde, Esq.,
1762 Columbia Street,
San Diego, CA 92101-2504

Re:     In re Larry J. Little,
        Court of Appeal No. D0447468
        DOB 01/03/1965
        CDC No. P-82205

Dear Ms. Shudde:

Thank you for requesting my opinions in this matter regarding your client on appeal,
Larry J. Little Jr. You have kindly provided most all of the documents that address the
questions raised both at the time of the trial and the Superior Court writ investigation
regarding factual documentation of Mr. Little's trauma and his psychological states
following the trauma. These records consist of about 1500 pages. I have reviewed these
critical records in detail.  I reviewed the following supplemental data to help determine
whether Mr. Little's mental status at the time of the criminal act was likely affected by a
combination of substance abuse, intoxication, prior head injury  and Posttraumatic Stress
Disorder (PTSD):

1.     Preliminary hearing transcript of May 17, 1993: People v. Whales, CR 139160
2.     Police reports of Assault/Mayhem on April 19, 1993
3.     Medical records Re:Assault/Mayhem on April 19, 1993
4.     CDC-R records Re: Larry J. Little under CDC No. H-37001 (partial)
5.     CDC-R records Re: Larry J. Little under CDC No. P-82205 (C-File)
6.     CDC-R Medical and Psychological Reports Re: Larry J. Little, P-82205
7.     San Diego County Jail Medical Records Re: Larry J. Little
8.     Archived CDC-R Records Re: Larry J. Little under CDC No. H-37001
9.     UCSD Medical Records Re: Larry J. Little from 8/94
10.    Superior Court Writ Testimony of Dr. Alan Abrams
11.    Records from Paradise Valley Hospital

If I had these documents at the time of my Superior Court testimony on August 25, 2004,
I would have been able to factually respond to DDA Patricia Mallen's and the Court's

**EXHIBIT  N**

In re Little
February 10, 2007
page 2

astute questions regarding the presence and nature of Mr. Little's irrational or extreme over-reactions in situations prior to the killing of Mr. Rabatore, and of other concrete examples of the existence of Posttraumatic Stress Disorder in Mr. Little prior to the killing. If I had these documents at the time of my Superior Court testimony on August 25, 2004, I would have been able to better address the reinforcing effects and nature of the combination of Mr. Little's substance abuse, head injury and Posttraumatic Stress Disorder. These records, at a minimum, would have greatly assisted Mr. Peckham and Mr. Little at the time of the original trial, and would have strongly indicated the need for an expert mental examination and assessment to explain Mr. Little's over-reaction on the night of June 15, 1999, when he stabbed decedent Eddy Rabatore.

Additionally, I sought to determine the extent to which these important records would have contributed to Mr. Little's defense of self-defense, regarding whether his mental status at the time of the crime was affected by full or Subsyndromal or Partial Post Traumatic Stress Disorder (PTSD), and if so, whether his prior court appointed defense attorney was remiss in not obtaining them or not obtaining a mental health expert, or both.

As I stated in my court testimony, I believe that Mr. Little's mental status—his mens rea—at the time of the criminal act was the central issue in his trial. These additional records strongly support my thesis that Mr. Little's mental status was influenced by symptoms of PTSD from being stabbed in the eye on April 19, 1993, and that his act was an impulsive, hyper-exaggerated response to a perceived (or misperceived) threat that he believed actually existed. Further the effects of substance abuse and possible brain damage needed to be considered in understanding this actual but possibly unreasonable perception. Though there was testimony at the original trial that Mr. Little committed the crime in a coldly deliberate manner, I believe that the majority of information I reviewed supports the defense of an extreme impulsive over-reaction based on a misperception of a life-threatening threat. I believe that the additional evidence would have firmly negated any claim that Mr. Little was malingering his mental state defense, if it was presented at trial. I believe that PTSD is fully relevant to Mr. Little's killing of Mr. Rabatore.

At the time I examined Mr. Little in March 2004, it was my opinion that Mr. Little did not meet full criteria for PTSD. This meant that at that time Mr. Little did not have all of the required symptoms under the C and D criteria of the DSM-IV-TR. Hence I testified about subsyndromal or partial PTSD. This did not mean that his response was any less an over-reaction than if he met the full diagnostic criteria. Now that I have had a chance to review the existing records of Mr. Little's behaviors and symptoms between 1993 and 1999, I believe that Mr. Little did meet the full criteria for PTSD at the time of the killing.

Personal History

In re Little
February 10, 2007
page 3

Mr. Little was born on January 3, 1965 in Willits, California and raised in the San Diego area. He was the younger of two children, and has an older sister. His parents divorced when he was about 20 years old. His parents are still alive, and his mother works as a civil service worker, and his father is retired. Mr. Little completed the 11th grade, and received his GED while in county jail in San Diego. He was last employed as a machinist for an aeronautics company. He never married and never had any children. Mr. Little admit to smoking marijuana and using alcohol while in high school, and by age 20 he began regularly using methamphetamines. He had two prison sentences prior to his murder conviction, one for Receiving Stolen Property, and one for Possession of Controlled Substances. At the time of his crime, he admitted to drinking alcohol, but denied using other drugs.

**Review of Newly Obtained Records:**

The Preliminary Hearing (record set 1) Transcript of May 17, 1993, describes the incident in which Mr. Little was stabbed five times in the left eye by a prostitute he had hired, rendering him blind in that eye and causing a psychological insult that led to his eventual development of Subsyndromal PTSD. Mr. Little indicated that on the night of April 16, 1983, he and his friend Ken Woo had eaten dinner around 7 or 8pm at a restaurant called Garcia's in San Diego. Hereafter, they went back to Mr. Little's residence at proceeded to drink a bottle of Jim Beam Whiskey together. Hereafter, they went to a club called Nite Life, and then to another called Pacers, where they consumed about five pitchers of beer and three rounds of tequila. After leaving the club and eating at a nearby Taco Bell, they picked up two prostitutes on Midway Drive. Mr. Little indicated that Ms. Whales, the prostitute who stabbed him, got in the back seat on the passenger's side next to Mr. Little, while Ms. McMasters, the other prostitute who handed Ms. Whales the knife used in the stabbing, sat in the front passenger seat next to Mr. Woo. Mr. Little indicated that after paying Ms. Whales about $15 as she was sitting next to him, he returned his money into his pants pocket and pulled down his trousers to about his knees while keeping his right arm over the "wad or cash" that he returned to his pocket. At this point Ms. Whales began orally copulating him. Mr. Little indicated that after about four minutes of oral copulation, his hand touched her knee, and she threatened, "Don't touch my leg or I'll bite your dick off." He stated that at this point he no longer felt the wad of cash in his pocket, and he believed he had been robbed. He stated that he then told her, "this isn't going to work…Give me my money back." Mr. Little indicated that she remarked that she didn't take his money; he next began screaming at her and using profanities. She yelled back insisting that she didn't take his money, and gave him a slight push; then he grabbed her by the collar. A struggle ensued in the back seat, and Mr. Little testified that she then told him, "I'm going to knife you," at which point he let her got, and yelled at her to go. Mr. Little indicated that instead of leaving after he had let her go, she obtained a throwing knife with a four inch blade from Ms. McMasters, which was passed to her from the front seat, and stabbed Mr. Little in

In re Little
February 10, 2007
page 4

the left eye repeatedly. Mr. Little stated that he only felt the first blow, after which he felt his face go numb. He struck out with his right arm and managed to hit Ms. Whales, after which she and Ms. McMasters fled the vehicle on foot. He was taken to Sharp Cabrillo Hospital by Mr. Woo. These records confirm Mr. Little's account that he provided to me at the time of my interview on March 30, 2004. DDA Mallen asked at the writ hearing if I had any independent factual confirmation of Mr. Little's trauma. This and the other records would have settled any concern that Mr. Little had fabricated the story of the traumatic assault.

According to Police <u>Reports of Assault/Mayhem (record set 2) on April 19, 1993</u>, Ms. Whales and Ms. McMasters were apprehended on April 19, 1993, identified in a photo lineup by Mr. Little, and sentenced to prison. Of note, the Investigator's Follow-Up Report (p144) indicates that both Ms. McMasters and Ms. Whales were arrested together seven times prior to their arrest in Mr. Little's case, and five cases involved their concurrent arrest for either theft, robbery, prostitution, or assault.

<u>Medical records Re: Assault/Mayhem from Sharp Cabrillo Hospital</u> (record set 3) indicate that Mr. Little was admitted to the Emergency Department at Sharp Cabrillo Hospital in San Diego on April 15, 1993 at about 3 am with multiple lacerations to the left eye. The same morning he underwent Repair of a Left Ruptured Globe, Exploration of Left Globe, and Repair of Lid Lacterations x 4, by Dr. Lance Arnell, the consulting Opthalmologist. Medical records indicate that from the time he was admitted, Mr. Little had no vision in his left eye, and never regained it postoperatively. Intraoperative records indicate that he suffered a vitreous hemorrhage and retinal detachment, rendering him blind in the left eye. Medical records also indicate that at the time he was admitted Mr. Little had no preexisting medical conditions, and that he was not taking any medications. Mr. Little did receive a presumptive diagnosis of Alcohol Abuse, in addition to a Ruptured Left Globe status post Repair and Medial Left Orbital Wall Fracture at the time of his discharge on April 19, 1993. Nursing notes during his inpatient stay indicate that for the most part Mr. Little remained sedated and medicated for pain. However, **a nursing note on 4/18/93 (Bates p221 0530 hours) indicated that he "always has bad dreams."** Of note, during his hospitalization, Mr. Little was never seen by a consulting psychiatrist for any preexisting psychiatric condition, including PTSD, Depression, or Anxiety. These records would have been substantially important in addressing any implication that Mr. Little was feigning injury or PTSD. They support that Mr. Little met the B criteria for PTSD shortly after the traumatic event.

<u>CDC-R Records of Case No. H-37001</u> (record set 4) indicate that Mr. Little had a prior convictions involving Receiving Stolen Property on July 20, 1995, and for Possession of Controlled Substances for Sale on July 7, 1987. Mr. Little spent 279 days in jail for the Possession conviction, and 18 days for the conviction of Receiving Stolen Property. This is significant in that his sentencing exposed him to mental health professionals who screen for psychiatric conditions in jails and prisons. **Psychological records (Bates pp**

In re Little
February 10, 2007
page 5

897- 899) from his second prison term for Receiving Stolen Property indicate that
on September 6, 1995, prior to his criminal act of stabbing Mr. Rabatore, Mr. Little
was in fact diagnosed with "Mild Major Depression with PTSD Features" and
"Methamphetamine Abuse" by Josh Haskett, Ph.D., a prison psychologist, after a
comprehensive psychological evaluation. Dr. Haskett noted that Mr. Little "became very
sensitive in crowds, being with people, secondary to being stared at because of his
obvious eye injury." Dr. Little added that Mr. Little complained of "intrusive
thoughts with nightmares at times associated with injury. Dr. Haskett's evaluation is
a clear indicator that Mr. Little's mental status was already affected by PTSD as well as
substance abuse, only two years after being stabbed in the eye, and four years prior to his
stabbing of Mr. Rabatore. The initial 31 question prison screening exam was negative,
but Dr. Huagen ordered a fuller examination, and referred Mr. Little to Dr. Haskett. Dr.
Haskett placed Mr. Little in the CCCMS classification, i.e. that Mr. Little had a serious
mental illness. This single document would have been highly significant in rebutting the
prosecution's claim that Mr. Little acted with malice, and intent to kill, and was
malingering his claim of an extreme over-reaction. I was not able to find follow-up
mental health records after Mr. Little was placed in CCCMS in 1995. It appears that Mr.
Little "fell through the cracks" of the prison mental health program in 1995.

CDC-R Records of Case No. P-82205 (record set 5) outline Mr. Little's crime,
conviction, sentencing, appeal, and prison course following his conviction for second
degree murder. They contain an account of the night of the crime, as summarized by his
appellate judges, as follows: On the night of June 15, 1999, Mr. Little was at the
residence of Mr. Rabatore and Mr. Rabatore's mother, Ms. Joyce Roesch, in El Cajon.
They were accompanied by Mr. Rabatore's friend, Alysen Brooks. At about six that
evening, Mr. Rabatore and Mr. Little got into an argument, at which point Ms. Roesch
demanded that Little leave the apartment. Little apparently refused, so Ms. Roesch asked
her son to call a friend to remove Mr. Little from the apartment. Hereafter she left the
apartment and her son called a friend to come over and help him deal with Little. Before
Roesch left, Little told her and Rabatore that if they call their friends, he'd call his, and
that they'd "make this into a riot, into a bloodbath." This verbal response was an early
indicator of the fact that he felt threatened. Hereafter, Little began gathering his
belongings as Rabatore went into the kitchen and retrieved a steak knife, which he
showed to Brooks. She asked him to get rid of it, and he apparently placed it on a sewing
machine cabinet in his mother's room. Little returned to the room and was preparing to
leave, when he instead stabbed Rabatore in the chest with the knife Rabatore placed in
his mother's room. Mr. Little testified that prior to the stabbing he had always been
"jumpy" as a result of being stabbed in the eye. He stated that he had been drinking
alcohol before his crime, and that everyone in the house apart from him had been using
methamphetamines. He added that Rabatore was hyperactive and aggressive because of
the methamphetamines, and that he felt threatened when he heard Rabatore call his
friends. Mr. Little stated that prior to his exiting the apartment, Rabatore told him not to
go anywhere, and picked up an ashtray and "lunged at him," at which point Little picked

In re Little
February 10, 2007
page 6

up a knife from a table and stabbed Rabatore in the chest.

Mr. Little was arrested the next day and subsequently found guilty of second degree murder on May 3, 2000. He was sentenced to 18 years to life. Mr. Little testified that he acted in self-defense, and that he felt threatened and thought he was being attacked when Mr. Rabatore allegedly came at him with an ash tray, so he struck out against him. After his conviction he appealed his case in 2001, claiming that the court erred in failing to instruct the jury on the standard of knowledge of a person with physical impairment (his blindness), erred in prejudicially and erroneously instructing the jury that "an intent to kill was an element of voluntary manslaughter," and erred in admitting the testimony of an informant. The appeal was ultimately unsuccessful. Mr. Little again appealed his case in August 2004, on an OSC writ, claiming that his court appointed counsel was ineffective for not thoroughly investigating the night of the murder, as well as not having Mr. Little evaluated for PTSD.

Mr. Little's prison records also indicate that he was segregated twice from the general population; once for suspicion of involvement in "a pattern of ongoing assaults initialized against the white inmates," and another time for masturbating in front of an officer (for which he plead not guilty because he claimed he could not see her standing there). They also indicate that Mr. Little earned vocational training certificates in Shop, Electronics, Janitorial Maintenance, as well as a High School Equivalency Certificate. A rules Violation Report indicates that Mr. Little received a violation on 9/19/05 for Mutual Combat with another inmate. In his statement, Mr. Little stated that "I'm blind and all I remember is a guy coming at me. I ran and was hit in the head when I woke up and there was blood all over. I don't remember anything." Both inmates received medical care and sustained no lasting injuries, and both were found guilty of rules violation. This incident was another example of Mr. Little's tendency to violently overreact in a situation of perceived threat, and dissociate during the actual violent struggle or act. It is noted that he had no immediate memory of what exactly happened during the struggle. At the time of the episode Mr. Little had been receiving Mental Health Services from the CDC. Obviously these records are post-event, but further support the actual existence of PTSD prior to the killing.

<u>Medical and Psychological Records for Mr. Little under CDC No. P-82205</u> indicate that when he was imprisoned in 2000 for second degree murder, Mr. Little was not taking any medicines to treat any chronic physical or psychiatric conditions, although he had been diagnosed with Depression with PTSD Features while imprisoned in 1995. Records indicate that Mr. Little received Mental Health services in prison beginning in August 2000, and was treated with Zoloft (an antidepressant and anxiolytic used to treat Depression and Anxiety Disorders such as PTSD) and Trazadone (an antidepressant often used as a sleep aid) for PTSD and Depression resulting from being stabbed in the eye. Psychiatric records indicate that Mr. Little's mood, sleep, affect, and behavior, in terms of irritability and impulsivity, improved with the medications. He also received

In re Little
February 10, 2007
page 7

therapy for anger management. Throughout his prison sentence, psychiatric records indicate that Mr. Little was being treated for PTSD and Depression.

Archived CDC-R Records (record set 8) indicate that on August 16, 1993, Mr. Little was arrested for brandishing a weapon against his father's girlfriend while at his father's residence. In a police report, his father's girlfriend stated that she was speaking to Mr. Little's father, when Mr. Little yelled at her and asked if she was talking about him. When she said yes, he "grabbed a butcher knife and told her to stop talking about him. He was waving the knife in the air as he walked towards her." At this point she called 911, and police arrived and arrested Mr. Little. Mr. Little minimized the incident, stating that he didn't think he was brandishing a weapon. No charges were filed, but this incident is another documented illustration of Mr. Little's paranoia and his propensity to act on it impulsively and in a potentially violent way.  When considered in context with Mr. Little's diagnosis of PTSD, which left him hypervigilant, and his continued methamphetamine abuse, which reinforced his anxiety, anger and impulsivity, as well as Dr. Haskett's reports that he was always very self conscious about his eye, this incident further supported a hyperexaggerated response to a perceived threat or slight by another female. Though Mr. Little had described this incident to me, and I testified as to its significance, having the actual records would have dispelled any doubts whether Mr. Little was prone to misperceiving events and over-reacting in a violent self-defensive manner to his misperceptions.

A 115 from March 17, 1997 indicates that Mr. Little was attacked while at Calipatria State Prison.

Records from RJ Donovan State Prison and San Diego County Jail indicate that after his conviction for killing Mr. Rabatore, Mr. Little was again placed in the CCCMS system, indicating significant mental illness.  Mr. Little continued to be treated with a variety of antidepressants including Zoloft, up to a maximum dose of 200mg, as well as Trazadone and Seroquel, an atypical antipsychotic which was added for symptoms of paranoia. Records indicate that Mr. Little was compliant with treatment and was indicated significant benefit in terms of his mood, his irritability, and his ability to cope.

Records from Paradise Valley Hospital confirm that Mr. Little was assaulted in June 1998. He was beaten by an unknown assailant, and had a dislocated toe, as well as bruising. There was no mental examination recorded.

Records from Pomerado Hospital suggest that Mr. Little was treated there in May 1978 at age 13 (presumably for the head injury) but that the records were purged.

Discussion

The core symptoms of PTSD as described in the DSM IV are:

In re Little
February 10, 2007
page 8

A. Exposure to a traumatic event associated with intense fear or horror.
B. Persistent reexperiencing of the event through intrusive recollection, nightmares or flashbacks, with intense distress when exposed to reminders of the event.
C. Feelings of detachment, anhedonia, amnesia, restricted affect, or active avoidance of thoughts or activities that may be reminders of the event.
D. A general state of persistently increased arousal after the traumatic event, which is characterized by poor concentration, hypervigilance, exaggerated startle response, insomnia, or irritability.
E. Symptoms present for at least 1 month.
F. Symptoms cause significant distress or impaired occupational or social functioning.

Because I did not have these additional records that you have provided, at the writ hearing I diagnosed Mr. Little with sub-syndromal PTSD. I believe that a mental health expert who would have examined Mr. Little after his arrest, and had access to the medical records, would likely have diagnosed the full syndrome of PTSD. This is supported by the additional documents you have provided.

At the time of his crime, Mr. Little met diagnostic criteria for Posttraumatic Stress Disorder, as Dr. Haskett observed in 1995, two years after his traumatic loss of vision and four years prior to his crime. His symptom of increased arousal surfaced in both subjective reports to prison psychologists (insomnia, irritability), but also through hyperexaggerated responses to misperceived threats, as when he brandished a weapon against his father's girlfriend. He also exhibited episodes of detachment and amnesia, particularly after his involvement in a fight with another inmate, in which he describes having no memory of the actual physical conflict, but woke up in a pool of blood. The C criteria of PTSD are identical to the symptoms Dr. Haskett indicated as the symptoms of Major Depression. That Mr. Little was suffering from PTSD at the time of his criminal act and well before it is established and documented, given existing medical records. The degree of his hyperexaggerated responses and their violent tone, although disturbing, is not inconsistent with individuals who experience behavioral disinhibition as a result of PTSD. There are numerous studies showing that patients with PTSD are more impulsive and more prone to violence because of their hypervigilance. See e.g. Casada JH, Roache JD. Behavioral inhibition and activation in post traumatic stress disorder. J Nerv Ment Dis. 2005 Feb;193(2):102-9. Casada and Roache compared inhibition and activation responses in relation to anxiety and showed that PTSD patients had an excessively disinhibited response to anxiety in comparison to normal control patients. The authors concluded that "the presence of disinhibition accompanying behavioral activation in these subjects may explain the impulsivity and aggression associated with PTSD." Though this is a recent study, there was an extensive scientific literature on PTSD and exaggerated aggressive responding at the time of Mr. Little's trial for the killing.

In re Little
February 10, 2007
page 9

It is important to note that Mr. Little had also consumed alcohol that night and was accompanied by individuals using methamphetamines, further disinhibiting his responses. I do not know whether the issue of the combination of substance abuse, substance intoxication and PTSD was considered by Mr. Peckham. There was also a history of brain injury which could have caused increased impulsivity and aggression. You were not able to obtain the records related to Mr. Little's head injury at age 13. If a mental health expert had been consulted, the expert could have assessed the role that Mr. Little's head injury may have played in the killing through a combination of brain imagining and neuropsychological testing. A significant head injury could lead to worsened impulsivity in combination with the PTSD and substance abuse. Again a mental health expert should have been consulted. The appellate court's unpublished opinion was primarily focused on the issue of Mr. Little's physical impairment, with minimal development of the psychological impairments likely because they were not presented to the jury.

The issue of Mr. Little's truthfulness was also central in the jury's assessment of his mental state at the time of the killing, because contradictory evidence was presented. My opinion is that a mental health expert could have explained the role of denial in people with PTSD, substance abuse and head injury.

<u>Summary</u>
As indicated in my court testimony, Mr. Little's exact mental status at the time of his criminal act remains the central issue in his case. In order to better understand his mental status at that time, I requested additional medical, psychological, and forensic data related to Mr. Little's mental state prior to the stabbing of Mr. Rabatore. The additional data allows a better estimation of Mr. Little's mental status prior to his being stabbed in the eye, after being stabbed in the eye, prior to stabbing Mr. Rabatore, and after his arrest and conviction. My analysis of the supplementary information has confirmed several important factors in this case:

1. Medical records indicate that prior to being assaulted and stabbed in the eye in 1993, Mr. Little did not suffer from any pre-existing mood or anxiety disorders.
2. Mr. Little suffered an acute, life-threatening trauma when he was criminally stabbed in the eye five times in 1993.
3. Medical records indicate that in 1995 Mr. Little was diagnosed with Depression and PTSD from being stabbed in the eye, while he was imprisoned for Receiving Stolen Goods.
4. After he was paroled, Mr. Little did not continue treatment for PTSD between 1995-1999.
5. Mr. Little was suffering from untreated PTSD at the time of his criminal act.
6. Mr. Little's mental status—his perception, thought processing, judgment and reaction—was significantly influenced by an underlying PTSD when he

In re Little
February 10, 2007
page 10

stabbed and killed Mr. Rabatore.

7. Mr. Little's preexisting PTSD and its affect on his perception and reaction to threats should have been investigated and addressed by his prior defense attorney, as it directly relates to his mental status at the time of the crime.

Additionally the interplay and synergistic reinforcement of substance intoxication and a history of head injury, with PTSD needed to be addressed by a mental health expert.

I firmly believe, to a medical certainty, that Mr. Little's untreated and underlying psychiatric condition was a crucial element in determining the presence or absence of malice and intent in this crime, and should have been addressed by his attorney. The additional records strongly establish the existence of Mr. Little's mental disorder prior to the killing.

I respectfully disagree with Judge Hanoian's opinion that "PTSD does not fit the facts of the case." (Bates p 446). I strongly agree with Judge Hanoian's opinion that a reasonably competent attorney would have and should have had Mr. Little evaluated for PTSD. If an evaluation had been done, and if Mr. Little's prior records were reviewed, and if the mental health expert presented the factual information to the jury about PTSD and Mr. Little's actually having been previously diagnosed with PTSD, as well as demonstrating aggressive behaviors driven by the combination of PTSD co-morbid with prior head injury and substance abuse and intoxication, Mr. Little would have had a more accurate finding of fact.

The recent U.S. Supreme Court decisions in <u>Wiggins v. Smith</u> (2003), and <u>Rompilla v. Beard</u> (2005) are highly relevant to Mr. Little's claim of ineffective assistance of counsel.

Sincerely,

Alan A. Abrams, M.D., J.D.
Director, Forensic Psychiatry Fellowship,
Georgetown University Hospital,
Diplomate, American Board of Psychiatry and Neurology,
Subspecialty Certification in Forensic Psychiatry,
Subspecialty Certification in Addiction Psychiatry

APPENDIX No. 1

# EXHIBIT    O

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT, DIVISION ONE

| | |
|---|---|
| In re | No. D047468 |
| LARRY JOHN LITTLE, | |
| on Habeas Corpus | |
| LARRY JOHN LITTLE, | Related Case:<br>No. D035850 |
| Petitioner, | |
| v. | Superior Court<br>Nos. SCE198946, EHC388 |
| W. J. SULLIVAN (Warden of California State Prison - Los Angeles County), | |
| Respondent. | DECLARATION OF<br>INGE BRAUER |
| PEOPLE OF THE STATE OF CALIFORNIA, | |
| Real Party in Interest. | |

Inge Brauer declares as follows:

I am an attorney duly licensed to practice before all courts in the State of California. I was admitted to practice in 1976, and have been practicing law 30 years, with my practice being exclusively dedicated to federal and state criminal defense work since 1983. I have handled literally hundreds of felony cases at the state level, ranging from simple burglaries through LWOP and capital cases. I have conducted hundreds of pretrial investigations, preliminary hearings, motions, and sentencing hearings. In addition, I have tried innumerable cases at the state level, including LWOP cases and one death

E X H I B I T    O                    1

penalty case. A number of cases have involved mental or psychological defenses. Under the San Diego conflicts panel, which administers appointments of counsel where the public offices have conflicts, I have been qualified to handle all manner of felony cases, including capital cases. At the federal level, I have been approved as a member of the felony appointment panel for a number of years and have handled at least 10 trials in federal court. I regularly attend continuing education seminars related to the nature of my practice and related to the presentation of all manner of defenses, including mental and other defenses.

I have been requested by counsel for petitioner to evaluate this matter as if it were a case of first impression and give my opinion regarding investigation and preparation of the case for trial based on my review of the records. In preparation of this assessment, I reviewed the following materials:

1.    the information in SCE198946;

2.    Five hundred eighty-two pages of discovery from the case, which included the crime report, witness statements, arrest reports, numerous supplemental reports; evidence lists, witness lists, the medical examiner's report, transcripts of interviews with various witnesses, including petitioner, petitioner's rap sheet, a transcript of a 911 call and crime scene and forensic lab reports;

3.    the trial testimony of petitioner in SCE198946; and

E X H I B I T    O                    2

4.    the superior court habeas corpus testimony of petitioner in

EHC388.

Based on my review of these materials, and based on my experience,

petitioner's physical condition suggested a psychological disorder like PTSD or

methamphetamine addiction or some combination or interrelationship between

the two.  I would have, among other things, had petitioner evaluated by one or

more psychologists or psychiatrists.  I would have done this despite petitioner's

repeated statements that he acted in self-defense or denied that PTSD had any

effect on his behavior, as I could not unilaterally accept these statements or

know whether petitioner's claims were consistent or inconsistent with PTSD or

some interrelated or independent mental disorder.  I would have requested a

full battery of tests to determine whether he suffered from methamphetamine

psychosis, an impulse control disorder, or PTSD, and whether they were

separate or interrelated add the extent to which any such potential defect was

operative at the time of the offense.  I also would have sought expert opinion

to determine whether petitioner's statements were consistent with the apparent

disorders.  In addition, I would have searched out any available medical

records to determine whether, and to what extent, petitioner previously had

been treated for any mental defect or disorder, or if he had obtained any

treatment for drug addiction.  I also would have investigated his prison and

civilian behavior with particular attention to any medical records and any pre-

E X H I B I T    0              3

offense misconduct. Dependent on the nature and circumstances of the medical evidence and/or misconduct, I would have discussed it with an expert to determine whether the event(s) was/were consistent with PTSD or any other disorder. Only after such investigation could I rule out or determine whether a psychological defense existed.

Based on my training and experience, in light of petitioner's particular vulnerability due to the traumatic loss of vision in one eye, and assuming he suffered from PTSD or some other independent or associated disorder, including methamphetamine psychosis at the time of the offense, my theory of the defense would have been geared toward manslaughter on the grounds petitioner's disorder(s) affected his ability to form the intent to kill, thereby reducing his culpability from murder to manslaughter, or, more likely, he killed in the actual but unreasonable belief he needed to defend himself. I probably also would ask for involuntary manslaughter instructions assuming the evidence at trial was consistent with evidence adduced at the preliminary hearing, namely, that petitioner picked up a knife, petitioner would testify as he did at the superior court habeas hearing and expert testimony substantiated a mental disorder.

I am aware that petitioner's trial counsel tried to bring in petitioner's vulnerability when petitioner testified that he was "jumpy" after the loss of his eye. Petitioner's trial counsel also touched on drug abuse. However,

E X H I B I T    O            4

FROM :          05/19/2007  10:54    6152942645        FAX NO. :          LAW OFFICES        Mar. 19 2007 10:05AM P1
                                                                                            PAGE  21

petitioner's counsel provided no context for petitioner's testimony. Without any background on PTSD, or any related diagnoses, a jury, presumably not affected by petitioner's disorders, could not have understood petitioner's testimony and what he perceived, why he perceived it and why he acted or reacted as he did. As a result, petitioner's counsel could not have given the jury a basis for anything other than a murder conviction. In my opinion, this tactical approach torpedoed the defense and ignored the available avenues of defense. In essence, defense counsel apparently hoped that the jury would accept and understand petitioner's actions without presenting any substantial evidence that could lead a jury to a reasonable doubt as to his mental state, or to the conclusion he acted in unreasonable self-defense, or the conclusion the killing was an involuntary manslaughter. In my opinion, no reasonably competent criminal defense attorney would have taken this approach without first having exhausted available investigation methods to determine the existence and scope of any mental defect or disorder.

I declare under penalty of perjury that the foregoing is true and correct and, if called to testify, I could testify competently thereto.

Executed this 19th day of _March_, 2007, at San Diego, California.

INGE BRAUER

EXHIBIT    O                    5

APPENDIX No. 1

# EXHIBIT    P

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT, DIVISION ONE

| | |
|---|---|
| In re<br><br>**LARRY JOHN LITTLE,**<br><br>on Habeas Corpus | No. D047468 |
| **LARRY JOHN LITTLE,**<br><br>Petitioner,<br><br>v.<br><br>W. J. SULLIVAN (Warden of California State Prison - Los Angeles County),<br><br>Respondent. | Related Case:<br>No. D035850<br><br>Superior Court<br>Nos. SCE198946, EHC388<br><br>**DECLARATION OF PETITIONER'S HABEAS COUNSEL** |
| **PEOPLE OF THE STATE OF CALIFORNIA,**<br><br>Real Party in Interest. | |

Athena Shudde declares as follows:

I am an attorney duly licensed to practice in the State of California. I am the attorney appointed for Larry John Little on the petition for habeas corpus presently pending in the Court of Appeal, Fourth Appellate District, in case no. D047468 (San Superior Court case nos. SCE198946; EHC388.)

I have been licensed to practice for almost 29 years, 20 of which were spent primarily as a criminal defense trial attorney. Over those 20 years, beginning first at Federal Defenders of San Diego, followed by private practice and a period in a County of San Diego program specifically instituted for

E X H I B I T   P                    1

homicide and capital case defense, I handled thousands of felony cases, ranging from what the County of San Diego classifies as class III felonies (i.e., burglary, drugs, felony theft, fraud, etc.) through class V and class VI felonies (murder and capital cases), from arraignment through preliminary hearing, motions and trial. As relevant here, I have tried numerous attempted murder cases, murder cases and three LWOP (life without possibility of parole) cases. In addition, I handled one capital case, a torture murder, from preliminary hearing and motions and through investigation of the guilt and penalty phases, to the day of trial, where the matter was resolved favorably to the defendant. I also shepherded a second death penalty case through preliminary hearing, pretrial motions and guilt phase and penalty phase investigation. I have read thousands of police reports and arranged for and directed pre-trial investigation in hundreds of cases, including investigation and retention of experts in cases involving mental defenses. In addition, during my years as a trial attorney, I attended numerous seminars and training programs, including the three-day death penalty seminar and other seminars related to the general defense of criminal cases and specifically related to specialized matters, such as murder, gang cases, drug and alcohol cases and mental defenses. Since leaving trial practice and commencing a criminal appellate practice, I have handled hundreds of cases ranging from simple felonies to LWOP's and have had the opportunity to review prosecution discovery and defense investigative reports

E X H I B I T    P                    2

associated with those cases while in the process of evaluating the record and, necessarily, the performance of the defense attorney.

Based on my background and experience and my review of numerous records in this case, I believe the following to be relevant to this matter:

Petitioner was convicted by jury of second degree murder with a true finding on the use of a dangerous weapon, to wit, a knife. Following the trial court's true findings on two prison terms, petitioner was sentenced to 3 years consecutive to 15 years to life in prison and appealed.

In the light most favorable to the judgment, the record reveals the facts as stated in the court of appeal opinion on the direct appeal in this matter, case no. D035850. (Exhibit E.) Succinctly stated, petitioner stabbed one Eddy Rabatore. According to the prosecution case, petitioner stabbed Rabatore with intent to kill. According to the defense, petitioner stabbed Rabatore in self-defense based on a vision impairment.

Based on the information known to me at the time of appointment, I contacted petitioner, petitioner's trial attorney, petitioner's attorney on the direct appeal and petitioner's attorney on the petition for habeas corpus filed in the superior court. Petitioner's trial attorney informed me he no longer had any files or records in the case, as they had been turned over to petitioner's father as instructed by petitioner. He further indicated his position on the case was as reflected in his testimony at the superior court habeas proceedings and

E X H I B I T   P.              3

he saw no way in which PTSD applied under the facts of the case and in light of petitioner's claims of self-defense. Petitioner's attorney on the superior court habeas matter, W. Allan Williams, Esq., provided me with his file, which contained the discovery in the case but contained no mental health documentation or any other background documentation regarding petitioner. Petitioner's attorney on the direct appeal provided me with transcripts of petitioner's trial, a copy of the Court of Appeal opinion in the matter (D035850). I also was provided with the transcript of the proceedings on the superior court habeas matter (EHC388), wherein petitioner claimed, inter alia, that his trial counsel was ineffective for failure to investigate and present a defense based on post traumatic stress syndrome (PTSD).

After a review of the materials obtained, and based on my experience, it appeared to me that the opinion elicited by Dr. Alan Abrams at the superior court habeas hearing was circumscribed by the lack of any supporting documentation and, as a result, necessarily impacted both the value of petitioner's claim of PTSD and the superior court's view of the relevancy of the evidence. The superior court hearing also lacked any expert testimony by a criminal defense attorney regarding the potential relevance of evidence of PTSD.

After learning that Dr. Abrams had not been provided any background documentation on petitioner, I began to collect, and collected, the following: 1)

EXHIBIT    P                4

the medical records regarding the assault/mayhem on petitioner on April 19, 1993, 2) the police reports of the same incident, 3) the preliminary hearing transcript of the same incident; 4) petitioner's prison records under both his archived prison number and his current prison identifier number; 5) petitioner's medical and psychological reports under his archived and current prison identifier numbers; 6) petitioner's San Diego County Jail medical records; 7) medical records from various hospitals where petitioner underwent medical treatment after April 19, 1993. I also attempted, but was unable, to collect medical records from what appeared to be a serious head injury suffered by petitioner as a child, as those records had been destroyed some time in 1999. I also attempted, but was unable, to collect any records on believed drug abuse treatment as those records had been destroyed.

After collecting approximately 1500 pages of documents, I provided them to Dr. Alan A. Abrams, M.D., J.D., for purposes of his examination and a supplemental evaluation of petitioner to determine whether he suffered from PTSD or any other mental disorder at the time of the charged offense. Dr. Abrams' report/evaluation is contained in letter form in this appendix as Exhibit N. It is Dr. Abrams' opinion that petitioner suffered from PTSD at the time of the offense, and probably suffered from some associated disorders, including major depression and substance abuse. As records of petitioner's

E X H I B I T    P                    5

head injury were not available, Dr. Abrams could not opine regarding the effect of such injury on petitioner.

I also contacted attorney Inge Brauer, a criminal defense attorney with 31 years of experience. I provided Ms. Brauer with copies of the information, some 582 pages of pretrial discovery, a copy of the preliminary hearing, a copy of petitioner's trial testimony and petitioner's testimony on the order to show cause in the superior court habeas proceeding. Ms. Brauer otherwise had no knowledge of the case. Ms. Brauer's opinion is attached hereto as Exhibit O. Ms. Brauer opines that she would have had petitioner evaluated by at least one expert, if not more, for PTSD and methamphetamine psychosis and any other disorders. If the report(s) were favorable, Ms. Brauer would have presented a defense focused on petitioner's state of mind and imperfect self-defense in an effort to convince the jury to return a manslaughter verdict. She also would have requested instruction on involuntary manslaughter. In Ms. Brauer's opinion, a reasonably competent criminal defense attorney would not have proceeded without expert testimony in a case such as that described in the discovery and the preliminary hearing transcript unless an expert evaluation was unfavorable to petitioner. (Exhibit O.)

Based on my training and experience, any reasonably competent criminal defense trial attorney knows, or is chargeable with knowledge of, the elements of the offense or offenses charged against his client and investigates any and all

EXHIBIT    P                    6

defenses of fact and law, including apparent psychological defenses and any defenses which would tend to overcome or diffuse proof of the elements of the offenses. Based on my training and experience, any reasonably competent criminal defense trial attorney acting as a diligent advocate, does not make a tactical decision as to, among other things, the theory of the defense, until such time as he or she has exhausted every reasonable avenue of investigation suggested by the facts, the client and the law.

Based on my review of the files and records in the case, and based on my experience before commencing appellate work, as more specifically outlined above, it is my opinion that petitioner's trial counsel's acts and omission fell outside this standard of a reasonably diligent advocate's duty to investigate. In my opinion, the files and records in the case demonstrated the need for a complete investigation of petitioner's background and a complete psychological or psychiatric assessment. This opinion is based on the following: 1) petitioner suffered a head injury at an early age, after which petitioner's behavior reportedly changed (Exhibit I, pp. 5-6; Exhibit J, pp. 31-32); 2) whatever the relationship between the head injury and petitioner's changed behavior, petitioner later suffered the traumatic loss of one eye which resulted in behavioral change (Exhibit I, pp. 4-5; Exhibit J, pp. 33-35; 3) petitioner received no immediate psychological or psychiatric treatment for the traumatic injury (Exhibit K, pp. 61-62, 68-70; 4) petitioner's behavior change included

E X H I B I T    P                    7

increasing reliance on street drugs, with an emphasis on methamphetamine use (Exhibit I, p. 16; Exhibit J, p. 30; Exhibit K, p. 53-54, 56; 5) methamphetamine is known to cause brain damage; 6) petitioner went to prison after the traumatic loss of his eye and prison authorities are required to classify inmates for placement and conduct medical evaluations and provide treatment; 7) petitioner had sought emergency treatment for various injuries suffered in incidents after the traumatic eye injury (Exhibit N); and 8) petitioner's family members believed petitioner suffered from PTSD (Exhibit I, p. 9).

Based on my view of the investigation required in the case, it is my further opinion that petitioner's defense counsel was ineffective in failing to fully investigate petitioner's background, including obtaining readily available records from both hospitals and jail and/or prison facilities and other sources. It is also my opinion that defense counsel was ineffective in failing to explore a mental defense, specifically, PTSD, and any other associated disorders. Without such materials and expert evaluation, it is my opinion that a psychological defense could not be excluded nor could an intelligent decision be made regarding a potential psychological or other defense.

My opinion remains the same despite evidence that petitioner steadfastly claimed PTSD did not affect his behavior, insisted he acted in self-defense and there was evidence he contrived a defense of self-defense. Any reasonably competent criminal defense attorney does not unilaterally accept his client's

EXHIBIT    P                8

statements at face value, does not automatically present the defense claimed by

a defendant and knows that damning information in discovery, such as a

statement of a contrived defense, must be explored and diffused or explained

to whatever extent possible. Moreover, any reasonably competent criminal

defense attorney would want to know whether petitioner's denial of PTSD and

claims of self-defense were part of the syndrome and its effects.

Given the report of Dr. Abrams (Exhibit N), which makes clear that

petitioner suffered from PTSD and some associated disorders, it is my

professional opinion, based on 20 years of criminal trial experience, that the

failure to present a defense based on PTSD and the associated disorders was

prejudicial to petitioner. Expert testimony of the disorder and its associated

symptoms would have provided petitioner with a state of mind defense, a

defense of imperfect self-defense and a claim of involuntary manslaughter.

Expert testimony would have explained the disorders from which petitioner

suffers, explained their effects upon perception, explained why petitioner, who

seemingly stabbed Rabatore for no apparent reason, perceived that he was

being attacked and acted or reacted or acted and overreacted in the manner

that he did. Expert testimony also would have described the milieu in which a

person suffering from PTSD exists and provided the jury with evidence from

which it could determine whether petitioner's perceptions and actions or

reactions were subjectively and objectively reasonable. Expert testimony also

E X H I B I T    P                    9

would have been relevant to petitioner's credibility, giving his testimony context and explaining the nature of his conduct.

In my opinion, any reasonably competent criminal defense attorney would have realized the import of such expert testimony and would have realized that presentation of any claim of self-defense or imperfect self-defense based on vision impairment was mere casuistry and expert testimony was imperative. Without any expert testimony to explain petitioner's world and why petitioner perceived the facts in a certain fashion and acted or reacted as he did, there was no avenue for the jury to understand and assess petitioner's behavior at the time of the offense. Without such expert testimony, it is my opinion the jury was not provided with any substantial evidence which could lead to the conclusion that he acted with a mental state incompatible with murder or acted in actual, but unreasonable, self-defense, or committed involuntary manslaughter.

Petitioner, as indicated in his testimony at the superior court habeas hearing, did not consent to or authorize any or all of the acts or omissions of trial counsel in failing to adequately represent him. (Exhibit K.)

Defense counsel's acts and omissions, wholly outside the scope of the performance of a reasonably diligent advocate and without the consent and authority of petitioner, exceeded and violated defense counsel's ethical obligation to investigate and explore all reasonably apparent avenues of

E X H I B I T    P                10

defense and to explore mental defenses and otherwise prejudicially violated petitioner's rights to due process.

Because a full and complete resolution of the issues raised herein may require resort to material extrinsic to the record on direct appeal and the record of the superior court habeas proceedings, petitioner's only remedy is through this petition for writ of habeas corpus.

I further declare that the exhibits attached to this petition are true and correct copies of 1) pages of the clerk's transcript on appeal in case no. D035850, the direct appeal identified herein; 2) the reporter's transcript in the superior court habeas proceedings (EHC388); 3) the declarations of Dr. Abrams, attorney Inge Brauer and petitioner's counsel herein; and 4) the letter evaluation of Dr. Abrams.

I further declare under penalty of perjury that the foregoing is true and correct and, if called upon to testify, I could and would competently testify thereto.

Executed this 20TH day of March 2007, at San Diego, California.

_____
Athena Shudde

APPENDIX No. 2

# E X H I B I T    A

STATEMENT OF FACTS AND DECLARATION OF PETITIONER, LARRY JOHN LITTLE:

I AM THE PETITIONER, LARRY JOHN LITTLE, JR. I have detailed knowledge of the facts as stated herein and the facts I don't, will be so stated or referenced by the record on appeal cite, am over the age of twenty-one years and am competent to do so testify. If called as a witness I would testify as follows:

The facts stated below are the petitioner's version of events and others as told to Petitioner of which were all relayed to Attorney Peckham prior and during the trial stage except for matters subsquently leared of and so stated. Peckham agreed to the relevancy and materiality of these matters and promised to do much investigation to produce evidence and winesses at trial and then failed to do same. Therefore matters that are not in evidence will be typed in bold. All other matt-ers will be referenced by Direct Appeal record. The following will include points of intereest relevant and material to petitioner's imperfect self-defense that Peckham failed to put forth competently.

A.  THE DAY MR. RABATORE DIED

Jöyce Margerate-Rita Roesch ("Joyce") and Ms. Brooks asked Petitioner to score drugs. Petitioner said he might know a place but was that was all he could do as he has been out of touch due to being in rehabilitation.

Petitioner, Brooks & Joyce drove and fropped petitioner off at 7-11 on Chase Street around 5:45-6:30 as they went shopping for food/beer and gave Petitioner $40.00 to score drugs. Petitioner walked to Sunshine Street and the dealer was gone. Brooks and Joyce picked Petitioner up and they all returned to aprasrtment. (This all can be verified by the 7-11 video the police had obtained.) As Petition-er was dropped off in the parking lot of Joyce's apartment, Joyce told Petitioner to keep everyone out of the apratment saying she would be back in 30-60 minutes.

At this point Josh & Corn showed up and smoked a joint on the porch. Crazy came over from Wendy's, said he was hungry, so Petitioner gave him a bowl with burrito's. Ted and Mary came in Joyce's apartment as Rabatore showed up. Then

EXHIBIT A    i

Joyce and Ms. Brooks pulled into the apartment parking lot and ran into Jermy and
Corn and came in the aprtment about 7:00-8:00 with beer and Vodka, having just
come from Winter Gardens Cheers and Beers where they had used a pay phone to call
Deny on Aroyal Road (* Deny is Ted's roomate who deals drugs)  Deny told the gals
that he would bring dope by later.  Later when Deny drove by their were cops
everywhere so Deny drove on by.  Ms. Brooks lied at the preliminary by saying
they were only driving out to Cheers and Beers to have a drink and not mentioning
drugs.

Petitioner met Deny for the first time in the county jail after the prelim-
inary hearing.  Deny told Petitioner he was incarcerated for drug sales, when
DenyDeny told Petitioner he had been called by Brooks and Joyce to purchase drugs
and that when he drove by cops were everywhere so he kept on driving.  Joyce told
Petitioner she wanted some people to leave so Petitioner told Josh  & Corn to
leave, whom didn't want to and Petitioner felt threatened. 2 RT 121

Ted, Mary, Rabatore, Joyce and Brooks all went into Rabatore's room and did
meth 4 RT 558 and were loading a glass pipe as they all set on the king size bed
and smoked speed. Petitioner grabbed his back pack and went into the bathroom,
shaved and showered and then put his back pack back in the room they were still
smoking it when Ms. Brooks handed Petitioner the pipe and Rabatore snatched it
out of Petitioner's hand like it was his God.  Thereafter they all came out of
the bedroom and Joyce said she wanted some people to leave her apratment as Rab-
atore and Joyce began arguing about Rabatore moving out and some watches he had
of hers that she said he had stole.  Ted and Mary did not want to leave, but they
did and drove to drug house on Royal.  Then Joyce started yelling at Petitioner
about the bowl Petitioner had previously let Crazy use and Joyce ended up going
across the street to get it.  Petitioner offered to get it but really was paran-
oid.  I thought Josh  and Corn and their friends wanted to jump me because I had
kicked them out of the apartment against their will is why I did not want to go

EXHIBIT A                    ii

1  outside.  When Joyce went to get the bowl Rabatore told Petitioner he will get me

2  because he has to move out of the apartment.  Rabatore started to choke and I

3  asked him if he needed help and he got madder.

4    Brooks hand me the crystal pipe and I stated I did not want to smoke this if

5  it is going to make me crazy idiots and  tossed the pipe at the wall betwen the

6  T.V. and cabinet 4 RT 618-620 Rabatore was 10 feet away and it was not thrown out

7  of anger.  @ RT 122-123  After Rabatore used methamphetamine he became "hyper &

8  aggressive and moved around alot" 4 RT 558  Rabatore test positive for methamphe-

9  taimine and alcohol. 4 RT 651-562  Rabatore starting yelling at Petitioner, "you

10  broke our only pipe and when my mom comes back she will kill you and I will help

11  her 4 RT 618-620  Joyce walked in, Rabatore told her about breaking the pipe and

12  Joyce got in Petitioner's faac, slapped Petitioner as said shut up and you got to

13  leave.  2 RT 122-123, 131  Petitioner said no, I am going to sleep and see you

14  when I wake up.  2 RT 131-132  Joyce then instructed Rabatore to call 2 RT 131-

15  132 this gang of Mexicans to remove Petitioner that they knew 4 RT 539, 582-583

16  and they will be here to wipe Petitioner out 4 RT 561 while Rabatore was on the

17  phone 2 RT 132-133; 3 RT 230, 300 Petitioner sat on the couch and Joyce said she

18  will wait in the parking lot for the gang 2 RT 133; 3 RT 231; 4 RT 561-562 and

19  told her son to make sure Petitioner stays there.  Petitioner stayed on the couch

20  for 10 minutes and couldn't sleep thinking these people are serious 4 RT 561

21  better get out of her, and went to Joyce's room grabbing his back pack 4 RT 562

22  came out putting his back pack next to the end table and grabbing his glasses

23  preparing to leave 2 RT 136-137, 139, 146-±47  Rabatore said you are not going

24  anywhere until my Mom come in and jumped up towards me as I went to pick up my

25  back pack 4 RT 562 grabbing the knife on the end table and threw two quick jabs

26  as Rabatoe came towards Petitioner with the knife in Petitioner's hand and

27  Rabatore had an ashtray in his hand 4 RT 563-564 as Rabatore was blocking Petit-

28  ioner's path to the door.  4 RT 586, 589, 592 and Petitioner grabbed his back

EXHIBIT A    iii

1  pack and left as Petitioner was scared as Rabatore was still standing and Petition-

2  er did not know if Rabatoe was still a threat.  Petitioner was defending himself

3  and not intending to kill Rabatore.  4 RT 564  The physical evidence matches

4  Petitioner's side of the story with the jab patter of the wounds going in an up

5  angle proves the Rabatere was standing.  4 RT 483

6  B.  EYE INJURY

7      Petitioner was stabbed five (5) times in the left eye 4 RT 551-552; 6 RT

8  748 and as a result leaves petitioner nervous, jumpy and reacting to threats of

9  injury.  4 RT 516, 552  Without glasses, petitioner's vision is 20/200 in his

10  right eye and left eye is blind, allowing no ability to distinguish faces four

11  (4) to five (5) feet away.  6 RT 741-3, 752.  The trial judge did not allow the

12  petitioner to discuss his state of mind regarding the details of his beieng

13  stabbed in the eye, 4 RT 551 and petitioner needed to subpeona some witnesses

14  that knew Rabatore thretened petitioner.

15  C.  PLEA COERCEN

16      Mr. Peckham tried to coerce Petitioner into taking a 15 years to life on

17  multiple occssions and said he would only do about twenty (20) years.  Petitioner

18  countered saying he was willing to take a straight twenty-five (25) years, which

19  would also cause petitioner to do twenty (20) years.  Further Petitioner ex-

20  plained that he was not guilty of murder and rather be aquitted than plea guilty

21  to something he was not guilty of.  Peckham further explained he could get him

22  less than 1st degree murder, i.e. 2nd degree with a 15 to life top.  Petitioner

23  did not realize that this was a sign Peckham was not representing him to his

24  best ability.  Then Peckham said he would extend the trial to investigate all new

25  facts including Alan Caton to find Overdor , Martin Carvolas, Mary Ross, Ken

26  Kempe and Joyce Roesch.

27  D.  RABATORE THREATS AND DISLIKE OF PETITIONER

28      When Petitioner told Deanne and Tina they had to leave, Rabatore got mad at

# EXHIBIT A    iv

1  Petitioner and threatened Petitioner and Tina and Deanne left.  Tina could test-
2  ify to this fact in addition to Petitioner and that Rabatore said that Petition-
3  er had stole his Mom and Petitioner said he was crazy.  Jim (AKA Jimbo) would
4  testify that when Rabatore came over to his house and  was confronted by Jim for
5  stealing something of his, Rabatore had threatened Petitioner by telling Petit-
6  ioner that he better watch out.

7  E.  PRIOR ACTS OF ARGUING, THREATS AND VIOLENCE

8      The first night Petitioner was at the apartment Rabatore and Joyce got in a
9  fight with Rabatore throwing a glass object at her, which flew over Petitioner's
10 head and hit the refrigarator.

11     Another incident was Joyce and Tina getting violent and someone called the
12 police whom cme out and ended arresting Toby for possession of meth.

13     When Scotty Rummel would come over, Rabatore who did not like him would
14 chase Scotty with a knife, and throw things at Scotty.

15     One day when Petitioner and Scotty had come back from having a couple of
16 beers they found Joyce on the phone with the police.  After she hung up her and
17 Rabatore told Petitioner and Scotty that they were being investigated for murder
18 ... they saw a bloody tee-shirt in Rabatore's room the morning it happened.

19     Three days prior to Rabatore's demise Petitioner saw Joyce thrown to the
20 ground by Rabatore and threatened by Rabatore.

21 F.  PRIOR DRUG USE

22     Tina would testify that she came over to Joyce's apartment to buy dope,
23 that Joyce and Rabatore physically fought over drugs, Joyce flipped out and
24 started dumping pills down her throat when Tina went to pry her mouth open Joyce
25 bit Tina's finger.  Joyce, Rabatore and herself tried to get Petitioner to sell
26 a bunch of downers (Vikodin), and the night of 6/14/99 Joyce, Tina, Rabatoe and
27 Deanne were their doing drugs and Petitioner was not indulging.

28     Martin Carvolas (AKA Crazy) would testify that Rabtore would come back and

EXHIBIT A    v

1   forth from the dope house, where Rabatore was planning on moving.    Crazy was there

2   with Mary, Brooks and Joyce when they said they were going to get some beer, food

3   and dope and would be right back in an hour or two.    When they got back Mary got

4   Ted to go get dope.

5       Bob Teal was not questioned about all the smoking of dope an hour prior to

6   Rabatore's demise.

7       Ms. Brooks testified the glass object Petitioner threw at Rabatere was not

8   a pipe.    2 RT 154-155, 3 RT 251 and there is available evidence that it was, in-

9   cluding crime sceen photographs.    Ms. Brooks testified the gals went all the way

10  over to Cheers & Beers.    Multiple witness would testify that drugs was involved

11  in that trip.    Versus her testifmony they went just for beer and food. One witness

12  is Deny whom Petitioner saw in the county jail after the preliminary hearing and

13  said that the gals hd called him for drugs nd he drove by Joyce's Apartment, but

14  the cops were their so he drove on by.

15      Joyce Roesch would testify that her and Ms. Brooks did dope with Rabatore in

16  the back room while Petitioner drank beer in the living room.    Joyce would also

17  testify that her and Tina got violent,, someone called the police and Toby had

18  gotten arrested.

19      Toby Slater would testify he knew where Petitioner could  stay and took Pet-

20  itition to Joyce's apartment and brought drugs from her and Rabatore while Tina

21  waited in the car on 6-10-99.

22  G.  AVALIABLE EVIDENCE MR. PECKHAM PROMISED THEN FAILED TO OBTAIN

23     a)  IMPEACHMENT EVIDENCE

24      Ms.  Brooks testified Petitioner was laying around for an hour after the

25  argument that llowed D.A. to argue no provacation.    Mary Ross & Ted Kempe would

26  testify it was a very short time.

27      Mary Ross, Ted Kempe, Joyce Roesch, Toby Slater, Scott Stefes, Jimbo, Tina,

28  Scotty Rummel and Martin Carvolas (Crazy) would all testify that drugs, threats by

EXHIBIT _A_                 vi

1  Rabatore and Joyce, was abound in that aprartment the day of Rabatore's demise and

2  each and everyday Petitioner lived there consistently, up until Rabatore's demise.

3  Toby got arrested for meth when it was really Joyce's and had purchased it at

4  Joyce's apartment from her and Rabatore.

5  Joyce actually told Mr. Brooks that Petitioner & Crazy fought, which is con-

6  trary to her testimony.

7  Jimbo lived across the street from Joyce's apartment and was Rabatore's friend.

8  After telling Rabatore he was crazy when Rabtore threatened Petitioner about Pet-

9  itioner stealing his Mom (Joyce), Petitioner went to Jimbo's place and mentioned

10  Rabatore having stole something from Jimbo.  Rabatore showed up and eventually

11  Jimbo asked Rabatore about stealing from him, which Rabatore denied.  Shortly

12  thereafter Jimbo asked Petitioner if he desired to go to the Casino's with him

13  (* Jimbo and Rabatore use to go to the casino's together.)  When Rabatore came

14  back over Jimbo's, Jimbo told Rabatore knew he lied and they were not friends

15  anymore.  Then Rabatore got made at Petitioner and told Petitioner they were not

16  friends anymore and that now Petitioner had stole his friend also and that Petit-

17  ioner had better watch out- this transpired on 6/15/99 at 2 a.m.  Crazy was at the

18  door also.  When Petitioner and Jimbo went to the csino they thought of talking to

19  Rabatore and then figured Crazy and Rabatore must have gone somewhere.

20  Scotty Rummel was their the first night Petitioner was there and he previously

21  with Joyce and Rabatore prior to Petitioner.  He would testify about all the drugs,

22  arguing, violence, fighting and so forth between Joyce and Rabatore and others.

23  Witnessed Rabatore being kicked out by his Mom and Joyce begging Petitioner to

24  stay their.

25  Scotty (Martin Carvolas) stayed across the street from Joyce's at Wendy's.

26  Scotty was in the back room asleep when the police interviewed Wendy.  He would

27  testify that Petitioner meet Ms. Brooks on the 15th of June 1999.  Crazy was at

28  apratment complex when he heard Mary, Brooks and Joyce saying they were going to

EXHIBIT A          vii

1  get some beer, food, and dope and would be back in an hour or two.

2     Mr. Peckham had interviews of Wendy Parker, Roesch, Toby Slater, Mary Ross

3  via police reports, plus the facts Petitioner told him and Peckham did not even

4  try to find them, interview them, nor subpeana them even though they were on the

5  D.A.'s witness list.  They were 100% relevant and material to Petitioner's sole .

6  defense of self-defense.

7    b)  POST TRAMATIC STRESS DISORDER

8     Sharon Little's Psychologist Dr. Diana K. Weiss advised Sharon on her feelings

9  regarding Petitioner's perdicament and suggested that he suffered from Post Tramatic

10 Stress Disorder.  Sharon had many discussions with Dr. Weiss whom offered her serv-

11 ices.  Mr. Peckham rejected Dr. Diana K. Weiss's offer to testify.  (See Sharon

12 Little declaration as esxhibit B.)

13    Ken Woo was interviewed by Mr. Pckham for Woo to testify about his witnessing

14 Petitioner being stabbed  . and  well  aware  of Petitioner being jumpy and nervous

15 over anything.  Peckham said he would call Woo to tesify to counter D.A. challenging

16 Petitioner's claim of jumpneness and nervousness.

17    Mr. Peckham being well aware of Dr. Aykraid treating Petitioner in the past

18 was going to call the Dr. to testify and half way through trial realized he had not

19 subpeaned Dr. Aykraid.  Mr. Peckham had Petitioner's father go and pick up the Dr.s

20 report.  (See Little, Sr. declaration  as exhibit B and 6 RT 747:14)  Mr. Peckham

21 did not understand how to argue the proff requested by the Judge 6 RT 749  Mr.

22 Peckham failed to make a . showing of Petitioner's jumpyness and being afraid of

23 injury  and it not being  a figment of petitoner's mind.

24    c)  PECKHAM TELLING PETITIONER NOT TO TESTIFY ABOUT BEING DRUNK NOR LACKING
         SLEEP

25    Mr. Peckham told Petitioner not to admit being drunk nor not having slept for

26 awhile.

27

28

# EXHIBIT A

d)  JOYCE ROESCH & TOBY SLATER

Toby Slater is Joyce Roesch's boyfriend.  Toby brought me to Joyce's, brought
drugs and left to do them with his other girlfriend, Tina.  Toby witnessesed Tina
and Joyce fighting when the police were called and Toby    arrested for meth.
Joyce later called police and told them the drugs were hers.

e)  IMPEACHING EVIDENCE IN THE RECORD TO IMPEACH MS. BROOKS WITH

Evidence in the record to impeach Ms. Brooks with was never utilized by Mr.
Peckham.  This evidence was the two phone calls beween Rabatore and Isreal Ackemon
that were 10-15 minutes apartment when Isreal claimed to have heard Petitioner and
Joyce arguing. 2 RT 132-133; 3 RT 230-300; 4 RT 559-560, 602, 3 RT 321  Ms. Brooks
testified that the arguing between Joyce and Petitioner was one hour prior to
Rabatore's demise.

e)  DIRECT APPEAL

The direct appeal opinion on page 14 says the jury would convict of involun-
tary manslaughter if they found their was no intent.  This instruction was never
given.  Page 14 quoted, "if jury believed Little unintentionaly  killed Rabatore
inan honest belief he was in peril, it would have concluded it could not convict
him of murder because he lacked the intent to kill.  A jury thus situated would
have convicted Little only of involuntary manslaughter, a lesser offense included
in the crime of murder, on which the jury was also instructed."  This is untrue.

f)  MR. PECKHAM PROMISED THEN FAILED TO HAVE THE FOLLOWING TESTIFY

1)  SCOTTY RUMMEL would testify He had previously lived with joyce and
Rabatore,  Rabatore did not like him and would chase Scotty around with a knife
and throw objects at him.  Was present when Joyce and Rabatore talked with police
on the phone Petitioner and Scotty they were being investigated for murder ...
and observed the bloody tee-shirt in Rabatore's room the morning it happened,
Scotty witnessed Joyce begging Petitioner to stay at her apartment, and was
their when Josh   came over and did dope with Joyce, Brooks and Rabatore between

EXHIBIT $A$   ix

5) TOBY SLATER was on the D.A.'s witness list and Mr. Peckham had the police reports of his interview. Mr. Peckham failed to interview Toby and Subpoena him for trial. Toby would testify to the fact of his buying drugs from Joyce, one of his girlfriends and Rabatore. That Joyce and Tina got violent and someone called the police which resulted in Toby getting arrested for meth.

6) SCOTT STEFES was not interviewed by Mr. Peckham, nor subpoenaed for trial. Scott ws nicknamed Shanky and came by to buy drugs and get high at Joyce's apartment many times, Shaky witnessed Rabatore throw his mom on the ground and threaten her three Days prior to Rabatore's demise.

7) JIM (AKA JIMBO) was never interviewed by Mr. Peckham, nor Subpoeaned for trial. Jimbo would testify that he was a friend of Rabatore. That Petitioner was over his place and told him that it was Rabatore that had stole something from Jimbo. That Jimbo and Rabatore use to go to the csino's all the time together. Jimbo asked Rabtore about stealing from him and he lied. Jimbo then asked Petitioner if he wanted to go to the casino's with him. Rabatore came back and Jimbo told him he knew he had lied to him about stealing from him and they were no longer friends and he did not want to go, to the casino's with him anymore and that he was taking his new friend, Petitioner. Rabatore told Petitioner "now I stole his friend and that Petitioner had better watch out on 6-15-02 at 2:00 a.m.

8) BOB TEAL ENCOUNTERS PETITIONER IN THE PRISON. 3 RT 336-337 TEAL TOLD Petitioner he got busted for auto theft but petitioner learned Teal was never convicted. Teal talked to Overdorf after seeing petitioner in prison. 3 RT 345 Petitioner contends that Teal got his story from Overdorf as Petitioner never said the things Teal said he did.

Overdorf called Joyce and Brooks while petitioner was with Overdorf from the gym at the prison and then Teal was in the gym at the prison with Overdorf. Overdorf is friends with Joyce and Brooks. 3 RT 331 Joyce and Brooks visited Overdorf at the jail and Joyce visited Overdorf at the prison. Overdorf was busted

EXHIBIT A                    xi

1    while driving Ms. Brooks car with alot of drugs.

2         Sony Clark could testify that Teal stole the car while he was at the ranch.

3    Peckham said he would call Sony Clark to testify and never did.

4         Defense counsel knew of all these facts, promised to investigate them and

5    call the respective witnesses and never did.

6         Defense counsel never asked for an evidentiary hearing to determine if

7    Teal's first letter to the D.A. was in fact lawfully blacked out.  (See letter

8    blacked out as exhibit E.)  The same goes for the trascription of Teals's

9    conversation with investigator Saraceni.  (See exhibit F.)

10        Clearly if this evidence was submitted then Teal's testimony would not have

11   been allowed.

12        Executed this 10th day of November in Los Angeles County of the year of

13   our Lord 2002.

14        I declare under penalty of perjury that the foregoing is true and correct.

15

16                                          *Larry Little Jr*
                                            LARRY LITTLE, JR.

17

18

19

20

21

22

23

24

25

26

27

28

                    EXHIBIT 4

APPENDIX No. 2

# E X H I B I T    B

<u>DECLARATION OF SHARON LITTLE RE:    EVIDENCE WITHHELD AT TRIAL</u>

I, Sharon Little, declare that:

I am the sister of Larry John Little, Jr. and I am the declarant herein.

In April of 2000 declarant was seeking emotional assistance from Psychologist Dr. Diana K. Weiss Ph.D.  During this time declarant was having many discussions in relation to her brother Larry John Little, Jr. who at the time was going through a murder trial.

After many discussions about her brother and a terrible accident he suffered in 1993 in which he was assaulted and lost his left eye due to a stabbing, Psychologist Dr. Diana K. Weiss Ph.D. was convinced declarant's brother may suffer from what is called <u>Post Traumatic Distress Disorder</u>.

Psychologist Dr. Diana K. Weiss Ph.D. was quite sure since Larry John Little, Jr. had never received any professional help in dealing with what happened to him, that he suffered from this disorder.  Declarant was told by Psychologist Dr. Diana K. Weiss Ph.D., she had testified as a professional witness many times before at trials about <u>Post Traumatic Distress Disorder</u>, and then offered her services to testify at the trial of Larry John Little Jr.

The information was given to Mr. Edward Peckham, the attorney representing Larry John Little, Jr. in hopes that it could help substantiate his frame of mind at the time of the events that occurred in June 1999.

This offer was rejected and Dr. Diana K. Weiss was not allowed to testify at the trial.  This medical evidence that was withheld from the jury could have possibly changed the final outcome of the trial.  The jury did not have knowledge of all of the evidence available before making their final decision.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at San Diego, California, on May 29th, 2002.

SHARON LITTLE

**EXHIBIT B**

APPENDIX No. 2

# EXHIBIT  C

## DECLARATION OF LARRY LITTLE SR.

I am the father of the Petitioner, Larry J. Little, Jr. I have detailed knowledge of the facts as stated herein, am over the age of twenty-one years and am competent to so testify. If called as a witness I would testify as follows:

My son, Larry J. Little, Jr. was the victim of a violent stabbing that was not provoked by my son. This stabbing left my son with out vision in one of his eyes. This stabbing also caused my son to be jumpy and faearfull of injury when any arguing, threats or aggressiveness is in his presence.

Prior to the start of trial, Mr. Peckham elicited my help in convincing my son to plea guilty to second degree murder. I was surprised by this as I knew my son did not intend to kill Rabatore. Not understanding the law much I spoke with my son as requested by Mr. Peckham and my son was not taking a second degree murder life sentence.

During the trial of my son, Mr. Peckham advised me he failed to **subpoena** reports from my son's eye Dr. Aykroid . Mr. Peckham did not understand how to argue the proof necessary to have Dr. **aykroid**'s report admitted at the trial. So Mr. Peckham had me go and pick up Dr. **aykroid**'s report. The Court would not allow Dr. **aykroid** report because I went and picked it up versus his having **subpoena it**

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and corrrect.

Executed this 2nd day of December, 2002 in California City, California.

*Larry Little* Sr.

LARRY LITTLE SR.

# EXHIBIT C

APPENDIX No. 2

# EXHIBIT D

**MARTHA L. McGILL**
ATTORNEY AT LAW
732 NORTH HIGHWAY 101, SUITE B
ENCINITAS, CA  92024
TELEPHONE (760) 632-8052
FAX (760)  436-5946

June 19, 2001

Larry Little, #P82205
C-2-143, CSP-LAC
44750 60th Street West
Lancaster, CA 93536-7619

      **RE:**   *People* v. *Larry Little*
              Court of Appeal Case No. D035850

Dear Mr. Little:

Thank you for your letter dated May 18, 2001, which I received on May 29, 2001. I will try to respond to your concerns as best I can.

As I understand it, you are concerned because the opening brief did not cite federal cases. As you are probably aware, an appeal must be based on matters that appear in the appellate record, specifically, the legal issues raised and the evidence presented in the trial court. In your case, the issues which could be raised, based on the record, were all issues based on California state law. Because these issues all involve state law, the relevant case law was California case law. It is my practice to look for possible federal issues to raise, but in this case I found no arguable federal issues, based on my review of the record.

If you believe there are federal issues in your case, and you wish to raise them on your own behalf, you may ask the court for permission to submit a supplemental brief.

In other developments in the case, the Attorney General has received a thirty-day extension to file the respondent's brief, which is now due June 29, 2001. I will keep you informed of the progress of the appeal.

                              Very truly yours,

                              Martha L. McGill

MLM:mm

**EXHIBIT  D**

APPENDIX No. 2

# EXHIBIT E



Robert Teal JIS315
3-11-247u
480 altha Rd
S.D. CA, 92179

STATE PRISON

USA
33

Office of The District
Attorneys Office
El Cajon Court House
480 E. MAIN St.

EXHIBIT E

502

I am an Inmate at Donovan State Prison. I have some information, that may or may not be of any importance to your office, but I will allow you to make the decission.

1) There is an Inmate, by the name of Little, his last name, who also goes by pirate. Well he and I ran around for 4-5 weeks prior to him stabbing a young man to death, by the name of Ed, on 1st off of Washington Ave, in El Cajon. By running with him, It was obviou he was the type to kill someone with out think ing twice about it. I, along with others I knew had tried to avoid him because of his tempe + attitude of being the one who will do you; as he would tell us. Any way I had to finnall leave the ranch I was at to, keep from him.

Well he + I were put into the gym here together + he told me the whole gory story of how he did it + how he is going to claim he wasn't high, when he was so high after just slamming 1/16 of speed.

Then he confronts me with, "If I aure wi 50?

EXHIBIT E

was the only witness who Said him cro
to he told me he told the cops Ed was going
to hit him with an ashtray when he really
wasn't.

Well if you need to speak at me, you
know where I am for now!

EXHIBIT E

APPENDIX No. 2

# EXHIBIT    F

1 | PEOPLE VS. LITTLE, LARRY

2 | DA CASE # PD2614

3

4 | S: DAI NICK SARACENI                  T: ROBERT TEAL

5

6

7 | S: IT'S SEPTEMBER 10TH, 1999, APPROXIMATELY 3:30 P.M. WE'RE AT THE

8 | COUNTY CENTRAL JAIL INTERVIEWING ROBERT TEAL.

9 | (BACKGROUND NOISE)

10 | S: UM, YOU..WE HAD A REAL BRIEF CONVERSATION ON THE PHONE, AND

11 | YOU TOLD ME THAT YOU HAD SOME INFORMATION ABOUT UH, PIRATE.

12 | UH...

13 | T: ...YEAH, I HUNG AROUND WITH HIM.

14 | S: YEAH. UM, I DON'T KNOW THAT MUCH ABOUT YOU BOB, WHAT UH,

15 | UM...HOW LONG YOU GONNA BE...YOU'RE UH, YOU'RE AT BAKER,

16 | RIGHT? (UNINTELLIGIBLE).

17 | T: YEAH.

18 | S: HOW LONG YOU GONNA BE THERE, YOU KNOW?

19 | T: WELL, I'M GONNA BE IN PROBABLY FOR TEN MORE MONTHS.

20 | S: O.K.

21 | T: BUT THIS IS WHAT I WAS ARRESTED ON, SO I DON'T KNOW. YOU KNOW?

22 | THESE HERE...

23 | S: ...YEAH. UM...

24 | T: ...I DON'T KNOW. MAYBE THAT'S WHY THEY BROUGHT ME DOWN...

25 | S: ...POSSESSION OF A WEAPON, STOLEN CAR...

26 | T: ...THE WEAPON WAS A KNIFE...

27 | S: ...SOME STOLEN PROPERTY. O.K.

28 | T: YEAH.

1

EXHIBIT F

554

1  T: O.K.

2  S: I, I, I DON'T...YOUR NAME...

3  T: ...BECAUSE (UNINTELLIGIBLE)...

4  S: ...JUST HAPPENED TO COME UP...

5  T: ...DON'T WANT TO GO TO COURT AND, AND BE IN THE PEN WITH THESE

6     GUYS.

7  S: UM HMM.

8  T: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

9     ▓▓▓▓▓▓▓▓▓▓▓

10 S: ...YEAH...

11 T: ..▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

12    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

13    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14 S: ...RIGHT...

15 T: ..▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

16    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ AND SO

17    THAT'S ANOTHER CASE.  BUT LARRY, LARRY, LARRY TOLD ME, WHAT

18    HE TOLD ME WAS THIS...FIRST OF ALL, HE SAID THAT HE STABBED, HE

19    CALLED ME WHEN HE GOT, WHEN HE KILLED THIS KID.

20 S: YEAH...

21 T: ...HE KILLED THIS KID NAMED ED.

22 S: RIGHT.

23 T: HE SAID HE BOOKED.  HE GAVE ME A PHONE CALL.  HE TRIED TO

24    LOCATE ME AT THE RANCH IN LAKESIDE.

25 S: WHAT RANCH?

26 T: UH, LAKESIDE RANCH.  WELL, IT'S A LITTLE HORSE RANCH THAT'S

27    EVERYBODY MOVED FROM NOW THOUGH.

28 S: IS IT CALLED LAKESIDE RANCH?

EXHIBIT F

556

APPENDIX No. 2

# E X H I B I T     G

F I L E D
Clerk of the Superior Court

NOV 1 8 2003

By: L. CASAUBON, Deputy

1  W. ALLAN WILLIAMS
   State Bar Number 75213
2  180 Rea Avenue
   El Cajon, California 92020
3  Telephone: (619) 593-3790

4  Attorney for Petitioner
   LARRY JOHN LITTLE, JR
5

6            SUPERIOR COURT OF THE STATE OF CALIFORNIA

7            COUNTY OF SAN DIEGO, EASY COUNTY DIVISION

8

9   LARRY JOHN LITTLE, JR.,           )   Case No. SCE 198946
                                      )   EHC 388
10              Petitioner,           )
                                      )   **PETITIONER'S DENIAL TO**
11     vs.                            )   **PEOPLE'S RETURN ON PETITION**
                                      )   **FOR WRIT OF HABEAS CORPUS**
12  THE PEOPLE OF THE STATE OF        )   **AND ORDER TO SHOW CAUSE,**
    CALIFORNIA                        )   **WITH POINTS AND**
13                                    )   **AUTHORITIES**
                                      )
14          Real Party in Interest.
15  _____

16        Comes now the Petitioner, LARRY JOHN LITTLE, JR, by and through his

17  attorney W. ALLAN WILLIAMS, and respectfully submits his **DENIAL TO**
18
    **PEOPLE'S RETURN ON PETITION FOR WRIT OF HABEAS CORPUS AND**
19
    **ORDER TO SHOW CAUSE, WITH POINTS AND AUTHORITIES** in response
20
21  to those filed by Real Party in Interest, The People of the State of California, by and

22  through it's attorneys, BONNIE M. DUMANIS, District Attorney, and PATRICIA

23  MALLEN, Deputy District Attorney.

24        Petitioner reaffirms all allegations made in his original Petition.

25        Petitioner will attempt to answer the issues in the order raised in the People's
26
    Return.
27
       /////           EXHIBIT    G
28
                              1

## STATEMENT OF THE FACTS

Petitioner concedes, for the purpose of this pleading, that the majority of the Statement of Facts as contained in the People's Return is accurate, except as noted in Argument and Exhibits.

## ARGUMENT

## I

## THE COURT CAN NOT DETERMINE FROM THE PLEADINGS WHETHER PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AND SHOULD HOLD AN EVIDENTIARY HEARING

The People assert that there is no reason to hold a hearing, because trial counsel, Edward Peckham, acted appropriately. The People point to Mr. Peckham's Declaration as proof.

What is interesting is that Mr. Peckham's Declaration in no way explains why he failed to request an instruction on involuntary manslaughter. This is because he affirmatively rejected it.(Exhibit pp. 671-676). As will be seen, there is absolutely no tactical reason for failing to request such an instruction or failing to argue the theory.

Mr. Peckham's Declaration further seems to indicate that he is some sort of expert in Post Traumatic Stress Disorder and therefore decided that it was not worth examining. What is troubling is that Mr. Peckham knew of Petitioner's prior traumatic experience, as shown by his sending him to an ophthalmologist and obtaining records from Petitioner's doctor who treated him for the traumatic stabbing in the eye. There is no explanation as to why the defense was not at least explored.

The Defense Attorney did not, as the People claim, "vigorously investigate all relevant information". If he had, he would have looked at the traumatic injury and near-death experience of Petitioner when he was stabbed in they eye and surmised that further investigation into Petitioner's mental state was needed.

## II

**THE PETITIONER HAS MET HIS BURDEN OF SHOWING THAT
BUT FOR THE INEFFECTIVE ASSISTANCE OF COUNSEL A MORE
FAVORABLE RESULT COULD HAVE BEEN OBTAINED**

Petitioner has met his burden to obtain a hearing. He has shown at least two failings by Defense Counsel, the failure to investigate a possible mental defense which would have given rise to an involuntary manslaughter instruction and the very failure to obtain an involuntary manslaughter instruction.

There is nothing in the People's Return that, on its face, justifies the failure to investigate and to request the involuntary manslaughter instruction.

The claim asserted in this petition is that Petitioner was deprived of the effective assistance of counsel and concomitantly the right to due process. These constitutional claims cannot be adequately presented on appeal or pleadings because their factual basis rests on evidence discovered outside of the appellate record. These matters, therefore, are not completely contained in the record of the trial. (See *In re Hochberg* (1970) 2 Cal.3d 870, 875.)

"[H]abeas corpus is an extraordinary and collateral action that lies to review a claim of denial of substantive constitutional rights that may have affected the integrity of the fact finding process." (*In re Coughlin* (1976) 16 Cal.3d 52, 55.) Further, the remedy of habeas corpus "permits the examination not only of the actual evidence introduced at petitioner's trial but of any necessary additional evidence bearing upon the infringement of petitioner's constitutional rights." (*In re Bell* (1942) 19 Cal.2d 488, 501, citations omitted.)

The right to effective assistance of counsel in a criminal case is guaranteed by the Sixth Amendment to the Constitution of the United States and by Article I, section 15 of the California Constitution. (*People v. Frierson* (1979) 25 Cal.3d 142, 162

3

1    *People v. Pope* (1979) 23 Cal.3d 412, 422.)  In cases in which trial counsel's reasons

2    for acts or omissions are not clear from the record on direct appeal, habeas corpus is

3    an appropriate vehicle to raise those issues. (*People v. Ledesma* (1987) 43 Cal.3d 171,

4    217-218.)

5

6    Under *Ledesma*, habeas corpus is the only vehicle in which petitioner may

7    raise his claim.

8    Denial of the right to a fair trial is a claim cognizable on habeas corpus

9    whether or not it was raised on appeal.  (*In re Ferguson* (1971) 5 Cal.3d 525.)

10    The very essence of due process, including the guarantees of the Sixth

11    Amendment, is the "adversarial process" and "meaningful adversarial testing" of the

12    prosecution's case.  (*United States v. Cronic* (1984) 466 U.S. 648, 656 [80 L.Ed.2d

13    657, 104 S.Ct. 2039]; *Strickland v. Washington* (1984) 466 U.S. 668, 684, 685, 691-

14    692 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *Withrow v. Williams* (1993) 507 U.S. 680 [123

15

16    L.Ed.2d 407, 416, 113 S.Ct. 1745].)  A breakdown in the adversary process that

17    renders the result unreliable constitutes a due process violation.  (*Strickland v.*

18    *Washington, supra*, 466 U.S. 668, 684, 687, 688.)

19    Every criminal defendant has a Sixth Amendment right to present an adequate

20    defense and that right encompasses the ability to discover and present evidence.  (Cf.

21    *Washington v. Texas* (1967) 388 U.S. 14, 19 [18 L.Ed.2d 1019, 87 S.Ct. 1920]; see

22    also *Chambers v. Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038];

23    *People v. Carter* (1957) 48 Cal.2d 737, 748; *People v. Torres* (1964) 61 Cal.2d 264,

24    266-267.)

25

26    Indeed, the Fifth, Sixth and Fourteenth Amendment rights are designed to

27    promote "reliability in the truth-finding functions of a criminal trial." (*Kentucky v.*

28    *Stincer* (1987) 482 U.S. 730, 737 [96 L.Ed.2d 631, 107 S.Ct. 2658].)

4

The People assert that the decisions by Defense Counsel were tactical and that we should not engage in "second-guessing" (People's Writ P's & A's p'6-7) Petitioner disagrees. So does the United States Supreme Court.

In *Strickland* the Court advised, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (*Strickland v. Washington, supra,* 466 U.S. 668, 690-69.)  In the instant case there was "no thorough investigation of law and facts," since defense counsel failed to take the second step, because he apparently failed to appreciate its significance as support for his client's defense.

Generally, prejudice must be affirmatively proved.  (*Strickland* v. *Washington, supra,* 466 U.S. at 693.)  "[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." (*Ibid.*)

> An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, ... and the appropriate standard of prejudice should be somewhat lower.  The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.  (*Id.* at p. 694.)

The high Court concluded,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  (*Ibid.*)

"In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." (*Id.* at p. 696.)

5

The People's assertion on pages 8 and 9 that Petitioner was able to explain to the jury about his own eye injury ignores trial experience. The presence of an expert would surely bolster and support that argument. The presence of an expert on how this could affect one's perception of danger would have been invaluable. Juries will seldom believe a defendant's self-diagnosis of his own problems. To think otherwise is to ignore reality.

As will be seen, there was "a breakdown in the adversarial process."

For all these reasons, habeas corpus is the proper procedure for resolution of the claims included herein.

They can only be resolved by an evidentiary hearing.

## III

### POST TRAUMATIC STRESS DISORDER SHOULD HAVE BEEN EXAMINED. FAILURE TO DO SO DEPRIVED PETITIONER OF DUE PROCESS AND THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

The People take the position on pages 11-13 that there was no Post Traumatic Stress Disorder (hereafter PSD) ever brought up until after trial and therefore it should be a non-issue. Obviously, Petitioner disagrees.

The assertion that somehow Mr. Peckham could be the ultimate judge of whether the Petitioner had PSD is unsound.

The assertion that calling what the Petitioner testified to by a medical term would have added nothing ignores logic and common trial experience. As mentioned above, juries do not believe self-diagnosis, especially by defendants. They want and expect an expert. Having an expert evaluate the Petitioner was the proper thing to do.

A jury must consider all the facts and circumstances it might "'expect [] to operate on [defendant's] mind...." [Citation.]'" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065; see also *People v. Humphrey* (1996) 13 Cal.4th 1073, 1086 [jury entitled

to be "'given a professional explanation of the battering syndrome and its effects on the woman through the use of expert testimony.'"])

A qualified expert would have been able to present information about PSD to educate the jury about the causes and effects of this syndrome or disorder. This testimony would have been invaluable to a jury whose task it was to determine degree of culpability in this offense. Even testimony in the abstract would have been helpful in reducing the degree of the crime.

Trial counsel's representation fell below an objective standard of reasonableness. Counsel's failure to secure the appointment of a mental health expert is without legitimate excuse. Clearly, after the personal history information about Petitioner was discovered, counsel should have recognized an evaluation by a mental health expert was advisable.. Yet, counsel did nothing to secure such an appointment. The sad and unnecessary result here was that no expert was presented as a defense witness for Petitioner at trial. Reasonably competent counsel should have realized that his client's testimony would have been strengthened by an espert's testimony. Accordingly, the failure to investigate, failure to secure the appointment of an expert and the failure to present the testimony of an expert severely impacted the ability to present any viable defense whatsoever to the murder charge.

The lack of an expert who could advise Petitioner's attorney and testify as to the impact of the Petitioner's personal traumatic experiences severely limited, through counsel's own lack of diligence, counsel's ability to formulate and argue a viable mental state that would negate malice.

In *In re Saunders* (1970) 2 Cal.3d 1033, defense counsel failed to obtain available medical reports reflecting past diagnosis and treatment and did not make any effort to have the defendant examined by a psychiatrist, even though counsel had been

7

advised several months prior to trial that defendant had earlier sustained head injuries which resulted in organic brain damage. Defense counsel presented no evidence on the defendant's behalf at the trial. On the date of the guilt verdicts, a clinical psychologist, who had actually treated the defendant, wrote to counsel and included several medical reports. Counsel took no action after receipt of the documents. (*Id.* at pp. 1036-1037.) Counsel filed a declaration indicating a tactical decision not to raise the defense. However, the court concluded that counsel's failure to avail himself of information relevant to the defense removed all rational support for the stated tactical decision. (*Id.* at pp. 1048-1049.) The court granted the writ finding counsel's omissions constituted a withholding of a crucial defense and operated to deny to the defendant his constitutional right to the effective assistance of counsel. (*Ibid.*)

In petitioner's case, there was no "tactical" decision to avoid a particular defense.

The law permits a defendant to assert a psychiatric defense and to have expert witnesses testify in his or her behalf. (*People v. Babbitt* (1988) 45 Cal.3d 660, 700.) A defendant is also permitted to provide a jury a professional explanation of PSD and its effects on people through the use of expert testimony.

Further, a defendant must be permitted to present evidence and obtain an instruction upon any theory which may negate an element of the charge: i.e., felonious intent. (See *People v. Bobo* (1990) 229 Cal.App.3d 1417, 1442 [defendant may not be denied an opportunity to prove absence of a statutorily required mental state]; *People v. Saille* (1991) 54 Cal.3d 1003, 1120 [right to request instruction pinpointing defense theory which negates an element of the charge].)

The People assert hat there was nothing to indicate that Petitioner possibly suffered from PSD. Petitioner disagrees.

8

Little Denial to People's Return on Petition for Writ of Habeas Corpus
SCE 198946 EHC 388

The testimony of Joshua Roberts showed that the victim was acting strange and in a threatening manner. (Exhibit 12 pp, 522-531). This, coupled with Petitioner's testimony and evidence regarding PSD would have been a tremendous defense argument for involuntary manslaughter.

It was Petitioner's lawyer's responsibility to present Petitioner's defense, not Petitioner's or Petitioner's family. (*Scott v. Mitchell* (6th Cir. 2000) 209 F.3d 854, 881.) A reliable, documented social history drawn from multiple sources other than the defendant is essential to a reliable assessment of mental health issues. (Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va.L.Rev. 1109 (1997).)

Further, counsel had the duty to provide readily available background and foundational materials to a defense mental health expert so that the expert could perform a valid evaluation. (*Wallace v. Stewart* (9th Cir. 1999) 184 F.3d 1112; *Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073, 1078-1079.) Petitioner had a right under *Ake v. Oklahoma* (1985) 470 U.S. 68 [84 L.Ed.2d 53, 105 S.Ct. 1087], and the authorities on which it was decided, to competent assistance of a psychiatric expert to assist in preparation and presentation of Petitioner's defense. The facts of abuse must be presented with corroborating or interpretive testimony. (*Devier v. Zant* (11th Cir. 1993) 3 F.3d 1445, 1453 & fn. 18.

On the basis of generally agreed-upon principles, the standard of care for both general psychiatric and forensic psychiatric examinations requires careful assessment of medical and organic factors contributing to, or causing, psychiatric or psychological dysfunction. (H. Kaplan & B. Sadock, *Comprehensive Texbook of Psychiatry,* (5th ed. 1989) vol. 1, p. 527-528.)

9

Sadly, as the record herein documents, defense counsel did not employ any of these assessment tools, even though he had developed much of the critical background information. Defense counsel failed to seek the assistance of a mental state expert and thereby learn the significance of Petitioner's condition and its implication and importance to substantiate his innocence.

A client with a history of life-threatening trauma, particularly a medical history as extraordinary as that here, requires counsel to obtain information about and understand the implications it may hold for the client's defense. (ABA Standards for Criminal Justice Prosecution Function and Defense Function, Standard 4-1.2, pp 122-123; Standard 4-4.1, pp. 181-183.) The relevance of physical trauma to criminal behavior has been topical since the 80's. (See, eg., *Colorado v. Wright* (1982) 648 P.2d 665, 667-668; *California v. Bean* (1988) 46 Cal.3d 919, 945 [251 Cal.Rptr. 467]; Anchor, et al., *Fundamentals of Disability Determination and Rehabilitation: A Higher Ground for the Applied Neurobehavioral Sciences*, American Journal of Trial Advocacy 8:337-375 (1985); Hall & McNinch, *Linking Crime-Specific Behavior to Neuropsychological Impairment*, The International Journal of Clinical Neuropsychology, 10:113-122 (1988).) Under prevailing national standards, general and forensic psychological evaluations require careful assessment of medical and organic factors contributing to, or causing, psychiatric or psychological dysfunction. (H. Kaplan & B. Sadock, *Comprehensive Texbook of Psychiatry*, (5th ed. 1989) vol. 1, p. 527-528.) This is the prevailing body of knowledge in the sphere in which Petitioner's case was prepared.

Defense Counsel had learned that Petitioner suffered a relatively recent life-threatening attack by knife. Published authority abounds that such highly traumatic life experiences often produce PTSD. "Severe or life-threatening trauma experienced

10

either in childhood or adulthood can further provoke emotional and behavioral reactions that jeopardize mental health." (U.S. Department of Health and Human Services, *Mental Health: A Report of the Surgeon General*, Rockville, MD: U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for mental Health Services, National Institutes of Health, National Institute of Mental Health (1999), p. 18.)

There is strong evidence that acute post-traumatic stress symptoms result from a violent life threat, and that the severity is related to the extent of exposure to the threat or the witnessing of injury or death. (Pynoos, R. & Nader, K., *Psychological First Aid and Treatment Approach to Children Exposed to Community Violence: Research Implications*, Journal of Traumatic Stress Studies (1988), Vol 1, #4, p. 447.)

"Traumatic reactions occur when action is of no avail. When neither resistance nor escape is possible, the human system of self-defense becomes overwhelmed and disorganized. Each component of the ordinary response to danger, having lost its utility, tends to persist in an altered and exaggerated state long after the actual danger is over. Traumatic events produce profound and lasting changes in physiological arousal, emotion, cognition, and memory." (Judith Herman, M.D., *Trauma and Recovery, The Aftermath of Violence—from Domestic Abuse to Political Terror* (1997), p. 34 ),

Defense counsel failed to seek the assistance of a mental state expert ~~and~~ thereby learn the significance of Petitioner's condition and its implication and importance to substantiate his viable defense. .

In *Strickland* the Court advised, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are

11

reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (*Strickland v. Washington, supra,* 466 U.S. 668, 690-69.) In the instant case there was "no thorough investigation of law and facts," since defense counsel failed to take the second step, because he apparently failed to appreciate its significance as support for his client's defense.

The People take the position that no psychologist or other mental health professional would diagnose or evaluate a person through another person's description. That is not entirely true. "Psychological autopsies" are frequently performed.

The fact that Mr. Peckham had the Petitioner testify as to his eye injury and how it affected him is sufficient evidence that he was aware of the effect such previous trauma could have on the defense. If nothing else, Defense Counsel should have called an expert to testify about PSD and its causes and effects. This would have at least given the jury some baseline to judge Petitioner's actions and to bolster his testimony.

Thus, Defense Counsel, with no reasonable tactical advantage to be gained, completely abandoned his client's only and highly viable defense.

In Petitioner's case, there was no "strategic" or "tactical" decision to avoid a particular defense.

## IV

## THE PRELIMINARY EXAMINATION

Petitioner takes no position regarding the Preliminary Examination other than to say that: (1) it in no way is evidence of Defense Counsel's effectiveness at trial (2) if it shows anything, it shows that the issue of Petitioner's mental state and why he acted the way he did was already in the mind of Counsel.

12

# V

## THE TRIAL ATTORNEY DID NOT PROVIDE ADEQUATE PROFESSIONAL SERVICES DURING THE TRIAL

The People seem to feel that Mr. Peckham's determination of what was relevant and not shows he was effective. Petitioner disagrees. The lifestyle of that apartment in general and the victim in particular was relevant to show the effect they had on Petitioner's actions the day in question.

The People point out that Mr. Peckham provided law on self-defense and imperfect self-defense. That is true. The problem is that shows that he was aware of the importance of the Petitioner's mental state at the time of the offense and did nothing about it.

It is also true that he made requests for specific jury instructions. The problem there is that he did NOT request Involuntary Manslaughter CALJIC 8.45 and 8.46. (Exhibit 8, pp.59-68)

The People state on page 16 that "Mr. Peckham arranged the evaluation of the petitioner, and presented testimony about the petitioner's vision problem as part of the imperfect self-defense claim of the petitioner."

Petitioner agrees with the People that he arranged for Petitioner to be evaluated by an ophthalmologist. The problem is that did he not go the logical and necessary one step further and have a mental health professional exam Petitioner to see what, if any, effects the stabbing in the eye had on Petitioner.

He did not even go a half step and have an expert testify about PSD in the abstract. This would have at least given the jury some reference as to the relevance and importance of the eye injury to Petitioner's defense. It was no so much that Petitioner had difficulty seeing as it was that being stabbed in the eye caused him to react when threatened.

13

Little Denial to People's Return on Petition for Writ of Habeas Corpus
SCE 198946 EHC 388

# VI

## PETITIONER'S DECLARATIONS ARE JUST AS RELIABLE AS THOSE OF ANYONE ELSE

The People seemingly ask this Court to reject Petitioner's Declaration and exhibits and attachments because it is he who made them.

Petitioner agrees that these statements may not be admissible as evidence at any subsequent hearing. He will testify under oath and be subject to cross-examination at the hearing.

Petitioner disagrees, however, with the People's position that they are unreliable because they are written to support Petitioner's claims. That does not make them unreliable. Mr. Peckham's Declaration was written to support the People's claim and he certainly has an interest in upholding his performance.

# VII

## THE MANSLAUGHTER INSTRUCTIONS WERE WOEFULLY INADEQUATE IN THAT NO INSTRUCTION ON INVOLUNTARY MANSLAUGHTER OR CALJIC 8.45 WAS GIVEN, REQUESTED AND IN FACT EXPLICITY REJECTED BY DEFENSE COUNSEL. THIS WAS INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner believes we should begin our discussion with the case cited by the People and attached as Exhibit 14. *People v. Blakely* (2000) 23 Cal.4th 82 does not stand for the proposition cited by the People on page 18. Looking at page 4 and 5 of Exhibit 14, it is obvious what the holding of the California Supreme Court was

> In his dissenting opinion in this case, Justice Mosk contends that a defendant who kills in unreasonable self-defense may sometimes be guilty of involuntary manslaughter. We have no quarrel with this view. We conclude only that a defendant who, *with the intent to kill or with conscious disregard for life,* unlawfully kills in unreasonable self-defense is guilty of voluntary manslaughter. *Id.* at 91

14

The People seem confused also about the effect if imperfect self-defense. A confusion that was shared by the Trial Court, the Prosecutor and, sadly, Defense Counsel. Justice Mosk, in his dissent in *Blakely* gives an excellent and correct synopsis of the law

> By its terms, the doctrine of imperfect self-defense, as we held in *Christian S.* and *Flannel*, prohibits an actor's "convict[ion] of" any "crime *greater than voluntary manslaughter.*" (*In re Christian S., supra,* 7 Cal.4th at p 771, italics added; see *People v. Flannel, supra,*25 Cal.3d at pp. 67.,674-680 (lead opn. of Tobriner *id.* at pp. 686-687 (conc. opn. of Richardson, J.).) It does not, however, mandate his conviction of voluntary manslaughter itself. The reason is easy to discern. *Id* at p 98.

Thus, the actions of Petitioner in light of his claim of imperfect self-defense, if believed by the jury, does not make him guilty of voluntary manslaughter per se. What it means is that the **most** he could have been convicted of was voluntary manslaughter. It certainly did not, as the People seem to suggest, preclude involuntary manslaughter.

In the discussions on jury instructions, as seen in People's Exhibit 12 pages 671 through 676, it is obvious that all parties have great confusion regarding the law of homicide in general and manslaughter in particular. Petitioner would once again point out that Defense Counsel specifically told the trial court he was not requesting involuntary manslaughter of intoxication as a defense. This was inexcusable.

The confusion of the parties is further reflected in pages that will be supplied by Petitioner as Exhibit A pages 697-709. It shows that this was the **first time** that the Prosecutor and trial court had ever dealt with homicide instructions of this type. (697-698). It also shows that Defense Counsel had a woefully inadequate understanding of the jury instructions required in a homicide case and the law of homicide.

Mr. Peckham in Exhibit 1 at page 2 says he has handled over 100 jury trials. One wonders as to how many have been homicides.

15

He also states that he has been a defense attorney for at least twenty years and has a background in psychiatric defenses and has experience with them in other cases. If so, why did he not raise it here?

There is nothing in Exhibit 1 to show that the failure to request CALJIC 8.45, 8.46 or any instruction on involuntary manslaughter was a tactical decision. There could be none.

Under California law, involuntary manslaughter is an unlawful killing in which the defendant does not harbor malice and does not intend to kill the victim. (*People v. Broussard* (1977) 76 Cal.App.3d 193, 197; *People v. McManis* (1954) 122 Cal.App.2d 891, 898; *People v. Kelley* (1914) 24 Cal.App.54, 62.)  California law recognizes four theories of involuntary manslaughter, two of which are based on statute and two of which are based on case law.

The two statutory theories of involuntary manslaughter are found in Penal Code §192, subdivision (b).  One of them is when the homicide occurs "in the commission of an unlawful act, not amounting to a felony. . . ."  (Ibid.)  Under this theory of involuntary manslaughter the unlawful act does not have to be a misdemeanor that is inherently dangerous in the abstract, but rather one that is dangerous under the circumstances of its commission in the case being tried and which was committed intentionally and with criminal negligence. (*People v. Cox* (2000) 23 Cal.4th 665, 670-676; *People v. Wells* (1996) 12 Cal.4th 979, 985-989.) Criminal (or gross) negligence is negligence that is "aggravated, culpable, gross or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences." (*People v. Penny* (1955)

16

44 Cal.2d 861, 879; citation and internal quotation marks omitted; accord, *People v. Sargent (*1999) 19 Cal.4th 1206, 1215.)  Under this definition, the homicide is not the result of misadventure but is instead the natural and probable consequence of the defendant's act. (*People v. Penny*, supra, 44 Cal.2d at p. 880.)

The second statutorily-based theory of involuntary manslaughter is when the homicide occurs "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Penal Code §192, subd. (b).)  The phrase "without due caution and circumspection" refers to criminal negligence of the same sort that is applicable in cases of involuntary manslaughter in the commission of an unlawful act not amounting to a felony. (*People v. Penny*, supra, 44 Cal.2d at pp. 869-880.)

The third theory of involuntary manslaughter is based on two cases -- People v. *Burroughs* (1984) 35 Cal.3d 824 and *People v. Morales* (1975) 49 Cal.App.3d 134. Under this theory a homicide is involuntary manslaughter if the homicide is unintentional, if it occurs during the commission of a noninherently dangerous felony and if that felony is committed without due caution and circumspection (i.e., with criminal negligence). (*People v. Burroughs*, supra, 35 Cal.3d at pp. 835-836; *People v. Morales*, supra, 49 Cal.App.3d at pp. 144-145.)

The fourth theory of involuntary manslaughter is based on *People v. Cameron* (1994) 30 Cal.App.4th 591.  Under this theory, a homicide can be involuntary manslaughter even if it occurred during the commission of an inherently dangerous felony, such as assault with a deadly weapon, so long as malice and intent to kill are absent. (Id. at pp. 603-605.)

Involuntary manslaughter is, of course, a lesser included offense of murder. (*People v. Prettyman* (1996) 14 Cal.4th 248, 274; *In re McCartney* (1966) 64 Cal.2d

17

1    830, 831. This fact was seemingly lost on the Trial Court, the Prosecutor and Defense

2    Counsel.

3          In Petitioner's case, it can be argued that all four of the above-described

4    theories of involuntary manslaughter were factually applicable.

5

6          What we should look at carefully is the facts of the case, especially as they

7    apply to the first and fourth theories above; are involuntary manslaughter during the

8    commission of a misdemeanor that is dangerous under the circumstances and the

9    fourth above-described theory that is based on *People v. Cameron*.

10         The homicide occurred when Petitioner stabbed the victim with a kitchen

11   knife. A kitchen knife is not a deadly weapon as a matter of law since the ordinary use

12   for which a knife is designed is not weapon-related. (*People v. Aguilar* (1997) 16

13   Cal.4th 1023, 1029.) In view of the nature of the knife and the manner in which it

14   was used, the jury could have found that the knife was a deadly weapon and that

15   Petitioner used it to commit an assault with a deadly weapon. (*Ibid.*) Alternatively,

16   the jury could have found that Petitioner used the knife to commit a simple battery in

17   order to get away from the victim.

18

19         The first approach supports an instruction on involuntary manslaughter under

20   the theory set forth in *Cameron*. The second falls under the misdemeanor theory of

21   involuntary manslaughter since the striking of the victim with the knife made the

22   battery dangerous under the circumstances of the offense. Because both theories were

23   supported by the evidence, Defense Counsel had a duty under *Breverman* to request

24   the jury be instructed that a verdict of involuntary manslaughter could be returned

25   even though Petitioner's conduct constituted an assault with a deadly weapon or

26   misdemeanor battery. Petitioner submits that the failure to request instruction under

27   both these theories was ineffective assistance of counsel under the requirement in

28

18

*Breverman* that juries be instructed on all factually applicable theories of a lesser included offense.

This ineffective assistance of counsel demands relief.

When a trial court fails to instruct on a lesser included offense or on a theory of such an offense, the error is evaluated under the standard of reversal found in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Breverman*, supra, 19 Cal.4th at pp. 164-178.) Under this standard, the conviction will be reversed if, after an examination of the entire cause, including the evidence, it appears reasonably probable the defendant would have obtained a more favorable outcome had the error not occurred. (Id. at p. 178.) Petitioner submits that his case meets this standard for reversal.

Thus if it is error for a trial court to fail to instruct; it is certainly ineffective assistance of counsel to allow the trial court to fail to do that and to, as here, even go so far as not request any instruction on involuntary manslaughter and to explicitly reject it.

The jury found Petitioner guilty of second degree murder. The court had instructed the jury on two theories of second degree murder -- murder with intent to kill (express malice -- see Penal Code §188) but without premeditation and deliberation and murder without an intent to kill but with implied malice, i.e., an act whose consequences are dangerous to life that was performed with knowledge of the danger and with a conscious disregard for life. (See Exhibit B pp. 106-107) Although we do not know for certain which theory of second degree murder the jury used as the basis for its verdict, the record strongly suggests the basis was murder with implied malice.

The line between implied malice that can be the basis for second degree

19

murder and the gross negligence that is an element of involuntary manslaughter is a fine one. "Implied malice contemplates a subjective awareness of a higher degree of risk than does gross negligence, and involves an element of wantonness which is absent in gross negligence." (*People v. Watson* (1981) 30 Cal.3d 290, 296.) In addition, courts apply a different test for the two. "A finding of gross negligence is made by applying an <u>objective</u> test: if a <u>reasonable person</u> in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such awareness. However, a finding of implied malice depends upon a determination that the defendant <u>actually appreciated</u> the risk involved, i.e., a <u>subjective</u> standard." (*Id.* at pp. 296-297, citations omitted, emphasis in original.)

In Petitioner's case, it was a close question whether his conduct involved an element of wantonness that goes beyond gross negligence or whether Petitioner actually appreciated the risk of death involved in his conduct. Under the version of events presented by Petitioner he was trying to get away from the victim and or protect himself when he struck him with the knife. A jury reasonably could conclude from this that Petitioner was acting in a panic and was not subjectively aware that the force he was using was such as to put the victim's life in danger. Instead, the jury reasonably could have found that Petitioner subjectively thought he was using only that amount of force that would let him get away, even though objectively the force he used was much greater. Petitioner submits that it is reasonably probable that the jury would have convicted him of involuntary manslaughter if they had been instructed on the theory of misdemeanor manslaughter and the theory found in *Cameron*.

The conclusion that the error was not harmless is not lessened by the fact that the jury rejected the theory of voluntary manslaughter on which they were instructed.. This is because there is an important factual difference between this theory and the

20

theory of voluntary manslaughter that the jury was instructed on.

Thus, given the circumstances of the offense, the jury most likely rejected the voluntary manslaughter verdict because the jury could not conclude that Petitioner's act fit the definition they received of imperfect self-defense. But it is reasonably probable that they would have found Petitioner's act constituted an assault with a deadly weapon or a battery, and reasonably probable that the jury would have found that Petitioner acted without malice and without an intent to kill.

CALJICS 8.45 and 8.46 are attached as Exhibit C. It is obvious that they fit the fact scenario here. At the least they should have been requested.

Finally, a tactical reason should be explored here. When the jury was instructed on first and second degree murder and voluntary manslaughter, second degree murder was "the middle road." While no one knows with certainty that that is why the chose second degree murder; it is reasonable to assume that if hey had been given a further option of involuntary manslaughter, they could have chosen it or, at the least, voluntary manslaughter as their "middle road." This would be obvious to any reasonably competent trial attorney defending homicide cases.

## VIII

## THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION. HOWEVER, THERE WAS ALSO SUFFICIENT EVIDENCE TO REQUIRE REQUESTING AN INVOLUNTARY MANSLAUGHTER INSTRUCTION

The People state that there was sufficient evidence to support convictions for murder. What the relevancy of this is to the claims of Petitioner is unclear. The issue before the court on this writ is effective assistance of counsel.

Petitioner concedes that here was sufficient evidence to find him guilty of Second Degree Murder. However, he must point out that there was abundant evidence

21

By which a jury could have found him guilty of involuntary manslaughter. The problem is he never had that chance. His trial counsel's ignorance of the law of homicide or his totally unacceptable tactical choice in not requesting any instruction on involuntary manslaughter deprived him of that crucial defense.

## **CONCLUSION**

The omission of the crucial involuntary manslaughter instruction(s) and any expert evidence about PSD denied Petitioner a fair trial.

His testimony needed buttressing.

He deserved and had a right to have his actions considered by a jury as possibly constituting involuntary manslaughter.

He did not get these crucial elements of his defense because his trial counsel did not pursue them.

This was ineffective assistance of counsel.

This undermines faith in the outcome.

The relief should be granted.

Dated: November 18, 2003                    Respectfully Submitted

                                            W. Allan Williams
                                            Attorney For Petitioner
                                            LARRY JOHN LITTLE, Jr.

22

# EXHIBIT A

## TRIAL TRANSCRIPT
## PAGES 697-709

### RELEVANT DISCUSSIONS
### REGARDING HOMICIDE
### INSTRUCTIONS

1  DEFENDANT BY HIS UNLAWFUL OR WRONGFUL CONDUCT CREATED THE

2  CIRCUMSTANCES WHICH LEGALLY JUSTIFIED HIS ADVERSARY'S USE

3  OF FORCE, ATTACK OR PURSUIT.

4      MR. PECKHAM:  THROWING AN OBJECT AT HIM IS NOT

5  JUSTIFICATION.  WELL, I MEAN --

6      MS. STEIN:  WELL, WE ALL GET TO MAKE ARGUMENTS IN THE

7  MORNING.

8      THE COURT:  SURE.  I THINK IT'S NECESSARY AND SHOULD

9  BE GIVEN.  LET'S SEE.  THAT'S 5.17.

10          AND WE SHOULD HAVE 8.50, DISTINCTION BETWEEN

11  MANSLAUGHTER AND MURDER.

12      MS. STEIN:  I'M SORRY.  WHICH ONE ARE WE ON?

13      MR. PECKHAM:  8.50.

14      THE COURT:  8.50.  WE HAD THAT EARLIER.  YEAH, I DID.

15  I HAD THE 8.50 BEFORE I GIVE THE 5.10.

16      MS. STEIN:  SO YOU'VE MOVED IT AFTER 8.40?

17      THE COURT:  DOESN'T THAT SEEM TO MAKE MORE SENSE TO

18  YOU?  I DON'T KNOW.

19      MS. STEIN:  THAT'S FINE.

20      THE COURT:  TO DISTINGUISH BETWEEN MURDER AND

21  MANSLAUGHTER BEFORE YOU ACTUALLY GET TO THE DEFINITIONS OF

22  SELF-DEFENSE, AND --

23      MR. PECKHAM:  YES, IT DOES.

24      MS. STEIN:  IT'S MY FIRST ATTEMPT AT PUTTING ONE OF

25  THESE PACKETS TOGETHER, SO --

26      THE COURT:  YEAH.  I'VE NEVER DONE THIS.

27      MS. STEIN:  THAT'S FINE.

28      THE COURT:  I'VE ONLY DONE ONE OF THESE BEFORE.  IT

1   WAS A FIRST DEGREE MURDER WHERE THE GUY EITHER COMMITTED

2   THE CRIME AND MURDERED THE GUY OR HE DIDN'T.  IT WAS A LOT

3   EASIER THAN --

4          MR. PECKHAM:  AN I.D. CASE?

5          THE COURT:  IT WAS AN I.D. CASE, ALTHOUGH THE

6   FINGERPRINTS PROBABLY DIDN'T HELP THE DEFENDANT.

7                OKAY.  SO -- AND WE HAVE 8.51.

8          MS. STEIN:  I THINK WE DECIDED THAT ONE DIDN'T APPLY.

9          THE COURT:  MURDER, MANSLAUGHTER, INVOL.

10         MS. STEIN:  BECAUSE IT DEALT WITH INVOL.

11         THE COURT:  OKAY.  THEN WE DELETED THE 4.20, 4.21,

12  4.21.1, 4.22.

13         MS. STEIN:  DOES COUNSEL WANT -- I KNOW WE DELETED IT

14  WITH REGARDS TO GETTING US TO AN INVOLUNTARY MANSLAUGHTER.

15  DOES COUNSEL WANT IT DELETED WITH REGARDS TO NEGATING

16  SPECIFIC INTENT?

17         MR. PECKHAM:  LET'S SEE.

18         THE COURT:  WELL, WHAT IS THE SPECIFIC INTENT?

19         MS. STEIN:  TO KILL FOR FIRST DEGREE OR EXPRESS MALICE

20  SECOND DEGREE.

21         THE COURT:  OKAY.  SO AND THEN AFTER 5.17, WE GET TO

22  8.70.  IS THAT WHERE WE ARE?

23         MS. STEIN:  WHAT ARE WE DOING ABOUT THESE VOLUNTARY

24  INTOXICATION INSTRUCTIONS?

25         MR. PECKHAM:  I DON'T THINK THERE'S ANY INVOLUNTARY

26  INTOXICATION.  IT WOULD BE NICE, BUT --

27         THE COURT:  LIKE I SAY, I HAVEN'T HEARD ANY EVIDENCE

28  TO SUPPORT THAT.  THE WITNESSES SAY, "WELL, HE'D BEEN

1  DRINKING," OR "HE'D BEEN TAKING DOPE."  THEN WE HAVE

2  MR. ROBERTS WHO CAME AND TOLD US THAT MR. RABATORE WAS A

3  LOT BETTER WHEN HE HAD TAKEN DOPE, BECAUSE IT KIND OF

4  CALMED HIM DOWN.  AND YOU HEAR PEOPLE COME IN SAY, "WELL, I

5  ALWAYS HAVE AT LEAST FOUR OUNCES OF GIN IN THE MORNING.  I

6  MEAN, THAT'S THE ONLY WAY I CAN GET GOING."

7      MR. PECKHAM:  I NEED MY COFFEE.

8      MS. STEIN:  SO 4.20, 4.21, AND 4.21.1 ARE OUT?

9      THE COURT:  CORRECT.

10     MS. STEIN:  AND 4.22?

11     THE COURT:  CORRECT.  THEN I HAVE 8.70, DUTY OF JURY

12 AS TO DEGREE OF MURDER.  DOUBT WHETHER FIRST OR SECOND

13 DEGREE MURDER, 8.71.  AND THEN 8.72, DOUBT WHETHER MURDER

14 OR MANSLAUGHTER.  AND THEN 8.74.

15     MS. STEIN:  WHAT ABOUT 8.73?

16     THE COURT:  DIDN'T THAT SEEM TO BE APPROPRIATE TO YOU?

17     MR. PECKHAM:  PROVOCATION.

18     THE COURT:  WHOOPS.  I'M SORRY.  I HAD TAKEN 8.73 OUT.

19     MR. PECKHAM:  YEAH, I THINK THAT'S --

20     THE COURT:  GETTING AHEAD OF MYSELF.

21     MS. STEIN:  THE ONLY CONFUSING THING ABOUT THAT IS --

22 AND I'M TALKING ABOUT 8.73.

23     THE COURT:  YEAH.

24     MS. STEIN:  IT SAYS, "IF THE EVIDENCE ESTABLISHES THAT

25 THERE WAS PROVOCATION WHICH PLAYED A PART IN INDUCING AN

26 UNLAWFUL KILLING OF A HUMAN BEING, BUT THE PROVOCATION WAS

27 NOT SUFFICIENT TO REDUCE THE HOMICIDE TO MANSLAUGHTER" --

28 THAT'S A THEORY OF MANSLAUGHTER THAT DEFENSE COUNSEL IS

1   CHOOSING NOT TO GO --

2        MR. PECKHAM:  YEAH.  I'M NOT REQUESTING 8.73.

3        MS. STEIN:  -- DOWN.

4        THE COURT:  IF YOU'RE NOT REQUESTING IT, WE DON'T NEED

5   TO GIVE IT.

6        MS. STEIN:  OKAY.  THAT ONE'S OUT?

7        THE COURT:  YES.

8            AND YOU'VE NOT REQUESTED 8.73, MR. PECKHAM;

9   IS THAT CORRECT?

10       MR. PECKHAM:  THAT'S CORRECT.

11       MS. STEIN:  THE USE NOTE SAYS THERE'S NO REQUIREMENT

12  IT BE GIVEN SUA SPONTE.

13       THE COURT:  I SEE THAT.

14           THEN I HAVE 8.74, UNANIMOUS AGREEMENT AS TO

15  OFFENSE, FIRST OR SECOND DEGREE MURDER OR MANSLAUGHTER.

16           DO YOU HAVE THE VERDICT FORMS?

17       MS. STEIN:  THOSE ARE BEING PREPARED, YOUR HONOR.

18       THE COURT:  OKAY.

19       MS. STEIN:  I ASKED FOR INVOLUNTARY AS WELL, BECAUSE I

20  DIDN'T KNOW EXACTLY HOW THINGS WERE GOING TO GO THIS

21  AFTERNOON, BUT SHE'S PREPARING ONE FOR FIRST DEGREE --

22       THE COURT:  SECOND DEGREE, INVOLUNTARY.

23       MS. STEIN:  -- SECOND WITH A KNIFE AND VOL WITH A

24  KNIFE.  AND I'LL HAVE THIS FIRST THING IN THE MORNING FOR

25  EVERYONE.

26       THE COURT:  SO AS TO 8.74, I WILL STRIKE THE "HER,"

27  STRIKE THE "SHE," STRIKE THE "OR INVOLUNTARY."  AND

28  OTHERWISE, IT'S AS YOU SEE IT.  YES?

1    MS. STEIN: YES.

2    THE COURT: MR. PECKHAM?

3    MR. PECKHAM: YES.

4    THE COURT: OKAY. THEN WE HAVE -- NOW WE'RE GOING TO

5    GET INTO THE ARGUMENT ABOUT THE 8.75. PARTIAL VERDICT. I

6    THINK THE PEOPLE HAD ONE FORM, AND I THINK YOU HAD ANOTHER

7    FORM.

8    MR. PECKHAM: MY PROBLEM WITH THIS IS THAT IT MAKES

9    THEM GO THROUGH STEP, AFTER STEP, AFTER STEP, OF SAYING,

10    NO, NO, NO, NO, NO, WHEN IN FACT IF THEY COULD AGREE

11    UNANIMOUSLY THAT IT WAS SELF-DEFENSE. IT PUTS SO MUCH

12    EMPHASIS ON THE DELIBERATION WITH RESPECT TO EACH STEP. I

13    THINK THEY OUGHT TO BE ABLE TO COME TO A DECISION OF

14    SELF-DEFENSE. THE SPECIAL VERDICT FORM, IF YOU FIND IN

15    FAVOR OF THE DEFENDANT THAT HE ACTED IN SELF-DEFENSE, THEN

16    HE'S NOT GUILTY. INSTEAD OF SO MUCH EMPHASIS ON ALL OF THE

17    OTHER CRIMES THAT THEY HAVE TO GO THROUGH IN ORDER TO GET

18    DOWN TO SELF-DEFENSE.

19    THE COURT: I'M LOOKING AT THE USE NOTE RIGHT NOW.

20    MR. PECKHAM: OKAY. SO THIS INDICATES SHOULDN'T WE

21    DELETE PARAGRAPH FOUR?

22    THE COURT: WELL, WHAT -- WHAT SPECIFICALLY DID YOU

23    HAVE PREPARED?

24    MR. PECKHAM: WELL, I THINK IT REFERS TO 17.10 AND 12.

25    THE COURT: THAT'S BASICALLY THE PEOPLE VS. STONE

26    INSTRUCTION?

27    MR. PECKHAM: YES.

28    THE COURT: IF YOU ARE NOT SATISFIED BEYOND A

1  REASONABLE DOUBT THAT THE DEFENDANT IS GUILTY OF THE CRIME

2  CHARGED, YOU MAY NEVERTHELESS CONVICT HIM OF ANY LESSER

3  CRIME IF YOU ARE CONVINCED BEYOND A REASONABLE DOUBT THE

4  DEFENDANT'S GUILTY OF A LESSER CRIME.  THE CRIME OF MURDER

5  IN THE SECOND DEGREE IS LESSER TO THAT OF MURDER IN THE

6  FIRST DEGREE AS CHARGED IN COUNT ONE.

7          WELL, YOU KNOW, AS I SAY, I STILL THINK THAT

8  THE 8.75 IS MORE SPECIFIC THAN THE 17.10.  I DON'T REALLY

9  FIND IT THAT CONFUSING.  DO YOU?

10     MR. PECKHAM:  NO.  IT'S JUST -- IT JUST SEEMS TO ME --

11  IT SEEMS TO GIVE UNDUE EMPHASIS TO DOING IT IN ORDER AND IN

12  SOME WAY PREVENTING THE JURY FROM WHAT I THINK WOULD BE

13  ALLOWED IN 17.10, TO JUST DISCUSS IT.  YOU KNOW, IT SORT

14  OF, LIKE, PUTS THEM ON A PROGRAM.

15     THE COURT:  WELL, IT DOES TELL THEM THAT.  THAT ONE

16  THING THAT MIGHT BE HELPFUL IS FOR THEM TO LOOK AT ALL THE

17  CHARGES.

18     MR. PECKHAM:  YES.

19     THE COURT:  "YOU MAY FIND IT TO BE PRODUCTIVE TO

20  CONSIDER AND REACH TENTATIVE CONCLUSIONS ON ALL CHARGES ON

21  LESSER CRIMES BEFORE REACHING ANY FINAL VERDICT."

22     MR. PECKHAM:  AND THAT'S WHAT 17.10 SAYS AS WELL.

23     THE COURT:  RIGHT.

24     MR. PECKHAM:  TO ME, 17.10 IS SO MUCH CLEARER WHEN IT

25  SAYS, IF YOU CAN'T -- SECOND DEGREE IS A LESSER OF FIRST

26  AND MANSLAUGHTER IS A LESSER OF SECOND.  AND THERE'S ENOUGH

27  INSTRUCTIONS TO DEFINE FIRST AND SECOND AND MANSLAUGHTER

28  AND SELF-DEFENSE.

1    THIS PARAGRAPH SIX SAYS, "THE COURT CANNOT

2  ACCEPT A VERDICT OF GUILTY OF VOLUNTARY OR INVOLUNTARY

3  MANSLAUGHTER UNLESS THE JURY ALSO UNANIMOUSLY FINDS AND

4  RETURNS A SIGNED NOT GUILTY VERDICT FORM AS TO BOTH MURDER

5  OF THE FIRST AND MURDER OF THE SECOND DEGREE."

6    THE COURT:  YES.  UH-HUH.

7    MS. STEIN:  THAT'S THE LAW, ISN'T IT?

8    THE COURT:  I THOUGHT THAT WAS THE LAW.

9    MS. STEIN:  I THINK -- I AGREE WITH THE COURT IN THAT

10  I THINK THAT THIS ADDRESSES SOME SPECIFIC ISSUES THAT I

11  GUARANTEE WILL COME UP IF WE USE 17.10, BECAUSE THEY'RE

12  GOING TO START COMING BACK WITH, "WELL, CAN WE ACQUIT ON

13  THIS, AND NOT GUILTY ON THIS, BUT UNDECIDED ON THE SECOND?"

14  AND THEN IF THEY HAVE THIS INFORMATION BEFORE THEM, IT LAYS

15  OUT VERY CLEARLY THAT THEY CANNOT RETURN A GUILTY VERDICT

16  ON A LESSER INCLUDED CRIME, UNLESS THEY HAVE SIGNED NOT

17  GUILTY ON THE GREATER CRIMES CHARGED.

18    MR. PECKHAM:  SO WHAT IF THEY DEADLOCK ON THE GREATER

19  CRIMES CHARGED?

20    MS. STEIN:  THEN IT'S A MISTRIAL.

21    MR. PECKHAM:  BUT THEY FEEL THAT IT'S A LESSER CRIME?

22    MS. STEIN:  IT'S A MISTRIAL.  THEY HAVE TO VOTE

23  UNANIMOUSLY NOT GUILTY -- IN ORDER TO GET TO A VOLUNTARY

24  MANSLAUGHTER, THEY HAVE TO VOTE NOT GUILTY ON FIRST, AND

25  NOT GUILTY ON SECOND.

26    THE COURT:  THAT'S MY UNDERSTANDING OF THE LAW.

27    MS. STEIN:  THAT'S THE LAW.

28    THE COURT:  DO YOU HAVE SOME AUTHORITY?

1    MR. PECKHAM:  I CITED IN MY POINTS AND AUTHORITIES.

2    PEOPLE VS. BLAIR.

3    THE COURT:  I'VE NOT READ THAT CASE.  I SAW YOUR

4    REFERENCES TO VOLUNTARY MANSLAUGHTER IS A CRIME.  AND I --

5    LET'S SEE.

6    THE COURT REPORTER:  COULD I HAVE THE CASE REPEATED?

7    PEOPLE VS. --

8    MR. PECKHAM:  BLAIR.

9    THE COURT:  IT'S A 1987 CASE AT 191 CAL.APP. 3D, 832,

10    AT 839 ACCORDING TO COUNSEL'S POINTS AND AUTHORITIES.  AND

11    AS I SAY, I'VE NOT PULLED THAT.

12          WELL, I GUESS I'M GOING TO HAVE TO TAKE A

13    LOOK AT THE CASE.

14          HAVE YOU INCLUDED 17.10?  I DIDN'T -- YOU

15    JUST GAVE A NUMBER.  I DIDN'T SEE THE INSTRUCTION THERE.

16    MS. STEIN:  I MADE COPIES OF THAT INSTRUCTION FOR THE

17    COURT AND FOR COUNSEL.  I NOTICED IT WASN'T IN HIS PACKET

18    SO --

19    THE COURT:  OKAY.  WELL, LET'S GO BACK TO 8.75 HERE

20    FOR JUST A MOMENT.  THE USE NOTE TELLS US IF THIS

21    INSTRUCTION IS GIVEN PRIOR TO ANY ISSUES ON DEADLOCK, THAT

22    I SHOULD READ IT IN ITS ENTIRETY EXCEPT FOR BRACKETED

23    PARAGRAPH FOUR.  WOULD YOU UNDERSTAND THAT TO MEAN I DON'T

24    READ PARAGRAPH FOUR AND THEN SIMPLY RENUMBER, OR WHAT?

25          INSTRUCTION ONE TELLS US -- OR TELLS THE

26    JURY THAT IF THEY FIND HIM -- ALL 12 AGREE TO THE FIRST

27    DEGREE, THEY SIGN IT, AND THE CASE IS OVER.

28          IF THEY CAN'T, THEN THEY TELL US THAT.

1   THAT'S WHAT TWO IS ABOUT.

2            THREE THEN TELLS THEM THAT THE COURT CANNOT

3   ACCEPT A VERDICT OF GUILTY ON A SECOND DEGREE UNLESS THEY

4   ALL 12 AGREE THAT HE'S NOT GUILTY OF FIRST DEGREE.

5            THEN FOUR SAYS, IF YOU FIND HIM NOT GUILTY

6   OF COUNT ONE OF FIRST DEGREE BUT YOU CANNOT AGREE AS TO

7   MURDER OF THE SECOND DEGREE -- OKAY.  NOW, THAT SHOULD BE

8   STILL BE APPROPRIATE.  I THINK I HAVE TO READ FOUR.  AND

9   THEY'RE DEADLOCKED.  UNLESS --

10       MR. PECKHAM:  SO, IF THEY'RE DEADLOCKED, IF YOU GIVE

11  IT --

12       THE COURT:  IF THEY CAN'T FIND -- IF THEY FIND HIM NOT

13  GUILTY IN COUNT ONE, BUT THEY CAN'T AGREE ON COUNT TWO,

14  IT'S A DEADLOCKED CASE AND WE CAN GO DO IT AGAIN.

15       MR. PECKHAM:  RIGHT.  WELL --

16       THE COURT:  IF THEY ALL AGREE THAT HE'S NOT GUILTY OF

17  SECOND DEGREE, THEN THEY GET A CHANCE TO LOOK AT VOLUNTARY

18  MANSLAUGHTER.

19            AND IF THEY AGREE HE'S GUILTY OF VOLUNTARY

20  MANSLAUGHTER, THE CASE IS OVER.  IF THEY CAN'T AGREE,

21  AGAIN, IT'S HUNG AS TO VOLUNTARY, AND HE'S NOT GUILTY ON

22  FIRST DEGREE AND SECOND DEGREE.  AND THEY GET A CHOICE ON

23  TO RETRY THE VOLUNTARY MANSLAUGHTER.

24            ISN'T THAT HOW YOU WOULD CONSTRUE THIS?

25       MR. PECKHAM:  SO THE USE NOTE SAYS DON'T READ FOUR IF

26  THEY'RE DEADLOCKED OR DO READ FOUR IF THEY'RE DEADLOCKED?

27       THE COURT:  THE USE NOTES TELL US THIS IS SPECIFICALLY

28  DESIGNED FOR A HOMICIDE CASE.  IF IT'S ANY OTHER KIND OF A

1   CASE, THEN YOU CAN READ 1.710 AND 17.12 AND 17.49.  THE

2   JURY IS MERELY PRECLUDED FROM RETURNING A VERDICT ON A

3   LESSER OFFENSE WITHOUT ALSO RETURNING A VERDICT ON THE

4   GREATER OFFENSE.  AND I THINK THAT'S APPROPRIATE WITH

5   CURRENT LAW.  THAT WAY, IF THEY FIND HIM NOT GUILTY ON THE

6   MAJOR CHARGE OF THE FIRST DEGREE, THE PEOPLE CAN'T RETRY

7   HIM ON THE FIRST DEGREE.  IF THEY CAN'T AGREE ON THE SECOND

8   DEGREE, THEN THEY CAN RETRY HIM ON THE SECOND DEGREE.

9   BECAUSE HE'S ALREADY STILL IN JEOPARDY ON THE FIRST DEGREE,

10  BUT THE JURY CAN'T AGREE ON THE LESSER.

11      MR. PECKHAM:  AND IF THEY DEADLOCK ON FIRST AND SECOND

12  AND FIND HIM GUILTY OF MANSLAUGHTER, DOES THAT MEAN THEY

13  CAN RETRY HIM ON FIRST AND SECOND?

14      THE COURT:  NO.  IF THEY FIND HIM NOT GUILTY OF THE

15  FIRST DEGREE, THEY CAN'T DO IT AGAIN, BUT THEY'RE NOT

16  SUPPOSED TO GET TO THE VOLUNTARY UNTIL THEY MAKE A DECISION

17  ON THE SECOND DEGREE.

18      MS. STEIN:  A UNANIMOUS DECISION.

19      THE COURT:  THERE ARE LESSER INCLUDED OFFENSES.  I

20  MEAN, THEY'RE NOT SEPARATELY CHARGED OFFENSES.  IF THEY

21  WERE SEPARATELY CHARGED OFFENSES, YOU GOT A DIFFERENT

22  ARGUMENT.  WHERE THERE ARE LESSER INCLUDED OFFENSES, IN

23  ORDER TO GET TO THE LESSER, THEY'VE GOT TO AGREE THAT HE'S

24  NOT GUILTY OF THE GREATER.

25      MR. PECKHAM:  OKAY.  THAT'S TRUE.

26      THE COURT:  AND MY CONFUSION IS THAT AT THE TOP OF

27  PAGE 465, "IN THE EVENT 8.75 IS GIVEN AT THE INITIAL CHARGE

28  TO THE JURY," WHICH WE'RE TALKING ABOUT AND I PLAN ON

707

1  DOING, "DELETE BRACKETED PARAGRAPH FOUR."

2      MS. STEIN:  YOUR HONOR, I FIGURED IT OUT.  IT'S ON

3  PAGE 462, THE FOURTH PARAGRAPH ON 462.  "DISREGARD THE

4  INSTRUCTION PREVIOUSLY GIVEN" --

5      THE COURT:  OH, OH, OH, OH.  SURE.

6      MS. STEIN:  -- "PREVIOUSLY GIVEN, WHICH REQUIRES THAT

7  YOU RETURN THE ONE" --

8      THE COURT:  SURE.  SURE.  FAIR ENOUGH.

9      MS. STEIN:  --"VERDICT FORM."  THAT'S WHAT IT IS.

10 THAT MAKES SENSE.

11     THE COURT:  IT DOES MAKE SENSE.  IT'S PARAGRAPH FOUR,

12 NOT --

13     MS. STEIN:  NUMBER.

14     THE COURT:  -- NUMBER.

15     MS. STEIN:  THAT'S WHAT I WAS DOING TOO.

16     THE COURT:  DING.  IT'S LATE.  I DON'T KNOW.  I GUESS

17 I HAD NOTED THAT SHOULD BE DELETED.

18     MR. PECKHAM:  YES.

19     THE COURT:  YES.  OKAY.  I THINK WE'RE ALL ON THE SAME

20 PAGE.

21          OKAY.  SO THEN NEXT I HAVE 8.74, 8.75, AND

22 17.16, THE PERSONAL USE.  YES.  NOW, IS THIS WHERE WE

23 SHOULD HAVE THE 3.31?

24     MS. STEIN:  MENTAL STATE?

25     THE COURT:  MENTAL STATE.

26     MS. STEIN:  THAT'S 331.5.

27     THE COURT:  WELL, NOT THE SPECIFIC INTENT.  YOU'RE

28 SUPPOSED TO HAVE, AFTER WE GO THROUGH ALL THE SPECIFIC

1  INSTRUCTIONS --

2        MS. STEIN:  I HAVE 331.5.  IT'S AFTER 3.31.

3        THE COURT:  OKAY.  BEFORE WE GET TO THE --

4        MS. STEIN:  WE CAN PUT IT ANYWHERE, BUT IT IS COPIED

5  AND IN THERE SOMEWHERE.

6        THE COURT:  WHY DO WE NEED 331.5?  THE MENTAL STATE

7  THAT WE'RE TALKING ABOUT IS SPECIFIC INTENT TO KILL

8  SOMEBODY.  SO WHY IS THERE OTHER THAN THAT?

9        MR. PECKHAM:  THOSE INSTRUCTIONS FOR MURDER INCLUDE

10  THAT SPECIFIC INTENT.

11        MS. STEIN:  THEY DO.  IT SAYS THAT IN PLEA 3.31 AND

12  3.31.5 THAT THERE HAS BEEN TO BE A JOINT UNION OF ACT AND

13  SPECIFIC CRIMINAL INTENT.  AND THEN THERE'S A PARAGRAPH

14  THAT SAYS THE SPECIFIC CRIMINAL INTENT REQUIRED IS SET OUT

15  ELSEWHERE IN THESE INSTRUCTIONS.

16        THE COURT:  AND THAT'S SET OUT IN WHICH INSTRUCTIONS?

17        MS. STEIN:  IT'S SET OUT IN FIRST DEGREE MURDER.

18        THE COURT:  THAT'S 8.00.

19        MS. STEIN:  AROUND IT SHOULD BE SET OUT IN

20  UNPREMEDITATED MURDER OF THE SECOND DEGREE, 8.30.  AND IT'S

21  ALSO IN 8.11, WHICH EXPLAINS EXPRESS MALICE AFORETHOUGHT,

22  WHICH IS THE INTENT TO KILL.

23        THE COURT:  8.11 TALKS ABOUT "WHEN IT IS SHOWN THAT A

24  KILLING RESULTED IN THE INTENTIONAL DOING OF AN ACT WITH

25  EXPRESS OR IMPLIED MALICE, NO OTHER MENTAL STATE NEED BE

26  SHOWN TO ESTABLISH THE MENTAL STATE MALICE AFORETHOUGHT.

27              "THE MENTAL STATE CONSTITUTING MALICE

28  AFORETHOUGHT DOES NOT NECESSARILY REQUIRE ANY ILL WILL OR

1    HATRED OF THE PERSON KILLED.

2              "THE WORD AFORETHOUGHT DOES NOT IMPLY

3    DELIBERATION OR THE LAPSE OF CONSIDERABLE TIME.  IT ONLY

4    MEANS THE REQUIRED MENTAL STATE MUST PRECEDE RATHER THAN

5    FOLLOW THE ACT."

6         MS. STEIN:  WELL, AT THE TOP OF IT IT SAYS -- OKAY.

7    "MALICE MAY BE EITHER EXPRESS OR IMPLIED.  MALICE IS

8    EXPRESS WHEN THERE IS MANIFESTED AN INTENTION UNLAWFULLY TO

9    KILL A HUMAN BEING."

10        THE COURT:  CORRECT.

11        MS. STEIN:  SO IT'S LAID OUT THERE.  AND THEN IT

12   SHOULD BE LAID OUT IN 8.30, PERPETRATOR INTENDED UNLAWFULLY

13   TO KILL A HUMAN BEING.  AND THEN IT SHOULD BE LAID OUT IN

14   FIRST DEGREE.  SO IT'S KIND OF WEIRD, BECAUSE THE ONLY

15   GENERAL INTENT CRIMES ARE VOLUNTARY MANSLAUGHTER AND SECOND

16   DEGREE MURDER, KILLING RESULTING FROM UNLAWFUL ACT

17   DANGEROUS TO LIFE.  THE SPECIFIC INTENT CRIMES ARE

18   UNPREMEDITATED MURDER OF THE SECOND DEGREE AND FIRST DEGREE

19   MURDER.  SO THERE'S REALLY TWO KINDS OF SECOND DEGREE.  ONE

20   OF THEM IS GENERAL INTENT, ONE OF THEM IS SPECIFIC.

21        THE COURT:  WELL, WHY DON'T YOU WORK ON --

22        MS. STEIN:  OKAY.

23        THE COURT:  -- 3.31, AND 3.30.  VOLUNTARY MANSLAUGHTER

24   IS A GENERAL INTENT CRIME.  FIRST DEGREE MURDER IS A

25   SPECIFIC INTENT CRIME.  AND WOULDN'T SECOND DEGREE ALSO BE

26   A SPECIFIC INTENT?

27        MS. STEIN:  NO.

28        THE COURT:  NO?

# EXHIBIT B

## COURT TRANSCRIPT
## PAGES 106 -108

### SECOND DEGREE MURDER AND
### VOLUNTARY MANSLAUGHTER
### INSTRUCTIONS GIVEN

0106

CALJIC 8.30

UNPREMEDITATED MURDER
OF THE SECOND DEGREE

Murder of the second degree is ▓▓▓▓▓ the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove delib- eration and premeditation.

Exact copy of CALJIC No. 8.30, except adaptations.

CALJIC 8.31

SECOND DEGREE MURDER--KILLING RESULTING
FROM UNLAWFUL ACT DANGEROUS TO LIFE


Murder of the second degree is [also] the unlawful killing of a human being when:

1. The killing resulted from an intentional act,

2. The natural consequences of the act are dangerous to human life, and

3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being.


Exact copy of CALJIC No. 8.31, except adaptations.

CALJIC 8.40

VOLUNTARY MANSLAUGHTER--DEFINED

(Pen. Code, § 192, subd. (a))

~~[redacted]~~

~~[redacted]~~

~~[redacted]~~

Every person who unlawfully kills another human being without malice aforethought but with an intent to kill, is guilty of voluntary manslaughter in violation of Penal Code section 192, subdivision (a).

There is no malice aforethought if the killing occurred ~~[redacted]~~ [in the honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury].

In order to prove this crime, each of the following elements must be proved:

1. A human being was killed;

2. The killing was unlawful; and

3. The killing was done with the intent to kill.

[A killing is unlawful, if it was [neither] ~~[redacted]~~ [justifiable] [nor] [excusable].]


Exact copy of CALJIC No. 8.40, except adaptations.

# EXHIBIT C

## CALJIC 8.45 AND 8.46

## INVOLUNTARY
## MANSLAUGHTER
## INSTRUCTIONS

CALJIC 8.45 (2001 Revision)

INVOLUNTARY MANSLAUGHTER--DEFINED

(Pen. Code, § 192, subd. (b))

[Defendant is accused [in Count[s]              ] of having committed the crime of involuntary manslaughter in violation of section 192, subdivision (b) of the Penal Code.]

Every person who unlawfully kills a human being, [without malice aforethought,] [and] [without an intent to kill, and without conscious disregard for human life,] is guilty of the crime of involuntary manslaughter in violation of Penal Code section 192, subdivision (b).

[There is no malice aforethought if the killing occurred in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury.]

[A killing in conscious disregard for human life occurs when a killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that [his] [her] conduct endangers the life of another and who acts with conscious disregard for human life.]

A killing is unlawful within the meaning of this instruction if it occurred:

1.  During the commission of an unlawful act [not amounting to a felony] which is dangerous to human life under the circumstances of its commission; or

2.  In the commission of an act, ordinarily lawful, which involves a high degree of risk of death or great bodily harm, without due caution and circumspection.

[An "unlawful act" [not amounting to a felony] consists of a violation of                Code section[s] .]

[The commission of an unlawful act, without due caution and circumspection, would necessarily be an act that was dangerous to human life in its commission.]

In order to prove this crime, each of the following elements must be proved:

1.  A human being was killed; and

2.  The killing was unlawful.

Exact copy of CALJIC No. 8.45, except adaptations.

CALJIC 8.46

DUE CAUTION AND CIRCUMSPECTION--DEFINED

The term "without due caution and circumspection" refers to [a] negligent act[s] which [is] [are] aggravated, reckless and flagrant and which [is] [are] such a departure from what would be the conduct of an ordinarily prudent, careful person under the same circumstances as to be contrary to a proper regard for [human life] [danger to human life] or to constitute indifference to the consequences of such act[s]. The facts must be such that the consequences of the negligent act[s] could reasonably have been foreseen. It must also appear that the [death] [danger to human life] was not the result of inattention, mistaken judgment or misadventure, but the natural and probable result of an aggravated reckless or grossly negligent act.

Exact copy of CALJIC No. 8.46, except adaptations.

APPENDIX No. 2

# E X H I B I T     H

<u>DECLARATION OF KEN KIMPE RE: EVIDENCE WITHHELD AT TRIAL</u>

I KEN KIMPE, DECLARE THAT:

I am a witness that was not located by, Larry Little Jr.s Lawyer or investigator and I am the declarant Herein.

I Ken Kimpe also known as Ted went to Joyce Roaches apartment with Mary Ross, a Number of times from 6-9-99 to 6-15-99.

On 6-13-99 a couple days before Eddie Rabatores Demise I witnesses Eddie Rabator threaten to get petitioner while he had a physical confrontation with his mother Joyce Roach because she was trying to kick him out of the apartment.

Again on 6-15-99 me and Mary Ross were at Joyces apartment minutes before Eddie Rabators Demise. and I wittnesses Eddie threaten to get petitioner any way he could while he was arguing with his mom Joyce about moving out of the apartment.

I Declare under penalty of Perjury under the laws of the state of California that the foregoing is true and correct. executed this <u>11th Day of January, 2006</u> In San Diego California.

# EXHIBIT H

<u>Dated 1-11-2006</u>

<u>SGT. E. RYAN</u>

Witnessed By  THAT THE I/M
SIGNING THIS DOCUMENT WAS
WHO HE SAID.

Ken Kimpe

<u>DECLARATION AND PROOF OF SERVICE BY MAIL</u>

I, Larry Little , declare under the penalty of perjury that I am over the age of 18 years, (    ) and not a party, or ( ✓ ) am a party to this action, and reside in Solano County, at P.O. Box 4000, Cell # 8-211ᵛ ) Vacaville, California. 95696-4000.

That on JUNE , 7 , 2008 . I submitted to custody officials for inspection, sealing and depositing in the United States Mail, consistent with the "Mailbox Rule"; Houston v. Lack, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) at the California State Prison-Solano, Vacaville, California. 95696-4000 a copy of the attached hereof: Petition for writ of habeas corpus united States District court Southern District of california

in a fully prepaid envelope, addressed to: United States District court Southern District of california Room 4290, 880 front Street San Diego CA. 92101-8900

I declare under the penalty of perjury that the foregoing is true and correct. This declaration was executed on this JUNE , 7 , 2008 , at CSP-Solano, Vacaville, California. 95696-4000.

Larry John Little Jr.
DECLARANT

# APPENDIX No. 1

# E X H I B I T    K

1    Q.    OKAY.

2    A.    HOW DID WE KNOW HE DIDN'T MAKE THESE HISSELF?

3    Q.    SO THE RECORDS WERE NOT ADMITTED INTO EVIDENCE;

4  IS THAT YOUR UNDERSTANDING?

5    A.    I GUESS, I DON'T KNOW.

6    Q.    YOU DON'T --

7    A.    I DON'T KNOW.

8          MR. WILLIAMS:  OKAY, THANK YOU.  I HAVE NOTHING

9  FURTHER.

10         THE COURT:  ANYTHING ELSE?

11         MS. MALLEN:  NO, THANK YOU.

12         THE COURT:  THANK YOU, MR. LITTLE.  YOU MAY STEP

13  DOWN.

14         THE WITNESS:  THANK YOU.

15         THE COURT:  WE'LL TAKE -- LET'S TAKE 15 MINUTES.

16         MS. MALLEN:  OKAY, THANK YOU.

17         THE COURT:  WE'LL BE IN RECESS UNTIL 10:30.

18                    (RECESS.)

19

20         THE COURT:  PETITIONER AND COUNSEL ARE ALL

21  PRESENT.

22              MR. WILLIAMS.

23         MR. WILLIAMS:  THANK YOU, YOUR HONOR.  WE'LL

24  CALL THE PETITIONER, LARRY LITTLE, JR.

25

26              **LARRY LITTLE, JR.,**

27  CALLED AS A WITNESS ON BEHALF OF THE DEFENDANT, HAVING

28  BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

## EXHIBIT K 1

1

2                            **DIRECT EXAMINATION**

3   BY MR. WILLIAMS:

4        Q.   STATE YOUR FULL NAME, SIR, AND SPELL YOUR LAST

5   NAME FOR THE RECORD.

6        A.   LARRY JOHN LITTLE.  L-I-T-T-L-E.

7        Q.   OKAY, AND YOU'RE LARRY JOHN LITTLE, JR.?

8        A.   YES.

9        Q.   AND YOU ARE THE PETITIONER IN THIS MATTER?

10       A.   YES.

11       Q.   YOU ARE THE PERSON CONVICTED OF SECOND DEGREE

12  MURDER IN THE KILLING OF MR. RABITOR(PH)?

13       A.   YES.

14            THE COURT:  MR. LITTLE, SCOOT UP TOWARD THE

15  MICROPHONE, IF YOU CAN.

16            THE WITNESS:  ALL RIGHT.

17  BY MR. WILLIAMS:

18       Q.   I'VE GOT A MIKE IN FRONT OF ME TOO.

19            YOU HEARD YOUR FATHER AND YOUR SISTER

20  TESTIFY, CORRECT?

21       A.   YES.

22       Q.   DO YOU RECALL THE BICYCLE ACCIDENT THAT YOU HAD

23  WHEN YOU WERE 12 OR 13 YEARS OF AGE?

24       A.   YES.  I WAS GOING DOWN A BIG HILL AND I GUESS

25  THERE WAS A LOT OF WEEDS AND THEY WERE REAL HIGH, AND I

26  HIT A DITCH AND I FLIPPED OVER AND I SMASHED MY WHOLE

27  FACE, MY HEAD INTO A BIG ROCK.  AND THEN I WOKE UP IN THE

28  HOSPITAL AND MY HEAD WAS ALL BIG.  AND WE HAD A FAMILY

1  FRIEND, HER NAME WAS MARIE, AND SHE LIVED LIKE ON THE

2  OTHER SIDE OF TOWN, AND SHE USED TO TAKE ME TO THE DOCTOR

3  AND THE HOSPITAL ALL THE TIME FOR -- TO SEE ALL THESE

4  DIFFERENT DOCTORS, TO TREAT MY --

5      Q.   LET ME INTERRUPT YOU.  YOU HIT YOUR HEAD -- THIS

6  WAS OBVIOUSLY IN THE DAYS BEFORE THEY REQUIRED BICYCLE

7  HELMETS, RIGHT?

8      A.   YEAH.

9      Q.   SO WERE YOU WEARING A HELMET?

10     A.   NO.

11     Q.   YOU HIT YOUR HEAD AND YOU WENT TO THE HOSPITAL?

12     A.   YEAH.

13     Q.   HOW LONG -- DO YOU KNOW HOW LONG YOU STAYED IN

14 THE HOSPITAL?

15     A.   I DON'T REALLY REMEMBER, BECAUSE THEY SAID THAT

16 I HAD AMNESIA, BECAUSE THEY ASKED ME IF I HAD A SISTER AND

17 THEY ASKED ME HOW OLD I WAS AND I DIDN'T KNOW HOW OLD I

18 WAS AND --

19     Q.   AND SO WHEN YOU GOT OUT, I TAKE IT YOU CONTINUED

20 TREATMENT FOR THAT?

21     A.   YEAH, I KEPT GOING TO THE HOSPITAL APPOINTMENTS.

22 THE FAMILY FRIEND, SHE WOULD TAKE ME THERE TO THE

23 APPOINTMENTS.

24     Q.   AND WHAT GRADE WERE YOU IN WHEN THAT HAPPENED?

25     A.   LIKE -- IN SEVENTH GRADE.

26     Q.   WHERE WERE YOU GOING TO SCHOOL?

27     A.   WANGENHEIM JUNIOR HIGH SCHOOL.

28     Q.   AFTER THAT HAPPENED, DID ANYTHING CHANGE FOR YOU

1    IN SCHOOL?

2        A.    YEAH, MY GRADES GOT BAD.  I HAD TO STAY BACK FOR

3    PART OF THE YEAR.

4        Q.    AND WHEN WAS -- HAD YOU --

5        A.    THAT WAS LIKE -- YEAH, THAT WAS EIGHTH GRADE I

6    STAYED BACK FOR PART OF THE YEAR, AND THEN I WENT TO A

7    CONTINUATION SCHOOL.  AND THEN I GOT BACK ON TRACK AND

8    THEN I -- I WENT TO THE HIGH SCHOOL, BUT I WAS IN THE

9    LOWER LEVEL THAN I USUALLY WAS.

10       Q.    WELL -- AND WAS THIS -- WAS THIS BECAUSE OF THE

11   HEAD INJURY?

12       A.    I DON'T KNOW.

13       Q.    OKAY, BUT YOUR ACADEMICS STARTED TO SUFFER?

14       A.    WENT DOWN, YEAH.

15       Q.    HAD YOU STARTED USING MARIJUANA BY THEN ALSO?

16       A.    I TRIED IT A COUPLE OF TIMES WHEN I WAS LIKE 13

17   OR 14, AND THEN I STARTED USING IT MORE WHEN I WAS LIKE

18   15, 16.

19       Q.    STARTED USING?

20       A.    YEAH.

21       Q.    USING WHAT?

22       A.    MARIJUANA.

23       Q.    OKAY.  YOU EVENTUALLY GRADUATED TO CRYSTAL

24   METHAMPHETAMINE?

25       A.    YEAH, I STARTED DOING THAT.  I ONLY DID IT A FEW

26   TIMES BECAUSE I WAS ALWAYS SURFING MOST OF THE TIME,

27   TRYING TO GET TO THE BEACH.  AND I ONLY DID IT A FEW

28   TIMES, LIKE WHEN I WAS LIKE 17, 18.  AND THEN I STARTED

1    DOING IT REGULARLY LIKE WHEN I WAS ABOUT 19 OR 20.

2         Q.    OKAY, WAS THIS AFTER YOU FINISHED HIGH SCHOOL?

3         A.    YEAH.

4         Q.    SO YOU HAD THIS HEAD INJURY AND THEN YOU STARTED

5    USING SOME MARIJUANA, AND DID YOU START DRINKING?

6         A.    YEAH, I DRANK LIKE THE REST OF THE KIDS, ALWAYS

7    GOING TO THE BEACH PARTIES AND STUFF WITH KEGS AND

8    DRINKING, AND I DRANK TOO, AND THEN WHEN MY DRINKING

9    PROBLEM STARTED GETTING WORSE BECAUSE I STARTED TO DRINK

10   ALONE, DRINKING IN MY GARAGE; SOMETIMES I WOULD HAVE A

11   COUPLE FRIENDS.

12        Q.    HOW OLD WERE YOU WHEN YOU STARTED DRINKING IN

13   YOUR GARAGE ALONE?

14        A.    HOW OLD WAS I?

15        Q.    YEAH.

16        A.    ABOUT 15 OR 16.

17        Q.    DID YOU DRINK QUITE A BIT?

18        A.    YEAH, I DRANK BEFORE SCHOOL SOMETIMES.

19        Q.    BEFORE SCHOOL?

20        A.    SOMETIMES I DID.

21        Q.    DID YOU EVER TELL YOUR FATHER ABOUT THIS

22   DRINKING PROBLEM?

23        A.    NO.

24        Q.    DID YOU EVER TELL ANY HIGH SCHOOL COUNSELORS

25   ABOUT THIS DRINKING PROBLEM?

26        A.    NO.

27        Q.    OKAY.  NOW YOU WERE ARRESTED FOR MURDER IN 1999?

28        A.    YES.

1    Q.   AND MR. PECKHAM WAS APPOINTED TO REPRESENT YOU?

2    A.   YES.

3    Q.   AND MR. PECKHAM CAME TO SEE YOU QUITE A BIT,

4    RIGHT?

5    A.   YEAH, QUITE A BIT.

6    Q.   SO YOU HAD A LOT OF CONVERSATIONS WITH

7    MR. PECKHAM?

8    A.   YES.

9    Q.   DID YOU EVER TELL MR. PECKHAM ABOUT YOUR HEAD

10   INJURY?

11   A.   YES.

12   Q.   WHEN WAS THAT?

13   A.   I BELIEVE MY DAD TOLD HIM ALSO.

14   Q.   OKAY, BUT I'M TALKING ABOUT YOU, LARRY.

15   A.   OKAY, YEAH, THAT WAS LIKE A COUPLE MONTHS BEFORE

16   THE TRIAL.

17   Q.   YOU DIDN'T TELL HIM AT THE INITIAL HEARING --

18   INITIAL MEETING?

19   A.   OH, WHEN I FIRST MET HIM?

20   Q.   YEAH.

21   A.   NO, I THINK IT WAS LIKE THE SECOND OR THIRD TIME

22   BECAUSE HE CAME OVER ABOUT A DOZEN TIMES.

23   Q.   THIS WAS BEFORE THE PRELIM THAT YOU TOLD HIM OR

24   AFTER, IF YOU RECALL?

25   A.   JUST AFTER.

26   Q.   OKAY.  NOW DID YOU TELL HIM THAT YOU HAD BEEN A,

27   FOR LACK OF A BETTER TERM, POLY-DRUG ABUSER?  IN OTHER

28   WORDS, ALCOHOL AND METHAMPHETAMINE SINCE YOUR TEEN AGE

1   YEARS?

2       A.   YEAH, I TOLD HIM I'D BEEN USING DRUGS FOR A LONG

3   TIME.

4       Q.   WHEN DID YOU TELL HIM THAT?

5       A.   I TOLD HIM ALL THE TIME.  PRETTY MUCH HE KNEW

6   BECAUSE I HAD HIM ON A -- ON ANOTHER CASE, WHICH WAS A

7   POSSESSION OF CRYSTAL; HE WAS MY LAWYER IN A PLEA BARGAIN.

8       Q.   OKAY, YOU WENT TO PRISON ON THAT?

9       A.   NO, JUST COUNTY, COUNTY JAIL.

10      Q.   SO YOU TOLD HIM ABOUT YOUR DRUG USE AND ALCOHOL

11  USE AND YOUR HEAD INJURY?

12      A.   YEAH.

13      Q.   OKAY.  NOW IN SOME TIME IN 1993 YOU WERE STABBED

14  AND LOST YOUR EYE; IS THAT CORRECT?

15      A.   YES.

16      Q.   HOW DID THAT HAPPEN?

17      A.   IT'S HARD TO TALK ABOUT.  ME AND MY FRIEND WERE

18  DRINKING, A GUY THAT I HAD GREW UP WITH IN HIGH SCHOOL.

19  AND WE WENT OUT AND WE WERE GOING OVER TO PACERS, AND WE

20  WERE STILL DRINKING.  AND THEN WE LEFT AND I HAD LIKE 3 OR

21  $400 ON ME FROM MY UNEMPLOYMENT CHECK THAT I GOT THAT

22  WEEK, AND I SHOULD HAVE LEFT IT AT HOME, BUT WE WERE

23  DRUNK.  AND AS SOON AS WE LEFT, WE PICKED UP A COUPLE

24  GIRLS AND THE NEXT THING YOU KNOW, ONE OF THEM SEEN THE

25  MONEY AND SHE SAID, "I'M GOING TO TAKE YOUR EYE OUT."  AND

26  THE NEXT THING YOU KNOW, SHE STABBED ME A BUNCH OF TIMES.

27  I THOUGHT I WAS GOING TO DIE.

28      Q.   SO HOW DID SHE SEE THE MONEY?

```
1       A.   BECAUSE I PULLED IT OUT OF MY POCKET.

2       Q.   WHY?

3       A.   BECAUSE I WAS DRUNK AND I WASN'T THINKING.

4       Q.   OKAY, DID YOU GUYS EVER GET TO PACERS?

5       A.   YEAH, WE WERE AT PACERS JUST BEFORE THAT.

6       Q.   OKAY.  NOW PACERS IS A TOPLESS BAR?

7       A.   YES.

8       Q.   OKAY.  ON MIDWAY, RIGHT?

9       A.   YES.

10      Q.   DID YOU MEET THESE GIRLS AT PACERS?

11      A.   NO.

12      Q.   WHERE DID YOU MEET THEM?

13      A.   WE WENT -- LIKE AS SOON AS WE GOT IN THE CAR, WE

14   PULLED OUT AND THEY WERE RIGHT THERE ON THE STREET.

15      Q.   NOW YOU GREW UP IN SAN DIEGO, RIGHT?

16      A.   YEAH.

17      Q.   SO YOU'RE DOWN IN THE MIDWAY DISTRICT, RIGHT?

18      A.   YES.

19      Q.   YES OR NO?

20      A.   YES.

21      Q.   GIRLS STANDING ON THE CORNER?

22      A.   YES.

23      Q.   ALSO NEAR PACERS.  YOU KNEW WHAT THEY WERE,

24   RIGHT?

25      A.   YEAH.

26      Q.   THEY WERE HOOKERS?

27      A.   YES.

28      Q.   OKAY.  SO YOU PICKED THEM UP?
```

1     A.    YES.

2     Q.    AND THEN YOU SHOWED HER SOME MONEY?

3     A.    YEAH, I HAD THE MONEY IN MY POCKET.

4     Q.    OKAY.  SHE SAYS I'M GOING TO TAKE YOUR EYE OUT

5  IF YOU DON'T GIVE ME THE MONEY OR --

6     A.    YEAH, AND THEN SHE DID IT THAT QUICK.

7     Q.    OKAY.  SO WHAT HAPPENED THEN?  YOU WENT TO THE

8  POLICE?

9     A.    I WENT TO THE HOSPITAL.

10     Q.    OKAY.  SO WHO DROVE YOU TO THE HOSPITAL?

11     A.    I GUESS MY FRIEND DID.

12     Q.    OKAY.  SO YOU WENT TO THE HOSPITAL?

13     A.    AND I WAS IN THE HOSPITAL FOR LIKE THREE OR FOUR

14  DAYS.  AND I WAS SUFFERING REAL BAD AND I WAS LIKE

15  THROWING UP BLOOD AND I THOUGHT I WAS GOING TO DIE.  AND I

16  WAS IN MORE PAIN THAN I'D EVER BEEN IN IN MY WHOLE LIFE.

17  AND I ALWAYS WILL REMEMBER THAT PAIN TO THIS DAY BECAUSE

18  IT HURT REALLY BAD AND I FELT HELPLESS.  THERE WAS NOTHING

19  I COULD DO AND I COULDN'T EVEN GET UP OR ANYTHING.

20     Q.    OKAY, NOW -- AND YOU LOST YOUR EYE AS A RESULT

21  OF THAT?

22     A.    I LOST MY EYE AND I WAS FREAKING OUT BECAUSE I

23  DIDN'T HAVE AN EYE AND MY FACE WAS SWOLE UP.

24     Q.    OKAY, NOW WHEN DID YOU KNOW THAT YOU HAD LOST

25  YOUR EYE?

26     A.    I KNEW RIGHT WHEN I CAME TO.  LIKE IT TOOK ME

27  ABOUT TWO DAYS BEFORE I CAME TO.

28     Q.    AND THEN IT WAS OBVIOUS THEN THAT YOU COULDN'T

1   SEE OUT OF ONE EYE, RIGHT?

2       A.   YEAH, BUT I WAS MOANING AND GROANING THE WHOLE

3   TIME.

4       Q.   SO IT WAS A FAIRLY PAINFUL EXPERIENCE?

5       A.   YEAH, AND THROWING UP BLOOD AND ALL KINDS OF

6   STUFF.

7       Q.   DID YOU TELL MR. PECKHAM ABOUT THIS INCIDENT IN

8   YOUR LIFE?

9       A.   YES, I TOLD HIM.

10      Q.   WHEN DID YOU TELL HIM?

11      A.   I TOLD HIM RIGHT AWAY.

12      Q.   NOW YOU'RE WEARING SOME GLASSES TODAY, RIGHT?

13      A.   YES.

14      Q.   THAT I BROUGHT TO YOU?

15      A.   YES.

16      Q.   AND THEY'RE VERY SPECIAL GLASSES?

17      A.   YES.

18      Q.   DO YOU KNOW WHAT YOUR VISUAL -- DO YOU KNOW WHAT

19  THE TERM VISUAL ACUITY MEANS?

20      A.   I THINK SOMEWHERE AROUND --

21           THE COURT:  THAT'S A YES OR NO QUESTION.

22           THE WITNESS:  YES.

23  BY MR. WILLIAMS:

24      Q.   IT MEANS WHAT YOU -- 20/20?

25      A.   YES.

26      Q.   DO YOU KNOW WHAT YOURS IS?

27      A.   IT'S 20/60.

28      Q.   20/60 IN ONE EYE?

1      A.   AND BLIND IN THE OTHER.

2      Q.   AND BLIND IN THE OTHER.  SO YOU OBVIOUSLY NEED

3   THOSE GLASSES?

4      A.   YES.

5      Q.   THOSE GLASSES ARE NEW, RIGHT?

6      A.   YES.

7      Q.   OKAY.  WHEN YOU MET MR. PECKHAM WHEN HE CAME TO

8   BE YOUR ATTORNEY FOR MURDER, WERE YOU WEARING YOUR

9   GLASSES?  DID YOU HAVE YOUR GLASSES THEN?

10     A.   MY GLASSES?

11     Q.   YES, SIR.

12     A.   THEY WERE IN THE PICTURE ON THE TABLE AT THE

13  APARTMENT WHERE THIS HAPPENED. I WAS GOING TO GET MY

14  GLASSES WHEN IT HAPPENED.  THEY'RE IN ONE OF THE EVIDENCE

15  PICTURES.

16          THE COURT:  THAT DOESN'T ANSWER THE QUESTION,

17  SIR.  THE QUESTION IS WHETHER OR NOT YOU HAD YOUR GLASSES

18  WHEN YOU MET MR. PECKHAM?

19          THE WITNESS:  NO, I DIDN'T HAVE THEM.

20  BY MR. WILLIAMS:

21     Q.   THEY HAD BEEN LEFT AT THE SCENE OF THE KILLING

22  OF MR. RABITOR?

23     A.   YEAH.

24     Q.   DO YOU RECALL STABBING MR. RABITOR?

25     A.   YES.

26     Q.   WHEN YOU STABBED MR. RABITOR, WERE YOU WEARING

27  YOUR GLASSES?

28     A.   NO.

1    Q.   WHEN YOU STABBED MR. RABITOR -- STRIKE THAT.

2    AFTER YOU HAD YOUR EYE CUT OUT, ALL RIGHT?

3    A.   YEAH.

4    Q.   DID YOU NOTICE ANY CHANGE IN YOURSELF?

5    A.   WELL, FIRST, LIKE THE FIRST FEW WEEKS, I WAS

6    SCARED TO GO OUTSIDE.  I WAS HAVING A LOT OF NIGHTMARES

7    AND EVERYTHING WAS SORT OF FREAKING ME OUT, IF I WENT

8    OUTSIDE.  AND THEN ABOUT THREE MONTHS LATER I HAD AN

9    EPISODE WITH A FRIEND OF MY DAD'S WHERE I -- SHE CAME

10   BEHIND ME AND SHE STARTED YELLING AND I TRIPPED OUT FOR NO

11   REASON.

12   Q.   WHAT DID YOU DO?

13   A.   WENT ALL CRAZY AND I WENT -- I WENT TO GRAB A

14   KITCHEN KNIFE OFF THE BOARD BECAUSE I WAS -- BECAUSE I WAS

15   SCARED AND THAT WAS ABOUT THREE MONTHS AFTER THIS

16   HAPPENED.

17   Q.   OKAY.

18   A.   AND I COULDN'T UNDERSTAND WHY I DID THAT.

19   Q.   ALL RIGHT, DID YOU STAB HIM?

20   A.   WHAT?

21   Q.   DID YOU STAB HIM?

22   A.   NO.

23   Q.   YOUR FRIEND?

24   A.   NO.

25   Q.   DID YOU CUT ANYBODY?

26   A.   NO.

27   Q.   DID YOU TELL ANYBODY ABOUT THIS?

28   A.   NOT REALLY.

1      Q.   DID YOU EVER RELATE THIS INCIDENT TO

2  MR. PECKHAM?

3      A.   NO, NOT THAT INCIDENT.

4      Q.   OKAY.  SO YOU STILL FELT PRETTY JUMPY AND --

5      A.   YES.

6      Q.   DID YOUR DAD TALK TO YOU ABOUT GETTING SOME

7  HELP?

8      A.   IT WAS ABOUT A YEAR LATER MY DAD SAID I WAS

9  ACTING REAL STRANGE.

10      Q.   OKAY.

11      A.   HE SAID THAT THERE'S SOMETHING WRONG WITH ME.

12      Q.   SO THE ANSWER IS "YES".  AND THEN WHAT DID HE

13  SAY?

14      A.   YEAH, HE'S SAYING THAT I'M TOO JUMPY AND I'M

15  RUNNING AROUND TOO PARANOID AND I'M TRIPPING ON EVERY

16  LITTLE THING AND PANICKING ABOUT STUFF.

17      Q.   OKAY, BY "TRIPPING ON EVERY LITTLE THING", YOU

18  DON'T MEAN PHYSICALLY TRIPPING OVER THINGS BECAUSE OF YOUR

19  EYESIGHT?

20      A.   NO, I MEAN LOOKING AROUND, TRYING TO SEE IF

21  SOMETHING IS HAPPENING.

22      Q.   NOW COULD YOU DESCRIBE YOUR -- DO YOU KNOW WHAT

23  THE TERM "PERIPHERAL VISION" MEANS?

24      A.   DEPTH PERCEPTION?

25      Q.   NO, IT'S LIKE --

26      A.   HOW FAR?

27      Q.   NO.  IF YOU TAKE YOUR NOSE, CAN YOU SEE TO THE

28  RIGHT AT ALL?

1        A.    NO.

2        Q.    SO YOU CAN'T SEE ANYTHING TO THE RIGHT OF YOUR

3   NOSE?

4        A.    NO.

5        Q.    BECAUSE YOU'RE BLIND IN THAT EYE; YOU DON'T HAVE

6   A EYE?

7        A.    YOU MEAN TO THE LEFT.

8        Q.    OKAY.  TO THE LEFT, YOU DON'T HAVE AN EYE THERE?

9        A.    NO.

10        Q.    EXCEPT FOR A GLASS EYE?

11        A.    YEAH, JUST A GLASS EYE.

12        Q.    HOW ABOUT THE OTHER EYE, HOW FAR CAN YOU SEE?

13        A.    WITH THE GLASSES, I CAN SEE PRETTY FAR.

14        Q.    OKAY, BUT TO THE SIDE, HOW FAR CAN YOU SEE?

15        A.    NOT VERY FAR.

16        Q.    OKAY.  SO AFTER THIS INCIDENT, WHAT HAPPENED?

17   ANY OTHER INCIDENTS OCCUR?

18        A.    I GOT JUMPED.

19        Q.    WHEN WAS THAT?

20        A.    BY A GANG OF MEXICANS, IT WAS LIKE IN '97, '98,

21   IN '98.

22        Q.    OKAY.

23        A.    AND I HAD TO GO TO THE HOSPITAL FOR MY FACE AND

24   MY FOOT BECAUSE I GOT BEAT UP AND IT WAS LIKE PARADISE

25   VALLEY HOSPITAL, OFF EUCLID.

26        Q.    RIGHT.  WHAT HAPPENED TO YOU?  WHAT WERE YOUR

27   INJURIES?

28        A.    MY MOUTH SMASHED IN, MY NOSE AND MY FOOT.  MY

1  FOOT WAS DISLOCATED.

2      Q.   HOW DID THAT MAKE YOU FEEL LATER?  DO YOU

3  UNDERSTAND MY QUESTION?

4      A.   REAL JUMPY.

5      Q.   OKAY.

6      A.   EVEN WAY MORE JUMPY THAN I'D BEEN BEFORE.

7      Q.   OKAY, NOW WHEN YOU WERE SENT TO PRISON THE FIRST

8  TIME, WHERE DID YOU GO?

9      A.   FIRST TIME I WENT TO AVENAL.

10     Q.   DID ANYTHING HAPPEN IN AVENAL --

11     A.   NO.

12     Q.   -- OF A VIOLENT NATURE TO YOU?

13     A.   NO, EVERYTHING WAS ALL RIGHT THAT TIME.

14     Q.   OKAY, SO THEN YOU GOT PAROLED AND THEN YOU WENT

15  BACK INTO THE PENAL SYSTEM.  AND WHEN WAS THAT?

16     A.   I WENT TO CHUCKAWALLA AND THEN -- BECAUSE I WAS

17  LIKE LOWER LEVEL.

18     Q.   BUT YOU DON'T KNOW WHAT YEAR THAT WAS WHEN YOU

19  FIRST WENT IN?

20     A.   IT WAS LIKE '92.

21     Q.   OKAY.  THIS WAS BEFORE YOUR EYE WAS STABBED,

22  KNOCKED OUT?

23     A.   IT WAS LIKE A COUPLE MONTHS BEFORE.

24     Q.   OKAY.  YOU WENT TO CHUCKAWALLA?

25     A.   IT WAS THE FIRST TIME I EVER WENT UP.

26     Q.   SO YOU WENT TO CHUCKAWALLA; ANYTHING HAPPEN

27  THERE, VIOLENT TO YOU?

28     A.   NO, BECAUSE I WASN'T REALLY -- I WASN'T THERE

1  THAT LONG AND IT WAS A LEVEL 2.

2      Q.    THEN DID YOU GET SENT TO CALIPATRIA?

3      A.    YEAH, I WAS A LEVEL 1, BUT THEY PUT ME ON LEVEL

4  4 YARD, WHICH IS MAXIMUM SECURITY.

5      Q.    DID ANYTHING HAPPEN TO YOU?

6      A.    YEAH, SOME GUY TRIED TO COME AT ME WITH A SHARP

7  OBJECT UP BY MY CELL, BECAUSE THEY HAD A FOOD STRIKE AND

8  NOBODY WAS SUPPOSED TO GO EAT, AND I WENT TO EAT AND

9  EVERYBODY GOT MAD.  AND SO WHEN I CAME IN, SOMEBODY

10  FOLLOWED ME AND AS SOON AS I WENT AROUND THE CORNER,

11  SOMEBODY SLID SOMETHING UNDER THE DOOR AND THE GUY TRIED

12  TO STAB ME WITH IT.

13      Q.    OKAY, THIS IS BEFORE YOU HAD YOUR EYE CUT OUT?

14      A.    IT WAS AFTER.

15      Q.    OKAY, SO YOU WERE IN PRISON WITH ONE EYE?

16      A.    YEAH.

17      Q.    AND THIS HAPPENED IN CALIPATRIA WHEN?  ABOUT

18  1996 DO YOU THINK?

19      A.    YEAH.

20      Q.    OKAY.  WERE YOU INJURED?

21      A.    NO, BUT I WAS SCARED.

22      Q.    DID YOU TELL MR. PECKHAM ABOUT THIS?

23      A.    NO, NOT THAT.  I TOLD HIM ABOUT THE MEXICANS

24  JUMPING ME, THOUGH.

25      Q.    TELL ME ABOUT THE MEXICANS JUMPING YOU, OKAY.

26  DID YOU HAVE ANY OTHER -- DID YOU WITNESS ANY STABBINGS IN

27  PRISON IN CALIPATRIA?

28      A.    YEAH, I SEEN A FEW PEOPLE GET STABBED.

1    Q.    HOW DID THAT MAKE YOU FEEL?

2    A.    SCARED.

3    Q.    WHY?

4    A.    BECAUSE AT THAT TIME EVERYBODY WAS MAD AT ME AND

5    I DIDN'T WANT TO GET STABBED BECAUSE I'D BEEN STABBED

6    BEFORE AND I KNEW WHAT IT FELT LIKE.  AND I KNOW THAT I

7    WOULD NEVER WANT TO LET IT HAPPEN TO ME EVER --

8    Q.    WHY?

9    A.    -- AGAIN.  BECAUSE IT WAS THE MOST WORSE PAIN,

10   THE MOST SUFFERING I'VE EVER DONE IN MY LIFE.  I MEAN, I

11   WISHED -- I WAS WISHING I WAS PRACTICALLY WISHING I WAS

12   DEAD, I WAS IN SO MUCH PAIN IN THAT HOSPITAL.

13   Q.    ALL RIGHT.

14   A.    MOANING AND GROANING AND JUST OUT OF IT.

15   Q.    DID THE INCIDENTS AT CALIPATRIA MAKE YOU JUMPIER

16   WHEN YOU WERE PAROLED?

17   A.    IT MADE ME MORE JUMPY, YES, SIR, TOWARDS CERTAIN

18   PEOPLE.

19   Q.    WHAT KIND OF CERTAIN PEOPLE?

20   A.    LIKE GANG TYPE PEOPLE, SKIN HEADS, MEXICAN

21   GANGS.

22   Q.    OKAY.

23   A.    PEOPLE THAT ARE LIKE IN THE ORGANIZED GROUPS IN

24   THE PRISONS.  AND YOU SEE THEM ON THE STREETS AND THEY'RE

25   ON THE STREETS TOO, THOSE KINDS OF PEOPLE, BECAUSE I KNOW

26   THEY'LL TRY TO JUMP YOU.

27   Q.    AND WHAT WERE YOU AFRAID OF SPECIFICALLY BY

28   BEING JUMPED?

1     A.    LOSING MY OTHER EYE.

2     Q.    OKAY, I MEAN, SO BASICALLY YOU DECIDED THAT AT

3  ALL COSTS YOU WERE GOING TO TRY TO KEEP FROM GOING TOTALLY

4  BLIND?

5     A.    KEEP MY OTHER EYE.

6     Q.    ALL RIGHT.  DID YOU EVER TELL MR. PECKHAM THIS?

7     A.    YES.

8     Q.    WHAT DID YOU TELL HIM?

9     A.    I TOLD HIM THAT I -- I REACT REALLY BAD TO

10  PEOPLE THAT COME AT ME VIOLENTLY, AND I REACT REAL QUICK

11  BECAUSE I DON'T WANT TO LOSE MY OTHER EYE.  BECAUSE BEFORE

12  THAT, THAT'S HOW IT HAPPENED, IT HAPPENED LIKE THAT QUICK.

13  (INDICATING.)

14     Q.    WHEN DID YOU TELL HIM THAT?

15     A.    I TOLD HIM THAT ALL THE TIME.

16     Q.    OKAY.  AND MR. PECKHAM PUT YOU ON THE STAND IN

17  THE JURY TRIAL, RIGHT?

18     A.    YES.

19     Q.    AND YOU TOLD THE JURY WHAT YOU'RE TELLING US

20  ABOUT HOW YOU FELT?

21     A.    YES.

22     Q.    THAT YOU WERE JUMPY?

23     A.    YES.

24     Q.    DID YOU TALK ABOUT CALIPATRIA IN FRONT OF THE

25  JURY AT ALL?

26     A.    I DIDN'T TALK ABOUT THAT.

27     Q.    OKAY, BUT YOU LET THEM KNOW THAT YOU DIDN'T WANT

28  TO LOSE YOUR OTHER EYE, RIGHT?

1  A. YEAH, I -- I ALSO TALKED ABOUT BEING JUMPED BY

2 THE MEXICAN GANGS BECAUSE THAT'S WHAT I WAS THREATENED

3 WITH.

4  Q. DO YOU KNOW WHAT THE TERM "POSTTRAUMATIC STRESS

5 DISORDER" MEANS?

6  A. IT'S --

7  Q. NO, JUST YES OR NO?

8  A. YES.

9  Q. COMMONLY REFERRED TO AS P.T.S.D., SOMETIMES

10 P.S.D.?

11  A. YES.

12  Q. WHEN DID YOU LEARN ABOUT P.T.S.D.?

13  A. I LEARNED IN PRISON WHEN I STARTED SEEKING THE

14 DOCTORS AND THEY STARTED TELLING ME ABOUT IT.  AND I ALSO

15 KNEW ABOUT IT.

16  Q. STOP THERE.  NOW I DON'T MEAN TO EMBARRASS YOU,

17 BUT WHEN YOU SAY YOU LEARNED IN PRISON, YOU'VE BEEN TO

18 PRISON A FEW TIMES; YOU LEARNED IN PRISON AFTER YOU WERE

19 CONVICTED OF MURDER AND SENTENCED TO PRISON?

20  A. NO, BEFORE.

21  Q. OKAY, SO YOU KNEW ABOUT IT BEFORE?

22  A. YES.

23  Q. OKAY, GO AHEAD.  YOU SAW A FEW DOCTORS ABOUT IT?

24  A. AND I LEARNED IT AND I SAW A DOCTOR WHEN I WAS

25 IN TEHACHAPIE, BECAUSE THEY HAD ME ON LEVEL 4 THERE, AND

26 I -- AND IT WAS LIKE RIGHT AFTER THIS HAPPENED TO MY EYE.

27 AND I TOLD THE DOCTOR THERE THAT I THOUGHT THAT THERE WAS

28 SOMETHING WRONG; THAT I COULDN'T LIVE AROUND ALL THESE

1    PEOPLE BECAUSE THEY PUT ME IN THIS GYM.  AND HE TOLD ME HE

2    WOULD MOVE ME TO A CELL WHERE I WOULD BE BY MYSELF, SO HE

3    MOVED ME OVER TO THE 3 YARD AND GOT ME OUT OF THERE

4    BECAUSE I WAS TRIPPING OUT.

5         Q.   OKAY.  DID YOU TAKE ANY MEDICATION WHILE YOU

6    WERE IN TEHACHAPIE?

7         A.   HE DIDN'T GIVE ME ANY MEDICATION BECAUSE I WAS

8    THERE FOR A RECEPTION.

9         Q.   OKAY.

10        A.   AND SO HE JUST SENT ME OVER TO THE OTHER YARD.

11        Q.   DID YOU TAKE ANY MEDICATION WHEN YOU WERE AT

12   CALIPATRIA?

13        A.   NO.

14        Q.   AT ANY TIME PRIOR TO BEING COMMITTED ON THIS

15   OFFENSE, HAD YOU TAKEN ANY PSYCHOTROPIC -- DO YOU KNOW

16   WHAT PSYCHOTROPIC MEANS?

17        A.   YES.

18        Q.   -- PSYCHOTROPIC MEDICATIONS IN THE PENAL SYSTEM?

19        A.   I'VE TAKEN TRAZODONE.

20        Q.   THAT'S TO HELP YOU SLEEP?

21        A.   YEAH, I GOT OFF THE TRAZODONE, IT WASN'T REALLY

22   HELPING ME.

23        Q.   WAS THAT BEFORE THE MURDER CASE?

24        A.   NO, AFTER.

25        Q.   OKAY, THAT'S MY QUESTION.  PRIOR TO BEING

26   COMMITTED TO THE STATE PENAL SYSTEM?

27        A.   OH, NO.

28        Q.   YOU WERE NEVER PRESCRIBED PSYCHOTROPIC

1  MEDICATIONS?

2       A.    NO, I'VE TALKED TO --

3       Q.    SINCE YOU'VE BEEN IN, YOU'VE HAD TRAZODONE AND

4  OTHER MEDICATIONS?

5       A.    YES.

6       Q.    SINCE YOU'VE BEEN IN, THAT MEANS SINCE YOU'VE

7  BEEN IN ON THE MURDER CASE THAT WE'RE TALKING ABOUT?

8       A.    YES.

9       Q.    SO THERE WAS NO MEDICATION HISTORY THAT YOU

10  COULD TALK TO MR. PECKHAM ABOUT?

11      A.    NO.

12      Q.    DID YOU TELL MR. PECKHAM -- I KNOW HE'D BEEN

13  YOUR ATTORNEY ON A POSSESSION CASE, BUT DID YOU INFORM

14  MR. PECKHAM OF YOUR DRUG USE?

15      A.    YES.

16      Q.    AND ABUSE?

17      A.    YES.

18      Q.    IN FACT, WHEN THIS HAPPENED, YOU HAD BEEN KICKED

19  OUT OF MC CALLISTER INSTITUTE, RIGHT?

20      A.    I COMPLETED THE PROGRAM, BUT I WAS IN THE PHASE

21  HOUSE AND I WAS DRINKING AND I TOLD THEM ABOUT IT AND THEY

22  KICKED ME OUT.

23      Q.    SO YOU -- YOU SELF-REPORTED YOURSELF FOR

24  DRINKING, NOT FOR DRUGS, RIGHT?

25      A.    YES.

26      Q.    AND DID YOU INFORM MR. PECKHAM PRIOR TO YOUR

27  TRIAL OR DURING YOUR CASE THAT YOU HAD BEEN HEAVILY USING

28  METHAMPHETAMINE FOR A WHILE?

1        A.   I TOLD HIM I'D BEEN USING, BUT I HADN'T BEEN

2  USING -- I HAD JUST GOTTEN OFF OF USING AT THE TIME THAT

3  HAPPENED, I WAS COMING DOWN.

4        Q.   DID YOU EVER TALK ABOUT HOW METHAMPHETAMINE MADE

5  YOU FEEL?

6        A.   YES.

7        Q.   DID YOU TALK ABOUT THAT TO MR. PECKHAM?

8        A.   YES.

9        Q.   WHAT DID YOU TELL HIM?

10       A.   I TOLD HIM IT MADE ME PARANOID, BUT MOSTLY WHEN

11  I WAS COMING DOWN WHEN I DIDN'T HAVE ANY SLEEP FOR A WHILE

12  THAT'S WHEN I WAS THE WORST.

13       Q.   DID YOU TELL MR. PECKHAM WHETHER YOU HAD BEEN

14  USING DRUGS THE DAY OF THE HOMICIDE?

15       A.   I TOLD HIM I HADN'T BEEN USING DRUGS, NOT THAT

16  DAY, BUT I WAS COMING OFF DRUGS.

17       Q.   OKAY.

18       A.   PRIOR TO.

19       Q.   HOW LONG PRIOR TO THE STABBING OF MR. RABITOR

20  HAD YOU BEEN USING METHAMPHETAMINE?

21       A.   SINCE ABOUT A DAY, A DAY OR TWO.

22       Q.   SO YOU FELT YOU WERE COMING DOWN?

23       A.   I WAS COMING DOWN.

24       Q.   DID YOU TELL MR. PECKHAM THAT?

25       A.   YES.

26       Q.   WHEN DID YOU TELL HIM?

27       A.   I TOLD HIM WHEN WE HAD ONE OF OUR MEETINGS IN

28  GEORGE BAILEY.

1    Q.    IS THIS PRIOR TO PRELIM OR PRIOR TO TRIAL?

2    A.    PRIOR TO THE TRIAL.

3    Q.    HOW LONG PRIOR TO THE TRIAL?

4    A.    PROBABLY A FEW MONTHS.

5    Q.    DID HE INDICATE TO YOU WHETHER THAT WAS

6    SIGNIFICANT OR HE WAS GOING TO DO ANYTHING ABOUT IT?

7    A.    NO.

8    Q.    OKAY.  DID YOU TELL HIM YOU HAD BEEN DRINKING

9    THAT DAY?

10    A.    YES.

11    Q.    OKAY.

12    A.    BECAUSE THEY HAD THE DRINKING ON THE -- WHEN

13    THEY FIRST PICKED ME UP, THE POLICE, I TOLD HIM THAT I WAS

14    DRUNK AND SO IT WAS ON THE FIRST CONDITION.

15    Q.    HAD YOU BEEN DRINKING AT THE TIME THAT YOU

16    STABBED MR. RABITOR TO DEATH?

17    A.    YES.

18    Q.    OKAY.  YOU DON'T DENY THAT YOU KILLED

19    MR. RABITOR, DO YOU?

20    A.    NO.

21    Q.    OKAY.  DID YOU TELL MR. PECKHAM YOU HAD BEEN

22    DRINKING?

23    A.    YES.

24    Q.    WHY DIDN'T YOU TELL THE JURY THAT YOU HAD BEEN

25    DRINKING?

26    A.    I DID TELL THEM THAT I HAD BEEN DRINKING.

27    Q.    YOU TOLD THE JURY THAT?

28    A.    YEAH.

1    Q.   OKAY.   AND DID MR. PECKHAM EVER TELL YOU NOT TO

2   TELL ANYBODY THAT YOU HAD BEEN DRINKING?

3    A.   HE SAID DON'T TELL THEM THAT YOU'RE DRUNK.

4    Q.   OKAY.   WERE YOU DRUNK?

5    A.   I WAS DRUNK, BECAUSE I'M PRETTY MUCH

6   HYPERSENSITIVE TO ALCOHOL.

7    Q.   BUT YOU TOLD THEM -- YOU'D JUST TOLD THEM YOU

8   WERE DRINKING, BUT YOU WEREN'T DRUNK, RIGHT?

9    A.   YES.

10    Q.   DID AN INDIVIDUAL COME IN AND SAY THAT YOU WERE

11   DRUNK?

12    A.   YES.

13    Q.   WHO WAS THAT, JOSH?

14    A.   I THINK SO.

15    Q.   JOSHUA ROBBINS WAS CALLED IN REBUTTAL BY THE

16   PEOPLE?

17    A.   YES.

18    Q.   OKAY.   NOW DID YOU EVER HAVE A CONVERSATION WITH

19   MR. PECKHAM ABOUT HOW ALCOHOL AFFECTED YOU?

20    A.   I THINK I TOLD HIM THAT I SHOULDN'T BE DRINKING

21   BECAUSE I'M REAL HYPERSENSITIVE TO DRINKING AND NOTHING

22   THAT -- NOTHING EVER POSITIVE HAS EVER COME OUT OF IT FOR

23   ME.

24    Q.   BUT DID YOU EVER -- DID YOU TELL HIM THAT?

25    A.   YEAH, I TOLD HIM I'VE LOST A LOT BECAUSE OF THE

26   DRINKING.

27    Q.   DID YOU -- BESIDES THE GENERAL REMORSE OVER

28   GOING TO PRISON BECAUSE YOU WERE DRINKING AND USING DRUGS,

1    DID YOU EVER TELL HIM HOW ALCOHOL AFFECTED YOU AS PER YOUR

2    PERCEPTION OF THE DANGERS AROUND YOU?

3         A.    YES.

4         Q.    WHAT DID YOU TELL HIM?

5         A.    I'D BLACK OUT, DON'T KNOW WHAT HAPPENED A LOT OF

6    TIMES.  AND I'M REAL SENSITIVE TO WHAT'S AROUND ME.

7         Q.    MORE SENSITIVE THAN YOU ARE NORMALLY?

8         A.    YES.

9         Q.    DID YOU TELL MR. PECKHAM THAT?

10        A.    YES.

11        Q.    WHEN DID YOU TELL HIM?

12        A.    I TOLD HIM RIGHT BEFORE THE TRIAL.

13        Q.    RIGHT BEFORE THE TRIAL?

14        A.    YEAH, ABOUT A MONTH BEFORE.

15        Q.    OKAY.  NOW THE TRIAL HAPPENED ABOUT NINE -- 11

16   MONTHS AFTER THE MURDER, RIGHT?

17        A.    YES, BECAUSE HE TOOK ME ON A VIOLATION AND THEY

18   REFILED.

19        Q.    WHEN DID THEY REFILE?

20        A.    THEY REFILED IN SEPTEMBER AND I WENT TO PRELIM

21   IN DECEMBER AND WE WERE DONE BY MAY.

22        Q.    OKAY, WHEN WAS MR. PECKHAM APPOINTED TO

23   REPRESENT YOU, IF YOU RECALL?

24        A.    IT WAS LIKE OCTOBER OR NOVEMBER.

25        Q.    OKAY.  SO YOU MET MR. PECKHAM ABOUT A COUPLE

26   MONTHS BEFORE YOUR PRELIM, RIGHT?

27        A.    YES.

28        Q.    BUT IT TOOK YOU UNTIL THE TRIAL DOOR BEFORE YOU

1    TOLD HIM ABOUT THE ALCOHOL?

2        A.    ABOUT A MONTH BEFORE.

3        Q.    OKAY.

4        A.    MONTH-AND-A-HALF.

5        Q.    OKAY.  DID MR. PECKHAM INDICATE AT ANY TIME TO

6    YOU AFTER YOU TOLD HIM THAT, THAT YOU THOUGHT THAT THAT

7    MIGHT BE SIGNIFICANT?

8        A.    HE SAID THAT IT WOULDN'T HELP.

9        Q.    OKAY.  DID HE SAY WHY?

10        A.    HE JUST SAID THAT IT WOULDN'T BE -- IT WOULDN'T

11    BE GOOD TO GO UP THERE BECAUSE YOU DISCREDIT YOURSELF BY

12    SAYING YOU'RE ALL DRUNK AND MESSED UP.

13        Q.    DID YOU EVER TELL MR. PECKHAM THAT YOU HAD

14    P.T.S.D.?

15        A.    I TOLD HIM I THOUGHT I HAD POSTTRAUMATIC STRESS

16    DISORDER BECAUSE I'D BEEN THROUGH A LOT.  AND HE TOLD ME

17    THAT HE HAD A FATHER THAT WAS IN THE WAR AND HE HAD THE

18    SAME KIND OF PROBLEMS THAT I -- LOOKED LIKE I HAD, AND HE

19    NEVER WENT AND GOT IT TAKEN CARE OF AND HE DIED A SAD MAN

20    OR SOMETHING LIKE THAT.

21        Q.    SO HE TOLD YOU THAT HE WAS AWARE OF

22    POSTTRAUMATIC STRESS DISORDER?

23        A.    YES.

24        Q.    AND HIS FATHER HAD HAD IT -- HE'D BEEN IN THE

25    WAR?

26        A.    HE SAID HE THOUGHT HIS FATHER MIGHT HAVE HAD

27    SOMETHING SIMILAR TO THAT.

28        Q.    DID HE EVER INDICATE WHICH WAR THAT WAS?

1    A.   NO.

2    Q.   WHAT WAS -- GUESSING FROM MR. PECKHAM'S AND MY

3  AGE, IT WAS EITHER WORLD WAR II OR KOREA, CORRECT; IS THAT

4  WHAT YOU THOUGHT?

5    A.   THAT'S WHAT I THOUGHT.

6         THE COURT:  DON'T LEAD THE WITNESS,

7  MR. WILLIAMS.

8         MR. WILLIAMS:  I'M SORRY.  THANK YOU, YOUR

9  HONOR.

10  BY MR. WILLIAMS:

11    Q.   SO HE TOLD YOU HE WAS AWARE.  DID HE EVER HAVE

12  YOU EVALUATED?

13    A.   NO.

14    Q.   DID YOU REQUEST TO BE EVALUATED?

15    A.   I ASKED HIM IF WE COULD GET A DOCTOR AND HE

16  SAID, NO, WE DIDN'T NEED ONE.

17    Q.   AND WHEN WAS THIS, MR. LITTLE?

18    A.   THIS WAS LIKE THREE MONTHS BEFORE THE TRIAL.

19    Q.   DID YOU EVER MEET MR. PECKHAM'S INVESTIGATOR?

20    A.   ALLAN COTTON(PH)?

21    Q.   YES, SIR.

22    A.   YES.

23    Q.   AND DID YOU TELL MR. COTTON ANY OF THIS?

24    A.   NO, I TOLD PECKHAM -- I TOLD MR. COTTON ABOUT

25  THE PEOPLE THAT HE CAN FIND.

26    Q.   OKAY.  SO THE WITNESSES THAT HE COULD FIND?

27    A.   YES.

28    Q.   ALL RIGHT, SO LET'S GET TO THE DAY THAT YOU

1    KILLED MR. RABITOR, CORRECT?

2        A.    YES.

3        Q.    HAD YOU -- YOU SAID YOU WERE DRUNK THAT DAY?

4        A.    YEAH, I WAS DRINKING THAT DAY.

5        Q.    WELL, WERE YOU DRINKING OR WERE YOU DRUNK?

6        A.    I WAS DRUNK BY THE END OF THE DAY.

7        Q.    WERE YOU -- DID YOU KILL HIM AT THE END OF THE

8    DAY OR DURING THE MIDDLE OF THE DAY?

9        A.    IT WAS THE END OF THE DAY.

10       Q.    SO YOU WERE DRUNK BY THE TIME YOU KILLED HIM?

11       A.    YES.

12       Q.    DO YOU RECALL HOW YOU KILLED HIM?  YES OR NO.

13       A.    YES.

14       Q.    WHAT DID YOU KILL HIM WITH?

15       A.    I KILLED HIM WITH A STEAK KNIFE.

16       Q.    WHERE WAS THE STEAK KNIFE?

17       A.    IT WAS LAYING ON THE CORNER COFFEE TABLE NEXT TO

18   THE COUCH.

19       Q.    DO YOU RECALL HOW YOU STABBED HIM?

20       A.    I JUST PICKED IT UP AND I THREW TWO JABS AT HIM.

21       Q.    WAS THIS AN UPWARD MOVEMENT OR DOWNWARD

22   MOVEMENT?

23       A.    IT WAS JUST STRAIGHT OUT.  (INDICATING.)  TWO

24   JABS STRAIGHT OUT.

25       Q.    WAS HE STANDING UP?

26       A.    HE WAS STANDING UP, COMING AT ME.

27       Q.    WHEN YOU SAY COMING AT YOU, WHAT DO YOU MEAN BY

28   THAT?

1    A.    HE GOT UP -- WHEN I CAME OUT -- WHEN I CAME OUT,

2    HE GOT UP IN FRONT OF ME AND SAID YOU'RE NOT GOING

3    ANYWHERE.    AND AS SOON AS HE DID THAT, I WAS NEXT TO THE

4    COFFEE TABLE WHERE I PUT MY STUFF DOWN, BECAUSE I WAS

5    GOING TO GO GET MY GLASSES.    AND HE CAME AT ME WITH

6    SOMETHING AND IT WAS LIKE THAT FAST, SO I GRABBED THE

7    KNIFE AND I JUST THREW TWO JABS AT HIM.

8    Q.    WHY?

9    A.    BECAUSE I THOUGHT HE WAS GOING TO HURT ME.

10    Q.    DO YOU KNOW WHAT HE HAD?

11    A.    HE -- HE HAD SOMETHING LIKE EITHER A GLASS

12    OBJECT OR MAYBE A KNIFE, BECAUSE HE'D ALWAYS BEEN CHASING

13    HIS MOM AROUND WITH KNIVES AND THROWING STUFF AT PEOPLE.

14    AND SHE ALWAYS HAD BEEN CHASING HIM AROUND AND THROWING

15    STUFF AT HER AND IT WAS A REGULAR OCCURRENCE AROUND THERE.

16    Q.    OKAY, NOW THIS PLACE WAS SORT OF A DRUG HOUSE,

17    RIGHT?

18    A.    YEAH, PEOPLE WERE COMING AND GOING ALL NIGHT

19    LONG.

20    Q.    AND AS YOU DESCRIBED, IT WAS SORT OF HECTIC IN

21    THERE?

22    A.    IT WAS OUT OF -- OUT OF CONTROL.

23    Q.    SO YOU FELT HE WAS COMING AT YOU WITH A KNIFE?

24    A.    YES.

25    Q.    WAS HE IN FRONT OF YOU?

26    A.    YEAH, HE WAS CUTTING RIGHT IN FRONT OF ME.    I'D

27    JUST COME OUT OF THE HALLWAY TO WHERE THE COFFEE TABLE IS,

28    RIGHT ABOUT HERE; AND RIGHT WHEN I WAS COMING, I PUT DOWN

1    MY STUFF TO GO GET MY GLASSES OFF THIS TABLE OVER HERE.

2    (INDICATING.)  AND BEFORE I COULD GET MY GLASSES OFF THE

3    TABLE, BECAUSE I WAS LEAVING, HE JUMPED UP OFF THE TABLE

4    AND CAME RIGHT HERE IN FRONT OF ME WITH SOMETHING IN HIS

5    HAND.  AND THAT'S WHEN I GRABBED WHAT WAS SITTING ON THE

6    COFFEE TABLE AND TOOK TWO JABS AT HIM.

7         Q.   OKAY.  HAD HE -- HAD YOU AND MR. RABITOR HAD AN

8    ARGUMENT THAT DAY?

9         A.   OH, YEAH.

10        Q.   WHAT WERE YOU ARGUING ABOUT?

11        A.   HEAVY ARGUMENT.  BECAUSE I BROKE HIS CRYSTAL

12   PIPE AND HE GOT ALL MAD AND HIS MOM GOT MAD.  AND HIS MOM

13   JUMPED IN MY FACE AND SAID THAT SHE WOULD CUT ME -- SHE

14   SLAPPED ME IN THE FACE AND SAID SHE WOULD HURT ME BECAUSE

15   I BROKE THE PIPE AND THEY WANTED TO SMOKE SOME CRYSTAL IN

16   IT.

17        Q.   OKAY, DID YOU TELL MR. PECKHAM ALL OF THIS?

18        A.   YEAH.

19        Q.   OKAY.  WHY DIDN'T YOU LEAVE?

20        A.   I WAS TRYING TO LEAVE, BUT HE JUMPED IN FRONT OF

21   ME, BUT AT FIRST I DIDN'T WANT TO LEAVE AT FIRST BECAUSE I

22   JUST KICKED OUT A COUPLE GUYS, ONE OF THEM WAS JOSH

23   ROBERTS AND HIS FRIEND CORN, AND I KICKED THEM OUT.  AND I

24   THOUGHT MAYBE THEY WERE MAD AT ME AND THEY WERE OUT THERE

25   WAITING FOR ME, SO I DIDN'T WANT TO LEAVE RIGHT AWAY.  SO

26   I WENT BACK AND SAT ON THE COUCH AND THAT'S WHEN THE OTHER

27   GUY CALLED THE MEXICAN GANG AND SAID THEY'RE GOING TO COME

28   OVER AND JUMP YOU AND BEAT YOU UP?

1              AND AT FIRST I THOUGHT HE WAS BLUFFING.

2   AND A COUPLE MINUTES LATER I GOT PARANOID AND I STARTED

3   FREAKING OUT AND I SAID, WOW, I BETTER GET OUT OF HERE.

4   THIS GUY IS SERIOUS THIS TIME, BECAUSE HE BLUFFED BEFORE

5   WITH OTHER PEOPLE.  AND BY THEN, HIS MOM SAID, WELL,

6   THEY'RE COMING HERE.  THERE'S NOTHING YOU CAN DO NOW, AND

7   I'M GONNA GO OUTSIDE AND WAIT FOR THEM, SO YOU'RE THROUGH.

8   YOU HAD YOUR CHANCE TO LEAVE, NOW YOU'RE GOING TO GET BEAT

9   UP.  AND SO I GOT UP FROM THE COUCH AND I WENT TO GO GET

10  MY STUFF, AND THAT'S WHEN I CAME OUT AND HE JUMPED UP AND

11  SAID "YOU'RE NOT GOING NOWHERE", AND THAT'S WHEN IT

12  HAPPENED.

13       Q.   DID YOU MEAN TO KILL HIM?

14       A.   NO, I DIDN'T MEAN TO KILL HIM.  I DIDN'T EVEN

15  KNOW HE DIED.  I WAS WALKING DOWN THE STREET AND I GOT

16  PICKED UP AND I HAD NO IDEA THAT HE DIED.

17       Q.   OKAY, BUT WHEN YOU WERE WALKING DOWN THE STREET

18  AND GOT PICKED UP, YOU SHAVED YOUR MUSTACHE OFF, RIGHT?

19       A.   YES.

20       Q.   WHY?  WHY?

21       A.   BECAUSE I WAS LOOKING FOR A JOB.

22       Q.   WERE YOU LIVING AT THIS HOUSE?

23       A.   YEAH, I WAS LIVING THERE.

24       Q.   DID YOU GET -- BECAUSE YOU'D BEEN KICKED OUT OF

25  MC CALLISTER, RIGHT?

26       A.   YES.

27       Q.   WHERE WAS YOUR DAD LIVING AT THIS DAY, DO YOU

28  KNOW?

1  A. HE WAS LIVING IN CALIFORNIA CITY.

2  Q. DID YOU HAVE ANY OTHER PLACE TO STAY?

3  A. NO.

4  Q. NOW YOU SAID YOU JUST JABBED HIM A COUPLE TIMES.

5 DO YOU HAVE ANY IDEA WHERE YOU HIT HIM?

6  A. I HAD NO IDEA WHERE I HIT HIM UNTIL I FOUND OUT

7 LATER.

8  Q. WELL, YOU REALIZED THAT THE KNIFE WENT TO THE

9 HEART -- RIGHT, I MEAN --

10  A. THAT'S WHAT I FOUND OUT LATER.

11  Q. IT WENT ALL THE WAY IN.

12    WERE YOU GUYS GOING TOWARDS EACH OTHER?

13  A. HE WAS COMING AT ME.

14  Q. WHAT WERE YOU DOING?

15  A. AND I PICKED UP THE THING AND I PUT IT OUT AND

16 JABBED TWICE.

17  Q. AT THE TIME OF THE STABBING, HE WAS COMING

18 TOWARDS YOU AND YOU WERE OBVIOUSLY GOING TOWARDS HIM WITH

19 A KNIFE?

20  A. YEAH.

21  Q. YOU TOLD MR. PECKHAM ALL THIS, IT WENT IN ALL

22 THE WAY?

23  A. YES.

24  Q. NOW, DID MR. PECKHAM EVER TALK TO YOU ABOUT A

25 PLEA BARGAIN?

26  A. YES.

27  Q. WHEN WAS -- WHEN WAS THAT?

28  A. IT WAS LIKE JUST BEFORE WE WERE SETTING THE

1  TRIAL DATE, PROBABLY ABOUT A MONTH, THREE WEEKS TO A MONTH

2  EARLIER.

3     Q.   WHERE WAS THAT?

4     A.   IT WAS AT GEORGE BAILEY.

5     Q.   WHAT DID HE TELL YOU?

6     A.   OKAY, HE CAME IN THERE AND WE SAT AT THE LITTLE

7  TABLE IN THERE AND HE PULLED OUT A BUNCH OF STUFF AND

8  HAD -- THE MEETING BEFORE THAT HE SAID THAT HE WAS -- HE

9  WAS GOING -- HE COULD GET SOME WITNESSES.  AND I SAID,

10  WELL, YOU SHOULD GET THOSE WITNESSES.  THEN HE TOLD ME HE

11  WAS GOING TO DO IT.  AND AT THE MEETING AFTER THAT, HE

12  TOLD ME THE TRIAL DATE IS GOING TO BE SOON BECAUSE WE SET

13  IT, AND HE COULDN'T GET AN EXTENSION BECAUSE MARNIE STEIN

14  WAS -- SHE WAS PREGNANT AND SHE WAS GOING TO LEAVE ON HER

15  VACATION, SO HE DIDN'T TAKE AN EXTENSION.

16          AND I WAS THINKING GOING PRO PER BECAUSE I

17  WANTED TO EXTEND IT BECAUSE I WANTED MORE TIME TOO.  AND I

18  ASKED HIM AND HE SAID, NO, THAT WOULDN'T BE A GOOD IDEA TO

19  DO THAT.  AND SO I SAID, ALL RIGHT.  AND WE WERE SITTING

20  THERE AND HE CAME IN ONE DAY ALL OF A SUDDEN AND HE SAID,

21  WELL, WE'RE GETTING REALLY CLOSE TO TRIAL NOW.  AND HE

22  SAID, YOU SHOULD TAKE THIS PLEA BARGAIN BECAUSE IF YOU

23  DON'T TAKE THIS PLEA BARGAIN, YOU'RE PROBABLY GOING TO GET

24  FIRST DEGREE MURDER.  AND THEN I GOT REAL SCARED AND I

25  STARTED TRIPPING OUT BECAUSE I DIDN'T KNOW NOTHING ABOUT

26  THE LAW OR ANYTHING.

27          AND THEN -- AND I WAS SERIOUSLY THINKING

28  ABOUT TAKING IT, BECAUSE I WAS SO SCARED AND HE PUT A

1    BUNCH OF PAPERS OUT THERE AND HE SAID -- AND HE SAID THIS

2    IS HOW MUCH THEY HAVE, THEY HAVE THIS MUCH.   (INDICATING.)

3         Q.   OKAY, DID YOU SHOW THE COURT -- HOLD YOUR HANDS

4    UP SO -- CAN YOU HOLD THE OTHER HAND UP?

5         A.   FROM THE TABLE I GOT --

6         Q.   GO AHEAD, SHOW US HOW HIGH.

7         A.   HE SAID THIS IS HOW MUCH THEY HAVE.

8         Q.   ABOUT AN 18-INCH STACK?  I CAN'T TELL.

9         A.   AND HE LOOKED AT ME AND HE PUT DOWN A FEW PIECES

10   OF PAPER, LIKE THAT MUCH, (INDICATING), AND HE PUT THEM

11   DOWN AND HE SAID THIS IS HOW MUCH WE HAVE.  HE SAID WE

12   DON'T REALLY HAVE A CHANCE, SO IF YOU TAKE THE PLEA

13   BARGAIN, YOU'LL BE BETTER OFF.  OTHERWISE, YOU MIGHT GET

14   FIRST DEGREE BECAUSE I DON'T SEE US GETTING ANYTHING

15   BETTER THAN A FIRST DEGREE OUT OF THIS.

16        Q.   HE SAID NOTHING BETTER THAN A FIRST?

17        A.   THAT'S WHAT HE SAID.

18        Q.   YOU SURE HE DIDN'T SAY NOTHING BETTER THAN A

19   SECOND?

20        A.   HE SAID WE COULD GET A SECOND IF WE WERE LUCKY.

21        Q.   AND SO HE WAS URGING YOU TO ACCEPT 15 TO LIFE

22   VERSES 25 TO LIFE?

23        A.   YES, YES.

24        Q.   AND YOU DID NOT TAKE THAT OFFER?

25        A.   I WAS THINKING ABOUT TAKING IT, AND I WAS GOING

26   TO TAKE IT AND I WAS JUST REALLY EMOTIONAL FOR WEEKS

27   THINKING ABOUT WHAT I WAS GOING TO DO FOR A COUPLE OF

28   WEEKS, BECAUSE I HAD A COUPLE OF WEEKS UNTIL THE TRIAL AND

1    I TOLD HIM I WASN'T GOING TO TAKE IT.

2        Q.   OKAY.  NOW, YOU SAID SOMETHING ABOUT AN

3    EXTENSION.  DO YOU MEAN A CONTINUANCE?

4        A.   YEAH, I WANTED TO GET A CONTINUANCE.

5        Q.   DID YOU TELL HIM THAT?

6        A.   YES.

7        Q.   AND HE TOLD YOU THAT HE COULDN'T BECAUSE MARNIE

8    WAS GOING -- MS. STEIN?

9        A.   YEAH.

10        Q.   WAS GOING ON MATERNITY LEAVE?

11        A.   YEAH.

12        Q.   TO YOUR KNOWLEDGE, DID HE EVER ASK -- WERE YOU

13    IN COURT?

14        A.   I WAS IN COURT AND SHE SAID SHE NEEDED MATERNITY

15    LEAVE AND SHE WANTED TO WRAP THIS UP AND HE AGREED TO IT.

16            THE COURT:  THAT'S -- LET ME -- I NEED TO TALK

17    TO BOTH OF YOU.

18            (SIDEBAR CONFERENCE NOT REPORTED.)

19    BY MR. WILLIAMS:

20        Q.   MR. LITTLE, I'M SORRY, BUT I'M GOING TO DIGRESS

21    HERE FOR A SECOND.

22            WHEN YOU AND I FIRST MET OR -- FIRST MET BY

23    COMMUNICATING BY WRITING, RIGHT?

24        A.   YES.

25        Q.   I INFORMED YOU THAT I WAS A RETIRED DEPUTY

26    DISTRICT ATTORNEY, CORRECT?

27        A.   YES.

28        Q.   AND I ALSO -- AND YOU SAID THAT WAS OKAY FOR ME

1    TO BE A RETIRED D.A.; YOU'D WAIVE ANY CONFLICT?

2        A.    YES.

3        Q.    I ALSO TOLD YOU THAT I KNEW MARNIE STEIN?

4        A.    YES.

5        Q.    AND YOU AGREED TO WAIVE ANY CONFLICT THERE?

6        A.    YES.

7        Q.    THAT I ACTUALLY LIKED MARNIE STEIN?

8        A.    YES.

9        Q.    OKAY.  I ALSO TOLD YOU THAT I LIKED ED PECKHAM,

10   RIGHT?

11       A.    YES.

12       Q.    OKAY, AND THAT YOU WAIVED ANY CONFLICT THERE

13   ALSO?

14       A.    YES.

15       Q.    DO YOU STILL FEEL THAT WAY?  IS IT OKAY IF I

16   CONTINUE TO REPRESENT YOU?  BECAUSE I WANT TO MAKE SURE.

17       A.    YES.

18            MR. WILLIAMS:  OKAY, IS THE COURT SATISFIED?

19            THE COURT:  I'M SATISFIED.

20            MR. WILLIAMS:  OKAY, THANK YOU.

21   BY MR. WILLIAMS:

22       Q.    NOW, MADAM COURT REPORTER, WHAT WAS THE LAST

23   QUESTION THAT I ASKED?  I HATE TO BOTHER YOU.

24            THE COURT:  IT WAS A DISCUSSION OF PLEA BARGAIN

25   ARRANGEMENTS.  AND MR. PECKHAM SAID HE WOULD BE LUCKY IF

26   HE GOT A SECOND.

27            MR. WILLIAMS:  THANKS.

28

BY MR. WILLIAMS:

Q.   AND SO YOU DECIDED THAT YOU DID NOT WANT TO DO

LIFE IN PRISON, SO YOU REJECTED THE PLEA BARGAIN; IS THAT

RIGHT?

A.   YES.

Q.   DID YOU REQUEST ANY OTHER TYPE OF ARRANGEMENT?

A.   I SAID I WOULD TAKE UP TO 25 YEARS WITHOUT THE

"L"; 20 YEARS.  I WAS SCARED.

Q.   OKAY.  AND YOU NEVER WERE ABLE TO GET THAT?

A.   HE SAID HE WENT AND ASKED MARNIE STEIN FOR IT

AND HE SAID SHE WASN'T -- SHE WOULDN'T DO IT.

MR. WILLIAMS:  OKAY.  THANK YOU.  I HAVE NOTHING

FURTHER.

THANK YOU, MR. LITTLE.

THE COURT:  MS. MALLEN.


### CROSS-EXAMINATION

BY MS. MALLEN:

Q.   YOU'VE MENTIONED THAT YOU REMEMBER YOUR

ATTORNEY, MR. PECKHAM.  AND HOW MANY TIMES DID YOU MEET

WITH HIM IN PERSON APPROXIMATELY FROM THE TIME HE WAS

APPOINTED UNTIL THE TRIAL DATE?

A.   PROBABLY ABOUT -- IS THAT INCLUDING IN THE

COURTROOM?

Q.   ALL RIGHT, YES.

A.   OKAY, PROBABLY ABOUT 12 TIMES.

Q.   DID MR. PECKHAM COME TO THE JAIL WHERE YOU WERE

BEING HELD AND TALK TO YOU?

1    A.   YES.

2    Q.   DID HE ALSO TALK TO YOU IN THE COURTROOM?

3    A.   YES.

4    Q.   DID HE MEET WITH YOU ANY PLACE ELSE THAT YOU

5 RECALL?

6    A.   NO.

7    Q.   DID HE TALK TO YOU BY PHONE IN ADDITION TO THOSE

8 TIMES IN PERSON?

9    A.   A COUPLE TIMES.

10    Q.   DID YOU CALL HIM?

11    A.   I THINK SO, YES.

12    Q.   AND DID HE THEN CALL YOU, RETURN CALLS?

13    A.   I DON'T THINK HE RETURNED ANY CALLS, HE JUST

14 CAME TO VISIT.

15    Q.   ALL RIGHT.  WERE THERE EVER ANY TIMES WHEN YOU

16 TRIED TO GET TO CONTACT HIM AND YOU WEREN'T ABLE TO?

17    A.   I PROBABLY CALLED HIS OFFICE AND HE PROBABLY

18 WASN'T THERE.

19    Q.   DO YOU REMEMBER THAT SPECIFICALLY?

20    A.   NO, NOT SPECIFICALLY.

21    Q.   WERE THERE TIMES WHEN YOU TRIED TO TALK TO HIM

22 AND HE WOULD REFUSE TO TALK TO YOU?

23    A.   NO.

24    Q.   WAS HE ALWAYS WILLING TO MEET WITH YOU OR TO

25 RETURN OR COMMUNICATE WITH YOU?

26    A.   SOMETIMES I COULDN'T GET A HOLD OF HIM.

27    Q.   HOW LONG DID THAT LAST?

28    A.   PROBABLY ABOUT A FEW WEEKS, A MONTH.

1      Q.   SO FOR A MONTH AT A TIME YOU WOULD -- HOW WOULD

2  YOU TRY TO CONTACT HIM?

3      A.   I WOULD TRY TO GET A HOLD OF HIM ON THE PHONE.

4      Q.   AND WHAT WOULD BE THE RESULT OF THAT?

5      A.   HE'D END UP COMING TO VISIT ME.

6      Q.   ALL RIGHT.  AND WHEN DID THIS HAPPEN, THAT HE

7  TRIED TO CALL -- THAT YOU TRIED TO CALL HIM BY PHONE?

8      A.   PROBABLY ALL DURING THE COURSE I WAS TRYING TO

9  CALL HIM.

10      Q.   DO YOU REMEMBER THAT SPECIFICALLY?

11      A.   I DON'T REMEMBER EXACTLY WHAT DAY.

12      Q.   WAS IT BEFORE THE TRIAL OR BEFORE THE

13  PRELIMINARY EXAMINATION OR WHEN?

14      A.   IT WAS ALL DURING, BEFORE, IN BETWEEN, THE WHOLE

15  TIME.  BECAUSE WHEN YOU'RE -- WHEN YOU'RE -- WHEN YOU HAVE

16  A LAWYER, YOU'RE ALWAYS TRYING TO GET A HOLD OF THEM.

17      Q.   DID YOU TALK TO MR. PECKHAM ABOUT -- DID YOU --

18  FIRST OF ALL, DID YOU FEEL THAT YOU WERE HAVING DIFFICULTY

19  THEN IN COMMUNICATING WITH HIM?

20      A.   NO, NOT REALLY.

21      Q.   DID YOU EVER TELL HIM THAT YOU NEEDED TO TALK TO

22  HIM MORE OFTEN THAN YOU WERE?

23      A.   NO.

24      Q.   DID MR. PECKHAM ANSWER -- ASK YOU QUESTIONS

25  ABOUT THINGS?

26      A.   YES.

27      Q.   DID YOU ANSWER THOSE QUESTIONS?

28      A.   YES.

1    Q.    WERE YOU TRUTHFUL WITH HIM?

2    A.    YES.

3    Q.    DID YOU EVER LIE TO HIM ABOUT ANYTHING?

4    A.    NO.

5    Q.    DID YOU TELL HIM THE ANSWERS TO WHAT HE WAS

6  ASKING YOU, TO THE BEST THAT YOU COULD?

7    A.    TO THE BEST THAT I COULD.

8    Q.    DID YOU -- DO YOU REMEMBER TELLING HIM ABOUT THE

9  APARTMENT BEING, BASICALLY WHAT I'LL CALL A DRUG HOUSE?

10    A.    YES.

11    Q.    AND HE KNEW THAT, DIDN'T HE?

12    A.    YES.

13    Q.    AND DID YOU TALK TO HIM ABOUT THE PEOPLE THAT

14  WERE THERE?

15    A.    YES.

16    Q.    DID YOU SPECIFICALLY DESCRIBE WHO WAS THERE

17  AND --

18    A.    YES.

19    Q.    AND WHAT THEY WERE DOING?

20    A.    YES.

21    Q.    DID YOU TALK TO HIM ABOUT THE LOSS OF YOUR EYE?

22    A.    YES.

23    Q.    DID YOU GIVE HIM ALL THE DETAILS?

24    A.    YES.

25    Q.    NOW DID YOU TALK TO MR. PECKHAM ABOUT MEDICAL

26  TREATMENT THAT YOU GOT?  FIRST OF ALL, WE'RE TALKING ABOUT

27  MEDICAL TREATMENT FOR YOUR EYE?

28    A.    YES, I DID.

1      Q.    DID YOU TALK TO HIM ABOUT PSYCHOLOGICAL

2  PROBLEMS?

3      A.    YES.

4      Q.    YOU TOLD HIM THAT YOU HADN'T HAD ANY

5  PSYCHOLOGICAL COUNSELING FOR IT, RIGHT?

6      A.    YES, BUT I THOUGHT THAT I NEEDED IT.

7      Q.    YOU TOLD HIM THAT YOU THOUGHT THAT YOU NEEDED

8  PSYCHOLOGICAL COUNSELING?

9      A.    YES.

10      Q.    AND WHAT DID HE SAY TO THAT?

11      A.    HE SAID -- HE SAID THAT I DIDN'T NEED IT, THAT

12  WE DIDN'T NEED THAT.

13      Q.    SO HE TOLD YOU THAT YOU DIDN'T NEED

14  PSYCHOLOGICAL COUNSELING?

15      A.    YES.

16      Q.    NOW UP TO THIS POINT, AND THIS IS IN 19 -- THIS

17  IS IN 1999, RIGHT, THAT YOU'RE TALKING TO MR. PECKHAM?

18      A.    YES.

19      Q.    HAD YOU HAD ANY PSYCHOLOGICAL COUNSELING AT ALL

20  IN RELATION TO THAT EYE STABBING?

21      A.    I DID AT TEHACHAPIE.

22      Q.    WHAT DID YOU HAVE DONE THERE?

23      A.    I JUST HAD THEM TALK TO ME ABOUT MY EYE AND HOW

24  IT BOTHERED ME BEING AROUND OTHER PEOPLE AND THEY MOVED ME

25  TO ANOTHER PLACE.  AND THEN I WENT TO THE SOCIAL SECURITY

26  OFFICE AND TALKED TO THEM.

27      Q.    WELL, LET ME STOP YOU FOR A MINUTE.  NOW IS IT

28  TEHACHAPIE?

1       A.   YES.

2       Q.   OKAY, AT TEHACHAPIE, WHAT YOU'RE TALKING ABOUT

3  IS WHEN YOU WERE IN RECEPTION?

4       A.   RECEPTION.

5       Q.   AND YOU WERE BEING HELD PENDING YOUR PLACEMENT,

6  RIGHT?

7       A.   YES.

8       Q.   YOU DIDN'T LIKE WHERE YOU WERE BEING HELD,

9  RIGHT?

10      A.   I WAS BEING HELD ON LEVEL 4 YARD.

11      Q.   OKAY.

12      A.   AND THERE WAS A GYM THERE AND IT WAS

13 OVERCROWDED.

14      Q.   AND YOU WANTED TO MOVE SOMEPLACE LESS CROWDED,

15 RIGHT?

16      A.   WHERE I COULD BE IN A CELL, SO I DON'T HAVE A

17 BUNCH OF PEOPLE AROUND ME.

18      Q.   SO WHEN YOU --

19      A.   BECAUSE IT BOTHERED ME.

20      Q.   ALL RIGHT.  AND YOU TALKED TO A GUARD, RIGHT?

21      A.   NO.

22      Q.   ABOUT BEING PLACED SOME PLACE ELSE?

23      A.   I TALKED TO A DOCTOR.

24      Q.   WHAT KIND OF DOCTOR?

25      A.   I PUT IN FOR THE PSYCHOLOGICAL DOCTOR.

26      Q.   AND DID YOU -- HOW LONG WERE YOU HELD IN

27 RECEPTION?

28      A.   PROBABLY ABOUT THREE MONTHS.

92

1          Q.    OKAY, AND DURING THAT THREE MONTH PERIOD, WHEN

2    YOU CONTACTED THE DOCTOR, YOU ASKED TO BE MOVED TO ANOTHER

3    CELL, RIGHT?

4          A.    ANOTHER YARD.

5          Q.    OKAY.  AND DID THE DOCTOR AGREE TO DO THAT OR

6    REQUEST THAT FOR YOU?

7          A.    HE AGREED TO DO IT, YES.

8          Q.    AND THEN YOU WERE MOVED, RIGHT?

9          A.    I WAS MOVED.

10         Q.    DID YOU SEE THAT DOCTOR AGAIN?

11         A.    NO, I SEEN A DIFFERENT DOCTOR.

12         Q.    WHAT DOCTOR DID YOU SEE?

13         A.    I DON'T KNOW, I DON'T REMEMBER HIS NAME BECAUSE

14   IT WAS A LONG TIME AGO.

15         Q.    AND THIS IS AT TEHACHAPIE YOU SAW A SECOND

16   DOCTOR?

17         A.    YES.

18         Q.    WHAT DID YOU SEE THIS DOCTOR FOR?

19         A.    PSYCH PROBLEMS.

20         Q.    HOW LONG DID YOU SEE HIM FOR?

21         A.    I SEEN HIM FOR ABOUT HALF HOUR.

22         Q.    AND YOU SAW HIM A HALF AN HOUR ONE TIME?

23         A.    YES.

24         Q.    AND WHAT DID YOU TALK ABOUT?

25         A.    TALKED ABOUT MY EYE AND HOW IT AFFECTED ME AND

26   IT AFFECTED PEOPLE BEING AROUND ME.

27         Q.    AND HOW DID IT AFFECT YOU?

28         A.    MADE ME PANIC, HAD NIGHTMARES SOMETIMES ABOUT

1    BAD DREAMS SINCE IT HAPPENED, JUST PEOPLE WOULD GET

2    VIOLENT.  I WOULD --

3        Q.    ARE YOU LOOKING AT SOMETHING IN FRONT OF YOU?

4        A.    YES.

5        Q.    WHAT ARE YOU LOOKING AT?

6        A.    I WAS LOOKING AT THE WATER.

7        Q.    YOU DON'T HAVE ANY PAPERS UP THERE WITH YOU?

8        A.    YES, I HAVE PAPERS UP HERE TOO.

9        Q.    WHAT KIND OF PAPERS DO YOU HAVE?

10       A.    LAW PAPERS.

11            MS. MALLEN:  CAN I APPROACH OR HAVE A GUARD HAND

12   THEM TO ME, PLEASE?

13            THE COURT:  ACTUALLY, DID YOU READ THROUGH ALL

14   THOSE PAPERS BEFORE YOU GOT ON THE STAND TO TESTIFY?

15            THE WITNESS:  WHO, ME?

16            THE COURT:  YES.

17            THE WITNESS:  NO, I READ THESE PAPERS, THEY'RE

18   JUST LIKE ABOUT LAW.

19            THE COURT:  SO YOU READ THOSE PAPERS?

20            THE WITNESS:  YES.

21            THE COURT:  BEFORE YOU GOT ON THE STAND TODAY?

22            THE WITNESS:  YES, I READ.

23            THE COURT:  OKAY, YOU CAN TAKE A LOOK AT THEM.

24            THE BAILIFF:  THERE'S NOTHING DISPLAYED; IT'S

25   ALL IN HIS FOLDER, NOTHING IS OUT.

26            MS. MALLEN:  OH, OKAY.  I SEE, FOR THE RECORD,

27   THEY'VE HANDED ME A CLOSED FOLDER, WHAT APPEARS TO BE A

28   CLOSED FOLDER.

1              THE COURT:  YES.

2   BY MS. MALLEN:

3      Q.   WHAT KIND OF PAPERS DO YOU HAVE IN HERE?

4      A.   I HAVE CASE LAW, I HAVE A 20 PAGE THING I WROTE

5   OUT ON MURDER INSTRUCTIONS AND I HAVE SOME TRANSCRIPTS AND

6   THAT'S ABOUT IT.

7          MS. MALLEN:  FOR PURPOSES FOR NOW, LET ME LEAVE

8   THE FOLDER CLOSED IN FRONT OF THE DEFENDANT.

9          THE COURT:  OKAY.

10         MS. MALLEN:  I'LL TAKE A LOOK AT THOSE LATER.

11  BY MS. MALLEN:

12     Q.   ALL RIGHT, WHEN DID YOU -- WHEN DID YOU FIRST

13  HEAR THE TERM "P.T.S.D."?

14     A.   I KNEW ABOUT IT PROBABLY AROUND '95.

15     Q.   HOW DID YOU HEAR ABOUT IT?

16     A.   BECAUSE I -- BECAUSE I MET OTHER PEOPLE WHO HAD

17  IT.

18     Q.   IN PRISON?

19     A.   IN PRISON, ON THE STREETS.

20     Q.   SO IT WAS SOMETHING THAT WAS TALKED ABOUT WITH

21  OTHER INMATES AND WITH YOUR FRIENDS?

22     A.   WE NEVER REALLY TALKED ABOUT IT; I JUST KNEW

23  THERE WAS A FEW WAR VETERANS WHO HAD IT AND PEOPLE THAT

24  HAD BEEN INVOLVED IN STUFF HAD HAD IT.

25     Q.   ALL RIGHT.  AND WHEN YOU HAD IT, WHAT IS YOUR

26  UNDERSTANDING?  WHAT IS P.T.S.D.?

27     A.   IT'S WHEN YOU GET REALLY DEPRESSED, WITHDRAWN,

28  SOME TRAUMATIC EVENT CHANGES YOU, YOU HAVE RECURRING

1    NIGHTMARES AND DREAMS.

2        Q.    SO YOU'VE LEARNED THAT THESE ARE WHAT YOU THINK

3    ARE THE SYMPTOMS OF P.T.S.D.?

4        A.    NO, THIS IS WHAT I FEEL.

5        Q.    ALL RIGHT.  AND HAVE YOU DONE ANY READING ON

6    P.T.S.D.?

7        A.    NO.

8        Q.    YOU HAVEN'T READ ANYTHING ABOUT IT AT ALL?

9        A.    NO.

10        Q.    DO YOU REMEMBER TALKING TO YOUR SISTER ABOUT

11    P.T.S.D.?

12        A.    YES.

13        Q.    AND SHE TALKED TO YOU ABOUT WHAT HER

14    PSYCHOLOGIST SAID?

15        A.    SHE SAID THAT SHE WOULD EVALUATE ME, MY SISTER

16    SAID SHE WOULD PAY FOR THE PSYCHIATRIST BECAUSE I DIDN'T

17    KNOW THAT YOU COULD -- YOU COULD GET FUNDS TO PAY FOR THE

18    DOCTORS AT THAT TIME, SO I WAS ASKING MY SISTER IF SHE

19    COULD GET ME A DOCTOR, TO PAY FOR ME.

20        Q.    THIS IS DURING THE TRIAL THAT YOUR SISTER TALKED

21    TO YOU ABOUT THIS?

22        A.    NO, IT WAS BEFORE THE TRIAL.

23        Q.    SO YOUR SISTER TALKED TO YOU ABOUT P.T.S.D.

24    BEFORE THE TRIAL?

25        A.    SHE TALKED -- SAID SHE COULD GET A DOCTOR.

26        Q.    AND WHEN DID SHE TALK TO YOU ABOUT THIS?

27        A.    BEFORE THE TRIAL.

28        Q.    WHEN BEFORE THE TRIAL?

1    A.   IT WAS LIKE A COUPLE MONTHS.

2    Q.   OKAY.  WHAT DID YOU TELL YOUR SISTER?

3    A.   I TOLD HER THAT I WANTED TO SEE HER DOCTOR, IF

4  SHE COULD PAY FOR THE DOCTOR BECAUSE I COULDN'T AFFORD ONE

5  AND SHE SAID SHE WOULD PAY FOR IT.

6    Q.   AND DID YOU -- WERE YOU SEEN BY A DOCTOR?

7    A.   NO, BECAUSE I ASKED MR. PECKHAM IF HE -- IF I

8  NEEDED TO SEE A DOCTOR FOR MY CASE AND HE SAID, NO, WE

9  DON'T NEED A DOCTOR.

10    Q.   SO YOU SPECIFICALLY ASKED MR. PECKHAM IF YOU

11  COULD BE EVALUATED BY A DOCTOR FOR P.T.S.D.?

12    A.   THAT'S WHAT I THOUGHT I HAD.

13    Q.   AND YOU DISCUSSED THAT WITH HIM?

14    A.   YES.

15    Q.   AND HE SAID WHAT?

16    A.   HE SAID WE DON'T NEED A DOCTOR.

17    Q.   NOW, YOU SAID MR. PECKHAM HAD BEEN YOUR ATTORNEY

18  IN A CASE BEFORE THIS STABBING CASE, THAT WAS IN 1987,

19  POSSESSION OF DRUGS?

20    A.   YES.

21    Q.   AT THAT POINT, IN THAT CASE, DID YOU TALK TO

22  MR. PECKHAM ABOUT YOUR DRUG USE?

23    A.   NO, I DIDN'T EVEN REMEMBER HE WAS MY LAWYER

24  UNTIL AFTER THE TRIAL, HE TOLD ME THAT HE'D BEEN MY LAWYER

25  BEFORE.

26    Q.   OH, SO YOU DIDN'T REMEMBER THAT YOU HAD EVER HAD

27  CONTACT WITH MR. PECKHAM BEFORE?

28    A.   NO.

1        Q.    OKAY.   NOW, WHEN YOU WERE STABBED IN THE EYE,

2    THAT HAPPENED WHEN YOU WERE IN A CAR?

3        A.    YES.

4        Q.    AND THE PROSTITUTE, THE WOMAN WAS SITTING NEXT

5    TO YOU?

6        A.    YES.

7        Q.    AND SHE REACHED -- AND SHE REACHED IN FRONT AND

8    STABBED YOU IN THE EYE?

9        A.    JUST HAPPENED LIKE THAT QUICK, BAM, BAM.

10       Q.    IS THAT WHAT HAPPENED?   SHE REACHED UP IN FRONT

11   AND STABBED YOU IN THE EYE?

12       A.    NO.

13       Q.    DO YOU REMEMBER?

14       A.    NO, WE WERE IN THE BACKSEAT.

15       Q.    YOU AND HER WERE IN THE BACKSEAT?

16       A.    YEAH.

17       Q.    AND WERE YOU FACING EACH OTHER WHEN THAT

18   HAPPENED?

19       A.    AND I WAS FACING HER AND ALL OF A SUDDEN, BOOM,

20   IT JUST HIT ME.

21       Q.    OKAY.   WHEN YOU WERE RELEASED FROM THE HOSPITAL,

22   WHERE DID YOU GO?

23       A.    I WENT TO MY DAD'S.

24       Q.    YOU WENT FOR FOLLOW-UP MEDICAL TREATMENT?

25       A.    YES.

26       Q.    DID YOU EVER GO FOR ANY KIND OF COUNSELING AT

27   THAT POINT?

28       A.    NO.

1    Q.    WHAT YEAR IS THE FIRST YEAR THAT YOU WENT AND

2    TALKED TO SOMEONE ABOUT HOW THIS STABBING MADE YOU FEEL?

3    A.    PROBABLY IN 2000.

4    Q.    ALL RIGHT.    WHEN YOU WERE -- WHEN YOU WENT BACK

5    TO YOUR FATHER'S AFTER THE STABBING, WERE YOU EMPLOYED?

6    A.    NO, I WAS COLLECTING UNEMPLOYMENT BECAUSE I WAS

7    JUST WORKING AT THIS COMPANY AS A MACHINIST AND I GOT LAID

8    OFF FOR A LITTLE WHILE, BUT I WAS GETTING PRETTY GOOD

9    MONEY FOR UNEMPLOYMENT BECAUSE I WAS WORKING THERE FOR A

10    LONG TIME.    AND I WAS GOING TO GO BACK TO WORK THERE

11    AFTER -- AFTER A WHILE, BECAUSE THEY WERE ONLY LAYING ME

12    OFF FOR A LITTLE WHILE.    AND I COULDN'T GO BACK TO WORK

13    THERE BECAUSE OF MY EYE.

14    Q.    SO BASICALLY YOU WERE RECEIVING UNEMPLOYMENT

15    BEFORE THE STABBING?

16    A.    YES.

17    Q.    AND YOU WERE STILL ON UNEMPLOYMENT AFTER THE

18    STABBING?

19    A.    YES, FOR A WHILE.

20    Q.    OKAY.    AND BEFORE THE STABBING, YOU WERE LIVING

21    WITH YOUR FATHER?

22    A.    YES.

23    Q.    AND AFTER THE STABBING, YOU WENT BACK TO HIS

24    HOUSE?

25    A.    YES.

26    Q.    BEFORE THE STABBING YOU WERE DRINKING?

27    A.    YEAH, WE WERE DRINKING THAT DAY.

28    Q.    YEAH, DID YOU CONTINUE TO DRINK AFTERWARDS?

1     A.   NOT RIGHT AWAY BECAUSE I DIDN'T LEAVE THE HOUSE

2     FOR LIKE OVER A MONTH.

3     Q.   WHEN DID YOU START DRINKING AGAIN?

4     A.   AND SLOWLY I JUST STARTED DRINKING BEER AGAIN,

5     BECAUSE I JUST WENT OUT ALONE; I DIDN'T REALLY HANG OUT

6     WITH NO ONE AND I JUST STARTED DRINKING MORE AND MORE.

7     Q.   WHEN YOU -- BEFORE THE STABBING, WERE YOU USING

8     CRYSTAL METH?

9     A.   BEFORE THE STABBING?  I WAS USING A LITTLE BIT,

10    BUT MORE -- I WAS MORE LIKE MORE DRINKING.

11    Q.   AND AFTER THE STABBING, DID YOU CONTINUE TO USE

12    CRYSTAL METH?

13    A.   I STARTED USING IT DIFFERENTLY.

14    Q.   HOW WAS THAT?

15    A.   STARTED USING IT INTRAVENOUSLY.

16    Q.   SO BEFORE YOU WERE SMOKING IT AND AFTER --

17    A.   NO, I JUST SNORTED IT.

18    Q.   AND AFTERWARDS YOU WERE INJECTING WITH A NEEDLE?

19    A.   YES.

20    Q.   WERE YOU STILL SMOKING MARIJUANA ALL ALONG?

21    A.   I SMOKED A LOT OF POT WHEN I WAS YOUNGER, BUT

22    PRETTY MUCH SLOWED DOWN ON THE POT WHEN I GOT OLDER.  I

23    DIDN'T SMOKE AS MUCH.

24    Q.   MEANING NOT AS MUCH, OKAY.  WERE YOU USING ANY

25    OTHER KIND OF DRUGS?

26    A.   NO.

27    Q.   ANY KIND OF COCAINE?

28    A.   NO.

1    Q.    ANY HEROIN?

2    A.    NO.

3    Q.    ANY PRESCRIPTION MEDICATIONS THAT -- LIKE VALIUM

4    OR ANYTHING LIKE THAT?

5    A.    NO.

6    Q.    OKAY.  HOW -- NOW AFTER THE STABBING, HOW DID

7    THE METHAMPHETAMINE MAKE YOU FEEL?

8    A.    AFTER THAT?  IT MADE ME FEEL MORE OUTGOING.

9    IT -- MORE LIKE BROUGHT ME OUT OF MY SHELL, BECAUSE I WAS

10   KIND OF AFRAID TO GO OUT AND TALK TO PEOPLE.

11   Q.    BUT METH MADE YOU FEEL BETTER?

12   A.    YES, EXCEPT FOR WHEN I WAS COMING OFF OF IT.

13   Q.    AND THEN IT WOULD MAKE YOU EXTREMELY TIRED?

14   A.    REAL TIRED.

15   Q.    SLEEPY?

16   A.    SLEEPY.

17   Q.    FOR LONG -- SEVERAL HOURS OR DAYS?

18   A.    YES.

19   Q.    OKAY.  DID METHAMPHETAMINE MAKE YOU FEEL JUMPY

20   AT ALL?

21   A.    YES, I'D GET PARANOID.  SOMETIMES I WOULD BE IN

22   MY ROOM GOING TO SLEEP AFTER BEING UP FOR A WHILE AND I

23   WOULD THINK I'D SEEN SOMEBODY COMING IN THE DARK AT ME.

24   Q.    SO --

25   A.    I'D ALWAYS BE ON EDGE AND I COULDN'T GET TO

26   SLEEP RIGHT AWAY, BUT I WOULD BE REAL TIRED AND I WOULD

27   THINK THAT THERE'S PEOPLE COMING IN AT ME.

28   Q.    SO METHAMPHETAMINE WOULD HAVE YOU STAY AWAKE FOR

1  LIKE A COUPLE OF DAYS IN A ROW?

2      A.   YES.

3      Q.   NOW YOU WERE TALKING ABOUT, YOU CALLED IT BEING

4  JUMPED BY A GROUP OF MEXICANS.  WAS THAT SOMETHING THAT

5  HAPPENED IN SAN DIEGO WHEN YOU WERE OUT OF JAIL?

6      A.   YES.

7      Q.   WHERE DID IT HAPPEN?

8      A.   IT'S HAPPENED TWICE.

9      Q.   WELL, THE TIME THAT YOU REFERRED TO, WHICH WAS

10 1997 OR '98, WHERE DID THAT HAPPEN?

11     A.   THAT HAPPENED LIKE RIGHT -- ABOUT A BLOCK OR TWO

12 FROM THE TROLLEY.

13     Q.   WHERE?

14     A.   EL CAJON TROLLEY.

15     Q.   SO YOU WERE JUMPED IN EL CAJON?

16     A.   YES.

17     Q.   AND WHEN -- DO YOU REMEMBER, WAS IT DAYTIME,

18 NIGHTTIME THAT THIS HAPPENED?

19     A.   IT WAS JUST BEFORE NIGHT.

20     Q.   WERE YOU AT THE TROLLEY STATION?

21     A.   NO, I WAS LIKE A BLOCK AWAY FROM THE TROLLEY

22 STATION OVER ON THE RIGHT SIDE.

23     Q.   WERE YOU LIVING OUT ON THE STREET AT THIS POINT?

24     A.   NO.

25     Q.   OR WERE YOU OUT ON THE STREET AT THIS POINT?

26     A.   YEAH.

27     Q.   AND WHAT -- THIS GROUP, HOW MANY PEOPLE WERE IN

28 THIS GROUP?

1    A.    THREE.

2    Q.    AND THEY ATTACKED YOU?

3    A.    YES.

4    Q.    ALL RIGHT.  DO YOU KNOW WHY?

5    A.    I DON'T KNOW.

6    Q.    WERE YOU DRINKING?

7    A.    YEAH, I WAS WALKING DOWN THE STREET DRUNK.

8    Q.    AND WERE THEY DRINKING?

9    A.    I DON'T KNOW WHAT THEY WERE DOING.

10    Q.    OKAY.

11    A.    I NEVER SEEN THEM BEFORE.

12    Q.    DID YOU -- WERE THERE ANY WORDS EXCHANGED OR --

13    A.    NO.

14    Q.    DID YOU SAY ANYTHING, DO YOU THINK, TO THEM

15 OR --

16    A.    I DON'T KNOW, I JUST WAS WALKING ALONG AND THEY

17 JUMPED ME.

18    Q.    OKAY.  AND YOU TOLD MR. PECKHAM ABOUT THIS?

19    A.    YES.

20    Q.    AND DID YOU REPORT THIS TO ANYBODY?  POLICE?

21    A.    YEAH, THE POLICE CAME OVER TO MY DAD'S HOUSE AND

22 THEN AN AMBULANCE CAME AND TOOK ME TO PARADISE VALLEY

23 HOSPITAL.

24    Q.    SO YOU WERE TREATED AT PARADISE VALLEY?

25    A.    YES.

26    Q.    HAVE YOU EVER RECEIVED TREATMENT FOR ALCOHOL

27 ABUSE?

28    A.    WELL, I WENT TO MC CALLISTER.

1      Q.    WHEN DID YOU DO THAT?

2      A.    IT WAS LIKE JANUARY OF '99.

3      Q.    WAS IT BEFORE OR AFTER THE STABBING?

4      A.    JUST BEFORE.

5      Q.    AND HOW LONG WERE YOU IN THE PROGRAM?

6      A.    FOUR OR FIVE MONTHS.

7      Q.    DID YOU STOP DRINKING ALL TOGETHER?

8      A.    NO.

9      Q.    OKAY, BECAUSE YOU WERE KICKED OUT BECAUSE OF THE

10   DRINKING?

11     A.    YES.

12     Q.    OKAY.

13     A.    I KICKED THE DRUGS, BUT I DIDN'T QUIT THE

14   DRINKING WHILE I WAS THERE.

15     Q.    OKAY.  SO THE TREATMENT FOR ALCOHOL WASN'T

16   SUCCESSFUL THEN?

17     A.    NO.

18     Q.    OKAY, NOW TREATMENT FOR DRUGS, HAVE YOU HAD

19   TREATMENT FOR DRUGS?

20     A.    THAT WAS -- IT WAS MORE LIKE A DRUG PROGRAM THAN

21   AN ALCOHOL PROGRAM.

22     Q.    YOU'RE TALKING ABOUT MC CALLISTER?

23     A.    YES.

24     Q.    OKAY.  AND DID YOU STOP USING METHAMPHETAMINE AT

25   THAT POINT?

26     A.    WHILE I WAS AT THE PROGRAM AND WHEN I WAS IN THE

27   PROGRAM I STOPPED USING.

28     Q.    WHEN DID YOU START AGAIN?

1      A.    WHEN I ENDED UP AT THAT HOUSE.

2      Q.    SO THE DAY BEFORE THE STABBING WAS THE FIRST

3  TIME IN SEVERAL MONTHS THAT YOU HAD USED METHAMPHETAMINE?

4      A.    NO, IT WAS LIKE ABOUT A WEEK BEFORE.

5      Q.    OKAY.  HAVE YOU HAD ANY OTHER TREATMENT FOR

6  ALCOHOL OR DRUGS OTHER THAN MC CALLISTER?

7      A.    NO.

8      Q.    NOW LET'S GO BACK TO THE PSYCHIATRIC TREATMENT.

9  YOU WERE SAYING THAT YOU HAD -- YOU TALKED TO A DOCTOR TO

10  GET MOVED TO A CELL IN TEHACHAPIE?

11      A.    YES.

12      Q.    THEN YOU TALKED TO ANOTHER DOCTOR AT TEHACHAPIE

13  ONCE ABOUT WHAT?

14      A.    ABOUT MY EYE.

15      Q.    AND WHAT ABOUT YOUR EYE?

16      A.    AND I TOLD HIM THAT I NEEDED THE PROSTHESIS.

17      Q.    OH, YOU WANTED TO GET --

18      A.    ALSO BECAUSE I -- I DIDN'T HAVE ONE FOR YEARS

19  WHEN I GOT LAID OFF WORK, AND THEN THIS HAPPENED AND THEN

20  I TRIED TO GET A PROSTHESIS.  AND I WENT TO THE -- SEE THE

21  PLACE DOWN ON MISSION GORGE, THEY GIVE YOU THE MEDICAL,

22  AND THEY TOLD ME THAT I MADE TOO MUCH MONEY FOR THEM TO

23  GET IT FOR ME.

24      Q.    OKAY, SO WHEN YOU WENT IN TO TEHACHAPIE, YOU

25  DIDN'T HAVE YOUR GLASS EYE YET?

26      A.    I DIDN'T HAVE IT.

27      Q.    WHEN YOU TALKED TO THE DOCTOR, WAS HE ABLE TO

28  ARRANGE FOR YOU TO GET A GLASS EYE?

1   A. AS SOON AS I GOT WHERE THEY SENT ME BECAUSE I

2 LEFT RIGHT AFTER THAT TO C.R.C., THEN C.R.C. TOOK ME TO A

3 RIVERSIDE HOSPITAL AND THEY LOOKED AT IT AND THEY SAID

4 THAT SINCE IT WAS COSMETIC, THEY COULDN'T DO NOTHING, BUT

5 I KEPT TELLING THEM IT HURT ME BECAUSE THE WIND WOULD

6 BELOW IN THERE AND I DIDN'T HAVE ANYTHING IN THERE AND

7 THEY WOULDN'T DO NOTHING.

8   Q. SO YOU -- YOU WERE TRYING TO GET THE GLASS EYE

9 GIVEN TO YOU BY THE PRISON PEOPLE?

10   A. YES.

11   Q. EVENTUALLY DID THAT HAPPEN?

12   A. NO, I GOT IT ON THE STREETS.

13   Q. OKAY.  LET ME -- SO THAT NEVER -- THAT NEVER

14 WENT ANYWHERE, THEN, ASKING FOR THAT KIND OF HELP?

15   A. NO.

16   Q. OKAY, DID YOU HAVE GLASSES WHEN YOU WERE IN

17 PRISON?

18   A. NO, I -- THEY GAVE ME PRESCRIPTION, BUT I GOT

19 OUT BEFORE I GOT THEM.

20   Q. OKAY.  WHEN WAS THE FIRST TIME THAT YOU GOT

21 GLASSES?

22   A. LIKE -- IT WAS LIKE -- I THINK IT WAS LIKE '97

23 OR NO, MAYBE IT WAS '96.

24   Q. WHO BOUGHT THEM FOR YOU?

25   A. I BOUGHT THEM.

26   Q. OKAY.  DO YOU REMEMBER YOUR DAD BUYING YOU

27 GLASSES?

28   A. HE TOOK ME TO GET THEM.

1    Q.    OH, OKAY, I SEE.

2    A.    HE HELPED ME.

3    Q.    FOR THE PRESCRIPTION?

4    A.    YEAH, THAT WASN'T THE FIRST PAIR, THAT WAS LIKE

5    THE SECOND OR THIRD PAIR.

6    Q.    OKAY.  NOW, YOU WERE TALKING ABOUT PREPARING FOR

7    TRIAL WITH MR. PECKHAM.  DID MR. PECKHAM TELL YOU TO LIE

8    ABOUT THINGS?

9    A.    HE JUST TOLD ME IT WOULDN'T BE IN MY BEST

10   INTEREST TO SAY CERTAIN THINGS.

11   Q.    DID HE TELL YOU WHY IT WOULDN'T BE IN YOUR BEST

12   INTEREST?

13   A.    HE SAID JUST BECAUSE I WOULDN'T LOOK GOOD IF I

14   SAID IT.

15   Q.    ALL RIGHT.  AND DID YOU UNDERSTAND WHAT HE WAS

16   TALKING ABOUT?

17   A.    YES.

18   Q.    DID YOU THINK THAT HE WAS TELLING YOU TO LIE?

19   A.    I THOUGHT HE WAS TELLING ME TO SAY THAT I WASN'T

20   DRUNK.

21   Q.    DID YOU ASK HIM IF THAT'S WHAT HE MEANT?

22   A.    NO, I DIDN'T ASK HIM, BUT --

23   Q.    OKAY.  DO YOU REMEMBER WHEN YOU TESTIFIED AT THE

24   TRIAL, YOU WERE SWORN TO TELL THE TRUTH?

25   A.    YES.

26   Q.    ARE YOU TELLING US THAT YOU LIED ANYWAY?

27   A.    I DIDN'T LIE, I JUST -- I WAS PROBABLY DRUNK,

28   BUT I DIDN'T REALIZE THAT I WAS THAT DRUNK BECAUSE A LOT

1  OF TIMES WHEN YOU DRINK, YOU KEEP DRINKING AND YOU DON'T

2  THINK YOU'RE AS DRUNK AS YOU REALLY ARE.

3      Q.    ALL RIGHT, SO IF YOU DIDN'T FEEL LIKE YOU WERE

4  DRUNK AT THE STABBING, WHY DO YOU THINK YOU WERE?

5      A.    BECAUSE A LOT OF PEOPLE TOLD ME, LIKE EVEN MY

6  DAD TOLD ME THAT A LOT OF TIMES WHEN I WAS -- I WOULD COME

7  HOME DRUNK, THAT I WOULD THINK THAT I WASN'T DRUNK, BUT HE

8  WOULD KNOW THAT I WAS -- THAT I WAS WAY DIFFERENT AND I

9  WAS DRUNK.

10     Q.    DOES IT MAKE YOU FEEL BETTER TO THINK THAT YOU

11  WERE DRUNK WHEN YOU DID THIS RATHER THAN NOT?

12     A.    I'M NOT REALLY THINKING THAT I WAS DRUNK, BUT

13  I'M HYPERSENSITIVE TO ALCOHOL, AND IT JUST COMPLETELY

14  CHANGES ME.  EVEN IF I DRINK LIKE THREE BEERS OR SIX PACK,

15  IT COMPLETELY CHANGES ME AND I DON'T REALIZE THAT I'M

16  DRUNK, BUT I COULD BE DRUNK.

17     Q.    OH, OKAY, SO BASICALLY WHAT YOU'RE SAYING IS

18  THAT YOU'RE NOT SURE, BUT MAYBE OTHER PEOPLE HAVE POINTED

19  OUT TO YOU THAT YOU MIGHT HAVE BEEN?

20     A.    YEAH.

21     Q.    HOW DOES BEING -- HOW DOES DRINKING CHANGE YOU?

22     A.    IT MAKES ME MORE IRRATIONAL.  IT MAKES ME MORE

23  ABOUT NOT THINKING ABOUT WHAT I'M DOING.

24     Q.    OKAY, MAKES YOU A LITTLE EDGY, A LITTLE JUMPY?

25     A.    YES.

26     Q.    SO YOU TOLD THE TRUTH THE BEST YOU COULD AT THE

27  TRIAL?

28     A.    YES.

Q. OKAY. NOW, WHEN YOU WERE TALKING ABOUT P.T.S.D. WITH MR. PECKHAM, DID YOU USE -- WELL, HOW -- WHAT DID YOU TELL HIM?

A. I TOLD HIM I THINK I MIGHT HAVE P.T.S.D. BECAUSE OF THE KNIFE INCIDENT AND OTHER THINGS THAT I'VE BEEN -- OTHER THINGS THAT HAVE HAPPENED TO ME.

Q. AND DID HE TALK TO YOU ABOUT THAT?

A. YES.

Q. DID HE ASK YOU QUESTIONS ABOUT THE KNIFE INCIDENT?

A. NOT REALLY TOO MANY QUESTIONS.

Q. DID YOU TALK TO HIM ABOUT IT, THOUGH?

A. YES.

Q. AND DID HE ASK YOU QUESTIONS ABOUT HOW YOU WERE FEELING?

A. WHEN I TALKED TO HIM ABOUT IT, IT MADE ME REAL EMOTIONAL AND I WAS STARTING TO CRY ABOUT IT. AND HE TOLD ME, WELL, YOU SHOULD GET -- YOU SHOULD GET HELP BECAUSE -- HE SAID BECAUSE MY DAD, HE HAD WENT THROUGH SOMETHING LIKE THAT AND HE -- HE GOT HELP IT AND IT WAS KIND OF LIKE YOU WERE GOING THROUGH THE SAME THING..

Q. DID YOU ASK FOR SOME KIND OF PSYCHOLOGICAL COUNSELING AT THAT POINT?

A. I TOLD HIM THAT MY SISTER COULD GET THE DOCTOR AND SHE WOULD PAY FOR THE DOCTOR.

Q. ALL RIGHT. BUT DID YOU EVER TAKE MR. PECKHAM'S ADVICE AND ASK FOR COUNSELING?

A. AND I SAID -- I SAID, WHY DON'T WE GET A DOCTOR

1    AND HE SAID, WE DON'T NEED ONE.

2        Q.    DID YOU ASK THIS PRISON TO TALK TO ANYBODY AT

3    THAT POINT?

4        A.    YES.

5        Q.    WHO DID YOU TALK TO?

6        A.    I TALKED TO SOME DOCTORS AT DONOVAN.

7        Q.    DO YOU REMEMBER THEIR NAMES?

8        A.    NOT RIGHT OFFHAND.

9        Q.    WELL --

10       A.    I --

11       Q.    AND DID YOU TALK TO DOCTORS?

12       A.    YES.

13       Q.    HOW MANY DIFFERENT DOCTORS?

14       A.    LIKE THREE.

15       Q.    AND THIS WAS BEFORE THE TRIAL?

16       A.    NO, THIS IS RIGHT AFTER.

17       Q.    OH, AFTER THE TRIAL.  OKAY, DID YOU TALK TO ANY

18   DOCTORS BEFORE THE TRIAL?

19       A.    DID I TALK TO ANY BEFORE?  NO.

20       Q.    OKAY.  NOW LET'S TALK A LITTLE BIT ABOUT WHEN

21   THE KILLING TOOK PLACE.  WHEN -- AFTER YOU KILLED

22   MR. RABITOR, YOU RAN OUT THE DOOR, RIGHT?

23       A.    YEAH, KIND OF JOGGED OUT.

24       Q.    AND YOU RAN BY HIS MOTHER, RIGHT?

25       A.    YEAH, SHE WAS OUTSIDE YELLING AT ME.

26       Q.    DID YOU STOP TO TELL HER WHAT HAD HAPPENED?

27       A.    NO.

28       Q.    DID YOU STOP TO TELL HER THAT HER SON NEEDED

1   HELP?

2       A.   I DIDN'T KNOW IF HE NEEDED HELP BECAUSE HE WAS

3   STILL STANDING UP WHEN I LEFT AND I WAS AFRAID HE WAS

4   COMING AFTER ME.

5       Q.   DID YOU STOP AND TELL HER ANYTHING AT ALL?

6       A.   NO.

7       Q.   YOU JUST RAN OFF?

8       A.   YES.

9       Q.   AND YOU THREW THE KNIFE INTO THE YARD TO

10  SOMEBODY ELSE, RIGHT?

11      A.   I JUST TOSSED IT TO THE SIDE.

12      Q.   OKAY, BUT IT FELL -- DID YOU SEE IT FALL?

13      A.   NO.

14      Q.   OKAY, SO YOU THREW IT SOME PLACE?

15      A.   YES.

16      Q.   NOW UP TO THAT POINT, UP TO THE TIME WHEN YOU

17  RAN OUT OF THE APARTMENT, YOU HAD A BIG MUSTACHE, RIGHT?

18      A.   NO, I SHAVED IT OFF EARLIER BECAUSE I WAS

19  LOOKING FOR A JOB.

20      Q.   WHEN DID YOU SHAVE IT OFF?

21      A.   LIKE WHEN I TOOK A SHOWER.

22      Q.   YOU MEAN THAT DAY?

23      A.   YEAH.

24      Q.   SO YOU'RE SAYING THAT WHEN YOU -- LET'S GO BACK

25  OVER THAT DAY THEN.  WHEN YOU GOT UP THAT MORNING -- YOU

26  STAYED OVERNIGHT AT THE APARTMENT, RIGHT?

27      A.   I LIVED THERE.

28      Q.   YOU WERE LIVING THERE AT THE TIME?

1    A.    YES.

2    Q.    STAYING THERE WITH EDDIE -- MR. RABITOR AND HIS

3    MOM?

4    A.    YES.

5    Q.    OKAY.  THAT MORNING EVERYBODY HAD BEEN GOING OUT

6    TO DO THINGS, PICK-UP GROCERIES, BUY BEER, THINGS LIKE

7    THAT, RIGHT?

8    A.    YES.

9    Q.    AND YOU HAD -- AND YOU HAD STAYED IN THE

10   APARTMENT?

11   A.    NO, I WENT OUT BECAUSE SOME GIRL CAME OVER AND

12   SHE NEEDED HELP BECAUSE HER -- THE JOSH GUY STOLE THE CAR

13   AND HE LEFT IT ON THE FREEWAY OFFRAMP AND I WAS HELPING

14   HER -- I VOLUNTEERED TO HELP HER TOW IT OFF THE FREEWAY

15   OFFRAMP SO IT WOULDN'T GET LOST.  AND AS SOON AS WE CAME

16   BACK, SHE BOUGHT -- SHE BOUGHT US SOME BEER AND THAT WAS

17   IN THE MORNING.  AND I DRANK A LITTLE BIT OF BEER, BUT

18   THEN I TOLD THEM I HAD TO GO LOOK -- FILL OUT A COUPLE

19   APPLICATIONS.

20   AND IT WAS HOT THAT DAY AND I'D BEEN UP ALL

21   NIGHT ALREADY, AND SO I WENT TO GO FILL OUT A COUPLE

22   APPLICATIONS.  AND BEFORE I DID ALL THAT, THAT LADY JOYCE,

23   SHE WAS BEGGING ME TO STAY THERE BECAUSE I WAS GOING TO

24   LEAVE BECAUSE THE NIGHT BEFORE SHE HAD A BUNCH OF PILLS

25   AND SHE WAS DUMPING THEM DOWN HER THROAT AND SHE BIT THIS

26   GIRL'S FINGER.

27   Q.    SO THERE WAS A LOT OF STUFF GOING ON IN THIS

28   APARTMENT?

1    A.    IT WAS CRAZY THERE.

2    Q.    AND YOU STAYED THERE FOR ABOUT A WEEK?

3    A.    YEAH.

4    Q.    SO AFTER YOU CAME BACK DOING THE JOB

5 APPLICATIONS, IS THAT WHEN YOU TOOK A SHOWER AND SHAVED?

6    A.    YEAH.

7    Q.    OKAY.

8    A.    BECAUSE I FIGURED IT WOULD HELP ME GET A JOB A

9 LOT EASIER.

10    Q.    IS THAT BEFORE OR AFTER YOU HAD THE ARGUMENT

11 WITH MR. RABITOR?

12    A.    THAT WAS BEFORE.

13    Q.    OKAY, SO AFTER YOU GOT OUT OF THE SHOWER AND YOU

14 SHAVED AND YOU GOT INTO AN ARGUMENT WITH MR. RABITOR ABOUT

15 THE GLASS PIPE, WHAT YOU CALL THE GLASS PIPE?

16    A.    YEAH.

17    Q.    THAT'S WHEN YOU THREW IT AT HIM?

18    A.    NO, I DIDN'T THROW IT AT HIM.

19    Q.    SOMEBODY ELSE THREW IT?

20    A.    SOMEBODY HANDED -- OKAY, THEY WERE IN THE ROOM

21 SMOKING CRYSTAL AND THERE WAS KEN KEMPY(PH), ALLISON,

22 JOYCE, EDDIE AND MARY ROSS AND I ASKED -- I ASKED HIM IF

23 HE COULD GET MARY ROSS --

24    Q.    LET ME STOP YOU THERE AND ASK YOU THE QUESTION.

25    A.    OKAY.

26    Q.    WHO THREW THE GLASS PIPE AT MR. RABITOR?

27    A.    I DIDN'T THROW IT AT HIM, I JUST THREW IT OFF TO

28 THE SIDE, TO THE WALL.

1    Q.    I SEE.  YOU THREW THE PIPE, BUT IT WASN'T AT

2    HIM?

3    A.    NO, NOT AT HIM.

4    Q.    ALL RIGHT.  AND HE GOT UPSET AT YOU?

5    A.    HE GOT REALLY UPSET.

6    Q.    THAT'S WHEN THEY TOLD YOU YOU NEEDED TO LEAVE?

7    A.    HIS MOM JUMPED UP AND GOT IN MY FACE.

8    Q.    ALL RIGHT, BUT YOU DIDN'T LEAVE THEN, DID YOU?

9    A.    NO, BECAUSE I JUST GOT DONE KICKING PEOPLE OUT.

10    Q.    AND YOU DIDN'T WANT TO LEAVE?

11    A.    AND I THOUGHT THOSE PEOPLE WERE GOING TO -- THEY

12    WERE OUT THERE WAITING FOR ME, AND SO I SAT ON THE COUCH

13    AND I THOUGHT THAT EVERYTHING WOULD BLOW OVER, BUT IT

14    DIDN'T AND IT GOT SERIOUSER AND --

15    Q.    LET ME STOP YOU FOR A MINUTE.  AND AT THE TIME

16    THAT YOU DECIDED TO LEAVE AND YOU GOT YOUR THINGS

17    TOGETHER, YOU WERE ALONE IN THE APARTMENT WITH -- WITH

18    MR. RABITOR AND ALLISON BROOKS, RIGHT?  DO YOU REMEMBER

19    THAT?

20    A.    YES.

21    Q.    OKAY, AND ALLISON BROOKS AND MR. RABITOR WERE

22    SITTING AT A TABLE, WEREN'T THEY?

23    A.    YEAH, THEY WERE DRUNK.

24    Q.    THEY WERE DRINKING SOMETHING AND THEY WERE

25    SITTING AT A TABLE, RIGHT?

26    A.    YES.

27    Q.    AND YOU WERE GETTING YOUR THINGS TOGETHER TO

28    LEAVE?

1    A.    YES.

2    Q.    YOU DECIDED TO WALK OUT?

3    A.    YES.

4    Q.    AND YOU WENT AND PICKED UP YOUR BACKPACK?

5    A.    YES.

6    Q.    YOU WENT OVER TO THE COFFEE TABLE?

7    A.    YES.

8    Q.    DO YOU REMEMBER DOING THAT?  AND YOU PICKED UP

9    THE KNIFE?  DO YOU REMEMBER DOING THAT?

10    A.    NO, I PUT THE BACKPACK DOWN BECAUSE I WAS GOING

11    TO GO GET MY GLASSES BECAUSE THEY WERE ON THE OTHER -- ON

12    THE LONG TABLE; THERE WAS LIKE A LITTLE SHORT TABLE AT THE

13    END AND A LONG TABLE, AND I WAS GOING TO GO OVER AND GET

14    MY GLASSES BEFORE I LEFT.

15    Q.    AND YOU PICKED UP THE KNIFE?

16    A.    AND HE JUMPED UP AND HE SAID, YOU'RE NOT GOING

17    ANYWHERE.  MY MOM IS WAITING FOR MY FRIENDS AND IT'S TOO

18    LATE, YOU KNOW, YOU'RE -- SO WHEN HE JUMPED UP, THAT'S

19    WHEN I GRABBED THE KNIFE.  HE CAME AT ME AND I THREW TWO

20    JABS AND HE WAS STILL STANDING WHEN I LEFT, SO I THOUGHT

21    HE WAS COMING AFTER ME WHEN I LEFT.

22    Q.    YOU DIDN'T STOP TO SEE?

23    A.    BECAUSE HE WAS IN FRONT OF ME.

24    Q.    ALL RIGHT.

25    A.    SO I WENT AROUND HIM.

26    Q.    NOW, YOU KNOW THAT HE WAS FOUND BY THE TABLE?

27    A.    YEAH, RIGHT WHERE HE JUMPED UP AT ME.

28    Q.    ALL RIGHT.  AND YOU KNOW THAT ALLISON BROOKS

1    TESTIFIED IN A DIFFERENT WAY THAN YOU DID?

2         A.    YES.

3         Q.    WAS YOUR MEMORY BETTER AT THE TIME THAT YOU

4    TESTIFIED OR IS IT BETTER NOW?

5         A.    IT'S THE SAME.

6         Q.    BUT YOU DIDN'T TESTIFY THE SAME WAY AT THE TRIAL

7    THAN YOU DID NOW, DID YOU?

8         A.    YES, I DID.

9         Q.    DO YOU REMEMBER TESTIFYING THAT YOU PICKED UP

10   THE KNIFE BEFORE MR. RABITOR APPROACHED YOU?

11        A.    WELL, HE PICKED SOMETHING UP FIRST AND THEN I

12   PICKED SOMETHING UP AND THEN HE CAME AT ME.

13        Q.    OKAY.  AND THIS SOMETHING THAT YOU PICKED UP WAS

14   THE KNIFE, RIGHT?

15        A.    YES.

16        Q.    AND YOU TOLD ALL OF THIS TO MR. PECKHAM, RIGHT?

17        A.    YES.

18        Q.    YOU BASICALLY WERE TELLING MR. PECKHAM THAT YOU

19   REACTED BECAUSE YOU THOUGHT YOU WERE BEING ATTACKED,

20   RIGHT?

21        A.    THAT AND I WAS PARANOID.

22        Q.    WELL, WHEN YOU SAY YOU WERE PARANOID, WHAT DO

23   YOU MEAN BY THAT?

24        A.    THAT I THOUGHT THESE PEOPLE WERE COMING TO GET

25   ME.

26        Q.    OKAY.

27        A.    THEY WERE COMING AFTER ME.

28        Q.    OKAY, BUT THERE WERE NO PEOPLE OTHER THAN

1    MR. RABITOR THERE, RIGHT?

2        A.    THERE WAS PEOPLE COMING OVER.

3        Q.    DID YOU SEE PEOPLE?

4        A.    AND THERE WAS THOSE PEOPLE IN AND OUT OF THERE

5    AND THERE WAS THOSE PEOPLE THAT WERE GANG RELATED, PEOPLE

6    THAT WERE ALWAYS THERE.

7        Q.    ALL RIGHT.

8        A.    AND THEY WERE THREATENING ME WITH THOSE PEOPLE.

9        Q.    DID YOU SEE SOMEONE COMING IN?

10       A.    NO, BUT I KNEW THEY WERE COMING AND THAT'S --

11   THAT'S WHAT MADE ME PARANOID.

12       Q.    DID YOU SEE SOMEONE COMING?

13       A.    I ALWAYS HEARD PEOPLE COMING AND GOING ALL THE

14   TIME.

15       Q.    IN THIS CASE, DID YOU HEAR SOMEONE COMING IN THE

16   DOOR?

17       A.    NOT AT THAT MOMENT.

18       Q.    ALL RIGHT, SO BASICALLY YOU WERE -- YOU THOUGHT

19   YOU WERE DEFENDING YOURSELF AGAINST MR. RABITOR?  IS THAT

20   YES?

21       A.    YES.

22       Q.    AND THAT'S WHAT YOU TOLD MR. PECKHAM YOU WERE

23   DOING, RIGHT?

24       A.    YES.

25       Q.    AND YOU NEVER CHANGED THAT, DID YOU?

26       A.    NO.

27       Q.    YOU NEVER TOLD HIM, I'VE CHANGED MY MIND, THAT'S

28   NOT WHAT I WAS DOING?

1    A.    NO, I NEVER CHANGED MY MIND.

2    Q.    THAT'S WHAT YOU THINK TODAY THAT YOU WERE

3 DEFENDING YOURSELF AGAINST HIM, RIGHT?

4    A.    YES.

5    Q.    OKAY.  WHY DIDN'T YOU WANT THE TRIAL TO BE

6 CONTINUED?  WHY DID YOU WANT THE TRIAL TO BE CONTINUED?

7    A.    BECAUSE HE SAID HE WAS GOING TO GO GET SOME

8 WITNESSES.  HE WAS GOING TO GO GET MIKE OVERDORF(PH), HE

9 WAS GOING TO GO GET MARY ROSS, HE WAS GOING TO GO GET KEN

10 KEMPY.  HE SAID HE DIDN'T WANT TO USE MARTIN CORVALES(PH).

11    Q.    WHEN YOU SAY "HE", YOU MEAN MR. PECKHAM, RIGHT?

12    A.    MR. PECKHAM, YES.

13    Q.    NOW, DID MR. PECKHAM ACTUALLY TELL YOU, I'M

14 GOING TO GET THESE PARTICULAR PEOPLE?

15    A.    YEAH.  HE SAID, I CAN GET THESE PEOPLE FOR YOU.

16 AND I SAID, LET'S GET THEM.  AND NEXT THING YOU KNOW, HE

17 SAYS, OH, IT'S TOO SOON; WE'RE GOING TO TRIAL RIGHT NOW

18 AND I CAN'T GET THEM RIGHT NOW.  AND I SAID, BUT WE NEED

19 THEM.

20    Q.    WHY DID YOU THINK THESE WITNESSES WERE

21 IMPORTANT?

22    A.    BECAUSE FOR ONE, THAT THEY WOULD HAVE IMPEACHED

23 ALLISON BROOKS' TESTIMONY, BECAUSE PART OF HER TESTIMONY

24 WAS ALREADY WRONG, BECAUSE THE ANGLE OF THE WOUND THAT WAS

25 IN THERE, PLUS THEY WOULD DESCRIBE THE TIMING BETWEEN

26 THERE BECAUSE THE TIMING BETWEEN THERE WAS ON THE PHONE

27 CALLS, IT WAS LESS THAN 10 MINUTES.  AND SHE LIED AND SAT

28 THERE AND SAID I WAS ON THE COUCH FOR AN HOUR BEFORE THE

1    ALTERCATION -- AFTER THE ALTERCATION HAPPENED, WHICH

2    WASN'T EVEN TRUE.

3        THE COURT:  LET ME STOP YOU, MS. MALLEN.  IT'S

4    NOON, SO WE'RE GOING TO TAKE THE LUNCH RECESS.  WE'LL BE

5    IN RECESS UNTIL 1:30.

6        MS. MALLEN:  THANK YOU.

7        MR. WILLIAMS:  THANK YOU.

8                (LUNCH RECESS.)

9                  --oOo--

1    <u>SAN DIEGO, CALIFORNIA, TUESDAY, AUGUST 24, 2004, 1:30 P.M.</u>

2                              --000--

3              THE COURT:  PETITIONER IS PRESENT, COUNSEL ARE

4    PRESENT.

5                   MS. MALLEN, YOU WERE CROSS-EXAMINING.

6              MS. MALLEN:  THANK YOU.

7    BY MS. MALLEN:

8         Q.   WE WERE TALKING ABOUT YOUR REACTION TO THE

9    REQUEST FOR A CONTINUANCE AND YOU HAD STATED THAT YOU

10   WANTED THE CONTINUANCE BECAUSE YOU THOUGHT MR. PECKHAM

11   SHOULD TALK TO MORE PEOPLE?

12        A.   YES.

13        Q.   IS THAT PRETTY MUCH CORRECT?  OKAY.  HAD YOU

14   GIVEN HIM THE NAMES OF THE PEOPLE?

15        A.   YES.

16        Q.   AND HE HAD THOSE ALREADY?

17        A.   YES.

18        Q.   DID YOU KNOW IF HE TALKED TO THEM OR NOT?

19        A.   HE SAID HE SEEN THE POLICE INTERVIEWS, BUT HE

20   HADN'T TALKED TO THEM.

21        Q.   SO AS FAR AS YOU KNOW --

22        A.   HE SAID HE WAS GOING TO TALK TO THEM.

23        Q.   OKAY.  WOULD -- DO YOU KNOW NOW THAT HE DID TALK

24   TO THOSE WITNESSES?  WERE YOU AWARE OF THAT?

25        A.   NO.

26        Q.   DID MR. PECKHAM EVER DISCUSS WITH YOU THAT HE

27   HAD TALKED TO SEVERAL OF THE WITNESSES?

28        A.   NO, HE SAID HE TALKED TO LIKE TWO PEOPLE AND

120

1 THAT WAS IT.

2      Q.   OKAY.  NOW THOSE PEOPLE THAT YOU HAD LISTED WITH

3 HIM, LET ME GO THROUGH THEM.  THERE WAS A PERSON BY THE

4 NAME OF SCOTTY RUMMEL(PH), RIGHT?

5      A.   YES.

6      Q.   AND AS FAR AS YOU KNEW, YOU WANTED MR. PECKHAM

7 TO KNOW THAT WHAT HE WOULD TESTIFY TO AS FAR AS YOU KNEW,

8 IS THAT PEOPLE IN THAT APARTMENT USED DRUGS AND THAT

9 MR. RUMMEL HAD ARGUED WITH THE VICTIM, SO THAT'S WHAT YOU

10 THOUGHT WAS IMPORTANT FOR -- FOR ED PECKHAM TO KNOW?

11      A.   NO, THERE'S MORE TO IT THAN THAT.

12      Q.   DID YOU TELL MR. PECKHAM WHAT MR. RUMMEL WOULD

13 TESTIFY TO?

14      A.   YES.

15      Q.   WAS MR. RUMMEL PRESENT WHEN THIS KILLING

16 OCCURRED?

17      A.   NO.

18      Q.   WAS HE PRESENT THAT MORNING?

19      A.   YES.

20      Q.   AT THE APARTMENT?

21      A.   YES.

22      Q.   OKAY.  AND DID YOU WANT HIM TO TALK ABOUT THE

23 BACKGROUND OF THE APARTMENT OF THE PEOPLE?

24      A.   YES.

25      Q.   OKAY, NOW THERE WAS A PERSON BY THE NAME OF

26 MARTIN CORVALES, OR CRAZY AS HE'S CALLED, AND HE WAS ONE

27 OF THE PEOPLE THAT YOU ASKED MR. PECKHAM TO FOLLOW UP ON,

28 RIGHT?

1    A.    YES.

2    Q.    AND YOU, AS FAR AS YOU KNEW, HE WAS GOING TO

3    TESTIFY ABOUT THE PEOPLE AT THE APARTMENT AND WHAT THEY

4    WERE DOING THAT MORNING, RIGHT?

5    A.    YES.

6    Q.    OKAY.

7    A.    HE -- HE DECIDED NOT TO USE THAT GUY AND THAT

8    WAS ALL RIGHT BECAUSE WHAT I MAINLY NEEDED WAS FOR HIM TO

9    GET SCOTT, BECAUSE SCOTT CAN TESTIFY TO IT ALSO THAT THOSE

10    PEOPLE WERE CHASING HIM WITH WEAPONS.

11    Q.    AT A DIFFERENT TIME AND PLACE?

12    A.    YES.

13    Q.    AND THEY WERE CHASING MR. RUMMEL?

14    A.    RUMMEL.

15    Q.    OKAY.  AND THEN THERE WAS A PERSON NAMED TINA

16    THAT YOU WANTED MR. PECKHAM TO TALK TO?

17    A.    YES.

18    Q.    AND YOU WANTED HER TO BE ABLE TO TALK ABOUT

19    BUYING DRUGS FROM THE VICTIM AND SEEING THE VICTIM MAD AT

20    DIFFERENT TIMES, RIGHT?

21    A.    YES.

22    Q.    OKAY.  AND THEN THERE WAS A JOYCE ROACH; THAT'S

23    ACTUALLY THE VICTIM'S MOTHER, RIGHT?

24    A.    THE MOTHER.

25    Q.    AND YOU WANTED HER TO TALK ABOUT SELLING DRUGS

26    AND FIGHTING WITH THE VICTIM, RIGHT?

27    A.    YEAH, AND THREATENING ME.

28    Q.    OKAY, BECAUSE SHE HAD -- YOU THOUGHT -- YOU FELT

1  SHE HAD THREATENED YOU, RIGHT?

2      A.   SHE DID.

3      Q.   OKAY, AND THEN THERE WAS A TOBY SLATER, WHO WAS

4  THE MOTHER'S BOYFRIEND IN PRISON, AND YOU WANTED HIM

5  TALKED TO BECAUSE HE HAD BOUGHT DRUGS BEFORE FROM THESE

6  PEOPLE, RIGHT?

7      A.   AND HE GOT BUSTED IN THE PARKING LOT.

8      Q.   RIGHT, AT A DIFFERENT TIME AND PLACE?

9      A.   AND SHE CALLED UP THE POLICE DEPARTMENT AND SAID

10  IT WAS HERS.

11      Q.   RIGHT, OKAY.  AND THEN THERE WAS A SCOTT

12  STEPHIS(PH), WHO AGAIN WOULD HAVE TESTIFIED ABOUT BUYING

13  DRUGS OCCASIONALLY FROM THESE PEOPLE IN THIS APARTMENT?

14      A.   AND HE ALSO SEEN EDDIE COME IN AND THROW HIS MOM

15  ON THE GROUND AND STEAL FROM HER.

16      Q.   HE HAD SEEN FIGHTING IN THE PAST?

17      A.   YES.

18      Q.   OKAY.  THEN THERE WAS A PERSON NAMED JIM WHO

19  WOULD HAVE TESTIFIED BASICALLY FOR -- OR HAD INFORMATION

20  BASICALLY THAT THE VICTIM WAS MAD AT YOU AND THAT THE

21  VICTIM HAD TAKEN THINGS FROM THIS JIM AND THAT THERE

22  WAS -- THERE WAS BAD BLOOD BASICALLY BETWEEN EVERYBODY?

23      A.   YEAH.

24      Q.   OKAY.  NOW, DO YOU HAVE ANY LEGAL BACKGROUND AT

25  ALL?

26      A.   NO.

27      Q.   DID YOU SPECIFICALLY ASK MR. PECKHAM ABOUT EACH

28  OF THESE PEOPLE AND WHAT HE WAS DOING WITH THEM?

1  A.  YES.

2  Q.  AND WHAT DID HE TELL YOU?

3  A.  HE TOLD ME THAT -- OKAY, THOSE PEOPLE RIGHT

4  THERE, HE DIDN'T TELL ME MUCH ABOUT THOSE PEOPLE.

5  Q.  OKAY.

6  A.  BUT THE PEOPLE HE DID TELL ME ABOUT WERE MIKE

7  OVERDORF AND KEN KEMPY AND MARY ROSS.

8  Q.  SO HE --

9  A.  HE SAID HE WOULD GET THOSE THREE PEOPLE.

10  Q.  SO HE DISCUSSED SOME PEOPLE WITH YOU?

11  A.  YES.

12  Q.  OKAY.  NOW, WHEN YOU REFUSED THE PLEA BARGAIN

13  THAT MR. PECKHAM TOLD YOU ABOUT, HOW DID MR. PECKHAM REACT

14  TO THAT?

15  A.  HE JUST SAID, I GUESS WE'LL HAVE TO TAKE IT TO

16  TRIAL THEN.

17  Q.  OKAY.  AND HE DID THEN TAKE IT TO TRIAL, RIGHT?

18  A.  YES.

19  Q.  WAS THERE ANYTHING IN WHAT HE SAID OR HOW HE

20  ACTED THAT MADE YOU THINK THAT HE WASN'T TRYING?

21  A.  IT'S JUST EVERYTHING CAME UP SO SUDDEN.  IT WAS

22  LIKE ONE DAY HE WAS TELLING ME HE WAS GOING TO GO FIND

23  MIKE OVERDORF AND HE WAS GOING TO GO FIND MARY ROSS AND HE

24  WAS GOING TO GO FIND KEN KEMPY BECAUSE THEY WERE THERE

25  LIKE WITHIN 15 MINUTES BEFORE THIS HAPPENED, SO THAT WOULD

26  HAVE HELPED A LOT WITH THE TIMING, BECAUSE THE TIMING WAS

27  WAY OFF.  AND HE SAID HE WAS GOING TO GO FIND THEM, AND

28  THEN BOOM, THE NEXT WEEKEND HE SHOWS UP AND HE SAYS HE

124

1    SAYS, WELL, WE'VE GOT TO TAKE THIS -- DO YOU WANT TO TAKE

2    THIS PLEA BARGAIN BECAUSE THE COURT DATE IS COMING UP

3    SOON.  IT WILL BE HERE ANY WEEK NOW AND I HAVE -- THEY

4    HAVE THIS MUCH AND WE ONLY HAVE THIS MUCH.

5         Q.   AND SO THE TIMING?

6         A.   SO HE SAID.

7         Q.   IT SEEMED --

8         A.   HE SAID WE DON'T HAVE NO TIME TO DO ANYTHING

9    ELSE EXCEPT -- IT WOULD BE BETTER IF YOU TOOK THE PLEA

10   BARGAIN BECAUSE YOU MIGHT NOT GET ANYTHING BETTER THAN

11   FIRST.

12        Q.   OKAY, AND THEN WHEN YOU TURNED HIM DOWN?

13        A.   THEN WE WENT TO TRIAL.

14        Q.   HE WENT TO TRIAL?  ALL RIGHT.  AND NONE OF THOSE

15   PEOPLE THAT YOU MENTIONED WERE THERE WHEN YOU KILLED THE

16   VICTIM, RIGHT?

17        A.   THEY WERE THERE LIKE RIGHT BEFORE.

18        Q.   THEY WEREN'T THERE AT THE TIME, THOUGH, WERE

19   THEY?

20        A.   NO, NOT EXACT TIME, BUT CLOSE TO IT.

21        Q.   OKAY.  AND THE PERSON WHO WAS THERE TESTIFIED,

22   ALLISON BROOKS, RIGHT?

23        A.   YES.

24        Q.   AND YOU ALSO REMEMBER THAT THE PEOPLE WHO MADE

25   THE TELEPHONE CALLS RIGHT BEFORE THIS OCCURRED TESTIFIED

26   AS WELL, DIDN'T THEY?  DO YOU REMEMBER THAT?

27        A.   THE PEOPLE THAT MADE THE CALLS.

28        Q.   IN OTHER WORDS --

1      A.    EDDIE IS THE ONE WHO MADE THE CALL.

2      Q.    IN OTHER WORDS, THERE WERE TELEPHONE CALLS MADE

3  AND THE PERSON WHO WAS ON THE OTHER END OF THE PHONE CAME

4  IN AND TESTIFIED AT YOUR TRIAL, DIDN'T THEY?

5      A.    YEAH.

6      Q.    OKAY, SO THEY TALKED ABOUT THE TIMING, RIGHT?

7      A.    NOBODY BROUGHT UP THE TIMING THAT WAS BETWEEN

8  THE TWO CALLS, SO THE TIMING COULD HAVE PROVED -- IF HE

9  WOULD HAVE BROUGHT IT UP, COULD HAVE PROVED THAT IT WASN'T

10 A WHOLE HOUR BETWEEN THE ALTERCATIONS BECAUSE THE

11 ALTERCATION ON ONE PHONE CALL.  AND THE ALTERCATION WAS

12 HAPPENING AS THE WITNESS SAID THAT CAME IN AND THEN THE

13 OTHER PHONE CALL WAS WITHIN 10 MINUTES LATER.  AND THE

14 ALTERCATION HAD ALREADY HAPPENED WITHIN THAT 10 MINUTES

15 LATER, SO THOSE TWO PHONE CALLS COULD PROVE THAT IT WASN'T

16 AN HOUR IN BETWEEN THE ALTERCATION, THAT IT WAS SOMETHING

17 THAT WAS GOING ON ALL AT ONCE.

18     Q.    AND YOU TESTIFIED, DIDN'T YOU?

19     A.    YES.

20     Q.    AND YOU TALKED ABOUT THE TIMING, DIDN'T YOU?

21     A.    I'M NOT SURE IF I DID OR NOT.

22     Q.    OKAY, BUT YOU HAD -- THAT WAS SOMETHING THAT

23 NOBODY TOLD YOU THAT YOU COULDN'T TALK ABOUT IT, RIGHT?

24     A.    I DON'T THINK SO.

25     Q.    YOU ANSWERED THE QUESTIONS THAT YOU WERE ASKED,

26 RIGHT?

27     A.    YES.

28     Q.    ALL RIGHT.  NOW LET ME GO OVER, DO YOU KNOW THIS

1    DR. WEISS?

2         A.   NO.

3         Q.   AND HAD YOU EVER MET HER?

4         A.   NO.

5         Q.   DID YOU EVER TALK TO HER?

6         A.   NO.

7         Q.   DO YOU KNOW ANYTHING ABOUT HER EXPERIENCE?

8         A.   I JUST KNOW THAT MY SISTER GOES TO HER AND

9    SHE'S -- IF SHE'S GOING TO HER, SHE'S PROBABLY A LICENSED

10   DOCTOR.

11        Q.   BUT YOU DON'T KNOW THAT, DO YOU?

12        A.   I DON'T KNOW FOR SURE.

13        Q.   OKAY, DO YOU KNOW ANYTHING ABOUT DR. WEISS'

14   EXPERIENCE IN THE AREA OF POSTTRAUMATIC STRESS SYNDROME?

15        A.   JUST WHAT SHE TOLD MY SISTER.

16        Q.   AND WHAT -- THAT WOULD HAVE BEEN TOLD TO YOU BY

17   YOUR SISTER, RIGHT?

18        A.   YES.

19        Q.   OKAY.  DO YOU KNOW -- YOU'RE FAMILIAR WITH

20   DR. AKRID?

21        A.   YES.

22        Q.   HE'S AN OPHTHALMOLOGIST -- OPTOMETRIST, RIGHT?

23   FITTED YOU FOR GLASSES?

24        A.   YES.

25        Q.   DID AN EYE EXAM WITH YOU?

26        A.   YES.

27        Q.   ABOUT HOW LONG WERE YOU WITH THIS DOCTOR?  AN

28   HOUR, HALF AN HOUR?

1      A.   I'VE BEEN WITH HIM -- LIKE I'VE SEEN HIM A

2  COUPLE TIMES.

3      Q.   OKAY, MORE THAN TWO?

4      A.   ABOUT TWICE, TWO OR THREE TIMES.

5      Q.   OKAY.  AND WAS THAT FOR BASICALLY EYE

6  EXAMINATIONS, NEW GLASSES?

7      A.   YES.

8      Q.   DID YOU EVER TALK TO THIS DR. AKRID ABOUT HIS

9  BACKGROUND?

10     A.   NO, BUT HE -- HE HAS HIS OWN BUSINESS AND HE HAS

11  A LICENSE AND EVERYTHING.

12     Q.   OKAY.  YOU DON'T KNOW WHETHER HE'S A MEDICAL

13  DOCTOR OR JUST A PERSON WHO FITS GLASSES, DO YOU?

14     A.   HE'S AN OPTOMETRIST.

15     Q.   OKAY.

16     A.   AND HE HAS A LADY WORKING OUT IN THE FRONT AND

17  SHE DOES -- SHE MAKES THE GLASSES AND FITS THE GLASSES.

18     Q.   DO YOU KNOW WHETHER HE KNOWS ANYTHING ABOUT

19  POSTTRAUMATIC STRESS DISORDER?

20     A.   NO, HE'S -- HE'S JUST A MEDICAL DOCTOR.

21     Q.   OKAY, HE WOULDN'T HAVE ANYTHING TO DO WITH THAT

22  THEN?

23         THE COURT:  I'M SORRY, IS HE AN OPTOMETRIST OR

24  OPHTHALMOLOGIST?

25         THE WITNESS:  I'M PRETTY SURE HE'S AN

26  OPTOMETRIST.

27         MS. MALLEN:  OKAY.

28

1    BY MS. MALLEN:

2         Q.    NOW, DID MR. PECKHAM PROMISE YOU THAT HE WOULD

3    DO ANYTHING SPECIFICALLY DURING HIS REPRESENTATION OF YOU

4    IN THIS CASE?

5         A.    HE SAID HE WOULD GO GET -- FIND MIKE OVERDORF,

6    HE WOULD FIND MARY ROSS AND HE WOULD FIND KEN KEMPY AND --

7    AND --

8         Q.    NOW --

9         A.    THAT WAS ABOUT IT.

10        Q.    MIKE OVERDORF, WAS HE AT THE APARTMENT THAT

11   MORNING?

12        A.    NO, HE WAS THERE THE NIGHT BEFORE.

13        Q.    OKAY.  AND WHAT WOULD HE HAVE CONTRIBUTED?

14        A.    OKAY, HE WAS IN THE PRISON YARD AND HE WAS

15   TALKING TO THE DECEASED'S MOTHER ON THE PHONE IN THE GYM

16   ON THE DONOVAN 3 YARD.  AND HE HAD PICTURES OF HIM AND HE

17   WAS RUNNING AROUND IN THE GYM AND HE WAS TALKING ABOUT

18   THAT BOB DEAL(PH) GUY, THEY WERE FRIENDS.

19        Q.    NOW, WERE YOU PRESENT WHEN HE WAS ON THE PHONE

20   IN THE YARD TO SOMEBODY?

21        A.    I WAS IN THE SAME GYM, BUT I MEAN, I WASN'T

22   RIGHT NEXT TO HIM WHEN HE WAS ON THE PHONE, BUT HE TOLD ME

23   HE WAS ON THE PHONE WITH THEM.

24        Q.    OKAY.  SO THIS IS SOMEBODY WHAT, KNEW SOMETHING

25   ABOUT THE JAIL INFORMANT WHO TESTIFIED, RIGHT?

26        A.    YEAH, HE WAS TALKING TO HIM.

27        Q.    ALL RIGHT.  DID YOU HAVE AN ADDRESS FOR

28   MR. OVERDORF?

1    A.    NO, I RAN INTO HIM IN JAIL NOT TOO LONG AGO AND

2 HE'S ON PAROLE, SO HE COULD BE GOTTEN A HOLD OF THROUGH

3 THE PAROLE DEPARTMENT.

4    Q.    AT THE TIME OF YOUR TRIAL, DID YOU GIVE

5 MR. PECKHAM AN ADDRESS?

6    A.    NO, HE WAS ON PAROLE; HE COULD BE FOUND THROUGH

7 AN INVESTIGATOR THROUGH THE PAROLE DEPARTMENT BECAUSE HE

8 WAS INSIDE.

9    Q.    DO YOU KNOW WHETHER MR. PECKHAM DID ANYTHING

10 WITH THE INFORMATION THAT YOU GAVE HIM ABOUT MR. OVERDORF?

11    A.    HE SAID HE WAS GOING TO, BUT I DON'T THINK HE

12 DID.

13    Q.    DID YOU ASK HIM ABOUT IT?

14    A.    YES.

15    Q.    WHAT DID HE TELL YOU?

16    A.    HE SAID THAT IT WAS TOO SOON, THAT WE WERE GOING

17 TO TRIAL SOON AND THERE WAS NOTHING THAT YOU COULD DO.

18    Q.    SO YOU TALKED TO HIM RIGHT BEFORE THE TRIAL

19 ABOUT MR. OVERDORF?

20    A.    NO, I TALKED TO HIM A COUPLE MONTHS, ABOUT A

21 MONTH BEFORE THE TRIAL.

22    Q.    OKAY, AND WHAT -- WHO IS -- MARY ROSS WAS A

23 PERSON WHO WAS AT THE APARTMENT THAT MORNING, RIGHT?

24    A.    SHE WAS THERE LIKE 15 MINUTES BEFORE THIS WHOLE

25 THING HAPPENED.

26    Q.    DO YOU KNOW WHETHER SHE WOULD HAVE BEEN HELPFUL

27 TO YOUR DEFENSE OR NOT?

28    A.    WITH HER AND KEN KEMPY, BECAUSE THEY LEFT LIKE

1  WITHIN 15 MINUTES, SO THAT WOULD PUT -- PUT THE TIMING IN

2  LINE, BECAUSE THAT EXTRA HOUR THAT SHE'S SAYING THAT I SAT

3  ON THE COUCH, I KNOW THAT'S THAT EXTRA HOUR THAT THEY WERE

4  IN THE ROOM SMOKING DOPE BEFORE IT HAPPENED.  AND SHE

5  DENIED THAT THEY WERE EVER DOING ALL OF THAT AND SHE SAID

6  THAT I WAS SITTING ON THE COUCH FOR AN HOUR WHEN -- WHEN I

7  WASN'T.  IT ALL WENT DOWN WITHIN LIKE 10 MINUTES.

8       Q.    ALL RIGHT.  SO THESE ARE PEOPLE WHO -- WHO, IN

9  GENERAL, JUST TALK ABOUT THE APARTMENT AND -- AND WHAT YOU

10  WERE DOING BEFORE THE STABBING HAPPENED, RIGHT?

11       A.    THEY WERE -- THEY WOULD CUT DOWN THE PROVOCATION

12  TIME.  IN OTHER WORDS, THEY WOULD SHOW THAT -- THAT I

13  WASN'T JUST -- THAT THE PROVOCATION HAD HAPPENED AND I SAT

14  DOWN AND COOLED OFF FOR AN HOUR AND THEN IT HAPPENED

15  AGAIN.  THEY WOULD SHOW THAT THEY JUST LEFT 15 MINUTES

16  BEFORE THAT, CAME BACK AND THEY WENT OVER TO SOMEONE'S

17  HOUSE TO GET SOMETHING AND THEY DROVE BACK.  AND WHEN THEY

18  DROVE BACK, WHICH ONLY TOOK THEM LIKE 15 OR 20 MINUTES TO

19  GO THERE AND BACK, BY THE TIME THEY GOT BACK, THEY SEEN

20  AMBULANCES THERE, SO IT WOULD SHOW THIS WHOLE ARGUMENT AND

21  THIS WHOLE THING WENT DOWN ALL IN ONE TIMING, AS TO WHERE

22  THE WITNESS SAID THAT WE GOT IN A FIGHT AND THEN I WENT

23  AND LAID ON THE COUCH FOR AN HOUR, WHICH WAS A LIE, AND --

24       Q.    WHAT ARGUMENT ARE YOU TALKING ABOUT?

25       A.    THAT -- IT'S UPON A SUDDEN QUARREL OR A HEAT OF

26  PASSION.

27       Q.    YOU'RE QUOTING YOUR INSTRUCTIONS?

28       A.    IT WAS A SUDDEN QUARREL.  IT HAPPENED WITHIN A

1    SHORT PERIOD OF TIME; THAT I WASN'T LAYING THERE FOR AN

2    HOUR AFTER WE GOT INTO AN ARGUMENT.  THAT IT ALL HAPPENED

3    IN ONE ACTION.

4        Q.    DESCRIBE TO ME THE ARGUMENT YOU'RE REFERRING TO,

5    WHAT HAPPENED?

6        A.    OKAY, FIRST THEY CAME OUT AND THEY HANDED ME A

7    PIPE.

8        Q.    WHO IS "THEY"?

9        A.    JOYCE AND ALLISON.  AND THEN I THREW IT AND THEN

10   EDDIE GOT ALL MAD.

11       Q.    DIDN'T THIS HAPPEN THE NIGHT BEFORE?

12       A.    NO.

13       Q.    IT HAPPENED THAT MORNING?

14       A.    IT HAPPENED THAT NIGHT, THIS ALL HAPPENED AT ONE

15   TIME.

16       Q.    WHEN DID THIS HAPPEN, AT WHAT TIME OF DAY?

17       A.    IT WAS LIKE ABOUT -- I DON'T KNOW, AROUND 7:30.

18       Q.    ALL RIGHT.  AND THAT'S WHEN YOU THREW THE PIPE

19   AT THE WALL?

20       A.    YES.

21       Q.    WELL, WHAT -- WHO WERE YOU ARGUING WITH?

22       A.    JOYCE AND EDDIE WERE ARGUING TOGETHER BECAUSE

23   EDDIE WAS SUPPOSED TO MOVE OUT AND EDDIE HAD STOLE SOME

24   WATCHES FROM HER.  AND THEY HANDED ME THE PIPE AND I THREW

25   IT BECAUSE THEY WERE ALL CRAZY.

26       Q.    SO YOU SAW JOYCE?

27       A.    I SAID IF THIS IS GOING TO MAKE YOU GUYS CRAZY

28   LIKE THIS, I DON'T WANT TO DO IT.  AND I THREW IT AT THE

132

1    WALL AND THEN THEY GOT MAD AT ME BECAUSE I BROKE THE PIPE.

2    AND SHE GOT IN MY FACE AND THEN HE SAID HE WAS GOING TO

3    CALL THIS GANG, AND HE CALLED THEM UP.  AND THEN SHE SAID

4    SHE WAS GOING TO GO OUT AND WAIT FOR THEM.  AND LIKE RIGHT

5    BEFORE THAT, MARY AND KEN WERE JUST SMOKING IN THE ROOM

6    WITH THEM AND THEY JUST LEFT BECAUSE THEY WERE GOING OVER

7    TO THIS GUY DENNIS', WHICH I FOUND OUT LATER IN COUNTY

8    JAIL WHEN I RAN INTO HIM BECAUSE HE SAID HE DROVE BACK BY.

9        Q.   LET ME STOP YOU FOR A MINUTE.  LET'S GO BACK TO

10   WHAT WE'RE TALKING ABOUT.  SO WHAT YOU'RE SAYING IS THIS

11   ARGUMENT THAT YOU HAD WITH JOYCE AND THE VICTIM HAPPENED

12   SOME TIME BEFORE THE FIRST PHONE CALL, RIGHT?

13       A.   NO, IT HAPPENED RIGHT -- YEAH, RIGHT ABOUT THE

14   FIRST PHONE CALL.

15       Q.   RIGHT ABOUT THE TIME OF THE FIRST PHONE CALL,

16   RIGHT?

17       A.   RIGHT AROUND THERE, YEAH.

18       Q.   SO THERE WAS TESTIMONY ABOUT WHEN THAT FIRST

19   PHONE CALLED HAPPENED, WASN'T THERE?

20       A.   I THINK THERE WAS JUST ONE SIDE, THOUGH.

21       Q.   OKAY.  AND THEN AFTER THE SECOND PHONE CALL, DO

22   YOU REMEMBER THE SECOND PHONE CALL?

23       A.   NO.

24       Q.   OKAY.  THEN THE STABBING TOOK PLACE AFTER THIS

25   FIRST PHONE CALL, RIGHT?

26       A.   I'M PRETTY SURE.

27       Q.   ALL RIGHT.  DID YOU -- DO YOU REMEMBER

28   MR. PECKHAM AT TRIAL?

1    A.    YES.

2    Q.    DO YOU REMEMBER THAT HE PRESENTED PAPERS TO THE

3 COURT?

4    A.    WHAT KIND OF PAPERS.

5    Q.    SO YOU DON'T KNOW EXACTLY WHAT HE DID, DO YOU?

6    A.    NO.

7    Q.    OKAY.  BECAUSE YOU'RE NOT A LAWYER, RIGHT?

8    A.    YES.

9    Q.    BUT YOU SAW HIM STAND UP AND MAKE OBJECTIONS,

10 RIGHT?

11    A.    HE DIDN'T MAKE THAT MANY OBJECTIONS.

12    Q.    OKAY.  BUT YOU SAW HIM MAKE SOME, DIDN'T YOU?

13    A.    HE MIGHT HAVE.

14    Q.    ALL RIGHT.  YOU SAW HIM TALK TO THE JUDGE ABOUT

15 THINGS, DIDN'T YOU?

16    A.    YES.

17    Q.    AND HE CALLED WITNESSES FOR YOU, DIDN'T HE?

18    A.    THE ONE WITNESS THAT -- THAT CAME IN THAT WAS A

19 WITNESS THAT WAS AT THE HOUSE, HE CAME IN FOR MARNIE STEIN

20 AND HE WAS SUBPOENAED BY MARNIE STEIN.  AND THAT'S THE

21 ONLY WITNESS THAT WAS AT THAT HOUSE THAT HE CALLED AND HE

22 DIDN'T REALLY CALL THEM.  I MEAN, HE JUST SEEN THAT HE WAS

23 THERE AND THAT'S WHEN HE WENT AND TALKED TO HIM AND

24 BROUGHT HIM IN AS A WITNESS.

25    Q.    DO YOU REMEMBER HE CALLED YOUR FATHER AS A

26 WITNESS FOR YOU?

27    A.    YES.

28    Q.    DO YOU REMEMBER THAT HE ALLOWED YOU TO TESTIFY

1    AS A WITNESS FOR YOURSELF?

2         A.    THE DOCTOR?

3         Q.    NO, MR. PECKHAM ALLOWED -- HAD YOU --

4         A.    YES.

5         Q.    AND HE HAD THE DOCTOR TESTIFY AS WELL?

6         A.    YES.

7         Q.    AND HE HAD JOSHUA ROBERTS TESTIFY AS WELL AND HE

8    HAD THE TOXICOLOGIST INFORMATION AS WELL?

9         A.    YES.

10        Q.    OKAY.  NOW THE KILLING, WHEN THE VICTIM WAS

11   KILLED, YOU'VE TESTIFIED THAT YOU THOUGHT THAT YOU WERE

12   BEING THREATENED BY THE VICTIM, RIGHT?  IS THAT A YES?

13        A.    YES.

14        Q.    AND YOU THOUGHT THAT YOU NEEDED TO PROTECT

15   YOURSELF, RIGHT?

16        A.    YES.

17        Q.    FROM THIS VICTIM AND WHATEVER HE WAS HOLDING,

18   RIGHT?

19        A.    YES.

20        Q.    AND YOU ACTED BASED ON A DESIRE TO STOP THIS

21   PERSON, RIGHT?

22        A.    YES.

23        Q.    OKAY.  YOU THOUGHT THAT THE VICTIM WAS MOVING

24   TOWARDS YOU AND YOU NEEDED TO MOVE TO STOP HIM?

25        A.    YES.

26        Q.    AND YOU WERE AFRAID OF THIS PARTICULAR VICTIM

27   AND WHAT -- WHAT HE MIGHT DO?

28        A.    YES.

1    Q.    NOW YOU HAD THE CHANCE TO TESTIFY IN THIS TRIAL,

2    RIGHT?

3    A.    YES.

4    Q.    YOU HAD THE CHANCE TO TALK ABOUT THE THINGS THAT

5    YOU THOUGHT WERE IMPORTANT?

6    A.    I DIDN'T HAVE A CHANCE TO TALK ABOUT EVERYTHING.

7    Q.    YOU TALKED ABOUT WHATEVER THE JUDGE WOULD LET

8    YOU TALK ABOUT, RIGHT?

9    A.    BECAUSE I WAS CUT OFF AS SOON AS I WAS TALKING

10   ABOUT THE ENVIRONMENT AROUND THERE AND I WAS TALKING ABOUT

11   WHAT WAS GOING ON WITH THEM WIELDING KNIVES AND STUFF LIKE

12   THAT.

13   Q.    AND THE JUDGE CUT YOU OFF, DIDN'T HE?

14   A.    THE JUDGE AND THE -- AND THE D.A. CUT ME OFF AND

15   THE JUDGE CUT ME OFF, BUT NOBODY CHALLENGED IT OR OBJECTED

16   TO IT.

17   Q.    OKAY.  AND SOME OF THE THINGS THAT YOU'VE TOLD

18   US HERE IN COURT TODAY, YOU HAD A CHANCE OR THEY'RE THE

19   SAME THINGS THAT YOU TOLD THE JURY, RIGHT?

20   A.    I GOT TO SAY MORE HERE THAN I DID THERE BECAUSE

21   I WAS CUT OFF ALL THE TIME, NOBODY OBJECTED, SO A LOT OF

22   STUFF I DIDN'T GET TO SAY THAT I'VE BEEN ABLE TO SAY HERE.

23   Q.    BUT BASICALLY YOU'RE NOT CHANGING ANYTHING THAT

24   YOU SAID THE FIRST TIME HERE, ARE YOU?  YOU'RE JUST

25   EXPANDING ON IT MORE, YOU'RE EXPLAINING?

26   A.    IT'S NOT REALLY THAT I'M TRYING TO CHANGE

27   ANYTHING, I'M TRYING TO EXPLAIN WHAT I WASN'T ALLOWED TO

28   EXPLAIN AND I EXPLAINED MORE OF WHAT I WASN'T ALLOWED TO

1    EXPLAIN BECAUSE I WAS CUT OFF.

2              MS. MALLEN:  OKAY.  THANK YOU.  NOTHING FURTHER.

3              THE COURT:  MR. WILLIAMS?

4              MR. WILLIAMS:  THANK YOU.

5

6                    **REDIRECT EXAMINATION**

7    BY MR. WILLIAMS:

8         Q.   WHEN YOU SAID YOU WERE CUT OFF TALKING ABOUT

9    CERTAIN THINGS, WHAT CERTAIN THINGS WERE YOU CUT OFF

10   TALKING ABOUT?

11        A.   OKAY, I WAS ASKED ABOUT THE ENVIRONMENT IN THE

12   APARTMENT.

13        Q.   OKAY.

14        A.   AND I WAS GOING TO TALK -- START TO TELL THEM

15   ABOUT HOW THE MOTHER AND THE SON WERE CHASING EACH OTHER

16   WITH BUTCHER KNIVES AND THROWING PHONES AND GLASSES AND

17   BOTTLES AT EACH OTHER.

18        Q.   OKAY.

19        A.   AND AS SOON AS I WENT TO TALK ABOUT THAT, IT'S

20   IN THE TRIAL TRANSCRIPT, THAT'S WHEN I WAS CUT OFF AND I

21   COULDN'T SAY ANYTHING ABOUT IT.

22        Q.   WERE YOU ALLOWED TO TALK ABOUT YOUR MENTAL

23   STATE?  DO YOU UNDERSTAND MY QUESTION?

24        A.   YES, AND THEN THAT -- FROM THERE I WAS GOING TO

25   TALK ABOUT HOW IT AFFECTED ME MENTALLY.

26        Q.   WERE YOU ALLUDED TO THAT?

27        A.   NO.

28        Q.   AND WHY DID YOU THROW THE PIPE?

1     A.   OH, BECAUSE THEY WERE FIGHTING WITH EACH OTHER

2    AFTER THEY CAME OUT OF THE ROOM AND THEY WANTED ME TO

3    SMOKE SOME.  AND I LOOKED AT THEM FIGHTING AND I GOT REAL

4    NERVOUS BECAUSE I DIDN'T WANT TO BE DOING ANYTHING WITH

5    THEM FIGHTING THE WAY THEY FIGHT WITH EACH OTHER BECAUSE

6    THEY ALWAYS THROW THINGS.

7     Q.   YOU DIDN'T WANT --

8     A.   I LOOKED AT THEM AND I SAID IF IT'S GOING TO

9    MAKE YOU GUYS LIKE THIS, IT'S NOT GOING TO BE NO FUN, AND

10    I THREW THE PIPE.

11     Q.   OKAY.  NOW YOU TALKED ABOUT GETTING A

12    CONTINUANCE.  DID YOU EVER ASK MR. PECKHAM -- YOU ASKED

13    HIM FOR A CONTINUANCE TO GET A CONTINUANCE, BUT THAT WAS

14    TO FIND MORE WITNESSES, CORRECT?

15     A.   YES.

16     Q.   DID YOU EVER ASK HIM TO GET A CONTINUANCE TO

17    HAVE YOU EVALUATED?

18     A.   I ASKED HIM -- I ASKED HIM NOT THROUGH THE

19    CONTINUANCE OR EVALUATION, BUT I ASKED HIM IF WE SHOULD

20    GET A PSYCH. BECAUSE I THOUGHT I NEEDED ONE AND HE SAID --

21    HE SAID, NO, WE DON'T NEED ONE.

22     Q.   OKAY.  NOW THE PAPERS THAT YOU HAD UP THERE AND

23    I'VE GOT THEM, THEY'RE RIGHT HERE IN THIS ENVELOPE IN

24    FRONT OF ME, SOME OF THOSE ARE LETTERS THAT YOU'VE WRITTEN

25    TO ME, CORRECT, OR THINGS YOU'VE WRITTEN FOR ME?

26     A.   JUST THINGS THAT I WROTE DOWN.

27     Q.   TO GIVE TO ME?

28     A.   YES.

1    Q.    AND SOME OF THEM ARE WHAT, XEROXED CASES?

2    A.    CASE LAW.

3    Q.    AND OBVIOUSLY THE PLEADINGS IN THIS CASE, RIGHT?

4    A.    YES.

5    Q.    OKAY, AND YOU'VE REVIEWED ALL THAT BEFORE YOU

6    CAME INTO COURT?

7    A.    YES, I -- I'M READING THEM.

8         MR. WILLIAMS:  NOTHING FURTHER.

9         THE COURT:  MS. MALLEN?

10        MS. MALLEN:  NO FURTHER QUESTIONS, THANK YOU.

11        THE COURT:  OKAY.  STEP DOWN.  YOU'LL BE

12   ESCORTED BACK --

13        MR. WILLIAMS:  YOU KNOW WHAT, WHY DON'T I ASK

14   HIM ONE QUESTION, COULD I PLEASE, YOUR HONOR?

15        THE COURT:  SURE.

16   BY MR. WILLIAMS:

17   Q.    MR. LITTLE, ACTUALLY IT'S GOING TO BE SEVERAL

18   QUESTIONS.  WHILE YOU WERE IN STATE PRISON, AWAITING

19   THIS -- THE FILING OF PAPERS AND HEARING ON A WRIT, I SENT

20   YOU SOME PLEADINGS, CORRECT?  PIECES OF PAPER FOR YOU TO

21   SIGN?

22   A.    YES.

23   Q.    ONE OF THEM IS WAIVER OF ATTORNEY/CLIENT

24   PRIVILEGE BETWEEN YOU AND MR. PECKHAM, CORRECT?

25   A.    YES.

26   Q.    AND YOU SIGNED THAT AND HAD IT WITNESSED, RIGHT?

27   A.    YES.

28   Q.    AND THEN LATER ON WHEN YOU FINALLY GOT HERE IN