ORIGINAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Larry John Little, Jr.
   Petitioner.



FILED

JUN 1 8 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

CASE NO.: 08CV1043 JM (PCL)

CA SUPREME CT NO. D047468

CT. OF APP. NO.  D035850

SUPERIOR CT NO.  SCE 198946

v.

D.K. Sisto, Warden of California
State Prison-Solano County,
   Respondant

NUNC PRO TUNC

JUN 1 3 2008

PEOPLE OF THE STATE OF CALIFORNIA

   Real Party in Interest      /

---

EXHIBITS TO

PETITION FOR WRIT OF HABEAS CORPUS

---

Larry John Little, Jr.
P-82205, 8-211U
CSP-Solano, P.O. Box 4000
Vacaville, CA  95696

In Pro Persona

## APPENDIX NO: 1 – EXHIBIT INDEX

| EXHIBIT NO: | DESCRIPTION |
|---|---|
| A. | Information filed December 14, 1999, in SCE198946. |
| B. | Minute Order of Verdict and Abstract of Judgment in case No.: SCE198946. |
| C. | Notice of Appeal filed June 15, 2000 in SCE198946. |
| D. | Court of Appeal Opinion in D035850 (Suoer.Ct. No. SCE198946 filed October 10, 2001. |
| E. | Minute Order of August 26, 2004, Decision after Hearing and partial transcript of Oral Proceedings of Court Order on hearingon Order to Show CAuse re: Habeas Corpus in No. EHC388 (SCE198946). |
| F. | Petition for Writ of Habeas Corpus form filed in Court of Appeal, Divison One, on November 3, 2005. |
| G. | Partial transcript of a summary denial of Petition filed on January 16, 2008, in Court of Appeal, Fourth Appellate District, Division One, on Order to Show Causere: Habeas Corpus in case No. EHC388 (SCE198946). |
| H. | Petition for Review filed in the California Supreme Court by Petitioner's Court Appointed Attorney and a Supplement Petitioner submitted by Petitioner to exhaust all Facts in the State's Highest Court and Petition for Review denied by Same on March 12, 2008. |
| I. | Partial transcript of oral proceedings of hearing on Order to Show Cause, re: Habeas Corpus in case no: EHC388 (SCE198946). |

## APPENDIX NO 1 - EXHIBIT INDEX con't

**EXHIBITS NO.**                                    **DISCRIPTION**

Witness:   Sharon Little.

J.        Partial transcript of oral proceedings of Hearing on Order

to Show Cause re: Habeas Corpus in case no: EHC388

(SCE198946)

Witness:   Larry Little, Sr.

K.        Partial transcript of oral proceedings of Hearing on Order

to Show Cause re: Habeas Corpus in case no: EHC388

(SCE198946)

Witness:   Petitioner

L.        Partial transcript of oral proceedings of Hearing on Order

to Show Cause re: Habeas Corpus in case no. EHC388

(SCE198946).

Witness:   Edward J. Peckham (Petitioner's Trial Attorney).

M.        Declaration of Alan A. Abrams, M.D., J.D.

N.        Letter report of Alan A. Abrams, M.D., J.D., dated February

10, 2007.

O.        Declaration of Inge Brauer, Esquire

P.        Declaration of petitioner's counsel

//

//

//

## APPENDIX NO: 2 – EXHIBIT INDEX

**EXHIBIT**                              **DESCRIPTION**

A.          Declaration of Larry John Littl, Jr.

B.          Declaration of Sharon Little re: Evidence withheld at trial

C.          Declaration of Larry Little, Sr.

D.          Marth L. McGill dated June 19, 2001.

E.          Robert Teal Letter.

F.          Robert Teal transcript.

G.          Supplemental application to Petitioner's Denial to

            People's return on Petition for Writ of Habeas Corpus and

            Order to Show Cause, with Points and Authorities.

H           Declaration of Ken Kimpe, re: Evidence withheld at trial.



ORIGINAL

# APPENDIX No. 1

# EXHIBIT   A

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SAN DIEGO

000

PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff,

v.

LARRY JOHN LITTLE,
dob 01/03/65;

Defendant

CT No. SCE198946
DA No. PD002614

INFORMATION

F I L E D
STEPHEN THUNBERG
Clerk of the Superior Court

DEC 1 4 1999

By: L. ARCHIBEQUE, Deputy

## CHARGE SUMMARY

| Count | Charge | Issue Type | Sentence Range | Special Allegations | Allegation Effect |
|-------|--------|-----------|----------------|---------------------|-------------------|
| 1 | PC187(a) | Felony | 25 Yrs-Life | | |
| | LITTLE, LARRY JOHN | | | PC12022(b)(1) | +1 Yr |

The District Attorney of the County of San Diego, State of California, accuses the Defendant(s) of committing, in the County of San Diego, State of California, the following crime(s):

## CHARGES

COUNT 1 - MURDER

On or about June 15, 1999, LARRY JOHN LITTLE did unlawfully murder Edward Rabatore, a human being, in violation of PENAL CODE SECTION 187(a).

And it is further alleged that in the commission and attempted commission of the above offense, the said defendant, LARRY JOHN LITTLE, personally used a deadly and dangerous weapon, to wit: a knife, within the meaning of PENAL CODE SECTION 12022(b)(1).

EXHIBIT A

# PRIORS

*LARRY JOHN LITTLE:*

FIRST PRISON PRIOR

And it is further alleged that said defendant, LARRY JOHN LITTLE served a separate prison term for such offense(s), which under California law is punishable by imprisonment in state prison whether in California or elsewhere, and that he has not remained free of prison custody and free of the commission of an offense resulting in a felony(ies) conviction for five years subsequent to his release from prison for the felony(ies) below, within the meaning of PENAL CODE SECTION 667.5(b) AND 668.

| Charge | Date of Conviction | Court Number | Court | County | State |
|--------|-------------------|--------------|-------|--------|-------|
| HS11378 | 07/07/1987 | CR88412 | Superior Court | San Diego | CA |

SECOND PRISON PRIOR

And it is further alleged that said defendant, LARRY JOHN LITTLE served a separate prison term for such offense(s), which under California law is punishable by imprisonment in state prison whether in California or elsewhere, and that he has not remained free of prison custody and free of the commission of an offense resulting in a felony(ies) conviction for five years subsequent to his release from prison for the felony(ies) below, within the meaning of PENAL CODE SECTION 667.5(b) AND 668.

| Charge | Date of Conviction | Court Number | Court | County | State |
|--------|-------------------|--------------|-------|--------|-------|
| PC496(A) | 07/20/1995 | ECR11693 | Superior Court | San Diego | CA |

THIS INFORMATION, NUMBERED SSCE198946, CONSISTS OF 1 COUNT.

Paul J. Pfingst
District Attorney
County of San Diego
State of California
by:

12 DEC. '99
_____
Date

_____
Deputy District Attorney

APPENDIX No. 1

# EXHIBIT  B

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN DIEGO
El Cajon Branch

DATE: MAY 03, 2000       DEPT: 9            REPORTER: LORI KOWALSKI           CSR#: 10810

PRESENT HON. MICHAEL B. HARRIS           REPORTER:                           CSR#:
                         JUDGE

CLERK: M. C. del TORO

BAILIFF: CONNIE LEHAN                     REPORTERS' ADDRESS: P.O. 128
                                          SAN DIEGO, CA 92112-4104

---

SCE198946        PEOPLE OF THE STATE OF CALIFORNIA,   BY: MARNIE STEIN, DDA
DA#PD002614                              Plaintiff,

                 vs.
                 LARRY JOHN LITTLE, JR.,              BY: EDWARD J. PECKHAM, PCC
                                         Defendant.

9:00 a.m.  This being the time previously set for **FURTHER JURY TRIAL** in the above entitled matter having been continued from May 02, 2000, the jurors are escorted to the jury deliberations room by the sworn bailiff to resume deliberations.

10:05 a.m.  The bailiff notifies the Court that the jury has reached a verdict.  Counsel and the alternate jurors are notified to return to court forthwith.  The jurors are admonished and excused for recess until 10:37 a.m. at which time court convenes with counsel as previously noted and the defendant present.  The jurors are escorted into the courtroom by the sworn bailiff.  The alternate jurors are present.  Upon the Court's inquiry, the presiding juror states that the jury has reached a verdict.  **TRIAL RESUMES** when, at the direction of the Court, the clerk reads the verdicts, copies of which are attached hereto and incorporated herein.  Counsel waive polling of the jury on the not guilty verdict on the first degree murder but defense counsel requests polling of the jury on the guilty verdict on the second degree murder.  The jury is polled with the following results to the question, "Is this your verdict, 12 Yes 0 No.  At the direction of the Court, the verdicts are recorded.  The jurors are thanked for their participation, released from the admonishment and excused to return to the jury lounge for release.  All jurors leave the courtroom.  As to the court trial on the priors, the People request additional time to get the priors.

10:50 a.m.  Court is in recess.

11:14 a.m.  Court reconvenes with counsel as previously noted and the defendant present.  The defendant having previously waived a trial by jury on the alleged priors, the Court proceeds to hear the matter.

11:15 a.m.  **CHRISTOPHER STARKOVSKY** is sworn and examined on behalf of the People.  The following court's exhibits have been previously marked for identification on behalf of the People and are received in evidence:

**COURT'S EXHIBIT 35 – 3 page documents consisting of booking sheet and face card**

EXHIBIT B

SCE198946          PEOPLE vs. LARRY J. LITTLE, JR.          PAGE 2          0240
                                                                      05-03-00

**COURT'S EXHIBIT 36 – 2 page documents consisting of booking sheet and fingerprint card**
**COURT'S EXHIBIT 37 – 10 print fingerprint card for defendant dated 01-19-83**
**COURT'S EXHIBIT 38 -** Certified copies of prison packets on cases CR88412 and ECR11693
**COURT'S EXHIBIT 33 -** Certified copies consisting of 10 pages on case CR88412
**COURT'S EXHIBIT 34 -** Certified copies consisting of 7 pages on case ECR11693

11:30 a.m.  Court is in recess.
11:45 a.m.  Court is again in session with counsel as previously noted and the defendant present.
**The Court makes a true finding as to the following allegations of priors:**

**First Prison Prior pursuant to PC667.5(b)**
**Second Prison Prior pursuant to PC667.5(b)**

A referral is made to the Probation Department for a pre-sentence report.  Defendant waives time and
**PROBATION HEARING AND SENTENCING IS SET FOR FRIDAY, JUNE 02, 2000 AT 1:30 P.M. IN
DEPARTMENT 9.**  The defendant is remanded into the custody of the Sheriff with no bail set.
11:50 a.m.  Court is adjourned in this matter.

-mcdt-

**CLERK'S NOTE:  Due to attorney Peckham, at the Court's request, having to be in the
courthouse all morning while the jurors were deliberating due to any questions the jurors
might have, the Court orders that Mr. Peckham be paid for a full day of services.**

ABSTRACT OF JUDGMENT – PRISON COMMITMENT – INDETERMINATE *(NOT VALID WITHOUT COMPLETED PAGE TWO OF CR-292 ATTACHED)*

CR-292

| ☒ SUPERIOR | COURT OF CALIFORNIA, COUNTY OF DIEGO |
| ☐ MUNICIPAL | BRANCH OR JUDICIAL DISTRICT EL CAJON |

0209

F I L E D
STEPHEN THUNBERG
Clerk of the Superior Court

JUN 0 8 2000

By M.C. del TORO, Deputy

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA vs. | DOB: 01-03-65 | SCE198946 -A |
| DEFENDANT: LARRY JOHN LITTLE, JR. | | -B |
| AKA: PIRATE | | -C |
| 397485 | ☐ NOT PRESENT | |
| NG #: 99161824A | | |
| COMMITMENT TO STATE PRISON | ☐ AMENDED ABSTRACT | -D |
| ABSTRACT OF JUDGMENT | | |

| DATE OF HEARING 06-08-00 | DEPT. NO. 9 | JUDGE M. B. HARRIS |
|---|---|---|
| CLERK C. del TORO | REPORTER C. CAMERON | PROBATION NO. OR PROBATION OFFICER F. AVILA |
| COUNSEL FOR PEOPLE M. STEIN | | COUNSEL FOR DEFENDANT E. PECKHAM   ☒ APPTD. |

1. Defendant was convicted of the commission of the following felonies:
   ☐ Additional counts are listed on attachment
   ___ (number of pages attached)

| CNT. | CODE | SECTION NO. | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION (MO./DATE/YEAR) | CONVICTED BY JURY | COURT | PLEA | CONCURRENT | CONSECUTIVE | 654 STAY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PC | 187(a)** | MURDER 2ND DEGREE | 99 | 05-03-00 | X | | | | | |
| | | | | | · · | | | | | | |
| | | | | | · · | | | | | | |
| | | | | | · · | | | | | | |
| | | | | | · · | | | | | | |

ENHANCEMENTS charged and found to be true TIED TO SPECIFIC COUNTS (mainly in the PC 12022 series). List each count enhancement horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST enhancements stricken under PC 1385.

| CNT. | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12022(b)(1) | 1 | | | | | | | 1 | 0 |
| | | | | | | | | | | |
| | | | | | | | | | | |

ENHANCEMENTS charged and found to be true FOR PRIOR CONVICTION OR PRISON TERMS (mainly in the PC 667 series). List all enhancements horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST enhancements stricken under PC 1385.

| ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|
| 667.5(b) | 1 | 667.5(b) | 1 | | | | | 2 | 0 |
| | | | | | | | | | |

efendant was sentenced to State Prison for an INDETERMINATE TERM:
☐ For LIFE WITHOUT THE POSSIBILITY OF PAROLE on counts
☐ For LIFE WITH POSSIBILITY OF PAROLE on counts
☒ For **15** years to life, WITH POSSIBILITY OF PAROLE on counts 1
PLUS enhancement time shown above.
☐ Additional determinate term (see CR-290).
Defendant was sentenced pursuant to ☐ PC 667(b)-(i) or PC 1170.12   ☐ PC 667.61   ☐ PC667.7   ☐ PC 667.9
☐ other *(specify)*:

's form is prescribed under PC 1213.5 to satisfy the requirements of PC 1213 for indeterminate sentences. Attachments may be used but must be referred to in this document.

*(Continued on reverse)*

ABSTRACT OF JUDGMENT – PRISON COMMITMENT – INDETERMINATE
*[NOT VALID WITHOUT COMPLETED PAGE TWO OF CR-292 ATTACHED]*

d by the
Judicial Council of California
-292 (Rev. January 1, 1999)

Penal Code
§§ 1213, 1213.5

EXHIBIT B

PEOPLE OF THE STATE OF CALIFORNIA vs
DEFENDANT: LARRY J. LITTLE JR.

CASE NUMBER: 01043-JM-PCL    Document 4    Filed 06/18/2008    Page 12 of 173

0210

| SCE198946 -A | | -B | | -C | | -D |
|---|---|---|---|---|---|---|

9. FINANCIAL OBLIGATIONS (including any applicable penalty assessments):

RESTITUTION FINE of: **$3600** per PC 1202.4(b) forthwith per PC 2085.5.
RESTITUTION FINE of: **$3600** per PC 1202.45 suspended unless parole is revoked.

c. RESTITUTION of: $**TBD** per PC 1202.4(f) to ☒ victim(s)* ☐ Restitution Fund
(*List victim name(s) if known and amount breakdown in item 11, below.)
(1) ☒ Amount to be determined.
(2) ☐ Interest rate of: __ % (not to exceed 10% per PC 1202.4(f)(3)(F)).

d. ☐ LAB FEE of: $____ for counts: _____ per H&SC 11372.5(a).

e. ☐ DRUG PROGRAM FEE of $150 per H&SC 11372.7(a).

f. ☐ FINE of $___ per PC 1202.5.

10. TESTING
a. ☐ AIDS pursuant to ☐ PC 1202.1 ☐ other (specify):
b. ☐ DNA pursuant to ☐ PC 290.2 ☐ other (specify):

11. Other orders (specify):

12. Execution of sentence imposed

a. ☒ at initial sentencing hearing. **06-08-00**      d. ☐ at resentencing per recall of commitment. (PC 1170(d).)
b. ☐ at resentencing per decision on appeal.      e. ☐ other (specify):
c. ☐ after revocation of probation.

13. CREDIT FOR TIME SERVED

| CASE NUMBER | TOTAL CREDITS | ACTUAL | LOCAL CONDUCT |
|---|---|---|---|
| SCE198946    -A | 314 | 314 | 0 | ☐ 4019  ☒ 2933.1 |
| -B | | | | ☐ 4019  ☐ 2933.1 |
| -C | | | | ☐ 4019  ☐ 2933.1 |
| -D | | | | ☐ 4019  ☐ 2933.1 |

| DATE SENTENCE PRONOUNCED: **06-08-00** | SERVED TIME IN STATE INSTITUTION: ☐ DMH | ☐ CDC | ☐ CRC |
|---|---|---|---|

14. The defendant is remanded to the custody of the sheriff ☒ forthwith ☐ after 48 hours excluding Saturdays, Sundays, and holidays.

To be delivered to ☒ the reception center designated by the director of the California Department of Corrections.
☐ other (specify):

---

## CLERK OF THE COURT

hereby certify the foregoing to be a correct abstract of the judgment made in this action.

| DEPUTY'S SIGNATURE  del TORO | DATE  **06-08-00** |
|---|---|

January 1, 1999      ABSTRACT OF JUDGMENT – PRISON COMMITMENT – INDETERMINATE      Page two

APPENDIX No. 1

# EXHIBIT    C

0211

EDWARD J. PECKHAM, ESQ.   (86609)
LAW OFFICES OF EDWARD J. PECKHAM
BRISTOL SQUARE
185 WEST "F" STREET, SUITE 700
San Diego, CA 92101
Telephone 619/231-9101

**Trial Counsel for Defendant**

F I L E D
STEPHEN THUNBERG
Clerk of the Superior Court

JUN 1 5 2000

By: J. ARELLANO, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

EL CAJON JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) ) ) | NO. SCE 198946 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | NOTICE OF APPEAL |
| LARRY JOHN LITTLE, | ) ) ) | |
| Defendant. | ) ) ) | |

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

NOTICE IS HEREBY GIVEN that defendant appeals from the judgment of this Court entered on June 8, 2000 in action No. SCE 198946. Defendant, being indigent, hereby requests appointment of counsel on appeal.

Dated: 6-14-00

Edward J. Peckham
Edward J. Peckham, Trial
Counsel for Defendant

# EXHIBIT C

1

NOTICE OF APPEAL AND REQUEST
FOR APPOINTMENT OF COUNSEL

# APPENDIX No. 1

# EXHIBIT   D

RECEIVED OCT 1 1 2001

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA   F I L E D
Stephen M. Kelly, Clerk

OCT 1 0 2001

| | |
|---|---|
| THE PEOPLE, | D035850   Court of Appeal Fourth District |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE 198946) |
| LARRY JOHN LITTLE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael B. Harris, Judge. Affirmed.

A jury convicted Larry John Little of second degree murder with a true finding he used a deadly and dangerous weapon, and true findings by the court of two prison priors. He appeals, arguing (1) the trial court erred in failing to instruct the jury pursuant to CALJIC No. 3.37 on the standard of knowledge of a person with physical impairment, (2) the court also erred prejudicially in instructing the jury, pursuant to the 1996 version of CALJIC No. 8.40 that an intent to kill was an element of voluntary manslaughter, and (3) the court erred in admitting the testimony of an informant. We disagree, and affirm.

EXHIBIT D

# FACTUAL BACKGROUND

## A. June 15, 1999 - Roesch, Rabatore, Brooks and Little

In June of 1999, Eddy Rabatore and his mother, Joyce Roesch, lived in El Cajon in an apartment on First Street. Some time around noon on June 15, 1999, Alysen Brooks, a friend of Rabatore, came to the apartment with another woman, Mary Ross. The women were there to meet with Joyce Roesch, who was planning to move into another apartment, with Mary Ross. There were then between six and eight people present at the Rabatore apartment, including Little, who was arguing with someone over cigarettes. Brooks went outside and waited in her car for Ross and Roesch.

The three women ran a few errands, and then returned to the apartment later in the afternoon. Roesch had asked Little to get everyone out of the apartment, and the group moved into the parking lot, again arguing. After the others left, Brooks remained at the apartment with Roesch, Little and Rabatore. Some time after six in the evening, another argument began. Behaving in a belligerent manner, Little called Rabatore a "punk-ass bitch," picked up a glass object, and threw it at Rabatore.

At this point, Roesch told Little that she wanted him to leave. Little refused, and said that he was tired and was going to lie on the couch and try to sleep, which he did. Roesch then told Rabatore she wanted Little to leave, and asked her son to call a friend to help remove Little from the apartment. Rabatore called his friend, Israel Ackerman, and Ackerman agreed to come over if Rabatore would pick him up. Rabatore called again in a few minutes and said he would pick up Ackerman, but he never did. During both of the

2

telephone conversations with Rabatore, Ackerman could hear arguments going on in the background.

After Rabatore had called Ackerman, Roesch left the apartment, and only Brooks, Little and Rabatore remained.  Before Roesch left, however, Little told her and Rabatore: "You don't want to cross me.  If you want to do this, fine.  We'll do it that way.  But it will be a bloodbath.  Because if you have your friends come over, then I'll call my brother Woods and the Martel brothers out in the Lakeside, and we'll make this into a riot, into a bloodbath.  That's up to you."  Little then began gathering his belongings and putting them into a backpack.

While Little was gathering his belongings, Rabatore went to the kitchen and got a steak knife, which he put in his pocket.  Rabatore showed the steak knife to Brooks, who told him to get rid of it because it would only cause trouble.  While Little was in the bathroom, Rabatore put the steak knife on a sewing machine cabinet in his mother's room.  Rabatore and Brooks then sat down at the dining room table and had cocktails, while Little went rummaging from room to room in the apartment, looking for his possessions.

### B. The Stabbing of Rabatore

While Rabatore and Brooks were sitting at the dining room table, Little came into the dining room and made a threat about getting even with people who cross him.  Little first picked up his backpack as if preparing to leave, but then he put the backpack down, picked up a glass figurine from a table, and threw the figurine at Rabatore.  Brooks saw Rabatore lean back in his chair, attempting to deflect the thrown object with his hands.  Little then stepped forward and struck at Rabatore, appearing to Brooks to attempt to punch Rabatore

3

in the face, but hitting him in the arm. At this point Rabatore yelled out "Oh, my God." As

Rabatore leaned back in his chair, Brooks could see blood coming out of Rabatore's arm.

Little then, standing over Rabatore, plunged a wooden-handled steak knife directly

into Rabatore's chest. Little then picked up his backpack, looked coldly at Brooks, and ran

out of the apartment door. Rabatore screamed that he had been stabbed, stood up, took two

steps, and then fell back onto a table and collapsed. Brooks, a registered nurse, called 911

and then tried to put pressure on Rabatore's wound. Rabatore stopped breathing, Brooks

performed CPR upon him, and later Rabatore stopped breathing again and his heart stopped.

Paramedics then arrived at the apartment, and they took Rabatore to the hospital. Rabatore

was, however, pronounced dead 40 minutes later, after attempts to resuscitate him at the

hospital were unsuccessful.

### C. The Autopsy of Rabatore

An autopsy revealed that the stab wound on Rabatore's arm was over two inches long

and two and a half inches deep. The chest wound was about two and a half inches long, and

about five inches deep. Little had pushed the knife through Rabatore's second and third ribs

(cutting the third rib), through the right lobe of Rabatore's lung, through the pericardial sac,

and on through the right atrium of Rabatore's heart, until the knife pierced Rabatore's aorta.

The direction of the chest wound was from right to left, and slightly upward. Little had to

have pushed the entire length of the knife blade into Rabatore's chest in order to reach as far

as his aorta.

4

### D. Subsequent Events - Little at Donovan State Prison

The day after Rabatore's murder, police arrested Little. Although he had been wearing a mustache at the time he stabbed Rabatore, Little had shaved it off at the time of his arrest. That same day, a neighbor who lived across the street from Roesch and Rabatore found the knife used in the murder in his back yard. The knife was bent, and had Rabatore's blood upon it.

Little was sent to Donovan State Prison in July of 1999, where he was housed with an acquaintance, Robert Teal.[1] After Rabatore's murder, Teal got a message that Little wanted to see him. In Donovan, Teal asked Little why he sent the message. Little said he had stabbed someone and had wanted Teal to get him out of town. Over the next days, Little spoke at length with Teal and others about the murder.

Little explained to Teal that he had been staying with a woman and her son, Ed, and Ed, who was unhappy with Little's selling and possessing drugs, had been nagging Little to leave. Little said that just before the murder, there had been another argument, and after he gathered up his belongings, he went to the room where Ed and a woman were sitting, then went into the kitchen and got a knife, and went back to the room where Ed and the woman were, reached across the woman, and stabbed. Little told Teal that because the woman screamed, he thought he might have stabbed her, and so he stabbed again, this time striking

---

[1]    The testimony of Teal is the subject of Little's third assertion of error.

Ed in the chest. Little said he left and took the knife with him, discarding it where he thought it would not be found.

Little went on to point out to his audiences at Donovan, including Teal, there had been only one witness to the murder, and "if this broad would just get knocked off or just get taken out of here until this was over, I'd walk free." Little mentioned that Brooks was a nurse, and in many conversations referred to having "this bitch knocked off." Little was also forthcoming about his planned trial defense. He stated he had told the police that Rabatore had picked up an ashtray and attempted to hit Little with it, and that his stabbing of Little was a mere reflexive (self-defense) action. Little also admitted to Teal that this story upon which he planned to rely was wholly fabricated.[2]

### E. The Defense Case

Little testified and admitted prior convictions for receiving stolen property and possessing drugs for sale, but stated he had not tried to fabricate a defense and he never wanted Brooks to be "knocked off." Little told the jury he had been stabbed in the eye at an earlier time, which left him blind in that eye and "jumpy." Little went on to say that on June 15, 1999, everyone at the apartment but him had been using methamphetamine. Little testified that Rabatore used some methamphetamine and became hyperactive and aggressive. Little also said Rabatore called friends to come beat Little, and told Little he would be "wiped out by some guys." Little did not credit these statements, and so did not

---

2      Little also told Teal that although Rabatore had threatened to call someone to come over and help him get Little out of the apartment, he was never concerned that this might actually happen.

leave. Little claimed he realized Rabatore was serious when he heard Rabatore tell his mother to wait outside for his friends.

The core of Little's testimony was that after he had collected his belongings and prepared to leave, Rabatore had then told him not to go anywhere, picked up an ashtray and blocked Little's egress from the apartment. At this point, Little said, he picked up a knife from a table, and when Rabatore lunged at him with the ashtray, Little made two jabs with the knife and ran out the door. Little claimed at this point Rabatore was standing, and Little was unaware he had actually stabbed Rabatore until he was told so in prison. Little said he did not contact police because he had been unaware he had killed Rabatore, and he had not attempted to change his appearance. Little admitted, however, that he did not see Rabatore with a knife that evening.

### F. Rebuttal

A witness who had earlier corroborated Little's claim he had not been using drugs on the day of the murder also told police he believed Little was under the influence of drugs that day. The witness also told police that Little had been acting aggressively towards Rabatore that day, and this had made him so uncomfortable that he had left the apartment.

### PROCEDURAL BACKGROUND

By information filed December 14, 1999, the San Diego District Attorney accused Little of murder, in violation of Penal Code[3] section 187, subdivision (a). It was also alleged Little used a knife in the commission of the murder, as proscribed by section 12022,

---

3      Subsequent unattributed statutory citations are to this Code.

subdivision (b)(1), and had two prior prison terms, within the meaning of section 667.5, subdivision (b).

Jury trial on the murder and weapon use charges began April 25, 2000. On May 3, 2000, the jury found Little guilty of second degree murder and use of a deadly weapon. The court thereafter found the prior prison term allegations true.

On June 8, 2000, Little was sentenced to a term of 18 years to life in state prison. Timely notice of appeal was thereafter filed.

## STANDARD OF REVIEW

We review the assertions of instructional error under an independent review or de novo standard (*People v. Waidla* (2000) 22 Cal.4th 690, 733), but we review the court's determinations on admission of evidence for abuse of discretion only. (*Id.* at p. 724.)

## DISCUSSION

### I

### *FAILURE TO GIVE CALJIC NO. 3.37*

Little first argues it was error for the trial judge to have refused his request the jury be instructed pursuant to CALJIC No. 3.37, which provides: "The amount of knowledge a reasonable person with impaired physical faculties should possess under particular circumstances is the knowledge which a person of ordinary prudence with similarly impaired faculties would have under circumstances similar to those shown by the evidence." This principle, derived from tort law, had prior to 1994 only been cited in dicta in a criminal law context. (See, e.g., *People v. Castillo* (1987) 193 Cal.App.3d 119, 124, [physical disability can be considered in defining reasonable person standard].)

8

It has however been held, in a case involving criminal negligence, that failure to give such an instruction was prejudicial error. The instruction is derived from the single case of *People v. Mathews* (1994) 25 Cal.App.4th 89 (*Mathews*). In that case, involving a blind and hearing impaired man convicted of exhibiting a firearm in the presence of a peace officer, it was held that an instruction such as the one cited above should have been given on the point of whether the defendant should reasonably have known the persons entering his house were peace officers. (*Id.* at pp. 98-100.)[4] The precise holding of the court was that the above principle "may be utilized as a theory of defense to exhibiting a firearm in the presence of a peace officer. We give the handicapped defendant the benefit of the doubt as to the proper interpretation of the 'reasonably should know' requirement . . . ." (*Id.* at p. 99.)

In this case, counsel for Little requested the jury be instructed with CALJIC No. 3.37, and the judge found this requested instruction (and two related ones which were not requested, CALJIC Nos. 3.35 [concurrence of act and criminal negligence] and 3.36 [gross or criminal negligence defined]) to be "limited to the few offenses where criminal negligence and not intent is involved. And since that is not the element here, that simply is not appropriate. And I would deny [the defense request to instruct pursuant to] 3.37." Little now argues, as in *Mathews, supra,* 25 Cal.App.4th 89, this instruction should have been given. He urges the failure to give it was error "both with respect to the defense of self-defense and the determination whether the killing was murder or manslaughter."

---

4    *Mathews, supra,* 25 Cal.App.4th 89 has been cited only once, and then in the civil context of whether mental illness was a defense to a negligence action. (*Bashi v. Wodarz* (1996) 45 Cal.App.4th 1314, 1324.) No reported criminal cases have cited the point.

9

While we do not disagree with the general principle expressed, and the question is an interesting one on the abstract, because there is no possibility whatsoever that refusal of the instruction contributed to the verdict herein, we decline to hold, as a matter of law, either that we agree with *Mathews, supra,* 25 Cal.App.4th 89 or that the instruction was required in this case.

The rule is, as the trial court noted, borrowed from tort law, i.e., BAJI No. 3.36 (8th ed. 1994), and is, as the trial court noted, generally applicable to cases of criminal negligence, rather than intentional criminal acts. In this case, because the question of reasonableness is an element of a *defense* to the charges, rather than an element of the charged *offense* itself, as was the case in *Mathews, supra,* 25 Cal.App.4th 89, it is not at all clear the giving of the requested instruction was required.

One reason for rejecting the instruction immediately appears and that is the jury was effectively given the substance of the proposed point under other instructions. As to self-defense, the jury in this case was told, pursuant to CALJIC No. 5.12, that for self-defense to obtain, "the circumstances must be such as would excite the fears of a reasonable person placed in a similar position . . . ."5 The "similar position" Little occupied was that of a man blind in one eye, as his counsel argued to the jury. The fact that Little's physical impediment was sufficiently set out by this instruction militates against the possibility of

---

5    See also CALJIC No. 5.13, read to the jury, providing that for self-defense "[a] person may act on appearances whether the danger is real or merely apparent." In this case, the question to be resolved was what could have been "apparent" to Little, necessarily including accounting for his physical impediment.

10

any prejudice, even assuming error, as to the trial judge's refusing to instruct pursuant to CALJIC No. 3.37.

Further, as the People point out and counsel for Little discusses, the jury was also told, pursuant to CALJIC No. 5.17, concerning an actual, although unreasonable, belief in the need for self-defense, that an actual belief in the need for self-defense would rebut malice, and thus preclude conviction of murder, even though "a reasonable person *in the same situation seeing and knowing the same facts* would not have had the same belief."

That is, with respect to this defense, the jury was told to evaluate it from Little's situation, which was that of a man who was blind in one eye. An "imminent peril" was further defined in this instruction as one that would "so *appear at the time to the slayer*," again referring the jury to Little's situation, which necessarily includes, as his counsel properly argued, his physical impediments, as a standard for evaluating his conduct in determining whether it were murder or manslaughter.

From the verdicts, it is quite clear the jury was repeatedly told to consider the case from (literally) how it appeared to Little, that is, through one eye alone. The point was repeatedly made, and it can thus be argued that the giving of CALJIC No. 3.37, on the particular facts of this case, might constitute an impermissible emphasis[6] of a matter whose factual underpinning (that is, in either point he argues, there is a requirement that there be an

---

6     That is, CALJIC No. 3.37 may be viewed, on this record, as an impermissible "pinpoint" instruction. (See, e.g., *People v. Garceau* (1993) 6 Cal.4th 140, 192.)

11

honest belief in the need for self-defense, a point which must be gotten through before "reasonableness" of any kind is required) is so largely in question.

In another part of this opinion, we reject the assertion that the informant's testimony of his conversations with Little, to the effect that Little admitted he had felt no need whatsoever for self-defense that night, but had given that story to the police so as to preserve a defense, was improperly admitted. That properly admitted testimony, which fully corroborates that of the surviving percipient witness apart from Little, fully supports the jury's necessary finding that, in this case, Little acted not out of fear, but of anger, and the offense thus was not any kind of manslaughter, but murder. This amply supported conclusion of the jury precludes any possibility that Little can have been prejudiced by the trial court's refusal to instruct pursuant to CALJIC No. 3.37.

Because there can have been no prejudice in this case, where there clearly was no *actual* belief in the need for self-defense, to reach and determine the question of whether or not further jury instruction was required on reasonableness would be sheer dicta, and without relevance to the result.[7] For all of the above reasons, no prejudicial error in the court's refusing to give CALJIC 3.37 occurred, and we reject the contrary assertion.

---

7    On the facts before us, the only relevance of Little's impaired vision was that he did not inflict fatal damage with his first blow, and was able to perceive well enough to try again, this time using the full length of the knife blade to sever the aorta. This sort of "manner of killing" (inflicting a wound likely to be fatal) has been held appropriately to support a verdict of first degree murder. (See, e.g., *People v. Welch* (1999) 20 Cal.4th 701, 759; and *People v. Thomas* (1992) 2 Cal.4th 489, 518.) That the jury returned a verdict of second degree murder in this case is thus another reason this should not be found to be a matter in which Little suffered prejudice.

12

II

## *INSTRUCTION ON INTENT TO KILL AS ELEMENT OF MANSLAUGHTER*

As relevant here, the trial court gave the jury the then-standard instruction on the elements of voluntary manslaughter (CALJIC No. 8.40): "Every person who unlawfully kills another human being without malice aforethought but with an intent to kill, is guilty of voluntary manslaughter in violation of Penal Code section 192, subdivision (a). [¶] There is no malice aforethought if the killing occurred in the honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury. [¶] In order to prove such crime, each of the following elements must be proved: [¶] 1. A human being was killed, [¶] 2. The killing was unlawful, and [¶] 3. *The killing was done with the intent to kill.* [¶] A killing is unlawful, if it was neither justifiable nor excusable." (Italics added.)

Little argues that the jury instruction was improper because intent to kill, as our Supreme Court has held after the trial of this cause, is not (despite numerous previous opinions suggesting the contrary) a necessary element of voluntary manslaughter. He is of course correct, but the now-discerned error was not prejudicial to Little.

Precisely one month after the jury began deliberations in this case, our Supreme Court held that apart from the traditional legal rule ("[w]hen a killer intentionally but unlawfully kills in a sudden quarrel or heat of passion, the killer lacks malice and is guilty only of voluntary manslaughter") it was also a correct principle of law "that this is also true of a killer who, acting with conscious disregard for life and knowing that the conduct endangers the life of another, *unintentionally* but unlawfully kills in a sudden quarrel or heat of passion." (*People v. Lasko* (2000) 23 Cal.4th 101, 104 (italics added); see also *People v.*

13

*Blakeley* (2000) 23 Cal.4th 82.)  The jury instructions in this case, of course, did not conform to the cited holdings.

Here, in addition to erroneous instruction to the jury that voluntary manslaughter requires an intent to kill, the court gave CALJIC No. 8.50, a standard instruction explaining the difference between murder and manslaughter.  This instruction stated in part:  "When the act causing the death, though unlawful, is done in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury the offense is manslaughter.  In that case, even if an intent to kill exists, the law is that malice, which is an essential element of murder, is absent.  [¶] To establish that a killing is murder and not manslaughter, the burden is on the prosecution to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done in the actual even though unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury."  Thus, the jury was told that regardless of whether killing Rabatore was intentional or unintentional, Little could not be convicted of murder unless the prosecution proved that, at the time of the killing, Little did not actually believe he was acting in self-defense.  (See *People v. Lasko, supra,* 23 Cal.4th at pp. 111-112.)

As the People note, if the jury believed Little unintentionally killed Rabatore in an honest belief he was in peril, it would have concluded it could not convict him of murder because he killed in self-defense, and also could not convict him of voluntary manslaughter, because he lacked the intent to kill.  A jury thus situated would have convicted Little only of involuntary manslaughter, a lesser offense included in the crime of murder, on which the

14

jury was also instructed. Instead, the jury convicted Little of second degree murder, thus

demonstrating it did not believe the killing was committed in self-defense.

The further observations of the *Lasko* court, in a case whose operative facts are quite

congruent to the present ones, are also of relevance in this case:

> "Moreover, the evidence strongly suggested an intent to kill. [The
> manner of killing, there a baseball bat to the head, here a knife to the
> heart, supports intent to kill.] There was also evidence that defendant
> had threatened to kill [the victim] [immediately] before the killing.
> Furthermore, defendant's actions after striking the fatal blow were not
> those of an unintentional killer: he did not call an ambulance [and] he
> tried to obscure evidence of the killing . . . Given the strength of the
> evidence indicating that the killing was not only intentional but
> premeditated, defendant could have been, but was not, convicted of
> first degree murder. Instead, the jury found him guilty of second
> degree murder. Under the circumstances, it is not reasonably probable
> that a properly instructed jury would have convicted defendant of the
> lesser offense of voluntary manslaughter. [Citation.]" (*People v.
> Lasko, supra,* 23 Cal.4th at pp. 112-113.)

Because the jury clearly found, under proper instructions, that the killing was not

done in self-defense, and because the evidence strongly supports an intentional killing, there

is under the standard of review just set forth no reasonable probability Little was prejudiced

by the instructional error in this case. As we observed with respect to Little's first

assignment of error, and as the *Lasko* court noted with respect to its facts, the "defendant

could have been, but was not, convicted of first degree murder."

The jury's finding Little guilty of second degree murder precludes the possibility of

prejudicial error having occurred by reason of the trial judge's having instructed the jury

pursuant to a now-incorrect manslaughter instruction. As we have noted, all of the evidence

in this case (apart from Little's fabricated claim of having been attacked by Rabatore and

15

thus, he asserts, having killed Rabatore because of a perceived need for self-defense)

overwhelmingly demonstrates Little's intent to kill, and the jury necessarily found such to

exist. This conclusion of the jury, amply supported by the evidence which was received at

the trial, rebuts any claim of prejudicial error

<div align="center">III</div>

## ADMISSION OF THE INFORMANT'S TESTIMONY

Little last argues the court failed to exercise its discretion pursuant to Evidence Code

section 352[8] when it determined to admit the testimony of Robert Teal on the subject of

various admissions made by Little at Donovan. We cannot agree.

Before admitting this evidence, the trial judge held a hearing during which he

considered and resolved various of the parties' written motions. Among the questions

addressed was Little's motion to exclude the testimony of Robert Teal, characterized by

counsel for Little as a "jailhouse informer." Little moved to preclude the testimony on

grounds it was (1) inherently unreliable and (2) unduly prejudicial.

At the pretrial hearing, on the point of unreliability, counsel for Little represented he

had been told by Teal he had only contacted the district attorney's office in order to divert

attention from his son, who (for no reason ever made clear) was assertedly being questioned

by the district attorney's office about the Rabatore homicide. The district attorney who had

---

8    Evidence Code section 352 provides: "The court in its discretion may exclude
evidence if its probative value is substantially outweighed by the probability that its
admission will (a) necessitate undue consumption of time or (b) create substantial danger of
undue prejudice, of confusing the issues, or of misleading the jury."

<div align="center">16</div>

been handling the case from the beginning denied any such matter had ever taken place. The district attorney further stated he had provided no benefits to Teal, that Teal knew details of the homicide known only to Little and Brooks, and Teal had no connection to Brooks. Based on these matters, the court tentatively rejected the assertion Teal's testimony was inherently unreliable, and ruled Teal would be examined by both counsel out of the presence of the jury before he testified. Counsel for Teal never mentioned the question of undue prejudice.[9]

Prior to having Teal testify before the jury, he was examined out of the jury's presence. The trial judge found that Teal's testimony was not unreliable because "I don't see any coercion there. If he wants to testify, he should testify."

Little now argues the trial judge erred in not setting out reasons for admitting the testimony as to the Evidence Code section 352 argument, cited in papers but never raised in court by counsel. Little argues that because "the record is devoid of any indication the trial court fulfilled its responsibility to weigh the probative value of Teal's testimony against its prejudicial effect," we must reverse.

First, we doubt whether the mere citation of the code section in moving papers with no mention of it thereafter in court is adequate to preserve the issue for appellate review. (See, e.g., Evid. Code, § 353, requiring in pertinent part that "[a] verdict or finding shall not be set aside . . . by reason of erroneous admission of evidence unless . . . there appears of

---

9    At other points in the pretrial hearings, counsel for Little demonstrated his ability to argue the "undue prejudice versus probative value" question when necessary.

record an objection to or a motion to exclude or to strike the evidence that was timely made

and so stated as to make clear the specific ground of the objection . . . .") Second, even were

the point preserved for review, Little's assertion of error-by-silence is not well taken, as the

law is clearly to the contrary. (*People v. Waidla, supra*, 22 Cal.4th at p. 724, fn. 6.) The

fact the trial judge ruled that Teal's testimony was to be admissible is satisfactory evidence

of his finding on the issue now raised.

Given the care with which the judge treated the evidence, we see no abuse of

discretion in the trial judge's necessarily implied conclusion that the probative value of

Teal's testimony was not substantially outweighed by the danger of undue prejudice. The

evidence of Little's statements was not inflammatory, and there was no risk of confusion.

Furthermore, the statements were not remote nor did evidence about these statements

consume much time at trial. The statements were also highly probative. Accordingly,

admission of the evidence of the statements made by Little to Teal and others was not an

abuse of discretion.

As has been often noted, we will not overturn or disturb a trial court's exercise of its

discretion under Evidence Code section 352 in the absence of manifest abuse, upon a

finding that its decision was palpably arbitrary, capricious and patently absurd. (*People v.

Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.) No such manifest abuse of discretion, or

indeed any abuse at all, appears in this case.

18

DISPOSITION

The judgment is affirmed.

_____
HUFFMAN, Acting P. J.

WE CONCUR:

_____
HALLER, J.

_____
McDONALD, J.

19

APPENDIX No. 1

# EXHIBIT    E

# SUPERIOR COURT OF CALIFORNIA
## EAST COUNTY DISTRICT
## COUNTY OF SAN DIEGO

DATE:  August 26, 2004                        DEPT:  9    Reporter: K. Langgle, CSR#8637

PRESENT HON. LOUIS R. HANOIAN
                    JUDGE

CLERK:  V. Pendleton

BAILIFF: B. Randall

REPORTER'S ADDRESS:  P.O. BOX 128
SAN DIEGO, CA  92112-4104

| EHC388 SCE198946 | People of the State of California, (Respondent)  Plaintiff | by Patricia Mallen |
|---|---|---|
| | vs | |
| | LARRY LITTLE, JR. (Petitioner)    Defendant | by Al Williams, PCC |

At 2:04pm case is called for continuing **OSC HEARING RE WRIT OF HABEAS CORPUS** having been trailed from August 25, 2004.  Petitioner is personally present, in custody, with court appointed counsel Al Williams.  Respondent is present by Deputy District Attorney Patricia Mallen.

The Court makes the following findings:

Relief cannot be granted for ineffective assistance of Appellate counsel as no evidence was presented on this issue.

Court finds no convincing or believeable factual support for the following allegations regarding ineffective assistance of trial counsel: (1) trial counsel failed to investigate facts of case; (2) Failed to interview witnesses; (3) failed to develop the environment of a drug house to support imperfect self defense; (4) counsel failed to interview and call the victim's mother as a witness; (5) counsel promised to call certain witnesses at trial and reneged; and (6) counsel tried to hide his lack of preparation by coercing a plea. Relief cannot be granted on the basis of those allegations.

As to the issue of ineffective assistance of counsel for failure to request involuntary manslaughter instruction, Court finds that trial counsel's decision that the instruction was not warranted did not fall below the level of a reasonably competent attorney defending his client and was not prejudicial to the defendant.

As to the issue of ineffective assistance of counsel for failure to have defendant evaluated for post ‏traumatic stress disorder (PTSD), Court finds that a reasonably competent attorney would have had ‏defendant evaluated and explored any relationship of PTSD to this case, but that the failure was not prejudicial to the defendant as PTSD does not fit the facts of this case.

MISCELLANEOUS & TRIAL MINUTES
(CONTINUED ON REVERSE – THIS DATE ONLY)

SUPCT 13

EXHIBIT E

...tion for writ of habeas corpus is denied.  Defendant is remanded to the custody of the Department of Corrections to continue serving sentence imposed on June 8, 2000.

Court's exhibit #1 remains in the custody of the clerk and is placed in the court's vault.

At 2:20pm court is in recess in this matter.

<div align="center">vjp</div>

1    EL CAJON, CALIFORNIA, AUGUST 26, 2004, 1:30 P.M.

2    --000--

3    THE COURT:  THIS IS IN RE: LARRY JOHN LITTLE

4    JUNIOR ON A HABEAS CORPUS, EHC388.  THE RECORD WILL

5    REFLECT THE PRESENCE OF MR. LITTLE, WITH COUNSEL, THE

6    DISTRICT ATTORNEY IS PRESENT.

7    AT THIS TIME, I'M GOING TO BE BASICALLY

8    ANNOUNCING THE COURT'S RULING WITH REGARD TO THE PETITION

9    FOR WRIT OF HABEAS CORPUS.  PRIOR TO -- TO THIS TIME, THE

10   COURT HAS FAMILIARIZED ITSELF WITH THE HISTORY OF THE

11   CASE, I HAVE READ THE CASE FILE IN THIS CASE, I HAVE READ

12   THE CASE FILE IN THE UNDERLYING TRIAL.  I HAVE READ THE

13   PETITION AND THE EXHIBITS THAT WERE ATTACHED TO THE

14   PETITION.

15   I'VE READ THE RETURN, AND I HAVE COMPLETED

16   READING THE -- THE EXHIBITS THAT WERE ATTACHED TO THE

17   RETURN AND ALL OTHER TRANSCRIPTS AND DOCUMENTS THAT WERE

18   LODGED IN CONNECTION WITH THE -- WITH THE HABEAS CORPUS

19   HEARING.  I'VE READ THE REPLY THAT WAS FILED BY

20   MR. WILLIAMS, I HAVE READ THE COURT OF APPEAL OPINION IN

21   THE CASE.  I HAVE READ ALL OF THE -- ALL OF THE PLEADINGS

22   THAT WERE HERE TO -- THAT WERE HERE TO READ.

23   THE SUPERIOR COURT ISSUED A ORDER TO SHOW

24   CAUSE ON THE 19TH OF FEBRUARY, 2003, TO ALLOW THE PEOPLE

25   TO SHOW CAUSE WHY RELIEF SHOULD NOT BE GRANTED.  A -- A

26   RETURN WAS FILED ON THE 18TH OF JUNE OF 2003.  A DENIAL

27   WAS THEREAFTER FILED ON THE 18TH OF NOVEMBER OF 2003.  AND

28   ON DECEMBER 11TH OF 2003, AN EVIDENTIARY HEARING WAS

EXHIBIT E

1    ORDERED TO DETERMINE IF PETITIONER WAS ENTITLED TO RELIEF

2    ON THE CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL.

3                    INITIALLY, THE PETITION CONTAINED SEVERAL

4    CLAIMS THAT WERE NOT INEFFECTIVE ASSISTANCE OF COUNSEL.

5    AT THE TIME, THE COURT ENTERED ITS ORDER TO SHOW CAUSE.

6    IT DENIED ALL CLAIMS THAT WERE NOT INEFFECTIVE ASSISTANCE

7    OF COUNSEL.  WE'VE HELD AN EVIDENTIARY HEARING IN THIS

8    DEPARTMENT STARTING ON TUESDAY, WE TOOK EVIDENCE ON

9    TUESDAY AND WEDNESDAY.  THE COURT HEARD ARGUMENT

10   YESTERDAY, WEDNESDAY, AND I HAVE CONSIDERED ALL OF THE

11   EVIDENCE, ALL OF THE ARGUMENT AND ALL OF THE PLEADINGS

12   PRIOR TO MAKING THE DECISION AT THIS TIME.

13                    I WANT TO THANK COUNSEL FOR THEIR

14   SUBMISSIONS AND THEIR REPRESENTATION IN THIS CASE.  IT IS

15   A GREAT DEAL OF HELP TO THE COURT WHEN THEY HAVE COUNSEL

16   THAT ARE PROVIDING REAL ASSISTANCE, AND THIS CASE WAS

17   NOT -- WAS NOT A PARTICULARLY EASY CASE, BUT I GUESS ANY

18   TIME THERE IS AN ORDER TO SHOW CAUSE ISSUED, THAT THERE IS

19   SOMETHING THAT NEEDS TO BE LITIGATED.

20                    AS TO THE PETITIONER'S CLAIM OF INEFFECTIVE

21   ASSISTANCE OF COUNSEL, IT ENCOMPASSED A NUMBER OF ISSUES,

22   MOST OF WHICH WERE NOT DEVELOPED AT THE EVIDENTIARY

23   HEARING.  AS FAR AS THERE WAS A CLAIM OF INEFFECTIVE

24   ASSISTANCE OF APPELLATE COUNSEL; THERE WAS NOTHING THAT

25   WAS PRESENTED AT THE EVIDENTIARY HEARING THAT RELATES TO

26   INEFFECTIVE ASSISTANCE BY APPELLATE COUNSEL.

27   CONSEQUENTLY, RELIEF CANNOT BE GRANTED ON THE BASIS OF

28   THOSE ALLEGATIONS.

1    ALSO, THERE WERE A NUMBER OF CLAIMS

2    RELATING TO TRIAL COUNSEL, WHEREIN PETITIONER ALLEGED THAT

3    COUNSEL FAILED TO INVESTIGATE THE FACTS OF THE CASE.

4    NUMBER TWO, COUNSEL FAILED TO INTERVIEW CERTAIN WITNESSES.

5    NUMBER THREE, COUNSEL FAILED TO DEVELOP THE ENVIRONMENT OF

6    A DRUG HOUSE TO SUPPORT ONE OF THE DEFENSES.  FOUR, THAT

7    COUNSEL FAILED TO INTERVIEW AND CALL THE VICTIMS'S MOTHER

8    AS A WITNESS.  FIVE, COUNSEL PROMISED TO CALL CERTAIN

9    WITNESSES AT TRIAL AND RENIGGED ON THE PROMISE.  SIX,

10   TRIAL COUNSEL TRIED TO HIDE HIS LACK OF PREPARATION BY --

11   IN THE PLEA.

12                AS TO EACH ONE OF THOSE CLAIMS THAT I JUST

13   NAMED, THERE IS NO FACTUAL SUPPORT FOR ANY OF THOSE

14   ALLEGATIONS; AT LEAST NO FACTUAL SUPPORT THAT I FIND TO BE

15   CONVINCING OR BELIEVABLE.  AND CONSEQUENTLY, THE RELIEF

16   WILL NOT BE GRANTED AND CANNOT BE GRANTED ON THE BASIS OF

17   THOSE ALLEGATIONS, WHICH LEADS US TO WHAT THIS HEARING WAS

18   ALL ABOUT.  THAT IS THE TWO CLAIMS OF INEFFECTIVE

19   ASSISTANCE OF COUNSEL; ONE OF WHICH RELATES TO THE FAILURE

20   OF DEFENSE COUNSEL TO REQUEST AN INSTRUCTION ON

21   INVOLUNTARY MANSLAUGHTER.  IN PARTICULAR, INSTRUCTION

22   NUMBER 8.45, 8.46 ON THE CALJIC INSTRUCTIONS THAT WERE

23   OF -- THAT WERE IN EXISTENCE AT THE TIME.

24                THE SECOND ISSUE IS WHETHER OR NOT COUNSEL

25   WAS INEFFECTIVE BECAUSE HE FAILED TO CONSULT WITH AN

26   EXPERT ON POSTTRAUMATIC STRESS DISORDER, OR FAILED TO HAVE

27   THE DEFENDANT EXAMINED BY AN EXPERT RELATING TO

28   POSTTRAUMATIC STRESS DISORDER, AND THEREBY WITHDREW A

1  POTENTIAL AND MERITORIOUS DEFENSE.  NOW, THOSE CLAIMS WERE

2  LEGITIMATE CLAIMS THAT WERE MADE BY THE -- BY THE

3  PETITIONER.  AND WE TOOK EVIDENCE ON IT AND THE -- THE

4  VAST MAJORITY OF THE EVIDENCE RELATED DIRECTLY TO THOSE

5  CLAIMS.

6                    IN CONNECTION WITH THE FAILURE TO HAVE THE

7  DEFENDANT EXAMINED, WE HEARD FROM AN EXPERT, DR. ABRAMS, A

8  VERY QUALIFIED PSYCHIATRIST IN THE FIELD, WHO ALSO HAPPENS

9  TO HAVE A LAW DEGREE AND A LICENSE TO PRACTICE LAW.  AND

10  FOR HIS UNIQUE PERSPECTIVE ON DEFENDANT'S -- DEFENSE

11  COUNSEL'S PERFORMANCE AND DEFENSE COUNSEL'S DECISION NOT

12  TO GO FORWARD WITH A PTSD-TYPE OF DEFENSE, BUT I'M GOING

13  TO DEAL WITH THAT SECOND.  I'M GOING TO DEAL FIRST OF ALL

14  WITH THE FAILURE TO GIVE THE INVOLUNTARY MANSLAUGHTER

15  INSTRUCTION, OR FAILURE TO REQUEST IT.

16                    FIRST, FROM THE TESTIMONY HERE AT THE

17  EVIDENTIARY HEARING, IT'S EVIDENT THAT INVOLUNTARY

18  MANSLAUGHTER INSTRUCTION WAS CONSIDERED.  MR. PECKHAM SAID

19  THAT HE THOUGHT ABOUT INVOLUNTARY MANSLAUGHTER, IT WAS --

20  IT CAME UP IN THE INSTRUCTION, IN THE CHAMBERS CONFERENCE.

21  IT WAS NOT ULTIMATELY REQUESTED BECAUSE, IN MR. PECKHAM'S

22  OPINION, THE INSTRUCTION WAS NOT WARRANTED BY THE EVIDENCE

23  IN THE CASE.  AND HAVING REVIEWED THE -- AND SO THE

24  QUESTION BECOMES WHETHER OR NOT THAT DECISION NOT TO

25  REQUEST IT FALLS BELOW THE STANDARD OF A REASONABLY

26  COMPETENT ATTORNEY REPRESENTING HIS CLIENT.  I FIND IT

27  DOES NOT.

28                    IT WAS A DECISION THAT WAS MADE WITH

1    KNOWLEDGE OF THE STATE OF THE LAW AT THE TIME, WITH

2    KNOWLEDGE OF WHAT THE INSTRUCTION CALLED FOR AT THE TIME,

3    AND THE PARTICULAR INSTRUCTION CALJIC 8.45, BASED UPON THE

4    FACTS OF THAT CASE, I THINK MR. PECKHAM'S DECISION THAT HE

5    WOULD NOT ASK FOR IT, BECAUSE HE DID NOT BELIEVE IT WOULD

6    APPLY WAS A CORRECT DECISION.  BUT MOREOVER, HE DIDN'T

7    JUST STOP TO -- STOP THINKING THAT THE QUESTION WHETHER OR

8    NOT IT WAS A CORRECT STATEMENT OF LAW, BUT WHETHER OR NOT

9    IT MIGHT HAVE SOME IMPACT THAT COULD BE NEGATIVE ON THOSE

10   DEFENSES THAT HE WAS GOING TO BE PRESENTING TO THE JURY.

11             AND THAT DURING THE TRIAL, AND I BELIEVE

12   WHAT HE SAID WAS THAT IT WOULD -- IT WOULD HAVE CREATED

13   A -- ANOTHER LEVEL OF LIABILITY OR CULPABILITY FOR THE

14   DEFENDANT, BUT IF HE CURED THE DAY WITH THE THEORY THAT HE

15   WANTED, THE DEFENDANT WOULD HAVE BEEN FOUND NOT GUILTY OF

16   EVERYTHING AND WALKED OUT THE DOOR.  IT WAS THE

17   SELF-DEFENSE, THE ACTUAL SELF-DEFENSE WAS THE STRONGEST

18   DEFENSE THAT HE HAD, AND AN INVOLUNTARY MANSLAUGHTER

19   INSTRUCTION DOESN'T ASSIST THAT AT ALL.

20             IT MAY CONFUSE THE ISSUES, AND

21   CONSEQUENTLY, I DON'T BELIEVE IT WAS BELOW THE STANDARD TO

22   NOT REQUEST IT, EVEN IF IT WAS A MISTAKE THAT FELL BELOW

23   THE STANDARD FOR HIM NOT TO REQUEST 8.45.  THERE IS NO

24   PREJUDICE TO THE DEFENDANT BECAUSE, NUMBER ONE, THE TRIAL

25   JUDGE WOULD HAVE GIVEN IT.  NUMBER TWO, IF IT WAS AN

26   APPROPRIATE INSTRUCTION UNDER THE FACTS OF THE CASE, THE

27   TRIAL JUDGE HAD A SUA SPONTE DUTY TO GIVE THAT

28   INSTRUCTION, WHICH HE DID NOT.  AND THIRDLY, IN TERMS OF

1  NO PREJUDICE, THE FACT THAT THE JURY RETURNED A VERDICT

2  FOR SECOND DEGREE MURDER MEANS THAT THEY NEVER WOULD HAVE

3  GOT TO THE QUESTION OF WHETHER OR NOT HE'S GUILTY OR NOT

4  GUILTY OF INVOLUNTARY MANSLAUGHTER.  BECAUSE TO MAKE A

5  DECISION ON THAT WOULD HAVE REQUIRED THEM TO HAVE FOUND

6  THE DEFENDANT NOT GUILTY OF SECOND DEGREE MURDER.  AND

7  BASED ON WHAT WAS STATED IN TERMS OF THE FACTS AS NOTED IN

8  THE COURT OF APPEAL OPINION, I DON'T THINK THERE IS ANY

9  QUESTION ABOUT THE FACT THAT THE -- THERE WAS EXTREMELY

10  STRONG EVIDENCE THAT WAS PRESENTED TO THE JURY ABOUT

11  INTENT TO KILL.  AND THAT THE -- THE THRUST THAT WERE DONE

12  IN THIS PARTICULAR CASE WERE IN FACT AN INTENT TO KILL.

13  AND AN INVOLUNTARY MANSLAUGHTER INSTRUCTION WOULD HAVE

14  BEEN OF NO BENEFIT.  SO RELIEF IS NOT GRANTED AS TO THAT

15  ISSUE.

16              NOW, THE QUESTION THAT REMAINS IS PTSD,

17  POSTTRAUMATIC STRESS DISORDER.  AND THERE IS NO QUESTION

18  THAT MR. PECKHAM DID NOT GET AN EXPERT TO EVALUATE

19  MR. LITTLE FOR POSTTRAUMATIC STRESS DISORDER.  MR. PECKHAM

20  WAS AWARE OF POSTTRAUMATIC STRESS DISORDER.  MR. PECKHAM

21  TESTIFIED THAT HE BELIEVED THAT THE DEFENDANT, MR. LITTLE,

22  SUFFERED FROM POSTTRAUMATIC STRESS DISORDER.  AND KNOWING

23  THOSE TWO THINGS, HE STILL DIDN'T GO OUT AND GET AN

24  EVALUATION, CONSULT WITH A PSYCHIATRIC PROFESSIONAL ABOUT

25  POSTTRAUMATIC STRESS DISORDER.

26              NOW THE QUESTION, FIRST QUESTION, OF

27  COURSE, IS WHETHER OR NOT THAT FAILURE DEMONSTRATES A -- A

28  LACK OF DILIGENCE, SUCH THAT WOULD SHOW REPRESENTATION

1    BELOW THE STANDARD.  THAT IS A CLOSE CALL.  ON THE ONE

2    HAND, IT IS VERY CLEAR TO THE COURT THAT MR. PECKHAM

3    CONSIDERED POSTTRAUMATIC STRESS DISORDER.  HE HAD A PRETTY

4    GOOD WORKING IDEA OF WHAT IT WAS.  AND COMPARING HIS

5    THOUGHT PROCESS WITH THE DESCRIPTION OF THE DISORDER BY

6    DR. ABRAMS, YOU KNOW, I'M SURE THAT MR. PECKHAM UNDERSTOOD

7    WHAT IT WAS.  WHETHER OR NOT HE'S CAPABLE OF DIAGNOSING IT

8    OR KNOWING WHAT TRIGGERS IT, AND KNOWING ALL THE DETAILS

9    ABOUT IT, I DON'T BELIEVE HE DID.

10                   AND I THINK THAT HE -- I KNOW HE WOULD HAVE

11   BENEFITED FROM AN EXAMINATION OF THE DEFENDANT AND A

12   CONSULTATION WITH THE EXPERT ABOUT POSTTRAUMATIC STRESS

13   DISORDER.  WHETHER OR NOT THE DEFENDANT SUFFERS FROM IT

14   AND WHETHER OR NOT IT HAS ANY APPLICATION TO THE CASE, HE

15   MADE A DECISION NOT TO -- NOT TO SEEK THE -- NOT TO SEEK

16   THE EXAMINATION.  THAT COULD BE DESCRIBED AS A TACTICAL

17   DECISION OR STRATEGIC DECISION, BECAUSE HE KNEW ABOUT

18   THE -- THE POSSIBLE CONDITION, AND HE KNEW IT MIGHT HAVE

19   SOMEWHAT OF AN IMPACT ON THE CASE.  BUT I -- I CAN'T, FOR

20   THE LIFE OF ME, THINK OF A GOOD REASON NOT TO CONFIRM HIS

21   SUSPICIONS AND CONSULT WITH AN EXPERT TO SEE WHETHER OR

22   NOT HE -- TO CONFIRM THAT HE'S RIGHT, THAT THE -- THERE IS

23   NOTHING TO BE GAINED FROM A DIAGNOSIS OF POSTTRAUMATIC

24   STRESS DISORDER.  SO I THINK THAT A -- A REASONABLY

25   COMPETENT ATTORNEY WOULD HAVE GOTTEN AN EXAMINATION, WOULD

26   HAVE SOUGHT AN EXAMINATION, WHICH SATISFIES PRONG NUMBER

27   1.

28                   PRONG NUMBER 2 IS A DIFFERENT STORY.  AND

1   THAT IS WHETHER OR NOT -- WELL, I GUESS THE ISSUE CAN BE

2   COUCHED IN A COUPLE OF DIFFERENT WAYS; ONE OF WHICH IS TO

3   GIVE A EXAMINATION AND DIAGNOSIS.  OKAY, SO WE HAVE A

4   DIAGNOSIS.  IF HE HAD THE DIAGNOSIS BEFORE, AND ACCORDING

5   TO MR. PECKHAM HE DIDN'T BELIEVE THE FACTS OF THE CASE

6   SUPPORTED A DEFENSE THAT WAS BASED ON POSTTRAUMATIC STRESS

7   DISORDER, SO THAT -- THAT'S THE REASON WHY HE DIDN'T SEEK

8   THE EXAMINATION.  HE WAS LACKING FOR THOSE THINGS.  HE

9   DIDN'T FIND THEM.  AND HE ASKED THE DEFENDANT SPECIFICALLY

10  AND REPEATEDLY ABOUT THAT PARTICULAR TOPIC, AND I BELIEVE

11  HE WAS SINCERE IN HIS WISH AND DESIRE THAT THE DEFENDANT

12  PROVIDE A DESCRIPTION OF THE EVENTS THAT WOULD SUPPORT

13  THAT PARTICULAR DEFENSE, BUT HE WAS NOT GOING TO PUT THE

14  WORDS IN THE DEFENDANT'S MOUTH.

15              AND -- AND IN HIS OPINION, NOTHING THAT WAS

16  SAID BY THE DEFENDANT WOULD HAVE BEEN USEFUL IN DEVELOPING

17  A DEFENSE BASED UPON PTSD.  SO AT THAT POINT, THEN, IF --

18  IF THE ISSUE IS COUCHED AS THE FAILURE TO GET AN

19  EXAMINATION, IT DOESN'T MEAN -- IT DOESN'T MAKE A

20  DIFFERENCE; THERE IS NO PREJUDICE, BECAUSE EVEN IF THERE

21  HAD BEEN AN EXAMINATION, IT WOULDN'T HAVE BEEN USED

22  BECAUSE IT DIDN'T FIT FACTUALLY, AND THAT WAS A STRATEGIC

23  CHOICE THAT WAS MADE.  MAYBE THE -- MAYBE THE BETTER

24  QUESTION IS WHETHER OR NOT THE FAILURE TO ACTUALLY PRESENT

25  THAT AS A DEFENSE IN SOME WAY PREJUDICED THE DEFENDANT.

26  SO IT'S NOT JUST THE -- HE FAILED TO GET THE EXAMINATION,

27  BUT HE FAILED TO USE THE RESULTS OF THE EXAMINATION TO THE

28  BENEFIT OF THE DEFENDANT.

1    NOW, THAT PRESUPPOSES A COUPLE OF THINGS,

2  ONE OF WHICH THE DIAGNOSIS WOULD HAVE COME IN WITH PTSD.

3  DR. ABRAMS THOUGHT IT WOULD.  MR. PECKHAM WAS CERTAIN THAT

4  IT WOULD, BUT IT'S MR. PECKHAM, NOT DR. PECKHAM.  SO HIS

5  DIAGNOSIS, IT DOESN'T CARRY ANY MORE WEIGHT THAN THE

6  DOCTOR'S DOES, BUT I'M GOING TO ASSUME FOR PURPOSES OF

7  THIS PARTICULAR ISSUE THAT THE -- THE -- AN EXAMINATION

8  WOULD HAVE SHOWN THAT THE DEFENDANT SUFFERED FROM PTSD.

9    SO THEN HAVING SUFFERED FROM PTSD, WAS IT

10  INEFFECTIVE ASSISTANCE OF COUNSEL TO PRESENT A DEFENSE

11  BASED UPON THAT FINDING?  AND THAT IS WHERE I FIND THERE

12  WAS NO PREJUDICE TO THE DEFENDANT, BECAUSE PTSD, AS

13  MR. PECKHAM TESTIFIED, AND AS THE DESCRIPTION OF THE

14  OFFENSE, WAS LAID OUT IN THE -- AT THE TRIAL AND LAID OUT

15  BY THE COURT OF APPEAL.  AND EVERYTHING THAT I -- THAT

16  I'VE LEARNED IN CONNECTION WITH THE EVIDENTIARY HEARING,

17  PTSD WOULD NOT HAVE ASSISTED THE DEFENDANT, DID NOT

18  PRODUCE PREJUDICE, ACCORDING TO *STRICKLAND*, AND THAT'S THE

19  BOTTOM LINE HERE.  AND THAT'S THE BOTTOM LINE HERE,

20  WHETHER OR NOT IT WAS PREJUDICIAL AND IT WAS NOT.

21    AND IT WAS NOT BECAUSE OF A NUMBER OF

22  REASONS, ONE OF WHICH IS A PSYCHIATRIC DEFENSE, WHEN IT IS

23  THE ONLY DEFENSE THAT'S PRESENTED, MAY BE A POWERFUL TOOL,

24  MAY BE A TOOL OF DESPERATION, BUT YOU KNOW IT IS WHEN,

25  STANDING ALONE, SOMETHING THAT A JURY CAN LOOK AT AND

26  EVALUATE AND -- AND ACCEPT, YOU KNOW, EXPERIENCE HAS

27  TAUGHT THIS COURT THAT PSYCHIATRIC DEFENSES DO NOT PLAY

28  WELL TO JURIES AS A GENERAL PROPOSITION.  THAT DOESN'T

1   MEAN THAT THEY SHOULDN'T BE PURSUED, AND THEY ESPECIALLY

2   WON'T PLAY WELL WHEN THERE IS SOME OTHER EXPLANATION FOR

3   THE CONDUCT OF THE DEFENDANT.

4               HERE, MR. PECKHAM WAS FACED WITH OF A

5   VARIETY OF OPTIONS.  OPTION NUMBER ONE WAS DEFENDANT'S

6   TESTIMONY; DEFENDANT'S TESTIMONY THAT HE ACTED IN

7   SELF-DEFENSE.  IT WAS TRULY SELF-DEFENSE.  OBJECTIVELY

8   REASONABLE THAT ANYBODY WOULD BELIEVE THAT HE WAS IN

9   DANGER AND THAT HE USED FORCE THAT WAS APPROPRIATE TO

10  THE -- TO THE NATURE OF THE ATTACK THAT WAS BEING MADE ON

11  HIM.  AND THAT WAS THE FACTUAL UNDERPINNINGS OF THE

12  PERFECT SELF-DEFENSE.  MR. PECKHAM WAS STUCK WITH THOSE,

13  IF YOU WILL.  AND THOSE WERE THE THINGS; DEFENDANT WASN'T

14  CHANGING HIS STORY, AND HE ACTED IN SELF-DEFENSE.  HE

15  BELIEVED IT PERSONALLY, SUBJECTIVELY, AND MR. PECKHAM

16  BELIEVED THAT HE MIGHT BE ABLE TO PERSUADE THE JURORS THAT

17  IT WAS OBJECTIVELY REASONABLE AS WELL.  ALTHOUGH, HE SURE

18  WOULD HAVE LIKED TO HAVE HAD THAT KNIFE IN MR. RABITOR'S

19  HAND, BUT THAT WASN'T THERE.  SO, WE HAVE AN EXPLANATION,

20  AN EXPLANATION THAT RISES TO A DEFENSE IF IT IS BELIEVED

21  BY THE JURY.  IT IS NOT ONLY A DEFENSE TO THE CHARGED

22  OFFENSES, IT IS A DEFENSE TO ALL UNDERLYING AND LESSER

23  INCLUDED OFFENSES TO; THAT'S WHAT MR. PECKHAM IS GOING TO

24  GO WITH.

25               SECONDARILY, HE HAD A -- A NOT INCONSISTENT

26  IMPERFECT SELF-DEFENSE.  YOU KNOW, OFTENTIMES WHEN -- WHEN

27  ALTERNATE DEFENSES ARE PRESENTED, THEY ARE INCONSISTENT

28  WITH ONE ANOTHER.  AND IN THIS CASE, IT WAS NOT

1    INCONSISTENCY, BECAUSE THE IMPERFECT SELF-DEFENSE WOULD BE

2    BASED UPON THE SUBJECTIVE THOUGHTS OF MR. LITTLE.   AND IT

3    WOULD BE SUPPORTED BY THE DEMONSTRABLE LACK OF PERCEPTION

4    THAT MR. LITTLE HAD AS A RESULT OF THE LIMITED EYESIGHT,

5    THE LOSS IN ONE EYE OF TOTAL SIGHT, AND REDUCED SIGHT IN

6    THE SECOND EYE.   AND HAD AN EXPERT WITNESS COME IN AND

7    TESTIFIED TO THOSE THINGS, AND -- AND WAS IN A POSITION TO

8    BE ABLE TO ARGUE, THAT EVEN IF YOU DON'T BELIEVE

9    OBJECTIVELY THAT THIS WAS A SITUATION WHERE HE WAS BEING

10   ATTACKED, SUBJECTIVELY HE BELIEVED IT.   AND HE BELIEVED IT

11   BECAUSE HE COULDN'T SEE AS WELL AS YOU AND I.   AND -- AND

12   MAYBE HE WAS MISPERCEIVING EVERYTHING IN THE HEAT OF THE

13   MOMENT BECAUSE OF THE NATURE OF THE ENVIRONMENT THAT HE

14   WAS IN, BECAUSE THE ENVIRONMENT WAS PART OF THIS CASE.   IT

15   WAS PRESENTED, WHAT KIND OF A MILIEU THAT THIS WHOLE THING

16   TOOK PLACE IN.   AND UNDER THOSE CIRCUMSTANCES, IMPERFECT

17   SELF-DEFENSE WAS SOMETHING TO BE OFFERED.

18              IF ONE PLACES INTO THAT PARTICULAR CONTEXT,

19   THE NOTION OF POSTTRAUMATIC STRESS DISORDER, WHICH IS

20   ESSENTIALLY A COMPLETE AND TOTAL MISPERCEPTION OF WHAT IT

21   IS THAT IS GOING ON IN A COMPLETELY UNREASONABLE REACTION

22   TO THE STRESSORS THAT ARE PRESENTED HERE, I DON'T THINK

23   THAT THAT'S OF ANY BENEFIT TO THE DEFENDANT'S STRATEGY AT

24   THIS TIME.   I THINK THAT THAT WAS SOMETHING THAT COULD BE

25   CONSIDERED BY MR. PECKHAM, AND I BELIEVE IT WAS CONSIDERED

26   BY MR. PECKHAM WHEN HE DECIDED NOT TO GET HIM EXAMINED,

27   BECAUSE IT WASN'T GOING TO BE A BENEFIT.   AND THAT THAT

28   STRATEGIC AND TACTICAL DECISION WAS REASONABLE, AND IT IS

546

1    NOT THE SUBJECT OF -- OF HINDSIGHT TO OVERTURN A JUDGMENT

2    IN THIS CASE.  CONSEQUENTLY, THE PETITION FOR WRIT OF

3    HABEAS CORPUS IS DENIED.

4         MS. MALLEN:  THANK YOU, YOUR HONOR.

5         MR. WILLIAMS:  THANK YOU.

6         THE COURT:  THAT'S IT.  THANK YOU.

7         (PROCEEDINGS ADJOURNED FOR THE DAY.)

8                    --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPENDIX No. 1

# EXHIBIT F

MC-275

Name **Larry John Little**

dress **R.J.D F3 B13**

**PO Box 799003**

**San Diego, CA 92179**

CDC or ID Number **P-82205**

F I L E D
Stephen M. Kelly, Clerk

NOV – 3 2005

Court of Appeal Fourth District

## COURT OF APPEALS, STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT, DIVISION ONE

*(Court)*

**PETITION FOR WRIT OF HABEAS CORPUS**

**LARRY JOHN LITTLE**

Petitioner

vs.

**ROBERT J. HERNANDEZ**

Respondent

No. _____

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS — READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. January 1, 1999]

**PETITION FOR WRIT OF HABEAS CORPUS**    WEST GROUP Official Publisher    Penal Code, § 1473 et seq.; Cal. Rules of Court, rules 56.5, 201(h)

EXHIBIT F

**This petition concerns:**

[X] A conviction                    [ ] Parole

[ ] A sentence                      [ ] Credits

[ ] Jail or prison conditions       [ ] Prison discipline

[ ] Other (specify):

1. Your name: **LARRY JOHN LITTLE**

2. Where are you incarcerated? **DONAVAN, CORRECTIONAL FACILITY**

3. Why are you in custody?  [X] Criminal Conviction   [ ] Civil Commitment

   Answer subdivisions a. through l. to the best of your ability.

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").
   **2nd Degree murder with use of deadly & Dangerous weapon, 2 priors**

   b. Penal or other code sections **187(b) 12022 (b)(1) 667.5 (b) of cal penal code**

   c. Name and location of sentencing or committing court: **Superior Court of San Diego County**
   **220 West Broadway, San Diego, CA 92101**

   d. Case number: **Superior court No: SCE-198946**

   e. Date convicted or committed: **MAY 3, 2000**

   f. Date sentenced: **June 8, 2000**

   g. Length of sentence: **INDETERMINATE TERM OF FIFTEEN YEARS TO LIFE, CSX 3 years**

   h. When do you expect to be released? **Never under California BPT practices**

   i. Were you represented by counsel in the trial court? [X] Yes.  [ ] No. If yes, state the attorney's name and address:
   **Edward Peckham, 10994 Cudahay # 308 San Diego, CA**

4. What was the LAST plea you entered? (check one)

   [X] Not guilty  [ ] Guilty  [ ] Nolo Contendere  [ ] Other:

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

MC-275 [Rev. January 1, 1999]      **PETITION FOR WRIT OF HABEAS CORPUS**   WEST GROUP Official Publisher      Page two of six

6. GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

**See Attached Arguments petition**

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

**See Attached arguments petition**

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

**See attached Arguments Petition**

7.  Ground 2 or Ground _____ *(if applicable)*:

_____

_____

**See attached Arguments Petition**

_____

a.  Supporting facts:

_____

**See attached Arguments Petition**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b.  Supporting cases, rules, or other authority:

_____

**See attached Arguments Petition**

_____

_____

_____

8. Did you appeal from the conviction, sentence, or commitment?    ☒ Yes.    ☐ No.    If yes, give the following information:
   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
   **Court of appeal—fourth appellate District, Division one**

   b. Result: **Affirmed**                                      c. Date of decision: **October, 10, 2001**

   d. Case number or citation of opinion, if known:    **D035850**

   e. Issues raised:    (1)    **Caljic No. 3.37 Jury instruction error;**

   (2)    **Caljic 8.40 1996 Version Jury instruction; and**

   (3)    **Error of admitting the testimony of informant.**

   f. Were you represented by counsel on appeal?    ☒ Yes.    ☐ No.    If yes, state the attorney's name and address, if known:
   **Martha L. McGill, 732 North Hwy. 101, suite B, Encinitas, CA 92024**

9. Did you seek review in the California Supreme Court?    ☒ Yes.    ☐ No.    If yes, give the following information:

   a. Result:    **Review Denied**                             b. Date of decision: **December 19, 2001**

   c. Case number or citation of opinion, if known:    **S102149**

   d. Issues raised:    (1) **Applicability of Caljic 3.37 W/ Defendant physical impairment;**
              **prejudical effect of former Caljic 8.40**
   (2)    **Caljic 3.37 Reasonableness for self-defense re visual impairment; and**

   (3)    **Erroneous instruction on Voluntary Manslaughter was perjudical**

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
    **Due to ineffective assistance of trial and appellate counsel as plaintiff**
    **has continously expressed these matters as stated herein. trial counsel**
    **failed to investigate and fell short of presenting sole defense with-drawing**

11. Administrative Review **same**
    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

    **N/A**

    b. Did you seek the highest level of administrative review available?    ☐ Yes.    ☐ No.
    *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?    ☒ Yes. If yes, continue with number 13.    ☐ No. If no, skip to number 15.

   a. (1) Name of court: **San Diego County Superior court, EL Cajon**

      (2) Nature of proceeding (for example, "habeas corpus petition"): **Habeas Corpus**

      (3) Issues raised: (a) **Ineffective assistance of Counsel, Failure to investigate**

          (b) **Trial counsel did not provide adequate professional assistance during the trial**

      (4) Result (Attach order or explain why unavailable): **Order to show cause: Lawyer failed to send me the transcripts**

      (5) Date of decision: **8-28-2004**

   b. (1) Name of court:

      (2) Nature of proceeding:

      (3) Issues raised: (a)

          (b)

      (4) Result (Attach order or explain why unavailable):

      (5) Date of decision:

   c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result: **Cal Superior court of EL Cajon, Showcause hearing of writ of habeas corpus IAC Denied relief under second prong of Strictland**

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.) **No unreasonable delay, attorney failed to contact me in a timely matter and send me hearing transcripts, county custody to state custody-transfer time _Legal property confiscated_ and obstruction of prison lockdowns and program interruptions _aug. to Nov. 05_**

16. Are you presently represented by counsel?    ☐ Yes.    ☒ No.  If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?    ☐ Yes.    ☒ No.  If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court: **under the California constitution this court has jurisdiction**

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: **8-26-05   11-1-05**                     ▶ *Larry Little*
                                                  (SIGNATURE OF PETITIONER)

APPENDIX No. 1

# E X H I B I T    G

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL - FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

F I L E D
Stephen M. Kelly, Clerk

JAN 16 2008

Court of Appeal Fourth District

| | |
|---|---|
| In re LARRY JOHN LITTLE<br><br>on<br><br>Habeas Corpus. | D047468<br><br>(San Diego County<br>Super. Ct. No. SCE198946) |

Petition for writ of habeas corpus challenging a judgment of the Superior Court of San Diego County, Michael B. Harris, Judge. Petition denied.

Larry John Little filed a petition for writ of habeas corpus challenging the judgment entered after a jury convicted him of the second degree murder of Eddy Rabatore. His petition asserts that because his trial counsel did not investigate the existence of, and present evidence on, posttraumatic stress disorder (PTSD), he was denied his constitutional right to effective assistance of counsel. Although the performance of Little's trial counsel was below the applicable standard of objective reasonableness, we conclude that, based on the record in this case, his counsel's deficient performance was not prejudicial.

# EXHIBIT G

not denied his constitutional right to effective assistance of counsel. (*Strickland, supra,*
at pp. 687, 691-692; *Ledesma, supra,* at pp. 216-217.)[19]

<div align="center">DISPOSITION</div>

The petition is denied.

<div align="right">*McDonald*_____
McDONALD, Acting P. J.</div>

WE CONCUR:

_____
AARON, J.

_____
IRION, J.

---

19    Because we issued the OSC solely on the question of whether Little was denied
effective assistance of counsel because his trial counsel did not investigate a PTSD
defense, we summarily deny, without any substantive discussion of, the other contentions
raised by Little in the Petition.

<div align="center">43</div>

APPENDIX No. 1

# EXHIBIT    H

Supreme Court No. _____

## IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

In re

LARRY JOHN LITTLE,

on Habeas Corpus.

No. D047468

Superior Court
No. SCE198946
(San Diego County)

---

## PETITION FOR REVIEW TO EXHAUST STATE REMEDIES AFTER THE UNPUBLISHED OPINION OF THE COURT OF APPEAL, FOURTH APPELLATE DISTRICT

---

Athena Shudde (SBN 80667)
Attorney at Law
1762 Columbia Street
San Diego, California 92101
Telephone: 619-234-2266
Facsimile: 619-234-2645

Attorney for Petitioner

By Appointment of the Court of
Appeal Under the
Appellate Defenders, Inc.
Independent-Case System

EXHIBIT H

Supreme Court No. _____

## IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| In re | No. D047468 |
| LARRY JOHN LITTLE, | Superior Court No. SCE198946 (San Diego County) |
| on Habeas Corpus. | |

---

**PETITION FOR REVIEW TO EXHAUST STATE REMEDIES
AFTER THE UNPUBLISHED OPINION OF THE
COURT OF APPEAL, FOURTH APPELLATE DISTRICT**

---

TO:   THE HONORABLE RONALD M. GEORGE, CHIEF JUSTICE,
      AND THE HONORABLE ASSOCIATE JUSTICES OF THE
      SUPREME COURT OF CALIFORNIA:

Pursuant to rule 8.508 of the California Rules of Court, petitioner Larry

John Little respectfully files this petition for review to exhaust his state

remedies for federal habeas corpus purposes following the January 16, 2007,

unpublished decision of the Court of Appeal, Fourth Appellate District,

denying his petition for writ of habeas corpus. The petition presents no

grounds for review under rule 8.500(b) of the California Rules of Court. A

copy of the Court of Appeal opinion is attached hereto as an appendix.

1



MARY JAMESON
AUTOMATIC APPEALS SUPERVISOR

JORGE NAVARRETE
SUPERVISING DEPUTY CLERK

SAN FRANCISCO

NATALIE ROBINSON
SUPERVISING DEPUTY CLERK

LOS ANGELES

SAN FRANCISCO 94102
EARL WARREN BUILDING
350 McALLISTER STREET
(415) 865-7000

☐   LOS ANGELES 90013
RONALD REAGAN BUILDING
300 SOUTH SPRING STREET
(213) 830-7570

## Supreme Court of California

FREDERICK K. OHLRICH
COURT ADMINISTRATOR AND
CLERK OF THE SUPREME COURT

February 21, 2008

Mr. Larry John Little
P-82205
P. O. Box 4000
Vacaville, CA 95696-4000

Re:    S160332 - In re Larry John Little on Habeas Corpus

Dear Mr. Little:

Returned unfiled is your "Supplement to Petition", which we received on
February 21, 2008. Our records indicate that you have the above-referenced petition for
review pending with this court, and there is no provision in the Rules of Court to
supplement such a petition. A copy of that decision will be mailed to you the same day it
is filed.

Very truly yours,

FREDERICK K. OHLRICH
Court Administrator and
Clerk of the Supreme Court

By:  C. Thompson, Deputy Clerk

2-19-08

S160332

Dear; Honorable california supreme
court I Larry John Little jr. already have
a petition for Review filed in your court
on 1-24-08 no. D047468 my previous court
apointed appelate council Athena Shudde
filed The one Issue out of my original
writ She was apointed to work on.
She filed The petition with out my Know-
-ledge and Before I was even notified
That The court of appeal forth appelate
District Division one had Sumarily
Denied my writ on a order Show cause.
 So here Is my original writ put in
form of Suppliment to petition for
filing in your court with in 30 days of
State appelate courts Decision. filing the
rest of Issues from my original writ
Is proper exhaustion of all The Issues
In The State court Before I go to
The federal courts.

                    Thank
                        you

Court of Appeal, Fourth Appellate District, Div. 1 - No. D047468
S160332

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re LARRY JOHN LITTLE on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

MAR 1 2 2008

Frederick K. Ohlrich, Clerk

_____
Deputy

Moreno, J., was absent and did not participate.

Chief Justice

APPENDIX No. 1

# E X H I B I T    I

1    OPINION.  I HAVE NOT READ ALL OF THE EXHIBITS, WHICH IS I

2    THINK THIS ONE RIGHT OVER HERE, THIS WHOLE THING.

3    (INDICATING.)  I'VE READ SOME OF THEM; I HAVEN'T GOTTEN

4    THROUGH ALL OF THEM, BUT I THINK I HAVE A FAIRLY GOOD IDEA

5    OF WHAT THE ISSUES ARE.  I'VE READ THE -- I'VE READ THE

6    PREVIOUS ORDERS ON THE HABEAS AS WELL, SO I UNDERSTAND

7    WHAT THE ORDER TO SHOW CAUSE IS RELATING TO.

8              IT'S NOT RELATING TO EVERYTHING IN THE

9    PETITION, BUT ONLY THE INEFFECTIVE ASSISTANCE OF COUNSEL

10   CLAIMS AS TO BOTH TRIAL AND APPEAL.  I DON'T RECALL

11   READING A WHOLE LOT ABOUT THE APPELLATE STUFF, BUT ANYWAY,

12   THE BALL IS YOUR IN COURT MR. WILLIAMS; YOU HAVE THE

13   LABORING OAR HERE, SO --

14             MR. WILLIAMS:  I CALL SHARON LITTLE.  I'LL GO

15   GET HER.

16

17                      SHARON LITTLE,

18   CALLED AS A WITNESS ON BEHALF OF THE DEFENDANT, HAVING

19   BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

20

21                     DIRECT EXAMINATION

22   BY MR. WILLIAMS:

23       Q.   STATE YOUR NAME AND SPELL YOUR LAST NAME FOR THE

24   RECORD, PLEASE, MA'AM?

25       A.   SHARON LITTLE.  AND MY LAST NAME IS L-I-T-T-L-E.

26       Q.   ARE YOU RELATED TO THE PETITIONER AND DEFENDANT,

27   LARRY LITTLE JUNIOR?

28       A.   YES.

EXHIBIT 1 J

4

```
 1          Q.   HOW ARE YOU RELATED TO HIM?

 2          A.   I'M HIS SISTER.

 3          Q.   ARE YOU OLDER OR YOUNGER THAN HIM?

 4          A.   YOUNGER.

 5          Q.   DO YOU RECALL AN INCIDENT THAT OCCURRED IN

 6    LARRY'S LIFE, APPROXIMATELY 1993, WHEN HE WAS STABBED?

 7          A.   YES.

 8          Q.   WHAT HAPPENED TO HIM?  I MEAN, DON'T GO INTO THE

 9    ENTIRE DETAIL, BUT DID HE SUSTAIN ANY INJURIES?

10          A.   YES, HE WAS STABBED IN HIS LEFT EYE.

11          Q.   AND AS A RESULT OF THAT, WHAT HAPPENED TO HIS

12    LEFT EYE?

13          A.   HE'S BLIND.

14          Q.   DID HE LOSE THE EYE ITSELF?

15          A.   YES.

16          Q.   AND SO HE HAS A PROSTHETIC?

17          A.   YES.

18          Q.   OR A GLASS EYE?

19          A.   UH-HUH.

20          Q.   PRIOR TO THAT, HAD YOU BEEN CLOSE TO LARRY?

21          A.   YES.

22          Q.   DID YOU NOTICE ANY CHANGE IN HIM?

23          A.   YOU MEAN AFTER THE ACCIDENT?

24          Q.   YES, MA'AM.

25          A.   DEFINITELY.

26          Q.   WHAT?

27          A.   HE BECAME MORE PARANOID, A LITTLE MORE -- LIKE

28    IF YOU APPROACHED HIM, HE WAS A LITTLE MORE PANICKY ABOUT
```

5

1  SOMEBODY COMING UP BEHIND HIM.

2      Q.   DID YOU EVER WITNESS HIM IN ANY OF THESE PANIC

3  ATTACKS?

4      A.   NOT REALLY.

5      Q.   HAVE THERE BEEN OTHER INJURIES PRIOR TO THAT, TO

6  YOUR KNOWLEDGE, GROWING UP WITH HIM?

7      A.   YES.

8      Q.   WHAT WAS THAT?

9      A.   HE HAD A BICYCLE ACCIDENT WHEN HE WAS 12.

10     Q.   WHAT HAPPENED TO HIM?

11     A.   HE WAS GOING DOWN A DIRT HILL AND HE LOST

12  CONTROL AND HE PLUNGED FACE FIRST INTO A BIG BOLDER.

13     Q.   DID HE GO TO THE HOSPITAL FOR THAT?

14     A.   YES.

15     Q.   HOW LONG DID HE STAY IN THE HOSPITAL?

16     A.   I THINK HE WAS THERE ABOUT A WEEK OR TWO.

17     Q.   SO HE HAD A HEAD INJURY?

18     A.   YES, MAJOR.

19     Q.   HOW OLD WERE YOU WHEN THAT HAPPENED?

20     A.   I WAS ABOUT 10 OR 11.

21     Q.   SO YOU GUYS ARE PRETTY CLOSE IN AGE?

22     A.   YES.

23     Q.   WAS THERE ANY CHANGE IN HIM AFTER THAT?

24     A.   YES.

25     Q.   WHAT WAS THAT?

26     A.   WELL, BEFORE THE ACCIDENT, HE WAS PRETTY POPULAR

27  IN SCHOOL AND VERY WELL LIKED BY EVERYBODY.  I MEAN, HE'S

28  ALWAYS BEEN WELL LIKED, BUT HIS PERSONALITY CHANGED.  HE

6

1    JUST STARTED TO -- HE USED TO BE A LOT MORE -- HOW DO I

2    SAY, OUTGOING, INTO A LOT OF SPORTS.  AND THEN AFTER THE

3    ACCIDENT, HE JUST KIND OF -- HE HAD A DIFFERENT

4    PERSONALITY.

5         Q.   BETWEEN THAT TIME AND THE TIME HE WAS STABBED IN

6    THE KNIFE IN 1993 -- STABBED IN THE KNIFE, STABBED IN THE

7    EYE WITH A KNIFE IN 1993, WERE THERE ANY OTHER SIGNIFICANT

8    INJURIES TO HIM THAT YOU WERE PERSONALLY AWARE OF?

9         A.   NOT THAT I'M AWARE OF.

10        Q.   OKAY.  NOW WERE YOU AWARE OF LARRY'S ABUSE OF

11   DRUGS?

12        A.   YES.

13        Q.   WHEN DID THAT START?

14        A.   AFTER HE HAD THE BICYCLE ACCIDENT, HE STARTED TO

15   TRY MARIJUANA, AND THAT'S PRETTY MUCH ALL HE DID

16   THROUGHOUT HIGH SCHOOL.  AND THEN AFTER HIGH SCHOOL, HE

17   WAS INTO CRYSTAL METH.

18        Q.   WERE YOU LIVING WITH HIM AT THE TIME WHEN HE WAS

19   INTO CRYSTAL METH?

20        A.   I THINK IT STARTED PRETTY MUCH RIGHT AFTER I

21   MOVED WITH MY MOM TO A CONDO.  WE ALL LIVED IN A HOUSE

22   TOGETHER, THIS WAS IN 1993, AND MY MOTHER AND I MOVED TO A

23   CONDO.  I REMEMBER IT WAS MY SENIOR YEAR IN HIGH SCHOOL

24   AND HE WAS WITH MY DAD, SO I THINK IT STARTED AROUND THAT

25   TIME.

26        Q.   OKAY, DID YOU SEE HIM DURING THAT TIME

27   FREQUENTLY?

28        A.   YES.

1    Q.    DID HE HAVE DIFFICULTIES WITH THE LAW AND

2    THINGS?

3    A.    OH, YES.

4    Q.    BECAUSE OF HIS DRUG ABUSE?

5    A.    YES.

6    Q.    NOW, AS A RESULT OF THE EYE INJURY TO YOUR

7    BROTHER, DID THAT HAVE ANY AFFECT ON YOU?

8    A.    YES.

9    Q.    WHAT AFFECT?

10    A.    I WAS DEVASTATED, SO --

11    Q.    TAKE YOUR TIME, MS. LITTLE.  THERE'S WATER AND

12    TISSUES UP THERE.

13    A.    WHEN IT HAPPENED, I JUST DEALT WITH IT BECAUSE I

14    DIDN'T REALLY KNOW HOW TO DEAL WITH IT.  IT ACTUALLY TOOK

15    ME ABOUT FIVE YEARS BEFORE I FULLY WENT TO A PSYCHOLOGIST

16    TO KIND OF HELP ME WITH IT.

17    Q.    OKAY, SO IT -- WAS IT A DEPRESSION?

18    A.    IT AFFECTS THE FAMILY.

19    Q.    OKAY.

20    A.    YES, IT IS.

21    Q.    DEPRESSION?

22    A.    YES.

23    Q.    SO YOU DID GO TO A PSYCHOLOGIST?

24    A.    YES.

25    Q.    WHO IS THAT PSYCHOLOGIST?

26    A.    DIANA KAY WEISS.

27    Q.    OKAY.  NOW, SO YOU RELATED TO DR. WEISS,

28    OBVIOUSLY, PROBLEMS WITH YOUR BROTHER?

```
 1      A.   YES.

 2      Q.   YOUR BROTHER'S INJURY?

 3      A.   YES.

 4      Q.   OKAY.  NOW IN 1999 YOUR BROTHER WAS ARRESTED FOR

 5 MURDER, CORRECT?

 6      A.   YES.

 7      Q.   DID YOU MEET HIS ATTORNEY, MR. PECKHAM?

 8      A.   YES.

 9      Q.   HOW MANY TIMES DID YOU MEET HIS ATTORNEY,

10 MR. PECKHAM?

11      A.   THE PRELIMINARY HEARING.

12      Q.   OKAY.

13      A.   AND DURING THE TRIAL.

14      Q.   OKAY.  DO YOU SEE MR. PECKHAM IN THE COURTROOM

15 TODAY?

16      A.   YES.

17      Q.   HE'S THE GUY -- NICE LOOKING GUY IN THE SUIT

18 BACK THERE, RIGHT?

19      A.   YES.

20      Q.   DID YOU EVER RELATE TO MR. PECKHAM ANYTHING

21 ABOUT LARRY'S INJURIES?

22      A.   I TRIED TO RELATE EVERYTHING I KNEW ABOUT LARRY

23 TO HIM.

24      Q.   WHAT DID YOU RELATE TO HIM?  JUST WHAT YOU CAN

25 RECALL.

26      A.   JUST -- WELL, I TRIED TO RELATE HIS WHOLE, YOU

27 KNOW, FROM THE BEGINNING WHEN HE HAD HIS HEAD INJURY, FROM

28 WHEN HE HAD THE STABBING, I JUST FIGURED THAT ALL THAT YOU
```

1    CAN CONTRIBUTE TO HIM BEING A LITTLE MORE PARANOID THAN A

2    REASONABLE PERSON.

3        Q.    AND DID MR. -- DID MR. PECKHAM RESPOND TO THIS?

4        A.    HE WAS VERY COMPASSIONATE.  I MEAN, I REALLY

5    FELT HE WAS LOOKING FOR THE BEST INTEREST OF MY BROTHER.

6        Q.    DID YOU EVER OFFER TO HAVE ANY TESTING DONE OF

7    YOUR BROTHER?

8        A.    YES.

9        Q.    WHEN DID YOU DO THAT?

10       A.    IT WAS DURING THE TRIAL, I WAS STILL SEEING MY

11   PSYCHOLOGIST.  AND SHE SAID THAT, YOU KNOW, FROM TALKING

12   WITH ME, SHE SAID SHE FELT MY BROTHER MAY SUFFER FROM

13   POSTTRAUMATIC, I THINK IT'S DISTRESS DISORDER.  AND SHE

14   SAID THAT SHE TESTIFIED AT A LOT OF TRIALS FOR THE SAME

15   THING AND THAT SHE WOULD OFFER HER SERVICES FOR FREE TO

16   TESTIFY FOR HIM.

17       Q.    ALL RIGHT, JUST TESTIFY, RIGHT?

18       A.    JUST TO TALK ABOUT IT, NOT TO TALK ABOUT HIM

19   BECAUSE SHE DOESN'T KNOW HIM, BUT JUST TO TALK ABOUT THE

20   THINGS THAT IT CAN CAUSE.

21       Q.    OKAY, AND WHAT DID MR. PECKHAM RESPOND -- HOW

22   DID HE RESPOND?

23       A.    I DON'T REALLY RECALL HOW HE RESPONDED; I JUST

24   GAVE HIM THE INFORMATION AND I -- I DON'T KNOW ACTUALLY IF

25   HE EVEN WENT TO THE JUDGE WITH IT OR TRIED TO BRING IT IN.

26   I JUST KNOW NOTHING EVER HAPPENED AND I WAS TOLD THAT WE

27   DIDN'T NEED HER.

28       Q.    OKAY.  DID YOU TESTIFY IN THE TRIAL?

1    A.    NO.

2    Q.    NOW YOUR PSYCHOLOGIST OBVIOUSLY DID NOT SEE

3  LARRY LITTLE, RIGHT?

4    A.    CORRECT.

5    Q.    BUT SHE TOLD YOU THAT HE MIGHT EXHIBIT SYMPTOMS

6  OF --

7    A.    SHE FELT SURE HE DID, BECAUSE OF THE TYPE -- I

8  MEAN TO HAVE YOUR EYE STABBED OUT, THAT'S PRETTY

9  TRAUMATIC.

10    Q.    DID YOU GIVE HER ANY OTHER HISTORY ABOUT LARRY

11  BESIDES HAVING HIS EYE STABBED OUT?

12    A.    I JUST TOLD HER HOW -- BEFORE HE HAD HIS HEAD

13  INJURY AS A KID, YOU KNOW, HE WAS QUITE DIFFERENT.  I

14  MEAN, IT WAS AFTER THAT.

15    Q.    SO YOU WEREN'T AWARE OF ANY ASSAULTS THAT

16  OCCURRED AFTER 1999, CORRECT?

17    A.    HE MAY HAVE BEEN JUMPED OR SOMETHING WHEN HE WAS

18  INCARCERATED, BUT I DON'T REALLY KNOW HOW MANY TIMES OR

19  WHO.

20    Q.    OKAY, THE QUESTION IS DID YOU RELATE ANYTHING TO

21  THE PSYCHOLOGIST OR MR. PECKHAM?  LET'S START WITH THE

22  PSYCHOLOGIST.  DID YOU RELATE ANYTHING TO THE PSYCHOLOGIST

23  ABOUT ANY INCIDENT AFTER 1993?

24    A.    THE -- IN --

25    Q.    AFTER THE EYE?  AFTER THE EYE, I'M SORRY?

26    A.    NO.

27    Q.    DID YOU RELAY ANYTHING TO MR. PECKHAM ABOUT

28  INJURIES AFTER THE EYE?

1      A.    NO.

2            MR. WILLIAMS:  I'M SORRY I CONFUSED YOU.

3                  NOTHING FURTHER.

4            THE COURT:  MS. MALLEN?

5            MS. MALLEN:  THANK YOU.

6

7                        **CROSS-EXAMINATION**

8      BY MS. MALLEN:

9      Q.    LET'S START A LITTLE BIT WITH THE BIKE ACCIDENT

10     THAT HAPPENED AT THE AGE OF 12.  WHERE WERE YOU LIVING AT

11     THAT TIME?

12     A.    I WAS LIVING IN MIRA MESA.

13     Q.    WHERE WAS LARRY LIVING?

14     A.    MIRA MESA.

15     Q.    WAS THE FAMILY TOGETHER, BASICALLY MOTHER,

16     FATHER, YOU AND LARRY?

17     A.    YES.

18     Q.    OKAY.  WAS LARRY USING MARIJUANA BEFORE THE BIKE

19     ACCIDENT, AS FAR AS YOU KNOW?

20     A.    NO.

21     Q.    HOW SOON AFTER THE BIKE ACCIDENT DID HE START

22     USING MARIJUANA?

23     A.    WELL, I'M NOT QUITE SURE EXACTLY WHEN THE BIKE

24     ACCIDENT WAS, YOU KNOW, IN THE CALENDAR YEAR, BUT IT'S

25     PROBABLY THE SUMMERTIME, I WOULD IMAGINE, AFTER THE BIKE

26     ACCIDENT.

27     Q.    OKAY.  DID THE BIKE ACCIDENT HAPPEN IN THE

28     SUMMER?

12

```
1        A.    THAT'S WHAT I -- IT'S SO LONG AGO, I REALLY
2   DON'T REMEMBER --
3        Q.    OKAY.
4        A.    -- WHEN IT WAS.
5        Q.    DID LARRY DRINK ALCOHOL AT THAT TIME?
6        A.    NO.
7        Q.    YOU'RE SURE?
8        A.    POSITIVE.
9        Q.    YOU SPENT A LOT OF TIME WITH HIM?
10       A.    YES.
11       Q.    WENT TO PARTIES WITH HIM?
12       A.    WE WERE 12 -- I MEAN, I WAS 11 AND HE WAS 12; WE
13   DIDN'T GO TO PARTIES.
14       Q.    HAVE THE SAME FRIENDS?
15       A.    PRETTY MUCH.
16       Q.    OKAY.  AND DID HIS FRIENDS ALL SMOKE MARIJUANA
17   TOO?
18       A.    NOT THAT I KNEW OF AT THAT TIME.  LIKE I SAID,
19   THEY WERE 12.
20       Q.    OKAY.
21       A.    I THINK IT STARTED PROBABLY ABOUT 13.
22       Q.    WAS HE USING ANYTHING ELSE BESIDES MARIJUANA?
23       A.    NO.
24       Q.    AS FAR AS YOU KNOW?
25       A.    YES.
26       Q.    DID YOU TALK TO HIM ABOUT IT?
27       A.    OH, YEAH, WE WERE VERY CLOSE.  WE TALKED ABOUT
28   EVERYTHING.
```

1    Q.    DID YOU SMOKE MARIJUANA TOO?

2    A.    I TRIED IT.

3    Q.    OKAY.

4    A.    I WAS PROBABLY 13 WHEN I TRIED IT.

5    Q.    DID LARRY START SPENDING TIME WITH OTHER PEOPLE

6    WHO SMOKED MARIJUANA?

7    A.    I WOULDN'T PUT IT THAT WAY.  I WOULD SAY HE HAD

8    FRIENDS AND THEY ALL KIND OF EXPERIMENTED WITH IT AT THE

9    SAME TIME.

10   Q.    OKAY.  SO HE WAS WITH A GROUP THEN THAT DID

11   THAT?

12   A.    RIGHT.

13   Q.    DO YOU KNOW ANYTHING ABOUT WHAT KIND OF INJURIES

14   LARRY HAD WHEN HE HIT HIS HEAD ON THE ROCK?

15   A.    YES, HE HAD A MAJOR --

16   Q.    IS THAT BECAUSE YOU TALKED TO A DOCTOR?

17   A.    WELL, I WAS AT THE HOSPITAL WITH MY MOTHER AND I

18   STOOD BY HER WHILE SHE TALKED TO THE DOCTOR.

19   Q.    OKAY, AND SO WHAT DID YOU HEAR THE DOCTOR SAY?

20   A.    HE HAD A MAJOR CONCUSSION.

21   Q.    WHAT KIND OF TREATMENT DID HE HAVE?

22   A.    THEY JUST HAD HIM IN THE HOSPITAL BED.  I DON'T

23   KNOW EXACTLY WHAT THEY WERE DOING.  THEY DIDN'T HAVE CAT

24   SCANS THEN, SO THEY COULDN'T REALLY SEE HOW -- HOW BAD THE

25   INJURY WAS, BUT IT WAS QUITE BAD BECAUSE HIS WHOLE HEAD

26   WAS SWOLLEN.

27   Q.    OKAY.  AND WAS HE RELEASED AFTER TWO WEEKS?

28   A.    I WOULD SAY ABOUT THAT.

1      Q.   OKAY.  DID HE HAVE -- DID HE GO TO DOCTORS AFTER

2   THAT FOR THE HEAD?

3      A.   I BELIEVE HE WENT TO CHECK-UPS.

4      Q.   OKAY.  AND THEN AS FAR AS THE EYE INJURY, THAT

5   WAS IN WHAT YEAR?

6      A.   '93.

7      Q.   OKAY, WERE YOU LIVING WITH LARRY AT THE TIME?

8      A.   NO.

9      Q.   WHERE WAS HE LIVING?

10     A.   I DON'T REALLY KNOW AT THAT TIME.  HE MAY HAVE

11  BEEN LIVING WITH MY FATHER.

12     Q.   BUT YOU'RE NOT SURE?

13     A.   HE LIVED AT DIFFERENT PLACES.

14     Q.   OKAY.  HE'D BEEN IN PRISON BEFORE THEN, HADN'T

15  HE?

16     A.   I DON'T KNOW ABOUT PRISON; I KNOW HE'D BEEN IN

17  JAIL BEFORE.

18     Q.   OKAY.  SO WHEN -- WHAT WAS THE LAST ADDRESS THAT

19  YOU KNEW LARRY HAD?

20     A.   HILGER STREET.

21     Q.   AND WHEN WAS THAT?

22     A.   PROBABLY AROUND '93.  I JUST DON'T KNOW EXACTLY

23  WHEN HE MOVED THERE AND WHEN HE MOVED OUT; I DIDN'T PAY

24  ATTENTION TO --

25     Q.   WHERE WAS THE LAST PLACE THAT YOU VISITED LARRY

26  WHERE HE LIVED?

27     A.   HILGER STREET.

28     Q.   WAS THAT AN APARTMENT?

1    A.    IT -- HE LIVED WITH MY FATHER; IT WAS A DUPLEX.

2    Q.    OKAY.  SO THAT'S WHERE YOUR FATHER LIVED?

3    A.    YES.

4    Q.    OKAY.  BUT DID YOU VISIT LARRY AT HIS OWN

5    APARTMENT OR DID HE LIVE OUT ON THE STREET OR WAS HE WITH

6    FRIENDS OR --

7    A.    HE MAINLY LIVED WITH MY FATHER, BUT SOMETIMES HE

8    WOULD, YOU KNOW, DISAPPEAR AND BE WITH FRIENDS.

9    Q.    OKAY.  WERE YOU PRESENT WHEN HE WAS STABBED IN

10   THE EYE?

11   A.    WAS I THERE?

12   Q.    YES.

13   A.    NO.

14   Q.    WHO DID YOU GET YOUR INFORMATION FROM ABOUT WHAT

15   HAPPENED?

16   A.    MY MOTHER CALLED ME.

17   Q.    AND --

18   A.    AT WORK.

19   Q.    WAS YOUR MOTHER THERE?

20   A.    MY MOTHER WAS NOT THERE.

21   Q.    WHO DID SHE GET THE INFORMATION FROM?  DO YOU

22   KNOW?

23   A.    EITHER MY FATHER OR A POLICEMAN, I DON'T RECALL.

24   Q.    OKAY.  DID YOU EVER TALK TO LARRY ABOUT WHAT

25   HAPPENED?

26   A.    YES.

27   Q.    AND DID HE TELL YOU HOW IT HAPPENED?

28   A.    YES.

```
 1        Q.   HOW DID IT HAPPEN?

 2        A.   HE WAS IN A CAR WITH HIS FRIEND IN THE MIDWAY

 3   DISTRICT AND HE AND HIS FRIEND HAD BEEN DRINKING.   THEY

 4   PICKED UP A COUPLE OF WOMEN AND WERE IN THE CAR WITH THEM

 5   PARKED, AND ONE OF THE WOMEN WAS TRYING TO ROB MY BROTHER.

 6        Q.   AND SHE WAS A PROSTITUTE, RIGHT?

 7        A.   AS FAR AS I KNOW.

 8        Q.   OKAY.   ALL RIGHT.   DID LARRY TELL YOU THAT HE'D

 9   BEEN USING DRUGS THAT NIGHT AS WELL?

10        A.   NO.

11        Q.   DID YOU ASK HIM ABOUT THAT?

12        A.   NO.

13        Q.   WHEN DID LARRY START -- WELL, YOU KNEW LARRY HAD

14   A DRINKING PROBLEM, RIGHT?

15        A.   I NEVER THOUGHT HE HAD A DRINKING PROBLEM.   I

16   KNEW HE HAD A DRUG PROBLEM, BUT I NEVER SAW A MAJOR

17   DRINKING PROBLEM.   I KNEW HE COULDN'T REALLY HANDLE

18   ALCOHOL IF HE DRANK TOO MUCH OF IT, BUT I WOULDN'T CALL

19   HIM AN ALCOHOLIC.

20        Q.   OKAY, SO HIS MAIN PROBLEM WAS IN DRUGS?

21        A.   CRYSTAL METH.

22        Q.   ANYTHING ELSE BESIDES METH THAT YOU WERE AWARE

23   OF?

24        A.   NO.

25        Q.   AND THEN WHEN HE -- OF HE WAS STABBED IN THE

26   EYE, WHERE DID LARRY LIVE?

27        A.   HE WAS LIVING WITH MY FATHER.

28        Q.   SO AS FAR AS YOU KNEW HE HAD GONE BACK TO LIVE
```

1  WITH YOUR FATHER?

2      A.   YES.

3      Q.   WHERE WERE YOU LIVING?

4      A.   LET'S -- I WAS LIVING IN A CONDO IN RANCHO

5  BERNARDO.

6      Q.   HAVE YOU --

7      A.   WITH MY MOTHER.

8      Q.   HAVE YOU EVER LIVED OUTSIDE OF SAN DIEGO COUNTY?

9      A.   YES.

10     Q.   WHEN --

11     A.   WELL, I DON'T KNOW, UNLESS YOU CONSIDER

12  ESCONDIDO OUTSIDE OF SAN DIEGO COUNTY.   ESCONDIDO.

13     Q.   YOU'VE STAYED BASICALLY IN THE LOCAL AREA?

14     A.   YES.

15     Q.   AND YOU SAID YOU MOVED WITH YOUR MOTHER TO THE

16  CONDOMINIUM IN 1993?

17     A.   YES.

18     Q.   THAT'S THE LAST TIME YOU LIVED WITH LARRY?

19     A.   NO, I DIDN'T LIVE WITH LARRY THEN.

20     Q.   BEFORE THAT IS THE LAST TIME YOU LIVED WITH

21  LARRY?

22     A.   THE LAST TIME I LIVED WITH LARRY WAS 1983.

23     Q.   OKAY.   AND AT THAT POINT THE FAMILY SEPARATED

24  BASICALLY?

25     A.   PRETTY MUCH.

26     Q.   WAS THAT AN UPSETTING THING FOR YOU?

27     A.   OF COURSE.

28     Q.   WAS IT A DIVORCE?

1    A.    NO, IT WAS A SEPARATION.

2    Q.    OKAY.  DID YOUR PARENTS EVER GET DIVORCED?

3    A.    NO.

4    Q.    DID YOU HAVE -- WELL, DID IT UPSET YOU WHEN THE

5    FAMILY SPLIT LIKE THAT?

6    A.    YES.

7    Q.    DID YOU GO TO A PSYCHIATRIST TO DEAL WITH THAT

8    ISSUE?

9    A.    YOU MEAN AFTER IT HAPPENED OR --

10    Q.    AFTER IT HAPPENED?

11    A.    NO.

12    Q.    NOW YOU MENTIONED THAT YOU WENT TO THIS DIANA

13    WEISS?

14    A.    WEISS, W-E-I-S-S.

15    Q.    AND WHEN DID YOU START SEEING HER?

16    A.    I STARTED SEEING HER IN LIKE ABOUT NOVEMBER --

17    LET'S SEE, OCTOBER OF '99.

18    Q.    SO YOU STARTED SEEING DR. WEISS AFTER LARRY

19    KILLED THE GENTLEMAN?

20    A.    YES, YES.

21    Q.    UP UNTIL THAT POINT HAD YOU SEEN A PSYCHIATRIST

22    OR A PSYCHOLOGIST AT ALL?

23    A.    YES.

24    Q.    YOU'D SEEN SOMEONE DIFFERENT?

25    A.    YES.

26    Q.    OKAY, AND WHEN WAS -- DID YOU -- ABOUT WHAT TIME

27    DID YOU SEE THE FIRST PSYCHIATRIST?

28    A.    I WOULD SAY IT WAS 1992.

1   Q.   AND HOW LONG DID YOU SEE THAT ONE?

2   A.   PROBABLY ONLY FOUR OR FIVE MONTHS.

3   Q.   OKAY.  AND THAT HAD NOTHING TO DO WITH LARRY,

4   RIGHT?

5   A.   IT HAD JUST EVERYTHING TO DO WITH MY WHOLE LIFE,

6   JUST MY -- ALL MY FAMILY.

7   Q.   OKAY.  NOW WHY DID YOU START SEEING DR. WEISS?

8   A.   BECAUSE I WAS HAVING A VERY HARD TIME DEALING

9   WITH THE FACT THAT MY BROTHER WAS ACCUSED OF MURDER.

10  Q.   AND HAD YOU TALKED TO LARRY ABOUT WHAT HAPPENED?

11  A.   OF COURSE.

12  Q.   HE DESCRIBED TO YOU THE KILLING?

13  A.   YES.

14  Q.   HOW LONG DID YOU SEE DR. WEISS?

15  A.   I SAW HER FOR APPROXIMATELY SIX MONTHS.

16  Q.   NOW DR. WEISS IS A STRESS EXPERT, RIGHT?

17  A.   CARDIAC PSYCHOLOGIST.

18  Q.   OKAY.  HOW -- WHAT BACKGROUND DID SHE TELL YOU

19  SHE HAD IN POSTTRAUMATIC STRESS DISORDER?

20  A.   SHE JUST SAID THAT SHE HAD TESTIFIED AT MANY

21  TRIALS ABOUT THE SUBJECT, SO I ASSUMED SHE HAD SOME

22  EXPERIENCE.

23  Q.   DID SHE GIVE YOU ANY DETAILS OF THAT?

24  A.   NO.

25  Q.   HOW MANY SESSIONS HAD YOU HAD WITH HER WHEN SHE

26  BROUGHT THIS UP TO YOU?

27  A.   I WAS SEEING HER WEEKLY.

28  Q.   AND ABOUT WHEN DID SHE TALK TO YOU ABOUT THIS?

20

```
 1        A.   IT WAS RIGHT AROUND WHEN MY BROTHER'S TRIAL WAS

 2   GOING TO START.   COULD HAVE BEEN ACTUALLY DURING THE

 3   TRIAL.

 4        Q.   SO YOU CONTINUED TO SEE HER DURING THE TRIAL?

 5        A.   YES.

 6        Q.   OKAY.

 7        A.   IT MAY HAVE BEEN LIKE A DAY THAT I SAW HER, LIKE

 8   RIGHT BEFORE IT STARTED OR RIGHT AFTER IT ENDED, I -- IT

 9   WAS RIGHT -- IT WAS ACTUALLY RIGHT BEFORE IT STARTED WHEN

10   SHE OFFERED HER SERVICES.

11        Q.   WHEN YOU DESCRIBED -- WHAT INFORMATION DID SHE

12   HAVE ABOUT LARRY WHEN SHE SAID SHE THOUGHT IT SOUNDED LIKE

13   HE MIGHT HAVE POSTTRAUMATIC STRESS DISORDER?

14        A.   SHE -- JUST LISTENING TO ME TALK ABOUT HIM AND

15   TALK ABOUT THE STABBING WHICH WAS VERY TRAUMATIC.

16        Q.   TO YOU?

17        A.   YES.

18        Q.   OKAY.  HAD SHE -- DID SHE EVER TALK TO LARRY?

19        A.   NO, BUT SHE SAID IF HE HAD NEVER HAD ANY

20   PROFESSIONAL COUNSELING, THAT -- THAT HE PROBABLY WAS

21   SUFFERING FROM SOME SORT OF DISORDER OF SOME KIND.

22        Q.   SO SHE THOUGHT HE MUST HAVE HAD SOMETHING WRONG,

23   BUT SHE WASN'T --

24        A.   SHE JUST THOUGHT HE MIGHT BE A LITTLE MORE

25   PARANOID THAN THE AVERAGE PERSON.

26        Q.   SO SHE'S THE ONE WHO SUGGESTED THAT THAT WOULD

27   BE A SYMPTOM TO LOOK FOR?

28        A.   YES.
```

1    Q.    AND DID YOU START THEN LOOKING FOR THAT SYMPTOM?

2    A.    YES.

3    Q.    AND DID YOU SEE IT?

4    A.    WELL, I ALWAYS THOUGHT THERE WAS SOME KIND --

5    SOMETHING LIKE THAT WRONG BECAUSE HE'D BEEN THROUGH SO

6    MANY THINGS AND NEVER DEALT WITH THEM, SO I DIDN'T KNOW

7    HOW THAT COULD NOT AFFECT HIM.

8    Q.    OKAY.  HOW ARE YOU EMPLOYED?

9    A.    I'M AN EXECUTIVE ASSISTANT.

10   Q.    DO YOU HAVE ANY MEDICAL BACKGROUND AT ALL?

11   A.    NO.

12   Q.    DID YOU TAKE ANY OTHER FAMILY MEMBERS TO SEE

13   DR. WEISS?

14   A.    NO.

15   Q.    DID SHE EVER ASK TO MEET ANY OF THEM?

16   A.    NO.

17   Q.    DID YOU EVER HAVE ANY GROUP MEETINGS WITH OTHER

18   PEOPLE BESIDES THE DOCTOR OR WERE THEY ALL SEPARATE

19   SESSIONS?

20   A.    SEPARATE, ONE-ON-ONE SESSIONS.

21   Q.    AT THE TIME THAT DR. WEISS BROUGHT UP

22   POSTTRAUMATIC DISTRESS DISORDER, DID YOU KNOW WHAT THAT

23   WAS?

24   A.    YES.

25   Q.    HOW?

26   A.    BECAUSE WHEN I WAS IN COLLEGE, I TOOK PSYCHOLOGY

27   AND THEY TALKED ABOUT DIFFERENT TYPES OF ILLNESSES.

28   Q.    OKAY.  DID YOU TALK TO LARRY WHEN YOU WERE IN

22

1    COLLEGE ABOUT POSTTRAUMATIC STRESS DISORDER?

2        A.    NO.

3        Q.    LET'S TALK A LITTLE BIT ABOUT LARRY.

4        A.    OKAY.

5        Q.    WHEN -- DID YOU EVER CONDUCT ANY OBSERVATIONS OF

6    HIM IN ANY MEDICAL SENSE?

7        A.    WELL, I ALWAYS THOUGHT HE PROBABLY SUFFERED FROM

8    SOME SORT OF BRAIN DAMAGE WHEN HE HAD THE BIKE ACCIDENT,

9    BECAUSE HIS HEAD WAS SO SWOLLEN UP AND I -- HE WASN'T THE

10   SAME AFTER THAT.

11       Q.    ALL RIGHT.  DO YOU KNOW WHETHER HIS DIFFERENCE

12   IN ACTIONS WERE CAUSED BY THE DRUGS THAT HE USED OR BY THE

13   BRAIN INJURY?

14       A.    I'D SAY BOTH.

15       Q.    DO YOU HAVE ANY MEDICAL INFORMATION ABOUT HOW

16   DRUG USE WOULD AFFECT A BRAIN INJURED PERSON?

17       A.    NO.

18       Q.    DO YOU HAVE ANY IDEA -- WHEN DID LARRY START

19   USING CRYSTAL METH AS FAR AS YOU KNOW?

20       A.    AS FAR AS I KNOW, IT WAS IN HIGH SCHOOL,

21   PROBABLY ABOUT THE AGE OF 17.

22       Q.    WAS HE DRINKING AT THE SAME TIME?

23       A.    YES.

24       Q.    WHEN DID HE START DRINKING?

25       A.    PROBABLY ABOUT THAT AGE.

26       Q.    OKAY.  AND WAS IT -- DID YOU SEE ANY OTHER

27   FURTHER CHANGING IN HIS BEHAVIOR AFTER HE STARTED USING

28   CRYSTAL METH AND DRINKING?

1       A.    WELL, I NEVER REALLY NOTICED HIM DRINKING MUCH,

2    BUT I NOTICED THAT HE WAS ALWAYS USING CRYSTAL METH.

3       Q.    HOW DID THAT MAKE HIM BEHAVE DIFFERENTLY?

4       A.    WIRED, PANICKY, TALKED A LOT.  I GUESS ANY WAY

5    THAT IT WOULD AFFECT ANYBODY WHO USED IT.

6       Q.    A LITTLE PARANOID PERHAPS?

7       A.    YES.

8       Q.    DO YOU HAVE ANY IDEA HOW MUCH HE WAS USING?

9       A.    NO.

10      Q.    OKAY.  WERE YOUR CONCERNS BASICALLY, THEN, THAT

11   YOU THOUGHT SOMETHING MUST BE WRONG WITH LARRY AND

12   SOMEBODY SHOULD FIND OUT ABOUT IT, BASICALLY?

13      A.    AT WHAT TIME FRAME ARE WE TALKING ABOUT HERE?

14      Q.    OKAY, WHEN YOU TALKED -- WELL, LET'S GO BACK TO

15   TALKING TO ED PECKHAM.  WHEN DID YOU TALK TO ED PECKHAM

16   ABOUT YOUR CONCERNS?  OR DID YOU?

17      A.    THROUGHOUT THE TRIAL, THROUGHOUT THE PRELIMINARY

18   HEARING, ANY TIME THAT WE COULD SPEND SOME TIME WITH HIM

19   AND JUST GO OVER IT.

20      Q.    AND HOW MANY TIMES WAS THAT?

21      A.    MAYBE FIVE TIMES.

22      Q.    AND WERE THEY LONG CONVERSATIONS OR

23   CONVERSATIONS IN THE HALLWAY OR WHAT KIND OF

24   CONVERSATIONS?

25      A.    WE'D GONE TO LUNCH WITH HIM ONCE, WE WENT TO A

26   AIRPLANE MUSEUM ONCE.

27      Q.    AND DID YOU TELL MR. PECKHAM THAT YOU THOUGHT

28   SOMETHING WAS WRONG WITH LARRY MENTALLY, I GUESS?

1    A.    I JUST FELT THAT HE MIGHT -- THAT HIS BIKE

2  ACCIDENT MAY HAVE CONTRIBUTED A LITTLE BIT SOMEWHAT TO

3  CONTRIBUTING TO BEING PARANOID AND THAT THE DRUG USE

4  DEFINITELY.

5    Q.    AND WHEN DID YOU FIRST BRING UP DR. WEISS?

6    A.    I BROUGHT HER UP -- I MEAN, I CAN'T BE EXACTLY

7  SURE WHAT DAY, BUT IT WAS RIGHT BEFORE THE TRIAL BEGAN

8  BECAUSE SHE OFFERED HER SERVICES.

9    Q.    DID SHE GIVE YOU A CARD TO GIVE TO MR. PECKHAM?

10   A.    NO.

11   Q.    DID SHE GIVE YOU ANY KIND OF LETTER TO GIVE TO

12  MR. PECKHAM?

13   A.    NO.

14   Q.    DID SHE -- DID YOU PASS ON A PHONE NUMBER?

15   A.    NO.  SHE WAS GOING THROUGH ME.

16   Q.    OKAY.  DID YOU PASS ON A RESUMÉ OF HERS WITH ANY

17  INFORMATION ABOUT WHO SHE WAS?

18   A.    NO.

19   Q.    DID YOU TELL ED THAT THIS WAS YOUR PSYCHOLOGIST?

20   A.    YES.

21   Q.    AND THAT YOU HAD TALKED TO HER ABOUT LARRY IN A

22  GENERAL WAY?

23   A.    YES, I WAS -- I TOLD HIM I WAS GOING TO THE

24  PSYCHOLOGIST TO DEAL WITH ALL OF THE PROBLEMS THAT WERE

25  UPSETTING ME IN MY LIFE AND MY BROTHER WAS ONE OF MY MAIN

26  CONCERNS.  I WAS HURTING MAJOR FOR HIM AND SHE WAS THE ONE

27  THAT SUGGESTED, YOU KNOW, THAT HE MAY SUFFER FROM THIS AND

28  SHE COULD -- OFFERED HER SERVICES.

1      Q.   OKAY, DID YOU TALK TO DR. WEISS ANYMORE ABOUT IT

2   OTHER THAN THAT ONE TIME?

3      A.   I BELIEVE I JUST TOLD HER THAT HE SAID SHE

4   WASN'T NEEDED.

5      Q.   OKAY.   THANK YOU.

6   BY MR. WILLIAMS:

7      Q.   MS. LITTLE --

8          THE COURT:  ARE YOU DONE?

9          MR. WILLIAMS:  OH, I -- I'M SORRY, I'M SORRY.

10  THANK YOU, YOUR HONOR.

11  BY MS. MALLEN:

12     Q.   ARE YOU UPSET THAT YOUR BROTHER IS STILL IN

13  JAIL?

14     A.   YES.

15     Q.   DO YOU WANT TO SEE HIM OUT?

16     A.   YES.

17     Q.   AND DO YOU WANT TO HELP HIM AS MUCH AS YOU CAN?

18     A.   YES.

19     Q.   HAVE YOU TALKED TO HIM ABOUT THIS LEGAL

20  PROCEEDING?

21     A.   NO.

22     Q.   HAVE YOU TALKED TO HIM ABOUT POSTTRAUMATIC

23  STRESS DISORDER?

24     A.   I DON'T RECALL.

25     Q.   HAVE YOU TALKED TO HIM ABOUT HOW HE FELT THAT --

26  THE DAY THAT HE KILLED THE PERSON?

27     A.   WHAT DO YOU MEAN HOW HE FELT?  BEFORE OR AFTER

28  OR --

26

1    Q.    DID YOU TALK TO HIM ABOUT WHEN IT HAPPENED?

2    A.    YES.

3    Q.    AND DID YOU ASK HIM HOW HE WAS FEELING AT THAT

4    TIME?

5    A.    YES.

6    Q.    AND DID YOU TALK TO HIM ABOUT WHETHER HE WAS

7    PARANOID OR NOT?

8    A.    YES.

9    Q.    AND DID HE -- DID YOU TALK TO HIM ABOUT SOME OF

10   THE OTHER SYMPTOMS THAT YOU'D LEARNED THAT GO WITH

11   P.T.S.D.?

12   A.    NO.

13   Q.    WHAT DID YOU TALK TO HIM ABOUT?

14   A.    I JUST TALKED TO HIM ABOUT -- I JUST ASKED HIM

15   IF HE HAD BEEN DOING DRUGS OR WHAT WAS GOING ON.  WHAT WAS

16   THE EVENTS THAT LED HIM TO DO WHAT HE DID AND HE FELT

17   THREATENED.

18   Q.    DID HE TELL YOU THAT HE'D BEEN USING DRUGS THAT

19   DAY?

20   A.    NO.

21   Q.    SO HE DENIED THAT?  THAT'S FINE, I DON'T MEAN TO

22   IMPLY, BUT DID HE TELL YOU THAT HE HAD NOT BEEN USING

23   DRUGS THEN?

24   A.    YES.

25   Q.    AND DID HE TELL YOU THAT HE HAD FELT THREATENED?

26   A.    YES.

27   Q.    BY THE VICTIM?

28   A.    THE VICTIM AND SOMEBODY HE HAD CALLED ON THE

1    PHONE.

2        Q.    ALL RIGHT.  DID HE TELL YOU THAT HE ACTED AS HE

3    DID BASICALLY TO STOP THE VICTIM?

4        A.    YES, HE THOUGHT HE WAS -- HE SAW SOMETHING

5    COMING UP BEHIND HIM AND HE THOUGHT HE WAS GOING TO HIT

6    HIM WITH SOMETHING.

7        Q.    DID LARRY TELL YOU THAT THE VICTIM WAS BEHIND

8    HIM AT THE TIME THAT HE STABBED HIM?

9        A.    NO, HE JUST SAW SOMETHING COMING TOWARDS HIM.

10        Q.    SO HE WAS TALKING ABOUT WHAT WAS IN FRONT OF

11    HIM?

12        A.    I DON'T REALLY KNOW, I WASN'T THERE.

13        Q.    OKAY.  AND LARRY WAS NOT CLEAR, THEN, ABOUT WHAT

14    HE WAS TELLING YOU OR --

15        A.    HE DIDN'T EXACTLY SPECIFY.  HE JUST SAID THAT HE

16    WAS GOING TO THROW SOMETHING AT HIM AND HE WAS DEFENDING

17    HIMSELF.

18        Q.    OKAY.  SO BASICALLY HE TOLD YOU THAT HE THOUGHT

19    THAT HE HAD ACTED IN SELF-DEFENSE?

20        A.    EXACTLY.

21        Q.    AND LARRY NEVER CHANGED FROM THAT, DID HE?

22        A.    NO.

23            MS. MALLEN:  OKAY, THANK YOU.  NOTHING FURTHER.

24            THE COURT:  NOW, MR. WILLIAMS.

25            MR. WILLIAMS:  THANK YOU.

26

27

28

1                        **REDIRECT EXAMINATION**

2    BY MR. WILLIAMS:

3         Q.   MS. MALLEN ASKED YOU ABOUT WHY YOU FELT THAT HE

4    MIGHT HAVE SOME PROBLEMS AND YOU MENTIONED THE BIKE

5    INJURY, THE DRINKING AND -- NOT SO MUCH THE DRINKING, BUT

6    THE METHAMPHETAMINE ABUSE WAS ALSO PART OF THAT, THE

7    STABBING IN THE EYE?

8         A.   ABSOLUTELY.

9         Q.   THE BLINDING OF YOUR BROTHER?

10        A.   THAT WAS THE MOST TRAUMATIC.

11        Q.   NOW, WHEN LARRY -- YOU SAID YOU TALKED TO LARRY

12   IN THE JAIL, I PRESUME AFTER HE WAS ARRESTED?

13        A.   OR ON THE PHONE, WE TALK ON THE PHONE A LOT.

14        Q.   BUT HE WAS IN CUSTODY?

15        A.   YES.

16        Q.   AND YOU SAID YOU TALKED TO HIM ABOUT THE

17   KILLING?

18        A.   YES.

19        Q.   DID HE EVER MENTION THAT HE HAD BEEN DRINKING

20   THAT NIGHT?

21        A.   YES.

22        Q.   HE TOLD YOU HE HAD BEEN DRINKING?

23        A.   YES.

24        Q.   DID YOU EVER RELATE THAT TO MR. PECKHAM THAT

25   LARRY WAS DRINKING THAT DAY, IF YOU RECALL?

26        A.   I DON'T RECALL.

27        Q.   OKAY.  DID YOU RELAY THE SUBSTANCE OF YOUR

28   CONVERSATIONS WITH LARRY TO MR. PECKHAM?  DO YOU

APPENDIX No. 1

# EXHIBIT    J

1    UNDERSTAND MY QUESTION?

2         A.   NO.

3         Q.   DID YOU TELL MR. PECKHAM WHAT YOU AND LARRY

4    TALKED ABOUT?

5         A.   NO.

6         Q.   OKAY.  YOU FIGURED IT WAS BETWEEN YOU AND LARRY,

7    RIGHT?

8         A.   RIGHT.

9              MR. WILLIAMS:  OKAY.  NOTHING FURTHER.

10             THE COURT:  MS. MALLEN?

11             MS. MALLEN:  NOTHING FURTHER.

12             THE COURT:  THANK YOU, YOU'RE EXCUSED.

13             THE WITNESS:  THANK YOU.

14             MR. WILLIAMS:  PETITIONER CALLS LARRY LITTLE

15   SENIOR.

16

17                 **LARRY LITTLE SENIOR,**

18   CALLED AS A WITNESS ON BEHALF OF THE DEFENDANT, HAVING

19   BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

20

21             THE CLERK:  WOULD YOU STEP UP HERE AND HAVE A

22   SEAT IN THE WITNESS STAND.

23             MR. WILLIAMS:  YOUR HONOR, MS. LITTLE HAD ASKED

24   THE BAILIFF WHETHER SHE CAN REMAIN; I THINK IF THE COURT

25   EXCUSED --

26             THE COURT:  I DID.

27             MR. WILLIAMS:  AND WE DECIDED NOT TO EXCLUDE

28   PEOPLE ANYWAY.  THANK YOU, YOUR HONOR.

**EXHIBIT J**

1

2                          **DIRECT EXAMINATION**

3    BY MR. WILLIAMS:

4         Q.   STATE YOUR NAME AND SPELL YOUR LAST NAME FOR THE

5    RECORD PLEASE, SIR.

6         A.   LARRY JOHN LITTLE.   L-I-T-T-L-E.

7         Q.   AND ARE YOU RELATED TO THE PETITIONER AND

8    DEFENDANT, LARRY LITTLE JUNIOR?

9         A.   YES, I AM.   I'M HIS FATHER.

10        Q.   AND DID LARRY RESIDE WITH YOU MOST OF HIS LIFE,

11   HIS TEENAGE LIFE?

12        A.   YES, HE DID.

13        Q.   HOW LONG DID HE LIVE WITH YOU?

14        A.   WELL, UNTIL 1998.

15        Q.   SO OFF -- HE WAS USUALLY RESIDING IN YOUR HOUSE?

16        A.   YEAH, MOST OF THE TIME, EXCEPT WHEN I WOULD BOOT

17   HIM OUT ONCE IN A WHILE, WHEN HE WOULD BE ON THAT STUFF,

18   YOU KNOW.

19        Q.   OKAY, SO YOU MEAN CRYSTAL METHAMPHETAMINE?

20        A.   YES, SIR, I DO.

21        Q.   WHEN HE WAS USING DRUGS, YOU KICKED HIM OUT?

22        A.   YEAH.

23        Q.   OKAY.   NOW ALSO DURING THIS TIME HE WENT TO

24   PRISON A COUPLE OF TIMES, RIGHT?

25        A.   YES, SIR.

26        Q.   SO HE WASN'T LIVING WITH YOU THEN?

27        A.   NO.

28        Q.   OKAY.   BUT WHEN HE WOULD GET PAROLED, HE WOULD

31

1   COME BACK TO YOU?

2       A.   YES.

3       Q.   NOW YOUR DAUGHTER SHARON JUST TESTIFIED, RIGHT?

4       A.   YES, SIR.

5       Q.   AND YOU WERE IN THE COURTROOM, YOU HEARD HER?

6       A.   YES, SIR.

7       Q.   DO YOU RECALL THE BICYCLE ACCIDENT THAT YOUR SON

8   WAS INVOLVED IN WHEN HE WAS APPROXIMATELY 12 YEARS OLD?

9       A.   THE WHAT?

10      Q.   WHEN HE WAS APPROXIMATELY 12, LARRY'S BIKE

11  ACCIDENT; DO YOU RECALL?

12      A.   YEAH, HE WAS 13.

13      Q.   13, OKAY.

14      A.   1978, IN MAY.

15      Q.   HOW LONG -- DO YOU RECALL HOW LONG HE WAS IN THE

16  HOSPITAL?

17      A.   I BELIEVE IT WAS ABOUT FOUR OR FIVE DAYS, YOU

18  KNOW, BUT HIS HEAD SWOLE UP LIKE THE PLANET OF THE APES,

19  THAT'S WHAT HE LOOKED LIKE.  KNOCKED HIS FRONT TEETH OUT

20  AND THEY HAD TO CUT HIS MOUTH OPEN AND STICK THEM BACK IN

21  WITH NO ANESTHETIC OR ANYTHING.

22      Q.   WAS LARRY -- WAS THERE A CHANGE IN LARRY AFTER

23  THE BIKE ACCIDENT?  I DON'T MEAN PHYSICALLY, BUT IN THE

24  WAY HE ACTED?

25      A.   YES, THERE WAS.

26      Q.   WHAT WAS THAT, SIR?

27      A.   WELL, SHORTLY AFTER THAT, HIM AND HIS BUDDY THAT

28  SUMMER GOT A HOLD OF A BOTTLE OF WHISKEY SOMEWHERE, A HALF

1    GALLON, AND HE GOT ARRESTED FOR THAT, A BUDDY OF HIS

2    TAKING THE KID'S BICYCLE OR SOMETHING, AND HE WAS FINALLY

3    RELEASED, BUT I FOUND HIM IN THE GARAGE ONE TIME HAVING

4    ONE OF -- ONE OF THESE DRINKING EPISODES WITH THAT HALF

5    GALLON WHISKEY, HANGING OUTSIDE IN THE GARAGE, ABOUT TO

6    DIE.  I HAD TO PUT HIM IN THE SHOWER AND HE HAD A DRINKING

7    PROBLEM RIGHT THEN.

8        Q.    DID THIS DRINKING CONTINUE THROUGHOUT HIS

9    TEENAGE YEARS?

10        A.    YEAH.

11        Q.    YOU SAW THIS, RIGHT?

12        A.    YES, I DID.

13        Q.    BUT YOUR -- YOU WERE SEPARATED FROM YOUR WIFE

14    AND YOUR DAUGHTER WAS LIVING WITH HER?

15        A.    YEAH.

16        Q.    SO THEY DIDN'T SEE IT?

17        A.    YEAH, THEY DIDN'T SEE IT.

18        Q.    WHAT DID YOU DO ABOUT THAT, BESIDES --

19        A.    WELL, WHEN IT GOT TOO BAD, I WOULD BOOT HIM OUT.

20    AFTER HE DRIED OUT AND COME BACK A MONTH OR SO, I WOULD

21    LET HIM BACK IN.

22        Q.    WAS HE GOING TO HIGH SCHOOL DURING THIS TIME?

23        A.    WELL, IT WASN'T SO BAD -- YEAH, HE WAS DOING

24    THAT IN HIGH SCHOOL WHEN HE DID THIS, BUT HE DIDN'T DO IT

25    DURING THE SCHOOL DAY.  I THINK IT WAS ON THE WEEKEND WHEN

26    THIS INCIDENT HAPPENED.

27        Q.    NOW, WHEN YOU STARTED BOOTING HIM OUT, WAS HE

28    OUT OF HIGH SCHOOL?

1      A.    OH, YEAH.

2      Q.    OKAY.  HOW OLD WAS HE?

3      A.    HE WAS PROBABLY 18.

4      Q.    NOW, DO YOU RECALL IN 1993 WHEN LARRY LOST HIS

5  EYE?

6      A.    YES, SIR, I DO.

7      Q.    WHICH EYE DID HE LOSE?

8      A.    HIS LEFT EYE.

9      Q.    DID YOU GO VISIT HIM IN THE HOSPITAL?

10     A.    YES, SIR.

11     Q.    AND HE TOLD YOU WHAT HAPPENED?

12     A.    WELL, WHAT HAPPENED, I WAS OUT OF TOWN FOR THREE

13  OR FOUR DAYS THAT WEEKEND --

14          THE COURT:  THAT'S NOT THE QUESTION, SIR, THE

15  QUESTION IS DID HE TELL YOU WHAT HAPPENED?

16          THE WITNESS:  DID HE TELL ME WHAT HAPPENED?

17  BY MR. WILLIAMS:

18     Q.    YES, SIR.

19     A.    I WENT TO THE HOSPITAL AND SEEN WHAT HAPPENED.

20     Q.    YOU SAW THE RESULT OF IT?

21     A.    YES.

22     Q.    LARRY TOLD YOU WHAT HAPPENED THAT DAY HE LOST

23  HIS EYE?

24     A.    NO, IT WAS A LADY STANDING THERE THAT TOLD ME.

25     Q.    OKAY.  SO AFTER HE LOST HIS EYE, HE CAME BACK TO

26  LIVE WITH YOU?

27     A.    YES.

28     Q.    DID YOU NOTICE ANY CHANGE IN HIM AFTER THE LOSS

1  OF THE EYE?

2      A.   YES, I DID.

3      Q.   WHAT WAS THAT, SIR?

4      A.   WELL, I COME IN FROM WORK AND I WALKED -- HE'D

5  BE IN THE KITCHEN, I'D WALK UP BEHIND HIM AND HE WOULD

6  JUMP LIKE, YOU KNOW, LIKE HE WAS -- HE WAS REAL JUMPY, YOU

7  KNOW.  HE DIDN'T WANT YOU WALKING UP BEHIND HIM.

8      Q.   THIS WAS JUST AFTER LOSING THE EYE?

9      A.   YEAH.

10     Q.   DID THIS CONTINUE?

11     A.   YES.

12     Q.   UNTIL WHEN?

13     A.   PRETTY MUCH ALL THE TIME HE WAS ALWAYS JUMPY.

14     Q.   SO TO YOUR KNOWLEDGE, DID IT EVER GO AWAY WHEN

15  HE WAS IN YOUR PRESENCE?  IN OTHER WORDS --

16     A.   WELL, YOU KNOW, IF YOU MAKE A LOT OF NOISE WHEN

17  YOU COME IN, HE WASN'T SO BAD, YOU KNOW.

18     Q.   OKAY, BUT --

19     A.   HE DIDN'T WANT YOU TO BE QUIET AND WALK UP

20  BEHIND HIM BECAUSE HE WOULD FREAK OUT.

21     Q.   HE WOULD FREAK OUT.  WAS THAT -- DO YOU KNOW

22  WHETHER THAT WAS BECAUSE OF THE METHAMPHETAMINE?  DO YOU

23  KNOW WHETHER HE WAS HIGH OR NOT?

24     A.   I DON'T KNOW WHETHER IT WAS BECAUSE OF THAT OR

25  BECAUSE OF THE EYE.

26     Q.   NOW HE WENT AWAY TO PRISON A COUPLE OF TIMES,

27  RIGHT?

28     A.   YES.

1   Q.   AND WHEN HE CAME BACK, DID HE RELATE TO YOU

2   ANYTHING THAT HAD HAPPENED IN PRISON, PHYSICAL THREATS OR

3   THINGS TO HIM?

4   A.   YEAH, HE HAD SOME PROBLEM IN CALIPATRIA.

5   Q.   AND DID YOU NOTICE ANY DIFFERENCE AFTER

6   CALIPATRIA?

7   A.   YEAH, HE --

8   Q.   THAT WAS AN UNFAIR QUESTION.   DID YOU NOTICE ANY

9   DIFFERENCE IN THE JUMPINESS AND THINGS LIKE THAT AFTER

10  CALIPATRIA?

11  A.   NO, HE WAS STILL JUMPY.

12  Q.   OKAY, BUT WAS IT MORE PRONOUNCED?   WAS HE MORE

13  JUMPY OR --

14  A.   IT'S REALLY HARD TO SAY.

15  Q.   OKAY.   THAT'S FINE.   NOW, WHEN HE WAS ARRESTED

16  FOR MURDER --

17  A.   YES, SIR.

18  Q.   DID YOU MEET HIS ATTORNEY?

19  A.   YES, SIR.

20  Q.   PARDON?

21  A.   YES, SIR.

22  Q.   AND MR. PECKHAM IS THE GUY IN THE BACK IN THE

23  SUIT?

24  A.   YES, SIR.

25  Q.   SEATED NEXT TO YOUR DAUGHTER?

26  A.   YES.

27  Q.   DID YOU TELL HIM ABOUT LARRY'S HEAD INJURY?

28  A.   ABOUT WHAT?

1     Q.   LARRY'S HEAD INJURY?

2     A.   I DON'T BELIEVE I TOLD HIM ABOUT THE HEAD

3  INJURY, NO.

4     Q.   DID YOU TELL HIM ABOUT LARRY'S JUMPINESS?

5     A.   YES.

6     Q.   WHEN DID YOU TELL HIM ABOUT THAT?

7     A.   WHEN WE WERE TALKING TO HIM OUT HERE, OUTSIDE

8  THIS COURTROOM HERE ABOUT THE PSYCHIATRIST, MAYBE GETTING

9  THE PSYCHIATRIST TO TALK TO HIM, THAT'S WHEN I TOLD HIM.

10     Q.   OKAY, BUT YOU NEVER TOLD HIM AT THE PRELIM?

11     A.   NO.

12     Q.   YOU NEVER TOLD HIM -- YOU WENT TO LUNCH WITH

13  HIM?

14     A.   YEAH, THAT WAS AFTER THE PRELIM.  THAT WAS WHEN

15  WE WERE IN TRIAL, I BELIEVE.

16     Q.   BUT DID YOU TELL HIM ABOUT LARRY'S JUMPINESS

17  THEN?

18     A.   I DON'T BELIEVE I DID, NO.

19     Q.   AND YOU WENT TO THE MUSEUM, THE AEROSPACE

20  MUSEUM?

21     A.   YEAH.

22     Q.   DID YOU TELL HIM ABOUT LARRY'S JUMPINESS THEN?

23     A.   NO.

24     Q.   THE FIRST TIME YOU BROUGHT UP TO MR. PECKHAM

25  THAT LARRY WAS ACTING STRANGE BECAUSE OF BEING JUMPY WAS

26  DURING THE TRIAL?

27     A.   WELL, YEAH, I THINK WHEN IT FIRST STARTED, YOU

28  KNOW.

```
 1        Q.   WHAT DID MR. PECKHAM RESPOND, IF YOU RECALL?

 2        A.   HE SAID HE DIDN'T BELIEVE THAT WE NEEDED HER

 3   RIGHT NOW.

 4        Q.   OKAY.  AT ANY TIME, DID YOU REQUEST OF

 5   MR. PECKHAM TO HAVE YOUR SON EVALUATED?

 6        A.   WITH MY DAUGHTER, OUT IN THE HALLWAY.

 7        Q.   AND THAT WAS DURING THE TRIAL?

 8        A.   YES, JUST WHEN IT STARTED.

 9        Q.   BUT NO TIME PRIOR?

10        A.   NO, NOT THAT I RECALL.

11        Q.   DID YOU EVER HAVE A CONVERSATION WITH

12   MR. PECKHAM ABOUT -- I WANT TO SAY DISPOSITION, BUT THAT'S

13   VAGUE, ABOUT A PLEA BARGAIN IN YOUR SON'S CASE?

14        A.   YES, SIR.

15        Q.   WHEN WAS THAT?

16        A.   BEFORE THE -- THIS -- MOST ALL OF THIS STARTED,

17   HE CALLED ME AT MY HOUSE UP IN CALIFORNIA CITY AND ASKED

18   ME IF I -- HE TALKED TO ME AND SAID LARRY CAN GET FIRST

19   DEGREE MURDER, AND IF I COULDN'T TALK TO HIM AND SEE IF HE

20   COULDN'T PLEAD TO A SECOND.

21        Q.   OKAY.  WHEN WAS THIS?

22        A.   I THINK IT WAS BEFORE THE PRELIMINARY EVEN OR

23   MAYBE IT WAS AFTER THE PRELIMINARY, I DON'T REMEMBER.  I

24   THINK THE PRELIMINARY WAS IN DECEMBER AND TRIAL WENT

25   AROUND TO THE NEXT YEAR IN JUNE OR SOMETHING, IF I

26   REMEMBER RIGHT.

27        Q.   WAS IT REAL CLOSE TO A TRIAL DATE OR --

28        A.   NO, IT WAS BEFORE THE TRIAL DATE.
```

38

1    Q.    HOW CLOSE -- HOW FAR?

2    A.    I REALLY DON'T KNOW.   IT WAS BETWEEN DECEMBER

3    AND JUNE.

4    Q.    OKAY.   THAT'S --

5    A.    IT WASN'T THE TRIAL DATE.

6    Q.    OKAY.

7    A.    SOMEWHERE BETWEEN.

8    Q.    OKAY, DID YOU TALK TO LARRY ABOUT THAT?

9    A.    YES.

10    Q.    AND LARRY REFUSED?

11    A.    ABSOLUTELY.

12    Q.    DID YOU TALK TO LARRY ABOUT THE KILLING?

13    A.    YES.

14    Q.    DID HE TELL YOU WHAT HAPPENED?

15    A.    YES.

16    Q.    DID HE TELL YOU HOW HE FELT?

17    A.    YES, HE -- HE FELT THAT THEY WERE GOING TO JUMP

18    HIM.

19    Q.    THAT THEY -- HE MEANS THE PEOPLE -- WHO DO YOU

20    MEAN?

21    A.    WELL, HE WAS IN THAT SITUATION AND THEY CALLED

22    TO GET SOME OTHER BUNCH OF PEOPLE TO COME OVER AND BEAT

23    HIM UP.

24    Q.    HE TOLD YOU THAT?

25    A.    YES.

26    Q.    DID YOU TELL MR. PECKHAM THAT?

27    A.    YOU KNOW, I DON'T RECALL.   I THINK I DID, BUT I

28    DON'T RECALL.   I CAN'T SAY FOR POSITIVE.

1      Q.   WE ONLY WANT WHAT YOU REALLY KNOW.

2      A.   OKAY.

3      Q.   DON'T GUESS.  DID YOU TELL MR. PECKHAM WHAT YOUR

4  SON HAD TOLD YOU?

5      A.   REGARDING WHAT?

6      Q.   YOU TALKED TO YOUR SON ABOUT THE KILLING, RIGHT?

7      A.   YES.

8      Q.   DID YOU TELL MR. PECKHAM WHAT YOUR SON HAD TOLD

9  YOU ABOUT THE KILLING?

10     A.   YOU KNOW, I BELIEVE I DID, BUT I'M SURE I TALKED

11  TO HIM ABOUT IT, YOU KNOW.

12     Q.   OKAY.  THAT'S FINE.  BUT YOU HAD SEVERAL

13  CONVERSATIONS WITH MR. PECKHAM?

14     A.   YES, WE TALKED ABOUT IT.

15     Q.   IN FACT, MR. PECKHAM, LET'S BE HONEST, SPENT A

16  LOT OF TIME WITH YOU?

17     A.   YES.

18     Q.   AND SHARON ON THIS CASE?

19     A.   YES.

20     Q.   TO YOUR KNOWLEDGE, OUTSIDE OF THE STATE PRISON

21  SYSTEM, HAS YOUR SON EVER BEEN EVALUATED BY A PSYCHOLOGIST

22  OR BY A PSYCHIATRIST?

23     A.   NO.

24     Q.   SO NEVER WHEN HE WAS AT JUVENILE COURT?

25     A.   NO.

26     Q.   AND YOU WERE THE CUSTODIAL PARENT, RIGHT?

27     A.   YES.

28     Q.   DID YOU EVER --

1       A.   WHEN HE GOT HIS EYE STABBED OUT, I RECOMMENDED

2   IT TO HIM, BUT I COULDN'T GET HIM TO DO IT.   AFTER HE

3   STARTED BEING ALL JUMPY, RIGHT AFTER HE GOT HIS EYE

4   STABBED, I SAID, YOU REALLY SHOULD GO SEE SOMEBODY AND

5   TALK ABOUT THAT, BUT HE DIDN'T DO IT.

6            MR. WILLIAMS:   THANK YOU.   NOTHING FURTHER.

7            THE COURT:   MS. MALLEN?

8            MS. MALLEN:   THANK YOU.

9

10                        **CROSS-EXAMINATION**

11   BY MS. MALLEN:

12       Q.   DO YOU HAVE A LEGAL BACKGROUND OF ANY KIND?

13       A.   NO.  NO, MA'AM.

14       Q.   OKAY.  ARE YOU SORRY YOUR SON IS IN JAIL?

15       A.   OF COURSE.

16       Q.   YOU'D LIKE TO SEE HIM OUT?

17       A.   OF COURSE.

18       Q.   LET'S START WITH, YOU TALKED ABOUT THE BIKE

19   ACCIDENT THAT MR. LITTLE, YOUR SON, HAD WHEN HE WAS 13.

20   IS THAT THE POINT WHEN -- AND YOU SAID THAT'S THE POINT

21   WHEN YOU SAW HIM START TO DRINK AS IN A PROBLEM SORT OF

22   WAY?

23       A.   YES, AFTER THAT.

24       Q.   DID YOU KNOW HE WAS USING MARIJUANA AS WELL?

25       A.   NOT RIGHT AWAY.  WHEN HE WAS ABOUT 14 OR 15 I

26   SEEN THAT COMING ON.

27       Q.   OKAY.  SO YOU KNEW THAT HE HAD STARTED USING

28   MARIJUANA AT 14 OR 15?

1    A.    YEAH.

2    Q.    DID YOU TRY TO GET HIM INTO ANY KIND OF

3    TREATMENT?

4    A.    NO, I DIDN'T.

5    Q.    DID YOU TAKE HIM TO SEE ANY KIND OF A COUNSELOR

6    OR A THERAPIST OR ANYTHING?

7    A.    NO.

8    Q.    AS FAR AS YOU KNEW, THEN, LARRY DIDN'T SEE

9    ANYBODY AT THAT POINT?

10    A.    SEE WHAT?

11    Q.    A DOCTOR, A THERAPIST OR ANYTHING?

12    A.    NO.

13    Q.    OKAY.  IN 1993 WHEN LARRY WAS STABBED IN HIS EYE

14    AND YOU VISITED HIM AT THE HOSPITAL, WHO WAS THE LADY WHO

15    TOLD YOU WHAT HAPPENED?

16    A.    SHE'S A FRIEND OF MINE FOR YEARS.

17    Q.    OH, SO SHE WAS VISITING LARRY AS WELL?

18    A.    NO, BUT SHE WENT UP THERE FOR ME BECAUSE I WAS

19    OUT OF TOWN FOR THREE DAYS.

20    Q.    SO YOU SENT A FRIEND TO SEE WHAT HAD HAPPENED?

21    A.    I DIDN'T SEND A FRIEND, SHE WENT UP THERE AND

22    THEN WHEN -- I WAS GONE TWO OR THREE DAYS.  WHEN I GOT

23    BACK, SHE CAME OVER AND TOLD ME WHAT WAS GOING ON.

24    Q.    DID YOU EVER TALK TO LARRY ABOUT WHAT HAPPENED

25    TO HIMSELF?

26    A.    YES, I DID.

27    Q.    OKAY, AND DID LARRY TELL YOU BASICALLY THAT HE

28    HAD BEEN DRINKING THAT NIGHT?

1      A.   YES, HE WAS -- YES, HE WAS DRINKING, I COULD

2  TELL.  HE LEFT A EMPTY BOTTLE OF WHISKEY ON MY KITCHEN

3  TABLE.

4      Q.   OH, SO YOU KNEW THAT ALREADY?

5      A.   YES.

6      Q.   AND YOU KNEW THAT HE HAD -- SOME WOMAN HAD

7  STABBED HIM IN THE EYE, A PROSTITUTE HE PICKED UP?

8      A.   THAT'S WHAT I WAS TOLD, YES.

9      Q.   BY LARRY?

10      A.   YEAH.

11      Q.   DID LARRY -- HOW LONG WAS HE IN THE HOSPITAL?

12      A.   FOR THE EYE?

13      Q.   FOR THE EYE?

14      A.   YOU KNOW, I DON'T RECALL THAT, TO BE HONEST WITH

15  YOU.

16      Q.   DO YOU THINK IT WAS MORE THAN A FEW DAYS OR DO

17  YOU KNOW?

18      A.   YEAH, IT WAS -- IT WAS A WHILE, PROBABLY FOUR OR

19  FIVE DAYS.

20      Q.   AND DID YOU KNOW THAT LARRY WAS USING CRYSTAL

21  METH AT THAT TIME?

22      A.   YES.

23      Q.   WHEN DID HE START USING CRYSTAL METH AS FAR AS

24  YOU KNEW?

25      A.   WELL, I THINK HE STARTED WAY BACK THERE WHEN HE

26  WAS 15 OR 16.  I NEVER CAUGHT HIM WITH ANY ON HIM, BUT I

27  COULD TELL THE WAY HE WAS ACTING HE WAS PROBABLY DOING IT.

28      Q.   HOW WAS HE ACTING?  WHAT WERE YOU NOTICING THAT

1   LED YOU TO THINK THAT?

2       A.   WELL, HE WAS A LITTLE BIT OUT OF CONTROL, YOU

3   KNOW.

4       Q.   OKAY.

5       A.   LIKE I HAD TO COME HOME FROM WORK A COUPLE TIMES

6   AND STRAIGHTEN OUT SOME STUFF AT SCHOOL.

7       Q.   OKAY.

8       A.   WHICH HE NEVER HAD THOSE PROBLEMS BEFORE.

9       Q.   OKAY.  WAS HE -- IF YOU NOTICED, WAS HE PARANOID

10  AND JUMPY WHEN HE WAS USING THE METH?

11      A.   YEAH, YEAH, I THINK HE WAS.

12      Q.   OKAY.

13      A.   PARANOID, REALLY.

14      Q.   AS FAR AS YOU KNOW, DID HE EVER GO FOR ANY KIND

15  OF TREATMENT, DRUG TREATMENT THAT YOU KNEW ABOUT?  DID YOU

16  SEND HIM TO ANY OR GO WITH HIM TO ANY?

17      A.   NO, I DIDN'T SEND HIM TO ANY, BUT I THINK HIS

18  PROBATION OFFICER SENT HIM TO SOMETHING, I'M NOT POSITIVE

19  ABOUT IT, BUT I THINK THEY SENT HIM TO SOME PLACE DOWN ON

20  EIGHTH STREET IN NATIONAL CITY.

21      Q.   OKAY.

22      A.   OR BY THE JAIL DOWN THERE I MEAN.

23      Q.   WELL, YOU KNEW HE WAS SUPPOSED TO AS PART OF HIS

24  PROBATION, RIGHT?

25      A.   YES.

26      Q.   DO YOU KNOW WHETHER HE ACTUALLY WENT OR NOT?

27      A.   WELL, I TOOK HIM A COUPLE TIMES.

28      Q.   DO YOU KNOW WHETHER HE ACTUALLY SPENT TIME?

1      A.   I SEEN HIM GO IN THERE; I DON'T KNOW IF HE WENT

2  OUT THE BACK DOOR.

3      Q.   YOU WEREN'T THERE?

4      A.   YEAH.

5      Q.   OKAY, ALL RIGHT.  NOW, WHEN YOU TALKED TO LARRY

6  ABOUT THE PLEA BARGAIN, WHAT DID MR. PECKHAM TELL YOU THAT

7  HE WANTED YOU TO TALK TO LARRY ABOUT?

8      A.   WELL, HE WAS AFRAID HE WAS GOING TO GET A FIRST

9  DEGREE AND HE WANTED ME TO TALK TO HIM, SEE IF HE WOULD

10  AGREE TO PLEA TO A SECOND DEGREE.

11      Q.   ALL RIGHT.  DID HE FORCE YOU TO TALK TO LARRY OR

12  THREATEN YOU IN ANY WAY?

13      A.   NO, OF COURSE NOT.  HE DIDN'T THREATEN ME.

14      Q.   OKAY.  SOMETIMES I HAVE TO ASK WHAT APPEARS TO

15  BE OBVIOUS.

16      A.   I DID TRY TO TELL HIM MAYBE YOU SHOULD OR

17  SOMETHING, BECAUSE IT WAS THE FIRST DEGREE THING AND I WAS

18  WORRIED ABOUT THAT, BUT HE ABSOLUTELY REFUSED WHEN I

19  TALKED TO HIM.

20      Q.   SO DID YOU THINK MR. PECKHAM MADE SENSE WHEN HE

21  TALKED TO YOU ABOUT THE PLEA BARGAIN?

22      A.   WELL, IT SEEMED LIKE THE SECOND WOULD BE BETTER

23  THAN THE FIRST.

24      Q.   OKAY.

25      A.   I MEAN, I'M NOT A LEGAL PERSON, SO I DON'T

26  REALLY KNOW.

27      Q.   OKAY.  AND LARRY REFUSED TO DISCUSS IT AT ALL?

28      A.   YEAH, HE DIDN'T FEEL THAT HE WAS -- HE DESERVED

1    IT.

2        Q.    OKAY.   DID LARRY OR THE DEFENDANT, YOUR SON, DID

3    HE TALK TO YOU ABOUT THE KILLING WITH THE KNIFE?

4        A.    YES.

5        Q.    DID HE TELL YOU THAT HE THOUGHT THAT HE WAS

6    ACTING IN SELF-DEFENSE?

7        A.    YES.

8        Q.    WAS HE VERY STRONG ABOUT THAT?

9        A.    YES.

10        Q.    DID HE EVER BRING UP ANYTHING ELSE OTHER THAN

11    THAT HE THOUGHT THAT HE WAS GOING TO BE ATTACKED?

12        A.    NO.

13        Q.    OKAY.

14        A.    HE DID SAY THAT THE GUY CAME AT HIM; HE DID SAY

15    THAT.

16        Q.    OKAY, SO THE GUY --

17        A.    HE WAS UP AND COMING AT HIM.

18        Q.    ALL RIGHT.   AND HE WAS REACTING TO WHAT HE SAW?

19        A.    YES.

20        Q.    NOW YOU MENTIONED THAT YOU HAD MOVED OUT OF

21    SOUTHERN CALIFORNIA, OUT OF SAN DIEGO.   WHEN DID YOU

22    MOVE -- WHERE DID YOU MOVE TO?

23        A.    MOVED TO CALIFORNIA CITY.

24        Q.    AND WHEN DID YOU MOVE THERE?

25        A.    JUNE OR JULY -- JULY OF 1998.

26        Q.    SO THAT WAS BEFORE THIS INCIDENT HAPPENED?

27        A.    YES.

28        Q.    DID YOU MOVE BY YOURSELF?

46

1    A.    YES.

2    Q.    WHERE WAS LARRY LIVING AT THE TIME?

3    A.    I DON'T KNOW.

4    Q.    WHEN WAS THE LAST --

5    A.    HE WAS WITH ME, BUT WHEN I MOVED, HE DIDN'T GO

6    WITH ME.  HE WAS LIVING WITH ME WHEN I LEFT, BUT WHEN I

7    WENT UP THERE, HE STAYED HERE.

8    Q.    OKAY.  NOW YOU HAVE MENTIONED IN YOUR

9    DECLARATION SOMETHING ABOUT A DR. AKRID(PH).  WHO IS

10   DR. AKRID?

11   A.    DR. AKRID?

12   Q.    YES.

13   A.    I THINK HE MIGHT BE THE EYE DOCTOR.

14   Q.    WHOSE EYE DOCTOR?

15   A.    LARRY'S.

16   Q.    WHEN DID LARRY GO TO THIS EYE DOCTOR?

17   A.    I CAN'T REMEMBER THE DATE THAT I TOOK HIM THERE.

18   I TOOK HIM THERE TO GET SOME GLASSES AND HAVE AN

19   EXAMINATION.  I'M NOT SURE IF THAT DOCTOR -- I'M NOT SURE

20   IF THE -- IF AKRID IS THAT ONE OR THE DOCTOR HE WENT TO

21   LATER, YOU KNOW, OVER HERE IN SPRING VALLEY.  I'M NOT SURE

22   WHAT THE NAME OF THE DOCTOR WAS.

23   Q.    OKAY.  DID YOU -- WELL, LET'S -- HE WAS -- LET'S

24   ASSUME HE'S AN EYE DOCTOR, OKAY?  WHEN DID YOU TAKE LARRY

25   TO AN EYE DOCTOR FOR GLASSES?  WHEN DID YOU FIRST TAKE

26   HIM?

27   A.    I DON'T REMEMBER.  I'M GOING TO SAY '94 OR '95,

28   SOMEWHERE IN THERE.

47

1    Q.    WAS THAT AFTER THE STABBING?

2    A.    AFTER, YEAH.

3    Q.    OKAY.  AND DID YOU TALK TO THE EYE DOCTOR ABOUT

4  WHAT HE WAS DOING WITH LARRY?

5    A.    NO, I DIDN'T.

6    Q.    OKAY.

7    A.    I TOOK HIM IN AND LET HIM EXAMINE HIM AND GIVE

8  HIM THE PRESCRIPTION OR WHATEVER.

9    Q.    DID HE PRESCRIBE EYEGLASSES FOR YOUR SON?

10    A.    YES.

11    Q.    DID HE MAKE GLASSES FOR YOUR SON?

12    A.    YES.

13    Q.    DID YOU PAY FOR THEM?

14    A.    YES.

15    Q.    OKAY.  AND DID HE DISCUSS ANYTHING ELSE WITH YOU

16  OTHER THAN GIVING LARRY, YOUR SON, EYEGLASSES?

17    A.    NO.

18    Q.    DID YOU TALK TO MR. PECKHAM ABOUT RECORDS FROM

19  AN EYE DOCTOR?

20    A.    YES.

21    Q.    WHAT DID YOU TALK TO HIM ABOUT?

22    A.    WELL, I DIDN'T TALK TO HIM, HE WANTED ME TO GET

23  THE RECORDS FROM THE DOCTOR IN CLAIREMONT.  I DON'T KNOW

24  IF IT'S AKRID, IT PROBABLY IS AKRID.  I DON'T REMEMBER THE

25  NAMES.

26    Q.    OKAY.

27    A.    BUT THE DOCTORS IN CLAIREMONT ON CLAIREMONT

28  DRIVE -- CLAIREMONT MESA BOULEVARD I MEAN.

1     Q.   ALL RIGHT.  AND DID YOU DO THAT?

2     A.   YEAH, I WENT AND GOT THEM.  HE REQUESTED I GO

3  AND GET THOSE RECORDS FOR HIM, AND SO I WENT AND GOT THEM.

4     Q.   WAS THERE A PROBLEM WITH YOU GETTING THE

5  RECORDS?

6     A.   NO.

7     Q.   DID -- DID MR. PECKHAM ASK YOU TO DO SOMETHING

8  THAT YOU DIDN'T UNDERSTAND?

9     A.   NO, JUST ASKED ME TO GO GET THE RECORDS AND I

10  DID.

11     Q.   OKAY, DID YOU KNOW WHY HE WAS GETTING THE

12  RECORDS?

13     A.   I -- I ASSUMED TO GET THEM TO USE THEM IN COURT

14  TO VERIFY HIS -- FOR HIM TO SEE.

15     Q.   DID YOU ASK MR. PECKHAM ABOUT WHY HE WAS GETTING

16  THE RECORDS?

17     A.   NO, I JUST -- AGAIN, I ASSUMED HE WAS GOING TO

18  USE THEM IN THE TRIAL.

19     Q.   DID -- AS FAR AS YOU KNOW, WAS THERE SOME KIND

20  OF PROBLEM WITH THOSE RECORDS?

21     A.   NO, THE DOCTOR HANDED THEM TO ME AND I BROUGHT

22  THEM DOWN THERE.

23     Q.   OKAY.  DID MR. PECKHAM EVER TELL YOU THAT HE HAD

24  DONE SOMETHING WRONG WITH THOSE RECORDS?

25     A.   THAT WHO HAD DONE SOMETHING WRONG?

26     Q.   MR. PECKHAM.  DID HE EVER TELL YOU THAT HE HAD

27  HANDLED SOMETHING -- THERE WAS A PROBLEM WITH THE RECORDS

28  OR SOMETHING HAD GONE WRONG WITH THEM?

49

1          A.    NO.   THE LADY IN COURT SAID THAT I COULD HAVE

2    MADE THE RECORDS MYSELF, THOUGH.   WHEN I FINALLY DID GET

3    INTO COURT, I COULDN'T GET IN THERE AND GET THE RECORDS

4    DOWN.   SHE ACCUSED ME OF MAKING THEM MYSELF.

5          Q.    WHO DID?

6          A.    WELL, THE PROSECUTOR.

7          Q.    OH, SO THE PROSECUTOR SAID SOMETHING ABOUT THE

8    WAY THAT YOU DID THE RECORDS THAT --

9          A.    NO, SHE SAID HE CAN GO MAKE THESE HISSELF.

10         Q.    OKAY, AND YOU DIDN'T THOUGH, RIGHT?

11         A.    WELL, I'M A PLUMBER, I'M NOT AN OPTOMETRIST.   I

12   WOULDN'T HAVE ANY IDEA HOW TO MAKE A RECORD LIKE THAT.

13         Q.    SO MR. PECKHAM ASKED YOU TO DO SOMETHING AND YOU

14   DID IT?

15         A.    YES.

16               MS. MALLEN:  OKAY, THANK YOU.  NOTHING FURTHER.

17               THE COURT:  MR. WILLIAMS?

18

19                     REDIRECT EXAMINATION

20   BY MR. WILLIAMS:

21         Q.    WHEN YOU SAID YOU WENT TO COURT AND THE LADY --

22   THE PROSECUTOR I ASSUME YOU MEAN, MS. STEIN?

23         A.    YES.

24         Q.    MARNIE STEIN?

25         A.    YES.

26         Q.    DID SHE SAY TO YOU YOU COULD HAVE MADE THESE

27   YOURSELF OR --

28         A.    THAT'S WHAT I HEARD HER SAY.

APPENDIX No. 1

# E X H I B I T    K

1      Q.   OKAY.

2      A.   HOW DID WE KNOW HE DIDN'T MAKE THESE HISSELF?

3      Q.   SO THE RECORDS WERE NOT ADMITTED INTO EVIDENCE;

4  IS THAT YOUR UNDERSTANDING?

5      A.   I GUESS, I DON'T KNOW.

6      Q.   YOU DON'T --

7      A.   I DON'T KNOW.

8      MR. WILLIAMS:  OKAY, THANK YOU.  I HAVE NOTHING

9  FURTHER.

10     THE COURT:  ANYTHING ELSE?

11     MS. MALLEN:  NO, THANK YOU.

12     THE COURT:  THANK YOU, MR. LITTLE.  YOU MAY STEP

13  DOWN.

14     THE WITNESS:  THANK YOU.

15     THE COURT:  WE'LL TAKE -- LET'S TAKE 15 MINUTES.

16     MS. MALLEN:  OKAY, THANK YOU.

17     THE COURT:  WE'LL BE IN RECESS UNTIL 10:30.

18          (RECESS.)

19

20     THE COURT:  PETITIONER AND COUNSEL ARE ALL

21  PRESENT.

22      MR. WILLIAMS.

23     MR. WILLIAMS:  THANK YOU, YOUR HONOR.  WE'LL

24  CALL THE PETITIONER, LARRY LITTLE, JR.

25

26         LARRY LITTLE, JR.,

27  CALLED AS A WITNESS ON BEHALF OF THE DEFENDANT, HAVING

28  BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

**EXHIBIT K** 1

1

## DIRECT EXAMINATION

3  BY MR. WILLIAMS:

4      Q.   STATE YOUR FULL NAME, SIR, AND SPELL YOUR LAST

5  NAME FOR THE RECORD.

6      A.   LARRY JOHN LITTLE.  L-I-T-T-L-E.

7      Q.   OKAY, AND YOU'RE LARRY JOHN LITTLE, JR.?

8      A.   YES.

9      Q.   AND YOU ARE THE PETITIONER IN THIS MATTER?

10      A.   YES.

11      Q.   YOU ARE THE PERSON CONVICTED OF SECOND DEGREE

12  MURDER IN THE KILLING OF MR. RABITOR(PH)?

13      A.   YES.

14          THE COURT:  MR. LITTLE, SCOOT UP TOWARD THE

15  MICROPHONE, IF YOU CAN.

16          THE WITNESS:  ALL RIGHT.

17  BY MR. WILLIAMS:

18      Q.   I'VE GOT A MIKE IN FRONT OF ME TOO.

19              YOU HEARD YOUR FATHER AND YOUR SISTER

20  TESTIFY, CORRECT?

21      A.   YES.

22      Q.   DO YOU RECALL THE BICYCLE ACCIDENT THAT YOU HAD

23  WHEN YOU WERE 12 OR 13 YEARS OF AGE?

24      A.   YES.  I WAS GOING DOWN A BIG HILL AND I GUESS

25  THERE WAS A LOT OF WEEDS AND THEY WERE REAL HIGH, AND I

26  HIT A DITCH AND I FLIPPED OVER AND I SMASHED MY WHOLE

27  FACE, MY HEAD INTO A BIG ROCK.  AND THEN I WOKE UP IN THE

28  HOSPITAL AND MY HEAD WAS ALL BIG.  AND WE HAD A FAMILY

52

1   FRIEND, HER NAME WAS MARIE, AND SHE LIVED LIKE ON THE

2   OTHER SIDE OF TOWN, AND SHE USED TO TAKE ME TO THE DOCTOR

3   AND THE HOSPITAL ALL THE TIME FOR -- TO SEE ALL THESE

4   DIFFERENT DOCTORS, TO TREAT MY --

5       Q.   LET ME INTERRUPT YOU.  YOU HIT YOUR HEAD -- THIS

6   WAS OBVIOUSLY IN THE DAYS BEFORE THEY REQUIRED BICYCLE

7   HELMETS, RIGHT?

8       A.   YEAH.

9       Q.   SO WERE YOU WEARING A HELMET?

10      A.   NO.

11      Q.   YOU HIT YOUR HEAD AND YOU WENT TO THE HOSPITAL?

12      A.   YEAH.

13      Q.   HOW LONG -- DO YOU KNOW HOW LONG YOU STAYED IN

14  THE HOSPITAL?

15      A.   I DON'T REALLY REMEMBER, BECAUSE THEY SAID THAT

16  I HAD AMNESIA, BECAUSE THEY ASKED ME IF I HAD A SISTER AND

17  THEY ASKED ME HOW OLD I WAS AND I DIDN'T KNOW HOW OLD I

18  WAS AND --

19      Q.   AND SO WHEN YOU GOT OUT, I TAKE IT YOU CONTINUED

20  TREATMENT FOR THAT?

21      A.   YEAH, I KEPT GOING TO THE HOSPITAL APPOINTMENTS.

22  THE FAMILY FRIEND, SHE WOULD TAKE ME THERE TO THE

23  APPOINTMENTS.

24      Q.   AND WHAT GRADE WERE YOU IN WHEN THAT HAPPENED?

25      A.   LIKE -- IN SEVENTH GRADE.

26      Q.   WHERE WERE YOU GOING TO SCHOOL?

27      A.   WANGENHEIM JUNIOR HIGH SCHOOL.

28      Q.   AFTER THAT HAPPENED, DID ANYTHING CHANGE FOR YOU

1  IN SCHOOL?

2      A.    YEAH, MY GRADES GOT BAD.  I HAD TO STAY BACK FOR

3  PART OF THE YEAR.

4      Q.    AND WHEN WAS -- HAD YOU --

5      A.    THAT WAS LIKE -- YEAH, THAT WAS EIGHTH GRADE I

6  STAYED BACK FOR PART OF THE YEAR, AND THEN I WENT TO A

7  CONTINUATION SCHOOL.  AND THEN I GOT BACK ON TRACK AND

8  THEN I -- I WENT TO THE HIGH SCHOOL, BUT I WAS IN THE

9  LOWER LEVEL THAN I USUALLY WAS.

10     Q.    WELL -- AND WAS THIS -- WAS THIS BECAUSE OF THE

11  HEAD INJURY?

12     A.    I DON'T KNOW.

13     Q.    OKAY, BUT YOUR ACADEMICS STARTED TO SUFFER?

14     A.    WENT DOWN, YEAH.

15     Q.    HAD YOU STARTED USING MARIJUANA BY THEN ALSO?

16     A.    I TRIED IT A COUPLE OF TIMES WHEN I WAS LIKE 13

17  OR 14, AND THEN I STARTED USING IT MORE WHEN I WAS LIKE

18  15, 16.

19     Q.    STARTED USING?

20     A.    YEAH.

21     Q.    USING WHAT?

22     A.    MARIJUANA.

23     Q.    OKAY.  YOU EVENTUALLY GRADUATED TO CRYSTAL

24  METHAMPHETAMINE?

25     A.    YEAH, I STARTED DOING THAT.  I ONLY DID IT A FEW

26  TIMES BECAUSE I WAS ALWAYS SURFING MOST OF THE TIME,

27  TRYING TO GET TO THE BEACH.  AND I ONLY DID IT A FEW

28  TIMES, LIKE WHEN I WAS LIKE 17, 18.  AND THEN I STARTED

54

1   DOING IT REGULARLY LIKE WHEN I WAS ABOUT 19 OR 20.

2        Q.   OKAY, WAS THIS AFTER YOU FINISHED HIGH SCHOOL?

3        A.   YEAH.

4        Q.   SO YOU HAD THIS HEAD INJURY AND THEN YOU STARTED

5   USING SOME MARIJUANA, AND DID YOU START DRINKING?

6        A.   YEAH, I DRANK LIKE THE REST OF THE KIDS, ALWAYS

7   GOING TO THE BEACH PARTIES AND STUFF WITH KEGS AND

8   DRINKING, AND I DRANK TOO, AND THEN WHEN MY DRINKING

9   PROBLEM STARTED GETTING WORSE BECAUSE I STARTED TO DRINK

10  ALONE, DRINKING IN MY GARAGE; SOMETIMES I WOULD HAVE A

11  COUPLE FRIENDS.

12       Q.   HOW OLD WERE YOU WHEN YOU STARTED DRINKING IN

13  YOUR GARAGE ALONE?

14       A.   HOW OLD WAS I?

15       Q.   YEAH.

16       A.   ABOUT 15 OR 16.

17       Q.   DID YOU DRINK QUITE A BIT?

18       A.   YEAH, I DRANK BEFORE SCHOOL SOMETIMES.

19       Q.   BEFORE SCHOOL?

20       A.   SOMETIMES I DID.

21       Q.   DID YOU EVER TELL YOUR FATHER ABOUT THIS

22  DRINKING PROBLEM?

23       A.   NO.

24       Q.   DID YOU EVER TELL ANY HIGH SCHOOL COUNSELORS

25  ABOUT THIS DRINKING PROBLEM?

26       A.   NO.

27       Q.   OKAY.  NOW YOU WERE ARRESTED FOR MURDER IN 1999?

28       A.   YES.

1     Q.   AND MR. PECKHAM WAS APPOINTED TO REPRESENT YOU?

2     A.   YES.

3     Q.   AND MR. PECKHAM CAME TO SEE YOU QUITE A BIT,

4  RIGHT?

5     A.   YEAH, QUITE A BIT.

6     Q.   SO YOU HAD A LOT OF CONVERSATIONS WITH

7  MR. PECKHAM?

8     A.   YES.

9     Q.   DID YOU EVER TELL MR. PECKHAM ABOUT YOUR HEAD

10  INJURY?

11     A.   YES.

12     Q.   WHEN WAS THAT?

13     A.   I BELIEVE MY DAD TOLD HIM ALSO.

14     Q.   OKAY, BUT I'M TALKING ABOUT YOU, LARRY.

15     A.   OKAY, YEAH, THAT WAS LIKE A COUPLE MONTHS BEFORE

16  THE TRIAL.

17     Q.   YOU DIDN'T TELL HIM AT THE INITIAL HEARING --

18  INITIAL MEETING?

19     A.   OH, WHEN I FIRST MET HIM?

20     Q.   YEAH.

21     A.   NO, I THINK IT WAS LIKE THE SECOND OR THIRD TIME

22  BECAUSE HE CAME OVER ABOUT A DOZEN TIMES.

23     Q.   THIS WAS BEFORE THE PRELIM THAT YOU TOLD HIM OR

24  AFTER, IF YOU RECALL?

25     A.   JUST AFTER.

26     Q.   OKAY.  NOW DID YOU TELL HIM THAT YOU HAD BEEN A,

27  FOR LACK OF A BETTER TERM, POLY-DRUG ABUSER?  IN OTHER

28  WORDS, ALCOHOL AND METHAMPHETAMINE SINCE YOUR TEEN AGE

1  YEARS?

2      A.    YEAH, I TOLD HIM I'D BEEN USING DRUGS FOR A LONG

3  TIME.

4      Q.    WHEN DID YOU TELL HIM THAT?

5      A.    I TOLD HIM ALL THE TIME.  PRETTY MUCH HE KNEW

6  BECAUSE I HAD HIM ON A -- ON ANOTHER CASE, WHICH WAS A

7  POSSESSION OF CRYSTAL; HE WAS MY LAWYER IN A PLEA BARGAIN.

8      Q.    OKAY, YOU WENT TO PRISON ON THAT?

9      A.    NO, JUST COUNTY, COUNTY JAIL.

10     Q.    SO YOU TOLD HIM ABOUT YOUR DRUG USE AND ALCOHOL

11  USE AND YOUR HEAD INJURY?

12     A.    YEAH.

13     Q.    OKAY.  NOW IN SOME TIME IN 1993 YOU WERE STABBED

14  AND LOST YOUR EYE; IS THAT CORRECT?

15     A.    YES.

16     Q.    HOW DID THAT HAPPEN?

17     A.    IT'S HARD TO TALK ABOUT.  ME AND MY FRIEND WERE

18  DRINKING, A GUY THAT I HAD GREW UP WITH IN HIGH SCHOOL.

19  AND WE WENT OUT AND WE WERE GOING OVER TO PACERS, AND WE

20  WERE STILL DRINKING.  AND THEN WE LEFT AND I HAD LIKE 3 OR

21  $400 ON ME FROM MY UNEMPLOYMENT CHECK THAT I GOT THAT

22  WEEK, AND I SHOULD HAVE LEFT IT AT HOME, BUT WE WERE

23  DRUNK.  AND AS SOON AS WE LEFT, WE PICKED UP A COUPLE

24  GIRLS AND THE NEXT THING YOU KNOW, ONE OF THEM SEEN THE

25  MONEY AND SHE SAID, "I'M GOING TO TAKE YOUR EYE OUT."  AND

26  THE NEXT THING YOU KNOW, SHE STABBED ME A BUNCH OF TIMES.

27  I THOUGHT I WAS GOING TO DIE.

28     Q.    SO HOW DID SHE SEE THE MONEY?

```
 1    A.   BECAUSE I PULLED IT OUT OF MY POCKET.

 2    Q.   WHY?

 3    A.   BECAUSE I WAS DRUNK AND I WASN'T THINKING.

 4    Q.   OKAY, DID YOU GUYS EVER GET TO PACERS?

 5    A.   YEAH, WE WERE AT PACERS JUST BEFORE THAT.

 6    Q.   OKAY.  NOW PACERS IS A TOPLESS BAR?

 7    A.   YES.

 8    Q.   OKAY.  ON MIDWAY, RIGHT?

 9    A.   YES.

10    Q.   DID YOU MEET THESE GIRLS AT PACERS?

11    A.   NO.

12    Q.   WHERE DID YOU MEET THEM?

13    A.   WE WENT -- LIKE AS SOON AS WE GOT IN THE CAR, WE

14 PULLED OUT AND THEY WERE RIGHT THERE ON THE STREET.

15    Q.   NOW YOU GREW UP IN SAN DIEGO, RIGHT?

16    A.   YEAH.

17    Q.   SO YOU'RE DOWN IN THE MIDWAY DISTRICT, RIGHT?

18    A.   YES.

19    Q.   YES OR NO?

20    A.   YES.

21    Q.   GIRLS STANDING ON THE CORNER?

22    A.   YES.

23    Q.   ALSO NEAR PACERS.  YOU KNEW WHAT THEY WERE,

24 RIGHT?

25    A.   YEAH.

26    Q.   THEY WERE HOOKERS?

27    A.   YES.

28    Q.   OKAY.  SO YOU PICKED THEM UP?
```

```
 1        A.   YES.

 2        Q.   AND THEN YOU SHOWED HER SOME MONEY?

 3        A.   YEAH, I HAD THE MONEY IN MY POCKET.

 4        Q.   OKAY.  SHE SAYS I'M GOING TO TAKE YOUR EYE OUT

 5   IF YOU DON'T GIVE ME THE MONEY OR --

 6        A.   YEAH, AND THEN SHE DID IT THAT QUICK.

 7        Q.   OKAY.  SO WHAT HAPPENED THEN?  YOU WENT TO THE

 8   POLICE?

 9        A.   I WENT TO THE HOSPITAL.

10        Q.   OKAY.  SO WHO DROVE YOU TO THE HOSPITAL?

11        A.   I GUESS MY FRIEND DID.

12        Q.   OKAY.  SO YOU WENT TO THE HOSPITAL?

13        A.   AND I WAS IN THE HOSPITAL FOR LIKE THREE OR FOUR

14   DAYS.  AND I WAS SUFFERING REAL BAD AND I WAS LIKE

15   THROWING UP BLOOD AND I THOUGHT I WAS GOING TO DIE.  AND I

16   WAS IN MORE PAIN THAN I'D EVER BEEN IN IN MY WHOLE LIFE.

17   AND I ALWAYS WILL REMEMBER THAT PAIN TO THIS DAY BECAUSE

18   IT HURT REALLY BAD AND I FELT HELPLESS.  THERE WAS NOTHING

19   I COULD DO AND I COULDN'T EVEN GET UP OR ANYTHING.

20        Q.   OKAY, NOW -- AND YOU LOST YOUR EYE AS A RESULT

21   OF THAT?

22        A.   I LOST MY EYE AND I WAS FREAKING OUT BECAUSE I

23   DIDN'T HAVE AN EYE AND MY FACE WAS SWOLE UP.

24        Q.   OKAY, NOW WHEN DID YOU KNOW THAT YOU HAD LOST

25   YOUR EYE?

26        A.   I KNEW RIGHT WHEN I CAME TO.  LIKE IT TOOK ME

27   ABOUT TWO DAYS BEFORE I CAME TO.

28        Q.   AND THEN IT WAS OBVIOUS THEN THAT YOU COULDN'T
```

59

1  SEE OUT OF ONE EYE, RIGHT?

2         A.   YEAH, BUT I WAS MOANING AND GROANING THE WHOLE

3  TIME.

4         Q.   SO IT WAS A FAIRLY PAINFUL EXPERIENCE?

5         A.   YEAH, AND THROWING UP BLOOD AND ALL KINDS OF

6  STUFF.

7         Q.   DID YOU TELL MR. PECKHAM ABOUT THIS INCIDENT IN

8  YOUR LIFE?

9         A.   YES, I TOLD HIM.

10        Q.   WHEN DID YOU TELL HIM?

11        A.   I TOLD HIM RIGHT AWAY.

12        Q.   NOW YOU'RE WEARING SOME GLASSES TODAY, RIGHT?

13        A.   YES.

14        Q.   THAT I BROUGHT TO YOU?

15        A.   YES.

16        Q.   AND THEY'RE VERY SPECIAL GLASSES?

17        A.   YES.

18        Q.   DO YOU KNOW WHAT YOUR VISUAL -- DO YOU KNOW WHAT

19  THE TERM VISUAL ACUITY MEANS?

20        A.   I THINK SOMEWHERE AROUND --

21             THE COURT:  THAT'S A YES OR NO QUESTION.

22             THE WITNESS:  YES.

23  BY MR. WILLIAMS:

24        Q.   IT MEANS WHAT YOU -- 20/20?

25        A.   YES.

26        Q.   DO YOU KNOW WHAT YOURS IS?

27        A.   IT'S 20/60.

28        Q.   20/60 IN ONE EYE?

1          A.   AND BLIND IN THE OTHER.

2          Q.   AND BLIND IN THE OTHER.   SO YOU OBVIOUSLY NEED

3   THOSE GLASSES?

4          A.   YES.

5          Q.   THOSE GLASSES ARE NEW, RIGHT?

6          A.   YES.

7          Q.   OKAY.   WHEN YOU MET MR. PECKHAM WHEN HE CAME TO

8   BE YOUR ATTORNEY FOR MURDER, WERE YOU WEARING YOUR

9   GLASSES?   DID YOU HAVE YOUR GLASSES THEN?

10         A.   MY GLASSES?

11         Q.   YES, SIR.

12         A.   THEY WERE IN THE PICTURE ON THE TABLE AT THE

13  APARTMENT WHERE THIS HAPPENED. I WAS GOING TO GET MY

14  GLASSES WHEN IT HAPPENED.   THEY'RE IN ONE OF THE EVIDENCE

15  PICTURES.

16              THE COURT:   THAT DOESN'T ANSWER THE QUESTION,

17  SIR.   THE QUESTION IS WHETHER OR NOT YOU HAD YOUR GLASSES

18  WHEN YOU MET MR. PECKHAM?

19              THE WITNESS:   NO, I DIDN'T HAVE THEM.

20  BY MR. WILLIAMS:

21         Q.   THEY HAD BEEN LEFT AT THE SCENE OF THE KILLING

22  OF MR. RABITOR?

23         A.   YEAH.

24         Q.   DO YOU RECALL STABBING MR. RABITOR?

25         A.   YES.

26         Q.   WHEN YOU STABBED MR. RABITOR, WERE YOU WEARING

27  YOUR GLASSES?

28         A.   NO.

1    Q.    WHEN YOU STABBED MR. RABITOR -- STRIKE THAT.

2   AFTER YOU HAD YOUR EYE CUT OUT, ALL RIGHT?

3    A.    YEAH.

4    Q.    DID YOU NOTICE ANY CHANGE IN YOURSELF?

5    A.    WELL, FIRST, LIKE THE FIRST FEW WEEKS, I WAS

6   SCARED TO GO OUTSIDE.  I WAS HAVING A LOT OF NIGHTMARES

7   AND EVERYTHING WAS SORT OF FREAKING ME OUT, IF I WENT

8   OUTSIDE.  AND THEN ABOUT THREE MONTHS LATER I HAD AN

9   EPISODE WITH A FRIEND OF MY DAD'S WHERE I -- SHE CAME

10  BEHIND ME AND SHE STARTED YELLING AND I TRIPPED OUT FOR NO

11  REASON.

12   Q.    WHAT DID YOU DO?

13   A.    WENT ALL CRAZY AND I WENT -- I WENT TO GRAB A

14  KITCHEN KNIFE OFF THE BOARD BECAUSE I WAS -- BECAUSE I WAS

15  SCARED AND THAT WAS ABOUT THREE MONTHS AFTER THIS

16  HAPPENED.

17   Q.    OKAY.

18   A.    AND I COULDN'T UNDERSTAND WHY I DID THAT.

19   Q.    ALL RIGHT, DID YOU STAB HIM?

20   A.    WHAT?

21   Q.    DID YOU STAB HIM?

22   A.    NO.

23   Q.    YOUR FRIEND?

24   A.    NO.

25   Q.    DID YOU CUT ANYBODY?

26   A.    NO.

27   Q.    DID YOU TELL ANYBODY ABOUT THIS?

28   A.    NOT REALLY.

1      Q.   DID YOU EVER RELATE THIS INCIDENT TO

2  MR. PECKHAM?

3      A.   NO, NOT THAT INCIDENT.

4      Q.   OKAY.  SO YOU STILL FELT PRETTY JUMPY AND --

5      A.   YES.

6      Q.   DID YOUR DAD TALK TO YOU ABOUT GETTING SOME

7  HELP?

8      A.   IT WAS ABOUT A YEAR LATER MY DAD SAID I WAS

9  ACTING REAL STRANGE.

10     Q.   OKAY.

11     A.   HE SAID THAT THERE'S SOMETHING WRONG WITH ME.

12     Q.   SO THE ANSWER IS "YES".  AND THEN WHAT DID HE

13 SAY?

14     A.   YEAH, HE'S SAYING THAT I'M TOO JUMPY AND I'M

15 RUNNING AROUND TOO PARANOID AND I'M TRIPPING ON EVERY

16 LITTLE THING AND PANICKING ABOUT STUFF.

17     Q.   OKAY, BY "TRIPPING ON EVERY LITTLE THING", YOU

18 DON'T MEAN PHYSICALLY TRIPPING OVER THINGS BECAUSE OF YOUR

19 EYESIGHT?

20     A.   NO, I MEAN LOOKING AROUND, TRYING TO SEE IF

21 SOMETHING IS HAPPENING.

22     Q.   NOW COULD YOU DESCRIBE YOUR -- DO YOU KNOW WHAT

23 THE TERM "PERIPHERAL VISION" MEANS?

24     A.   DEPTH PERCEPTION?

25     Q.   NO, IT'S LIKE --

26     A.   HOW FAR?

27     Q.   NO.  IF YOU TAKE YOUR NOSE, CAN YOU SEE TO THE

28 RIGHT AT ALL?

1      A.   NO.

2      Q.   SO YOU CAN'T SEE ANYTHING TO THE RIGHT OF YOUR

3   NOSE?

4      A.   NO.

5      Q.   BECAUSE YOU'RE BLIND IN THAT EYE; YOU DON'T HAVE

6   A EYE?

7      A.   YOU MEAN TO THE LEFT.

8      Q.   OKAY.   TO THE LEFT, YOU DON'T HAVE AN EYE THERE?

9      A.   NO.

10      Q.   EXCEPT FOR A GLASS EYE?

11      A.   YEAH, JUST A GLASS EYE.

12      Q.   HOW ABOUT THE OTHER EYE, HOW FAR CAN YOU SEE?

13      A.   WITH THE GLASSES, I CAN SEE PRETTY FAR.

14      Q.   OKAY, BUT TO THE SIDE, HOW FAR CAN YOU SEE?

15      A.   NOT VERY FAR.

16      Q.   OKAY.   SO AFTER THIS INCIDENT, WHAT HAPPENED?

17   ANY OTHER INCIDENTS OCCUR?

18      A.   I GOT JUMPED.

19      Q.   WHEN WAS THAT?

20      A.   BY A GANG OF MEXICANS, IT WAS LIKE IN '97, '98,

21   IN '98.

22      Q.   OKAY.

23      A.   AND I HAD TO GO TO THE HOSPITAL FOR MY FACE AND

24   MY FOOT BECAUSE I GOT BEAT UP AND IT WAS LIKE PARADISE

25   VALLEY HOSPITAL, OFF EUCLID.

26      Q.   RIGHT.   WHAT HAPPENED TO YOU?   WHAT WERE YOUR

27   INJURIES?

28      A.   MY MOUTH SMASHED IN, MY NOSE AND MY FOOT.   MY

1  FOOT WAS DISLOCATED.

2      Q.   HOW DID THAT MAKE YOU FEEL LATER?  DO YOU

3  UNDERSTAND MY QUESTION?

4      A.   REAL JUMPY.

5      Q.   OKAY.

6      A.   EVEN WAY MORE JUMPY THAN I'D BEEN BEFORE.

7      Q.   OKAY, NOW WHEN YOU WERE SENT TO PRISON THE FIRST

8  TIME, WHERE DID YOU GO?

9      A.   FIRST TIME I WENT TO AVENAL.

10     Q.   DID ANYTHING HAPPEN IN AVENAL --

11     A.   NO.

12     Q.   -- OF A VIOLENT NATURE TO YOU?

13     A.   NO, EVERYTHING WAS ALL RIGHT THAT TIME.

14     Q.   OKAY, SO THEN YOU GOT PAROLED AND THEN YOU WENT

15  BACK INTO THE PENAL SYSTEM.  AND WHEN WAS THAT?

16     A.   I WENT TO CHUCKAWALLA AND THEN -- BECAUSE I WAS

17  LIKE LOWER LEVEL.

18     Q.   BUT YOU DON'T KNOW WHAT YEAR THAT WAS WHEN YOU

19  FIRST WENT IN?

20     A.   IT WAS LIKE '92.

21     Q.   OKAY.  THIS WAS BEFORE YOUR EYE WAS STABBED,

22  KNOCKED OUT?

23     A.   IT WAS LIKE A COUPLE MONTHS BEFORE.

24     Q.   OKAY.  YOU WENT TO CHUCKAWALLA?

25     A.   IT WAS THE FIRST TIME I EVER WENT UP.

26     Q.   SO YOU WENT TO CHUCKAWALLA; ANYTHING HAPPEN

27  THERE, VIOLENT TO YOU?

28     A.   NO, BECAUSE I WASN'T REALLY -- I WASN'T THERE

1  THAT LONG AND IT WAS A LEVEL 2.

2       Q.    THEN DID YOU GET SENT TO CALIPATRIA?

3       A.    YEAH, I WAS A LEVEL 1, BUT THEY PUT ME ON LEVEL

4  4 YARD, WHICH IS MAXIMUM SECURITY.

5       Q.    DID ANYTHING HAPPEN TO YOU?

6       A.    YEAH, SOME GUY TRIED TO COME AT ME WITH A SHARP

7  OBJECT UP BY MY CELL, BECAUSE THEY HAD A FOOD STRIKE AND

8  NOBODY WAS SUPPOSED TO GO EAT, AND I WENT TO EAT AND

9  EVERYBODY GOT MAD.  AND SO WHEN I CAME IN, SOMEBODY

10  FOLLOWED ME AND AS SOON AS I WENT AROUND THE CORNER,

11  SOMEBODY SLID SOMETHING UNDER THE DOOR AND THE GUY TRIED

12  TO STAB ME WITH IT.

13      Q.    OKAY, THIS IS BEFORE YOU HAD YOUR EYE CUT OUT?

14      A.    IT WAS AFTER.

15      Q.    OKAY, SO YOU WERE IN PRISON WITH ONE EYE?

16      A.    YEAH.

17      Q.    AND THIS HAPPENED IN CALIPATRIA WHEN?  ABOUT

18  1996 DO YOU THINK?

19      A.    YEAH.

20      Q.    OKAY.  WERE YOU INJURED?

21      A.    NO, BUT I WAS SCARED.

22      Q.    DID YOU TELL MR. PECKHAM ABOUT THIS?

23      A.    NO, NOT THAT.  I TOLD HIM ABOUT THE MEXICANS

24  JUMPING ME, THOUGH.

25      Q.    TELL ME ABOUT THE MEXICANS JUMPING YOU, OKAY.

26  DID YOU HAVE ANY OTHER -- DID YOU WITNESS ANY STABBINGS IN

27  PRISON IN CALIPATRIA?

28      A.    YEAH, I SEEN A FEW PEOPLE GET STABBED.

1      Q.    HOW DID THAT MAKE YOU FEEL?

2      A.    SCARED.

3      Q.    WHY?

4      A.    BECAUSE AT THAT TIME EVERYBODY WAS MAD AT ME AND

5   I DIDN'T WANT TO GET STABBED BECAUSE I'D BEEN STABBED

6   BEFORE AND I KNEW WHAT IT FELT LIKE.  AND I KNOW THAT I

7   WOULD NEVER WANT TO LET IT HAPPEN TO ME EVER --

8      Q.    WHY?

9      A.    -- AGAIN.  BECAUSE IT WAS THE MOST WORSE PAIN,

10  THE MOST SUFFERING I'VE EVER DONE IN MY LIFE.  I MEAN, I

11  WISHED -- I WAS WISHING I WAS PRACTICALLY WISHING I WAS

12  DEAD, I WAS IN SO MUCH PAIN IN THAT HOSPITAL.

13     Q.    ALL RIGHT.

14     A.    MOANING AND GROANING AND JUST OUT OF IT.

15     Q.    DID THE INCIDENTS AT CALIPATRIA MAKE YOU JUMPIER

16  WHEN YOU WERE PAROLED?

17     A.    IT MADE ME MORE JUMPY, YES, SIR, TOWARDS CERTAIN

18  PEOPLE.

19     Q.    WHAT KIND OF CERTAIN PEOPLE?

20     A.    LIKE GANG TYPE PEOPLE, SKIN HEADS, MEXICAN

21  GANGS.

22     Q.    OKAY.

23     A.    PEOPLE THAT ARE LIKE IN THE ORGANIZED GROUPS IN

24  THE PRISONS.  AND YOU SEE THEM ON THE STREETS AND THEY'RE

25  ON THE STREETS TOO, THOSE KINDS OF PEOPLE, BECAUSE I KNOW

26  THEY'LL TRY TO JUMP YOU.

27     Q.    AND WHAT WERE YOU AFRAID OF SPECIFICALLY BY

28  BEING JUMPED?

1    A.    LOSING MY OTHER EYE.

2    Q.    OKAY, I MEAN, SO BASICALLY YOU DECIDED THAT AT

3    ALL COSTS YOU WERE GOING TO TRY TO KEEP FROM GOING TOTALLY

4    BLIND?

5    A.    KEEP MY OTHER EYE.

6    Q.    ALL RIGHT.  DID YOU EVER TELL MR. PECKHAM THIS?

7    A.    YES.

8    Q.    WHAT DID YOU TELL HIM?

9    A.    I TOLD HIM THAT I -- I REACT REALLY BAD TO

10   PEOPLE THAT COME AT ME VIOLENTLY, AND I REACT REAL QUICK

11   BECAUSE I DON'T WANT TO LOSE MY OTHER EYE.  BECAUSE BEFORE

12   THAT, THAT'S HOW IT HAPPENED, IT HAPPENED LIKE THAT QUICK.

13   (INDICATING.)

14   Q.    WHEN DID YOU TELL HIM THAT?

15   A.    I TOLD HIM THAT ALL THE TIME.

16   Q.    OKAY.  AND MR. PECKHAM PUT YOU ON THE STAND IN

17   THE JURY TRIAL, RIGHT?

18   A.    YES.

19   Q.    AND YOU TOLD THE JURY WHAT YOU'RE TELLING US

20   ABOUT HOW YOU FELT?

21   A.    YES.

22   Q.    THAT YOU WERE JUMPY?

23   A.    YES.

24   Q.    DID YOU TALK ABOUT CALIPATRIA IN FRONT OF THE

25   JURY AT ALL?

26   A.    I DIDN'T TALK ABOUT THAT.

27   Q.    OKAY, BUT YOU LET THEM KNOW THAT YOU DIDN'T WANT

28   TO LOSE YOUR OTHER EYE, RIGHT?

1      A.   YEAH, I -- I ALSO TALKED ABOUT BEING JUMPED BY

2  THE MEXICAN GANGS BECAUSE THAT'S WHAT I WAS THREATENED

3  WITH.

4      Q.   DO YOU KNOW WHAT THE TERM "POSTTRAUMATIC STRESS

5  DISORDER" MEANS?

6      A.   IT'S --

7      Q.   NO, JUST YES OR NO?

8      A.   YES.

9      Q.   COMMONLY REFERRED TO AS P.T.S.D., SOMETIMES

10  P.S.D.?

11      A.   YES.

12      Q.   WHEN DID YOU LEARN ABOUT P.T.S.D.?

13      A.   I LEARNED IN PRISON WHEN I STARTED SEEKING THE

14  DOCTORS AND THEY STARTED TELLING ME ABOUT IT.  AND I ALSO

15  KNEW ABOUT IT.

16      Q.   STOP THERE.  NOW I DON'T MEAN TO EMBARRASS YOU,

17  BUT WHEN YOU SAY YOU LEARNED IN PRISON, YOU'VE BEEN TO

18  PRISON A FEW TIMES; YOU LEARNED IN PRISON AFTER YOU WERE

19  CONVICTED OF MURDER AND SENTENCED TO PRISON?

20      A.   NO, BEFORE.

21      Q.   OKAY, SO YOU KNEW ABOUT IT BEFORE?

22      A.   YES.

23      Q.   OKAY, GO AHEAD.  YOU SAW A FEW DOCTORS ABOUT IT?

24      A.   AND I LEARNED IT AND I SAW A DOCTOR WHEN I WAS

25  IN TEHACHAPIE, BECAUSE THEY HAD ME ON LEVEL 4 THERE, AND

26  I -- AND IT WAS LIKE RIGHT AFTER THIS HAPPENED TO MY EYE.

27  AND I TOLD THE DOCTOR THERE THAT I THOUGHT THAT THERE WAS

28  SOMETHING WRONG; THAT I COULDN'T LIVE AROUND ALL THESE

1    PEOPLE BECAUSE THEY PUT ME IN THIS GYM.  AND HE TOLD ME HE

2    WOULD MOVE ME TO A CELL WHERE I WOULD BE BY MYSELF, SO HE

3    MOVED ME OVER TO THE 3 YARD AND GOT ME OUT OF THERE

4    BECAUSE I WAS TRIPPING OUT.

5         Q.    OKAY.  DID YOU TAKE ANY MEDICATION WHILE YOU

6    WERE IN TEHACHAPIE?

7         A.    HE DIDN'T GIVE ME ANY MEDICATION BECAUSE I WAS

8    THERE FOR A RECEPTION.

9         Q.    OKAY.

10        A.    AND SO HE JUST SENT ME OVER TO THE OTHER YARD.

11        Q.    DID YOU TAKE ANY MEDICATION WHEN YOU WERE AT

12   CALIPATRIA?

13        A.    NO.

14        Q.    AT ANY TIME PRIOR TO BEING COMMITTED ON THIS

15   OFFENSE, HAD YOU TAKEN ANY PSYCHOTROPIC -- DO YOU KNOW

16   WHAT PSYCHOTROPIC MEANS?

17        A.    YES.

18        Q.    -- PSYCHOTROPIC MEDICATIONS IN THE PENAL SYSTEM?

19        A.    I'VE TAKEN TRAZODONE.

20        Q.    THAT'S TO HELP YOU SLEEP?

21        A.    YEAH, I GOT OFF THE TRAZODONE, IT WASN'T REALLY

22   HELPING ME.

23        Q.    WAS THAT BEFORE THE MURDER CASE?

24        A.    NO, AFTER.

25        Q.    OKAY, THAT'S MY QUESTION.  PRIOR TO BEING

26   COMMITTED TO THE STATE PENAL SYSTEM?

27        A.    OH, NO.

28        Q.    YOU WERE NEVER PRESCRIBED PSYCHOTROPIC

1  MEDICATIONS?

2      A.   NO, I'VE TALKED TO --

3      Q.   SINCE YOU'VE BEEN IN, YOU'VE HAD TRAZODONE AND

4  OTHER MEDICATIONS?

5      A.   YES.

6      Q.   SINCE YOU'VE BEEN IN, THAT MEANS SINCE YOU'VE

7  BEEN IN ON THE MURDER CASE THAT WE'RE TALKING ABOUT?

8      A.   YES.

9      Q.   SO THERE WAS NO MEDICATION HISTORY THAT YOU

10  COULD TALK TO MR. PECKHAM ABOUT?

11      A.   NO.

12      Q.   DID YOU TELL MR. PECKHAM -- I KNOW HE'D BEEN

13  YOUR ATTORNEY ON A POSSESSION CASE, BUT DID YOU INFORM

14  MR. PECKHAM OF YOUR DRUG USE?

15      A.   YES.

16      Q.   AND ABUSE?

17      A.   YES.

18      Q.   IN FACT, WHEN THIS HAPPENED, YOU HAD BEEN KICKED

19  OUT OF MC CALLISTER INSTITUTE, RIGHT?

20      A.   I COMPLETED THE PROGRAM, BUT I WAS IN THE PHASE

21  HOUSE AND I WAS DRINKING AND I TOLD THEM ABOUT IT AND THEY

22  KICKED ME OUT.

23      Q.   SO YOU -- YOU SELF-REPORTED YOURSELF FOR

24  DRINKING, NOT FOR DRUGS, RIGHT?

25      A.   YES.

26      Q.   AND DID YOU INFORM MR. PECKHAM PRIOR TO YOUR

27  TRIAL OR DURING YOUR CASE THAT YOU HAD BEEN HEAVILY USING

28  METHAMPHETAMINE FOR A WHILE?

1    A.   I TOLD HIM I'D BEEN USING, BUT I HADN'T BEEN

2  USING -- I HAD JUST GOTTEN OFF OF USING AT THE TIME THAT

3  HAPPENED, I WAS COMING DOWN.

4    Q.   DID YOU EVER TALK ABOUT HOW METHAMPHETAMINE MADE

5  YOU FEEL?

6    A.   YES.

7    Q.   DID YOU TALK ABOUT THAT TO MR. PECKHAM?

8    A.   YES.

9    Q.   WHAT DID YOU TELL HIM?

10    A.   I TOLD HIM IT MADE ME PARANOID, BUT MOSTLY WHEN

11  I WAS COMING DOWN WHEN I DIDN'T HAVE ANY SLEEP FOR A WHILE

12  THAT'S WHEN I WAS THE WORST.

13    Q.   DID YOU TELL MR. PECKHAM WHETHER YOU HAD BEEN

14  USING DRUGS THE DAY OF THE HOMICIDE?

15    A.   I TOLD HIM I HADN'T BEEN USING DRUGS, NOT THAT

16  DAY, BUT I WAS COMING OFF DRUGS.

17    Q.   OKAY.

18    A.   PRIOR TO.

19    Q.   HOW LONG PRIOR TO THE STABBING OF MR. RABITOR

20  HAD YOU BEEN USING METHAMPHETAMINE?

21    A.   SINCE ABOUT A DAY, A DAY OR TWO.

22    Q.   SO YOU FELT YOU WERE COMING DOWN?

23    A.   I WAS COMING DOWN.

24    Q.   DID YOU TELL MR. PECKHAM THAT?

25    A.   YES.

26    Q.   WHEN DID YOU TELL HIM?

27    A.   I TOLD HIM WHEN WE HAD ONE OF OUR MEETINGS IN

28  GEORGE BAILEY.

1        Q.    IS THIS PRIOR TO PRELIM OR PRIOR TO TRIAL?

2        A.    PRIOR TO THE TRIAL.

3        Q.    HOW LONG PRIOR TO THE TRIAL?

4        A.    PROBABLY A FEW MONTHS.

5        Q.    DID HE INDICATE TO YOU WHETHER THAT WAS

6    SIGNIFICANT OR HE WAS GOING TO DO ANYTHING ABOUT IT?

7        A.    NO.

8        Q.    OKAY.  DID YOU TELL HIM YOU HAD BEEN DRINKING

9    THAT DAY?

10       A.    YES.

11       Q.    OKAY.

12       A.    BECAUSE THEY HAD THE DRINKING ON THE -- WHEN

13   THEY FIRST PICKED ME UP, THE POLICE, I TOLD HIM THAT I WAS

14   DRUNK AND SO IT WAS ON THE FIRST CONDITION.

15       Q.    HAD YOU BEEN DRINKING AT THE TIME THAT YOU

16   STABBED MR. RABITOR TO DEATH?

17       A.    YES.

18       Q.    OKAY.  YOU DON'T DENY THAT YOU KILLED

19   MR. RABITOR, DO YOU?

20       A.    NO.

21       Q.    OKAY.  DID YOU TELL MR. PECKHAM YOU HAD BEEN

22   DRINKING?

23       A.    YES.

24       Q.    WHY DIDN'T YOU TELL THE JURY THAT YOU HAD BEEN

25   DRINKING?

26       A.    I DID TELL THEM THAT I HAD BEEN DRINKING.

27       Q.    YOU TOLD THE JURY THAT?

28       A.    YEAH.

1    Q.    OKAY.  AND DID MR. PECKHAM EVER TELL YOU NOT TO

2    TELL ANYBODY THAT YOU HAD BEEN DRINKING?

3    A.    HE SAID DON'T TELL THEM THAT YOU'RE DRUNK.

4    Q.    OKAY.  WERE YOU DRUNK?

5    A.    I WAS DRUNK, BECAUSE I'M PRETTY MUCH

6    HYPERSENSITIVE TO ALCOHOL.

7    Q.    BUT YOU TOLD THEM -- YOU'D JUST TOLD THEM YOU

8    WERE DRINKING, BUT YOU WEREN'T DRUNK, RIGHT?

9    A.    YES.

10   Q.    DID AN INDIVIDUAL COME IN AND SAY THAT YOU WERE

11   DRUNK?

12   A.    YES.

13   Q.    WHO WAS THAT, JOSH?

14   A.    I THINK SO.

15   Q.    JOSHUA ROBBINS WAS CALLED IN REBUTTAL BY THE

16   PEOPLE?

17   A.    YES.

18   Q.    OKAY.  NOW DID YOU EVER HAVE A CONVERSATION WITH

19   MR. PECKHAM ABOUT HOW ALCOHOL AFFECTED YOU?

20   A.    I THINK I TOLD HIM THAT I SHOULDN'T BE DRINKING

21   BECAUSE I'M REAL HYPERSENSITIVE TO DRINKING AND NOTHING

22   THAT -- NOTHING EVER POSITIVE HAS EVER COME OUT OF IT FOR

23   ME.

24   Q.    BUT DID YOU EVER -- DID YOU TELL HIM THAT?

25   A.    YEAH, I TOLD HIM I'VE LOST A LOT BECAUSE OF THE

26   DRINKING.

27   Q.    DID YOU -- BESIDES THE GENERAL REMORSE OVER

28   GOING TO PRISON BECAUSE YOU WERE DRINKING AND USING DRUGS,

1    DID YOU EVER TELL HIM HOW ALCOHOL AFFECTED YOU AS PER YOUR

2    PERCEPTION OF THE DANGERS AROUND YOU?

3         A.    YES.

4         Q.    WHAT DID YOU TELL HIM?

5         A.    I'D BLACK OUT, DON'T KNOW WHAT HAPPENED A LOT OF

6    TIMES.  AND I'M REAL SENSITIVE TO WHAT'S AROUND ME.

7         Q.    MORE SENSITIVE THAN YOU ARE NORMALLY?

8         A.    YES.

9         Q.    DID YOU TELL MR. PECKHAM THAT?

10        A.    YES.

11        Q.    WHEN DID YOU TELL HIM?

12        A.    I TOLD HIM RIGHT BEFORE THE TRIAL.

13        Q.    RIGHT BEFORE THE TRIAL?

14        A.    YEAH, ABOUT A MONTH BEFORE.

15        Q.    OKAY.  NOW THE TRIAL HAPPENED ABOUT NINE -- 11

16   MONTHS AFTER THE MURDER, RIGHT?

17        A.    YES, BECAUSE HE TOOK ME ON A VIOLATION AND THEY

18   REFILED.

19        Q.    WHEN DID THEY REFILE?

20        A.    THEY REFILED IN SEPTEMBER AND I WENT TO PRELIM

21   IN DECEMBER AND WE WERE DONE BY MAY.

22        Q.    OKAY, WHEN WAS MR. PECKHAM APPOINTED TO

23   REPRESENT YOU, IF YOU RECALL?

24        A.    IT WAS LIKE OCTOBER OR NOVEMBER.

25        Q.    OKAY.  SO YOU MET MR. PECKHAM ABOUT A COUPLE

26   MONTHS BEFORE YOUR PRELIM, RIGHT?

27        A.    YES.

28        Q.    BUT IT TOOK YOU UNTIL THE TRIAL DOOR BEFORE YOU

1    TOLD HIM ABOUT THE ALCOHOL?

2         A.   ABOUT A MONTH BEFORE.

3         Q.   OKAY.

4         A.   MONTH-AND-A-HALF.

5         Q.   OKAY.  DID MR. PECKHAM INDICATE AT ANY TIME TO

6    YOU AFTER YOU TOLD HIM THAT, THAT YOU THOUGHT THAT THAT

7    MIGHT BE SIGNIFICANT?

8         A.   HE SAID THAT IT WOULDN'T HELP.

9         Q.   OKAY.  DID HE SAY WHY?

10        A.   HE JUST SAID THAT IT WOULDN'T BE -- IT WOULDN'T

11   BE GOOD TO GO UP THERE BECAUSE YOU DISCREDIT YOURSELF BY

12   SAYING YOU'RE ALL DRUNK AND MESSED UP.

13        Q.   DID YOU EVER TELL MR. PECKHAM THAT YOU HAD

14   P.T.S.D.?

15        A.   I TOLD HIM I THOUGHT I HAD POSTTRAUMATIC STRESS

16   DISORDER BECAUSE I'D BEEN THROUGH A LOT.  AND HE TOLD ME

17   THAT HE HAD A FATHER THAT WAS IN THE WAR AND HE HAD THE

18   SAME KIND OF PROBLEMS THAT I -- LOOKED LIKE I HAD, AND HE

19   NEVER WENT AND GOT IT TAKEN CARE OF AND HE DIED A SAD MAN

20   OR SOMETHING LIKE THAT.

21        Q.   SO HE TOLD YOU THAT HE WAS AWARE OF

22   POSTTRAUMATIC STRESS DISORDER?

23        A.   YES.

24        Q.   AND HIS FATHER HAD HAD IT -- HE'D BEEN IN THE

25   WAR?

26        A.   HE SAID HE THOUGHT HIS FATHER MIGHT HAVE HAD

27   SOMETHING SIMILAR TO THAT.

28        Q.   DID HE EVER INDICATE WHICH WAR THAT WAS?

76

1      A.  NO.

2      Q.  WHAT WAS -- GUESSING FROM MR. PECKHAM'S AND MY

3  AGE, IT WAS EITHER WORLD WAR II OR KOREA, CORRECT; IS THAT

4  WHAT YOU THOUGHT?

5      A.  THAT'S WHAT I THOUGHT.

6        THE COURT:  DON'T LEAD THE WITNESS,

7  MR. WILLIAMS.

8        MR. WILLIAMS:  I'M SORRY.  THANK YOU, YOUR

9  HONOR.

10  BY MR. WILLIAMS:

11      Q.  SO HE TOLD YOU HE WAS AWARE.  DID HE EVER HAVE

12  YOU EVALUATED?

13      A.  NO.

14      Q.  DID YOU REQUEST TO BE EVALUATED?

15      A.  I ASKED HIM IF WE COULD GET A DOCTOR AND HE

16  SAID, NO, WE DIDN'T NEED ONE.

17      Q.  AND WHEN WAS THIS, MR. LITTLE?

18      A.  THIS WAS LIKE THREE MONTHS BEFORE THE TRIAL.

19      Q.  DID YOU EVER MEET MR. PECKHAM'S INVESTIGATOR?

20      A.  ALLAN COTTON(PH)?

21      Q.  YES, SIR.

22      A.  YES.

23      Q.  AND DID YOU TELL MR. COTTON ANY OF THIS?

24      A.  NO, I TOLD PECKHAM -- I TOLD MR. COTTON ABOUT

25  THE PEOPLE THAT HE CAN FIND.

26      Q.  OKAY.  SO THE WITNESSES THAT HE COULD FIND?

27      A.  YES.

28      Q.  ALL RIGHT, SO LET'S GET TO THE DAY THAT YOU

1    KILLED MR. RABITOR, CORRECT?

2        A.    YES.

3        Q.    HAD YOU -- YOU SAID YOU WERE DRUNK THAT DAY?

4        A.    YEAH, I WAS DRINKING THAT DAY.

5        Q.    WELL, WERE YOU DRINKING OR WERE YOU DRUNK?

6        A.    I WAS DRUNK BY THE END OF THE DAY.

7        Q.    WERE YOU -- DID YOU KILL HIM AT THE END OF THE

8    DAY OR DURING THE MIDDLE OF THE DAY?

9        A.    IT WAS THE END OF THE DAY.

10        Q.    SO YOU WERE DRUNK BY THE TIME YOU KILLED HIM?

11        A.    YES.

12        Q.    DO YOU RECALL HOW YOU KILLED HIM?  YES OR NO.

13        A.    YES.

14        Q.    WHAT DID YOU KILL HIM WITH?

15        A.    I KILLED HIM WITH A STEAK KNIFE.

16        Q.    WHERE WAS THE STEAK KNIFE?

17        A.    IT WAS LAYING ON THE CORNER COFFEE TABLE NEXT TO

18    THE COUCH.

19        Q.    DO YOU RECALL HOW YOU STABBED HIM?

20        A.    I JUST PICKED IT UP AND I THREW TWO JABS AT HIM.

21        Q.    WAS THIS AN UPWARD MOVEMENT OR DOWNWARD

22    MOVEMENT?

23        A.    IT WAS JUST STRAIGHT OUT.  (INDICATING.)  TWO

24    JABS STRAIGHT OUT.

25        Q.    WAS HE STANDING UP?

26        A.    HE WAS STANDING UP, COMING AT ME.

27        Q.    WHEN YOU SAY COMING AT YOU, WHAT DO YOU MEAN BY

28    THAT?

1    A.    HE GOT UP -- WHEN I CAME OUT -- WHEN I CAME OUT,

2    HE GOT UP IN FRONT OF ME AND SAID YOU'RE NOT GOING

3    ANYWHERE.    AND AS SOON AS HE DID THAT, I WAS NEXT TO THE

4    COFFEE TABLE WHERE I PUT MY STUFF DOWN, BECAUSE I WAS

5    GOING TO GO GET MY GLASSES.    AND HE CAME AT ME WITH

6    SOMETHING AND IT WAS LIKE THAT FAST, SO I GRABBED THE

7    KNIFE AND I JUST THREW TWO JABS AT HIM.

8    Q.    WHY?

9    A.    BECAUSE I THOUGHT HE WAS GOING TO HURT ME.

10    Q.    DO YOU KNOW WHAT HE HAD?

11    A.    HE -- HE HAD SOMETHING LIKE EITHER A GLASS

12    OBJECT OR MAYBE A KNIFE, BECAUSE HE'D ALWAYS BEEN CHASING

13    HIS MOM AROUND WITH KNIVES AND THROWING STUFF AT PEOPLE.

14    AND SHE ALWAYS HAD BEEN CHASING HIM AROUND AND THROWING

15    STUFF AT HER AND IT WAS A REGULAR OCCURRENCE AROUND THERE.

16    Q.    OKAY, NOW THIS PLACE WAS SORT OF A DRUG HOUSE,

17    RIGHT?

18    A.    YEAH, PEOPLE WERE COMING AND GOING ALL NIGHT

19    LONG.

20    Q.    AND AS YOU DESCRIBED, IT WAS SORT OF HECTIC IN

21    THERE?

22    A.    IT WAS OUT OF -- OUT OF CONTROL.

23    Q.    SO YOU FELT HE WAS COMING AT YOU WITH A KNIFE?

24    A.    YES.

25    Q.    WAS HE IN FRONT OF YOU?

26    A.    YEAH, HE WAS CUTTING RIGHT IN FRONT OF ME.    I'D

27    JUST COME OUT OF THE HALLWAY TO WHERE THE COFFEE TABLE IS,

28    RIGHT ABOUT HERE; AND RIGHT WHEN I WAS COMING, I PUT DOWN

1    MY STUFF TO GO GET MY GLASSES OFF THIS TABLE OVER HERE.

2    (INDICATING.)  AND BEFORE I COULD GET MY GLASSES OFF THE

3    TABLE, BECAUSE I WAS LEAVING, HE JUMPED UP OFF THE TABLE

4    AND CAME RIGHT HERE IN FRONT OF ME WITH SOMETHING IN HIS

5    HAND.  AND THAT'S WHEN I GRABBED WHAT WAS SITTING ON THE

6    COFFEE TABLE AND TOOK TWO JABS AT HIM.

7        Q.    OKAY.  HAD HE -- HAD YOU AND MR. RABITOR HAD AN

8    ARGUMENT THAT DAY?

9        A.    OH, YEAH.

10       Q.    WHAT WERE YOU ARGUING ABOUT?

11       A.    HEAVY ARGUMENT.  BECAUSE I BROKE HIS CRYSTAL

12   PIPE AND HE GOT ALL MAD AND HIS MOM GOT MAD.  AND HIS MOM

13   JUMPED IN MY FACE AND SAID THAT SHE WOULD CUT ME -- SHE

14   SLAPPED ME IN THE FACE AND SAID SHE WOULD HURT ME BECAUSE

15   I BROKE THE PIPE AND THEY WANTED TO SMOKE SOME CRYSTAL IN

16   IT.

17       Q.    OKAY, DID YOU TELL MR. PECKHAM ALL OF THIS?

18       A.    YEAH.

19       Q.    OKAY.  WHY DIDN'T YOU LEAVE?

20       A.    I WAS TRYING TO LEAVE, BUT HE JUMPED IN FRONT OF

21   ME, BUT AT FIRST I DIDN'T WANT TO LEAVE AT FIRST BECAUSE I

22   JUST KICKED OUT A COUPLE GUYS, ONE OF THEM WAS JOSH

23   ROBERTS AND HIS FRIEND CORN, AND I KICKED THEM OUT.  AND I

24   THOUGHT MAYBE THEY WERE MAD AT ME AND THEY WERE OUT THERE

25   WAITING FOR ME, SO I DIDN'T WANT TO LEAVE RIGHT AWAY.  SO

26   I WENT BACK AND SAT ON THE COUCH AND THAT'S WHEN THE OTHER

27   GUY CALLED THE MEXICAN GANG AND SAID THEY'RE GOING TO COME

28   OVER AND JUMP YOU AND BEAT YOU UP?

1           AND AT FIRST I THOUGHT HE WAS BLUFFING.

2   AND A COUPLE MINUTES LATER I GOT PARANOID AND I STARTED

3   FREAKING OUT AND I SAID, WOW, I BETTER GET OUT OF HERE.

4   THIS GUY IS SERIOUS THIS TIME, BECAUSE HE BLUFFED BEFORE

5   WITH OTHER PEOPLE.  AND BY THEN, HIS MOM SAID, WELL,

6   THEY'RE COMING HERE.  THERE'S NOTHING YOU CAN DO NOW, AND

7   I'M GONNA GO OUTSIDE AND WAIT FOR THEM, SO YOU'RE THROUGH.

8   YOU HAD YOUR CHANCE TO LEAVE, NOW YOU'RE GOING TO GET BEAT

9   UP.  AND SO I GOT UP FROM THE COUCH AND I WENT TO GO GET

10  MY STUFF, AND THAT'S WHEN I CAME OUT AND HE JUMPED UP AND

11  SAID "YOU'RE NOT GOING NOWHERE", AND THAT'S WHEN IT

12  HAPPENED.

13          Q.   DID YOU MEAN TO KILL HIM?

14          A.   NO, I DIDN'T MEAN TO KILL HIM.  I DIDN'T EVEN

15  KNOW HE DIED.  I WAS WALKING DOWN THE STREET AND I GOT

16  PICKED UP AND I HAD NO IDEA THAT HE DIED.

17          Q.   OKAY, BUT WHEN YOU WERE WALKING DOWN THE STREET

18  AND GOT PICKED UP, YOU SHAVED YOUR MUSTACHE OFF, RIGHT?

19          A.   YES.

20          Q.   WHY?  WHY?

21          A.   BECAUSE I WAS LOOKING FOR A JOB.

22          Q.   WERE YOU LIVING AT THIS HOUSE?

23          A.   YEAH, I WAS LIVING THERE.

24          Q.   DID YOU GET -- BECAUSE YOU'D BEEN KICKED OUT OF

25  MC CALLISTER, RIGHT?

26          A.   YES.

27          Q.   WHERE WAS YOUR DAD LIVING AT THIS DAY, DO YOU

28  KNOW?

1    A.    HE WAS LIVING IN CALIFORNIA CITY.

2    Q.    DID YOU HAVE ANY OTHER PLACE TO STAY?

3    A.    NO.

4    Q.    NOW YOU SAID YOU JUST JABBED HIM A COUPLE TIMES.

5  DO YOU HAVE ANY IDEA WHERE YOU HIT HIM?

6    A.    I HAD NO IDEA WHERE I HIT HIM UNTIL I FOUND OUT

7  LATER.

8    Q.    WELL, YOU REALIZED THAT THE KNIFE WENT TO THE

9  HEART -- RIGHT, I MEAN --

10    A.    THAT'S WHAT I FOUND OUT LATER.

11    Q.    IT WENT ALL THE WAY IN.

12              WERE YOU GUYS GOING TOWARDS EACH OTHER?

13    A.    HE WAS COMING AT ME.

14    Q.    WHAT WERE YOU DOING?

15    A.    AND I PICKED UP THE THING AND I PUT IT OUT AND

16  JABBED TWICE.

17    Q.    AT THE TIME OF THE STABBING, HE WAS COMING

18  TOWARDS YOU AND YOU WERE OBVIOUSLY GOING TOWARDS HIM WITH

19  A KNIFE?

20    A.    YEAH.

21    Q.    YOU TOLD MR.  PECKHAM ALL THIS, IT WENT IN ALL

22  THE WAY?

23    A.    YES.

24    Q.    NOW, DID MR. PECKHAM EVER TALK TO YOU ABOUT A

25  PLEA BARGAIN?

26    A.    YES.

27    Q.    WHEN WAS -- WHEN WAS THAT?

28    A.    IT WAS LIKE JUST BEFORE WE WERE SETTING THE

1   TRIAL DATE, PROBABLY ABOUT A MONTH, THREE WEEKS TO A MONTH

2   EARLIER.

3       Q.   WHERE WAS THAT?

4       A.   IT WAS AT GEORGE BAILEY.

5       Q.   WHAT DID HE TELL YOU?

6       A.   OKAY, HE CAME IN THERE AND WE SAT AT THE LITTLE

7   TABLE IN THERE AND HE PULLED OUT A BUNCH OF STUFF AND

8   HAD -- THE MEETING BEFORE THAT HE SAID THAT HE WAS -- HE

9   WAS GOING -- HE COULD GET SOME WITNESSES.  AND I SAID,

10  WELL, YOU SHOULD GET THOSE WITNESSES.  THEN HE TOLD ME HE

11  WAS GOING TO DO IT.  AND AT THE MEETING AFTER THAT, HE

12  TOLD ME THE TRIAL DATE IS GOING TO BE SOON BECAUSE WE SET

13  IT, AND HE COULDN'T GET AN EXTENSION BECAUSE MARNIE STEIN

14  WAS -- SHE WAS PREGNANT AND SHE WAS GOING TO LEAVE ON HER

15  VACATION, SO HE DIDN'T TAKE AN EXTENSION.

16           AND I WAS THINKING GOING PRO PER BECAUSE I

17  WANTED TO EXTEND IT BECAUSE I WANTED MORE TIME TOO.  AND I

18  ASKED HIM AND HE SAID, NO, THAT WOULDN'T BE A GOOD IDEA TO

19  DO THAT.  AND SO I SAID, ALL RIGHT.  AND WE WERE SITTING

20  THERE AND HE CAME IN ONE DAY ALL OF A SUDDEN AND HE SAID,

21  WELL, WE'RE GETTING REALLY CLOSE TO TRIAL NOW.  AND HE

22  SAID, YOU SHOULD TAKE THIS PLEA BARGAIN BECAUSE IF YOU

23  DON'T TAKE THIS PLEA BARGAIN, YOU'RE PROBABLY GOING TO GET

24  FIRST DEGREE MURDER.  AND THEN I GOT REAL SCARED AND I

25  STARTED TRIPPING OUT BECAUSE I DIDN'T KNOW NOTHING ABOUT

26  THE LAW OR ANYTHING.

27           AND THEN -- AND I WAS SERIOUSLY THINKING

28  ABOUT TAKING IT, BECAUSE I WAS SO SCARED AND HE PUT A

1    BUNCH OF PAPERS OUT THERE AND HE SAID -- AND HE SAID THIS

2    IS HOW MUCH THEY HAVE, THEY HAVE THIS MUCH.  (INDICATING.)

3        Q.    OKAY, DID YOU SHOW THE COURT -- HOLD YOUR HANDS

4    UP SO -- CAN YOU HOLD THE OTHER HAND UP?

5        A.    FROM THE TABLE I GOT --

6        Q.    GO AHEAD, SHOW US HOW HIGH.

7        A.    HE SAID THIS IS HOW MUCH THEY HAVE.

8        Q.    ABOUT AN 18-INCH STACK?  I CAN'T TELL.

9        A.    AND HE LOOKED AT ME AND HE PUT DOWN A FEW PIECES

10   OF PAPER, LIKE THAT MUCH, (INDICATING), AND HE PUT THEM

11   DOWN AND HE SAID THIS IS HOW MUCH WE HAVE.  HE SAID WE

12   DON'T REALLY HAVE A CHANCE, SO IF YOU TAKE THE PLEA

13   BARGAIN, YOU'LL BE BETTER OFF.  OTHERWISE, YOU MIGHT GET

14   FIRST DEGREE BECAUSE I DON'T SEE US GETTING ANYTHING

15   BETTER THAN A FIRST DEGREE OUT OF THIS.

16       Q.    HE SAID NOTHING BETTER THAN A FIRST?

17       A.    THAT'S WHAT HE SAID.

18       Q.    YOU SURE HE DIDN'T SAY NOTHING BETTER THAN A

19   SECOND?

20       A.    HE SAID WE COULD GET A SECOND IF WE WERE LUCKY.

21       Q.    AND SO HE WAS URGING YOU TO ACCEPT 15 TO LIFE

22   VERSES 25 TO LIFE?

23       A.    YES, YES.

24       Q.    AND YOU DID NOT TAKE THAT OFFER?

25       A.    I WAS THINKING ABOUT TAKING IT, AND I WAS GOING

26   TO TAKE IT AND I WAS JUST REALLY EMOTIONAL FOR WEEKS

27   THINKING ABOUT WHAT I WAS GOING TO DO FOR A COUPLE OF

28   WEEKS, BECAUSE I HAD A COUPLE OF WEEKS UNTIL THE TRIAL AND

1    I TOLD HIM I WASN'T GOING TO TAKE IT.

2        Q.    OKAY.  NOW, YOU SAID SOMETHING ABOUT AN

3    EXTENSION.  DO YOU MEAN A CONTINUANCE?

4        A.    YEAH, I WANTED TO GET A CONTINUANCE.

5        Q.    DID YOU TELL HIM THAT?

6        A.    YES.

7        Q.    AND HE TOLD YOU THAT HE COULDN'T BECAUSE MARNIE

8    WAS GOING -- MS. STEIN?

9        A.    YEAH.

10       Q.    WAS GOING ON MATERNITY LEAVE?

11       A.    YEAH.

12       Q.    TO YOUR KNOWLEDGE, DID HE EVER ASK -- WERE YOU

13   IN COURT?

14       A.    I WAS IN COURT AND SHE SAID SHE NEEDED MATERNITY

15   LEAVE AND SHE WANTED TO WRAP THIS UP AND HE AGREED TO IT.

16           THE COURT:  THAT'S -- LET ME -- I NEED TO TALK

17   TO BOTH OF YOU.

18           (SIDEBAR CONFERENCE NOT REPORTED.)

19   BY MR. WILLIAMS:

20       Q.    MR. LITTLE, I'M SORRY, BUT I'M GOING TO DIGRESS

21   HERE FOR A SECOND.

22           WHEN YOU AND I FIRST MET OR -- FIRST MET BY

23   COMMUNICATING BY WRITING, RIGHT?

24       A.    YES.

25       Q.    I INFORMED YOU THAT I WAS A RETIRED DEPUTY

26   DISTRICT ATTORNEY, CORRECT?

27       A.    YES.

28       Q.    AND I ALSO -- AND YOU SAID THAT WAS OKAY FOR ME

1   TO BE A RETIRED D.A.; YOU'D WAIVE ANY CONFLICT?

2        A.   YES.

3        Q.   I ALSO TOLD YOU THAT I KNEW MARNIE STEIN?

4        A.   YES.

5        Q.   AND YOU AGREED TO WAIVE ANY CONFLICT THERE?

6        A.   YES.

7        Q.   THAT I ACTUALLY LIKED MARNIE STEIN?

8        A.   YES.

9        Q.   OKAY.  I ALSO TOLD YOU THAT I LIKED ED PECKHAM,

10  RIGHT?

11       A.   YES.

12       Q.   OKAY, AND THAT YOU WAIVED ANY CONFLICT THERE

13  ALSO?

14       A.   YES.

15       Q.   DO YOU STILL FEEL THAT WAY?  IS IT OKAY IF I

16  CONTINUE TO REPRESENT YOU?  BECAUSE I WANT TO MAKE SURE.

17       A.   YES.

18            MR. WILLIAMS:  OKAY, IS THE COURT SATISFIED?

19            THE COURT:  I'M SATISFIED.

20            MR. WILLIAMS:  OKAY, THANK YOU.

21  BY MR. WILLIAMS:

22       Q.   NOW, MADAM COURT REPORTER, WHAT WAS THE LAST

23  QUESTION THAT I ASKED?  I HATE TO BOTHER YOU.

24            THE COURT:  IT WAS A DISCUSSION OF PLEA BARGAIN

25  ARRANGEMENTS.  AND MR. PECKHAM SAID HE WOULD BE LUCKY IF

26  HE GOT A SECOND.

27            MR. WILLIAMS:  THANKS.

28

86

BY MR. WILLIAMS:

    Q.    AND SO YOU DECIDED THAT YOU DID NOT WANT TO DO LIFE IN PRISON, SO YOU REJECTED THE PLEA BARGAIN; IS THAT RIGHT?

    A.    YES.

    Q.    DID YOU REQUEST ANY OTHER TYPE OF ARRANGEMENT?

    A.    I SAID I WOULD TAKE UP TO 25 YEARS WITHOUT THE "L"; 20 YEARS.  I WAS SCARED.

    Q.    OKAY.  AND YOU NEVER WERE ABLE TO GET THAT?

    A.    HE SAID HE WENT AND ASKED MARNIE STEIN FOR IT AND HE SAID SHE WASN'T -- SHE WOULDN'T DO IT.

        MR. WILLIAMS:  OKAY.  THANK YOU.  I HAVE NOTHING FURTHER.

            THANK YOU, MR. LITTLE.

            THE COURT:  MS. MALLEN.


                    **CROSS-EXAMINATION**

BY MS. MALLEN:

    Q.    YOU'VE MENTIONED THAT YOU REMEMBER YOUR ATTORNEY, MR. PECKHAM.  AND HOW MANY TIMES DID YOU MEET WITH HIM IN PERSON APPROXIMATELY FROM THE TIME HE WAS APPOINTED UNTIL THE TRIAL DATE?

    A.    PROBABLY ABOUT -- IS THAT INCLUDING IN THE COURTROOM?

    Q.    ALL RIGHT, YES.

    A.    OKAY, PROBABLY ABOUT 12 TIMES.

    Q.    DID MR. PECKHAM COME TO THE JAIL WHERE YOU WERE BEING HELD AND TALK TO YOU?

87

1      A.    YES.

2      Q.    DID HE ALSO TALK TO YOU IN THE COURTROOM?

3      A.    YES.

4      Q.    DID HE MEET WITH YOU ANY PLACE ELSE THAT YOU

5  RECALL?

6      A.    NO.

7      Q.    DID HE TALK TO YOU BY PHONE IN ADDITION TO THOSE

8  TIMES IN PERSON?

9      A.    A COUPLE TIMES.

10     Q.    DID YOU CALL HIM?

11     A.    I THINK SO, YES.

12     Q.    AND DID HE THEN CALL YOU, RETURN CALLS?

13     A.    I DON'T THINK HE RETURNED ANY CALLS, HE JUST

14  CAME TO VISIT.

15     Q.    ALL RIGHT.  WERE THERE EVER ANY TIMES WHEN YOU

16  TRIED TO GET TO CONTACT HIM AND YOU WEREN'T ABLE TO?

17     A.    I PROBABLY CALLED HIS OFFICE AND HE PROBABLY

18  WASN'T THERE.

19     Q.    DO YOU REMEMBER THAT SPECIFICALLY?

20     A.    NO, NOT SPECIFICALLY.

21     Q.    WERE THERE TIMES WHEN YOU TRIED TO TALK TO HIM

22  AND HE WOULD REFUSE TO TALK TO YOU?

23     A.    NO.

24     Q.    WAS HE ALWAYS WILLING TO MEET WITH YOU OR TO

25  RETURN OR COMMUNICATE WITH YOU?

26     A.    SOMETIMES I COULDN'T GET A HOLD OF HIM.

27     Q.    HOW LONG DID THAT LAST?

28     A.    PROBABLY ABOUT A FEW WEEKS, A MONTH.

1    Q.    SO FOR A MONTH AT A TIME YOU WOULD -- HOW WOULD

2    YOU TRY TO CONTACT HIM?

3    A.    I WOULD TRY TO GET A HOLD OF HIM ON THE PHONE.

4    Q.    AND WHAT WOULD BE THE RESULT OF THAT?

5    A.    HE'D END UP COMING TO VISIT ME.

6    Q.    ALL RIGHT.    AND WHEN DID THIS HAPPEN, THAT HE

7    TRIED TO CALL -- THAT YOU TRIED TO CALL HIM BY PHONE?

8    A.    PROBABLY ALL DURING THE COURSE I WAS TRYING TO

9    CALL HIM.

10    Q.    DO YOU REMEMBER THAT SPECIFICALLY?

11    A.    I DON'T REMEMBER EXACTLY WHAT DAY.

12    Q.    WAS IT BEFORE THE TRIAL OR BEFORE THE

13    PRELIMINARY EXAMINATION OR WHEN?

14    A.    IT WAS ALL DURING, BEFORE, IN BETWEEN, THE WHOLE

15    TIME.    BECAUSE WHEN YOU'RE -- WHEN YOU'RE -- WHEN YOU HAVE

16    A LAWYER, YOU'RE ALWAYS TRYING TO GET A HOLD OF THEM.

17    Q.    DID YOU TALK TO MR. PECKHAM ABOUT -- DID YOU --

18    FIRST OF ALL, DID YOU FEEL THAT YOU WERE HAVING DIFFICULTY

19    THEN IN COMMUNICATING WITH HIM?

20    A.    NO, NOT REALLY.

21    Q.    DID YOU EVER TELL HIM THAT YOU NEEDED TO TALK TO

22    HIM MORE OFTEN THAN YOU WERE?

23    A.    NO.

24    Q.    DID MR. PECKHAM ANSWER -- ASK YOU QUESTIONS

25    ABOUT THINGS?

26    A.    YES.

27    Q.    DID YOU ANSWER THOSE QUESTIONS?

28    A.    YES.

89

1      Q.   WERE YOU TRUTHFUL WITH HIM?

2      A.   YES.

3      Q.   DID YOU EVER LIE TO HIM ABOUT ANYTHING?

4      A.   NO.

5      Q.   DID YOU TELL HIM THE ANSWERS TO WHAT HE WAS

6  ASKING YOU, TO THE BEST THAT YOU COULD?

7      A.   TO THE BEST THAT I COULD.

8      Q.   DID YOU -- DO YOU REMEMBER TELLING HIM ABOUT THE

9  APARTMENT BEING, BASICALLY WHAT I'LL CALL A DRUG HOUSE?

10     A.   YES.

11     Q.   AND HE KNEW THAT, DIDN'T HE?

12     A.   YES.

13     Q.   AND DID YOU TALK TO HIM ABOUT THE PEOPLE THAT

14  WERE THERE?

15     A.   YES.

16     Q.   DID YOU SPECIFICALLY DESCRIBE WHO WAS THERE

17  AND --

18     A.   YES.

19     Q.   AND WHAT THEY WERE DOING?

20     A.   YES.

21     Q.   DID YOU TALK TO HIM ABOUT THE LOSS OF YOUR EYE?

22     A.   YES.

23     Q.   DID YOU GIVE HIM ALL THE DETAILS?

24     A.   YES.

25     Q.   NOW DID YOU TALK TO MR. PECKHAM ABOUT MEDICAL

26  TREATMENT THAT YOU GOT?  FIRST OF ALL, WE'RE TALKING ABOUT

27  MEDICAL TREATMENT FOR YOUR EYE?

28     A.   YES, I DID.

1     Q.   DID YOU TALK TO HIM ABOUT PSYCHOLOGICAL

2  PROBLEMS?

3     A.   YES.

4     Q.   YOU TOLD HIM THAT YOU HADN'T HAD ANY

5  PSYCHOLOGICAL COUNSELING FOR IT, RIGHT?

6     A.   YES, BUT I THOUGHT THAT I NEEDED IT.

7     Q.   YOU TOLD HIM THAT YOU THOUGHT THAT YOU NEEDED

8  PSYCHOLOGICAL COUNSELING?

9     A.   YES.

10     Q.   AND WHAT DID HE SAY TO THAT?

11     A.   HE SAID -- HE SAID THAT I DIDN'T NEED IT, THAT

12  WE DIDN'T NEED THAT.

13     Q.   SO HE TOLD YOU THAT YOU DIDN'T NEED

14  PSYCHOLOGICAL COUNSELING?

15     A.   YES.

16     Q.   NOW UP TO THIS POINT, AND THIS IS IN 19 -- THIS

17  IS IN 1999, RIGHT, THAT YOU'RE TALKING TO MR. PECKHAM?

18     A.   YES.

19     Q.   HAD YOU HAD ANY PSYCHOLOGICAL COUNSELING AT ALL

20  IN RELATION TO THAT EYE STABBING?

21     A.   I DID AT TEHACHAPIE.

22     Q.   WHAT DID YOU HAVE DONE THERE?

23     A.   I JUST HAD THEM TALK TO ME ABOUT MY EYE AND HOW

24  IT BOTHERED ME BEING AROUND OTHER PEOPLE AND THEY MOVED ME

25  TO ANOTHER PLACE.  AND THEN I WENT TO THE SOCIAL SECURITY

26  OFFICE AND TALKED TO THEM.

27     Q.   WELL, LET ME STOP YOU FOR A MINUTE.  NOW IS IT

28  TEHACHAPIE?

1    A.    YES.

2    Q.    OKAY, AT TEHACHAPIE, WHAT YOU'RE TALKING ABOUT

3 IS WHEN YOU WERE IN RECEPTION?

4    A.    RECEPTION.

5    Q.    AND YOU WERE BEING HELD PENDING YOUR PLACEMENT,

6 RIGHT?

7    A.    YES.

8    Q.    YOU DIDN'T LIKE WHERE YOU WERE BEING HELD,

9 RIGHT?

10    A.    I WAS BEING HELD ON LEVEL 4 YARD.

11    Q.    OKAY.

12    A.    AND THERE WAS A GYM THERE AND IT WAS

13 OVERCROWDED.

14    Q.    AND YOU WANTED TO MOVE SOMEPLACE LESS CROWDED,

15 RIGHT?

16    A.    WHERE I COULD BE IN A CELL, SO I DON'T HAVE A

17 BUNCH OF PEOPLE AROUND ME.

18    Q.    SO WHEN YOU --

19    A.    BECAUSE IT BOTHERED ME.

20    Q.    ALL RIGHT.  AND YOU TALKED TO A GUARD, RIGHT?

21    A.    NO.

22    Q.    ABOUT BEING PLACED SOME PLACE ELSE?

23    A.    I TALKED TO A DOCTOR.

24    Q.    WHAT KIND OF DOCTOR?

25    A.    I PUT IN FOR THE PSYCHOLOGICAL DOCTOR.

26    Q.    AND DID YOU -- HOW LONG WERE YOU HELD IN

27 RECEPTION?

28    A.    PROBABLY ABOUT THREE MONTHS.

1       Q.   OKAY, AND DURING THAT THREE MONTH PERIOD, WHEN

2  YOU CONTACTED THE DOCTOR, YOU ASKED TO BE MOVED TO ANOTHER

3  CELL, RIGHT?

4       A.   ANOTHER YARD.

5       Q.   OKAY.  AND DID THE DOCTOR AGREE TO DO THAT OR

6  REQUEST THAT FOR YOU?

7       A.   HE AGREED TO DO IT, YES.

8       Q.   AND THEN YOU WERE MOVED, RIGHT?

9       A.   I WAS MOVED.

10      Q.   DID YOU SEE THAT DOCTOR AGAIN?

11      A.   NO, I SEEN A DIFFERENT DOCTOR.

12      Q.   WHAT DOCTOR DID YOU SEE?

13      A.   I DON'T KNOW, I DON'T REMEMBER HIS NAME BECAUSE

14  IT WAS A LONG TIME AGO.

15      Q.   AND THIS IS AT TEHACHAPIE YOU SAW A SECOND

16  DOCTOR?

17      A.   YES.

18      Q.   WHAT DID YOU SEE THIS DOCTOR FOR?

19      A.   PSYCH PROBLEMS.

20      Q.   HOW LONG DID YOU SEE HIM FOR?

21      A.   I SEEN HIM FOR ABOUT HALF HOUR.

22      Q.   AND YOU SAW HIM A HALF AN HOUR ONE TIME?

23      A.   YES.

24      Q.   AND WHAT DID YOU TALK ABOUT?

25      A.   TALKED ABOUT MY EYE AND HOW IT AFFECTED ME AND

26  IT AFFECTED PEOPLE BEING AROUND ME.

27      Q.   AND HOW DID IT AFFECT YOU?

28      A.   MADE ME PANIC, HAD NIGHTMARES SOMETIMES ABOUT

1  BAD DREAMS SINCE IT HAPPENED, JUST PEOPLE WOULD GET

2  VIOLENT.  I WOULD --

3       Q.  ARE YOU LOOKING AT SOMETHING IN FRONT OF YOU?

4       A.  YES.

5       Q.  WHAT ARE YOU LOOKING AT?

6       A.  I WAS LOOKING AT THE WATER.

7       Q.  YOU DON'T HAVE ANY PAPERS UP THERE WITH YOU?

8       A.  YES, I HAVE PAPERS UP HERE TOO.

9       Q.  WHAT KIND OF PAPERS DO YOU HAVE?

10       A.  LAW PAPERS.

11       MS. MALLEN:  CAN I APPROACH OR HAVE A GUARD HAND

12  THEM TO ME, PLEASE?

13       THE COURT:  ACTUALLY, DID YOU READ THROUGH ALL

14  THOSE PAPERS BEFORE YOU GOT ON THE STAND TO TESTIFY?

15       THE WITNESS:  WHO, ME?

16       THE COURT:  YES.

17       THE WITNESS:  NO, I READ THESE PAPERS, THEY'RE

18  JUST LIKE ABOUT LAW.

19       THE COURT:  SO YOU READ THOSE PAPERS?

20       THE WITNESS:  YES.

21       THE COURT:  BEFORE YOU GOT ON THE STAND TODAY?

22       THE WITNESS:  YES, I READ.

23       THE COURT:  OKAY, YOU CAN TAKE A LOOK AT THEM.

24       THE BAILIFF:  THERE'S NOTHING DISPLAYED; IT'S

25  ALL IN HIS FOLDER, NOTHING IS OUT.

26       MS. MALLEN:  OH, OKAY.  I SEE, FOR THE RECORD,

27  THEY'VE HANDED ME A CLOSED FOLDER, WHAT APPEARS TO BE A

28  CLOSED FOLDER.

```
 1              THE COURT:  YES.

 2  BY MS. MALLEN:

 3      Q.   WHAT KIND OF PAPERS DO YOU HAVE IN HERE?

 4      A.   I HAVE CASE LAW, I HAVE A 20 PAGE THING I WROTE

 5  OUT ON MURDER INSTRUCTIONS AND I HAVE SOME TRANSCRIPTS AND

 6  THAT'S ABOUT IT.

 7              MS. MALLEN:  FOR PURPOSES FOR NOW, LET ME LEAVE

 8  THE FOLDER CLOSED IN FRONT OF THE DEFENDANT.

 9              THE COURT:  OKAY.

10              MS. MALLEN:  I'LL TAKE A LOOK AT THOSE LATER.

11  BY MS. MALLEN:

12      Q.   ALL RIGHT, WHEN DID YOU -- WHEN DID YOU FIRST

13  HEAR THE TERM "P.T.S.D."?

14      A.   I KNEW ABOUT IT PROBABLY AROUND '95.

15      Q.   HOW DID YOU HEAR ABOUT IT?

16      A.   BECAUSE I -- BECAUSE I MET OTHER PEOPLE WHO HAD

17  IT.

18      Q.   IN PRISON?

19      A.   IN PRISON, ON THE STREETS.

20      Q.   SO IT WAS SOMETHING THAT WAS TALKED ABOUT WITH

21  OTHER INMATES AND WITH YOUR FRIENDS?

22      A.   WE NEVER REALLY TALKED ABOUT IT; I JUST KNEW

23  THERE WAS A FEW WAR VETERANS WHO HAD IT AND PEOPLE THAT

24  HAD BEEN INVOLVED IN STUFF HAD HAD IT.

25      Q.   ALL RIGHT.  AND WHEN YOU HAD IT, WHAT IS YOUR

26  UNDERSTANDING?  WHAT IS P.T.S.D.?

27      A.   IT'S WHEN YOU GET REALLY DEPRESSED, WITHDRAWN,

28  SOME TRAUMATIC EVENT CHANGES YOU, YOU HAVE RECURRING
```

1    NIGHTMARES AND DREAMS.

2         Q.   SO YOU'VE LEARNED THAT THESE ARE WHAT YOU THINK

3    ARE THE SYMPTOMS OF P.T.S.D.?

4         A.   NO, THIS IS WHAT I FEEL.

5         Q.   ALL RIGHT.  AND HAVE YOU DONE ANY READING ON

6    P.T.S.D.?

7         A.   NO.

8         Q.   YOU HAVEN'T READ ANYTHING ABOUT IT AT ALL?

9         A.   NO.

10        Q.   DO YOU REMEMBER TALKING TO YOUR SISTER ABOUT

11   P.T.S.D.?

12        A.   YES.

13        Q.   AND SHE TALKED TO YOU ABOUT WHAT HER

14   PSYCHOLOGIST SAID?

15        A.   SHE SAID THAT SHE WOULD EVALUATE ME, MY SISTER

16   SAID SHE WOULD PAY FOR THE PSYCHIATRIST BECAUSE I DIDN'T

17   KNOW THAT YOU COULD -- YOU COULD GET FUNDS TO PAY FOR THE

18   DOCTORS AT THAT TIME, SO I WAS ASKING MY SISTER IF SHE

19   COULD GET ME A DOCTOR, TO PAY FOR ME.

20        Q.   THIS IS DURING THE TRIAL THAT YOUR SISTER TALKED

21   TO YOU ABOUT THIS?

22        A.   NO, IT WAS BEFORE THE TRIAL.

23        Q.   SO YOUR SISTER TALKED TO YOU ABOUT P.T.S.D.

24   BEFORE THE TRIAL?

25        A.   SHE TALKED -- SAID SHE COULD GET A DOCTOR.

26        Q.   AND WHEN DID SHE TALK TO YOU ABOUT THIS?

27        A.   BEFORE THE TRIAL.

28        Q.   WHEN BEFORE THE TRIAL?

96

1      A.   IT WAS LIKE A COUPLE MONTHS.

2      Q.   OKAY.  WHAT DID YOU TELL YOUR SISTER?

3      A.   I TOLD HER THAT I WANTED TO SEE HER DOCTOR, IF

4  SHE COULD PAY FOR THE DOCTOR BECAUSE I COULDN'T AFFORD ONE

5  AND SHE SAID SHE WOULD PAY FOR IT.

6      Q.   AND DID YOU -- WERE YOU SEEN BY A DOCTOR?

7      A.   NO, BECAUSE I ASKED MR. PECKHAM IF HE -- IF I

8  NEEDED TO SEE A DOCTOR FOR MY CASE AND HE SAID, NO, WE

9  DON'T NEED A DOCTOR.

10     Q.   SO YOU SPECIFICALLY ASKED MR. PECKHAM IF YOU

11  COULD BE EVALUATED BY A DOCTOR FOR P.T.S.D.?

12     A.   THAT'S WHAT I THOUGHT I HAD.

13     Q.   AND YOU DISCUSSED THAT WITH HIM?

14     A.   YES.

15     Q.   AND HE SAID WHAT?

16     A.   HE SAID WE DON'T NEED A DOCTOR.

17     Q.   NOW, YOU SAID MR. PECKHAM HAD BEEN YOUR ATTORNEY

18  IN A CASE BEFORE THIS STABBING CASE, THAT WAS IN 1987,

19  POSSESSION OF DRUGS?

20     A.   YES.

21     Q.   AT THAT POINT, IN THAT CASE, DID YOU TALK TO

22  MR. PECKHAM ABOUT YOUR DRUG USE?

23     A.   NO, I DIDN'T EVEN REMEMBER HE WAS MY LAWYER

24  UNTIL AFTER THE TRIAL, HE TOLD ME THAT HE'D BEEN MY LAWYER

25  BEFORE.

26     Q.   OH, SO YOU DIDN'T REMEMBER THAT YOU HAD EVER HAD

27  CONTACT WITH MR. PECKHAM BEFORE?

28     A.   NO.

1    Q.   OKAY.  NOW, WHEN YOU WERE STABBED IN THE EYE,

2    THAT HAPPENED WHEN YOU WERE IN A CAR?

3    A.   YES.

4    Q.   AND THE PROSTITUTE, THE WOMAN WAS SITTING NEXT

5    TO YOU?

6    A.   YES.

7    Q.   AND SHE REACHED -- AND SHE REACHED IN FRONT AND

8    STABBED YOU IN THE EYE?

9    A.   JUST HAPPENED LIKE THAT QUICK, BAM, BAM.

10    Q.   IS THAT WHAT HAPPENED?  SHE REACHED UP IN FRONT

11    AND STABBED YOU IN THE EYE?

12    A.   NO.

13    Q.   DO YOU REMEMBER?

14    A.   NO, WE WERE IN THE BACKSEAT.

15    Q.   YOU AND HER WERE IN THE BACKSEAT?

16    A.   YEAH.

17    Q.   AND WERE YOU FACING EACH OTHER WHEN THAT

18    HAPPENED?

19    A.   AND I WAS FACING HER AND ALL OF A SUDDEN, BOOM,

20    IT JUST HIT ME.

21    Q.   OKAY.  WHEN YOU WERE RELEASED FROM THE HOSPITAL,

22    WHERE DID YOU GO?

23    A.   I WENT TO MY DAD'S.

24    Q.   YOU WENT FOR FOLLOW-UP MEDICAL TREATMENT?

25    A.   YES.

26    Q.   DID YOU EVER GO FOR ANY KIND OF COUNSELING AT

27    THAT POINT?

28    A.   NO.

98

1      Q.    WHAT YEAR IS THE FIRST YEAR THAT YOU WENT AND

2   TALKED TO SOMEONE ABOUT HOW THIS STABBING MADE YOU FEEL?

3      A.    PROBABLY IN 2000.

4      Q.    ALL RIGHT.  WHEN YOU WERE -- WHEN YOU WENT BACK

5   TO YOUR FATHER'S AFTER THE STABBING, WERE YOU EMPLOYED?

6      A.    NO, I WAS COLLECTING UNEMPLOYMENT BECAUSE I WAS

7   JUST WORKING AT THIS COMPANY AS A MACHINIST AND I GOT LAID

8   OFF FOR A LITTLE WHILE, BUT I WAS GETTING PRETTY GOOD

9   MONEY FOR UNEMPLOYMENT BECAUSE I WAS WORKING THERE FOR A

10  LONG TIME.  AND I WAS GOING TO GO BACK TO WORK THERE

11  AFTER -- AFTER A WHILE, BECAUSE THEY WERE ONLY LAYING ME

12  OFF FOR A LITTLE WHILE.  AND I COULDN'T GO BACK TO WORK

13  THERE BECAUSE OF MY EYE.

14     Q.    SO BASICALLY YOU WERE RECEIVING UNEMPLOYMENT

15  BEFORE THE STABBING?

16     A.    YES.

17     Q.    AND YOU WERE STILL ON UNEMPLOYMENT AFTER THE

18  STABBING?

19     A.    YES, FOR A WHILE.

20     Q.    OKAY.  AND BEFORE THE STABBING, YOU WERE LIVING

21  WITH YOUR FATHER?

22     A.    YES.

23     Q.    AND AFTER THE STABBING, YOU WENT BACK TO HIS

24  HOUSE?

25     A.    YES.

26     Q.    BEFORE THE STABBING YOU WERE DRINKING?

27     A.    YEAH, WE WERE DRINKING THAT DAY.

28     Q.    YEAH, DID YOU CONTINUE TO DRINK AFTERWARDS?

99

1    A.    NOT RIGHT AWAY BECAUSE I DIDN'T LEAVE THE HOUSE

2  FOR LIKE OVER A MONTH.

3    Q.    WHEN DID YOU START DRINKING AGAIN?

4    A.    AND SLOWLY I JUST STARTED DRINKING BEER AGAIN,

5  BECAUSE I JUST WENT OUT ALONE; I DIDN'T REALLY HANG OUT

6  WITH NO ONE AND I JUST STARTED DRINKING MORE AND MORE.

7    Q.    WHEN YOU -- BEFORE THE STABBING, WERE YOU USING

8  CRYSTAL METH?

9    A.    BEFORE THE STABBING?  I WAS USING A LITTLE BIT,

10  BUT MORE -- I WAS MORE LIKE MORE DRINKING.

11    Q.    AND AFTER THE STABBING, DID YOU CONTINUE TO USE

12  CRYSTAL METH?

13    A.    I STARTED USING IT DIFFERENTLY.

14    Q.    HOW WAS THAT?

15    A.    STARTED USING IT INTRAVENOUSLY.

16    Q.    SO BEFORE YOU WERE SMOKING IT AND AFTER --

17    A.    NO, I JUST SNORTED IT.

18    Q.    AND AFTERWARDS YOU WERE INJECTING WITH A NEEDLE?

19    A.    YES.

20    Q.    WERE YOU STILL SMOKING MARIJUANA ALL ALONG?

21    A.    I SMOKED A LOT OF POT WHEN I WAS YOUNGER, BUT

22  PRETTY MUCH SLOWED DOWN ON THE POT WHEN I GOT OLDER.  I

23  DIDN'T SMOKE AS MUCH.

24    Q.    MEANING NOT AS MUCH, OKAY.  WERE YOU USING ANY

25  OTHER KIND OF DRUGS?

26    A.    NO.

27    Q.    ANY KIND OF COCAINE?

28    A.    NO.

1    Q.    ANY HEROIN?

2    A.    NO.

3    Q.    ANY PRESCRIPTION MEDICATIONS THAT -- LIKE VALIUM

4    OR ANYTHING LIKE THAT?

5    A.    NO.

6    Q.    OKAY.  HOW -- NOW AFTER THE STABBING, HOW DID

7    THE METHAMPHETAMINE MAKE YOU FEEL?

8    A.    AFTER THAT?  IT MADE ME FEEL MORE OUTGOING.

9    IT -- MORE LIKE BROUGHT ME OUT OF MY SHELL, BECAUSE I WAS

10   KIND OF AFRAID TO GO OUT AND TALK TO PEOPLE.

11   Q.    BUT METH MADE YOU FEEL BETTER?

12   A.    YES, EXCEPT FOR WHEN I WAS COMING OFF OF IT.

13   Q.    AND THEN IT WOULD MAKE YOU EXTREMELY TIRED?

14   A.    REAL TIRED.

15   Q.    SLEEPY?

16   A.    SLEEPY.

17   Q.    FOR LONG -- SEVERAL HOURS OR DAYS?

18   A.    YES.

19   Q.    OKAY.  DID METHAMPHETAMINE MAKE YOU FEEL JUMPY

20   AT ALL?

21   A.    YES, I'D GET PARANOID.  SOMETIMES I WOULD BE IN

22   MY ROOM GOING TO SLEEP AFTER BEING UP FOR A WHILE AND I

23   WOULD THINK I'D SEEN SOMEBODY COMING IN THE DARK AT ME.

24   Q.    SO --

25   A.    I'D ALWAYS BE ON EDGE AND I COULDN'T GET TO

26   SLEEP RIGHT AWAY, BUT I WOULD BE REAL TIRED AND I WOULD

27   THINK THAT THERE'S PEOPLE COMING IN AT ME.

28   Q.    SO METHAMPHETAMINE WOULD HAVE YOU STAY AWAKE FOR

1   LIKE A COUPLE OF DAYS IN A ROW?

2       A.   YES.

3       Q.   NOW YOU WERE TALKING ABOUT, YOU CALLED IT BEING

4   JUMPED BY A GROUP OF MEXICANS.   WAS THAT SOMETHING THAT

5   HAPPENED IN SAN DIEGO WHEN YOU WERE OUT OF JAIL?

6       A.   YES.

7       Q.   WHERE DID IT HAPPEN?

8       A.   IT'S HAPPENED TWICE.

9       Q.   WELL, THE TIME THAT YOU REFERRED TO, WHICH WAS

10  1997 OR '98, WHERE DID THAT HAPPEN?

11      A.   THAT HAPPENED LIKE RIGHT -- ABOUT A BLOCK OR TWO

12  FROM THE TROLLEY.

13      Q.   WHERE?

14      A.   EL CAJON TROLLEY.

15      Q.   SO YOU WERE JUMPED IN EL CAJON?

16      A.   YES.

17      Q.   AND WHEN -- DO YOU REMEMBER, WAS IT DAYTIME,

18  NIGHTTIME THAT THIS HAPPENED?

19      A.   IT WAS JUST BEFORE NIGHT.

20      Q.   WERE YOU AT THE TROLLEY STATION?

21      A.   NO, I WAS LIKE A BLOCK AWAY FROM THE TROLLEY

22  STATION OVER ON THE RIGHT SIDE.

23      Q.   WERE YOU LIVING OUT ON THE STREET AT THIS POINT?

24      A.   NO.

25      Q.   OR WERE YOU OUT ON THE STREET AT THIS POINT?

26      A.   YEAH.

27      Q.   AND WHAT -- THIS GROUP, HOW MANY PEOPLE WERE IN

28  THIS GROUP?

| | | |
|---|---|---|
| 1 | A. | THREE. |
| 2 | Q. | AND THEY ATTACKED YOU? |
| 3 | A. | YES. |
| 4 | Q. | ALL RIGHT.  DO YOU KNOW WHY? |
| 5 | A. | I DON'T KNOW. |
| 6 | Q. | WERE YOU DRINKING? |
| 7 | A. | YEAH, I WAS WALKING DOWN THE STREET DRUNK. |
| 8 | Q. | AND WERE THEY DRINKING? |
| 9 | A. | I DON'T KNOW WHAT THEY WERE DOING. |
| 10 | Q. | OKAY. |
| 11 | A. | I NEVER SEEN THEM BEFORE. |
| 12 | Q. | DID YOU -- WERE THERE ANY WORDS EXCHANGED OR -- |
| 13 | A. | NO. |
| 14 | Q. | DID YOU SAY ANYTHING, DO YOU THINK, TO THEM |
| 15 | OR -- | |
| 16 | A. | I DON'T KNOW, I JUST WAS WALKING ALONG AND THEY |
| 17 | JUMPED ME. | |
| 18 | Q. | OKAY.  AND YOU TOLD MR. PECKHAM ABOUT THIS? |
| 19 | A. | YES. |
| 20 | Q. | AND DID YOU REPORT THIS TO ANYBODY?  POLICE? |
| 21 | A. | YEAH, THE POLICE CAME OVER TO MY DAD'S HOUSE AND |
| 22 | THEN AN AMBULANCE CAME AND TOOK ME TO PARADISE VALLEY | |
| 23 | HOSPITAL. | |
| 24 | Q. | SO YOU WERE TREATED AT PARADISE VALLEY? |
| 25 | A. | YES. |
| 26 | Q. | HAVE YOU EVER RECEIVED TREATMENT FOR ALCOHOL |
| 27 | ABUSE? | |
| 28 | A. | WELL, I WENT TO MC CALLISTER. |

1       Q.   WHEN DID YOU DO THAT?

2       A.   IT WAS LIKE JANUARY OF '99.

3       Q.   WAS IT BEFORE OR AFTER THE STABBING?

4       A.   JUST BEFORE.

5       Q.   AND HOW LONG WERE YOU IN THE PROGRAM?

6       A.   FOUR OR FIVE MONTHS.

7       Q.   DID YOU STOP DRINKING ALL TOGETHER?

8       A.   NO.

9       Q.   OKAY, BECAUSE YOU WERE KICKED OUT BECAUSE OF THE

10   DRINKING?

11      A.   YES.

12      Q.   OKAY.

13      A.   I KICKED THE DRUGS, BUT I DIDN'T QUIT THE

14   DRINKING WHILE I WAS THERE.

15      Q.   OKAY.  SO THE TREATMENT FOR ALCOHOL WASN'T

16   SUCCESSFUL THEN?

17      A.   NO.

18      Q.   OKAY, NOW TREATMENT FOR DRUGS, HAVE YOU HAD

19   TREATMENT FOR DRUGS?

20      A.   THAT WAS -- IT WAS MORE LIKE A DRUG PROGRAM THAN

21   AN ALCOHOL PROGRAM.

22      Q.   YOU'RE TALKING ABOUT MC CALLISTER?

23      A.   YES.

24      Q.   OKAY.  AND DID YOU STOP USING METHAMPHETAMINE AT

25   THAT POINT?

26      A.   WHILE I WAS AT THE PROGRAM AND WHEN I WAS IN THE

27   PROGRAM I STOPPED USING.

28      Q.   WHEN DID YOU START AGAIN?

1          A.    WHEN I ENDED UP AT THAT HOUSE.

2          Q.    SO THE DAY BEFORE THE STABBING WAS THE FIRST

3     TIME IN SEVERAL MONTHS THAT YOU HAD USED METHAMPHETAMINE?

4          A.    NO, IT WAS LIKE ABOUT A WEEK BEFORE.

5          Q.    OKAY.   HAVE YOU HAD ANY OTHER TREATMENT FOR

6     ALCOHOL OR DRUGS OTHER THAN MC CALLISTER?

7          A.    NO.

8          Q.    NOW LET'S GO BACK TO THE PSYCHIATRIC TREATMENT.

9     YOU WERE SAYING THAT YOU HAD -- YOU TALKED TO A DOCTOR TO

10    GET MOVED TO A CELL IN TEHACHAPIE?

11         A.    YES.

12         Q.    THEN YOU TALKED TO ANOTHER DOCTOR AT TEHACHAPIE

13    ONCE ABOUT WHAT?

14         A.    ABOUT MY EYE.

15         Q.    AND WHAT ABOUT YOUR EYE?

16         A.    AND I TOLD HIM THAT I NEEDED THE PROSTHESIS.

17         Q.    OH, YOU WANTED TO GET --

18         A.    ALSO BECAUSE I -- I DIDN'T HAVE ONE FOR YEARS

19    WHEN I GOT LAID OFF WORK, AND THEN THIS HAPPENED AND THEN

20    I TRIED TO GET A PROSTHESIS.   AND I WENT TO THE -- SEE THE

21    PLACE DOWN ON MISSION GORGE, THEY GIVE YOU THE MEDICAL,

22    AND THEY TOLD ME THAT I MADE TOO MUCH MONEY FOR THEM TO

23    GET IT FOR ME.

24         Q.    OKAY, SO WHEN YOU WENT IN TO TEHACHAPIE, YOU

25    DIDN'T HAVE YOUR GLASS EYE YET?

26         A.    I DIDN'T HAVE IT.

27         Q.    WHEN YOU TALKED TO THE DOCTOR, WAS HE ABLE TO

28    ARRANGE FOR YOU TO GET A GLASS EYE?

1      A.    AS SOON AS I GOT WHERE THEY SENT ME BECAUSE I

2   LEFT RIGHT AFTER THAT TO C.R.C., THEN C.R.C. TOOK ME TO A

3   RIVERSIDE HOSPITAL AND THEY LOOKED AT IT AND THEY SAID

4   THAT SINCE IT WAS COSMETIC, THEY COULDN'T DO NOTHING, BUT

5   I KEPT TELLING THEM IT HURT ME BECAUSE THE WIND WOULD

6   BELOW IN THERE AND I DIDN'T HAVE ANYTHING IN THERE AND

7   THEY WOULDN'T DO NOTHING.

8      Q.    SO YOU -- YOU WERE TRYING TO GET THE GLASS EYE

9   GIVEN TO YOU BY THE PRISON PEOPLE?

10     A.    YES.

11     Q.    EVENTUALLY DID THAT HAPPEN?

12     A.    NO, I GOT IT ON THE STREETS.

13     Q.    OKAY.  LET ME -- SO THAT NEVER -- THAT NEVER

14  WENT ANYWHERE, THEN, ASKING FOR THAT KIND OF HELP?

15     A.    NO.

16     Q.    OKAY, DID YOU HAVE GLASSES WHEN YOU WERE IN

17  PRISON?

18     A.    NO, I -- THEY GAVE ME PRESCRIPTION, BUT I GOT

19  OUT BEFORE I GOT THEM.

20     Q.    OKAY.  WHEN WAS THE FIRST TIME THAT YOU GOT

21  GLASSES?

22     A.    LIKE -- IT WAS LIKE -- I THINK IT WAS LIKE '97

23  OR NO, MAYBE IT WAS '96.

24     Q.    WHO BOUGHT THEM FOR YOU?

25     A.    I BOUGHT THEM.

26     Q.    OKAY.  DO YOU REMEMBER YOUR DAD BUYING YOU

27  GLASSES?

28     A.    HE TOOK ME TO GET THEM.

1      Q.   OH, OKAY, I SEE.

2      A.   HE HELPED ME.

3      Q.   FOR THE PRESCRIPTION?

4      A.   YEAH, THAT WASN'T THE FIRST PAIR, THAT WAS LIKE

5  THE SECOND OR THIRD PAIR.

6      Q.   OKAY.  NOW, YOU WERE TALKING ABOUT PREPARING FOR

7  TRIAL WITH MR. PECKHAM.  DID MR. PECKHAM TELL YOU TO LIE

8  ABOUT THINGS?

9      A.   HE JUST TOLD ME IT WOULDN'T BE IN MY BEST

10  INTEREST TO SAY CERTAIN THINGS.

11     Q.   DID HE TELL YOU WHY IT WOULDN'T BE IN YOUR BEST

12  INTEREST?

13     A.   HE SAID JUST BECAUSE I WOULDN'T LOOK GOOD IF I

14  SAID IT.

15     Q.   ALL RIGHT.  AND DID YOU UNDERSTAND WHAT HE WAS

16  TALKING ABOUT?

17     A.   YES.

18     Q.   DID YOU THINK THAT HE WAS TELLING YOU TO LIE?

19     A.   I THOUGHT HE WAS TELLING ME TO SAY THAT I WASN'T

20  DRUNK.

21     Q.   DID YOU ASK HIM IF THAT'S WHAT HE MEANT?

22     A.   NO, I DIDN'T ASK HIM, BUT --

23     Q.   OKAY.  DO YOU REMEMBER WHEN YOU TESTIFIED AT THE

24  TRIAL, YOU WERE SWORN TO TELL THE TRUTH?

25     A.   YES.

26     Q.   ARE YOU TELLING US THAT YOU LIED ANYWAY?

27     A.   I DIDN'T LIE, I JUST -- I WAS PROBABLY DRUNK,

28  BUT I DIDN'T REALIZE THAT I WAS THAT DRUNK BECAUSE A LOT

1   OF TIMES WHEN YOU DRINK, YOU KEEP DRINKING AND YOU DON'T

2   THINK YOU'RE AS DRUNK AS YOU REALLY ARE.

3       Q.   ALL RIGHT, SO IF YOU DIDN'T FEEL LIKE YOU WERE

4   DRUNK AT THE STABBING, WHY DO YOU THINK YOU WERE?

5       A.   BECAUSE A LOT OF PEOPLE TOLD ME, LIKE EVEN MY

6   DAD TOLD ME THAT A LOT OF TIMES WHEN I WAS -- I WOULD COME

7   HOME DRUNK, THAT I WOULD THINK THAT I WASN'T DRUNK, BUT HE

8   WOULD KNOW THAT I WAS -- THAT I WAS WAY DIFFERENT AND I

9   WAS DRUNK.

10      Q.   DOES IT MAKE YOU FEEL BETTER TO THINK THAT YOU

11  WERE DRUNK WHEN YOU DID THIS RATHER THAN NOT?

12      A.   I'M NOT REALLY THINKING THAT I WAS DRUNK, BUT

13  I'M HYPERSENSITIVE TO ALCOHOL, AND IT JUST COMPLETELY

14  CHANGES ME.  EVEN IF I DRINK LIKE THREE BEERS OR SIX PACK,

15  IT COMPLETELY CHANGES ME AND I DON'T REALIZE THAT I'M

16  DRUNK, BUT I COULD BE DRUNK.

17      Q.   OH, OKAY, SO BASICALLY WHAT YOU'RE SAYING IS

18  THAT YOU'RE NOT SURE, BUT MAYBE OTHER PEOPLE HAVE POINTED

19  OUT TO YOU THAT YOU MIGHT HAVE BEEN?

20      A.   YEAH.

21      Q.   HOW DOES BEING -- HOW DOES DRINKING CHANGE YOU?

22      A.   IT MAKES ME MORE IRRATIONAL.  IT MAKES ME MORE

23  ABOUT NOT THINKING ABOUT WHAT I'M DOING.

24      Q.   OKAY, MAKES YOU A LITTLE EDGY, A LITTLE JUMPY?

25      A.   YES.

26      Q.   SO YOU TOLD THE TRUTH THE BEST YOU COULD AT THE

27  TRIAL?

28      A.   YES.

1      Q.   OKAY.   NOW, WHEN YOU WERE TALKING ABOUT P.T.S.D.

2   WITH MR. PECKHAM, DID YOU USE -- WELL, HOW -- WHAT DID YOU

3   TELL HIM?

4      A.   I TOLD HIM I THINK I MIGHT HAVE P.T.S.D. BECAUSE

5   OF THE KNIFE INCIDENT AND OTHER THINGS THAT I'VE BEEN --

6   OTHER THINGS THAT HAVE HAPPENED TO ME.

7      Q.   AND DID HE TALK TO YOU ABOUT THAT?

8      A.   YES.

9      Q.   DID HE ASK YOU QUESTIONS ABOUT THE KNIFE

10  INCIDENT?

11     A.   NOT REALLY TOO MANY QUESTIONS.

12     Q.   DID YOU TALK TO HIM ABOUT IT, THOUGH?

13     A.   YES.

14     Q.   AND DID HE ASK YOU QUESTIONS ABOUT HOW YOU WERE

15  FEELING?

16     A.   WHEN I TALKED TO HIM ABOUT IT, IT MADE ME REAL

17  EMOTIONAL AND I WAS STARTING TO CRY ABOUT IT.   AND HE TOLD

18  ME, WELL, YOU SHOULD GET -- YOU SHOULD GET HELP BECAUSE --

19  HE SAID BECAUSE MY DAD, HE HAD WENT THROUGH SOMETHING LIKE

20  THAT AND HE -- HE GOT HELP IT AND IT WAS KIND OF LIKE YOU

21  WERE GOING THROUGH THE SAME THING.

22     Q.   DID YOU ASK FOR SOME KIND OF PSYCHOLOGICAL

23  COUNSELING AT THAT POINT?

24     A.   I TOLD HIM THAT MY SISTER COULD GET THE DOCTOR

25  AND SHE WOULD PAY FOR THE DOCTOR.

26     Q.   ALL RIGHT.   BUT DID YOU EVER TAKE MR. PECKHAM'S

27  ADVICE AND ASK FOR COUNSELING?

28     A.   AND I SAID -- I SAID, WHY DON'T WE GET A DOCTOR

1   AND HE SAID, WE DON'T NEED ONE.

2       Q.   DID YOU ASK THIS PRISON TO TALK TO ANYBODY AT

3   THAT POINT?

4       A.   YES.

5       Q.   WHO DID YOU TALK TO?

6       A.   I TALKED TO SOME DOCTORS AT DONOVAN.

7       Q.   DO YOU REMEMBER THEIR NAMES?

8       A.   NOT RIGHT OFFHAND.

9       Q.   WELL --

10      A.   I --

11      Q.   AND DID YOU TALK TO DOCTORS?

12      A.   YES.

13      Q.   HOW MANY DIFFERENT DOCTORS?

14      A.   LIKE THREE.

15      Q.   AND THIS WAS BEFORE THE TRIAL?

16      A.   NO, THIS IS RIGHT AFTER.

17      Q.   OH, AFTER THE TRIAL.  OKAY, DID YOU TALK TO ANY

18   DOCTORS BEFORE THE TRIAL?

19      A.   DID I TALK TO ANY BEFORE?  NO.

20      Q.   OKAY.  NOW LET'S TALK A LITTLE BIT ABOUT WHEN

21   THE KILLING TOOK PLACE.  WHEN -- AFTER YOU KILLED

22   MR. RABITOR, YOU RAN OUT THE DOOR, RIGHT?

23      A.   YEAH, KIND OF JOGGED OUT.

24      Q.   AND YOU RAN BY HIS MOTHER, RIGHT?

25      A.   YEAH, SHE WAS OUTSIDE YELLING AT ME.

26      Q.   DID YOU STOP TO TELL HER WHAT HAD HAPPENED?

27      A.   NO.

28      Q.   DID YOU STOP TO TELL HER THAT HER SON NEEDED

1   HELP?

2       A.   I DIDN'T KNOW IF HE NEEDED HELP BECAUSE HE WAS

3   STILL STANDING UP WHEN I LEFT AND I WAS AFRAID HE WAS

4   COMING AFTER ME.

5       Q.   DID YOU STOP AND TELL HER ANYTHING AT ALL?

6       A.   NO.

7       Q.   YOU JUST RAN OFF?

8       A.   YES.

9       Q.   AND YOU THREW THE KNIFE INTO THE YARD TO

10  SOMEBODY ELSE, RIGHT?

11      A.   I JUST TOSSED IT TO THE SIDE.

12      Q.   OKAY, BUT IT FELL -- DID YOU SEE IT FALL?

13      A.   NO.

14      Q.   OKAY, SO YOU THREW IT SOME PLACE?

15      A.   YES.

16      Q.   NOW UP TO THAT POINT, UP TO THE TIME WHEN YOU

17  RAN OUT OF THE APARTMENT, YOU HAD A BIG MUSTACHE, RIGHT?

18      A.   NO, I SHAVED IT OFF EARLIER BECAUSE I WAS

19  LOOKING FOR A JOB.

20      Q.   WHEN DID YOU SHAVE IT OFF?

21      A.   LIKE WHEN I TOOK A SHOWER.

22      Q.   YOU MEAN THAT DAY?

23      A.   YEAH.

24      Q.   SO YOU'RE SAYING THAT WHEN YOU -- LET'S GO BACK

25  OVER THAT DAY THEN.  WHEN YOU GOT UP THAT MORNING -- YOU

26  STAYED OVERNIGHT AT THE APARTMENT, RIGHT?

27      A.   I LIVED THERE.

28      Q.   YOU WERE LIVING THERE AT THE TIME?

111

1     A.   YES.

2     Q.   STAYING THERE WITH EDDIE -- MR. RABITOR AND HIS

3  MOM?

4     A.   YES.

5     Q.   OKAY.  THAT MORNING EVERYBODY HAD BEEN GOING OUT

6  TO DO THINGS, PICK-UP GROCERIES, BUY BEER, THINGS LIKE

7  THAT, RIGHT?

8     A.   YES.

9     Q.   AND YOU HAD -- AND YOU HAD STAYED IN THE

10 APARTMENT?

11    A.   NO, I WENT OUT BECAUSE SOME GIRL CAME OVER AND

12 SHE NEEDED HELP BECAUSE HER -- THE JOSH GUY STOLE THE CAR

13 AND HE LEFT IT ON THE FREEWAY OFFRAMP AND I WAS HELPING

14 HER -- I VOLUNTEERED TO HELP HER TOW IT OFF THE FREEWAY

15 OFFRAMP SO IT WOULDN'T GET LOST.  AND AS SOON AS WE CAME

16 BACK, SHE BOUGHT -- SHE BOUGHT US SOME BEER AND THAT WAS

17 IN THE MORNING.  AND I DRANK A LITTLE BIT OF BEER, BUT

18 THEN I TOLD THEM I HAD TO GO LOOK -- FILL OUT A COUPLE

19 APPLICATIONS.

20            AND IT WAS HOT THAT DAY AND I'D BEEN UP ALL

21 NIGHT ALREADY, AND SO I WENT TO GO FILL OUT A COUPLE

22 APPLICATIONS.  AND BEFORE I DID ALL THAT, THAT LADY JOYCE,

23 SHE WAS BEGGING ME TO STAY THERE BECAUSE I WAS GOING TO

24 LEAVE BECAUSE THE NIGHT BEFORE SHE HAD A BUNCH OF PILLS

25 AND SHE WAS DUMPING THEM DOWN HER THROAT AND SHE BIT THIS

26 GIRL'S FINGER.

27    Q.   SO THERE WAS A LOT OF STUFF GOING ON IN THIS

28 APARTMENT?

1       A.    IT WAS CRAZY THERE.

2       Q.    AND YOU STAYED THERE FOR ABOUT A WEEK?

3       A.    YEAH.

4       Q.    SO AFTER YOU CAME BACK DOING THE JOB

5   APPLICATIONS, IS THAT WHEN YOU TOOK A SHOWER AND SHAVED?

6       A.    YEAH.

7       Q.    OKAY.

8       A.    BECAUSE I FIGURED IT WOULD HELP ME GET A JOB A

9   LOT EASIER.

10      Q.    IS THAT BEFORE OR AFTER YOU HAD THE ARGUMENT

11  WITH MR. RABITOR?

12      A.    THAT WAS BEFORE.

13      Q.    OKAY, SO AFTER YOU GOT OUT OF THE SHOWER AND YOU

14  SHAVED AND YOU GOT INTO AN ARGUMENT WITH MR. RABITOR ABOUT

15  THE GLASS PIPE, WHAT YOU CALL THE GLASS PIPE?

16      A.    YEAH.

17      Q.    THAT'S WHEN YOU THREW IT AT HIM?

18      A.    NO, I DIDN'T THROW IT AT HIM.

19      Q.    SOMEBODY ELSE THREW IT?

20      A.    SOMEBODY HANDED -- OKAY, THEY WERE IN THE ROOM

21  SMOKING CRYSTAL AND THERE WAS KEN KEMPY(PH), ALLISON,

22  JOYCE, EDDIE AND MARY ROSS AND I ASKED -- I ASKED HIM IF

23  HE COULD GET MARY ROSS --

24      Q.    LET ME STOP YOU THERE AND ASK YOU THE QUESTION.

25      A.    OKAY.

26      Q.    WHO THREW THE GLASS PIPE AT MR. RABITOR?

27      A.    I DIDN'T THROW IT AT HIM, I JUST THREW IT OFF TO

28  THE SIDE, TO THE WALL.

1    Q.   I SEE.  YOU THREW THE PIPE, BUT IT WASN'T AT

2   HIM?

3    A.   NO, NOT AT HIM.

4    Q.   ALL RIGHT.  AND HE GOT UPSET AT YOU?

5    A.   HE GOT REALLY UPSET.

6    Q.   THAT'S WHEN THEY TOLD YOU YOU NEEDED TO LEAVE?

7    A.   HIS MOM JUMPED UP AND GOT IN MY FACE.

8    Q.   ALL RIGHT, BUT YOU DIDN'T LEAVE THEN, DID YOU?

9    A.   NO, BECAUSE I JUST GOT DONE KICKING PEOPLE OUT.

10   Q.   AND YOU DIDN'T WANT TO LEAVE?

11   A.   AND I THOUGHT THOSE PEOPLE WERE GOING TO -- THEY

12  WERE OUT THERE WAITING FOR ME, AND SO I SAT ON THE COUCH

13  AND I THOUGHT THAT EVERYTHING WOULD BLOW OVER, BUT IT

14  DIDN'T AND IT GOT SERIOUSER AND --

15   Q.   LET ME STOP YOU FOR A MINUTE.  AND AT THE TIME

16  THAT YOU DECIDED TO LEAVE AND YOU GOT YOUR THINGS

17  TOGETHER, YOU WERE ALONE IN THE APARTMENT WITH -- WITH

18  MR. RABITOR AND ALLISON BROOKS, RIGHT?  DO YOU REMEMBER

19  THAT?

20   A.   YES.

21   Q.   OKAY, AND ALLISON BROOKS AND MR. RABITOR WERE

22  SITTING AT A TABLE, WEREN'T THEY?

23   A.   YEAH, THEY WERE DRUNK.

24   Q.   THEY WERE DRINKING SOMETHING AND THEY WERE

25  SITTING AT A TABLE, RIGHT?

26   A.   YES.

27   Q.   AND YOU WERE GETTING YOUR THINGS TOGETHER TO

28  LEAVE?

1    A.    YES.

2    Q.    YOU DECIDED TO WALK OUT?

3    A.    YES.

4    Q.    AND YOU WENT AND PICKED UP YOUR BACKPACK?

5    A.    YES.

6    Q.    YOU WENT OVER TO THE COFFEE TABLE?

7    A.    YES.

8    Q.    DO YOU REMEMBER DOING THAT?  AND YOU PICKED UP

9    THE KNIFE?  DO YOU REMEMBER DOING THAT?

10    A.    NO, I PUT THE BACKPACK DOWN BECAUSE I WAS GOING

11    TO GO GET MY GLASSES BECAUSE THEY WERE ON THE OTHER -- ON

12    THE LONG TABLE; THERE WAS LIKE A LITTLE SHORT TABLE AT THE

13    END AND A LONG TABLE, AND I WAS GOING TO GO OVER AND GET

14    MY GLASSES BEFORE I LEFT.

15    Q.    AND YOU PICKED UP THE KNIFE?

16    A.    AND HE JUMPED UP AND HE SAID, YOU'RE NOT GOING

17    ANYWHERE.  MY MOM IS WAITING FOR MY FRIENDS AND IT'S TOO

18    LATE, YOU KNOW, YOU'RE -- SO WHEN HE JUMPED UP, THAT'S

19    WHEN I GRABBED THE KNIFE.  HE CAME AT ME AND I THREW TWO

20    JABS AND HE WAS STILL STANDING WHEN I LEFT, SO I THOUGHT

21    HE WAS COMING AFTER ME WHEN I LEFT.

22    Q.    YOU DIDN'T STOP TO SEE?

23    A.    BECAUSE HE WAS IN FRONT OF ME.

24    Q.    ALL RIGHT.

25    A.    SO I WENT AROUND HIM.

26    Q.    NOW, YOU KNOW THAT HE WAS FOUND BY THE TABLE?

27    A.    YEAH, RIGHT WHERE HE JUMPED UP AT ME.

28    Q.    ALL RIGHT.  AND YOU KNOW THAT ALLISON BROOKS

1   TESTIFIED IN A DIFFERENT WAY THAN YOU DID?

2        A.   YES.

3        Q.   WAS YOUR MEMORY BETTER AT THE TIME THAT YOU

4   TESTIFIED OR IS IT BETTER NOW?

5        A.   IT'S THE SAME.

6        Q.   BUT YOU DIDN'T TESTIFY THE SAME WAY AT THE TRIAL

7   THAN YOU DID NOW, DID YOU?

8        A.   YES, I DID.

9        Q.   DO YOU REMEMBER TESTIFYING THAT YOU PICKED UP

10  THE KNIFE BEFORE MR. RABITOR APPROACHED YOU?

11       A.   WELL, HE PICKED SOMETHING UP FIRST AND THEN I

12  PICKED SOMETHING UP AND THEN HE CAME AT ME.

13       Q.   OKAY.  AND THIS SOMETHING THAT YOU PICKED UP WAS

14  THE KNIFE, RIGHT?

15       A.   YES.

16       Q.   AND YOU TOLD ALL OF THIS TO MR. PECKHAM, RIGHT?

17       A.   YES.

18       Q.   YOU BASICALLY WERE TELLING MR. PECKHAM THAT YOU

19  REACTED BECAUSE YOU THOUGHT YOU WERE BEING ATTACKED,

20  RIGHT?

21       A.   THAT AND I WAS PARANOID.

22       Q.   WELL, WHEN YOU SAY YOU WERE PARANOID, WHAT DO

23  YOU MEAN BY THAT?

24       A.   THAT I THOUGHT THESE PEOPLE WERE COMING TO GET

25  ME.

26       Q.   OKAY.

27       A.   THEY WERE COMING AFTER ME.

28       Q.   OKAY, BUT THERE WERE NO PEOPLE OTHER THAN

```
1    MR. RABITOR THERE, RIGHT?

2         A.    THERE WAS PEOPLE COMING OVER.

3         Q.    DID YOU SEE PEOPLE?

4         A.    AND THERE WAS THOSE PEOPLE IN AND OUT OF THERE

5    AND THERE WAS THOSE PEOPLE THAT WERE GANG RELATED, PEOPLE

6    THAT WERE ALWAYS THERE.

7         Q.    ALL RIGHT.

8         A.    AND THEY WERE THREATENING ME WITH THOSE PEOPLE.

9         Q.    DID YOU SEE SOMEONE COMING IN?

10        A.    NO, BUT I KNEW THEY WERE COMING AND THAT'S --

11   THAT'S WHAT MADE ME PARANOID.

12        Q.    DID YOU SEE SOMEONE COMING?

13        A.    I ALWAYS HEARD PEOPLE COMING AND GOING ALL THE

14   TIME.

15        Q.    IN THIS CASE, DID YOU HEAR SOMEONE COMING IN THE

16   DOOR?

17        A.    NOT AT THAT MOMENT.

18        Q.    ALL RIGHT, SO BASICALLY YOU WERE -- YOU THOUGHT

19   YOU WERE DEFENDING YOURSELF AGAINST MR. RABITOR?  IS THAT

20   YES?

21        A.    YES.

22        Q.    AND THAT'S WHAT YOU TOLD MR. PECKHAM YOU WERE

23   DOING, RIGHT?

24        A.    YES.

25        Q.    AND YOU NEVER CHANGED THAT, DID YOU?

26        A.    NO.

27        Q.    YOU NEVER TOLD HIM, I'VE CHANGED MY MIND, THAT'S

28   NOT WHAT I WAS DOING?
```

1    A.   NO, I NEVER CHANGED MY MIND.

2    Q.   THAT'S WHAT YOU THINK TODAY THAT YOU WERE

3  DEFENDING YOURSELF AGAINST HIM, RIGHT?

4    A.   YES.

5    Q.   OKAY.  WHY DIDN'T YOU WANT THE TRIAL TO BE

6  CONTINUED?  WHY DID YOU WANT THE TRIAL TO BE CONTINUED?

7    A.   BECAUSE HE SAID HE WAS GOING TO GO GET SOME

8  WITNESSES.  HE WAS GOING TO GO GET MIKE OVERDORF(PH), HE

9  WAS GOING TO GO GET MARY ROSS, HE WAS GOING TO GO GET KEN

10 KEMPY.  HE SAID HE DIDN'T WANT TO USE MARTIN CORVALES(PH).

11   Q.   WHEN YOU SAY "HE", YOU MEAN MR. PECKHAM, RIGHT?

12   A.   MR. PECKHAM, YES.

13   Q.   NOW, DID MR. PECKHAM ACTUALLY TELL YOU, I'M

14 GOING TO GET THESE PARTICULAR PEOPLE?

15   A.   YEAH.  HE SAID, I CAN GET THESE PEOPLE FOR YOU.

16 AND I SAID, LET'S GET THEM.  AND NEXT THING YOU KNOW, HE

17 SAYS, OH, IT'S TOO SOON; WE'RE GOING TO TRIAL RIGHT NOW

18 AND I CAN'T GET THEM RIGHT NOW.  AND I SAID, BUT WE NEED

19 THEM.

20   Q.   WHY DID YOU THINK THESE WITNESSES WERE

21 IMPORTANT?

22   A.   BECAUSE FOR ONE, THAT THEY WOULD HAVE IMPEACHED

23 ALLISON BROOKS' TESTIMONY, BECAUSE PART OF HER TESTIMONY

24 WAS ALREADY WRONG, BECAUSE THE ANGLE OF THE WOUND THAT WAS

25 IN THERE, PLUS THEY WOULD DESCRIBE THE TIMING BETWEEN

26 THERE BECAUSE THE TIMING BETWEEN THERE WAS ON THE PHONE

27 CALLS, IT WAS LESS THAN 10 MINUTES.  AND SHE LIED AND SAT

28 THERE AND SAID I WAS ON THE COUCH FOR AN HOUR BEFORE THE

1    ALTERCATION -- AFTER THE ALTERCATION HAPPENED, WHICH

2    WASN'T EVEN TRUE.

3              THE COURT:  LET ME STOP YOU, MS. MALLEN.  IT'S

4    NOON, SO WE'RE GOING TO TAKE THE LUNCH RECESS.  WE'LL BE

5    IN RECESS UNTIL 1:30.

6              MS. MALLEN:  THANK YOU.

7              MR. WILLIAMS:  THANK YOU.

8                        (LUNCH RECESS.)

9                          --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  <u>SAN DIEGO, CALIFORNIA, TUESDAY, AUGUST 24, 2004, 1:30 P.M.</u>

2                              --oOo--

3           THE COURT:  PETITIONER IS PRESENT, COUNSEL ARE

4  PRESENT.

5                 MS. MALLEN, YOU WERE CROSS-EXAMINING.

6           MS. MALLEN:  THANK YOU.

7  BY MS. MALLEN:

8      Q.   WE WERE TALKING ABOUT YOUR REACTION TO THE

9  REQUEST FOR A CONTINUANCE AND YOU HAD STATED THAT YOU

10 WANTED THE CONTINUANCE BECAUSE YOU THOUGHT MR. PECKHAM

11 SHOULD TALK TO MORE PEOPLE?

12     A.   YES.

13     Q.   IS THAT PRETTY MUCH CORRECT?  OKAY.  HAD YOU

14 GIVEN HIM THE NAMES OF THE PEOPLE?

15     A.   YES.

16     Q.   AND HE HAD THOSE ALREADY?

17     A.   YES.

18     Q.   DID YOU KNOW IF HE TALKED TO THEM OR NOT?

19     A.   HE SAID HE SEEN THE POLICE INTERVIEWS, BUT HE

20 HADN'T TALKED TO THEM.

21     Q.   SO AS FAR AS YOU KNOW --

22     A.   HE SAID HE WAS GOING TO TALK TO THEM.

23     Q.   OKAY.  WOULD -- DO YOU KNOW NOW THAT HE DID TALK

24 TO THOSE WITNESSES?  WERE YOU AWARE OF THAT?

25     A.   NO.

26     Q.   DID MR. PECKHAM EVER DISCUSS WITH YOU THAT HE

27 HAD TALKED TO SEVERAL OF THE WITNESSES?

28     A.   NO, HE SAID HE TALKED TO LIKE TWO PEOPLE AND

1    THAT WAS IT.

2        Q.    OKAY.  NOW THOSE PEOPLE THAT YOU HAD LISTED WITH

3    HIM, LET ME GO THROUGH THEM.   THERE WAS A PERSON BY THE

4    NAME OF SCOTTY RUMMEL(PH), RIGHT?

5        A.    YES.

6        Q.    AND AS FAR AS YOU KNEW, YOU WANTED MR. PECKHAM

7    TO KNOW THAT WHAT HE WOULD TESTIFY TO AS FAR AS YOU KNEW,

8    IS THAT PEOPLE IN THAT APARTMENT USED DRUGS AND THAT

9    MR. RUMMEL HAD ARGUED WITH THE VICTIM, SO THAT'S WHAT YOU

10   THOUGHT WAS IMPORTANT FOR -- FOR ED PECKHAM TO KNOW?

11       A.    NO, THERE'S MORE TO IT THAN THAT.

12       Q.    DID YOU TELL MR. PECKHAM WHAT MR. RUMMEL WOULD

13   TESTIFY TO?

14       A.    YES.

15       Q.    WAS MR. RUMMEL PRESENT WHEN THIS KILLING

16   OCCURRED?

17       A.    NO.

18       Q.    WAS HE PRESENT THAT MORNING?

19       A.    YES.

20       Q.    AT THE APARTMENT?

21       A.    YES.

22       Q.    OKAY.  AND DID YOU WANT HIM TO TALK ABOUT THE

23   BACKGROUND OF THE APARTMENT OF THE PEOPLE?

24       A.    YES.

25       Q.    OKAY, NOW THERE WAS A PERSON BY THE NAME OF

26   MARTIN CORVALES, OR CRAZY AS HE'S CALLED, AND HE WAS ONE

27   OF THE PEOPLE THAT YOU ASKED MR. PECKHAM TO FOLLOW UP ON,

28   RIGHT?

1    A.   YES.

2    Q.   AND YOU, AS FAR AS YOU KNEW, HE WAS GOING TO

3  TESTIFY ABOUT THE PEOPLE AT THE APARTMENT AND WHAT THEY

4  WERE DOING THAT MORNING, RIGHT?

5    A.   YES.

6    Q.   OKAY.

7    A.   HE -- HE DECIDED NOT TO USE THAT GUY AND THAT

8  WAS ALL RIGHT BECAUSE WHAT I MAINLY NEEDED WAS FOR HIM TO

9  GET SCOTT, BECAUSE SCOTT CAN TESTIFY TO IT ALSO THAT THOSE

10  PEOPLE WERE CHASING HIM WITH WEAPONS.

11    Q.   AT A DIFFERENT TIME AND PLACE?

12    A.   YES.

13    Q.   AND THEY WERE CHASING MR. RUMMEL?

14    A.   RUMMEL.

15    Q.   OKAY.  AND THEN THERE WAS A PERSON NAMED TINA

16  THAT YOU WANTED MR. PECKHAM TO TALK TO?

17    A.   YES.

18    Q.   AND YOU WANTED HER TO BE ABLE TO TALK ABOUT

19  BUYING DRUGS FROM THE VICTIM AND SEEING THE VICTIM MAD AT

20  DIFFERENT TIMES, RIGHT?

21    A.   YES.

22    Q.   OKAY.  AND THEN THERE WAS A JOYCE ROACH; THAT'S

23  ACTUALLY THE VICTIM'S MOTHER, RIGHT?

24    A.   THE MOTHER.

25    Q.   AND YOU WANTED HER TO TALK ABOUT SELLING DRUGS

26  AND FIGHTING WITH THE VICTIM, RIGHT?

27    A.   YEAH, AND THREATENING ME.

28    Q.   OKAY, BECAUSE SHE HAD -- YOU THOUGHT -- YOU FELT

1     SHE HAD THREATENED YOU, RIGHT?

2         A.    SHE DID.

3         Q.    OKAY, AND THEN THERE WAS A TOBY SLATER, WHO WAS

4     THE MOTHER'S BOYFRIEND IN PRISON, AND YOU WANTED HIM

5     TALKED TO BECAUSE HE HAD BOUGHT DRUGS BEFORE FROM THESE

6     PEOPLE, RIGHT?

7         A.    AND HE GOT BUSTED IN THE PARKING LOT.

8         Q.    RIGHT, AT A DIFFERENT TIME AND PLACE?

9         A.    AND SHE CALLED UP THE POLICE DEPARTMENT AND SAID

10    IT WAS HERS.

11        Q.    RIGHT, OKAY.  AND THEN THERE WAS A SCOTT

12    STEPHIS(PH), WHO AGAIN WOULD HAVE TESTIFIED ABOUT BUYING

13    DRUGS OCCASIONALLY FROM THESE PEOPLE IN THIS APARTMENT?

14        A.    AND HE ALSO SEEN EDDIE COME IN AND THROW HIS MOM

15    ON THE GROUND AND STEAL FROM HER.

16        Q.    HE HAD SEEN FIGHTING IN THE PAST?

17        A.    YES.

18        Q.    OKAY.  THEN THERE WAS A PERSON NAMED JIM WHO

19    WOULD HAVE TESTIFIED BASICALLY FOR -- OR HAD INFORMATION

20    BASICALLY THAT THE VICTIM WAS MAD AT YOU AND THAT THE

21    VICTIM HAD TAKEN THINGS FROM THIS JIM AND THAT THERE

22    WAS -- THERE WAS BAD BLOOD BASICALLY BETWEEN EVERYBODY?

23        A.    YEAH.

24        Q.    OKAY.  NOW, DO YOU HAVE ANY LEGAL BACKGROUND AT

25    ALL?

26        A.    NO.

27        Q.    DID YOU SPECIFICALLY ASK MR. PECKHAM ABOUT EACH

28    OF THESE PEOPLE AND WHAT HE WAS DOING WITH THEM?

1    A.    YES.

2    Q.    AND WHAT DID HE TELL YOU?

3    A.    HE TOLD ME THAT -- OKAY, THOSE PEOPLE RIGHT

4    THERE, HE DIDN'T TELL ME MUCH ABOUT THOSE PEOPLE.

5    Q.    OKAY.

6    A.    BUT THE PEOPLE HE DID TELL ME ABOUT WERE MIKE

7    OVERDORF AND KEN KEMPY AND MARY ROSS.

8    Q.    SO HE --

9    A.    HE SAID HE WOULD GET THOSE THREE PEOPLE.

10   Q.    SO HE DISCUSSED SOME PEOPLE WITH YOU?

11   A.    YES.

12   Q.    OKAY.  NOW, WHEN YOU REFUSED THE PLEA BARGAIN

13   THAT MR. PECKHAM TOLD YOU ABOUT, HOW DID MR. PECKHAM REACT

14   TO THAT?

15   A.    HE JUST SAID, I GUESS WE'LL HAVE TO TAKE IT TO

16   TRIAL THEN.

17   Q.    OKAY.  AND HE DID THEN TAKE IT TO TRIAL, RIGHT?

18   A.    YES.

19   Q.    WAS THERE ANYTHING IN WHAT HE SAID OR HOW HE

20   ACTED THAT MADE YOU THINK THAT HE WASN'T TRYING?

21   A.    IT'S JUST EVERYTHING CAME UP SO SUDDEN.  IT WAS

22   LIKE ONE DAY HE WAS TELLING ME HE WAS GOING TO GO FIND

23   MIKE OVERDORF AND HE WAS GOING TO GO FIND MARY ROSS AND HE

24   WAS GOING TO GO FIND KEN KEMPY BECAUSE THEY WERE THERE

25   LIKE WITHIN 15 MINUTES BEFORE THIS HAPPENED, SO THAT WOULD

26   HAVE HELPED A LOT WITH THE TIMING, BECAUSE THE TIMING WAS

27   WAY OFF.  AND HE SAID HE WAS GOING TO GO FIND THEM, AND

28   THEN BOOM, THE NEXT WEEKEND HE SHOWS UP AND HE SAYS HE

·124

1    SAYS, WELL, WE'VE GOT TO TAKE THIS -- DO YOU WANT TO TAKE

2    THIS PLEA BARGAIN BECAUSE THE COURT DATE IS COMING UP

3    SOON.  IT WILL BE HERE ANY WEEK NOW AND I HAVE -- THEY

4    HAVE THIS MUCH AND WE ONLY HAVE THIS MUCH.

5        Q.   AND SO THE TIMING?

6        A.   SO HE SAID.

7        Q.   IT SEEMED --

8        A.   HE SAID WE DON'T HAVE NO TIME TO DO ANYTHING

9    ELSE EXCEPT -- IT WOULD BE BETTER IF YOU TOOK THE PLEA

10   BARGAIN BECAUSE YOU MIGHT NOT GET ANYTHING BETTER THAN

11   FIRST.

12       Q.   OKAY, AND THEN WHEN YOU TURNED HIM DOWN?

13       A.   THEN WE WENT TO TRIAL.

14       Q.   HE WENT TO TRIAL?  ALL RIGHT.  AND NONE OF THOSE

15   PEOPLE THAT YOU MENTIONED WERE THERE WHEN YOU KILLED THE

16   VICTIM, RIGHT?

17       A.   THEY WERE THERE LIKE RIGHT BEFORE.

18       Q.   THEY WEREN'T THERE AT THE TIME, THOUGH, WERE

19   THEY?

20       A.   NO, NOT EXACT TIME, BUT CLOSE TO IT.

21       Q.   OKAY.  AND THE PERSON WHO WAS THERE TESTIFIED,

22   ALLISON BROOKS, RIGHT?

23       A.   YES.

24       Q.   AND YOU ALSO REMEMBER THAT THE PEOPLE WHO MADE

25   THE TELEPHONE CALLS RIGHT BEFORE THIS OCCURRED TESTIFIED

26   AS WELL, DIDN'T THEY?  DO YOU REMEMBER THAT?

27       A.   THE PEOPLE THAT MADE THE CALLS.

28       Q.   IN OTHER WORDS --

1       A.    EDDIE IS THE ONE WHO MADE THE CALL.

2       Q.    IN OTHER WORDS, THERE WERE TELEPHONE CALLS MADE

3    AND THE PERSON WHO WAS ON THE OTHER END OF THE PHONE CAME

4    IN AND TESTIFIED AT YOUR TRIAL, DIDN'T THEY?

5       A.    YEAH.

6       Q.    OKAY, SO THEY TALKED ABOUT THE TIMING, RIGHT?

7       A.    NOBODY BROUGHT UP THE TIMING THAT WAS BETWEEN

8    THE TWO CALLS, SO THE TIMING COULD HAVE PROVED -- IF HE

9    WOULD HAVE BROUGHT IT UP, COULD HAVE PROVED THAT IT WASN'T

10   A WHOLE HOUR BETWEEN THE ALTERCATIONS BECAUSE THE

11   ALTERCATION ON ONE PHONE CALL.  AND THE ALTERCATION WAS

12   HAPPENING AS THE WITNESS SAID THAT CAME IN AND THEN THE

13   OTHER PHONE CALL WAS WITHIN 10 MINUTES LATER.  AND THE

14   ALTERCATION HAD ALREADY HAPPENED WITHIN THAT 10 MINUTES

15   LATER, SO THOSE TWO PHONE CALLS COULD PROVE THAT IT WASN'T

16   AN HOUR IN BETWEEN THE ALTERCATION, THAT IT WAS SOMETHING

17   THAT WAS GOING ON ALL AT ONCE.

18      Q.    AND YOU TESTIFIED, DIDN'T YOU?

19      A.    YES.

20      Q.    AND YOU TALKED ABOUT THE TIMING, DIDN'T YOU?

21      A.    I'M NOT SURE IF I DID OR NOT.

22      Q.    OKAY, BUT YOU HAD -- THAT WAS SOMETHING THAT

23   NOBODY TOLD YOU THAT YOU COULDN'T TALK ABOUT IT, RIGHT?

24      A.    I DON'T THINK SO.

25      Q.    YOU ANSWERED THE QUESTIONS THAT YOU WERE ASKED,

26   RIGHT?

27      A.    YES.

28      Q.    ALL RIGHT.  NOW LET ME GO OVER, DO YOU KNOW THIS

1   DR. WEISS?

2        A.   NO.

3        Q.   AND HAD YOU EVER MET HER?

4        A.   NO.

5        Q.   DID YOU EVER TALK TO HER?

6        A.   NO.

7        Q.   DO YOU KNOW ANYTHING ABOUT HER EXPERIENCE?

8        A.   I JUST KNOW THAT MY SISTER GOES TO HER AND

9   SHE'S -- IF SHE'S GOING TO HER, SHE'S PROBABLY A LICENSED

10  DOCTOR.

11       Q.   BUT YOU DON'T KNOW THAT, DO YOU?

12       A.   I DON'T KNOW FOR SURE.

13       Q.   OKAY, DO YOU KNOW ANYTHING ABOUT DR. WEISS'

14  EXPERIENCE IN THE AREA OF POSTTRAUMATIC STRESS SYNDROME?

15       A.   JUST WHAT SHE TOLD MY SISTER.

16       Q.   AND WHAT -- THAT WOULD HAVE BEEN TOLD TO YOU BY

17  YOUR SISTER, RIGHT?

18       A.   YES.

19       Q.   OKAY.  DO YOU KNOW -- YOU'RE FAMILIAR WITH

20  DR. AKRID?

21       A.   YES.

22       Q.   HE'S AN OPHTHALMOLOGIST -- OPTOMETRIST, RIGHT?

23  FITTED YOU FOR GLASSES?

24       A.   YES.

25       Q.   DID AN EYE EXAM WITH YOU?

26       A.   YES.

27       Q.   ABOUT HOW LONG WERE YOU WITH THIS DOCTOR?  AN

28  HOUR, HALF AN HOUR?

1    A.    I'VE BEEN WITH HIM -- LIKE I'VE SEEN HIM A

2    COUPLE TIMES.

3    Q.    OKAY, MORE THAN TWO?

4    A.    ABOUT TWICE, TWO OR THREE TIMES.

5    Q.    OKAY.  AND WAS THAT FOR BASICALLY EYE

6    EXAMINATIONS, NEW GLASSES?

7    A.    YES.

8    Q.    DID YOU EVER TALK TO THIS DR. AKRID ABOUT HIS

9    BACKGROUND?

10    A.    NO, BUT HE -- HE HAS HIS OWN BUSINESS AND HE HAS

11    A LICENSE AND EVERYTHING.

12    Q.    OKAY.  YOU DON'T KNOW WHETHER HE'S A MEDICAL

13    DOCTOR OR JUST A PERSON WHO FITS GLASSES, DO YOU?

14    A.    HE'S AN OPTOMETRIST.

15    Q.    OKAY.

16    A.    AND HE HAS A LADY WORKING OUT IN THE FRONT AND

17    SHE DOES -- SHE MAKES THE GLASSES AND FITS THE GLASSES.

18    Q.    DO YOU KNOW WHETHER HE KNOWS ANYTHING ABOUT

19    POSTTRAUMATIC STRESS DISORDER?

20    A.    NO, HE'S -- HE'S JUST A MEDICAL DOCTOR.

21    Q.    OKAY, HE WOULDN'T HAVE ANYTHING TO DO WITH THAT

22    THEN?

23    THE COURT:  I'M SORRY, IS HE AN OPTOMETRIST OR

24    OPHTHALMOLOGIST?

25    THE WITNESS:  I'M PRETTY SURE HE'S AN

26    OPTOMETRIST.

27    MS. MALLEN:  OKAY.

28

1     BY MS. MALLEN:

2       Q.   NOW, DID MR. PECKHAM PROMISE YOU THAT HE WOULD

3   DO ANYTHING SPECIFICALLY DURING HIS REPRESENTATION OF YOU

4   IN THIS CASE?

5       A.   HE SAID HE WOULD GO GET -- FIND MIKE OVERDORF,

6   HE WOULD FIND MARY ROSS AND HE WOULD FIND KEN KEMPY AND --

7   AND --

8       Q.   NOW --

9       A.   THAT WAS ABOUT IT.

10      Q.   MIKE OVERDORF, WAS HE AT THE APARTMENT THAT

11   MORNING?

12      A.   NO, HE WAS THERE THE NIGHT BEFORE.

13      Q.   OKAY.   AND WHAT WOULD HE HAVE CONTRIBUTED?

14      A.   OKAY, HE WAS IN THE PRISON YARD AND HE WAS

15   TALKING TO THE DECEASED'S MOTHER ON THE PHONE IN THE GYM

16   ON THE DONOVAN 3 YARD.   AND HE HAD PICTURES OF HIM AND HE

17   WAS RUNNING AROUND IN THE GYM AND HE WAS TALKING ABOUT

18   THAT BOB DEAL(PH) GUY, THEY WERE FRIENDS.

19      Q.   NOW, WERE YOU PRESENT WHEN HE WAS ON THE PHONE

20   IN THE YARD TO SOMEBODY?

21      A.   I WAS IN THE SAME GYM, BUT I MEAN, I WASN'T

22   RIGHT NEXT TO HIM WHEN HE WAS ON THE PHONE, BUT HE TOLD ME

23   HE WAS ON THE PHONE WITH THEM.

24      Q.   OKAY.   SO THIS IS SOMEBODY WHAT, KNEW SOMETHING

25   ABOUT THE JAIL INFORMANT WHO TESTIFIED, RIGHT?

26      A.   YEAH, HE WAS TALKING TO HIM.

27      Q.   ALL RIGHT.   DID YOU HAVE AN ADDRESS FOR

28   MR. OVERDORF?

1     A.   NO, I RAN INTO HIM IN JAIL NOT TOO LONG AGO AND

2   HE'S ON PAROLE, SO HE COULD BE GOTTEN A HOLD OF THROUGH

3   THE PAROLE DEPARTMENT.

4     Q.   AT THE TIME OF YOUR TRIAL, DID YOU GIVE

5   MR. PECKHAM AN ADDRESS?

6     A.   NO, HE WAS ON PAROLE; HE COULD BE FOUND THROUGH

7   AN INVESTIGATOR THROUGH THE PAROLE DEPARTMENT BECAUSE HE

8   WAS INSIDE.

9     Q.   DO YOU KNOW WHETHER MR. PECKHAM DID ANYTHING

10   WITH THE INFORMATION THAT YOU GAVE HIM ABOUT MR. OVERDORF?

11     A.   HE SAID HE WAS GOING TO, BUT I DON'T THINK HE

12   DID.

13     Q.   DID YOU ASK HIM ABOUT IT?

14     A.   YES.

15     Q.   WHAT DID HE TELL YOU?

16     A.   HE SAID THAT IT WAS TOO SOON, THAT WE WERE GOING

17   TO TRIAL SOON AND THERE WAS NOTHING THAT YOU COULD DO.

18     Q.   SO YOU TALKED TO HIM RIGHT BEFORE THE TRIAL

19   ABOUT MR. OVERDORF?

20     A.   NO, I TALKED TO HIM A COUPLE MONTHS, ABOUT A

21   MONTH BEFORE THE TRIAL.

22     Q.   OKAY, AND WHAT -- WHO IS -- MARY ROSS WAS A

23   PERSON WHO WAS AT THE APARTMENT THAT MORNING, RIGHT?

24     A.   SHE WAS THERE LIKE 15 MINUTES BEFORE THIS WHOLE

25   THING HAPPENED.

26     Q.   DO YOU KNOW WHETHER SHE WOULD HAVE BEEN HELPFUL

27   TO YOUR DEFENSE OR NOT?

28     A.   WITH HER AND KEN KEMPY, BECAUSE THEY LEFT LIKE

1   WITHIN 15 MINUTES, SO THAT WOULD PUT -- PUT THE TIMING IN

2   LINE, BECAUSE THAT EXTRA HOUR THAT SHE'S SAYING THAT I SAT

3   ON THE COUCH, I KNOW THAT'S THAT EXTRA HOUR THAT THEY WERE

4   IN THE ROOM SMOKING DOPE BEFORE IT HAPPENED.  AND SHE

5   DENIED THAT THEY WERE EVER DOING ALL OF THAT AND SHE SAID

6   THAT I WAS SITTING ON THE COUCH FOR AN HOUR WHEN -- WHEN I

7   WASN'T.  IT ALL WENT DOWN WITHIN LIKE 10 MINUTES.

8        Q.   ALL RIGHT.  SO THESE ARE PEOPLE WHO -- WHO, IN

9   GENERAL, JUST TALK ABOUT THE APARTMENT AND -- AND WHAT YOU

10  WERE DOING BEFORE THE STABBING HAPPENED, RIGHT?

11       A.   THEY WERE -- THEY WOULD CUT DOWN THE PROVOCATION

12  TIME.  IN OTHER WORDS, THEY WOULD SHOW THAT -- THAT I

13  WASN'T JUST -- THAT THE PROVOCATION HAD HAPPENED AND I SAT

14  DOWN AND COOLED OFF FOR AN HOUR AND THEN IT HAPPENED

15  AGAIN.  THEY WOULD SHOW THAT THEY JUST LEFT 15 MINUTES

16  BEFORE THAT, CAME BACK AND THEY WENT OVER TO SOMEONE'S

17  HOUSE TO GET SOMETHING AND THEY DROVE BACK.  AND WHEN THEY

18  DROVE BACK, WHICH ONLY TOOK THEM LIKE 15 OR 20 MINUTES TO

19  GO THERE AND BACK, BY THE TIME THEY GOT BACK, THEY SEEN

20  AMBULANCES THERE, SO IT WOULD SHOW THIS WHOLE ARGUMENT AND

21  THIS WHOLE THING WENT DOWN ALL IN ONE TIMING, AS TO WHERE

22  THE WITNESS SAID THAT WE GOT IN A FIGHT AND THEN I WENT

23  AND LAID ON THE COUCH FOR AN HOUR, WHICH WAS A LIE, AND --

24       Q.   WHAT ARGUMENT ARE YOU TALKING ABOUT?

25       A.   THAT -- IT'S UPON A SUDDEN QUARREL OR A HEAT OF

26  PASSION.

27       Q.   YOU'RE QUOTING YOUR INSTRUCTIONS?

28       A.   IT WAS A SUDDEN QUARREL.  IT HAPPENED WITHIN A

1  SHORT PERIOD OF TIME; THAT I WASN'T LAYING THERE FOR AN

2  HOUR AFTER WE GOT INTO AN ARGUMENT.  THAT IT ALL HAPPENED

3  IN ONE ACTION.

4      Q.   DESCRIBE TO ME THE ARGUMENT YOU'RE REFERRING TO,

5  WHAT HAPPENED?

6      A.   OKAY, FIRST THEY CAME OUT AND THEY HANDED ME A

7  PIPE.

8      Q.   WHO IS "THEY"?

9      A.   JOYCE AND ALLISON.  AND THEN I THREW IT AND THEN

10 EDDIE GOT ALL MAD.

11     Q.   DIDN'T THIS HAPPEN THE NIGHT BEFORE?

12     A.   NO.

13     Q.   IT HAPPENED THAT MORNING?

14     A.   IT HAPPENED THAT NIGHT, THIS ALL HAPPENED AT ONE

15 TIME.

16     Q.   WHEN DID THIS HAPPEN, AT WHAT TIME OF DAY?

17     A.   IT WAS LIKE ABOUT -- I DON'T KNOW, AROUND 7:30.

18     Q.   ALL RIGHT.  AND THAT'S WHEN YOU THREW THE PIPE

19 AT THE WALL?

20     A.   YES.

21     Q.   WELL, WHAT -- WHO WERE YOU ARGUING WITH?

22     A.   JOYCE AND EDDIE WERE ARGUING TOGETHER BECAUSE

23 EDDIE WAS SUPPOSED TO MOVE OUT AND EDDIE HAD STOLE SOME

24 WATCHES FROM HER.  AND THEY HANDED ME THE PIPE AND I THREW

25 IT BECAUSE THEY WERE ALL CRAZY.

26     Q.   SO YOU SAW JOYCE?

27     A.   I SAID IF THIS IS GOING TO MAKE YOU GUYS CRAZY

28 LIKE THIS, I DON'T WANT TO DO IT.  AND I THREW IT AT THE

1    WALL AND THEN THEY GOT MAD AT ME BECAUSE I BROKE THE PIPE.

2    AND SHE GOT IN MY FACE AND THEN HE SAID HE WAS GOING TO

3    CALL THIS GANG, AND HE CALLED THEM UP.  AND THEN SHE SAID

4    SHE WAS GOING TO GO OUT AND WAIT FOR THEM.  AND LIKE RIGHT

5    BEFORE THAT, MARY AND KEN WERE JUST SMOKING IN THE ROOM

6    WITH THEM AND THEY JUST LEFT BECAUSE THEY WERE GOING OVER

7    TO THIS GUY DENNIS', WHICH I FOUND OUT LATER IN COUNTY

8    JAIL WHEN I RAN INTO HIM BECAUSE HE SAID HE DROVE BACK BY.

9        Q.   LET ME STOP YOU FOR A MINUTE.  LET'S GO BACK TO

10   WHAT WE'RE TALKING ABOUT.  SO WHAT YOU'RE SAYING IS THIS

11   ARGUMENT THAT YOU HAD WITH JOYCE AND THE VICTIM HAPPENED

12   SOME TIME BEFORE THE FIRST PHONE CALL, RIGHT?

13       A.   NO, IT HAPPENED RIGHT -- YEAH, RIGHT ABOUT THE

14   FIRST PHONE CALL.

15       Q.   RIGHT ABOUT THE TIME OF THE FIRST PHONE CALL,

16   RIGHT?

17       A.   RIGHT AROUND THERE, YEAH.

18       Q.   SO THERE WAS TESTIMONY ABOUT WHEN THAT FIRST

19   PHONE CALLED HAPPENED, WASN'T THERE?

20       A.   I THINK THERE WAS JUST ONE SIDE, THOUGH.

21       Q.   OKAY.  AND THEN AFTER THE SECOND PHONE CALL, DO

22   YOU REMEMBER THE SECOND PHONE CALL?

23       A.   NO.

24       Q.   OKAY.  THEN THE STABBING TOOK PLACE AFTER THIS

25   FIRST PHONE CALL, RIGHT?

26       A.   I'M PRETTY SURE.

27       Q.   ALL RIGHT.  DID YOU -- DO YOU REMEMBER

28   MR. PECKHAM AT TRIAL?

```
 1        A.    YES.

 2        Q.    DO YOU REMEMBER THAT HE PRESENTED PAPERS TO THE

 3   COURT?

 4        A.    WHAT KIND OF PAPERS.

 5        Q.    SO YOU DON'T KNOW EXACTLY WHAT HE DID, DO YOU?

 6        A.    NO.

 7        Q.    OKAY.  BECAUSE YOU'RE NOT A LAWYER, RIGHT?

 8        A.    YES.

 9        Q.    BUT YOU SAW HIM STAND UP AND MAKE OBJECTIONS,

10   RIGHT?

11        A.    HE DIDN'T MAKE THAT MANY OBJECTIONS.

12        Q.    OKAY.  BUT YOU SAW HIM MAKE SOME, DIDN'T YOU?

13        A.    HE MIGHT HAVE.

14        Q.    ALL RIGHT.  YOU SAW HIM TALK TO THE JUDGE ABOUT

15   THINGS, DIDN'T YOU?

16        A.    YES.

17        Q.    AND HE CALLED WITNESSES FOR YOU, DIDN'T HE?

18        A.    THE ONE WITNESS THAT -- THAT CAME IN THAT WAS A

19   WITNESS THAT WAS AT THE HOUSE, HE CAME IN FOR MARNIE STEIN

20   AND HE WAS SUBPOENAED BY MARNIE STEIN.  AND THAT'S THE

21   ONLY WITNESS THAT WAS AT THAT HOUSE THAT HE CALLED AND HE

22   DIDN'T REALLY CALL THEM.  I MEAN, HE JUST SEEN THAT HE WAS

23   THERE AND THAT'S WHEN HE WENT AND TALKED TO HIM AND

24   BROUGHT HIM IN AS A WITNESS.

25        Q.    DO YOU REMEMBER HE CALLED YOUR FATHER AS A

26   WITNESS FOR YOU?

27        A.    YES.

28        Q.    DO YOU REMEMBER THAT HE ALLOWED YOU TO TESTIFY
```

```
1   AS A WITNESS FOR YOURSELF?

2        A.   THE DOCTOR?

3        Q.   NO, MR. PECKHAM ALLOWED -- HAD YOU --

4        A.   YES.

5        Q.   AND HE HAD THE DOCTOR TESTIFY AS WELL?

6        A.   YES.

7        Q.   AND HE HAD JOSHUA ROBERTS TESTIFY AS WELL AND HE

8   HAD THE TOXICOLOGIST INFORMATION AS WELL?

9        A.   YES.

10       Q.   OKAY.  NOW THE KILLING, WHEN THE VICTIM WAS

11  KILLED, YOU'VE TESTIFIED THAT YOU THOUGHT THAT YOU WERE

12  BEING THREATENED BY THE VICTIM, RIGHT?  IS THAT A YES?

13       A.   YES.

14       Q.   AND YOU THOUGHT THAT YOU NEEDED TO PROTECT

15  YOURSELF, RIGHT?

16       A.   YES.

17       Q.   FROM THIS VICTIM AND WHATEVER HE WAS HOLDING,

18  RIGHT?

19       A.   YES.

20       Q.   AND YOU ACTED BASED ON A DESIRE TO STOP THIS

21  PERSON, RIGHT?

22       A.   YES.

23       Q.   OKAY.  YOU THOUGHT THAT THE VICTIM WAS MOVING

24  TOWARDS YOU AND YOU NEEDED TO MOVE TO STOP HIM?

25       A.   YES.

26       Q.   AND YOU WERE AFRAID OF THIS PARTICULAR VICTIM

27  AND WHAT -- WHAT HE MIGHT DO?

28       A.   YES.
```

1    Q.   NOW YOU HAD THE CHANCE TO TESTIFY IN THIS TRIAL,

2    RIGHT?

3    A.   YES.

4    Q.   YOU HAD THE CHANCE TO TALK ABOUT THE THINGS THAT

5    YOU THOUGHT WERE IMPORTANT?

6    A.   I DIDN'T HAVE A CHANCE TO TALK ABOUT EVERYTHING.

7    Q.   YOU TALKED ABOUT WHATEVER THE JUDGE WOULD LET

8    YOU TALK ABOUT, RIGHT?

9    A.   BECAUSE I WAS CUT OFF AS SOON AS I WAS TALKING

10   ABOUT THE ENVIRONMENT AROUND THERE AND I WAS TALKING ABOUT

11   WHAT WAS GOING ON WITH THEM WIELDING KNIVES AND STUFF LIKE

12   THAT.

13   Q.   AND THE JUDGE CUT YOU OFF, DIDN'T HE?

14   A.   THE JUDGE AND THE -- AND THE D.A. CUT ME OFF AND

15   THE JUDGE CUT ME OFF, BUT NOBODY CHALLENGED IT OR OBJECTED

16   TO IT.

17   Q.   OKAY.  AND SOME OF THE THINGS THAT YOU'VE TOLD

18   US HERE IN COURT TODAY, YOU HAD A CHANCE OR THEY'RE THE

19   SAME THINGS THAT YOU TOLD THE JURY, RIGHT?

20   A.   I GOT TO SAY MORE HERE THAN I DID THERE BECAUSE

21   I WAS CUT OFF ALL THE TIME, NOBODY OBJECTED, SO A LOT OF

22   STUFF I DIDN'T GET TO SAY THAT I'VE BEEN ABLE TO SAY HERE.

23   Q.   BUT BASICALLY YOU'RE NOT CHANGING ANYTHING THAT

24   YOU SAID THE FIRST TIME HERE, ARE YOU?  YOU'RE JUST

25   EXPANDING ON IT MORE, YOU'RE EXPLAINING?

26   A.   IT'S NOT REALLY THAT I'M TRYING TO CHANGE

27   ANYTHING, I'M TRYING TO EXPLAIN WHAT I WASN'T ALLOWED TO

28   EXPLAIN AND I EXPLAINED MORE OF WHAT I WASN'T ALLOWED TO

```
 1   EXPLAIN BECAUSE I WAS CUT OFF.

 2              MS. MALLEN:  OKAY.  THANK YOU.  NOTHING FURTHER.

 3              THE COURT:  MR. WILLIAMS?

 4              MR. WILLIAMS:  THANK YOU.

 5

 6                       REDIRECT EXAMINATION

 7   BY MR. WILLIAMS:

 8        Q.   WHEN YOU SAID YOU WERE CUT OFF TALKING ABOUT

 9   CERTAIN THINGS, WHAT CERTAIN THINGS WERE YOU CUT OFF

10   TALKING ABOUT?

11        A.   OKAY, I WAS ASKED ABOUT THE ENVIRONMENT IN THE

12   APARTMENT.

13        Q.   OKAY.

14        A.   AND I WAS GOING TO TALK -- START TO TELL THEM

15   ABOUT HOW THE MOTHER AND THE SON WERE CHASING EACH OTHER

16   WITH BUTCHER KNIVES AND THROWING PHONES AND GLASSES AND

17   BOTTLES AT EACH OTHER.

18        Q.   OKAY.

19        A.   AND AS SOON AS I WENT TO TALK ABOUT THAT, IT'S

20   IN THE TRIAL TRANSCRIPT, THAT'S WHEN I WAS CUT OFF AND I

21   COULDN'T SAY ANYTHING ABOUT IT.

22        Q.   WERE YOU ALLOWED TO TALK ABOUT YOUR MENTAL

23   STATE?  DO YOU UNDERSTAND MY QUESTION?

24        A.   YES, AND THEN THAT -- FROM THERE I WAS GOING TO

25   TALK ABOUT HOW IT AFFECTED ME MENTALLY.

26        Q.   WERE YOU ALLUDED TO THAT?

27        A.   NO.

28        Q.   AND WHY DID YOU THROW THE PIPE?
```

1    A.    OH, BECAUSE THEY WERE FIGHTING WITH EACH OTHER

2    AFTER THEY CAME OUT OF THE ROOM AND THEY WANTED ME TO

3    SMOKE SOME.  AND I LOOKED AT THEM FIGHTING AND I GOT REAL

4    NERVOUS BECAUSE I DIDN'T WANT TO BE DOING ANYTHING WITH

5    THEM FIGHTING THE WAY THEY FIGHT WITH EACH OTHER BECAUSE

6    THEY ALWAYS THROW THINGS.

7    Q.    YOU DIDN'T WANT --

8    A.    I LOOKED AT THEM AND I SAID IF IT'S GOING TO

9    MAKE YOU GUYS LIKE THIS, IT'S NOT GOING TO BE NO FUN, AND

10   I THREW THE PIPE.

11   Q.    OKAY.  NOW YOU TALKED ABOUT GETTING A

12   CONTINUANCE.  DID YOU EVER ASK MR. PECKHAM -- YOU ASKED

13   HIM FOR A CONTINUANCE TO GET A CONTINUANCE, BUT THAT WAS

14   TO FIND MORE WITNESSES, CORRECT?

15   A.    YES.

16   Q.    DID YOU EVER ASK HIM TO GET A CONTINUANCE TO

17   HAVE YOU EVALUATED?

18   A.    I ASKED HIM -- I ASKED HIM NOT THROUGH THE

19   CONTINUANCE OR EVALUATION, BUT I ASKED HIM IF WE SHOULD

20   GET A PSYCH. BECAUSE I THOUGHT I NEEDED ONE AND HE SAID --

21   HE SAID, NO, WE DON'T NEED ONE.

22   Q.    OKAY.  NOW THE PAPERS THAT YOU HAD UP THERE AND

23   I'VE GOT THEM, THEY'RE RIGHT HERE IN THIS ENVELOPE IN

24   FRONT OF ME, SOME OF THOSE ARE LETTERS THAT YOU'VE WRITTEN

25   TO ME, CORRECT, OR THINGS YOU'VE WRITTEN FOR ME?

26   A.    JUST THINGS THAT I WROTE DOWN.

27   Q.    TO GIVE TO ME?

28   A.    YES.

1      Q.   AND SOME OF THEM ARE WHAT, XEROXED CASES?

2      A.   CASE LAW.

3      Q.   AND OBVIOUSLY THE PLEADINGS IN THIS CASE, RIGHT?

4      A.   YES.

5      Q.   OKAY, AND YOU'VE REVIEWED ALL THAT BEFORE YOU

6  CAME INTO COURT?

7      A.   YES, I -- I'M READING THEM.

8           MR. WILLIAMS:. NOTHING FURTHER.

9           THE COURT:  MS. MALLEN?

10          MS. MALLEN:  NO FURTHER QUESTIONS, THANK YOU.

11          THE COURT:  OKAY.  STEP DOWN.  YOU'LL BE

12  ESCORTED BACK --

13          MR. WILLIAMS:  YOU KNOW WHAT, WHY DON'T I ASK

14  HIM ONE QUESTION, COULD I PLEASE, YOUR HONOR?

15          THE COURT:  SURE.

16  BY MR. WILLIAMS:

17     Q.   MR. LITTLE, ACTUALLY IT'S GOING TO BE SEVERAL

18  QUESTIONS.  WHILE YOU WERE IN STATE PRISON, AWAITING

19  THIS -- THE FILING OF PAPERS AND HEARING ON A WRIT, I SENT

20  YOU SOME PLEADINGS, CORRECT?  PIECES OF PAPER FOR YOU TO

21  SIGN?

22     A.   YES.

23     Q.   ONE OF THEM IS WAIVER OF ATTORNEY/CLIENT

24  PRIVILEGE BETWEEN YOU AND MR. PECKHAM, CORRECT?

25     A.   YES.

26     Q.   AND YOU SIGNED THAT AND HAD IT WITNESSED, RIGHT?

27     A.   YES.

28     Q.   AND THEN LATER ON WHEN YOU FINALLY GOT HERE IN

1    FEBRUARY OF 2004, I HAD YOU SIGN ANOTHER ONE, RIGHT?

2         A.    YES.

3         Q.    YOU'RE STILL WAIVING THAT PRIVILEGE SO

4    MR. PECKHAM CAN TESTIFY ON YOUR CASE?

5         A.    YES.

6              MR. WILLIAMS:  THANK YOU.  I JUST WANTED TO GET

7    THAT IN THE RECORD.

8                   DO YOU WANT ME TO FILE THESE, YOUR HONOR?

9              THE COURT:  YES.

10             MR. WILLIAMS:  THAT'S WHY I WAS --

11             THE COURT:  IT IS WAIVED BY THE FILING OF THE

12   WRIT, BUT LET'S JUST BE VERY CAUTIOUS ABOUT THAT.

13                   IS THAT IT?

14             MR. WILLIAMS:  THAT'S IT.

15             THE COURT:  MS. MALLEN, ANYTHING FURTHER?

16             MS. MALLEN:  NOTHING FURTHER, YOUR HONOR.  THANK

17   YOU.

18             MR. WILLIAMS:  MY NEXT WITNESS IS DR. ABRAMS AND

19   OBVIOUSLY MS. MALLEN DOESN'T WANT TO CALL MR. PECKHAM

20   UNTIL DR. ABRAMS TESTIFIES.

21             THE COURT:  OKAY, SO THAT'S TOMORROW AT

22   9:00 O'CLOCK?

23             MR. WILLIAMS:  YES, SIR.  I CONFIRMED IT AT NOON

24   AND I'LL CONFIRM IT AGAIN TONIGHT.

25             THE COURT:  ALL RIGHT, WE'RE IN RECESS UNTIL

26   9:00 A.M.  THANK YOU.

27             MS. MALLEN:  THANK YOU.

28             MR. WILLIAMS:  THANK YOU.

APPENDIX No. 1

# EXHIBIT    L

228

<u>EL CAJON, CALIFORNIA, AUGUST 25, 2004, 1:30 P.M.</u>

2                              --oOo--

3              THE COURT:  THE PARTIES AND ATTORNEYS ARE

4    PRESENT.

5                   MS. MALLEN, YOU MAY PRESENT YOUR FIRST

6    WITNESS.

7              MS. MALLEN:  THANK YOU.  WE WOULD CALL

8    MR. PECKHAM TO THE STAND.

9

10                    **EDWARD JOHN PECKHAM,**

11   CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, HAVING

12   BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

13

14             THE CLERK:  TAKE THE STAND, PLEASE.

15

16                   **DIRECT EXAMINATION**

17   BY MS. MALLEN:

18        Q.   PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

19   NAME.

20        A.   MY FULL NAME IS EDWARD JOHN PECKHAM.  LAST NAME

21   IS SPELLED P-E-C-K-H-A-M.

22        Q.   HOW ARE YOU CURRENTLY EMPLOYED?

23        A.   I'M EMPLOYED -- I'M SELF-EMPLOYED ACTUALLY BY

24   THE LAW OFFICES OF EDWARD J. PECKHAM.

25        Q.   DOES THAT MEAN YOU'RE A LAWYER?

26        A.   I'M A LAWYER.

27        Q.   AND APPROXIMATELY HOW LONG HAVE YOU PRACTICED

28   LAW?

**EXHIBIT L**

228

1     <u>**EL CAJON, CALIFORNIA, AUGUST 25, 2004, 1:30 P.M.**</u>

2                   --000--

3         THE COURT:  THE PARTIES AND ATTORNEYS ARE

4 PRESENT.

5            MS. MALLEN, YOU MAY PRESENT YOUR FIRST

6 WITNESS.

7         MS. MALLEN:  THANK YOU.  WE WOULD CALL

8 MR. PECKHAM TO THE STAND.

9

10                **EDWARD JOHN PECKHAM,**

11 CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, HAVING

12 BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

13

14         THE CLERK:  TAKE THE STAND, PLEASE.

15

16                **DIRECT EXAMINATION**

17 BY MS. MALLEN:

18     Q.    PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

19 NAME.

20     A.    MY FULL NAME IS EDWARD JOHN PECKHAM.  LAST NAME

21 IS SPELLED P-E-C-K-H-A-M.

22     Q.    HOW ARE YOU CURRENTLY EMPLOYED?

23     A.    I'M EMPLOYED -- I'M SELF-EMPLOYED ACTUALLY BY

24 THE LAW OFFICES OF EDWARD J. PECKHAM.

25     Q.    DOES THAT MEAN YOU'RE A LAWYER?

26     A.    I'M A LAWYER.

27     Q.    AND APPROXIMATELY HOW LONG HAVE YOU PRACTICED

28 LAW?

229

1    A.    I PASSED THE BAR IN 1979, AND SO ABOUT COMING UP

2    ON 25 YEARS THIS FALL.

3    Q.    HAVE YOU HANDLED -- WELL, LET ME ASK YOU FIRST:

4    DO YOU RECOGNIZE THE PERSON IN COURT SEATED TO MY RIGHT

5    WEARING GREEN BY THE NAME OF MR. LITTLE?

6    A.    YES, I DO.

7    Q.    DID YOU REPRESENT MR. LITTLE?

8    A.    YES, I DID.

9    Q.    HAVE YOU HANDLED MURDER CASES OTHER THAN THE ONE

10   FOR MR. LITTLE?

11   A.    I HANDLED ONE MURDER CASE PRIOR TO MR. LITTLE'S,

12   AND I HANDLED TWO HOMICIDE CASES PRIOR TO THIS CASE, BOTH

13   OF WHICH WERE VEHICULAR HOMICIDE.  ONE WAS CHARGED AS A

14   MURDER, BUT SETTLED AS A MANSLAUGHTER.

15   Q.    HAVE YOU HANDLED OTHER CASES INVOLVING DEATHS?

16   A.    YES.  I HANDLED A WRONGFUL DEATH CASE IN FEDERAL

17   COURT; I THINK IT WAS PRIOR TO MR. LITTLE'S CASE.  IT WAS

18   A CIVIL CASE IN WHICH A CLIENT WAS KILLED BY A CUSTOMS

19   AGENT, IN WHAT THEY THOUGHT WAS A PROSTITUTION/RAPE CASE.

20   Q.    HAVE YOU HANDLED OTHER CRIMINAL CASES?

21   A.    YES.

22   Q.    AND HOW LONG HAVE YOU BEEN PRACTICING CRIMINAL

23   LAW?

24   A.    I STARTED PRACTICING CRIMINAL LAW IN THE EARLY

25   '80'S WITH TWO LAW PARTNERS.  THE THREE OF US HAD A

26   MISDEMEANOR CONTRACT WITH THE COUNTY OF SAN DIEGO AND WE

27   DID CRIMINAL INDIGENT WORK ON THAT CONTRACT FOR ABOUT FIVE

28   YEARS.  THEN ONE OF THE PARTNERS LEFT AND WE PICKED UP

1   ANOTHER PARTNER AND GOT ANOTHER CONTRACT FOR CLASS -- WHAT

2   THEY CALL CLASS 3 FELONIES, AND WITH THE COUNTY OF

3   SAN DIEGO, WHICH WE DID IN VOLUME.  AND I'M THINKING FOR

4   ANOTHER FIVE TO SEVEN YEARS, I'M NOT EXACTLY SURE OF THE

5   DATES, BUT IN 19 -- ABOUT '88 I WENT OFF -- NO, 19 -- IT

6   WAS ABOUT 1988, I THINK, I WENT OFF ON MY OWN.  ACTUALLY,

7   I WENT TO WORK FOR A SMALL CIVIL LAW FIRM FOR A SHORT

8   PERIOD OF TIME.  AND IN ABOUT 1990 I WENT BACK OUT

9   PRACTICING AS A SOLE PRACTITIONER, DOING PRIMARILY

10  CRIMINAL LAW, BUT A FAIR AMOUNT OF CIVIL LAW AS WELL.

11      Q.    APPROXIMATELY HOW MANY TRIALS, CRIMINAL TRIALS

12  WOULD YOU SAY YOU'VE DONE?

13      A.    THE LAST COUNT, SEVERAL YEARS AGO I HAD WELL

14  OVER 100 CRIMINAL JURY TRIALS.

15      Q.    DO YOU ATTEND TRAINING IN THE AREA OF CRIMINAL

16  LEGAL DEFENSE?

17      A.    YES.

18      Q.    AND DO YOU DO THAT ON A REGULAR BASIS?

19      A.    YES.  AS A PART OF OUR CONTRACT WITH THE PRIVATE

20  CONFLICTS COUNSEL, WE ARE REQUIRED TO ATTEND A MINIMUM OF

21  12 HOURS OF LEGAL TRAINING WITH AN EMPHASIS IN CRIMINAL

22  LAW EVERY YEAR.  AND I OFTEN GET OTHER TRAINING AS WELL

23  THAT'S NOT RELATED TO THE CRIMINAL PRACTICE.

24      Q.    HAVE YOU RECEIVED TRAINING IN THE AREA OF --

25  WELL, LET ME REPHRASE THAT.  DO YOU BELONG TO THE LOCAL

26  BAR ASSOCIATION?

27      A.    YES.  I BELONG TO THE COUNTY BAR OF SAN DIEGO.

28      Q.    AND DO YOU BELONG TO THE STATE BAR ASSOCIATION

1   AS WELL?

2       A.   YES.   I'M A MEMBER OF THE STATE BAR AS WELL.

3       Q.   YOU MENTIONED THAT YOU WORK FOR THE CONFLICTS

4   PANEL?

5       A.   YES.   THERE IS A ORGANIZATION OF ATTORNEYS WHO

6   APPLY FOR AND ARE APPOINTED UNDER PRIVATE CONFLICTS.   IT'S

7   A THIRD LEVEL APPOINTMENT AFTER THE PUBLIC DEFENDER, AND

8   THEN YOU HAVE ALTERNATE PUBLIC DEFENDER, AND THEN CASES

9   WHICH ARE EITHER CONFLICTED WITH ONE OF THOSE TWO

10  ORGANIZATIONS.   OR IF THERE'S MULTIPLE DEFENDANTS, THEY

11  WILL THEN GO OUT TO PRIVATE CONFLICTS.   YOU HAVE TO

12  QUALIFY AS A CLASS IN PRIVATE CONFLICTS OR UP TO A CLASS,

13  THEY HAVE SIX CLASSES, CLASS SIX BEING DEATH PENALTY

14  CASES.   CLASS 5 IS EVERYTHING BELOW THAT.   CLASS 4 IS

15  CERTAIN VIOLENT FELONIES.   3, ET CETERA, TO LESSER

16  FELONIES.

17      Q.   AND WHAT CLASS ARE YOU QUALIFIED?

18      A.   I'M QUALIFIED AS A CLASS 5 LAWYER.   I'VE NEVER

19  APPLIED FOR A CLASS 6; I JUST DON'T CARE TO DO THOSE

20  CASES.

21      Q.   WERE YOU APPOINTED TO REPRESENT MR. LITTLE AS

22  PART OF YOUR WORK WITH THE PRIVATE CONFLICTS PANEL?

23      A.   YES, I WAS.

24      Q.   NOW, HAVE ANY OF THE CASES THAT YOU'VE BEEN

25  INVOLVED IN UP TO THE POINT WHERE YOU WERE APPOINTED TO

26  WORK WITH MR. LITTLE, DID ANY OF THEM INVOLVE

27  POSTTRAUMATIC STRESS DISORDER?

28      A.   I HAD A CIVIL CASE THAT DID INVOLVE A CLIENT WHO

1    WAS BEATEN BY WHAT HE CLAIMED TO BE HIGHWAY PATROL

2    OFFICERS, AFTER THEY DETAINED HIM ON A DRUNK DRIVING.  AND

3    HE CLAIMED THAT HE WAS SUFFERING FROM POSTTRAUMATIC STRESS

4    SYNDROME.

5         Q.   AS PART OF THAT CIVIL CASE, DID YOU CONSULT WITH

6    EXPERTS IN THAT AREA?

7         A.   YES.

8         Q.   DID YOU DO RESEARCH IN THAT AREA?

9         A.   YES.

10        Q.   DID YOU INTERVIEW THE CLIENT ON THAT ISSUE?

11        A.   YES.

12        Q.   AND DID YOU SEND THE CLIENT FOR FURTHER

13   EVALUATION?

14        A.   YES.

15        Q.   DID YOU REVIEW THE EVALUATION DOCUMENTS THAT

16   WERE RETURNED?

17        A.   YES.

18        Q.   ARE YOU AWARE OF VARIOUS PSYCHOLOGICAL DEFENSES

19   AS THEY MIGHT PERTAIN TO CRIMINAL DEFENSE AND CIVIL CASES?

20        A.   YES.  IN THE CIVIL CASE, IT WAS MORE OF A CLAIM

21   FOR DAMAGES BECAUSE HE WAS SUFFERING AS A RESULT OF THE

22   BEATING IN HIS PERSONAL LIFE WITH RECURRING NIGHTMARES AND

23   RELIVING THE SITUATION.  AND HE WAS ALSO FEARFUL OF

24   CERTAIN SITUATIONS THAT OCCURRED INVOLVING POLICE

25   OFFICERS.  AND ALL THOSE WERE APPARENT.  AND, OF COURSE,

26   WE DISCUSSED THOSE AS FAR AS CRIMINAL DEFENSE GOES.  THEN,

27   OF COURSE, YOU KIND OF TAKE THE OTHER SIDE.  YOU LOOK AT

28   IT AS A POTENTIAL DEFENSE TO A -- AS THE DOCTOR WAS

1    POINTING OUT TODAY, HIS STATE OF MIND, OR MENS REA.

2        Q.    AND DO YOU HAVE A PARTICULAR INTEREST IN THE

3    AREA OF PSYCHOLOGY?

4        A.    WELL, ACTUALLY, I WAS -- I WAS AT ONE TIME

5    MARRIED TO A WOMAN THAT I PUT THROUGH MEDICAL SCHOOL AND

6    SHE BECAME A PSYCHIATRIST.  AND IT WAS CONCURRENTLY WITH

7    THAT PERIOD WHEN SHE WAS IN TRAINING, AND THEN WHEN SHE

8    OPENED HER -- HER MEDICAL OFFICE THAT I WAS DOING A FAIR

9    AMOUNT OF WORK IN THE COUNTY ON APPOINTMENT TO REPRESENT

10   PERSONS THAT WERE SUBJECT TO CONSERVATORSHIP.  THEY HAD TO

11   HAVE A LAWYER APPOINTED, SO I GOT AN OPPORTUNITY TO TRAVEL

12   AROUND TO MANY OF THE MENTAL INSTITUTIONS AND HOSPITALS

13   AND BOARD AND CARE HOMES IN SAN DIEGO, TALKED TO PATIENTS,

14   REVIEWED MEDICAL AND PSYCHIATRIC RECORDS, SO I DEVELOPED

15   QUITE AN INTEREST IN IT AT THE TIME.

16       Q.    AND ABOUT HOW LONG DID YOU DO COUNTY WORK IN

17   CONJUNCTION WITH CONSERVATORSHIPS?

18       A.    I THINK I DID THAT FOR ABOUT TWO OR THREE YEARS.

19   THEY PAID SO POORLY, AND THE WORK THAT YOU HAD TO DO WITH

20   IT WAS QUITE EXTENSIVE.  SO IT DIDN'T REALLY PAY OFF TOO

21   WELL.

22       Q.    BUT DURING THAT TIME PERIOD, YOU BECAME FAMILIAR

23   WITH VARIOUS MEDICAL RECORDS?

24       A.    YES.

25       Q.    YOU BECAME FAMILIAR WITH VARIOUS DOCTOR'S

26   REPORTS?

27       A.    YES.

28       Q.    AND YOU TALKED TO VARIOUS PEOPLE CONCERNING

1    PSYCHOLOGICAL ISSUES?

2    A.    MANY CASES INVOLVED, OF COURSE, PSYCHOLOGICAL

3    ISSUES THAT WERE DEBILITATING TO THE CLIENT THAT WAS IN

4    ESSENCE CAUSING THEM TO BE PLACED ON A CONSERVATORSHIP.

5    THEIR PSYCHOLOGICAL DISEASE WAS SO BAD THAT THEY COULDN'T

6    FUNCTION, THEY COULDN'T PROVIDE FOR THEIR OWN FOOD,

7    CLOTHING, OR SHELTER, SO THEY WERE PLACED ON A

8    CONSERVATORSHIP.

9    Q.    DID THE ISSUE EVER ARISE WHERE THERE WAS A

10   QUESTION ABOUT WHETHER A CONSERVATORSHIP WAS CALLED FOR OR

11   NOT BASED ON PSYCHOLOGICAL PROBLEMS?

12   A.    YES.

13   Q.    AND DID YOU HAVE TO EVALUATE OR OBTAIN

14   INFORMATION TO EVALUATE WHETHER A PERSON WAS -- HAD

15   PSYCHIATRIC PROBLEMS THAT WOULD COMPROMISE THEM THAT MUCH?

16   A.    YES.    AND I TRIED CASES IN FRONT OF JURIES ON

17   PSYCHOLOGICAL ISSUES WHERE THE CLIENT WAS CLAIMING THAT HE

18   OR SHE WAS COMPETENT TO TAKE CARE OF HIS OWN NEEDS AND A

19   PUBLIC CONSERVATOR WAS TRYING TO PLACE THE PERSON ON A

20   CONSERVATORSHIP.    SO THOSE ISSUES WERE PRESENTED IN TRIAL,

21   EXPERTS WERE CALLED TO TESTIFY.    AND SO I WAS FAMILIAR

22   WITH THEM AND HAD -- HAD BEEN INVOLVED IN PSYCHIATRIC

23   ISSUES QUITE A LOT.

24   Q.    THANK YOU.    NOW, WHEN YOU BECAME INVOLVED WITH

25   MR. LITTLE'S CASE, THE DEFENDANT, WAS THAT BECAUSE YOU

26   WERE APPOINTED TO REPRESENT HIM FOR ALL PURPOSES IN THE

27   CRIMINAL CASE INVOLVING A STABBING THAT OCCURRED WITH A

28   MR. RABITOR?

1     A.   THAT'S CORRECT, YES.

2     Q.   NOW, DID YOU HAVE A CONVERSATION WITH THE

3  DEFENDANT?

4     A.   I DID.  MANY CONVERSATIONS WITH HIM.

5     Q.   DID HE MAKE YOU AWARE THAT HE WAS -- HE HAD A

6  LOSS OF AN EYE?

7     A.   YES.

8     Q.   DID HE TELL YOU HOW THAT OCCURRED?

9     A.   YES, HE DID.

10    Q.   DID HE TELL YOU THAT HE HAD BEEN STABBED IN THE

11  EYE IN 1993 OR '94?

12    A.   YES.

13    Q.   DID YOU DISCUSS THIS WITH THE DEFENDANT?

14    A.   I DID.

15    Q.   AND DID YOU INVESTIGATE THAT LOSS OF THE EYE ANY

16  FURTHER, THAN DISCUSSIONS WITH THE DEFENDANT?

17    A.   WELL, I TALKED TO HIS FAMILY MEMBERS AND THEY

18  CONFIRMED THAT THAT INCIDENT HAD OCCURRED.  HE DID HAVE A

19  LOT OF DETAILS ABOUT IT.  AND HE INDICATED THAT THERE WAS

20  A CRIMINAL CASE AND HE WAS INVOLVED IN THAT.  AND SO BASED

21  UPON THAT, I WOULDN'T DO ANY EXTENSIVE INVESTIGATION TO

22  CONFIRM THAT HE LOST HIS EYE THAT WAY, NO.

23    Q.   BUT YOU DID TALK TO HIS FAMILY?

24    A.   YES.

25    Q.   TALKED TO HIS FATHER?

26    A.   YES.

27    Q.   AND WAS HIS FATHER ABLE TO CONFIRM A VISIT TO A

28  HOSPITAL, ET CETERA?

1    A.   YES.

2    Q.   DID YOU TALK TO MR. LITTLE ABOUT TREATMENT THAT

3    HE RECEIVED, MEDICAL TREATMENT FIRST OF ALL, IN RELATION

4    TO THE LOSS OF THE EYE?

5    A.   ONLY AS IT RELATED TO THE CRIMINAL CASE THAT HE

6    WENT TO THE HOSPITAL.  HIS EYE HAD BEEN DAMAGED BEYOND

7    REPAIR, AND THEY REMOVED IT.  AND THE FACTS THAT

8    SURROUNDED IT.  WE DISCUSSED THAT, AS HE TESTIFIED IN

9    COURT, I THINK IT WAS YESTERDAY, THAT HE HAD BEEN STABBED

10   BY THIS PROSTITUTE AND --

11   Q.   DID HE TELL YOU BASICALLY THE SAME THINGS THAT

12   HE TOLD THE COURT HERE TODAY?

13   A.   YES.

14   Q.   AND YOU WERE PRESENT AND HEARD HIM TESTIFY IN

15   COURT?

16   A.   YES.  I ACTUALLY DIDN'T LEARN ANYTHING NEW,

17   EXCEPT I THINK HE SAID THEY WERE OUTSIDE PACERS, AND I'M

18   NOT SURE THAT I KNEW THAT.

19   Q.   OKAY.  NOW, WHEN YOU HEARD FROM MR. LITTLE ABOUT

20   THE EYE, DID THAT RAISE ANY KIND OF A FLAG FOR YOU IN

21   TERMS OF A PSYCHOLOGICAL CONCERN?

22   A.   YES.

23   Q.   TELL US ABOUT THAT.

24   A.   WELL, I RECOGNIZE THIS IS A VERY TRAUMATIC EVENT

25   THAT HE HAD SUSTAINED, AND I WANTED TO DEVELOP FURTHER

26   INFORMATION ABOUT IT.  SO AFTER I LEARNED ABOUT IT, I

27   STARTED ASKING HIM QUESTIONS THAT WOULD HELP US IN THE

28   DEFENSE OF HIS CASE, BECAUSE HE WAS INVOLVED IN A

1    STABBING.  SO I IMMEDIATELY SAW THAT THERE WOULD BE A --

2    POTENTIALLY A BIG CONNECTION WITH THE TWO EVENTS.

3        Q.    AND ARE YOU FAMILIAR WITH FULL SYNDROME

4    POSTTRAUMATIC STRESS DISORDER?

5        A.    YES.

6        Q.    HAVE YOU EVER HEARD OF OR HAVE ANY INFORMATION

7    ABOUT PARTIAL SYNDROME, POSTTRAUMATIC STRESS DISORDER?

8        A.    NO.  THAT WAS THE FIRST I HEARD ABOUT IT WAS

9    THIS MORNING.

10       Q.    AND HAVE YOU -- YOU MENTIONED THAT YOU'VE

11   HANDLED A CIVIL CASE WITH POSTTRAUMATIC STRESS DISORDER.

12   IN RELATION TO THAT, YOU MENTIONED TO TALKING TO

13   SPECIALISTS.  AND DURING THAT CIVIL CASE, DID YOU RESEARCH

14   VARIOUS ISSUES IN P.T.S.D.?

15       A.    WELL, I BECAME QUITE FAMILIAR WITH POSTTRAUMATIC

16   STRESS SYNDROME, BOTH READING DSM-4 AND ALSO DISCUSSING

17   THE SYNDROME WITH MY EXPERT WITNESS HAKLESH CARION.  I MET

18   WITH HIM ON SEVERAL OCCASIONS, SPOKE WITH HIM ON THE PHONE

19   AND THEN BROUGHT MY CLIENT TO HIS OFFICE TO BE EVALUATED,

20   AND THEN HAD DISCUSSIONS WITH HIM AFTER THE EVALUATION WAS

21   COMPLETED.

22       Q.    IN THIS CASE, WHAT DID YOU -- CAN YOU DESCRIBE

23   FOR US SOME OF YOUR EFFORTS TO EVALUATE WHETHER IT EXISTED

24   OR NOT WITH MR. LITTLE?

25       A.    YES.

26       Q.    DID YOU TALK TO THE DEFENDANT?

27       A.    YES.

28       Q.    AND DID YOU GET DETAILS WITH THE EYE INJURY FROM

1    HIM AS MUCH AS POSSIBLE?

2        A.    YES.

3        Q.    DID YOU LOOK TO SEE WHETHER THERE WAS ANY

4    OTHER -- ANY INDICATORS THAT WOULD SUGGEST POSTTRAUMATIC

5    STRESS DISORDER EXISTED?

6        A.    WELL, THAT'S EXACTLY WHAT I WAS LOOKING FOR,

7    WERE SOMETHING THAT MIGHT ASSIST US IN HIS DEFENSE IN THIS

8    CASE.    SO I STARTED ASKING LARRY -- EXCUSE ME, MR. LITTLE

9    WHETHER OR NOT THIS EVENT, THIS STABBING IN HIS FACE

10   CAUSED HIM TO HAVE ANY KIND OF NIGHTMARES, IF HE HAD

11   FLASHBACKS, IF HE HAD FEARS ABOUT BEING IN PLACES, OR WAS

12   HE AFRAID OF PEOPLE OR ANYTHING LIKE THAT THAT -- THAT WE

13   COULD ATTRIBUTE TO HIS REACTION IN THIS CASE.    AND HE

14   CONSISTENTLY INDICATED TO ME THAT HE HAD NO FEARS; THAT HE

15   DIDN'T HAVE ANY NIGHTMARES.    THAT THERE WASN'T ANYTHING

16   ABOUT WHAT HAPPENED BACK THEN THAT HAD ANYTHING TO DO WITH

17   WHAT WENT ON WITH MR. RABITOR.

18              I SPECIFICALLY RECALL HAVING A CONVERSATION

19   WITH HIM WHERE WE WERE REVIEWING PHOTOGRAPHS, AND WE

20   NOTICED THAT MR. RABITOR -- HIS BODY WAS LYING ON THE

21   LIVING ROOM.    AND WHEN THEY REMOVED IT, THERE WERE OTHER

22   PHOTOGRAPHS OF BLOOD STAINS, ET CETERA, IN THE AREA.    AND

23   I NOTICED THAT THERE WAS A KNIFE LYING ON THE FLOOR, WHICH

24   APPARENTLY HAD BEEN HIDDEN BY MR. RABITOR'S BODY.    AND I

25   PRACTICALLY JUMPED OUT OF MY SKIN WHEN I SAW THAT.    AND I

26   ASKED MR. LITTLE IF HE WAS ATTACKED OR THOUGHT HE WAS

27   ATTACKED BY MR. RABITOR BEARING THE KNIFE.    AND HE SAID,

28   "NO, HE CAME AT ME WITH AN ASHTRAY."

1            AND I SAID, "WELL, YOU SEE THIS KNIFE?

2   THERE'S A KNIFE LAYING ON THE FLOOR.  ARE YOU SURE THAT HE

3   DIDN'T TRY TO GET YOU WITH THIS KNIFE?"  HE SAYS, "NO, NO,

4   NO, NO.  THERE WAS NO KNIFE; IT WAS AN ASHTRAY."  AND I

5   WAS HOPING BEYOND HOPE THAT HE WOULD TELL ME THAT EDDIE

6   RABITOR CAME AFTER HIM WITH A KNIFE.

7        Q.   WERE YOU ASKING VARIOUS QUESTIONS DESIGNED TO

8   ELICIT ANY -- ANYTHING THAT THE DEFENDANT COULD DESCRIBE

9   TO YOU THAT MIGHT POINT TO P.T.S.D.?

10       A.   YES.

11       Q.   DID YOU HAVE MORE THAN ONE CONVERSATION LIKE

12  THAT?

13       A.   I HAD -- I PROBABLY HAD TWO OR THREE

14  CONVERSATIONS WITH HIM ABOUT WHAT WENT THROUGH HIS MIND AT

15  THE TIME.  AND I TRIED TO EVEN GET HIM TO TELL ME THAT HE

16  FELT LIKE HE WAS UNDER ATTACK, LIKE HE HAD BEEN BEFORE

17  FROM THIS HOOKER THAT WENT AFTER HIM.  I TRIED TO GET HIM

18  TO SAY THAT, WITHOUT PUTTING THOSE WORDS IN HIS MOUTH.  I

19  KEPT ASKING HIM AND INQUIRING OF HIM, DID THIS HAVE

20  ANYTHING TO DO WITH WHAT HAPPENED BEFORE?  DID YOU FEEL

21  LIKE YOU WERE BEING ATTACKED BY THIS WOMAN?  NO, IT WAS

22  COMPLETELY SEPARATE; DIDN'T HAVE ANYTHING TO DO WITH IT

23  WAS HIS RESPONSE.

24       Q.   AND WAS THE DEFENDANT CONSISTENT IN HIS

25  RESPONSES TO YOU IN THAT AREA?

26       A.   HE WAS ALWAYS INSISTENT THAT OUR DEFENSE WAS A

27  SELF-DEFENSE.  HE FELT THAT HE WAS JUSTIFIED IN JABBING

28  THIS OBJECT AT MR. RABITOR BECAUSE HE -- HE THOUGHT HE WAS

1    COMING AFTER HIM WITH AN ASHTRAY.  HE THOUGHT HE WAS GOING

2    TO HIT HIM WITH AN ASHTRAY.  AND HE WAS VERY CONCERNED,

3    VERY CONCERNED ABOUT LOSING ANOTHER EYE.  AND THAT WAS

4    HIS -- HIS PRINCIPAL FOCUS.  HE DIDN'T WANT TO GET HIT IN

5    THE FACE WITH AN ASHTRAY.

6         Q.    OKAY.  DID YOU ASK THE DEFENDANT ABOUT PRIOR

7    MENTAL -- ABOUT MENTAL HEALTH TREATMENT AFTER HE'D BEEN --

8    AFTER HE LOST HIS EYE?

9         A.    I INQUIRED WITH HIM AS TO ONE OF THE QUESTIONS:

10   HAVE YOU EVER SEEN A PSYCHIATRIST?  HIS ANSWER WAS NO.

11        Q.    AND WERE YOU EVER ABLE TO COME UP WITH ANYTHING

12   DIFFERENT THAT SHOWED ANY KIND OF PSYCHIATRIC TREATMENT?

13        A.    NO.

14        Q.    DID YOU SPECIFICALLY TALK TO THE DEFENDANT ABOUT

15   HIS REACTION TO THE EYE INJURY AND HOW IT AFFECTED HIS

16   FUNCTIONING AFTERWARDS?

17        A.    YEAH.  I ASKED HIM IF IT HAD ANY AFFECT ON

18   WHAT'S HAPPENED SINCE.

19        Q.    AND WHAT WAS HIS RESPONSE?

20        A.    IT WAS NO.

21        Q.    DID YOU TALK TO THE DEFENDANT ABOUT ANY

22   FOLLOW-UPS TO THE INJURY, ANYTHING THAT HE HAD DONE

23   SEEKING MEDICATION OR ANYTHING LIKE THAT?

24        A.    A LOT OF IT -- WHAT CAME OUT IN THE COURSE OF MY

25   REPRESENTATION OF HIM WAS THAT HE HAD DIFFICULTY SEEING.

26   WE HAD TO GET AN OPHTHALMOLOGICAL EXAM TO SHOW THAT HIS

27   EYESIGHT WAS -- BECAUSE I WAS TRYING TO SHOW THAT HE

28   COULDN'T SEE VERY WELL.  THAT THE THREAT WAS ONE THAT --

1    HE COULDN'T ACTUALLY SEE; HE DIDN'T KNOW EXACTLY WHAT WAS

2    HAPPENING.  SO THOSE ISSUES KIND OF CAME UP ABOUT HIS --

3    ABOUT HIS TREATMENT.  I FOUND OUT THAT HE DIDN'T HAVE A

4    PAIR OF GLASSES, OR IF HE -- IF HE DID, THEY WERE AT THE

5    CRIME SCENE.  THAT HE HADN'T BEEN GIVEN A PAIR IN JAIL.

6    HE DIDN'T HAVE A PROSTHESIS THAT HE WAS WEARING.  SO A LOT

7    OF DISCUSSION CAME ABOUT REGARDING THOSE ISSUES.

8        Q.   DID YOU EVER -- DID THE DEFENDANT EVER GIVE YOU

9    ANY INDICATORS OR ANY INDICATION THAT POSTTRAUMATIC STRESS

10   DISORDER HAD PLAYED A PART IN HIS ACTIONS INVOLVING THE

11   KILLING OF MR. RABITOR?

12       A.   NO, BUT THAT DIDN'T -- IT DIDN'T MEAN THAT I

13   DIDN'T THINK THAT HE HAD P.T.S.D.  I THOUGHT HE DID.  I

14   THOUGHT HE JUST -- HE HAD TO HAVE HAD IT.  HE HAD TO HAVE

15   BEEN SUFFERING FROM P.T.S.D., BUT, YOU KNOW, HE WASN'T

16   GIVING ME ANY HELP TALKING ABOUT HOW -- HIS REACTION TO IT

17   AND HOW IT AFFECTED HIS REACTION AND/OR CONDUCT IN THIS

18   CASE.

19       Q.   SO WERE YOU EVER ABLE TO CONNECT ANYTHING

20   INVOLVING P.T.S.D. WITH WHAT HE DID WHEN HE KILLED

21   MR. RABITOR?

22       A.   I COULDN'T SEE ANY CONNECTION.

23       Q.   OKAY.  AND DID YOU TALK TO HIS FAMILY TO TRY TO

24   GET INFORMATION AS WELL?

25       A.   WELL --

26       Q.   HIS FATHER AND HIS SISTER?

27       A.   I DID SPEAK TO MR. LITTLE AND TO SHARON LITTLE

28   AS WELL.  AND SHE DID OFFER THE ASSISTANCE OF A PERSON

1   THAT SHE WAS SEEING, AND SHE OBVIOUSLY KNEW THAT LARRY WAS

2   TRAUMATIZED AND -- BUT WHAT THEY DIDN'T UNDERSTAND WAS

3   THAT THERE WAS A LEGAL QUESTION THAT HAD TO BE ANSWERED

4   WITH RESPECT TO WHETHER OR NOT THERE WAS A DEFENSE.  AND

5   IN TALKING TO MR. LITTLE, IN TRYING TO EXPLORE THOSE

6   AREAS, I DID NOT FEEL THAT THERE WOULD BE ANYTHING THAT WE

7   COULD DO.  I WAS CONSIDERING HIRING A PSYCHIATRIST, BUT

8   FROM THE COMMENTS THAT HE MADE TO ME, I THOUGHT THAT THE

9   PSYCHIATRIST WOULD COME TO THE SAME CONCLUSION.  SURE, HE

10  HAD P.T.S.D., BUT DID IT AFFECT THE WAY HE RESPONDED THAT

11  DAY?  AND I WAS CONVINCED THAT THE PSYCHIATRIST WOULDN'T

12  BE ABLE TO SAY THAT HE DID.

13       Q.   NOW, YOU MENTIONED THAT THE SISTER TALKED ABOUT

14  A DR. WEISS.  AND YOU HEARD THE SISTER'S TESTIMONY IN

15  COURT?

16       A.   YES.

17       Q.   DID -- WAS THERE EVER ANY INDICATION THAT THE

18  DEFENDANT HAD BEEN TREATED BY DR. WEISS BEFORE THIS

19  KILLING?

20       A.   NO.

21       Q.   WAS THERE EVER ANY INDICATION THAT THIS

22  DR. WEISS HAD EVER SEEN THE DEFENDANT AT ALL?

23       A.   I DON'T BELIEVE SHE EVER HAD, NO.

24       Q.   AND YOU WERE AWARE THAT THIS DR. WEISS WAS THE

25  SISTER'S DOCTOR?

26       A.   YES.  I THINK SHE TOLD ME THAT SHE WAS A FAMILY

27  COUNSELOR AND MAYBE A PSYCHOLOGIST.

28       Q.   WERE YOU EVER CONTACTED BY THIS DR. WEISS?

1      A.    NO.

2      Q.    AND IN YOUR PROFESSIONAL OPINION, WOULD THERE

3  HAVE BEEN ANY RELEVANCE TO AN EXAMINATION BY THIS

4  DR. WEISS -- FIRST OF ALL, DID YOU KNOW THE CREDENTIALS OF

5  DR. WEISS?

6      A.    NO.

7      Q.    COULD YOU SEE ANY RELEVANCE TO AN EXAMINATION BY

8  THIS DOCTOR RIGHT BEFORE THE TRIAL?

9      A.    NO.  IF -- IF I WAS GOING TO HIRE A -- AN EXPERT

10  TO COME IN AND INTERVIEW LARRY, I WOULD HAVE CHOSEN A

11  PSYCHIATRIST RATHER THAN A PSYCHOLOGIST.  AND IT -- MAYBE

12  IT STEMS FROM MY PREJUDICE ACQUIRED THROUGH MY EX-WIFE,

13  WHO HAD LITTLE, IF ANYTHING, GOOD TO SAY ABOUT

14  PSYCHOLOGISTS.  PRIMARILY BECAUSE SHE WAS A MEDICAL DOCTOR

15  AND A PSYCHIATRIST, I THINK, BUT I PROBABLY WOULD HAVE

16  USED A PSYCHIATRIST, IF I DECIDED TO GO THAT ROUTE.

17      Q.    IN FACT, WHEN YOU WERE IN TRIAL, YOU ARRANGED TO

18  HAVE MR. LITTLE, HIS VISION TESTED BY AN OPTOMETRIST RIGHT

19  BEFORE TRIAL, DIDN'T YOU?

20      A.    CORRECT.

21          THE COURT:  I'M SORRY, WAS IT AN OPTOMETRIST OR

22  OPHTHALMOLOGIST?  I'LL ASK THAT OF YOU.

23          MS. MALLEN:  OH, DR. ZABER(PH).

24          THE WITNESS:  I THINK HE WAS AN OPHTHALMOLOGIST,

25  NOT OPTOMETRIST.

26          THE COURT:  SO HE WAS AN M.D. AS OPPOSED TO --

27          THE WITNESS:  YES.

28          THE COURT:   -- AN EYE DOCTOR?

244

BY MS. MALLEN:

Q.   WASN'T THERE A DISCUSSION WITH THE JUDGE ABOUT WHETHER THAT WAS EVEN RELEVANT, THE VISION THING?

A.   YES.

Q.   BECAUSE IT WAS RIGHT BEFORE TRIAL?

A.   WELL, IT WASN'T BECAUSE IT WAS RIGHT BEFORE TRIAL.  HE JUST DIDN'T THINK IT WAS RELEVANT.  AND I THINK I EXPLAINED TO HIM THAT WAS ONE OF THE KEY ELEMENTS OF MY CASE, WAS WHAT HE COULD SEE.  AND YOU PERCEIVE THINGS WITH YOUR EYES AND YOU CAN'T SEE SOMETHING, THEN IT WOULD BE RELEVANT.

Q.   OKAY.  LET'S GO BACK TO, WERE YOU TOLD OF ANY OTHER INJURIES OF THE DEFENDANT THAT HAD ANY KIND OF CONNECTION WITH P.T.S.D.?  DID MR. LITTLE TELL YOU ABOUT ANYTHING ELSE THAT HE HAD A CONNECTION WITH P.T.S.D.?

A.   NO.  I WASN'T AWARE THAT HE HAD BEEN ATTACKED BY ANYBODY.  I WASN'T AWARE THAT HE HAD EVER COMPLAINED ABOUT LACK OF SLEEP, NONE OF THOSE THINGS.  AND I ASKED ABOUT STUFF LIKE THAT.

Q.   AND MR. LITTLE DID NOT SHARE THOSE WITH YOU?

A.   HE DID NOT TELL ME ANYTHING ABOUT IT.

Q.   OKAY.  WERE YOU -- DID MR. LITTLE TELL YOU ABOUT ANY TREATMENT FOR HEALTH PROBLEMS BEFORE 1999?

A.   YES.  I WAS AWARE THAT HE HAD BEEN INJURED IN A BICYCLING ACCIDENT.  HIS FATHER AND SISTER ALSO TOLD ME ABOUT THAT AS WELL.

Q.   AS FAR AS YOU COULD TELL, DID THAT HAVE ANY BEARING ON POSTTRAUMATIC STRESS DISORDER IN RELATION TO

1    THIS CURRENT KILLING?

2        A.    NO.

3        Q.    NOW LET'S TALK A LITTLE BIT ABOUT THE -- A

4    POSSIBLE PLEA BARGAIN ISSUE.  AT -- WHEN YOU REPRESENTED

5    MR. LITTLE, AT SOME POINT DID YOU HAVE AN OFFER TO

6    CONSIDER BY THE PROSECUTION?

7        A.    YES.  SEVERAL TIMES DURING THE COURSE OF THE

8    PROCESS WE DISCUSSED SETTLEMENT.  AT ONE PARTICULAR

9    JUNCTURE, I THINK IT WAS AFTER THE PRELIM AND BEFORE THE

10   READINESS, I CONTACTED MARNIE STEIN AND ASKED TO SPEAK TO

11   HER BOSS, WHO I KNEW, GREG MC CLAIN.  GREG AND I HAD GONE

12   BACK QUITE A WAYS.  I FELT FAR MORE COMFORTABLE IN TALKING

13   TO AND BENDING HIS ARM AND HOLLERING AT HIM RATHER THAN

14   MARNIE STEIN, WHO I DIDN'T KNOW VERY WELL; I HAD NO

15   CONTACT WITH.  AND WE HAD A MEETING WITH MS. STEIN,

16   MR. MC CLAIN AND GEORGE -- HIS NAME ESCAPES ME NOW.

17       Q.    BENNETT?  BENNETT?

18       A.    GEORGE BENNETT.  I THINK IT'S GEORGE BENNETT,

19   WHO, AT THE TIME, WAS EITHER NUMBER ONE OR NUMBER TWO IN

20   CHARGE.  AND WE SAT UP IN THE CONFERENCE ROOM UP IN THE

21   D.A.'S OFFICE, AND I PITCHED MY CASE TO THEM AND I TOLD

22   THEM THAT I WAS GOING TO DEFENSE THEM, AND THEY WERE GOING

23   TO BE SORRY.  AND THEY BETTER TAKE MY MANSLAUGHTER OFFER

24   RIGHT NOW, OR THEY'D HAVE TO PAY FOR IT IN SPADES DOWN THE

25   ROAD.  AND THEN IT WAS AT THAT POINT THAT I WAS HANDED

26   SOME INFORMATION ABOUT A ROBERT TEAL.  AND PRIOR TO THAT,

27   I HADN'T KNOWN ABOUT MR. TEAL.

28       Q.    LET ME STOP YOU FOR A MINUTE NOW.  UP TO THIS

1  POINT, YOU'VE BEEN REPRESENTING THE DEFENDANT; YOU'VE BEEN

2  TALKING TO HIM AND HIS FAMILY.  HAD THE DEFENDANT BEEN

3  CONSISTENT IN HIS SELF-DEFENSE CLAIM?

4      A.  YES.

5      Q.  AND UP TO THAT POINT, DID YOU FEEL THAT THAT WAS

6  A VALID DEFENSE?

7      A.  I THOUGHT, YOU KNOW, FROM THE LOOKS OF IT, THE

8  WHOLE THING SURROUNDING THE HOME, THE HOUSE, WHAT WAS

9  GOING ON.  I WAS EVALUATING THE CREDITABILITY OF THE

10  WITNESSES, MR. LITTLE INCLUDED.  THE FACT THAT HE WAS

11  BLIND IN ONE EYE, THE FACT THAT THERE WERE KNIVES AND

12  STUFF GOING ON IN THE HOUSE, I THOUGHT, YES, I THOUGHT WE

13  HAD PRETTY GOOD SELF-DEFENSE CASE.

14      Q.  AND HAD YOU TALKED -- HAD YOU BEEN POSITIVE IN

15  YOUR DEALINGS WITH MR. LITTLE?

16      A.  I GENERALLY TOLD MR. LITTLE THAT WE HAD A STRONG

17  DEFENSE.  I FELT THAT WE COULD PREVAIL UNTIL I GOT THAT

18  INFORMATION.

19      Q.  NOW UP UNTIL YOU GOT THAT INFORMATION ABOUT

20  MR. TEAL, THE INFORMANT, HAD YOU TALKED TO THE DEFENDANT

21  ABOUT SETTLING THE CASE AT ALL?  AS FAR AS YOU RECALL?

22      A.  YES.

23      Q.  AND DID YOU --

24      A.  MR. LITTLE INDICATED TO ME, YOU KNOW, HE SORT OF

25  GAVE ME MARCHING ORDERS, HE DIDN'T WANT A LIFE CASE.  HE

26  WANTED A DETERMINATE SENTENCE, AND THAT'S ONE OF THE

27  PITCHES THAT I MADE TO MR. MC CLAIN; MY CLIENT WILL TAKE,

28  YOU KNOW, SOME YEARS IF THAT'S IN THE OFFING, RATHER THAN

1    AN INDETERMINATE SENTENCE.  THAT WAS SORT OF THE BOTTOM OF

2    WHERE WE WERE GOING TO GO, BUT IT WASN'T OFFERED.

3        Q.    AND WHEN YOU TALKED TO MR. LITTLE ABOUT SETTLING

4    THE CASE, DID YOU LISTEN TO WHAT HE HAD TO SAY?

5        A.    YES.

6        Q.    DID YOU EVER TRY TO FORCE HIM TO MAKE A PLEA

7    BARGAIN?

8        A.    NO.  I'M ONE OF THOSE LAWYERS THAT DOESN'T LIKE

9    TO DO THAT.  I'VE SEEN A LOT OF LAWYERS PUSH THEIR CLIENTS

10   INTO A RESOLUTION, AND I DON'T LIKE TO DO THAT.  I LIKE TO

11   LET THE CLIENT MAKE UP HIS OR HER MIND.  I TELL THEM, I

12   DON'T SOFT PEDAL IT.  I DON'T MILK, YOU KNOW, SUGAR COAT

13   IT.  I TRY TO TELL THEM, THIS IS WHAT YOU'RE FACING.  IF

14   YOU'RE CONVICTED OF THIS, THIS IS WHAT YOU FACE IF YOU DO

15   THIS.  THIS IS WHAT HAPPENS IF THIS HAPPENS, AND LET THEM

16   DECIDE.  AND I FOUND THROUGH THE COURSE OF MY PRACTICE OF

17   LAW THAT THAT PLAYS MUCH BETTER THAN ME TRYING TO TWIST

18   SOMEBODY'S ARM AND TAKE SOMETHING.  I VERY RARELY TOLD A

19   CLIENT, YOU'VE GOT TO TAKE THIS OR ELSE.

20       Q.    AND IN THIS CASE, WHEN MR. LITTLE TOLD YOU WHAT

21   HE WANTED, YOU TOOK THAT TO THE DISTRICT ATTORNEY TO ASK

22   FOR IT, DIDN'T YOU?

23       A.    I DID.

24       Q.    OKAY.  NOW, AT THIS MEETING THAT YOU'VE

25   DESCRIBED, YOU MENTIONED THAT YOU WERE GIVEN NEW

26   INFORMATION ABOUT MR. TEAL.  WHAT WAS THAT NEW

27   INFORMATION?  WHO WAS THAT PERSON?

28       A.    WELL, UP UNTIL THAT POINT, I DON'T BELIEVE I

1    KNEW ABOUT MR. TEAL.  AND SO I WAS A LITTLE BIT SHOCKED

2    WHEN I STARTED READING THE REPORTS; THAT MR. LITTLE HAD

3    BEEN INCARCERATED OVER AT DONOVAN FOR A PROBATION

4    VIOLATION, AND HE HAD BEEN TALKING ABOUT THE CASE, ABOUT

5    THIS TO ROBERT TEAL.

6        Q.   WHEN YOU WERE GIVEN INFORMATION ABOUT THE

7    DEFENDANT TALKING ABOUT THE CASE, DID THAT INFORMATION

8    INCLUDE THE DEFENDANT'S DISCUSSION OF HIS SELF-DEFENSE

9    CLAIM?

10       A.   YES.

11       Q.   DID IT INCLUDE A DISCUSSION OF WHAT THE

12   DEFENDANT HAD DONE AND THOUGHT AT THE TIME?

13       A.   YES.

14       Q.   AND WAS THAT INFORMATION BEING GIVEN TO YOU

15   DIFFERENT THAN WHAT THE DEFENDANT WAS TELLING YOU?

16       A.   YES.

17       Q.   DID THAT --

18       A.   WELL, LET ME PUT IT THIS WAY, IT WAS -- IT

19   APPEARED TO BE INFORMATION THAT A BUDDY WOULD GIVE TO A

20   BUDDY, TALKING ABOUT IT IN KIND OF A CASUAL WAY.  AND

21   BECAUSE OF THAT, IT APPEARED TO BE VERY BELIEVABLE THAT

22   LARRY OR MR. LITTLE WOULD HAVE SAID CERTAIN THINGS TO

23   MR. TEAL ABOUT HIS CASE AND WHAT HE WAS GOING TO DO WITH

24   IT, AND WHAT OUR DEFENSE WAS GOING TO BE.

25       Q.   AND DID THAT INFORMATION BASICALLY CONSIST OF

26   THE DEFENDANT SAYING HE WAS GOING TO MAKE UP A

27   SELF-DEFENSE CLAIM SO HE COULD GET OFF?

28       A.   HE SAID THAT HE WAS GOING TO USE A SELF-DEFENSE

1  CLAIM.  I'M NOT SURE IF HE SAID HE WAS GOING TO MAKE IT

2  UP, BUT IT CAME OFF THAT WAY.

3       Q.   WAS THIS NEW INFORMATION A CONCERN THAT YOU FELT

4  YOU HAD TO ADDRESS IN PRESENTING THE DEFENDANT'S CASE?

5       A.   YES.

6       Q.   AND DID THAT BECOME A FOCUS OF TRYING TO PRESENT

7  A STRONG CASE FOR THIS DEFENDANT?

8       A.   YES, IT DID.

9       Q.   LET ME GO BACK TO YOUR HANDLING OF THIS CASE.

10 LET'S START AT, ONCE YOU WERE APPOINTED TO THE CASE, DID

11 YOU RECEIVE DISCOVERY?

12      A.   YES.

13      Q.   AND DID YOU REVIEW THAT DISCOVERY?

14      A.   YES.

15      Q.   IN PREPARING THE CASE, YOU TALKED TO THE

16 DEFENDANT?

17      A.   YES.

18      Q.   TALKED TO HIS FAMILY?

19      A.   YES.

20      Q.   YOU TOOK YOUR DEFENSE OF THE DEFENDANT

21 SERIOUSLY?

22      A.   YES, OF COURSE.

23      Q.   AND DID YOU TALK TO THE DEFENDANT ABOUT THE

24 INFORMATION THAT WAS IN THOSE REPORTS?

25      A.   YES.

26      Q.   DID THE REPORTS THAT YOU WERE GIVEN AS

27 DISCOVERIES, WERE SOME OF THEM WITNESS STATEMENTS?

28      A.   YES.

1        Q.    WERE SOME OF THEM WITNESS STATEMENTS OF THE

2    PEOPLE THAT WERE TALKED ABOUT BY THE DEFENDANT AS HE

3    TESTIFIED HERE?

4        A.    YES.

5        Q.    AND DID YOU ASK THE DEFENDANT FOR ADDITIONAL

6    INFORMATION ABOUT THE PEOPLE THAT HE MENTIONED?

7        A.    YES.

8        Q.    DID YOU REVIEW THOSE INTERVIEWS OF POTENTIAL

9    WITNESSES TO EVALUATE THEIR -- WHETHER YOU COULD USE THEM

10   OR NOT?

11       A.    YES.

12       Q.    WHAT WAS YOUR -- NOW, YOU -- WE WENT THROUGH

13   WITH THE DEFENDANT A VARIETY OF PEOPLE AND WHAT THEIR USES

14   WOULD HAVE BEEN.   AND WERE YOU AWARE OF THE BACKGROUND

15   INFORMATION ABOUT THIS APARTMENT, THE DRUG USE, AND

16   LIFESTYLES?

17       A.    YES.

18       Q.    DID THE DEFENDANT TELL YOU ABOUT THOSE THINGS?

19       A.    YES, HE DID.

20       Q.    AND DID HE TELL YOU THAT -- MORE SPECIFICALLY

21   THAT DIFFERENT PEOPLE HAD BEEN IN THE APARTMENT THAT DAY

22   USING DRUGS?

23       A.    YES.

24       Q.    DID HE TELL YOU THOUGH THAT NO ONE ELSE WAS

25   THERE AT THE TIME OF THE KILLING, OTHER THAN HIM AND

26   ALLISON BROOKS?

27       A.    YES.

28       Q.    DID HE TELL YOU --

1        A.    AND THE DECEDENT, OF COURSE.

2        Q.    TRUE.   DID HE TELL YOU ABOUT HIS OWN DRUG AND

3    ALCOHOL USE?

4        A.    YES.

5        Q.    AND DID HE TELL YOU ABOUT THE PRIOR VIOLENCE

6    BETWEEN THE VICTIM AND THE VICTIM'S MOTHER?

7        A.    HE INDICATED THAT THEY HAD A LOT OF ARGUMENTS,

8    THAT THEY WERE -- THEY THREW THINGS AT EACH OTHER.   IT WAS

9    A VERY UNHAPPY HOUSEHOLD.

10        Q.    IN YOUR PROFESSIONAL OPINION, COULD YOU SEE A

11    WAY TO USE THE GENERAL LIFESTYLE INFORMATION IN SOME WAY

12    TO BOLSTER THE DEFENDANT'S SELF-DEFENSE CLAIM?

13        A.    YES.

14        Q.    AND HOW WAS THAT?

15        A.    WELL, IT SET UP A PATTERN -- A PATTERN OF

16    POTENTIAL EXPECTATION ON THE PART OF MR. LITTLE, WHAT

17    MIGHT HAPPEN, WHAT WAS GOING ON.   THERE WAS A LOT OF

18    SHOUTING, IT WAS AN INFLAMED KIND OF SITUATION.   SO IT WAS

19    IMPORTANT TO GET THAT INFORMATION IN FRONT OF THE JURY.

20        Q.    AND, IN FACT, YOU HAD THAT INFORMATION TESTIFIED

21    TO BY ONE OF YOUR WITNESSES, A MR. JOSHUA ROBBINS, DIDN'T

22    YOU?

23        A.    YES.

24        Q.    AND THE DEFENDANT HIMSELF TESTIFIED ABOUT THE

25    APARTMENT AND THE ATMOSPHERE, DIDN'T HE?

26        A.    HE DID.   AND I THOUGHT HE DID A GOOD JOB IN

27    EXPLAINING WHAT IT WAS LIKE OVER THERE.

28        Q.    NOW, THERE WAS SOME PEOPLE THAT THE DEFENDANT

1  SPECIFICALLY SAYS HE TALKED TO YOU ABOUT AND THAT YOU

2  PROMISED TO INTERVIEW THEM AND PROMISED TO USE AT TRIAL.

3  DID YOU, FIRST OF ALL, MAKE A PROMISE TO THIS DEFENDANT

4  THAT YOU WOULD INTERVIEW CERTAIN PEOPLE?

5      A.   WELL, I TOLD HIM THAT I WOULD INTERVIEW OR HAVE

6  INTERVIEWED INDIVIDUALS THAT HE HAD MENTIONED, AND I DID.

7      Q.   AND DID YOU DO SO?

8      A.   YES, I DID.

9      Q.   AND WHAT WAS YOUR RESULT OF YOUR INTERVIEWS WITH

10  THOSE PEOPLE?

11      A.   MY OPINION WAS THAT THEIR INFORMATION WAS NOT

12  WORTH WHILE TO ADD ANYTHING TO WHAT WE ALREADY KNEW, OR

13  THAT I COULD GET THE INFORMATION AND DIFFERENT -- THROUGH

14  A DIFFERENT, MORE CREDIBLE WITNESS.  BECAUSE A LOT OF

15  THESE PEOPLE WERE PRETTY FLAKY; THEY -- THEY WERE HARD TO

16  FIND.  THEY WERE NOT VERY COOPERATIVE.  THEY HAD POLICE

17  RECORDS, BEEN ARRESTED NUMEROUS TIMES.  AND I FELT THAT,

18  YOU KNOW, HE HAD WITNESSES THAT COULD TESTIFY AS TO WHAT I

19  THOUGHT WAS IMPORTANT AT THE SCENE.

20          SO THERE WAS ONE OTHER WITNESS, THIS

21  OVERDORF(PH) FELLA WHO WAS IN CUSTODY.  LARRY WAS

22  INSISTING THAT I BRING HIM IN AS A WITNESS, AND I SAID,

23  "WHY?"  HE SAID, "WELL, HE KNOWS STUFF ABOUT BOB TEAL."

24  AND I SAID, "WHAT DOES HE KNOW?"  AND HE SAID, "HE KNOWS

25  BOB TEAL WENT TO THE COPS BECAUSE HIS SON WAS ACCUSED, OR

26  IS A SUSPECT IN THIS CASE."  SO I WENT TO -- WHEN I

27  INTERVIEWED TEAL, TEAL ADMITTED TO ME THAT, YES, HIS SON

28  WAS CONSIDERED A SUSPECT.  SO I SAID, OKAY, IF HE'S GOING

253

1  TO SAY THAT, I DON'T NEED OVERDORF TO TELL ME.  SO A LOT

2  OF IT WAS SUPERFLUOUS TO BRING IN OTHER PEOPLE TO SAY THE

3  SAME THING THAT I WAS GOING TO GET OUT THROUGH OTHER

4  WITNESSES.

5        Q.   AND, IN FACT, MR. TEAL DID TESTIFY AT THE TRIAL

6  AND HE DID ADMIT OR TALK ABOUT HIS SON AND THE SUSPECT

7  THING?

8        A.   YES.

9        Q.   OKAY.

10       A.   AND I INTERVIEWED MR. TEAL WITH MY INVESTIGATOR,

11 ALLEN COTTON(PH), AND I -- AND I WOULD TRAVEL TO BAKER, I

12 THINK IT'S AVENAL STATE PRISON, JUST SO THAT I COULD

13 EVALUATE MR. TEAL AS A CREDIBLE OR NONCREDIBLE WITNESS.

14 AND DESPITE THE FACT THAT I DIDN'T CARE FOR THE MAN, I WAS

15 VERY, VERY CONCERNED, AFTER I HAD A CHANCE TO INTERVIEW

16 HIM, BELIEVING THAT HE WOULD BE A VERY CREDIBLE WITNESS.

17 SO I -- I PUT A LOT OF EFFORT IN TO TRY TO DESTROY, AS

18 MUCH AS I COULD, HIS TESTIMONY IN FRONT OF THAT JURY.

19       Q.   WAS THERE EVER A POINT THAT YOU REFUSED TO

20 CONSIDER INFORMATION FROM THE DEFENDANT?

21       A.   NO.  I ALWAYS THINK OF THE CLIENT AS THE

22 GREATEST SOURCE OF THE INFORMATION.  AND I LOVE IT WHEN

23 CLIENTS TELL ME THINGS ABOUT WHAT WENT ON.  THEY OFTEN

24 TIMES THINK THINGS ARE RELEVANT WHEN THEY'RE NOT, BUT I

25 LIKE TO HEAR WHAT THEY HAVE TO SAY, BECAUSE THEY DROP

26 HURLS OF WISDOM ACCIDENTALLY MANY, MANY, MANY TIMES.  AND

27 THEY DO NOT KNOW THEY'RE GIVING YOU THE BEST WHEN WE GIVE

28 IT TO THEM.

1    Q.   WAS THERE EVER ANYONE -- WELL, DID YOU EVER

2   PROMISE THE DEFENDANT THAT YOU WOULD PRESENT CERTAIN

3   PEOPLE AT THE TRIAL?

4    A.   NO.   I NEVER PROMISE THAT I'LL DO THAT.   OFTEN

5   TIMES IT'S OUT OF YOUR HANDS ANYWAY.   IF THE JUDGE DEEMS

6   THE INFORMATION TO BE NOT RELEVANT OR YOU -- YOU ASK A

7   QUESTION, AND IT'S OBJECTED TO, AND THE INFORMATION IS

8   KEPT OUT.   IT'S -- THERE'S NOTHING YOU CAN DO ABOUT IT.

9    Q.   DID YOU CONSIDER USING THE VICTIM'S MOTHER IN

10   SOME WAY IN YOUR CASE?

11    A.   AFTER I HEARD THAT 911 TAPE OF THE VICTIM'S

12   MOTHER, I WANTED TO KEEP HER AS FAR AWAY FROM THIS

13   COURTROOM AS I COULD.

14    Q.   WHY IS THAT?

15    A.   SHE WAS SO INCREDIBLY EMOTIONAL THAT GETTING HER

16   IN FRONT OF THAT JURY WOULD RAISE SUCH A ISSUE OF

17   SYMPATHY, AND I DIDN'T WANT HER IN THE COURTROOM.   SO I

18   THINK HER EMOTIONS OUTWEIGHED WHATEVER VALUE SHE COULD

19   CONTRIBUTE TO SETTING THE SCENE AT THE TIME OF THE

20   KILLING.

21    Q.   DID YOU FILE MOTIONS IN LIMINE TO RESTRICT

22   HARMFUL WITNESSES OR EVIDENCE?

23    A.   YES.

24    Q.   AND, IN FACT, YOU PREPARED SEVEN MOTIONS IN

25   LIMINE AND FILED THEM ON BEHALF OF THIS DEFENDANT; DIDN'T

26   YOU?

27    A.   YES, I DID.

28    Q.   WAS THERE EVER A TIME AFTER YOUR OFFER TO SETTLE

1    WAS REJECTED WHEN YOU TRIED TO GET THIS DEFENDANT, IN

2    LITTLE, TO SETTLE THE CASE AGAIN RIGHT BEFORE TRIAL?

3        A.    I DON'T BELIEVE THAT I TRIED TO GET HIM TO

4    SETTLE.  I MAY HAVE SAID TO HIM, YOU KNOW, ON THE EVE OF

5    TRIAL, WE STILL HAVE THE SAME OFFER IF YOU WANT TO TAKE

6    THAT, IT'S OPEN, BUT -- AND I DON'T HONESTLY RECALL HIS

7    DESCRIPTION OF OUR MEETING, WHERE I SAID, AS HE PUT IT,

8    THIS IS WHAT THE PROSECUTION HAS AND THIS IS WHAT WE HAVE.

9    IT'S PROBABLY SOMETHING I WOULD DO.  I MEAN, IF IT WERE

10   TRUE, I MIGHT DO THAT.  AND IN THIS CASE, THAT WAS

11   CERTAINLY THE TRUTH.  WE WERE OUTGUNNED AND, YOU KNOW,

12   THEY HAD A LOT OF EVIDENCE THAT WAS GOING TO BE VERY

13   DIFFICULT TO OVERCOME.  AND TO ADDRESS, AND HE -- HE

14   QUOTED ME CORRECTLY, WHEN I SAID I THOUGHT WE WOULD BE

15   LUCKY IF WE GOT A SECOND.

16       Q.    SO BASICALLY YOU WERE LOOKING AT A CASE WHERE

17   THE DEFENDANT HAD AN EYEWITNESS TO THE KILLING, RIGHT?

18       A.    YES.

19       Q.    AND THE DEFENDANT HAD ADMITTED DOING THE

20   KILLING?

21       A.    YES.

22       Q.    AND BASICALLY YOU WERE DEALING WITH TRYING TO

23   EXPLAIN HIS ACTIONS IN SOME WAY TO LESSON THE CULPABILITY?

24       A.    YES.

25       Q.    DID YOU INTEND TO TRY TO PRESENT AS STRONG A

26   DEFENSE AS YOU COULD?

27     • A.    YES, I DID.

28       Q..   DID YOU PREPARE FOR TRIAL?

1       A.    YES.

2       Q.    AND IN DOING SO, DID YOU REVIEW DISCOVERY?

3       A.    YES.

4       Q.    DID YOU TALK TO THE DEFENDANT?

5       A.    YES, I DID.

6       Q.    DID YOU ARRANGE FOR AN EYE APPOINTMENT FOR THIS

7    DEFENDANT BEFORE THE TRIAL?

8       A.    YES.

9       Q.    AND WHY WAS THAT?

10      A.    WELL, I WANTED THE JURY TO UNDERSTAND FROM THE

11   WORDS OF AN EXPERT WITNESS WHAT HIS VISION WAS LIKE, AND

12   DISCUSS WHAT HE COULD SEE AND WHAT HE COULDN'T SEE.  AND

13   THE BEST WAY TO DO IT WAS TO HAVE SOMEBODY LOOK AT HIM

14   JUST A FEW MONTHS AFTER THE INCIDENT AND HOPEFULLY TO

15   TESTIFY WHAT HIS VISION WAS.  AND THEN I WAS GOING TO TRY

16   TO MAKE HAY WITH THAT IN FRONT OF THE JURY.

17      Q.    AND DID YOU ARRANGE FOR ADDITIONAL WITNESSES TO

18   TESTIFY AT THE TRIAL?

19      A.    YES.

20      Q.    DID YOU FILE A TRIAL BRIEF?

21      A.    YES.

22      Q.    AND DURING THIS TIME YOU HAD CONTACT WITH THE

23   DEFENDANT'S FAMILY AS WELL?

24      A.    I DID.

25      Q.    DID THE DEFENDANT EVER TELL YOU THAT THE

26   STABBING IN HIS EYE AFFECTED HIS DAILY FUNCTIONING IN ANY

27   WAY?

28      A.    NO.  I MEAN, OTHER THAN THE FACT THAT HE WAS

1    BLIND, I MEAN THAT -- THAT AFFECTED HIM.  AND HE DID SAY

2    THAT HE DIDN'T -- HE COULDN'T SEE ON THAT LEFT SIDE.  AND

3    HE DIDN'T LIKE PEOPLE COMING UP ON HIM THAT WAY, BECAUSE

4    HE COULDN'T SEE THEM.  AND HE WAS KEENLY AWARE THAT HE HAD

5    ONE EYE LEFT, AND HE WAS VERY PROTECTIVE OF THAT, BUT THE

6    TRAUMA OF THE INCIDENT, HE NEVER ELABORATED ON AS

7    AFFECTING HIM.

8        Q.   AND DID YOUR INVESTIGATION INTO WHETHER

9    POSTTRAUMATIC STRESS DISORDER PLAYED A PART IN HIS -- IN

10   THE -- IN THE KILLING THAT HE DID WITH MR. RABITOR, IN

11   YOUR INVESTIGATION INTO THAT ASPECT, IN YOUR PROFESSIONAL

12   JUDGMENT, WAS THERE A CONNECTION THAT YOU COULD SEE?

13       A.   NO.

14       Q.   AND DID YOU LOOK FOR THAT CONNECTION?

15       A.   YES, I DID.

16       Q.   NOW EVEN IF THERE HAD BEEN -- WELL, DID THE

17   DEFENDANT EVER SAY ANYTHING TO YOU THAT IMPLIED ANY -- ANY

18   THOUGHTS AT ALL BACK TO THE STABBING IN THE EYE?

19       A.   NO.  AND I LOOKED FOR IT, AND I SPECIFICALLY

20   ASKED HIM.

21       Q.   WAS HIS FOCUS MAINLY ON MR. RABITOR, THE CURRENT

22   VICTIM?

23       A.   YES.

24       Q.   AND WHAT MR. RABITOR WAS DOING AND HIS REACTIONS

25   TO THAT?

26       A.   YES.

27       Q.   AGAIN, WAS IT HIS UNDERSTANDING THAT HE WAS

28   DEFENDING HIMSELF AGAINST THIS VICTIM?

1        A.    YES.

2        Q.    DID YOU -- WERE YOU AWARE THAT THERE WAS A

3    DR. AKRID WHO WAS AN EYE DOCTOR OR AN OPTOMETRIST THAT

4    DEALT WITH THE DEFENDANT EARLIER?

5        A.    YES.

6        Q.    WERE YOU AWARE OR TOLD THAT HE HAD ANY KIND OF

7    EXPERTISE AT ALL IN POSTTRAUMATIC STRESS DISORDER?

8        A.    NO, I WAS NOT.

9        Q.    WERE YOU GIVEN ANY INFORMATION THAT HE HAD

10   SOMETHING TO ADD TO THE QUESTION OF POSTTRAUMATIC STRESS

11   DISORDER IN CONNECTION WITH THIS DEFENDANT?

12       A.    NO.

13       Q.    DID YOU CONTINUE TO VIGOROUSLY DEFEND THE

14   DEFENDANT DURING THE TRIAL?

15       A.    YES.

16       Q.    AND DID THAT INCLUDE FILING MOTIONS IN LIMINE?

17       A.    YES.

18       Q.    DID THAT INCLUDE CROSS-EXAMINING WITNESSES?

19       A.    YES.

20       Q.    DURING THE TRIAL, DID YOU DISCUSS WITH THE

21   DEFENDANT THE VARIOUS WITNESSES THAT WERE APPEARING?

22       A.    YES, I -- I THINK I DID.  AND IF HE HAD ANY

23   QUESTIONS, I ANSWERED THEM.  AND, OF COURSE, I PREPARED

24   HIM TO GO ON THE STAND.  WE HAD A MINI KIND OF MOCK

25   INTERVIEWS OF HIS TESTIMONY, AND I TRIED TO PREPARE HIM AS

26   BEST I COULD, GIVING HIM SOME CUES AS TO WHAT TO DO; TO

27   LOOK AT THE JURY.  WE ALWAYS TELL OUR CLIENTS TO LOOK AT

28   THE JURY, TO NOT GET IN AN ARGUMENT WITH THE D.A.  AND

1    NOT, YOU KNOW, BE BITTER OR ANGRY, JUST ANSWER THE

2    QUESTION THAT'S ASKED, THOSE KINDS OF THINGS.  AND, YOU

3    KNOW, WE DISCUSSED SOME SENSITIVE AREAS, YOU KNOW, AND I

4    TRIED -- BECAUSE I BELIEVED LARRY LITTLE.  I -- I TRIED TO

5    BRING OUT TO THE JURY WHAT I WAS SEEING OR WHAT I WAS

6    BELIEVING ABOUT WHAT HE HAD SEEN AND HEARD AND SAID AND

7    THOUGHT.  SO I TRIED TO -- I TRIED TO MAKE HIM AS HUMAN

8    AND AS PERSONABLE AS I COULD IN OUR PREPARATION FOR THE

9    TRIAL.

10        Q.   AND DURING THAT TRIAL, DID YOU END UP MAKING

11   VARIOUS OBJECTIONS WHEN APPROPRIATE?

12        A.   YES.

13        Q.   YOU PUT ON WITNESSES FOR THE DEFENSE IN ADDITION

14   TO THE DEFENDANT?

15        A.   YES.

16        Q.   PRESENTED YOUR INSTRUCTIONS?

17        A.   YES.

18        Q.   PRESENTED CLOSING ARGUMENT?

19        A.   YES.

20        Q.   AND, IN FACT, EVEN AT THE SENTENCING YOU

21   PRESENTED A STATEMENT IN MITIGATION?

22        A.   YES.

23        Q.   SO DID YOU MAKE A STRONG EFFORT THEN TO PRESENT

24   THE DEFENDANT'S CASE IN CLAIM OF SELF-DEFENSE TO THIS

25   JURY?

26        A.   YES, I DID.

27        Q.   WAS THE DEFENDANT CONSISTENT IN WHAT HAPPENED,

28   EVEN THROUGH YOUR MOCK INTERVIEWS AND PREPARATION FOR HIS

1  TESTIMONY?

2      A.   YES, HE WAS.

3      Q.   IN YOUR OPINION, HOW COULD -- EVEN ASSUMING THAT

4  THERE WAS SOME INDICATION OF POSTTRAUMATIC STRESS DISORDER

5  DISPLAYED BY THIS DEFENDANT, COULD YOU SEE ANY CONNECTION

6  TO WHAT HAPPENED AT -- WHEN MR. RABITOR WAS KILLED?

7      A.   I LOOKED FOR THE CONNECTION.  I TRIED TO GET HIM

8  TO TELL ME THAT THERE WAS A CONNECTION.  I PRACTICALLY PUT

9  WORDS IN HIS MOUTH.  I GOT TO THE POINT WHERE I FELT LIKE

10 I MAY BE CROSSING THE LINE AS A -- AS A LAWYER IN CREATING

11 SOMETHING THAT WASN'T THERE.  I WANTED IT SO BADLY THAT I

12 WANTED TO TELL HIM WHAT TO SAY, AND I DIDN'T.  AND I

13 DIDN'T FEEL LIKE I COULD UNLESS IT CAME FROM HIS MOUTH,

14 YOU KNOW, WHAT WAS GOING ON.

15          I ASKED AN OPEN ENDED QUESTION.  I TRIED TO

16 GET HIM TO TELL ME WHAT THE ANSWER WAS.  I DIDN'T TELL

17 HIM, NOW, LARRY, YOU SAW THIS GUY COMING AT YOU WITH A

18 KNIFE AND YOU THOUGHT IT WAS A BLACK WOMAN, RIGHT?  I

19 DIDN'T DO THAT, BUT I -- BECAUSE I WANTED HIM TO TELL ME

20 IT WAS THERE, SO THAT THEN I COULD ETHICALLY GO TO PRESENT

21 THAT EVIDENCE THROUGH EITHER AN EXPERT OR HIS OWN

22 TESTIMONY.

23     Q.   AND DID HE EVER PROVIDE YOU WITH A BASIS FOR

24 THAT --

25     A.   NO.

26     Q.   -- CONNECTION?

27     A.   NEVER.

28     Q.   DID MR. LITTLE CONTINUE TO FOCUS ON HIS CLAIM OF

1   SELF-DEFENSE?

2        A.   YES.

3        Q.   AND DID YOU EVER TELL THIS DEFENDANT THEN TO

4   LIE?

5        A.   NO.

6        Q.   DID YOU EVER TELL THIS DEFENDANT TO SAY OR NOT

7   SAY CERTAIN THINGS DURING HIS TESTIMONY, SUCH AS HE'D BEEN

8   DRINKING OR NOT DRINKING?

9        A.   NO.  I TOLD HIM -- HOW I COUCHED THINGS THAT

10  WERE DIFFICULT FOR US IN OUR DEFENSE, WE'RE TO EITHER

11  AVOID GOING INTO THAT AREA ON DIRECT AND/OR JUST ANSWERING

12  THE QUESTION THAT'S ASKED, IF IT'S ASKED ON CROSS, YES OR

13  NO.  I DIDN'T TELL HIM TO LIE.  I GAVE HIM STRATEGIES ON

14  HOW TO PRESENT HIS CASE, OUR CASE, THE BEST THAT WE COULD.

15       Q.   DURING YOUR INVESTIGATION IN THE TRIAL, DID YOU

16  EVER LEARN ABOUT ANY NEW EYEWITNESSES BESIDES THE

17  DEFENDANT AND MS. BROOKS TO THIS INCIDENT?

18       A.   NO.

19       Q.   NOW, IN YOUR EXPERIENCE AND WITH YOUR KNOWLEDGE

20  OF P.T.S.D., IT'S A DISORDER THAT HAS VARIOUS SYMPTOMS

21  DISPLAYED BY THE PERSON WHO -- WHO HAS THIS DISORDER,

22  RIGHT?

23       A.   IT'S MY UNDERSTANDING THAT A PERSON WHO SUFFERS

24  FROM P.T.S.D. WOULD HAVE CERTAIN FEATURES THAT ARE FAIRLY

25  RECOGNIZABLE, IF YOU ASK THEM THOSE KINDS OF QUESTIONS.

26       Q.   AND THOSE THINGS WOULD HAVE TO DO WITH THEIR

27  REACTION AND HELP TO EXPLAIN THEIR REACTION AT WHATEVER

28  INCIDENT IS THE FOCUS?

262

1      A.   YES.

2      Q.   DID YOU --

3      A.   LET ME CITE FOR AN EXAMPLE.  IN THIS CASE THAT I

4 HAD WHERE WE HAD A GENTLEMAN TOURIST THAT WAS BEATEN BY

5 THESE HIGHWAY PATROL OFFICERS, HE VOLUNTARILY, WITHOUT ANY

6 PROMPTING WHATSOEVER, INDICATED TO ME THAT WHENEVER HE SAW

7 A POLICE CAR, HE BECAME VERY ANXIOUS.  HE WOULD BREAK OUT

8 INTO A SWEAT, AND HE WOULD THINK ABOUT THE INCIDENT.  I

9 DIDN'T ASK HIM THIS IN MY INTERVIEW WITH HIM LATER; HE

10 BROUGHT THIS UP.  I IMMEDIATELY RECOGNIZED THAT WAS

11 P.T.S.D. AND I CONTACTED DR. CARION TO DO AN ANALYSIS.  I

12 COULDN'T GET ANYTHING LIKE THAT OUT OF LARRY.

13      Q.   IN THIS CASE, HOWEVER -- WELL, DID YOU EVER

14 CONSIDER FABRICATING A DEFENSE FOR MR. LITTLE WITHOUT ANY

15 BASIS?

16      A.   I THINK --

17      THE COURT:  THAT'S TWO QUESTIONS.

18      THE WITNESS:  I THINK I HAVE TO TAKE THE FIFTH.

19      THE COURT:  I DON'T THINK I WANT YOU TO ANSWER

20 EITHER ONE OF THOSE QUESTIONS.

21      MS. MALLEN:  LET ME REPHRASE THAT.

22      MR. WILLIAMS:  I'LL STIPULATE THAT HE'S NEVER

23 DONE THAT, ALL RIGHT, YOUR HONOR?

24      THE COURT:  NO, NO.

25      MS. MALLEN:  LET ME REPHRASE IT.

26 BY MS. MALLEN:

27      Q.   WOULD YOU CONSIDER MAKING UP A DEFENSE FOR A

28 DEFENDANT IF YOU DIDN'T THINK THERE WAS A BASIS THERE?

263

1     A.   NO.  I MEAN -- BUT YOU'RE TEMPTED TO DO THINGS

2  IN THESE KINDS OF CASES, WHERE THE LIABILITY IS SO HEAVY

3  AND THE RISK IS SO GREAT, YOU JUST WANT TO DO EVERYTHING

4  YOU CAN.  AND THERE WAS A TEMPTATION THERE TO SIT LARRY

5  DOWN AND WORK ON IT AND -- BUT I WASN'T GOING TO GO THERE.

6  I WASN'T GOING TO DO THAT.

7     Q.   DID YOU EVER TELL MR. LITTLE TO LIE ABOUT

8  THINGS?

9     A.   NO.

10     Q.   AND WHEN YOU -- AS PART OF YOUR TRIAL WORK, DO

11  YOU RECALL SUBMITTING JURY INSTRUCTION REQUESTS?

12     A.   YES, I DO.

13     Q.   WERE THEY BASED ON THE EVIDENCE THAT WAS

14  PRESENTED AT THE TRIAL TO THAT POINT?

15     A.   YES.

16     Q.   WERE THEY CHOSEN TO MATCH YOUR THEORY OF THE

17  CASE?

18     A.   YES.

19     Q.   AND WHAT WAS YOUR THEORY OF THE CASE?

20     A.   MY THEORY OF THE CASE WAS THAT THIS WAS EITHER A

21  SELF-DEFENSE CLAIM IN WHICH HE WOULD HAVE BEEN ACQUITTED

22  AND/OR AN IMPERFECT SELF-DEFENSE WHERE HE WOULD BE

23  POTENTIALLY CONVICTED OF MANSLAUGHTER.  CERTAINLY I DIDN'T

24  THINK IT WAS A FIRST DEGREE MURDER CASE BASED UPON THE

25  FACT THAT I DIDN'T THINK THERE WAS ANY PREMEDITATION OR

26  DELIBERATION.  AND FRANKLY, I THINK EVEN MS. STEIN

27  VIRTUALLY CONCEDED THAT THERE WASN'T, IN MY DISCUSSION

28  WITH HER IN AND AROUND THE COURTHOUSE.

1    SO I ALSO SAW THAT THERE WERE SOME OTHER

2    FEATURES REGARDING HIS FACT THAT HE WAS BLIND, AND WE HAD

3    A TON OF THINGS TO DEAL WITH, HIS PRIOR RECORD AND HIS

4    TESTIMONY AND OTHER WITNESSES COMING IN THAT HAD -- THAT

5    WERE IN PRISON AND IN JAIL.  SO -- BUT I THOUGHT

6    ULTIMATELY WE WOULD PREVAIL, EITHER ON ACQUITTAL; I FELT

7    VERY STRONGLY THAT WE COULD PREVAIL ON ACQUITTAL, AND/OR

8    AT WORST A MANSLAUGHTER CONVICTION.  AND THAT WAS -- I WAS

9    VERY DISAPPOINTED THAT HE WAS CONVICTED OTHERWISE.

10    Q.    I'M GOING TO BE SHOWING YOU WHAT'S BEEN

11    PREVIOUSLY ALREADY GIVEN TO COUNSEL, LODGED WITH COUNSEL

12    AND THE COURT, WHICH IS THE MANSLAUGHTER INSTRUCTION FOR

13    INVOLUNTARY MANSLAUGHTER, 8.45 IN EXISTENCE AT THE TIME

14    THAT YOU WERE DOING THE JURY INSTRUCTIONS.  AND I'LL ASK

15    YOU TO TAKE A LOOK AT THIS.

16    DOES THAT INSTRUCTION LOOK FAMILIAR?

17    A.    ALL TOO FAMILIAR.

18    Q.    DO YOU BELIEVE THAT THAT'S THE INSTRUCTION THAT

19    YOU CONSIDERED WHEN THE INSTRUCTIONS WERE GIVEN?

20    A.    THIS IS ONE OF THE INSTRUCTIONS THAT I DID

21    CONSIDER.  I DIDN'T REQUEST IT.  THERE WAS SOME DISCUSSION

22    CONCERNING INVOLUNTARY MANSLAUGHTER IN THE COURSE OF OUR

23    DISCUSSIONS IN CHAMBERS PRIOR TO SELECTING THE JURY

24    INSTRUCTIONS, AND I -- AS I LOOK AT IT TODAY, I STILL HAVE

25    SOME DOUBT AS TO WHETHER OR NOT JUDGE HARRIS WOULD HAVE

26    PERMITTED IT.  HE WAS A STICKLER ON THE BLACK LETTER LAW.

27    I ATTEMPTED ON A COUPLE OF OCCASIONS TO

28    MAKE EVEN SOME GRAMMATICAL CHANGES IN SOME OF THE

1    INSTRUCTIONS.  I PULLED SOME INSTRUCTIONS OUT OF AREAS

2    THAT COULD FOCUS ON MR. LITTLE'S INJURY THAT HE REFUSED TO

3    GIVE.  AND I KEEP LOOKING BACK AT THIS INSTRUCTION, NO. 1

4    SAYS, "A KILLING IS UNLAWFUL WITHIN THE MEANING OF THIS

5    INSTRUCTION IF IT OCCURRED DURING THE COMMISSION OF AN

6    UNLAWFUL ACT NOT AMOUNTING TO A FELONY, WHICH IS DANGEROUS

7    TO HUMAN LIFE UNDER THE CIRCUMSTANCES, OR ITS COMMISSION."

8    AND I COULDN'T THINK OF ANYTHING THAT OCCURRED OTHER THAN

9    THE STABBING AS BEING THE UNLAWFUL ACT THAT WE COULD LOOK

10   TO.  AND CERTAINLY I WOULD BE PRESSED TO SAY THAT STABBING

11   SOMEBODY WITH A KNIFE WAS NOT A FELONY, THAT IT WAS

12   SOMEHOW A MISDEMEANOR.  SO I DIDN'T -- I DID NOT REQUEST

13   THIS INSTRUCTION.

14       Q.   NOW, LET ME -- LET ME ASK YOU.  AT THE TIME THAT

15   YOU DEALT WITH MR. LITTLE, DID YOU LIKE HIM?

16       A.   I DID LIKE, AND I STILL DO.  AND I HAVE, AND I

17   STILL HAVE SOME PRETTY SOUR FEELINGS ABOUT THE RESULT IN

18   HIS TRIAL.  AND I LIKE HIS FAMILY; I SPENT A LOT OF TIME

19   WITH HIS FATHER AND HIS SISTER.  I'M VERY FOND OF THEM.

20       Q.   DID YOU MAKE YOUR BEST POSSIBLE EFFORTS TO

21   PRESENT A DEFENSE FOR MR. LITTLE BASED ON THE FACTS YOU

22   WERE AWARE OF?

23       A.   YES, I DID.

24       Q.   DID YOU ATTEMPT TO FOLLOW-UP WHERE YOU THOUGHT

25   INFORMATION SUGGESTED THAT IT MIGHT LEAD TO SOMETHING SUCH

26   AS THE EYE DOCTOR?

27       A.   YES.

28       Q.   DID YOU ASSUME THAT THE DEFENDANT WAS TELLING

1    YOU THE TRUTH WHEN HE TOLD YOU THINGS?

2        A.    YES.  I -- I ALWAYS FELT THAT LARRY WAS VERY

3    CANDID WITH ME ABOUT THINGS, ANYTHING THAT I WOULD ASK

4    HIM.

5        Q.    WERE YOU COMFORTABLE PRESENTING THE DEFENDANT'S

6    IMPERFECT SELF-DEFENSE CLAIM BASED ON WHAT YOU HAD BEEN

7    TOLD AND WHAT YOU KNEW?

8        A.    YES.

9        Q.    AND WAS THE DEFENDANT VERY CONCRETE IN HIS

10   EXPLANATION IN THAT AREA?

11       A.    HE WAS.

12       Q.    NOW YOU'VE MENTIONED THAT THERE WERE SOME THINGS

13   THAT YOU WERE AWARE OF THAT CONTRIBUTED TO MR. LITTLE'S

14   STATE OF MIND AT THE TIME OF THIS KILLING.  ONE OF THEM

15   BEING HIS VISION PROBLEMS, AND YOU WERE AWARE OF THAT?

16       A.    YES.

17       Q.    AND YOU INVESTIGATED THAT BY ARRANGING AN EXTRA

18   EXAMINATION AND USING OLD RECORDS?

19       A.    YES.

20       Q.    AND, IN FACT, YOU HAD LARRY'S -- MR. LITTLE'S

21   FATHER TESTIFY TO HIS VISION PROBLEMS DURING THE TRIAL,

22   DIDN'T YOU?

23       A.    YES.

24       Q.    AND YOU IN FACT HAD MR. LITTLE TESTIFY TO THE

25   VISION PROBLEMS IN HIS TRIAL, DIDN'T YOU?

26       A.    YES.

27       Q.    NOW, YOU WERE ALSO AWARE THAT THERE WAS DRUG USE

28   AND VARIOUS ARGUMENTS AND THINGS OCCURRING IN THIS

1  APARTMENT AT THE TIME -- AT OR AROUND THE TIME OF THE

2  KILLING, WEREN'T YOU?

3       A.   YES.

4       Q.   AND YOU WERE ABLE TO BRING THAT INFORMATION OUT

5  THROUGH MR. ROBERTS DURING THE TRIAL?

6       A.   YES.

7       Q.   AND, IN FACT, THIS DEFENDANT TESTIFIED ABOUT

8  SOME OF THOSE ARGUMENTS AND THINGS DURING HIS CHANCE AT

9  TESTIFYING, DIDN'T HE?

10       A.   YES.

11       Q.   AND, IN FACT, THE DEFENDANT WAS ABLE TO TESTIFY

12  ABOUT BEING AFRAID AND ABOUT THE WAY THE VICTIM MOVED AND

13  DESCRIBED HIS STATE OF MIND, WASN'T HE?

14       A.   YES.  AND I THINK WE ALSO BROUGHT OUT THAT BASED

15  UPON THE PHYSICAL EVIDENCE, SOME OF THE WITNESSES,

16  MS. BROOKS SPECIFICALLY, WAS EITHER MISTAKEN OR FALSIFYING

17  HER TESTIMONY.  THE PHYSICAL WOUNDS THEMSELVES INDICATED

18  THAT THE STABBING OCCURRED WHEN MR. RABITOR WAS ON HIS

19  FEET.  AND I THINK WE BROUGHT THAT OUT WITH CONSIDERABLE

20  DETAIL DURING THE -- WHEN THE DOCTOR TESTIFIED IN

21  PERFORMING THE AUTOPSY.  AND I THINK WE DID A LOT OF

22  DAMAGE TO IMPEACH HER.  SHE WAS THE CHIEF WITNESS IN THIS

23  INSTANCE, AND I USED THOSE AND OTHER METHODS TO TRY TO SET

24  ASIDE OR PUT HER TESTIMONY IN BAD LIGHT.  SO, YOU KNOW,

25  EVERY ASPECT OF THE TRIAL, I THINK, THAT I DID THE BEST

26  THAT I COULD, BASED ON THE YEARS OF EXPERIENCE THAT I HAD.

27       Q.   DID YOU -- AS FAR AS YOU CAN RECALL, DID YOU

28  ATTEMPT OR DID YOU PRESENT AS AN EFFECTIVE DEFENSE OF

1    MR. LITTLE AS YOU COULD?

2        A.    THIS IS MONDAY MORNING.  YOU ALWAYS WALK OUT OF

3    A TRIAL THINKING, IF I ONLY HAD ASKED THAT QUESTION, IF

4    I'D ONLY MADE THAT ARGUMENT, IF I'D ONLY BROUGHT IN THAT

5    ONE LITTLE LAST PIECE OF EVIDENCE, IT WOULD HAVE MADE A

6    DIFFERENCE.  BUT WHEN YOU'RE IN THE HEAT OF IT AND YOU'RE

7    DOING THE BEST JOB THAT YOU POSSIBLY CAN, THEN YOU --

8    YOU'VE GOT TO GO WITH THAT EXAMINATION I DID -- I THINK I

9    DID.  I MEAN, I MADE MISTAKES IN THAT TRIAL, I KNOW I DID,

10   AND I COULD HAVE DONE THINGS DIFFERENTLY OR EVEN BETTER,

11   BUT AT THE TIME, I FELT LIKE I DID THE BEST JOB THAT I

12   COULD.

13        MS. MALLEN:  OKAY, THANK YOU.

14            NOTHING FURTHER.

15        THE COURT:  MR. WILLIAMS.

16        MR. WILLIAMS:  THANK YOU, JUDGE.

17

18                    **CROSS-EXAMINATION**

19   BY MR. WILLIAMS:

20        Q.    AT THE TIME THAT YOU TRIED THIS CASE, YOU SAID

21   YOU HAD HAD ONE PREVIOUS MURDER, A 187?

22        A.    YES, I HAD A MURDER TRIAL.  IT WAS A STABBING

23   CASE.

24        Q.    UH-HUH.

25        A.    IT WAS A SELF-DEFENSE CASE.  IT WAS TRIED WITH

26   BROWDER WILLIS, WHO IS NOW ON THE BENCH, WAS THE

27   PROSECUTOR.  AND LAURA HAMMES WAS THE JUDGE IN THAT CASE.

28        Q.    AND DID YOU RUN WHAT IS COMMONLY REFERRED TO AS

1    A FLANNEL DEFENSE IN THAT CASE?

2         A.    YES.

3         Q.    AND WERE YOU SUCCESSFUL?

4         A.    NO.

5         Q.    THEY FOUND FOR MURDER?

6         A.    THEY FOUND MURDER IN THE FIRST DEGREE.

7         Q.    OKAY.   SO THAT WAS THE ONLY MURDER TRIAL THAT

8    YOU HAD HAD, CORRECT?

9         A.    YES.

10        Q.    HAD YOU HANDLED ANY MURDERS OTHER THAN THAT?

11        A.    I HAD ONE CASE WHERE MY CLIENT WAS CHARGED WITH

12   A MURDER IN A DRUNK DRIVING.

13        Q.    THAT'S RIGHT, A WATSON --

14        A.    YES.

15        Q.    OKAY.

16        A.    AND THAT CASE EVENTUALLY SETTLED AS A

17   MANSLAUGHTER.

18        Q.    ANY OTHER HOMICIDES?

19        A.    HOMICIDE.   I HAD ONE VEHICULAR HOMICIDE CASE

20   WHERE KIDS WERE RACING ON MIRA MESA BOULEVARD AND A YOUNG

21   LADY WAS KILLED THEN.

22        Q.    SO IT'S FAIR TO SAY THAT, YOU KNOW, THIS IS ONE

23   OF YOUR FIRST MURDER CASES?

24        A.    YES.

25        Q.    NOW, YOU INDICATED TO MS. MALLEN AND TO US THAT

26   YOU DID REQUEST A LOT OF JURY INSTRUCTIONS?

27        A.    YES.

28        Q.    IN FACT, YOU PRINTED OUT OR YOU SUBMITTED TO THE

270

1    COURT ALL YOUR REQUESTED INSTRUCTIONS BY CALJIC NUMBERS,

2    AND EVEN SOME SPECIALS THAT YOU PROBABLY GOT FROM

3    FORESIGHT OR SOMETHING LIKE THAT?

4        A.   RIGHT.

5        Q.   DID YOU DO THAT PRIOR TO TRIAL OR AFTER TRIAL OR

6    DURING TRIAL?

7        A.   WELL --

8        Q.   AFTER TRIAL, I MEAN AFTER THE EVIDENCE WAS

9    CLOSED?  I'M SORRY.

10       A.   I PROBABLY DID IT AT THE CONCLUSION OF THE

11   EVIDENCE.

12       Q.   OKAY.

13       A.   ALTHOUGH, YOU KNOW, WHEN YOU TRY A CASE, YOU TRY

14   A CASE AND YOU -- WITH THOSE INSTRUCTIONS IN MIND, SO --

15       Q.   BUT YOU DID NOT EVER REQUEST 8.45 INVOLUNTARY

16   MANSLAUGHTER?

17       A.   I DID NOT.

18       Q.   AND ITS COMPANION 8.46, WHICH IS DUE CAUTION AND

19   CIRCUMSPECTION DEFINED; YOU DID NOT --

20       A.   THAT'S CORRECT.

21       Q.   DID IT EVER OCCUR TO YOU THAT THIS COULD BE AN

22   INVOLUNTARY MANSLAUGHTER?

23       A.   IT DID NOT AT THE TIME.

24       Q.   WHY?

25       A.   BECAUSE I BELIEVE THAT THERE -- IT DIDN'T FIT IN

26   THE -- WITHIN THE FOUR CORNERS OF THIS INSTRUCTION.

27       Q.   OKAY.  LET'S TALK ABOUT HOMICIDE.  PRIOR TO THIS

28   TRIAL, HAD YOU ATTENDED THE CALIFORNIA PUBLIC DEFENDERS

1 ASSOCIATION HOMICIDE SEMINAR?

2   A. I ATTENDED THAT ON TWO OCCASIONS. AND I'M NOT

3 SURE IF I ATTENDED IT BEFORE OR AFTER THIS TRIAL.

4   Q. PRIOR TO THIS, HAD YOU ATTENDED THE C.A.C.J.

5 DEATH PENALTY SYMPOSIUM?

6   A. I HAD NOT.

7   Q. HAD YOU ATTENDED ANY TRAINING IN THE LAW OF

8 HOMICIDES?

9   A. NOT SPECIFICALLY HOMICIDE, NO, OTHER THAN, LIKE

10 I SAID, I MAY HAVE ATTENDED -- THERE IS A SEMINAR GIVEN UP

11 IN SACRAMENTO OR IN THE SAN FRANCISCO AREA BY C.A.C.A.J.

12 ON HOMICIDES, AND I'VE BEEN TO THAT ON TWO OCCASIONS. AND

13 ONE OF THOSE OCCASIONS MAY HAVE BEEN BEFORE THIS WENT TO

14 TRIAL.

15   Q. OKAY. WAS IT YOUR UNDERSTANDING OF THE LAW AT

16 THAT TIME THAT THE -- OF COURSE, WE CAN ONLY DEAL WITH

17 1999 OR 2000, THE TRIAL, THAT IF THERE'S ANY THEORY OR ANY

18 JUSTIFICATION AT ALL FOR A HOMICIDE THEORY, THAT THE

19 DEFENDANT IS ENTITLED TO AN INSTRUCTION?

20   A. YES.

21   Q. YOU KNEW THAT?

22   A. YES.

23   Q. AND THE LAW AT THAT TIME, IN FACT UNTIL ONE

24 MONTH AFTER THE TRIAL, WAS THAT VOLUNTARY MANSLAUGHTER

25 REQUIRED AN INTENT TO KILL?

26   A. YES.

27   Q. WAS THAT YOUR UNDERSTANDING?

28   A. YES.

272

1     Q.   SECOND DEGREE MURDER DOES NOT REQUIRE AN INTENT

2  TO KILL, DOES IT?

3     A.   RIGHT.  IT SEEMS ILLOGICAL, I KNOW.

4     Q.   THEY CLEARED THAT UP, BUT THAT IS NOT YOUR

5  FAULT.  HOWEVER, INVOLUNTARY MANSLAUGHTER IS ALMOST LIKE

6  VOLUNTARY, IN THAT IT'S WITHOUT MALICE AND WITHOUT AN

7  INTENT TO KILL, RIGHT?

8     A.   RIGHT.

9     Q.   DID YOU THINK LARRY LITTLE INTENDED TO KILL

10  MR. RABITOR?

11     A.   NO, I -- I MEAN, I DON'T THINK HE HAD THE INTENT

12  TO KILL.  I THINK HIS CONDUCT WAS, YOU KNOW, IMPLIED, THE

13  MALICE WAS IMPLIED FROM THE CONDUCT.

14     Q.   YOU THOUGHT THERE WAS MALICE IMPLIED?

15     A.   YES.

16     Q.   MANSLAUGHTER REQUIRES AN ABSENCE OF MALICE,

17  RIGHT?

18     A.   MANSLAUGHTER REQUIRES AN ABSENCE OF MALICE.

19     Q.   BUT IF YOU THOUGHT THERE WAS MALICE?

20     A.   WELL, WHAT I THOUGHT -- WE'RE TALKING ABOUT TWO

21  DIFFERENT THINGS.  WE'RE TALKING ABOUT MY DEFENSE --

22     Q.   YES, SIR.

23     A.   -- OR WHAT THE EVIDENCE WAS?

24     Q.   BOTH.  IT WAS YOUR DEFENSE THAT HE DID NOT

25  INTEND TO KILL HIM AND HE DID IT WITHOUT MALICE?

26     A.   YES.

27     Q.   THAT'S INVOLUNTARY MANSLAUGHTER, ISN'T IT?

28     A.   NO, I THINK THAT IS AN ACQUITTAL.  I THINK

1    THAT'S A JUSTIFIABLE, YOU KNOW, HOMICIDE, IF HE'S DONE IT

2    IN SELF-DEFENSE.

3        Q.    OKAY.  SO YOUR THEORY WAS ALL OR NOTHING ON

4    THAT?

5        A.    ALL OR NOTHING.

6        Q.    AND, IN FACT, THE JUDGE SPECIFICALLY ASKED YOU,

7    "YOU'RE NOT REQUESTING ANY INSTRUCTIONS ON INVOLUNTARY

8    MANSLAUGHTER?"  AND YOU SAID, "NO"?

9        A.    RIGHT.

10       Q.    AND/OR VOLUNTARY INTOXICATION?

11       A.    RIGHT.

12       Q.    YOU DID NOT CONSIDER VOLUNTARY INTOXICATION A

13   DEFENSE?

14       A.    NOT BASED UPON WHAT I WAS TOLD BY LARRY LITTLE.

15       Q.    WERE YOU AWARE THAT HE WAS ALSO COMING DOWN FROM

16   METHAMPHETAMINE AT THE TIME?

17       A.    NO.

18       Q.    OKAY.  HE DIDN'T TELL YOU THAT?

19       A.    WELL, HE TOLD ME HE HAD USED IT A WEEK BEFORE,

20   AND I DIDN'T ASSUME THAT --

21       Q.    BUT YOU KNEW THIS WAS A EL CAJON DRUG HOUSE,

22   RIGHT?  I MEAN --

23       A.    EL CAJON HAS A REPUTATION.

24       Q.    I MEAN, THIS SPECIFIC HOUSE.  LET'S NOT SLANDER

25   ALL OF US, BUT THIS SPECIFIC HOUSE IN EL CAJON?

26       A.    YES.

27       Q.    OKAY.  WERE YOU AWARE THAT VOLUNTARY

28   INTOXICATION CAN NEGATE MALICE?

1    A.    YES.

2    Q.    WERE YOU AWARE THAT VOLUNTARY INTOXICATION CAN

3 GO TO THE SUBJECTIVE STANDARD OF REASONABLENESS IN PERFECT

4 SELF-DEFENSE IN THE INVOLUNTARY MANSLAUGHTER/FLANNEL?

5    A.    YES.

6    Q.    BUT YOU STILL DIDN'T WANT A VOLUNTARY

7 INTOXICATION INSTRUCTION?

8    A.    BECAUSE I DIDN'T THINK WE HAD ONE.  I DIDN'T

9 THINK THE FACTS LAID OUT TO INVOLUNTARY INTOXICATION TO

10 THE POINT WHERE IT WOULD MAKE SENSE TO ARGUE IN FRONT OF

11 THE JURY THAT MY CLIENT WAS SO DRUNK, HE DIDN'T KNOW WHAT

12 WAS GOING ON.  BECAUSE HE KNEW AND WAS KEENLY AWARE OF THE

13 SITUATION THERE.  AND HONESTLY --

14    Q.    GO AHEAD.

15    A.    YOU KNOW, I COULD SAY I PROBABLY SHOULD HAVE

16 REQUESTED THIS INSTRUCTION, BASED UPON THOSE THEORIES IN

17 CIRCUMSPECTION, IN LOOKING BACK, YES.

18    Q.    YOU'RE RIGHT, YOU SAID THIS IS MONDAY MORNING.

19    A.    THAT'S WHAT YOU WANT ME TO SAY.

20    Q.    NO, SIR.  YOU AND I ARE SUNDAY AFTERNOON

21 PLAYERS; WE'RE GOING TO LET THE MONDAY MORNING

22 QUARTERBACKS DO IT LATER, OKAY?

23         THE COURT:  IS THAT A REFERENCE TO ME?

24         MR. WILLIAMS:  NO.

25         THE COURT:  OH.

26         MR. WILLIAMS:  NO, IT'S NOT.  I DON'T LIKE TO BE

27 SECOND GUESSED EITHER.

28         THE COURT:  I'M GOING TO BE THE ONE WHO DECIDES

1    THIS.  IT'S GOING TO BE MONDAY WHEN I DO IT.

2                MR. WILLIAMS:  OKAY, FINE.  THAT'S FINE.

3    BY MR. WILLIAMS:

4        Q.   WAS THAT YOUR UNDERSTANDING, THE ONLY WAY YOU

5    COULD USE VOLUNTARY INTOXICATION WAS IF YOUR CLIENT WAS

6    TOO DRUNK TO KNOW WHAT WAS GOING ON?

7        A.   YES.

8        Q.   YOU WEREN'T AWARE YOU COULD USE VOLUNTARY

9    INTOXICATION TO SHOW HIS PERCEPTION MIGHT HAVE BEEN JUST A

10   LITTLE BIT SKEWED?

11       A.   WELL, IF IT WAS THERE, BUT HE WAS, YOU KNOW,

12   HE'S NOT TELLING ME THAT IT'S THAT WAY.

13       Q.   DIDN'T JOSH ROBERTS TESTIFY THAT LARRY HAD BEEN

14   DRINKING THAT DAY?

15       A.   YES.

16       Q.   AND YOU KNEW JOSHUA ROBERTS WAS A CRIMINAL,

17   RIGHT?  A FELON, RIGHT?

18       A.   HE WAS TESTIFYING IN HIS GREEN JUMP SUIT.

19       Q.   OKAY.  YOU SAID THAT YOU WENT AND TALKED TO BOB

20   TEAL, RIGHT?

21       A.   YES.

22       Q.   DID YOU HAVE MR. COTTON TESTIFY?

23       A.   WELL, WE GOT HIS RECORDS, AND, YOU KNOW, WE KNEW

24   KIND OF WHAT WAS GOING ON WITH HIM.  AND WE QUIZZED HIM

25   PRETTY CLOSELY ABOUT STUFF THAT HE HAD DONE AND WHY HE WAS

26   THERE.  AND HE REALLY DIDN'T WANT TO TALK TO US BECAUSE HE

27   DIDN'T WANT TO GET A SNITCH JACKET AND A LOT OF, YOU

28   KNOW --

1    Q.    DID THE DISTRICT ATTORNEY'S OFFICE EVER TELL YOU

2    THAT HE HAD EVER BEEN A SNITCH ON ANY OTHER OCCASIONS?

3    A.    NO.

4    Q.    WERE YOU ABLE TO DETERMINE THAT?

5    A.    NO.

6    Q.    THIS WAS A -- THIS WAS NOT A WHO DONE IT, RIGHT?

7    A.    CORRECT.

8    Q.    IT'S A WHAT IS IT WE CALL IT?

9    A.    YES.

10   Q.    AND A WHAT IS IT.  WOULD YOU AGREE, MR. PECKHAM,

11   AS THE CRIMINAL DEFENSE ATTORNEY, THE WHY IS IMPORTANT?

12   A.    YES.

13   Q.    WHY THE KILLING?  DID IT MAKE SENSE TO YOU THAT

14   MR. LITTLE WOULD JUST PICK UP A KNIFE AND STAB MR. RABITOR

15   FOR NO REASON?

16   A.    NO.

17   Q.    SO YOU DEFINITELY WERE LOOKING FOR WHY; IS THAT

18   CORRECT?

19   A.    YES.

20   Q.    NOW AFTER YOU TALKED TO LARRY AND HE TOLD YOU

21   ABOUT HIS EYE INJURY, DID YOU TALK TO ANY EXPERTS AT ALL?

22   A.    ABOUT THE EYE INJURY ITSELF?

23   Q.    YES, SIR.

24   A.    NO.

25   Q.    DID YOU TALK TO ANY OTHER LAWYERS ABOUT WHAT

26   YOUR COURSE SHOULD BE, KNOWING THAT YOUR CLIENT HAD HAD

27   HIS EYE STABBED?

28   A.    I GENERALLY TALK ABOUT MY CASES WITH OTHER

1   DEFENSE LAWYERS.  I PROBABLY DID.  I PROBABLY BROUGHT IT

2   UP AND DISCUSSED IT HERE AND THERE.

3        Q.   NO ONE EVER SUGGESTED THAT YOU GET A MENTAL

4   HEALTH EXPERT OR A MEDICAL DOCTOR TO DO A MENTAL STATUS

5   AND --

6        A.   THE -- I DIDN'T SEE ENOUGH OR I DIDN'T REALLY

7   SEE ANYTHING IN LARRY THAT WAS SUGGESTED.  I COULD HAVE

8   DONE IT, CERTAINLY.  AND AS DR. ABRAM SAID THIS MORNING,

9   YOU KNOW, INFORMATION IS HELPFUL AND CAN'T BE, YOU KNOW,

10  IT'S ALWAYS GOOD AND -- BUT I DIDN'T SEE -- LIKE I SAID

11  BEFORE, I DIDN'T SEE ANYTHING IN LARRY THAT WOULD SUGGEST

12  THAT I NEEDED A MENTAL STATUS AND --

13       Q.   BY THAT YOU MEAN TO SEE IF THERE WERE ANY

14  MENTAL -- I KNOW THERE WAS -- WHAT I MEAN IS DID YOU

15  CONSIDER GETTING ANYONE TO LOOK FOR ANY MENTAL DEFENSES?

16       A.   NO.

17       Q.   AT THAT POINT, WHEN YOU WERE HANDLING THIS CASE,

18  HAD YOUR TRAINING CONSISTED OR EVER TOLD YOU THAT IN ANY

19  HOMICIDE YOU SHOULD GET AN EXPERT TO EXPLORE MENTAL

20  DEFENSES?

21       A.   NO.

22       Q.   HAVE YOU SINCE LEARNED THAT?

23       A.   WELL, I'M GOING TO BE OBVIOUSLY A LOT MORE

24  CONCERNED.

25       Q.   I MEAN IN THE SEMINARS WERE YOU TOLD THAT?

26       A.   NO.  I DON'T THINK ANY SEMINAR THAT I EVER

27  ATTENDED SAID YOU AUTOMATICALLY GET A MENTAL HEALTH EXPERT

28  TO COME IN AND INTERVIEW YOUR CLIENT.  I THINK THERE HAS

1    TO BE SOMETHING THERE FOR YOU TO FOCUS ON TO DO THAT.

2         Q.    AND THE SOMETHING THERE IS -- WAS BASED UPON

3    YOUR EVALUATION, CORRECT?

4         A.    I'M THE ONLY ONE THAT IS SEEING HIM TO DO THAT

5    EVALUATION, SO YEAH.

6         Q.    BECAUSE YOUR CLIENT BASICALLY TOLD YOU HE HAD

7    P.T.S.D. IMMEDIATELY?

8         A.    HE DIDN'T MENTION THAT, BUT HE DID MENTION THAT

9    HE WAS HAVING NIGHTMARES.  AND WHENEVER HE CAME AROUND

10   POLICE OFFICERS, HE HAD THIS REACTION.  AND HE SAID HE WAS

11   RELIVING THE EVENTS.  HE COULD SEE HIMSELF LAYING ON THE

12   PAVEMENT BEING KICKED BY THESE POLICE OFFICERS.  HE WOULD

13   WAKE UP AT NIGHT WITH SWEAT.  YOU KNOW, IT WAS PRETTY

14   APPARENT THAT HIS LIFE WAS BEING AFFECTED BY WHAT HAD

15   HAPPENED.

16        Q.    IS THAT WHAT HAPPENED?  WERE YOU SUING THE

17   HIGHWAY PATROL OR SOMETHING?

18        A.    YES.

19        Q.    OKAY.  WAS HE TALKING ABOUT WHAT HAPPENED WITH

20   THE HIGHWAY PATROL OFFICERS?

21        A.    YES.

22        Q.    OKAY.  SO YOU WERE SUING FOR DAMAGES, RIGHT?

23        A.    CORRECT.

24        Q.    HE WAS A CIVIL PLAINTIFF?

25        A.    CORRECT.

26        Q.    IT WAS -- OBVIOUSLY I'M ASSUMING HE WAS OUT OF

27   CUSTODY?

28        A.    HE WAS THEN OUT OF CUSTODY.

```
 1        Q.   OKAY.  AND WAS HE A VERY SOPHISTICATED GENTLEMAN
 2   OR --
 3        A.   NOT ESPECIALLY, NO.
 4        Q.   WAS HE MORE SOPHISTICATED THAN MR. LITTLE?
 5        A.   HE WAS MORE SOPHISTICATED THAN MR. LITTLE.
 6        Q.   NOW, YOU SAID THAT AT ONE POINT YOU TOLD LARRY
 7   IF YOU THOUGHT -- HE HAD TO HAVE HAD P.T.S.D., RIGHT?
 8        A.   I BELIEVE HE DID, YEAH.
 9        Q.   BUT DURING THE PENDENCY OF THIS CASE, YOU CAME
10   TO THAT CONCLUSION, RIGHT?
11        A.   YES.
12        Q.   BUT YOU NEEDED TO GET HIM SOME HELP; HE NEEDED
13   TO GET HELP, RIGHT?
14        A.   WELL, HE MENTIONED THAT I HAD SAID SOMETHING
15   ABOUT A FAMILY MEMBER OF MINE WHO HAD A TRAUMATIC EVENT IN
16   HIS LIFE, AND HE DEALT WITH IT IN THE '60'S.  AND I MAY
17   HAVE SAID SOMETHING TO LARRY ABOUT, YOU KNOW, YOU NEED TO
18   PROBABLY DEAL WITH THIS; IT MAY COME BACK TO HAUNT YOU ONE
19   DAY.
20        Q.   YOU DIDN'T THINK TO GET ANYBODY TO EVALUATE
21   LITTLE AS A POSSIBLE DEFENSE AT THAT TIME?
22        A.   I DIDN'T -- I MEAN, I THOUGHT ABOUT IT.  AND I
23   DIDN'T DO IT BECAUSE OF WHAT INFORMATION HE WAS GIVING TO
24   ME.
25        Q.   OKAY.  BUT WHY DID YOU THINK HE HAD P.T.S.D.,
26   BECAUSE OF AN EYE STABBING?
27        A.   YEAH.  JUST BECAUSE THERE WAS, YOU KNOW, A
28   HUGELY TRAUMATIC EVENT WHERE HE LOST AN EYE.  I THOUGHT
```

1    THAT ALONE WAS PROBABLY ENOUGH AS AN INDICATOR.

2        Q.    I DON'T MEAN TO BE COY, BUT YOU SAID THAT WAS AN

3    INDICATOR, AND THAT YOU WERE CONVINCED OF P.T.S.D.    WHAT

4    MORE DID YOU NEED?

5        A.    NOTHING.    I KNEW HE HAD IT, BUT I COULDN'T FIND

6    OUT, I COULDN'T PUT IT IN MY CASE.    THAT THAT WAS THE

7    PROBLEM THAT I WAS HAVING, IS FINDING A WAY TO GET IT IN

8    THE CASE.

9        Q.    NOW YOUR PREVIOUS MENTAL HEALTH EXPERIENCE AS A

10   LAWYER -- YOU ALSO HAD SOME AS A HUSBAND, RIGHT?    YOUR

11   WIFE WAS A --

12       A.    MORE THAN YOU KNOW.    IT'S MY EX-WIFE.

13       Q.    I PROMISE I WILL NOT -- BUT YOUR MENTAL HEALTH

14   LEGAL FIELD EXPERIENCE IS PRIMARILY THE AREA OF WHAT WE

15   COMMONLY REFER TO AS L.P.S., RIGHT?    THE LAN PENPETRO(PH)

16   SHORT CONSERVATORSHIP?

17       A.    YES.

18       Q.    AND THOSE PEOPLE -- CORRECT ME WHEN I MAKE A

19   MISTAKE.    THE BASIC QUESTION IN THAT CASE IS ARE THEY

20   SUFFERING FROM A MENTAL DISORDER, RIGHT?

21       A.    CORRECT.

22       Q.    AND TWO -- IS IT OF SUCH THAT IT MAKES THEM

23   EITHER A DANGER TO THEMSELVES OR OTHERS OR UNABLE TO

24   PROVIDE THE BASIC NEEDS?

25       A.    CORRECT.

26       Q.    SO THAT'S THE THRUST OF THEIR BASIC ABILITIES?

27       A.    CORRECT.

28       Q.    SO USUALLY GOING IN, THEY HAVE A DISABILITY?

1    A.    YES.

2    Q.    MAJOR QUESTION IS USUALLY THE SECOND ONE, RIGHT?

3  I MEAN, CAN THEY CARE FOR THEMSELVES, DESPITE THIS?

4    A.    RIGHT.

5    Q.    IN AN OUTSIDE LIVING SITUATION?

6    A.    RIGHT.

7    Q.    DID ANY OF THOSE PEOPLE HAVE P.T.S.D.?

8    A.    WELL --

9    Q.    WAIT A MINUTE, THAT'S AN UNFAIR QUESTION.  WERE

10  ANY OF THESE PEOPLE TO BE ALLEGED TO BE SUFFERING FROM

11  P.T.S.D.?

12    A.    THERE ARE -- WHEN I THINK BACK, THERE WAS A

13  COUPLE VIETNAM VETS.  THIS WAS BACK WHEN -- RIGHT AT THE

14  END OF THE WAR, THESE GUYS WERE COMING BACK.  AND I'M NOT

15  SURE IF THEY WERE TALKING ABOUT P.T.S.D. THEN, OR IF THEY

16  WERE TALKING --

17    Q.    COMBAT FATIGUE?

18    A.    YEAH.  AND THERE WERE A COUPLE GUYS, I REMEMBER,

19  THAT WERE HAVING A PROBLEM WITH IT.

20         THE COURT:  WOULD THIS BE A GOOD TIME TO BREAK

21  FOR THE BREAK?

22         MR. WILLIAMS:  SURE, YOUR HONOR.

23         THE COURT:  LET'S TAKE 15 MINUTES.  WE'LL BE IN

24  RECESS UNTIL 3:15.  THANK YOU.

25                    (RECESS.)

26

27         THE COURT:  ALL PARTIES ARE PRESENT.

28  MR. PECKHAM IS ON THE STAND.

1          MR. WILLIAMS, YOU MAY CONTINUE TO

2    CROSS-EXAMINE.

3          MR. WILLIAMS:  THANK YOU, YOUR HONOR.

4    BY MR. WILLIAMS:

5          Q.   MR. PECKHAM, YOU INDICATED ON YOUR DIRECT

6    EXAMINATION THAT A KEY ELEMENT OF YOUR CASE WAS THAT HE

7    COULD NOT PERCEIVE WITH HIS EYE; IS THAT CORRECT?

8          A.   YES.

9          Q.   DID YOU EVER CONSIDER THE PERCEPTION WITH THE

10   MIND IN THIS CASE?

11         A.   WELL, THE EYES ARE THE WINDOWS TO THE MIND.  SO

12   I THOUGHT THAT IF I COULD CONVINCE THE JURY THAT HE WASN'T

13   SEEING AS MUCH AS HE SHOULD HAVE OR COULD HAVE, THAT THAT

14   WOULD AFFECT HIS RESPONSE.

15         Q.   I MEAN, DID YOU EVER CONSIDER THAT THERE MIGHT

16   BE SOMETHING OTHER THAN A LACK OF VISION, LIKE SOME MENTAL

17   DIFFICULTIES?

18         A.   WELL, I KNEW THAT LARRY WAS SUFFERING FROM

19   P.T.S.D., SO -- BUT AGAIN, I -- I DID CONSIDER THOSE

20   THINGS, BUT I TRIED TO FIT THOSE INTO A PLACE IN THE CASE

21   THAT WOULD HELP US, AND I DIDN'T SEE A WAY TO DO THAT.

22         Q.   OKAY, SO AT THE TIME YOU COULD NOT SEE HOW THE

23   P.T.S.D. COULD BE USED TO NEGATE THE MALICE AND SHOW A

24   REASONABLE BELIEF OF SELF-DEFENSE?

25         A.   THAT'S CORRECT.

26         Q.   DID YOU THINK -- AND YOU ALSO DID NOT SEE HOW IT

27   COULD NEGATE THE INTENT TO KILL?

28         A.   RIGHT, BECAUSE OF THE SAME REASON.

1      Q.   NOW, YOU HEARD DR. ABRAMS, I THINK, TODAY

2  TESTIFY THAT P.T.S.D. SUFFERERS, OR PEOPLE WITH IT,

3  WHATEVER YOU WANT TO CALL THEM, ARE POOR HISTORIANS, ARE

4  POOR REPORTERS, OR SOMETHING LIKE THAT, RIGHT?

5      A.   YES, I WOULD SAY THAT.

6      Q.   WERE YOU AWARE OF THAT IN 1999?

7      A.   NO.

8      Q.   OKAY.  YOU'RE FAMILIAR WITH PRIVATE CONFLICTS

9  COUNSEL, OR P.C.C. PROCEDURES, CORRECT?

10     A.   CORRECT.

11     Q.   IN ORDER TO GET A PSYCHIATRIST OR A

12  PSYCHOLOGIST, WE JUST CALL AND GET AN AUTHORIZATION?

13     A.   CORRECT.

14     Q.   YOU HAVE TO JUSTIFY IT, OBVIOUSLY?

15     A.   YES.

16     Q.   THE MONEY DOESN'T COME OUT OF OUR -- BY "OUR," I

17  MEAN THE ATTORNEY'S POCKETS, RIGHT?

18     A.   CORRECT.

19     Q.   SO THERE WAS OBVIOUSLY NO PECUNIARY REASON NOT

20  TO GET IT?

21     A.   ABSOLUTELY NOT.

22          MR. WILLIAMS:  THANK YOU, YOUR HONOR.  I BELIEVE

23  I HAVE NOTHING FURTHER.

24          THE COURT:  MS. MALLEN?

25          MS. MALLEN:  NOTHING FURTHER.  THANK YOU.

26          THE COURT:  ALL RIGHT, MR. PECKHAM, I HAVE --

27  DON'T LEAVE.  I DO HAVE A COUPLE OF QUESTIONS.

28

1    BY THE COURT:

2        Q.    IN CONNECTION WITH, WHEN YOU WERE EVALUATING THE

3    DEFENSE AND THE IMPERFECT SELF-DEFENSE, AND YOU WERE ALSO

4    EVALUATING A SELF-DEFENSE CLAIM; ISN'T THAT TRUE?

5        A.    YES.

6        Q.    AND THAT'S WHAT MR. LITTLE HAD TOLD YOU

7    REPEATEDLY, THAT IT WAS IN FACT A REAL SELF-DEFENSE?

8        A.    YES.

9        Q.    BECAUSE MR. ROBERT RAN --

10       A.    RABITOR.

11       Q.    RABITOR, THAT'S THE GUY.  THAT MR. RABITOR WAS

12   COMING AT HIM WITH AN OBJECT, AND MR. LITTLE WAS INSISTING

13   THAT THAT OBJECT WAS A GLASS ASHTRAY?

14       A.    YES.

15       Q.    AND, OF COURSE, THEN YOU SAW THE KNIFE IN THE

16   PHOTOGRAPHS UNDER THE BODY OF MR. RABITOR AND YOU WERE

17   HOPING THAT THAT WAS THE OBJECT THAT HE CAME AT YOUR

18   CLIENT WITH, CORRECT?

19       A.    I WAS HOPING LIKE MAD.

20       Q.    NOW, THAT WOULD HAVE -- THAT WOULD HAVE ASSISTED

21   YOU NOT ONLY IN YOUR -- A CLAIM OF -- POTENTIAL CLAIM OF

22   POSTTRAUMATIC STRESS DISORDER, BUT THAT WOULD HAVE BEEN A

23   REAL BOON FOR YOUR TRUE SELF-DEFENSE CLAIM, WOULDN'T IT?

24       A.    YES.

25       Q.    NOW WHAT -- IN TERMS OF WHEN YOU'RE SITTING DOWN

26   AND STRATEGIZING AND FIGURING OUT WHAT TO DO IN A CASE

27   SUCH AS THIS, WHAT'S -- WHAT'S GENERALLY YOUR FEELING

28   ABOUT INCONSISTENT DEFENSES?

1      A.   I DON'T LIKE TO PRESENT INCONSISTENT DEFENSES

2   BECAUSE I THINK IT CONFUSES THE JURY AS TO WHAT ARE YOUR

3   STRENGTHS, WHERE YOUR REAL DEFENSE IS GOING TO BE.  SO

4   I -- I HESITATE TO BRING IN INCONSISTENT DEFENSES.  I

5   THINK THE JURY DOESN'T LIKE THOSE; THEY TEND NOT TO ACCEPT

6   YOU AS A CREDIBLE PRESENTER OF THE FACTS WHEN YOU'RE

7   SAYING ONE THING ON ONE SIDE OF THE CASE, AND ANOTHER AND

8   ANOTHER.  SO I TEND NOT TO DO THAT IF THEY'RE TRULY

9   INCONSISTENT.

10      Q.   AND IF YOUR CLIENT IS GOING TO BE TESTIFYING TO

11   A -- A TRUE SELF-DEFENSE SITUATION?

12      A.   YES.

13      Q.   BASED UPON THE FACTS AS HE PERCEIVES THEM, WOULD

14   IT NOT BE INCONSISTENT THEN TO PRESENT SOME KIND OF

15   PSYCHIATRIC BASIS FOR MISPERCEPTION?

16      A.   YES.

17      Q.   AND DID YOU CONSIDER THAT WHEN YOU WERE MAKING

18   YOUR DECISION?

19      A.   THAT WAS PART OF WHAT I WAS CONSIDERING, SURE.

20      Q.   OKAY.  AND IS THAT ONE OF THE REASONS WHY YOU

21   DIDN'T SEEK OUT -- WELL, THAT -- I'M NOT GOING TO ASK THIS

22   QUESTION, BECAUSE YOU -- AS FAR AS THE -- THE JURY

23   INSTRUCTION, THE INVOLUNTARY MANSLAUGHTER INSTRUCTIONS,

24   YOU DIDN'T SEE ANYWAY WHERE THEY FIT IN THIS CASE?

25      A.   CORRECT.

26      Q.   AND APPARENTLY THERE WAS SOME DISCUSSION, AND

27   JUDGE HARRIS DIDN'T SEE ANY PLACE WHERE THEY FIT EITHER?

28      A.   RIGHT.

286

```
 1        Q.    IF THEY REALLY DID FIT, THE JUDGE HAD A DUTY ON

 2   HIS OWN TO GIVE THAT INSTRUCTION, RIGHT?

 3        A.    SUA SPONTE, YES.

 4             THE COURT:  RIGHT.  OKAY.

 5                  MS. MALLEN, ANYTHING ELSE?

 6             MS. MALLEN:  NO, YOUR HONOR.

 7             THE COURT:  MR. WILLIAMS, ANYTHING ELSE?

 8

 9                     RECROSS-EXAMINATION

10   BY MR. WILLIAMS:

11        Q.    YOU RAN A FLANNEL DEFENSE AND ASKED FOR

12   VOLUNTARY BASED UPON HIS LACK OF PERCEPTION VISUALLY,

13   CORRECT?

14        A.    AS A BACK UP.  IT WAS -- YOU KNOW, THE VOLUNTARY

15   WAS A BACK UP TO AN ACQUITTAL.  I DIDN'T WANT THE JURY

16   TO -- I WANTED TO GIVE THEM A CHOICE.

17        Q.    THE CHOICE --

18        A.    THE WORSE CASE SCENARIO WOULD HAVE BEEN

19   VOLUNTARY, IN MY OPINION, IN MY BELIEF.

20        Q.    SO YOU DIDN'T WANT TO GIVE HIM THE OTHER CHOICE

21   BECAUSE THAT WOULD HAVE REQUIRED A TOTALLY INCONSISTENT

22   DEFENSE?

23        A.    IT WAS INCONSISTENT WITH THE FACTS AS I SAW

24   THEM, AND IT DIDN'T -- AS THE FACTS THAT I HAD REALLY

25   DIDN'T SEEM TO FIT A VOLUNTARY.

26        Q.    WHAT WAS THEIR -- OKAY.  BY THE TIME THAT YOU

27   GOT TO TRIAL, THE KNIFE UNDER MR. RABITOR'S BODY WAS

28   BASICALLY OUT THE WINDOW, RIGHT?
```

1      A.   THE --

2      Q.   DO YOU UNDERSTAND MY QUESTION?

3      A.   IT WASN'T AVAILABLE, OR THE THEORY?

4      Q.   THAT -- WHAT I MEAN IS YOU FELT THAT THERE WAS

5  NO WAY THAT YOU COULD PROVE THAT RABITOR WAS ARMED WITH A

6  KNIFE AT THE TIME OF THE ASSAULT?

7      A.   OH, I KNEW HE WAS ARMED.

8      Q.   DO YOU THINK YOU COULD PROVE IT?

9      A.   YEAH.  I HAD A WITNESS THAT WOULD SAY THAT HE

10  WAS ARMED AND HE -- SHE SAW THE KNIFE, BUT HE --

11  MR. LITTLE NEVER SAW A KNIFE.  AND SO I THINK WE DID BRING

12  THAT OUT, THE FACT THAT HE SHOWED IT TO HER AND HE WENT

13  AND SAT DOWN.  AND I THINK THAT'S WHERE THE KNIFE CAME

14  FROM; HE WENT TO THE KITCHEN TO GET IT, BUT I DON'T THINK

15  LARRY, MR. LITTLE, KNEW HE HAD IT.

16      Q.   OKAY.

17      A.   I COULDN'T PROVE THAT.

18      Q.   BUT FAILING THAT, THEN YOU WOULD HAVE BEEN

19  DEFENDING A PERSON WITH AN ASHTRAY BEING STABBED TO DEATH,

20  RIGHT?

21      A.   THAT'S RIGHT.

22      Q.   DID YOU THINK THAT COULD SUCCEED AS A PERFECT

23  SELF-DEFENSE?

24      A.   WELL, BECAUSE OF THE FACT --

25      Q.   PERFECT --

26      A.   -- IMPERFECT.  BECAUSE OF THE FACT THAT AN

27  ASHTRAY CAN BE A WEAPON, AND IT CAN CAUSE INJURY, SERIOUS

28  BODILY INJURY, CERTAINLY IN MR. LITTLE'S CASE, BECAUSE HE

1   ONLY HAD ONE EYE LEFT AND/OR POTENTIALLY DEATH, I THINK

2   THAT CREDIBLY I COULD MAKE THE ARGUMENT TO THE JURY THAT

3   HE WAS DEFENDING HIMSELF FROM THOSE TWO POSSIBILITIES AND

4   HE HAD A RIGHT TO DO SO.

5        Q.   AND YOU DID NOT THINK THAT ANY EVIDENCE OF HIS

6   INTOXICATION WOULD HELP YOU IN THE FLANNEL DEFENSE, RIGHT?

7        A.   RIGHT.

8        Q.   AND YOU DIDN'T THINK ANY EVIDENCE OF ANY MENTAL

9   PROBLEMS -- BY "MENTAL PROBLEMS" I MEAN P.T.S.D. WOULD

10  HELP YOU IN THE VOL --

11       A.   WELL, HE EXPRESSED TO ME THAT -- THAT THIS WAS A

12  REACTION TO SOMETHING THAT HAPPENED; THAT HE WAS SUFFERING

13  AS A RESULT OF BEING STABBED, BEING STABBED IN THE EYE AND

14  THE TRAUMA THAT WENT ALONG WITH THAT, I PROBABLY WOULD

15  HAVE USED IT.

16            MR. WILLIAMS:  THANK YOU, MR. PECKHAM.

17                 THANK YOU, YOUR HONOR.

18            THE COURT:  MS. MALLEN?

19            MS. MALLEN:  NOTHING.  THANK YOU, YOUR HONOR.

20            THE COURT:  I STILL HAVE A COUPLE MORE

21  QUESTIONS.

22  BY THE COURT:

23       Q.   WERE THERE TWO KNIVES?

24       A.   THERE WERE TWO KNIVES.

25       Q.   NOW, MS. -- IT WAS MS. BROOKS THAT TESTIFIED

26  THAT MR. RABITOR HAD THE KNIFE, CORRECT?

27       A.   CORRECT.

28       Q.   AND THAT HE SHOWED IT TO HER FROM HIS POCKET;

1    THIS IS FROM THE TESTIMONY AT TRIAL -- I THINK IT WAS THE

2    TRIAL, MAYBE AT THE PRELIMINARY HEARING, BUT HE SHOWED IT

3    TO HER AND SHE TOLD HIM TO GET RID OF IT, DIDN'T SHE?

4         A.   CORRECT.

5         Q.   AND DIDN'T SHE TESTIFY THAT I -- THAT HE PUT IT

6    ON THE -- ON A COUNTER OR ON SOME PLACE ELSE OR --

7         A.   HE PUT IT IN THE KITCHEN OR SOMETHING LIKE THAT.

8    I THINK THERE WAS TESTIMONY TO THAT AFFECT.

9         Q.   AND THAT'S NOT THE KNIFE, THOUGH, THAT

10   MR. LITTLE ENDED UP USING TO STAB MR. RABITOR?

11        A.    IT MAY HAVE BEEN, I DON'T KNOW.

12        Q.   WELL, IF IT WASN'T THE KNIFE THAT HE USED TO

13   STAB HIM, THEN MR. -- THEN MR. LITTLE BROUGHT IN A KNIFE

14   INTO THE -- INTO THE OTHER ROOM BEFORE THE ALTERCATION

15   EVEN BEGAN, RIGHT?  I MEAN, THERE'S NO TWO OTHER --

16   THERE'S NO OTHER POSSIBILITY, IS THERE?

17        A.   NOT THAT I CAN THINK OF.  I MEAN, IT HAD TO HAVE

18   COME FROM SOMEWHERE, AND I ASSUMED THAT THE KNIFE THAT WAS

19   UNDER THE BODY WAS THE ONE THAT MR. RABITOR HAD PUT IN HIS

20   POCKET.  AND HE PROBABLY NEVER ACTUALLY PUT IT DOWN

21   ANYWHERE, AND THAT THE ONE THAT MR. LITTLE PICKED UP WAS A

22   SECOND KNIFE.

23        Q.   AND, OF COURSE, IF MR. LITTLE BROUGHT A KNIFE

24   INTO THE ROOM FROM SOME OTHER LOCATION, THAT'S NOT A REAL

25   GOOD THING FOR THE SELF-DEFENSE POINT OF VIEW, IS IT?

26        A.   NO.

27             THE COURT:  ANYTHING ELSE, MR. WILLIAMS?

28

```
 1                    RECROSS-EXAMINATION (RESUMED)

 2    BY MR. WILLIAMS:

 3         Q.    MR. LITTLE TESTIFIED, THOUGH, THAT HE PICKED UP

 4    A KNIFE THAT WAS THERE; HE DIDN'T BRING ONE, RIGHT?

 5         A.    RIGHT.

 6         Q.    HE TESTIFIED -- I'M NOT SAYING -- OKAY, THAT'S

 7    ALL.

 8              THE COURT:  YES, THANK YOU.  YOU CAN STEP DOWN.

 9              MS. MALLEN:  WE HAVE NO FURTHER WITNESSES TO

10    PRESENT, YOUR HONOR.

11              THE COURT:  MR. WILLIAMS.

12              MR. WILLIAMS:  CAN I TALK TO MS. MALLEN REAL

13    QUICK?

14              THE COURT:  SURE.

15              MR. WILLIAMS:  RECALL MR. LITTLE.

16              THE COURT:  WHICH MR. LITTLE?

17              MR. WILLIAMS:  THIS MR. LITTLE.  THANK YOU, YOUR

18    HONOR.

19              THE COURT:  ALL RIGHT.  LET'S JUST HAVE HIM SIT

20    RIGHT THERE.

21              MR. WILLIAMS:  OKAY, FINE.

22              THE COURT:  YOU DON'T HAVE TO MOVE HIM.

23

24                    LARRY LITTLE, JR.,

25    CALLED AS A WITNESS ON BEHALF OF THE DEFENDANT, HAVING

26    BEEN PREVIOUSLY DULY SWORN, TESTIFIED FURTHER AS FOLLOWS:

27

28
```

APPENDIX No. 1

# E X H I B I T    M

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT, DIVISION ONE

| | |
|---|---|
| In re<br><br>LARRY JOHN LITTLE,<br><br>on Habeas Corpus | No. D047468 |
| LARRY JOHN LITTLE,<br>Petitioner,<br><br>v.<br><br>W. J. SULLIVAN (Warden of California State Prison - Los Angeles County),<br><br>Respondent. | Related Case:<br>No. D035850<br><br>Superior Court<br>Nos. SCE198946,<br>EHC388<br><br>**DECLARATION OF<br>ALAN A. ABRAMS** |
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Real Party in Interest. | |

Alan A. Abrams declares as follows:

I am a medical doctor, licensed to practice in the State of California and in Washington D.C. My specialty is in psychiatry and I have a subspecialty in both forensic psychiatry and addiction psychiatry. I am also a member of the State Bar of California. My curriculum vitae is attached to this declaration in seven pages and incorporated by reference as if set forth in full at this point.

I was retained by W. Allan Williams in 2004 for the purpose of evaluating Larry John Little in connection with superior court habeas corpus

E X H I B I T   M                    1

proceedings. (EHC388.) At that time, I reviewed a number of documents related to the case, including police reports, excerpts from the trial transcripts, the briefing in the Court of Appeal and the opinion of the Court of appeal. I also reviewed the pleadings related to the petition for writ of habeas corpus filed in the superior court. Also provided to me were some testing results done by another doctor and some mental health reports from the Department of Corrections. Based on such materials, I rendered an opinion and testified thereto in August 25, 2004.

In August, 2006, petitioner's current counsel, Athena Shudde, contacted me and asked if I would be willing to reevaluate petitioner if additional background documentation became available. She also asked if arrangements needed to be made for me to consult personally with petitioner again. At that time, I indicated I remembered the case very well and, as is my practice, had taken, and maintained, extensive, copious notes at the time of the personal contact with, and evaluation of, petitioner. I indicated I did not believe an additional personal contact with petitioner would be necessary and that I would be happy to do a supplemental evaluation with more complete background information.

In November, 2006, Ms. Shudde contacted me again and inquired whether I was still available and willing to undertake a supplemental evaluation

EXHIBIT   M                    2

of petitioner. I agreed to do so and she indicated she would send me the additional materials.

In December, 2006, Ms. Shudde sent me a package containing approximately 1500 pages of documents. I carefully reviewed them in conjunction with my prior testimony and my original evaluation of petitioner, and prepared a letter directed to Ms. Shudde as my supplemental evaluation of petitioner. I understand that letter is attached as an exhibit (Exhibit N) to petitioner's supplemental petition.

I declare under penalty of perjury that the foregoing is true and correct and my letter to Ms. Shudde, dated February 10, 2007, is true and correct. If called to testify, I could and would competently testify to this declaration and the letter and its contents.

Executed this _14_ day of _MARCH_, 2007, at _WASHINGTON D.C._.

ALAN A. ABRAMS, M.D., J.D., FCLM

E X H I B I T    M                    3

## ALAN A. ABRAMS, M.D., J.D., FCLM

## I. PERSONAL HISTORY:

ADDRESS: St. Elizabeths Hospital,
Bldg. CT-3, Rm. 109,
2700 Martin Luther King Jr. Blvd SE,
Washington D.C. 20032

202-645-5766 (voice)
202-645-8808 (fax)

LICENSES: Calif. Physicians and Surgeons G30135
Washington D.C. Medicine and Surgery MD035334
Calif. State Bar 163839
DEA AA6612293

MEMBERSHIP:

American Medical Association
American College of Legal Medicine
American Academy of Addiction Psychiatry
American Society of Addiction Medicine
American College of Forensic Psychiatry
American Bar Association
San Diego Psych-Law Society

## II. EDUCATIONAL HISTORY:

University of Rochester, Rochester, New York
1966-1970, B.A. with honors

University of California, San Diego, School of Medicine,
La Jolla, Ca., 1970-1974, M.D.

UCLA-Harbor General Hospital, Torrance, Ca., 1974-1975,
Internship

UCSD School of Medicine, Dept. of Psychiatry, 1975-1976,
Resident in Psychiatry

UCSD School of Medicine, Dept. of Psychiatry, 1976-1977,
Post-doctoral Fellowship in Psychopharmacology

1

UCSD School of Medicine, Dept. of Psychiatry, 1977-1978,
        Resident in Psychiatry

UCSD School of Medicine, Dept. of Psychiatry, 1978-1979,
        Chief Resident in Psychiatry

UC Berkeley, Boalt Hall School of Law, Berkeley, Ca., 1989 to
        1992, J.D.; graduated upper 10% of class.

## III. SCHOLARLY ACCOMPLISHMENTS:

Phi Beta Kappa, University of Rochester, 1970
Benjamin Graham Award in Psychiatry, 1974
Diplomate, American Board of Psychiatry and Neurology, 1981
Award for Volunteer Work, City of San Diego, 1983
Prosser Prize, Contracts, 1990
American Jurisprudence Award, Biomedical Ethics, 1992
Commendation for Outstanding Oral Performance in Moot
        Court, 1990
California Law Review, member 1990 to 1992, technical editor 1990
to 1992, associate editor 1991 to 1992.
Order of the Coif, U.C. Berkeley School of Law, 1992
Board Subspecialty Certification in Forensic Psychiatry, APBN, 1994.
Recertified 2004
Board Certified Forensic Examiner, 1995
Diplomate, American Board of Forensic Medicine, 1996
Fellow, American College of Legal Medicine, 1996
Board Subspecialty Certification in Addiction
Psychiatry, APBN, 1998
Certified Correctional Health Professional 2002

## IV. TEACHING ACCOMPLISHMENTS:

Associate Clinical Professor of Psychiatry, UCSD School of
Medicine, 1979 to present
Outstanding Clinical Teacher Award, UCSD, 1984

Individual Supervision of Psychiatric Residents, UCSD 1979 to 1988;
1991 to 1997;

Formal Teaching:
Seminar in Forensic Psychiatry, September 2005 to present. A

weekly 90 minute seminar at St. Elizabeths involving readings in psychiatry and the law. Topics have included competency to stand trial, criminal responsibility, mental health issues in civil litigation, employment discrimination under ADA, psychiatric disability evaluations, mens rea defenses to crime, and the mentally ill in the criminal justice system. Participants in the seminar include medical students, psychiatry residents, psychiatry externs, psychology interns, and psychiatry faculty.

Issues in Psychopharmacology, July 2005 to present. A weekly 60 minute class for PGY1 Psychiatry Residents at St. Elizabeths. Topics have included psychopharmacologic treatment of Lewy Body Dementia, psychopharmacological approaches to impulsive aggression, selegine transdermal treatment of depression, uses of psychotropics in the pregnant patient.

Mentorship in Forensic Psychiatry, July 2005 to present. Individual mentorship of a PGY-IV Georgetown Psychiatry Resident in forensic psychiatry. The resident is involved in actual case workups, and preparation of scholarly articles.

Introduction to Forensic Psychiatry, July 2005 to present. A once monthly 60 minute presentation to Georgetown U. medical students doing their psychiatry rotation.

## V.    EMPLOYMENT HISTORY

Private practice of Psychiatry, 1979 to present. Practice includes expert testimony and evaluations in criminal, civil, disability, competency and worker's compensation cases; medical expert to Social Security Office of Hearings and Appeals; individual and group psychotherapy; teaching and supervision of medical students and residents.

Chief Psychiatrist, Centinela State Prison, 1997 to December 2003

Staff Psychiatrist, Parole Region IV, December 2003 to April 2005

Private practice of law, 1993 to 1997. Practice included personal injury litigation, family law, probate, employment and health law.

Associate Director Psychiatric Training, Saint Elizabeths Hospital, Washington D.C. Feb 2005 - present

3

Director, Georgetown University Forensic Psychiatry Fellowship
Program

## VI. ADMINISTRATIVE SERVICE:

Commissioner, San Diego County Juvenile Justice Commission, 1997 to
2003.

Physician Member, Diversion Evaluation Committee, Board of
Registered Nursing, State of California, 1999 - April 2005

Board Member, California-Nevada Chapter, American Correctional
Health Services Association, 2001 - 2003

President, San Diego Psych-Law Society 2000-2002

Medical Advisory Board, San Diego Chapter, National Alliance for the
Mentally Ill (NAMI) 2000 to 2005

Executive Board, San Diego Chapter, National Alliance for the Mentally
Ill (NAMI) 2003 to 2005

Member, Legal Process Subcommittee, San Diego Sex Offender
Management Council 2003

Psychiatric Expert Consultant to California Medical Board 2003 to
present

Examiner, Part II, National Boards, ABPN, Washington 2005

## VI: DEMONSTRATION OF SCHOLARLY ACTIVITY:

### PUBLICATIONS:

Abrams A, Treatment Issues in Prisons, Jails, and Correctional and
Forensic Settings, CME Bipolar Disorder and Impulse Disorder
Spectrum Letter, 10:3 August 2004

Abrams A, "Assessment of Criminal Competency", in B. Van Dorsten,
ed., Forensic Psychology: From Classroom to Courtroom Kluwer
Academic/Plenum Publishers, New York, 2002

4

Huey LY, Janowsky DS, Judd LL, Abrams A, Parker D, Clopton P. , Effects of lithium carbonate on methylphenidate-induced mood, behavior, and cognitive processes. Psychopharmacology (Berl). 1981;73(2):161-4.

Abrams AA, Braff DL. Lithium induced cogwheel rigidity: treatment with amantadine. Pharmakopsychiatr Neuropsychopharmakol. 1980 Jul;13(4):240-2.

Janowsky DS, Clopton PL, Leichner PP, Abrams AA, Judd LL, Pechnick R. Interpersonal effects of marijuana. A model for the study of interpersonal psychopharmacology. Arch Gen Psychiatry. 1979 Jul;36(7):781-5.

Janowsky DS, Abrams AA, Groom GP, Judd LL, Cloptin P. Lithium administration antagonizes cholinergic behavioral effects in rodents. Psychopharmacology (Berl). 1979 May 25;63(2):147-50.

Janowsky DS, Abrams AA, McCunney S,, Judd LL "Lithium and acetylcholine" in Nemeroff, C. ed <u>Acetylcholine and Neuropsychiatric Disease</u> Plenum Press New York 1979

Miley DP, Abrams AA, Atkinson JH, Janowsky DS Successful treatment of thalamic pain with apomorphine. Am J Psychiatry. 1978 Oct;135(10):1230-2.

Abrams A, Braff D, Janowsky D, Hall S, Segal D. Unresponsiveness of cataonic symptoms to naloxone. Pharmakopsychiatr Neuropsychopharmakol. 1978 Jul;11(4):177-9.

Janowsky DS, Segal DS, Abrams A, Bloom F, Guillemin R. Negative naloxone effects in schizophrenic patients. Psychopharmacology (Berl). 1977 Aug 16;53(3):295-7.

Janowsky DS, Segal DS, Bloom F, Abrams A, Guillemin R., Lack of effect on naloxone on schizophrenic symptoms. Am J Psychiatry. 1977 Aug;134(8):926-7.

## SCIENTIFIC PRESENTATIONS:

Abrams, A, Muth, A, Patel, M., Soysal, N "The Incompetent To Stand Trial Sexually Violent Offender" American College of Forensic Psychiatry, March 2006

Abrams A "Ganser Syndrome" Grand Rounds, Dept. of Psychiatry, Howard University, May 2005

Abrams, A "Risk Assessment of Sexual Offenders" U.S. Psychiatric Congress, San Diego, November 2004

Abrams, A "Involuntary Treatment in the Criminal Justice System" U.S. Psychiatric Congress, San Diego, November 2004

Abrams, A "Predicting Future Sexual Violence" Mental Health Conference, Patton State Hospital, September 2004

Abrams, A "Predicting Future Sexual Violence" American College of Forensic Psychiatry, March 2004

Abrams, A "Paraphilias" Orange County Psychiatric Society, November 2003

Abrams, A "Atkins v. Virginia: Mercy for the Mentally Retarded" American College of Forensic Psychiatry, April 2003

"Legal and Ethical Issues in Prescribing" panel presentation – Sept 28, 2002 San Diego Psychiatric Society, 2nd Annual Psychopharmacology Conference

Abrams A and Taylor C., "Deception in Disability Evaluations"  - May 30, 2002 County of San Diego, Dept. of Mental Health

Abrams A. "Involuntary Treatment to Restore Competency" – April 11, 2002, American College of Forensic Psychiatry, 20th Annual Symposium, San Francisco

Abrams A. "Open Access: The Medical-Legal Challenges" – November 9, 2001, San Antonio, Strategy and Consulting Conference on Open Access.

"Frontal Lobe Functioning in a Prison Population" – March 15, 2000, Asilomar, Calif. Forensic Mental Health Assoc.,

Abrams A and Davis SJ. "Court Mandated Restrictions on Medicated Mentally Ill State Inmates in California Meeting the ADA" - March 30, 2000 San Diego, American College of Legal Medicine

TEACHING:

Forensic Psychiatry lecture, July 2005- ongoing; monthly lecture to Georgetown University Medical School third year students as part of Psychiatry didactics during their clerkship.

Seminar in Forensic Psychiatry, September 2005 - ongoing. 90 minute lecture and discussion series on forensic psychiatry, taught at St. Elizabeths Hospital for medical students, residents and psychiatrists.

Supervision of psychiatric residents 1979 to present at UCSD; 2005 at Georgetown U.

Lectures to medical students UCSD on correctional psychiatry 1997 to 2003

APPENDIX No. 1

# EXHIBIT N

ALAN A. ABRAMS, M.D., J.D., FCLM
1400 EAST CAPITOL STREET NE,
WASHINGTON, DC 20003
202-248-6416 (voice)
619-295-2987 (voice messaging)
aabrams@n2.net

February 10, 2007

Athena Shudde, Esq.,
1762 Columbia Street,
San Diego, CA 92101-2504

Re:     In re Larry J. Little,
        Court of Appeal No. D0447468
        DOB 01/03/1965
        CDC No. P-82205

Dear Ms. Shudde:

Thank you for requesting my opinions in this matter regarding your client on appeal, Larry J. Little Jr. You have kindly provided most all of the documents that address the questions raised both at the time of the trial and the Superior Court writ investigation regarding factual documentation of Mr. Little's trauma and his psychological states following the trauma. These records consist of about 1500 pages. I have reviewed these critical records in detail. I reviewed the following supplemental data to help determine whether Mr. Little's mental status at the time of the criminal act was likely affected by a combination of substance abuse, intoxication, prior head injury and Posttraumatic Stress Disorder (PTSD):

1.     Preliminary hearing transcript of May 17, 1993: People v. Whales, CR 139160
2.     Police reports of Assault/Mayhem on April 19, 1993
3.     Medical records Re:Assault/Mayhem on April 19, 1993
4.     CDC-R records Re: Larry J. Little under CDC No. H-37001 (partial)
5.     CDC-R records Re: Larry J. Little under CDC No. P-82205 (C-File)
6.     CDC-R Medical and Psychological Reports Re: Larry J. Little, P-82205
7.     San Diego County Jail Medical Records Re: Larry J. Little
8.     Archived CDC-R Records Re: Larry J. Little under CDC No. H-37001
9.     UCSD Medical Records Re: Larry J. Little from 8/94
10.    Superior Court Writ Testimony of Dr. Alan Abrams
11.    Records from Paradise Valley Hospital

If I had these documents at the time of my Superior Court testimony on August 25, 2004, I would have been able to factually respond to DDA Patricia Mallen's and the Court's

EXHIBIT   N

In re Little
February 10, 2007
page 2

astute questions regarding the presence and nature of Mr. Little's irrational or extreme over-reactions in situations prior to the killing of Mr. Rabatore, and of other concrete examples of the existence of Posttraumatic Stress Disorder in Mr. Little prior to the killing. If I had these documents at the time of my Superior Court testimony on August 25, 2004, I would have been able to better address the reinforcing effects and nature of the combination of Mr. Little's substance abuse, head injury and Posttraumatic Stress Disorder. These records, at a minimum, would have greatly assisted Mr. Peckham and Mr. Little at the time of the original trial, and would have strongly indicated the need for an expert mental examination and assessment to explain Mr. Little's over-reaction on the night of June 15, 1999, when he stabbed decedent Eddy Rabatore.

Additionally, I sought to determine the extent to which these important records would have contributed to Mr. Little's defense of self-defense, regarding whether his mental status at the time of the crime was affected by full or Subsyndromal or Partial Post Traumatic Stress Disorder (PTSD), and if so, whether his prior court appointed defense attorney was remiss in not obtaining them or not obtaining a mental health expert, or both.

As I stated in my court testimony, I believe that Mr. Little's mental status—his mens rea—at the time of the criminal act was the central issue in his trial. These additional records strongly support my thesis that Mr. Little's mental status was influenced by symptoms of PTSD from being stabbed in the eye on April 19, 1993, and that his act was an impulsive, hyper-exaggerated response to a perceived (or misperceived) threat that he believed actually existed. Further the effects of substance abuse and possible brain damage needed to be considered in understanding this actual but possibly unreasonable perception. Though there was testimony at the original trial that Mr. Little committed the crime in a coldly deliberate manner, I believe that the majority of information I reviewed supports the defense of an extreme impulsive over-reaction based on a misperception of a life-threatening threat. I believe that the additional evidence would have firmly negated any claim that Mr. Little was malingering his mental state defense, if it was presented at trial. I believe that PTSD is fully relevant to Mr. Little's killing of Mr. Rabatore.

At the time I examined Mr. Little in March 2004, it was my opinion that Mr. Little did not meet full criteria for PTSD. This meant that at that time Mr. Little did not have all of the required symptoms under the C and D criteria of the DSM-IV-TR. Hence I testified about subsyndromal or partial PTSD. This did not mean that his response was any less an over-reaction than if he met the full diagnostic criteria. Now that I have had a chance to review the existing records of Mr. Little's behaviors and symptoms between 1993 and 1999, I believe that Mr. Little did meet the full criteria for PTSD at the time of the killing.

Personal History

In re Little
February 10, 2007
page 3

Mr. Little was born on January 3, 1965 in Willits, California and raised in the San Diego area. He was the younger of two children, and has an older sister. His parents divorced when he was about 20 years old. His parents are still alive, and his mother works as a civil service worker, and his father is retired. Mr. Little completed the 11th grade, and received his GED while in county jail in San Diego. He was last employed as a machinist for an aeronautics company. He never married and never had any children. Mr. Little admit to smoking marijuana and using alcohol while in high school, and by age 20 he began regularly using methamphetamines. He had two prison sentences prior to his murder conviction, one for Receiving Stolen Property, and one for Possession of Controlled Substances. At the time of his crime, he admitted to drinking alcohol, but denied using other drugs.

**Review of Newly Obtained Records:**

The Preliminary Hearing (record set 1) Transcript of May 17, 1993, describes the incident in which Mr. Little was stabbed five times in the left eye by a prostitute he had hired, rendering him blind in that eye and causing a psychological insult that led to his eventual development of Subsyndromal PTSD. Mr. Little indicated that on the night of April 16, 1983, he and his friend Ken Woo had eaten dinner around 7 or 8pm at a restaurant called Garcia's in San Diego. Hereafter, they went back to Mr. Little's residence at proceeded to drink a bottle of Jim Beam Whiskey together. Hereafter, they went to a club called Nite Life, and then to another called Pacers, where they consumed about five pitchers of beer and three rounds of tequila. After leaving the club and eating at a nearby Taco Bell, they picked up two prostitutes on Midway Drive. Mr. Little indicated that Ms. Whales, the prostitute who stabbed him, got in the back seat on the passenger's side next to Mr. Little, while Ms. McMasters, the other prostitute who handed Ms. Whales the knife used in the stabbing, sat in the front passenger seat next to Mr. Woo. Mr. Little indicated that after paying Ms. Whales about $15 as she was sitting next to him, he returned his money into his pants pocket and pulled down his trousers to about his knees while keeping his right arm over the "wad or cash" that he returned to his pocket. At this point Ms. Whales began orally copulating him. Mr. Little indicated that after about four minutes of oral copulation, his hand touched her knee, and she threatened, "Don't touch my leg or I'll bite your dick off." He stated that at this point he no longer felt the wad of cash in his pocket, and he believed he had been robbed. He stated that he then told her, "this isn't going to work...Give me my money back." Mr. Little indicated that she remarked that she didn't take his money; he next began screaming at her and using profanities. She yelled back insisting that she didn't take his money, and gave him a slight push; then he grabbed her by the collar. A struggle ensued in the back seat, and Mr. Little testified that she then told him, "I'm going to knife you," at which point he let her got, and yelled at her to go. Mr. Little indicated that instead of leaving after he had let her go, she obtained a throwing knife with a four inch blade from Ms. McMasters, which was passed to her from the front seat, and stabbed Mr. Little in

In re Little
February 10, 2007
page 4

the left eye repeatedly. Mr. Little stated that he only felt the first blow, after which he felt his face go numb. He struck out with his right arm and managed to hit Ms. Whales, after which she and Ms. McMasters fled the vehicle on foot. He was taken to Sharp Cabrillo Hospital by Mr. Woo. These records confirm Mr. Little's account that he provided to me at the time of my interview on March 30, 2004. DDA Mallen asked at the writ hearing if I had any independent factual confirmation of Mr. Little's trauma. This and the other records would have settled any concern that Mr. Little had fabricated the story of the traumatic assault.

According to Police Reports of Assault/Mayhem (record set 2) on April 19, 1993, Ms. Whales and Ms. McMasters were apprehended on April 19, 1993, identified in a photo lineup by Mr. Little, and sentenced to prison. Of note, the Investigator's Follow-Up Report (p144) indicates that both Ms. McMasters and Ms. Whales were arrested together seven times prior to their arrest in Mr. Little's case, and five cases involved their concurrent arrest for either theft, robbery, prostitution, or assault.

Medical records Re: Assault/Mayhem from Sharp Cabrillo Hospital (record set 3) indicate that Mr. Little was admitted to the Emergency Department at Sharp Cabrillo Hospital in San Diego on April 15, 1993 at about 3 am with multiple lacerations to the left eye. The same morning he underwent Repair of a Left Ruptured Globe, Exploration of Left Globe, and Repair of Lid Lacerations x 4, by Dr. Lance Arnell, the consulting Opthalmologist. Medical records indicate that from the time he was admitted, Mr. Little had no vision in his left eye, and never regained it postoperatively. Intraoperative records indicate that he suffered a vitreous hemorrhage and retinal detachment, rendering him blind in the left eye. Medical records also indicate that at the time he was admitted Mr. Little had no preexisting medical conditions, and that he was not taking any medications. Mr. Little did receive a presumptive diagnosis of Alcohol Abuse, in addition to a Ruptured Left Globe status post Repair and Medial Left Orbital Wall Fracture at the time of his discharge on April 19, 1993. Nursing notes during his inpatient stay indicate that for the most part Mr. Little remained sedated and medicated for pain. However, **a nursing note on 4/18/93 (Bates p221 0530 hours) indicated that he "always has bad dreams."** Of note, during his hospitalization, Mr. Little was never seen by a consulting psychiatrist for any preexisting psychiatric condition, including PTSD, Depression, or Anxiety. These records would have been substantially important in addressing any implication that Mr. Little was feigning injury or PTSD. They support that Mr. Little met the B criteria for PTSD shortly after the traumatic event.

CDC-R Records of Case No. H-37001 (record set 4) indicate that Mr. Little had a prior convictions involving Receiving Stolen Property on July 20, 1995, and for Possession of Controlled Substances for Sale on July 7, 1987. Mr. Little spent 279 days in jail for the Possession conviction, and 18 days for the conviction of Receiving Stolen Property. This is significant in that his sentencing exposed him to mental health professionals who screen for psychiatric conditions in jails and prisons. **Psychological records (Bates pp**

In re Little
February 10, 2007
page 5

897- 899) from his second prison term for Receiving Stolen Property indicate that on September 6, 1995, prior to his criminal act of stabbing Mr. Rabatore, Mr. Little was in fact diagnosed with "Mild Major Depression with PTSD Features" and "Methamphetamine Abuse" by Josh Haskett, Ph.D., a prison psychologist, after a comprehensive psychological evaluation. Dr. Haskett noted that Mr. Little "became very sensitive in crowds, being with people, secondary to being stared at because of his obvious eye injury." Dr. Haskett added that Mr. Little complained of "intrusive thoughts with nightmares at times associated with injury." Dr. Haskett's evaluation is a clear indicator that Mr. Little's mental status was already affected by PTSD as well as substance abuse, only two years after being stabbed in the eye, and four years prior to his stabbing of Mr. Rabatore. The initial 31 question prison screening exam was negative, but Dr. Huagen ordered a fuller examination, and referred Mr. Little to Dr. Haskett. Dr. Haskett placed Mr. Little in the CCCMS classification, i.e. that Mr. Little had a serious mental illness. This single document would have been highly significant in rebutting the prosecution's claim that Mr. Little acted with malice, and intent to kill, and was malingering his claim of an extreme over-reaction. I was not able to find follow-up mental health records after Mr. Little was placed in CCCMS in 1995. It appears that Mr. Little "fell through the cracks" of the prison mental health program in 1995.

CDC-R Records of Case No. P-82205 (record set 5) outline Mr. Little's crime, conviction, sentencing, appeal, and prison course following his conviction for second degree murder. They contain an account of the night of the crime, as summarized by his appellate judges, as follows: On the night of June 15, 1999, Mr. Little was at the residence of Mr. Rabatore and Mr. Rabatore's mother, Ms. Joyce Roesch, in El Cajon. They were accompanied by Mr. Rabatore's friend, Alysen Brooks. At about six that evening, Mr. Rabatore and Mr. Little got into an argument, at which point Ms. Roesch demanded that Little leave the apartment. Little apparently refused, so Ms. Roesch asked her son to call a friend to remove Mr. Little from the apartment. Hereafter she left the apartment and her son called a friend to come over and help him deal with Little. Before Roesch left, Little told her and Rabatore that if they call their friends, he'd call his, and that they'd "make this into a riot, into a bloodbath." This verbal response was an early indicator of the fact that he felt threatened. Hereafter, Little began gathering his belongings as Rabatore went into the kitchen and retrieved a steak knife, which he showed to Brooks. She asked him to get rid of it, and he apparently placed it on a sewing machine cabinet in his mother's room. Little returned to the room and was preparing to leave, when he instead stabbed Rabatore in the chest with the knife Rabatore placed in his mother's room. Mr. Little testified that prior to the stabbing he had always been "jumpy" as a result of being stabbed in the eye. He stated that he had been drinking alcohol before his crime, and that everyone in the house apart from him had been using methamphetamines. He added that Rabatore was hyperactive and aggressive because of the methamphetamines, and that he felt threatened when he heard Rabatore call his friends. Mr. Little stated that prior to his exiting the apartment, Rabatore told him not to go anywhere, and picked up an ashtray and "lunged at him," at which point Little picked

In re Little
February 10, 2007
page 6

up a knife from a table and stabbed Rabatore in the chest.

Mr. Little was arrested the next day and subsequently found guilty of second degree murder on May 3, 2000. He was sentenced to 18 years to life. Mr. Little testified that he acted in self-defense, and that he felt threatened and thought he was being attacked when Mr. Rabatore allegedly came at him with an ash tray, so he struck out against him. After his conviction he appealed his case in 2001, claiming that the court erred in failing to instruct the jury on the standard of knowledge of a person with physical impairment (his blindness), erred in prejudicially and erroneously instructing the jury that "an intent to kill was an element of voluntary manslaughter," and erred in admitting the testimony of an informant. The appeal was ultimately unsuccessful. Mr. Little again appealed his case in August 2004, on an OSC writ, claiming that his court appointed counsel was ineffective for not thoroughly investigating the night of the murder, as well as not having Mr. Little evaluated for PTSD.

Mr. Little's prison records also indicate that he was segregated twice from the general population; once for suspicion of involvement in "a pattern of ongoing assaults initialized against the white inmates," and another time for masturbating in front of an officer (for which he plead not guilty because he claimed he could not see her standing there). They also indicate that Mr. Little earned vocational training certificates in Shop, Electronics, Janitorial Maintenance, as well as a High School Equivalency Certificate. A rules Violation Report indicates that Mr. Little received a violation on 9/19/05 for Mutual Combat with another inmate. In his statement, Mr. Little stated that "I'm blind and all I remember is a guy coming at me. I ran and was hit in the head when I woke up and there was blood all over. I don't remember anything." Both inmates received medical care and sustained no lasting injuries, and both were found guilty of rules violation. This incident was another example of Mr. Little's tendency to violently overreact in a situation of perceived threat, and dissociate during the actual violent struggle or act. It is noted that he had no immediate memory of what exactly happened during the struggle. At the time of the episode Mr. Little had been receiving Mental Health Services from the CDC. Obviously these records are post-event, but further support the actual existence of PTSD prior to the killing.

Medical and Psychological Records for Mr. Little under CDC No. P-82205 indicate that when he was imprisoned in 2000 for second degree murder, Mr. Little was not taking any medicines to treat any chronic physical or psychiatric conditions, although he had been diagnosed with Depression with PTSD Features while imprisoned in 1995. Records indicate that Mr. Little received Mental Health services in prison beginning in August 2000, and was treated with Zoloft (an antidepressant and anxiolytic used to treat Depression and Anxiety Disorders such as PTSD) and Trazadone (an antidepressant often used as a sleep aid) for PTSD and Depression resulting from being stabbed in the eye. Psychiatric records indicate that Mr. Little's mood, sleep, affect, and behavior, in terms of irritability and impulsivity, improved with the medications. He also received

In re Little
February 10, 2007
page 7

therapy for anger management. Throughout his prison sentence, psychiatric records indicate that Mr. Little was being treated for PTSD and Depression.

Archived CDC-R Records (record set 8) indicate that on August 16, 1993, Mr. Little was arrested for brandishing a weapon against his father's girlfriend while at his father's residence. In a police report, his father's girlfriend stated that she was speaking to Mr. Little's father, when Mr. Little yelled at her and asked if she was talking about him. When she said yes, he "grabbed a butcher knife and told her to stop talking about him. He was waving the knife in the air as he walked towards her." At this point she called 911, and police arrived and arrested Mr. Little. Mr. Little minimized the incident, stating that he didn't think he was brandishing a weapon. No charges were filed, but this incident is another documented illustration of Mr. Little's paranoia and his propensity to act on it impulsively and in a potentially violent way. When considered in context with Mr. Little's diagnosis of PTSD, which left him hypervigilant, and his continued methamphetamine abuse, which reinforced his anxiety, anger and impulsivity, as well as Dr. Haskett's reports that he was always very self conscious about his eye, this incident further supported a hyperexaggerated response to a perceived threat or slight by another female. Though Mr. Little had described this incident to me, and I testified as to its significance, having the actual records would have dispelled any doubts whether Mr. Little was prone to misperceiving events and over-reacting in a violent self-defensive manner to his misperceptions.

A 115 from March 17, 1997 indicates that Mr. Little was attacked while at Calipatria State Prison.

Records from RJ Donovan State Prison and San Diego County Jail indicate that after his conviction for killing Mr. Rabatore, Mr. Little was again placed in the CCCMS system, indicating significant mental illness. Mr. Little continued to be treated with a variety of antidepressants including Zoloft, up to a maximum dose of 200mg, as well as Trazadone and Seroquel, an atypical antipsychotic which was added for symptoms of paranoia. Records indicate that Mr. Little was compliant with treatment and was indicated significant benefit in terms of his mood, his irritability, and his ability to cope.

Records from Paradise Valley Hospital confirm that Mr. Little was assaulted in June 1998. He was beaten by an unknown assailant, and had a dislocated toe, as well as bruising. There was no mental examination recorded.

Records from Pomerado Hospital suggest that Mr. Little was treated there in May 1978 at age 13 (presumably for the head injury) but that the records were purged.

Discussion

The core symptoms of PTSD as described in the DSM IV are:

In re Little
February 10, 2007
page 8

    A. Exposure to a traumatic event associated with intense fear or horror.

    B. Persistent reexperiencing of the event through intrusive recollection, nightmares or flashbacks, with intense distress when exposed to reminders of the event.

    C. Feelings of detachment, anhedonia, amnesia, restricted affect, or active avoidance of thoughts or activities that may be reminders of the event.

    D. A general state of persistently increased arousal after the traumatic event, which is characterized by poor concentration, hypervigilance, exaggerated startle response, insomnia, or irritability.

    E. Symptoms present for at least 1 month.

    F. Symptoms cause significant distress or impaired occupational or social functioning.

Because I did not have these additional records that you have provided, at the writ hearing I diagnosed Mr. Little with sub-syndromal PTSD. I believe that a mental health expert who would have examined Mr. Little after his arrest, and had access to the medical records, would likely have diagnosed the full syndrome of PTSD. This is supported by the additional documents you have provided.

At the time of his crime, Mr. Little met diagnostic criteria for Posttraumatic Stress Disorder, as Dr. Haskett observed in 1995, two years after his traumatic loss of vision and four years prior to his crime. His symptom of increased arousal surfaced in both subjective reports to prison psychologists (insomnia, irritability), but also through hyperexaggerated responses to misperceived threats, as when he brandished a weapon against his father's girlfriend. He also exhibited episodes of detachment and amnesia, particularly after his involvement in a fight with another inmate, in which he describes having no memory of the actual physical conflict, but woke up in a pool of blood. The C criteria of PTSD are identical to the symptoms Dr. Haskett indicated as the symptoms of Major Depression. That Mr. Little was suffering from PTSD at the time of his criminal act and well before it is established and documented, given existing medical records. The degree of his hyperexaggerated responses and their violent tone, although disturbing, is not inconsistent with individuals who experience behavioral disinhibition as a result of PTSD. There are numerous studies showing that patients with PTSD are more impulsive and more prone to violence because of their hypervigilance. See e.g. Casada JH, Roache JD. Behavioral inhibition and activation in post traumatic stress disorder. J Nerv Ment Dis. 2005 Feb;193(2):102-9. Casada and Roache compared inhibition and activation responses in relation to anxiety and showed that PTSD patients had an excessively disinhibited response to anxiety in comparison to normal control patients. The authors concluded that "the presence of disinhibition accompanying behavioral activation in these subjects may explain the impulsivity and aggression associated with PTSD." Though this is a recent study, there was an extensive scientific literature on PTSD and exaggerated aggressive responding at the time of Mr. Little's trial for the killing.

In re Little
February 10, 2007
page 9

It is important to note that Mr. Little had also consumed alcohol that night and was accompanied by individuals using methamphetamines, further disinhibiting his responses. I do not know whether the issue of the combination of substance abuse, substance intoxication and PTSD was considered by Mr. Peckham. There was also a history of brain injury which could have caused increased impulsivity and aggression. You were not able to obtain the records related to Mr. Little's head injury at age 13. If a mental health expert had been consulted, the expert could have assessed the role that Mr. Little's head injury may have played in the killing through a combination of brain imagining and neuropsychological testing. A significant head injury could lead to worsened impulsivity in combination with the PTSD and substance abuse. Again a mental health expert should have been consulted. The appellate court's unpublished opinion was primarily focused on the issue of Mr. Little's physical impairment, with minimal development of the psychological impairments likely because they were not presented to the jury.

The issue of Mr. Little's truthfulness was also central in the jury's assessment of his mental state at the time of the killing, because contradictory evidence was presented. My opinion is that a mental health expert could have explained the role of denial in people with PTSD, substance abuse and head injury.

Summary
As indicated in my court testimony, Mr. Little's exact mental status at the time of his criminal act remains the central issue in his case. In order to better understand his mental status at that time, I requested additional medical, psychological, and forensic data related to Mr. Little's mental state prior to the stabbing of Mr. Rabatore. The additional data allows a better estimation of Mr. Little's mental status prior to his being stabbed in the eye, after being stabbed in the eye, prior to stabbing Mr. Rabatore, and after his arrest and conviction. My analysis of the supplementary information has confirmed several important factors in this case:

1. Medical records indicate that prior to being assaulted and stabbed in the eye in 1993, Mr. Little did not suffer from any pre-existing mood or anxiety disorders.
2. Mr. Little suffered an acute, life-threatening trauma when he was criminally stabbed in the eye five times in 1993.
3. Medical records indicate that in 1995 Mr. Little was diagnosed with Depression and PTSD from being stabbed in the eye, while he was imprisoned for Receiving Stolen Goods.
4. After he was paroled, Mr. Little did not continue treatment for PTSD between 1995-1999.
5. Mr. Little was suffering from untreated PTSD at the time of his criminal act.
6. Mr. Little's mental status—his perception, thought processing, judgment and reaction—was significantly influenced by an underlying PTSD when he

In re Little
February 10, 2007
page 10

stabbed and killed Mr. Rabatore.

7. Mr. Little's preexisting PTSD and its affect on his perception and reaction to threats should have been investigated and addressed by his prior defense attorney, as it directly relates to his mental status at the time of the crime.

Additionally the interplay and synergistic reinforcement of substance intoxication and a history of head injury, with PTSD needed to be addressed by a mental health expert.

I firmly believe, to a medical certainty, that Mr. Little's untreated and underlying psychiatric condition was a crucial element in determining the presence or absence of malice and intent in this crime, and should have been addressed by his attorney. The additional records strongly establish the existence of Mr. Little's mental disorder prior to the killing.

I respectfully disagree with Judge Hanoian's opinion that "PTSD does not fit the facts of the case." (Bates p 446). I strongly agree with Judge Hanoian's opinion that a reasonably competent attorney would have and should have had Mr. Little evaluated for PTSD. If an evaluation had been done, and if Mr. Little's prior records were reviewed, and if the mental health expert presented the factual information to the jury about PTSD and Mr. Little's actually having been previously diagnosed with PTSD, as well as demonstrating aggressive behaviors driven by the combination of PTSD co-morbid with prior head injury and substance abuse and intoxication, Mr. Little would have had a more accurate finding of fact.

The recent U.S. Supreme Court decisions in Wiggins v. Smith (2003), and Rompilla v. Beard (2005) are highly relevant to Mr. Little's claim of ineffective assistance of counsel.

Sincerely,

Alan A. Abrams, M.D., J.D.
Director, Forensic Psychiatry Fellowship,
Georgetown University Hospital,
Diplomate, American Board of Psychiatry and Neurology,
Subspecialty Certification in Forensic Psychiatry,
Subspecialty Certification in Addiction Psychiatry

APPENDIX No. 1

# EXHIBIT   O

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT, DIVISION ONE

| | |
|---|---|
| In re | No. D047468 |
| LARRY JOHN LITTLE, | |
| on Habeas Corpus | |
| LARRY JOHN LITTLE, | Related Case: No. D035850 |
| Petitioner, | |
| v. | Superior Court Nos. SCE198946, EHC388 |
| W. J. SULLIVAN (Warden of California State Prison - Los Angeles County), | |
| Respondent. | DECLARATION OF INGE BRAUER |
| PEOPLE OF THE STATE OF CALIFORNIA, | |
| Real Party in Interest. | |

Inge Brauer declares as follows:

I am an attorney duly licensed to practice before all courts in the State

of California. I was admitted to practice in 1976, and have been practicing law

30 years, with my practice being exclusively dedicated to federal and state

criminal defense work since 1983. I have handled literally hundreds of felony

cases at the state level, ranging from simple burglaries through LWOP and

capital cases. I have conducted hundreds of pretrial investigations, preliminary

hearings, motions, and sentencing hearings. In addition, I have tried

innumerable cases at the state level, including LWOP cases and one death

E X H I B I T     O                    1

penalty case. A number of cases have involved mental or psychological defenses. Under the San Diego conflicts panel, which administers appointments of counsel where the public offices have conflicts, I have been qualified to handle all manner of felony cases, including capital cases. At the federal level, I have been approved as a member of the felony appointment panel for a number of years and have handled at least 10 trials in federal court. I regularly attend continuing education seminars related to the nature of my practice and related to the presentation of all manner of defenses, including mental and other defenses.

I have been requested by counsel for petitioner to evaluate this matter as if it were a case of first impression and give my opinion regarding investigation and preparation of the case for trial based on my review of the records. In preparation of this assessment, I reviewed the following materials:

1.    the information in SCE198946;

2.    Five hundred eighty-two pages of discovery from the case, which included the crime report, witness statements, arrest reports, numerous supplemental reports; evidence lists, witness lists, the medical examiner's report, transcripts of interviews with various witnesses, including petitioner, petitioner's rap sheet, a transcript of a 911 call and crime scene and forensic lab reports;

3.    the trial testimony of petitioner in SCE198946; and

E X H I B I T    0                    2

4.    the superior court habeas corpus testimony of petitioner in

EHC388.

Based on my review of these materials, and based on my experience,

petitioner's physical condition suggested a psychological disorder like PTSD or

methamphetamine addiction or some combination or interrelationship between

the two.  I would have, among other things, had petitioner evaluated by one or

more psychologists or psychiatrists.  I would have done this despite petitioner's

repeated statements that he acted in self-defense or denied that PTSD had any

effect on his behavior, as I could not unilaterally accept these statements or

know whether petitioner's claims were consistent or inconsistent with PTSD or

some interrelated or independent mental disorder.  I would have requested a

full battery of tests to determine whether he suffered from methamphetamine

psychosis, an impulse control disorder, or PTSD, and whether they were

separate or interrelated add the extent to which any such potential defect was

operative at the time of the offense.  I also would have sought expert opinion

to determine whether petitioner's statements were consistent with the apparent

disorders.  In addition, I would have searched out any available medical

records to determine whether, and to what extent, petitioner previously had

been treated for any mental defect or disorder, or if he had obtained any

treatment for drug addiction.  I also would have investigated his prison and

civilian behavior with particular attention to any medical records and any pre-

EXHIBIT    0                    3

offense misconduct. Dependent on the nature and circumstances of the medical evidence and/or misconduct, I would have discussed it with an expert to determine whether the event(s) was/were consistent with PTSD or any other disorder. Only after such investigation could I rule out or determine whether a psychological defense existed.

Based on my training and experience, in light of petitioner's particular vulnerability due to the traumatic loss of vision in one eye, and assuming he suffered from PTSD or some other independent or associated disorder, including methamphetamine psychosis at the time of the offense, my theory of the defense would have been geared toward manslaughter on the grounds petitioner's disorder(s) affected his ability to form the intent to kill, thereby reducing his culpability from murder to manslaughter, or, more likely, he killed in the actual but unreasonable belief he needed to defend himself. I probably also would ask for involuntary manslaughter instructions assuming the evidence at trial was consistent with evidence adduced at the preliminary hearing, namely, that petitioner picked up a knife, petitioner would testify as he did at the superior court habeas hearing and expert testimony substantiated a mental disorder.

I am aware that petitioner's trial counsel tried to bring in petitioner's vulnerability when petitioner testified that he was "jumpy" after the loss of his eye. Petitioner's trial counsel also touched on drug abuse. However,

E X H I B I T    0                    4

petitioner's counsel provided no context for petitioner's testimony.  Without
any background on PTSD, or any related diagnoses, a jury, presumably not
affected by petitioner's disorders, could not have understood petitioner's
testimony and what he perceived, why he perceived it and why he acted or
reacted as he did.  As a result, petitioner's counsel could not have given the
jury a basis for anything other than a murder conviction.  In my opinion, this
tactical approach torpedoed the defense and ignored the available avenues of
defense.  In essence, defense counsel apparently hoped that the jury would
accept and understand petitioner's actions without presenting any substantial
evidence that could lead a jury to a reasonable doubt as to his mental state, or
to the conclusion he acted in unreasonable self-defense, or the conclusion the
killing was an involuntary manslaughter.  In my opinion, no reasonably
competent criminal defense attorney would have taken this approach without
first having exhausted available investigation methods to determine the
existence and scope of any mental defect or disorder.

I declare under penalty of perjury that the foregoing is true and correct
and, if called to testify, I could testify competently thereto.

Executed this 19th day of _March_, 2007, at San Diego, California.

_____

**INGE BRAUER**

E X H I B I T     O                    5

APPENDIX No. 1

# EXHIBIT   P

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT, DIVISION ONE

| | |
|---|---|
| In re<br><br>LARRY JOHN LITTLE,<br><br>on Habeas Corpus | No. D047468 |
| LARRY JOHN LITTLE,<br><br>Petitioner,<br><br>v.<br><br>W. J. SULLIVAN (Warden of California State Prison - Los Angeles County),<br><br>Respondent. | Related Case:<br>No. D035850<br><br>Superior Court<br>Nos. SCE198946, EHC388<br><br>DECLARATION OF<br>PETITIONER'S HABEAS<br>COUNSEL |
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Real Party in Interest. | |

Athena Shudde declares as follows:

I am an attorney duly licensed to practice in the State of California.  I am the attorney appointed for Larry John Little on the petition for habeas corpus presently pending in the Court of Appeal, Fourth Appellate District, in case no. D047468 (San Superior Court case nos. SCE198946; EHC388.)

I have been licensed to practice for almost 29 years, 20 of which were spent primarily as a criminal defense trial attorney.  Over those 20 years, beginning first at Federal Defenders of San Diego, followed by private practice and a period in a County of San Diego program specifically instituted for

E X H I B I T   P                    1

homicide and capital case defense, I handled thousands of felony cases, ranging

from what the County of San Diego classifies as class III felonies (i.e., burglary,

drugs, felony theft, fraud, etc.) through class V and class VI felonies (murder

and capital cases), from arraignment through preliminary hearing, motions and

trial. As relevant here, I have tried numerous attempted murder cases, murder

cases and three LWOP (life without possibility of parole) cases. In addition, I

handled one capital case, a torture murder, from preliminary hearing and

motions and through investigation of the guilt and penalty phases, to the day of

trial, where the matter was resolved favorably to the defendant. I also

shepherded a second death penalty case through preliminary hearing, pretrial

motions and guilt phase and penalty phase investigation. I have read

thousands of police reports and arranged for and directed pre-trial

investigation in hundreds of cases, including investigation and retention of

experts in cases involving mental defenses. In addition, during my years as a

trial attorney, I attended numerous seminars and training programs, including

the three-day death penalty seminar and other seminars related to the general

defense of criminal cases and specifically related to specialized matters, such as

murder, gang cases, drug and alcohol cases and mental defenses. Since leaving

trial practice and commencing a criminal appellate practice, I have handled

hundreds of cases ranging from simple felonies to LWOP's and have had the

opportunity to review prosecution discovery and defense investigative reports

E X H I B I T    P              2

associated with those cases while in the process of evaluating the record and, necessarily, the performance of the defense attorney.

Based on my background and experience and my review of numerous records in this case, I believe the following to be relevant to this matter:

Petitioner was convicted by jury of second degree murder with a true finding on the use of a dangerous weapon, to wit, a knife. Following the trial court's true findings on two prison terms, petitioner was sentenced to 3 years consecutive to 15 years to life in prison and appealed.

In the light most favorable to the judgment, the record reveals the facts as stated in the court of appeal opinion on the direct appeal in this matter, case no. D035850. (Exhibit D Succinctly stated, petitioner stabbed one Eddy Rabatore. According to the prosecution case, petitioner stabbed Rabatore with intent to kill. According to the defense, petitioner stabbed Rabatore in self-defense based on a vision impairment.

Based on the information known to me at the time of appointment, I contacted petitioner, petitioner's trial attorney, petitioner's attorney on the direct appeal and petitioner's attorney on the petition for habeas corpus filed in the superior court. Petitioner's trial attorney informed me he no longer had any files or records in the case, as they had been turned over to petitioner's father as instructed by petitioner. He further indicated his position on the case was as reflected in his testimony at the superior court habeas proceedings and

E X H I B I T   P                3

he saw no way in which PTSD applied under the facts of the case and in light

of petitioner's claims of self-defense.  Petitioner's attorney on the superior

court habeas matter, W. Allan Williams, Esq., provided me with his file, which

contained the discovery in the case but contained no mental health

documentation or any other background documentation regarding petitioner.

Petitioner's attorney on the direct appeal provided me with transcripts of

petitioner's trial, a copy of the Court of Appeal opinion in the matter

(D035850).  I also was provided with the transcript of the proceedings on the

superior court habeas matter (EHC388), wherein petitioner claimed, inter alia,

that his trial counsel was ineffective for failure to investigate and present a

defense based on post traumatic stress syndrome (PTSD).

     After a review of the materials obtained, and based on my experience, it

appeared to me that the opinion elicited by Dr. Alan Abrams at the superior

court habeas hearing was circumscribed by the lack of any supporting

documentation and, as a result, necessarily impacted both the value of

petitioner's claim of PTSD and the superior court's view of the relevancy of the

evidence.  The superior court hearing also lacked any expert testimony by a

criminal defense attorney regarding the potential relevance of evidence of

PTSD.

     After learning that Dr. Abrams had not been provided any background

documentation on petitioner, I began to collect, and collected, the following: 1)

E X H I B I T    P              4

the medical records regarding the assault/mayhem on petitioner on April 19, 1993, 2) the police reports of the same incident, 3) the preliminary hearing transcript of the same incident; 4) petitioner's prison records under both his archived prison number and his current prison identifier number; 5) petitioner's medical and psychological reports under his archived and current prison identifier numbers; 6) petitioner's San Diego County Jail medical records; 7) medical records from various hospitals where petitioner underwent medical treatment after April 19, 1993. I also attempted, but was unable, to collect medical records from what appeared to be a serious head injury suffered by petitioner as a child, as those records had been destroyed some time in 1999. I also attempted, but was unable, to collect any records on believed drug abuse treatment as those records had been destroyed.

After collecting approximately 1500 pages of documents, I provided them to Dr. Alan A. Abrams, M.D., J.D., for purposes of his examination and a supplemental evaluation of petitioner to determine whether he suffered from PTSD or any other mental disorder at the time of the charged offense. Dr. Abrams' report/evaluation is contained in letter form in this appendix as Exhibit N. It is Dr. Abrams' opinion that petitioner suffered from PTSD at the time of the offense, and probably suffered from some associated disorders, including major depression and substance abuse. As records of petitioner's

E X H I B I T    P                5

head injury were not available, Dr. Abrams could not opine regarding the effect of such injury on petitioner.

I also contacted attorney Inge Brauer, a criminal defense attorney with 31 years of experience. I provided Ms. Brauer with copies of the information, some 582 pages of pretrial discovery, a copy of the preliminary hearing, a copy of petitioner's trial testimony and petitioner's testimony on the order to show cause in the superior court habeas proceeding. Ms. Brauer otherwise had no knowledge of the case. Ms. Brauer's opinion is attached hereto as Exhibit O. Ms. Brauer opines that she would have had petitioner evaluated by at least one expert, if not more, for PTSD and methamphetamine psychosis and any other disorders. If the report(s) were favorable, Ms. Brauer would have presented a defense focused on petitioner's state of mind and imperfect self-defense in an effort to convince the jury to return a manslaughter verdict. She also would have requested instruction on involuntary manslaughter. In Ms. Brauer's opinion, a reasonably competent criminal defense attorney would not have proceeded without expert testimony in a case such as that described in the discovery and the preliminary hearing transcript unless an expert evaluation was unfavorable to petitioner. (Exhibit O.)

Based on my training and experience, any reasonably competent criminal defense trial attorney knows, or is chargeable with knowledge of, the elements of the offense or offenses charged against his client and investigates any and all

EXHIBIT    P              6

defenses of fact and law, including apparent psychological defenses and any defenses which would tend to overcome or diffuse proof of the elements of the offenses. Based on my training and experience, any reasonably competent criminal defense trial attorney acting as a diligent advocate, does not make a tactical decision as to, among other things, the theory of the defense, until such time as he or she has exhausted every reasonable avenue of investigation suggested by the facts, the client and the law.

Based on my review of the files and records in the case, and based on my experience before commencing appellate work, as more specifically outlined above, it is my opinion that petitioner's trial counsel's acts and omission fell outside this standard of a reasonably diligent advocate's duty to investigate. In my opinion, the files and records in the case demonstrated the need for a complete investigation of petitioner's background and a complete psychological or psychiatric assessment. This opinion is based on the following: 1) petitioner suffered a head injury at an early age, after which petitioner's behavior reportedly changed (Exhibit I, pp. 5-6; Exhibit J, pp. 31-32); 2) whatever the relationship between the head injury and petitioner's changed behavior, petitioner later suffered the traumatic loss of one eye which resulted in behavioral change (Exhibit I, pp. 4-5; Exhibit J, pp. 33-35; 3) petitioner received no immediate psychological or psychiatric treatment for the traumatic injury (Exhibit K, pp. 61-62, 68-70; 4) petitioner's behavior change included

E X H I B I T    P                7

increasing reliance on street drugs, with an emphasis on methamphetamine use (Exhibit I, p. 16; Exhibit J, p. 30; Exhibit K, p. 53-54, 56; 5) methamphetamine is known to cause brain damage; 6) petitioner went to prison after the traumatic loss of his eye and prison authorities are required to classify inmates for placement and conduct medical evaluations and provide treatment; 7) petitioner had sought emergency treatment for various injuries suffered in incidents after the traumatic eye injury (Exhibit N); and 8) petitioner's family members believed petitioner suffered from PTSD (Exhibit I, p. 9).

Based on my view of the investigation required in the case, it is my further opinion that petitioner's defense counsel was ineffective in failing to fully investigate petitioner's background, including obtaining readily available records from both hospitals and jail and/or prison facilities and other sources. It is also my opinion that defense counsel was ineffective in failing to explore a mental defense, specifically, PTSD, and any other associated disorders. Without such materials and expert evaluation, it is my opinion that a psychological defense could not be excluded nor could an intelligent decision be made regarding a potential psychological or other defense.

My opinion remains the same despite evidence that petitioner steadfastly claimed PTSD did not affect his behavior, insisted he acted in self-defense and there was evidence he contrived a defense of self-defense. Any reasonably competent criminal defense attorney does not unilaterally accept his client's

E X H I B I T    P                8

statements at face value, does not automatically present the defense claimed by a defendant and knows that damning information in discovery, such as a statement of a contrived defense, must be explored and diffused or explained to whatever extent possible.  Moreover, any reasonably competent criminal defense attorney would want to know whether petitioner's denial of PTSD and claims of self-defense were part of the syndrome and its effects.

Given the report of Dr. Abrams (Exhibit N), which makes clear that petitioner suffered from PTSD and some associated disorders, it is my professional opinion, based on 20 years of criminal trial experience, that the failure to present a defense based on PTSD and the associated disorders was prejudicial to petitioner.  Expert testimony of the disorder and its associated symptoms would have provided petitioner with a state of mind defense, a defense of imperfect self-defense and a claim of involuntary manslaughter.  Expert testimony would have explained the disorders from which petitioner suffers, explained their effects upon perception, explained why petitioner, who seemingly stabbed Rabatore for no apparent reason, perceived that he was being attacked and acted or reacted or acted and overreacted in the manner that he did.  Expert testimony also would have described the milieu in which a person suffering from PTSD exists and provided the jury with evidence from which it could determine whether petitioner's perceptions and actions or reactions were subjectively and objectively reasonable.  Expert testimony also

E X H I B I T    P              9

would have been relevant to petitioner's credibility, giving his testimony context and explaining the nature of his conduct.

In my opinion, any reasonably competent criminal defense attorney would have realized the import of such expert testimony and would have realized that presentation of any claim of self-defense or imperfect self-defense based on vision impairment was mere casuistry and expert testimony was imperative. Without any expert testimony to explain petitioner's world and why petitioner perceived the facts in a certain fashion and acted or reacted as he did, there was no avenue for the jury to understand and assess petitioner's behavior at the time of the offense. Without such expert testimony, it is my opinion the jury was not provided with any substantial evidence which could lead to the conclusion that he acted with a mental state incompatible with murder or acted in actual, but unreasonable, self-defense, or committed involuntary manslaughter.

Petitioner, as indicated in his testimony at the superior court habeas hearing, did not consent to or authorize any or all of the acts or omissions of trial counsel in failing to adequately represent him. (Exhibit K.)

Defense counsel's acts and omissions, wholly outside the scope of the performance of a reasonably diligent advocate and without the consent and authority of petitioner, exceeded and violated defense counsel's ethical obligation to investigate and explore all reasonably apparent avenues of

E X H I B I T    P                10

defense and to explore mental defenses and otherwise prejudicially violated petitioner's rights to due process.

Because a full and complete resolution of the issues raised herein may require resort to material extrinsic to the record on direct appeal and the record of the superior court habeas proceedings, petitioner's only remedy is through this petition for writ of habeas corpus.

I further declare that the exhibits attached to this petition are true and correct copies of 1) pages of the clerk's transcript on appeal in case no. D035850, the direct appeal identified herein; 2) the reporter's transcript in the superior court habeas proceedings (EHC388); 3) the declarations of Dr. Abrams, attorney Inge Brauer and petitioner's counsel herein; and 4) the letter evaluation of Dr. Abrams.

I further declare under penalty of perjury that the foregoing is true and correct and, if called upon to testify, I could and would competently testify thereto.

Executed this 20TH day of March 2007, at San Diego, California.

Athena Shudde

EXHIBIT    P          11

APPENDIX No. 2

# E X H I B I T    A

1  <u>STATEMENT OF FACTS AND DECLARATION OF PETITIONER, LARRY JOHN LITTLE</u>:

2      I AM THE PETITIONER, LARRY JOHN LITTLE, JR.  I have detailed knowledge of the

3  facts as stated herein and the facts I don't, will be so stated or referenced by

4  the record on appeal cite, am over the age of twenty-one years and am competent to

5  do so testify.  If called as a witness I would testify as follows:

6      The facts stated below are the petitioner's version of events and others as

7  told to Petitioner of which were all relayed to Attorney Peckham prior and during

8  the trial stage except for matters subsquently leared of and so stated.  Peckham

9  agreed to the relevancy and materiality of these matters and promised to do much

10 investigation to produce evidence and winesses at trial and then failed to do same.

11 Therefore matters that are not in evidence will be typed in bold.  All other matt-

12 ers will be referenced by Direct Appeal record.  The following will include points

13 of intereest relevant and material to petitioner's imperfect self-defense that

14 Peckham failed to put forth competently.

15 A.  <u>THE DAY MR. RABATORE DIED</u>

16     Joyce Margerate-Rita Roesch ("Joyce") and Ms. Brooks asked Petitioner to

17 score drugs.  Petitioner said he might know a place but was that was all he could

18 do as he has been out of touch due to being in rehabilitation.

19     Petitioner, Brooks & Joyce drove and fropped petitioner off at 7-11 on Chase

20 Street around  5:45-6:30 as they went shopping for food/beer and gave Petitioner

21 $40.00 to score drugs.  Petitioner walked to Sunshine Street and the dealer was

22 gone.  Brooks and Joyce picked Petitioner up and they all returned to apraartment.

23 (This all can be verified by the 7-11 video the police had obtained.)  As Petition-

24 er was dropped off in the parking lot of Joyce's apartment, Joyce told Petitioner

25 to keep everyone out of the apratment saying she would be back in 30-60 minutes.

26     At this point Josh & Corn  showed up and smoked a joint on the porch.  Crazy

27 came over from Wendy's, said he was hungry, so Petitioner gave him a bowl  with

28 burrito's.  Ted and Mary came in Joyce's apartment as Rabatore showed up.  Then

EXHIBIT A          i

Joyce and Ms. Brooks pulled into the apartment parking lot and ran into Jermy and Corn and came in the aprtment about 7:00-8:00 with beer and Vodka, having just come from Winter Gardens Cheers and Beers where they had used a pay phone to call Deny on Aroyal Road (* Deny is Ted's roomate who deals drugs)  Deny told the gals that he would bring dope by later.  Later when Deny drove by their were cops everywhere so Deny drove on by.  Ms. Brooks lied at the preliminary by saying they were only driving out to Cheers and Beers to have a drink and not mentioning drugs.

Petitioner met Deny for the first time in the county jail after the prelim-inary hearing.  Deny told Petitioner he was incarcerated for drug sales, when DenyDeny told Petitioner he had been called by Brooks and Joyce to purchase drugs and that when he drove by cops were everywhere so he kept on driving.  Joyce told Petitioner she wanted some people to leave so Petitioner told Josh & Corn to leave, whom didn't want to and Petitioner felt threatened. 2 RT 121

Ted, Mary, Rabatore, Joyce and Brooks all went into Rabatore's room and did meth 4 RT 558 and were loading a glass pipe as they all sat on the king size bed and smoked speed. Petitioner grabbed his back pack and went into the bathroom, shaved and showered and then put his back pack back in the room they were still smoking in when Ms. Brooks handed Petitioner the pipe and Rabatore snatched it out of Petitioner's hand like it was his God.  Thereafter they all came out of the bedroom and Joyce said she wanted some people to leave her apratment as Rab-atore and Joyce began arguing about Rabatore moving out and some watches he had of hers that she said he had stole.  Ted and Mary did not want to leave, but they did and drove to drug house on Royal.  Then Joyce started yelling at Petitioner about the bowl Petitioner had previously let Crazy use and Joyce ended up going across the street to get it.  Petitioner offered to get it but really was paran-oid.  I thought Josh and Corn and their friends wanted to jump me because I had kicked them out of the apartment against their will is why I did not want to go

EXHIBIT A                    ii

1    outside.  When Joyce went to get the bowl Rabatore told Petitioner he will get me

2    because he has to move out of the apartment.  Rabatore started to choke and I

3    asked him if he needed help and he got madder.

4        Brooks hand me the crystal pipe and I stated I did not want to smoke this if

5    it is going to make me crazy idiots and  tossed the pipe at the wall betwen the

6    T.V. and cabinet 4 RT 618-620 Rabatore was 10 feet away and it was not thrown out

7    of anger.  @ RT 122-123  After Rabatore used methamphetamine he became "hyper &

8    aggressive and moved around alot" 4 RT 558  Rabatore test positive for methamphe-

9    taimine and alcohol. 4 RT 651-562  Rabatore starting yelling at Petitioner, "you

10   broke our only pipe and when my mom comes back she will kill you and I will help

11   her 4 RT 618-620  Joyce walked in, Rabatore told her about breaking the pipe and

12   Joyce got in Petitioner's faac, slapped Petitioner as said shut up and you got to

13   leave.  2 RT 122-123, 131  Petitioner said no, I am going to sleep and see you

14   when I wake up.  2 RT 131-132  Joyce then instructed Rabatore to call 2 RT 131-

15   132 this gang of Mexicans to remove Petitioner that they knew 4 RT 539, 582-583

16   and they will be here to wipe Petitioner out 4 RT 561 while Rabatore was on the

17   phone 2 RT 132-133; 3 RT 230, 300 Petitioner sat on the couch and Joyce said she

18   will wait in the parking lot for the gang 2 RT 133; 3 RT 231; 4 RT 561-562 and

19   told her son to make sure Petitioner stays there.  Petitioner stayed on the couch

20   for 10 minutes and couldn't sleep thinking these people are serious 4 RT 561

21   better get out of her, and went to Joyce's room grabbing his back pack 4 RT 562

22   came out putting his back pack next to the end table and grabbing his glasses

23   preparing to leave 2 RT 136-137, 139, 146-±47  Rabatore said you are not going

24   anywhere until my Mom come in and jumped up towards me as I went to pick up my

25   back pack 4 RT 562 grabbing the knife on the end table and threw two quick jabs

26   as Rabatoe came towards Petitioner with the knife in Petitioner's hand and

27   Rabatore had an ashtray in his hand 4 RT 563-564 as Rabatore was blocking Petit-

28   ioner's path to the door.  4 RT 586, 589, 592 and Petitioner grabbed his back

EXHIBIT A        iii

pack and left as Petitioner was scared as Rabatore was still standing and Petitioner did not know if Rabatore was still a threat. Petitioner was defending himself and not intending to kill Rabatore. 4 RT 564  The physical evidence matches Petitioner's side of the story with the jab patter of the wounds going in an up angle proves the Rabatore was standing. 4 RT 483

B.  EYE INJURY

Petitioner was stabbed five (5) times in the left eye 4 RT 551-552; 6 RT 748 and as a result leaves petitioner nervous, jumpy and reacting to threats of injury. 4 RT 516, 552  Without glasses, petitioner's vision is 20/200 in his right eye and left eye is blind, allowing no ability to distinguish faces four (4) to five (5) feet away. 6 RT 741-3, 752. The trial judge did not allow the petitioner to discuss his state of mind regarding the details of his beieng, stabbed in the eye, 4 RT 551 and petitioner needed to subpeona some witnesses that knew Rabatore thretened petitioner.

C.  PLEA COERCEN

Mr. Peckham tried to coeros Petitioner into taking a 15 years to life on multiple occssions and said he would only do about twenty (20) years. Petitioner countered saying he was willing to take a straight twenty-five (25) years, which would also cause petitioner to do twenty (20) years.  Further Petitioner explained that he was not guilty of murder and rather be aquitted than plea guilty to something he was not guilty of. Peckham further explained he could get him less than 1st degree murder, i.e. 2nd degree with a 15 to life top. Petitioner did not realize that this was a sign Peckham was not representing him to his best ability.  Then Peckham said he would extend the trial to investigate all new facts including Alan Caton to find Overdor , Martin Carvolas, Mary Ross, Ken Kempe and Joyce Roesch.

D.  RABATORE THREATS AND DISLIKE OF PETITIONER

When Petitioner told Deanne and Tina they had to leave, Rabatore got mad at

EXHIBIT A    iv

1  Petitioner and threatened Petitioner and Tina and Deanne left.  Tina could test-

2  ify to this fact in addition to Petitioner and that Rabatore said that Petition-

3  er had stole his Mom and Petitioner said he was crazy.  Jim (AKA Jimbo) would

4  testify that when Rabatore came over to his house and  was confronted by Jim for

5  stealing something of his, Rabatore had threatened Petitioner by telling Petit-

6  ioner that he better watch out.

7  E.  PRIOR ACTS OF ARGUING, THREATS AND VIOLENCE

8      The first night Petitioner was at the apartment Rabatore and Joyce got in a

9  fight with Rabatore throwing a glass object at her, which flew over Petitioner's

10  head and hit the refrigarator.

11      Another incident was Joyce and Tina getting violent and someone called the

12  police whom cme out and ended arresting Toby for possession of meth.

13      When Scotty Rummel would come over, Rabatore who did not like him would

14  chase Scotty with a knife, and throw things at Scotty.

15      One day when Petitioner and Scotty had come back from having a couple of

16  beers they found Joyce on the phone with the police.  After she hung up her and

17  Rabatore told Petitioner and Scotty that they were being investigated for murder

18  ... they saw a bloody tee-shirt in Rabatore's room the morning it happened.

19      Three days prior to Rabatore's demise Petitioner saw Joyce thrown to the

20  ground by Rabatore and threatened by Rabatore.

21  F.  PRIOR DRUG USE

22      Tina would testify that she came over to Joyce's apartment to buy dope,

23  that Joyce and Rabatore physically fought over drugs, Joyce flipped out and

24  started dumping pills down her throat when Tina went to pry her mouth open Joyce

25  bit Tina's finger.  Joyce, Rabatore and herself tried to get Petitioner to sell

26  a bunch of downers (Vikodin), and the night of 6/14/99 Joyce, Tina, Rabatoe and

27  Deanne were their doing drugs and Petitioner was not indulging.

28      Martin Carvolas (AKA Crazy) would testify that Rabtore would come back and

EXHIBIT A

v

1    forth from the dope house, where Rabatore was planning on moving.    Crazy was there

2    with Mary, Brooks and Joyce when they said they were going to get some beer, food

3    and dope and would be right back in an hour or two.    When they got back Mary got

4    Ted to go get dope.

5        Bob Teal was not questioned about all the smoking of dope an hour prior to

6    Rabatore's demise.

7        Ms. Brooks testified the glass object Petitioner threw at Rabatere was not

8    a pipe. 2 RT 154-155, 3 RT 251 and there is available evidence that it was, in-

9    cluding crime sceen photographs.  Ms. Brooks testified the gals went all the way

10    over to Cheers & Beers.  Multiple witness would testify that drugs was involved

11    in that trip.  Versus her testifmony they went just for beer and food. One witness

12    is Deny whom Petitioner saw in the county jail after the preliminary hearing and

13    said that the gals hd called him for drugs nd he drove by Joyce's Apartment, but

14    the cops were their so he drove on by.

15        Joyce Roesch would testify that her and Ms. Brooks did dope with Rabatore in

16    the back room while Petitioner drank beer in the living room.  Joyce would also

17    testify that her and Tina got violent,, someone called the police and Toby had

18    gotten arrested.

19        Toby Slater would testify he knew where Petitioner could  stay and took Pet-

20    ititioner to Joyce's apartment and brought drugs from her and Rabatore while Tina

21    waited in the car on 6-10-99.

22    G.  AVALIABLE EVIDENCE MR. PECKHAM PROMISED THEN FAILED TO OBTAIN

23      a)  IMPEACHMENT EVIDENCE

24        Ms.  Brooks testified Petitioner was laying around for an hour after the

25    argument that llowed D.A. to argue no provacation.  Mary Ross & Ted Kempe would

26    testify it was a very short time.

27        Mary Ross, Ted Kempe, Joyce Roesch, Toby Slater, Scott Stefes, Jimbo, Tina,

28    Scotty Rummel and Martin Carvolas (Crazy) would all testify that drugs, threats by

EXHIBIT A

vi

1  Rabatore and Joyce, was abound in that aprartment the day of Rabatore's demise and

2  each and everyday Petitioner lived there consistently, up until Rabatore's demise.

3      Toby got arrested for meth when it was really Joyce's and had purchased it at

4  Joyce's apartment from her and Rabatore.

5      Joyce actually told Mr. Brooks that Petitioner & Crazy fought, which is con-

6  trary to her testimony.

7      Jimbo lived across the street from Joyce's apartment and was Rabatore's friend.

8  After telling Rabatore he was crazy when Rabtore threatened Petitioner about Pet-

9  itioner stealing his Mom (Joyce), Petitioner went to Jimbo's place and mentioned

10  Rabatore having stole something from Jimbo.  Rabatore showed up and eventually

11  Jimbo asked Rabatore about stealing from him, which Rabatore denied.  Shortly

12  thereafter Jimbo asked Petitioner if he desired to go to the Casino's with him

13  (* Jimbo and Rabatore use to go to the casino's together.)  When Rabatore came

14  back over Jimbo's, Jimbo told Rabatore knew he lied and they were not friends

15  anymore. Then Rabatore got made at Petitioner and told Petitioner they were not

16  friends anymore and that now Petitioner had stole his friend also and that Petit-

17  ioner had better watch out- this transpired on 6/15/99 at 2 a.m.  Crazy was at the

18  door also.  When Petitioner and Jimbo went to the csino they thought of talking to

19  Rabatore and then figured Crazy and Rabatore must have gone somewhere.

20      Scotty Rummel was their the first night Petitioner was there and he previously

21  with Joyce and Rabatore prior to Petitioner.  He would testify about all the drugs,

22  arguing, violence, fighting and so forth between Joyce and Rabatore and others.

23  Witnessed Rabatore being kicked out by his Mom and Joyce begging Petitioner to

24  stay their.

25      Scotty (Martin Carvolas) stayed across the street from Joyce's at Wendy's.

26  Scotty was in the back room asleep when the police interviewed Wendy.  He would

27  testify that Petitioner meet Ms. Brooks on the 15th of June 1999.  Crazy was at

28  apratment complex when he heard Mary, Brooks and Joyce saying they were going to

EXHIBIT A        vii

1  get some beer, food, and dope and would be back in an hour or two.

2      Mr. Peckham had interviews of Wendy Parker, Roesch, Toby Slater, Mary Ross

3  via police reports, plus the facts Petitioner told him and Peckham did not even

4  try to find them, interview them, nor subpeana them even though they were on the

5  D.A.'s witness list. They were 100% relevant and material to Petitioner's sole .

6  defense of self-defense.

7    b) POST TRAMATIC STRESS DISORDER

8      Sharon Little's Psychologist Dr. Diana K. Weiss advised Sharon on her feelings

9  regarding Petitioner's perdicament and suggested that he suffered from Post Tramatic

10  Stress Disorder. Sharon had many discussions with Dr. Weiss whom offered her serv-

11  ices. Mr. Peckham rejected Dr. Diana K. Weiss's offer to testify. (See Sharon

12  Little declaration as esxhibit B.)

13      Ken Woo was interviewed by Mr. Pckham for Woo to testify about his witnessing

14  Petitioner being stabbed . and  well  aware  of Petitioner being jumpy and nervous

15  over anything. Peckham said he would call Woo to tesify to counter D.A. challenging

16  Petitioner's claim of jumpneness and nervousness.

17      Mr. Peckham being well aware of Dr. Aykraid treating Petitioner in the past

18  was going to call the Dr. to testify and half way through trial realized he had not

19  subpeaned Dr. Aykraid. Mr. Peckham had Petitioner's father go and pick up the Dr..s

20  report. (See Little, Sr. declaration as exhibit B and 6 RT 747:14)  Mr. Peckham

21  did not understand how to argue the proff requested by the Judge 6 RT 749  Mr.

22  Peckham failed to make a . showing of Petitioner's jumpyness and being afraid of

23  injury  and it not being  a figment of petitoner's mind.

24    c) PECKHAM TELLING PETITIONER NOT TO TESTIFY ABOUT BEING DRUNK NOR LACKING
     SLEEP

25      Mr. Peckham told Petitioner not to admit being drunk nor not having slept for

26  awhile.

27

28

## EXHIBIT A

viii

d)  JOYCE ROESCH & TOBY SLATER

Toby Slater is Joyce Roesch's boyfriend.  Toby brought me to Joyce's, brought drugs and left to do them with his other girlfriend, Tina.  Toby witnessesed Tina and Joyce fighting when the police were called and Toby     arrested for meth.  Joyce later called police and told them the drugs were hers.

e)  IMPEACHING EVIDENCE IN THE RECORD TO IMPEACH MS. BROOKS WITH

Evidence in the record to impeach Ms. Brooks with was never utilized by Mr. Peckham.  This evidence was the two phone calls beween Rabatore and Isreal Ackemon that were 10-15 minutes apartment when Isreal claimed to have heard Petitioner and Joyce arguing. 2 RT 132-133; 3 RT 230-300; 4 RT 559-560, 602, 3 RT 321  Ms. Brooks testified that the arguing between Joyce and Petitioner was one hour prior to Rabatore's demise.

e)  DIRECT APPEAL

The direct appeal opinion on page 14 says the jury would convict of involuntary manslaughter if they found their was no intent.  This instruction was never given.  Page 14 quoted, "if jury believed Little unintentionaly  killed Rabatore inan honest belief he was in peril, it would have concluded it could not convict him of murder because he lacked the intent to kill.  A jury thus situated would have convicted Little only of involuntary manslaughter, a lesser offense included in the crime of murder, on which the jury was also instructed."  This is untrue.

f)  MR. PECKHAM PROMISED THEN FAILED TO HAVE THE FOLLOWING TESTIFY

1)  SCOTTY RUMMEL would testify He had previously lived with joyce and Rabatore,  Rabatore did not like him and would chase Scotty around with a knife and throw objects at him.  Was present when Joyce and Rabatore talked with police on the phone Petitioner and Scotty they were being investigated for murder ... and observed the bloody tee-shirt in Rabatore's room the morning it happened,  Scotty witnessed Joyce begging Petitioner to stay at her apartment, and was their when Josh  came over and did dope with Joyce, Brooks and Rabatore between

EXHIBIT A    ix

5) TOBY SLATER was on the D.A.'s witness list and Mr. Peckham had the police reports of his interview. Mr. Peckham failed to interview Toby and **Subpoena** him for trial. Toby would testify to the fact of his buying drugs from Joyce, one of his girlfriends and Rabatore. That Joyce and Tina got violent and someone called the police which resulted in Toby getting arrested for meth.

6) SCOTT STEFES was not interviewed by Mr. Peckham, nor **subpoenaed** for trial. Scott ws nicknamed **Shanky** and came by to buy drugs and get high at Joyce's apartment many **times, Shaky** witnessed Rabatore throw his mom on the ground and threaten her three **Days** prior to Rabatore's demise.

7) JIM (AKA JIMBO) was never interviewed by Mr. Peckham, nor **Subpoeaned** for trial. Jimbo would testify that he was a friend of Rabatore. That Petitioner was over his place and told him that it was Rabatore that had stole something from Jimbo. That Jimbo and Rabatore use to go to the csino's all the time together. Jimbo asked Rabtore about stealing from him and he lied. Jimbo then asked Petitioner if he wanted to go to the casino's with him. Rabatore came back and Jimbo told him he knew he had lied to him about stealing from him and they were no longer friends and he did not want to **go, to** the casino's with him anymore and that he was taking his new friend, Petitioner. Rabatore told Petitioner "now I stole his friend and that Petitioner had better watch out on 6-15-02 at 2:00 a.m.

8) BOB TEAL ENCOUNTERS PETITIONER IN THE PRISON. 3 RT 336-337 TEAL TOLD Petitioner he got busted for auto theft but petitioner learned Teal was never convicted. Teal talked to Overdorf after seeing petitioner in prison. 3 RT 345 **Petitioner** contends that Teal got his story from Overdorf as Petitioner never said the things Teal said he did.

Overdorf called Joyce and Brooks while petitioner was with Overdorf from the gym at the prison and then Teal was in the gym at the prison with Overdorf. Overdorf is friends with Joyce and Brooks. 3 RT 331 Joyce and Brooks visited Overdorf at the jail and Joyce visited Overdorf at the prison. Overdorf was busted

EXHIBIT A    xi

1    while driving Ms. Brooks car with alot of drugs.

2         Sony Clark could testify that Teal stole the car while he was at the ranch.

3    Peckham said he would call Sony Clark to testify and never did.

4         Defense counsel knew of all these facts, promised to investigate them and

5    call the respective witnesses and never did.

6         Defense counsel never asked for an evidentiary hearing to determine if

7    Teal's first letter to the D.A. was in fact lawfully blacked out. (See letter

8    blacked out as exhibit E.) The same goes for the trascription of Teals's

9    conversation with investigator Saraceni. (See exhibit F.)

10         Clearly if this evidence was submitted then Teal's testimony would not have

11   been allowed.

12         Executed this 10th day of November in Los Angeles County of the year of

13   our Lord 2002.

14         I declare under penalty of perjury that the foregoing is true and correct.

15

16                                        _Larry Little Jr_
                                          LARRY LITTLE, JR.

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

APPENDIX No. 2

# E X H I B I T     B

<u>DECLARATION OF SHARON LITTLE RE:   EVIDENCE WITHHELD AT TRIAL</u>

I, Sharon Little, declare that:

I am the sister of Larry John Little, Jr. and I am the declarant herein.

In April of 2000 declarant was seeking emotional assistance from Psychologist Dr. Diana K. Weiss Ph.D.  During this time declarant was having many discussions in relation to her brother Larry John Little, Jr. who at the time was going through a murder trial.

After many discussions about her brother and a terrible accident he suffered in 1993 in which he was assaulted and lost his left eye due to a stabbing, Psychologist Dr. Diana K. Weiss Ph.D. was convinced declarant's brother may suffer from what is called <u>Post Traumatic Distress Disorder</u>.

Psychologist Dr. Diana K. Weiss Ph.D. was quite sure since Larry John Little, Jr. had never received any professional help in dealing with what happened to him, that he suffered from this disorder.  Declarant was told by Psychologist Dr. Diana K. Weiss Ph.D., she had testified as a professional witness many times before at trials about <u>Post Traumatic Distress Disorder</u>, and then offered her services to testify at the trial of Larry John Little Jr.

The information was given to Mr. Edward Peckham, the attorney representing Larry John Little, Jr. in hopes that it could help substantiate his frame of mind at the time of the events that occurred in June 1999.

This offer was rejected and Dr. Diana K. Weiss was not allowed to testify at the trial.  This medical evidence that was withheld from the jury could have possibly changed the final outcome of the trial.  The jury did not have knowledge of all of the evidence available before making their final decision.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at San Diego, California, on May 29th, 2002.

_Sharon Little_
SHARON LITTLE

# EXHIBIT B

APPENDIX No. 2

# EXHIBIT    C

## DECLARATION OF LARRY LITTLE SR.

I am the father of the Petitioner, Larry J. Little, Jr. I have detailed knowledge of the facts as stated herein, am over the age of twenty-one years and am competent to so testify. If called as a witness I would testify as follows:

My son, Larry J. Little, Jr. was the victim of a violent stabbing that was not provoked by my son. This stabbing left my son with out vision in one of his eyes. This stabbing also caused my son to be jumpy and faearfull of injury when any arguing, threats or aggressiveness is in his presence.

Prior to the start of trial, Mr. Peckham elicited my help in convincing my son to plea guilty to second degree murder. I was surprised by this as I knew my son did not intend to kill Rabatore. Not understanding the law much I spoke with my son as requested by Mr. Peckham and my son was not taking a second degree murder life sentence.

During the trial of my son, Mr. Peckham advised me he failed to **subpoena** reports from my son's eye Dr.**Aykroid** . Mr. Peckham did not understand how to argue the proof necessary to have Dr. **aykroid**'s report admitted at the trial. So Mr. Peckham had me go and pick up Dr. **aykroid**'s report. The Court would not allow Dr. **aykroid** report because I went and picked it up versus his having **subpoena** it

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and corrrect.

Executed this 2nd day of December, 2002 in California City, California.

*Larry Little Sr.*

LARRY LITTLE SR.

# EXHIBIT C

APPENDIX No. 2

# EXHIBIT    D

**MARTHA L. McGILL**
ATTORNEY AT LAW
732 NORTH HIGHWAY 101, SUITE B
ENCINITAS, CA 92024
TELEPHONE (760) 632-8052
FAX (760) 436-5946

June 19, 2001

Larry Little, #P82205
C-2-143, CSP-LAC
44750 60th Street West
Lancaster, CA 93536-7619

      **RE:**   *People v. Larry Little*
            Court of Appeal Case No. D035850

Dear Mr. Little:

    Thank you for your letter dated May 18, 2001, which I received on May 29, 2001. I will try to respond to your concerns as best I can.

    As I understand it, you are concerned because the opening brief did not cite federal cases. As you are probably aware, an appeal must be based on matters that appear in the appellate record, specifically, the legal issues raised and the evidence presented in the trial court. In your case, the issues which could be raised, based on the record, were all issues based on California state law. Because these issues all involve state law, the relevant case law was California case law. It is my practice to look for possible federal issues to raise, but in this case I found no arguable federal issues, based on my review of the record.

    If you believe there are federal issues in your case, and you wish to raise them on your own behalf, you may ask the court for permission to submit a supplemental brief.

    In other developments in the case, the Attorney General has received a thirty-day extension to file the respondent's brief, which is now due June 29, 2001. I will keep you informed of the progress of the appeal.

                      Very truly yours,

                      Martha L. McGill

MLM:mm

**EXHIBIT D**

APPENDIX No. 2

# E X H I B I T    E

Robert Teal J15315
3-11-247u
480 alta Rd
S.D. CA., 92179



STATE PRISON

USA
33

Office of The District
attorneys Office

El Cajon Court House
480 E. Main St.

EXHIBIT E

502

I am an inmate at Donovan State Prison.
I have some information, that may or
may not be of any importance to your office,
but I will allow you to make the decision.

1) There is an inmate, by the name of Little,
his last name, who also goes by pirate. Well he
and I ran around for 4-5 weeks prior to
him stabbing a young man to death, by the
name of Ed, on 1st off of Washington Ave, in
El Cajon. By running with him; It was obvious
he was the type to kill someone with out think-
ing twice about it. I, along with others I knew
had tried to avoid him because of his temper
+ attitude of being the one who will do you;
as he would tell us. Any way I had to finally
leave the ranch I was at to, keep from him.

Well he + I were put into the gym here
together + he told me the whole gory story of
how he did it + how he is going to claim
he wasn't high, when he was so high after
jest slamming 1/16 of speed.

Then he confronts me with; "If you were

50?

was the only witness who Ed was going — he told me he told the cops Ed was going to hit him with an ashtray when he really wasn't.

Well if you need to speak at me, you know where I am for now!

EXHIBIT E

APPENDIX No. 2

# E X H I B I T     F

1 | PEOPLE VS. LITTLE, LARRY

2 | DA CASE # PD2614

3

4 | S: DAI NICK SARACENI                    T: ROBERT TEAL

5

6

7 | S: IT'S SEPTEMBER 10TH, 1999, APPROXIMATELY 3:30 P.M. WE'RE AT THE

8 | COUNTY CENTRAL JAIL INTERVIEWING ROBERT TEAL.

9 | (BACKGROUND NOISE)

10 | S: UM, YOU..WE HAD A REAL BRIEF CONVERSATION ON THE PHONE, AND

11 | YOU TOLD ME THAT YOU HAD SOME INFORMATION ABOUT UH, PIRATE.

12 | UH...

13 | T: ...YEAH, I HUNG AROUND WITH HIM.

14 | S: YEAH. UM, I DON'T KNOW THAT MUCH ABOUT YOU BOB, WHAT UH,

15 | UM...HOW LONG YOU GONNA BE...YOU'RE UH, YOU'RE AT BAKER,

16 | RIGHT? (UNINTELLIGIBLE).

17 | T: YEAH.

18 | S: HOW LONG YOU GONNA BE THERE, YOU KNOW?

19 | T: WELL, I'M GONNA BE IN PROBABLY FOR TEN MORE MONTHS.

20 | S: O.K.

21 | T: BUT THIS IS WHAT I WAS ARRESTED ON, SO I DON'T KNOW. YOU KNOW?

22 | THESE HERE...

23 | S: ...YEAH. UM...

24 | T: ...I DON'T KNOW. MAYBE THAT'S WHY THEY BROUGHT ME DOWN...

25 | S: ...POSSESSION OF A WEAPON, STOLEN CAR...

26 | T: ...THE WEAPON WAS A KNIFE...

27 | S: ...SOME STOLEN PROPERTY. O.K.

28 | T: YEAH.

1

EXHIBIT F

334

1  T: O.K.

2  S: I, I, I DON'T...YOUR NAME...

3  T: ...BECAUSE (UNINTELLIGIBLE)...

4  S: ...JUST HAPPENED TO COME UP...

5  T: ...DON'T WANT TO GO TO COURT AND, AND BE IN THE PEN WITH THESE

6     GUYS.

7  S: UM HMM.

8  T: ████████████████████████████████████████████

9     ████████████████

10 S: ...YEAH...

11 T: .. ████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████████

14 S: ...RIGHT...

15 T: .. ████████████████████████████████████████████

16 ████████████████████████████████        AND SO

17    THAT'S ANOTHER CASE. BUT LARRY, LARRY, LARRY TOLD ME, WHAT

18    HE TOLD ME WAS THIS...FIRST OF ALL, HE SAID THAT HE STABBED, HE

19    CALLED ME WHEN HE GOT, WHEN HE KILLED THIS KID.

20 S: YEAH..

21 T: ...HE KILLED THIS KID NAMED ED.

22 S: RIGHT.

23 T: HE SAID HE BOOKED. HE GAVE ME A PHONE CALL. HE TRIED TO

24    LOCATE ME AT THE RANCH IN LAKESIDE.

25 S: WHAT RANCH?

26 T: UH, LAKESIDE RANCH. WELL, IT'S A LITTLE HORSE RANCH THAT'S

27    EVERYBODY MOVED FROM NOW THOUGH.

28 S: IS IT CALLED LAKESIDE RANCH?

3

EXHIBIT P

556

APPENDIX No. 2

E X H I B I T     G

F I L E D
Clerk of the Superior Court

NOV 1 8 2003

By: L. CASAUBON, Deputy

1  W. ALLAN WILLIAMS
   State Bar Number 75213
2  180 Rea Avenue
   El Cajon, California 92020
3  Telephone: (619) 593-3790

4  Attorney for Petitioner
   LARRY JOHN LITTLE, JR
5

6           SUPERIOR COURT OF THE STATE OF CALIFORNIA

7           COUNTY OF SAN DIEGO, EASY COUNTY DIVISION

8

9  LARRY JOHN LITTLE, JR.,              )    Case No. SCE 198946
                                        )    EHC 388
10          Petitioner,                 )
                                        )    PETITIONER'S DENIAL TO
11     vs.                              )    PEOPLE'S RETURN ON PETITION
                                        )    FOR WRIT OF HABEAS CORPUS
12  THE PEOPLE OF THE STATE OF          )    AND ORDER TO SHOW CAUSE,
    CALIFORNIA                          )    WITH POINTS AND
13                                      )    AUTHORITIES
                                        )
14          Real Party in Interest.
15  _____

16      Comes now the Petitioner, LARRY JOHN LITTLE, JR, by and through his

17  attorney W. ALLAN WILLIAMS, and respectfully submits his DENIAL TO

18  PEOPLE'S RETURN ON PETITION FOR WRIT OF HABEAS CORPUS AND

19

20  ORDER TO SHOW CAUSE, WITH POINTS AND AUTHORITIES in response

21  to those filed by Real Party in Interest, The People of the State of California, by and

22  through it's attorneys, BONNIE M. DUMANIS, District Attorney, and PATRICIA

23  MALLEN, Deputy District Attorney.

24      Petitioner reaffirms all allegations made in his original Petition.

25      Petitioner will attempt to answer the issues in the order raised in the People's

26  Return.

27      /////     EXHIBIT G

28
                                  1

Little Denial to People's Return on Petition for Writ of Habeas Corpus
                  SCE 198946 EHC 388

## STATEMENT OF THE FACTS

Petitioner concedes, for the purpose of this pleading, that the majority of the Statement of Facts as contained in the People's Return is accurate, except as noted in Argument and Exhibits.

## ARGUMENT

## I

## THE COURT CAN NOT DETERMINE FROM THE PLEADINGS WHETHER PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AND SHOULD HOLD AN EVIDENTIARY HEARING

The People assert that there is no reason to hold a hearing, because trial counsel, Edward Peckham, acted appropriately. The People point to Mr. Peckham's Declaration as proof.

What is interesting is that Mr. Peckham's Declaration in no way explains why he failed to request an instruction on involuntary manslaughter. This is because he affirmatively rejected it.(Exhibit pp. 671-676). As will be seen, there is absolutely no tactical reason for failing to request such an instruction or failing to argue the theory.

Mr. Peckham's Declaration further seems to indicate that he is some sort of expert in Post Traumatic Stress Disorder and therefore decided that it was not worth examining. What is troubling is that Mr. Peckham knew of Petitioner's prior traumatic experience, as shown by his sending him to an ophthalmologist and obtaining records from Petitioner's doctor who treated him for the traumatic stabbing in the eye. There is no explanation as to why the defense was not at least explored.

The Defense Attorney did not, as the People claim, "vigorously investigate all relevant information". If he had, he would have looked at the traumatic injury and near-death experience of Petitioner when he was stabbed in they eye and surmised that further investigation into Petitioner's mental state was needed.

## II

### THE PETITIONER HAS MET HIS BURDEN OF SHOWING THAT BUT FOR THE INEFFECTIVE ASSISTANCE OF COUNSEL A MORE FAVORABLE RESULT COULD HAVE BEEN OBTAINED

Petitioner has met his burden to obtain a hearing. He has shown at least two failings by Defense Counsel, the failure to investigate a possible mental defense which would have given rise to an involuntary manslaughter instruction and the very failure to obtain an involuntary manslaughter instruction.

There is nothing in the People's Return that, on its face, justifies the failure to investigate and to request the involuntary manslaughter instruction.

The claim asserted in this petition is that Petitioner was deprived of the effective assistance of counsel and concomitantly the right to due process. These constitutional claims cannot be adequately presented on appeal or pleadings because their factual basis rests on evidence discovered outside of the appellate record. These matters, therefore, are not completely contained in the record of the trial. (See *In re Hochberg* (1970) 2 Cal.3d 870, 875.)

"[H]abeas corpus is an extraordinary and collateral action that lies to review a claim of denial of substantive constitutional rights that may have affected the integrity of the fact finding process." (*In re Coughlin* (1976) 16 Cal.3d 52, 55.) Further, the remedy of habeas corpus "permits the examination not only of the actual evidence introduced at petitioner's trial but of any necessary additional evidence bearing upon the infringement of petitioner's constitutional rights." (*In re Bell* (1942) 19 Cal.2d 488, 501, citations omitted.)

The right to effective assistance of counsel in a criminal case is guaranteed by the Sixth Amendment to the Constitution of the United States and by Article I, section 15 of the California Constitution. (*People v. Frierson* (1979) 25 Cal.3d 142, 162

3

*People v. Pope* (1979) 23 Cal.3d 412, 422.)  In cases in which trial counsel's reasons for acts or omissions are not clear from the record on direct appeal, habeas corpus is an appropriate vehicle to raise those issues. (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.)

Under *Ledesma*, habeas corpus is the only vehicle in which petitioner may raise his claim.

Denial of the right to a fair trial is a claim cognizable on habeas corpus whether or not it was raised on appeal.  (*In re Ferguson* (1971) 5 Cal.3d 525.)

The very essence of due process, including the guarantees of the Sixth Amendment, is the "adversarial process" and "meaningful adversarial testing" of the prosecution's case.  (*United States v. Cronic* (1984) 466 U.S. 648, 656 [80 L.Ed.2d 657, 104 S.Ct. 2039]; *Strickland v. Washington* (1984) 466 U.S. 668, 684, 685, 691-692 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *Withrow v. Williams* (1993) 507 U.S. 680 [123 L.Ed.2d 407, 416, 113 S.Ct. 1745].)  A breakdown in the adversary process that renders the result unreliable constitutes a due process violation.  (*Strickland v. Washington, supra*, 466 U.S. 668, 684, 687, 688.)

Every criminal defendant has a Sixth Amendment right to present an adequate defense and that right encompasses the ability to discover and present evidence. (Cf. *Washington v. Texas* (1967) 388 U.S. 14, 19 [18 L.Ed.2d 1019, 87 S.Ct. 1920]; see also *Chambers v. Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038]; *People v. Carter* (1957) 48 Cal.2d 737, 748; *People v. Torres* (1964) 61 Cal.2d 264, 266-267.)

Indeed, the Fifth, Sixth and Fourteenth Amendment rights are designed to promote "reliability in the truth-finding functions of a criminal trial." (*Kentucky v. Stincer* (1987) 482 U.S. 730, 737 [96 L.Ed.2d 631, 107 S.Ct. 2658].)

4

The People assert that the decisions by Defense Counsel were tactical and that we should not engage in "second-guessing" (People's Writ P's & A's p'6-7) Petitioner disagrees. So does the United States Supreme Court.

In *Strickland* the Court advised, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (*Strickland v. Washington, supra*, 466 U.S. 668, 690-69.) In the instant case there was "no thorough investigation of law and facts," since defense counsel failed to take the second step, because he apparently failed to appreciate its significance as support for his client's defense.

Generally, prejudice must be affirmatively proved. (*Strickland* v. *Washington, supra*, 466 U.S. at 693.) "[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." (*Ibid.*)

> An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, ... and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome. (*Id.* at p. 694.)

The high Court concluded,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Ibid.*)

"In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." (*Id.* at p. 696.)

5

The People's assertion on pages 8 and 9 that Petitioner was able to explain to the jury about his own eye injury ignores trial experience. The presence of an expert would surely bolster and support that argument. The presence of an expert on how this could affect one's perception of danger would have been invaluable. Juries will seldom believe a defendant's self-diagnosis of his own problems. To think otherwise is to ignore reality.

As will be seen, there was "a breakdown in the adversarial process."

For all these reasons, habeas corpus is the proper procedure for resolution of the claims included herein.

They can only be resolved by an evidentiary hearing.

### III

### POST TRAUMATIC STRESS DISORDER SHOULD HAVE BEEN EXAMINED. FAILURE TO DO SO DEPRIVED PETITIONER OF DUE PROCESS AND THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

The People take the position on pages 11-13 that there was no Post Traumatic Stress Disorder (hereafter PSD) ever brought up until after trial and therefore it should be a non-issue. Obviously, Petitioner disagrees.

The assertion that somehow Mr. Peckham could be the ultimate judge of whether the Petitioner had PSD is unsound.

The assertion that calling what the Petitioner testified to by a medical term would have added nothing ignores logic and common trial experience. As mentioned above, juries do not believe self-diagnosis, especially by defendants. They want and expect an expert. Having an expert evaluate the Petitioner was the proper thing to do.

A jury must consider all the facts and circumstances it might "'expect [] to operate on [defendant's] mind....' [Citation.]'" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065; see also *People v. Humphrey* (1996) 13 Cal.4th 1073, 1086 [jury entitled

to be "'given a professional explanation of the battering syndrome and its effects on the woman through the use of expert testimony.'"])

A qualified expert would have been able to present information about PSD to educate the jury about the causes and effects of this syndrome or disorder. This testimony would have been invaluable to a jury whose task it was to determine degree of culpability in this offense. Even testimony in the abstract would have been helpful in reducing the degree of the crime.

Trial counsel's representation fell below an objective standard of reasonableness. Counsel's failure to secure the appointment of a mental health expert is without legitimate excuse. Clearly, after the personal history information about Petitioner was discovered, counsel should have recognized an evaluation by a mental health expert was advisable.. Yet, counsel did nothing to secure such an appointment. The sad and unnecessary result here was that no expert was presented as a defense witness for Petitioner at trial. Reasonably competent counsel should have realized that his client's testimony would have been strengthened by an espert's testimony. Accordingly, the failure to investigate, failure to secure the appointment of an expert and the failure to present the testimony of an expert severely impacted the ability to present any viable defense whatsoever to the murder charge.

The lack of an expert who could advise Petitioner's attorney and testify as to the impact of the Petitioner's personal traumatic experiences severely limited, through counsel's own lack of diligence, counsel's ability to formulate and argue a viable mental state that would negate malice.

In *In re Saunders* (1970) 2 Cal.3d 1033, defense counsel failed to obtain available medical reports reflecting past diagnosis and treatment and did not make any effort to have the defendant examined by a psychiatrist, even though counsel had been

7

advised several months prior to trial that defendant had earlier sustained head injuries which resulted in organic brain damage. Defense counsel presented no evidence on the defendant's behalf at the trial.  On the date of the guilt verdicts, a clinical psychologist, who had actually treated the defendant, wrote to counsel and included several medical reports.  Counsel took no action after receipt of the documents. (*Id.* at pp. 1036-1037.)  Counsel filed a declaration indicating a tactical decision not to raise the defense.  However, the court concluded that counsel's failure to avail himself of information relevant to the defense removed all rational support for the stated tactical decision. (*Id.* at pp. 1048-1049.)  The court granted the writ finding counsel's omissions constituted a withholding of a crucial defense and operated to deny to the defendant his constitutional right to the effective assistance of counsel. (*Ibid.*)

In petitioner's case, there was no "tactical" decision to avoid a particular defense.

The law permits a defendant to assert a psychiatric defense and to have expert witnesses testify in his or her behalf. (*People v. Babbitt* (1988) 45 Cal.3d 660, 700.) A defendant is also permitted to provide a jury a professional explanation of PSD and its effects on people through the use of expert testimony.

Further, a defendant must be permitted to present evidence and obtain an instruction upon any theory which may negate an element of the charge: i.e., felonious intent. (See *People v. Bobo* (1990) 229 Cal.App.3d 1417, 1442 [defendant may not be denied an opportunity to prove absence of a statutorily required mental state]; *People v. Saille* (1991) 54 Cal.3d 1003, 1120 [right to request instruction pinpointing defense theory which negates an element of the charge].)

The People assert hat there was nothing to indicate that Petitioner possibly suffered from PSD. Petitioner disagrees.

8

The testimony of Joshua Roberts showed that the victim was acting strange and in a threatening manner. (Exhibit 12 pp, 522-531). This, coupled with Petitioner's testimony and evidence regarding PSD would have been a tremendous defense argument for involuntary manslaughter.

It was Petitioner's lawyer's responsibility to present Petitioner's defense, not Petitioner's or Petitioner's family. (*Scott v. Mitchell* (6th Cir. 2000) 209 F.3d 854, 881.) A reliable, documented social history drawn from multiple sources other than the defendant is essential to a reliable assessment of mental health issues. (Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va.L.Rev. 1109 (1997).)

Further, counsel had the duty to provide readily available background and foundational materials to a defense mental health expert so that the expert could perform a valid evaluation. (*Wallace v. Stewart* (9th Cir. 1999) 184 F.3d 1112; *Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073, 1078-1079.) Petitioner had a right under *Ake v. Oklahoma* (1985) 470 U.S. 68 [84 L.Ed.2d 53, 105 S.Ct. 1087], and the authorities on which it was decided, to competent assistance of a psychiatric expert to assist in preparation and presentation of Petitioner's defense. The facts of abuse must be presented with corroborating or interpretive testimony. (*Devier v. Zant* (11th Cir. 1993) 3 F.3d 1445, 1453 & fn. 18.

On the basis of generally agreed-upon principles, the standard of care for both general psychiatric and forensic psychiatric examinations requires careful assessment of medical and organic factors contributing to, or causing, psychiatric or psychological dysfunction. (H. Kaplan & B. Sadock, *Comprehensive Textbook of Psychiatry,* (5th ed. 1989) vol. 1, p. 527-528.)

9

1    Sadly, as the record herein documents, defense counsel did not employ any of

2 these assessment tools, even though he had developed much of the critical

3 background information. Defense counsel failed to seek the assistance of a mental

4 state expert and thereby learn the significance of Petitioner's condition and its

5 implication and importance to substantiate his innocence.

6

7    A client with a history of life-threatening trauma, particularly a medical history

8 as extraordinary as that here, requires counsel to obtain information about and

9 understand the implications it may hold for the client's defense. (ABA Standards for

10 Criminal Justice Prosecution Function and Defense Function, Standard 4-1.2, pp 122-

11 123; Standard 4-4.1, pp. 181-183.) The relevance of physical trauma to criminal

12 behavior has been topical since the 80's. (See, eg., *Colorado v. Wright* (1982) 648

13 P.2d 665, 667-668; *California v. Bean* (1988) 46 Cal.3d 919, 945 [251 Cal.Rptr. 467];

14 Anchor, et al., *Fundamentals of Disability Determination and Rehabilitation: A*

15 *Higher Ground for the Applied Neurobehavioral Sciences*, American Journal of Trial

16 Advocacy 8:337-375 (1985); Hall & McNinch, *Linking Crime-Specific Behavior to*

17 *Neuropsychological Impairment*, The International Journal of Clinical

18 Neuropsychology, 10:113-122 (1988).) Under prevailing national standards, general

19 and forensic psychological evaluations require careful assessment of medical and

20 organic factors contributing to, or causing, psychiatric or psychological dysfunction.

21 (H. Kaplan & B. Sadock, *Comprehensive Texbook of Psychiatry*, (5th ed. 1989) vol. 1,

22 p. 527-528.) This is the prevailing body of knowledge in the sphere in which

23 Petitioner's case was prepared.

24

25    Defense Counsel had learned that Petitioner suffered a relatively recent life-

26 threatening attack by knife. Published authority abounds that such highly traumatic

27 life experiences often produce PTSD. "Severe or life-threatening trauma experienced

28

10

either in childhood or adulthood can further provoke emotional and behavioral reactions that jeopardize mental health." (U.S. Department of Health and Human Services, *Mental Health: A Report of the Surgeon General*, Rockville, MD: U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for mental Health Services, National Institutes of Health, National Institute of Mental Health (1999), p. 18.)

There is strong evidence that acute post-traumatic stress symptoms result from a violent life threat, and that the severity is related to the extent of exposure to the threat or the witnessing of injury or death. (Pynoos, R. & Nader, K., *Psychological First Aid and Treatment Approach to Children Exposed to Community Violence: Research Implications*, Journal of Traumatic Stress Studies (1988), Vol 1, #4, p. 447.)

"Traumatic reactions occur when action is of no avail. When neither resistance nor escape is possible, the human system of self-defense becomes overwhelmed and disorganized. Each component of the ordinary response to danger, having lost its utility, tends to persist in an altered and exaggerated state long after the actual danger is over. Traumatic events produce profound and lasting changes in physiological arousal, emotion, cognition, and memory." (Judith Herman, M.D., *Trauma and Recovery, The Aftermath of Violence—from Domestic Abuse to Political Terror* (1997), p. 34 ),

Defense counsel failed to seek the assistance of a mental state expert and thereby learn the significance of Petitioner's condition and its implication and importance to substantiate his viable defense. .

In *Strickland* the Court advised, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are

11

reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (*Strickland v. Washington, supra,* 466 U.S. 668, 690-69.) In the instant case there was "no thorough investigation of law and facts," since defense counsel failed to take the second step, because he apparently failed to appreciate its significance as support for his client's defense.

The People take the position that no psychologist or other mental health professional would diagnose or evaluate a person through another person's description. That is not entirely true. "Psychological autopsies" are frequently performed.

The fact that Mr. Peckham had the Petitioner testify as to his eye injury and how it affected him is sufficient evidence that he was aware of the effect such previous trauma could have on the defense. If nothing else, Defense Counsel should have called an expert to testify about PSD and its causes and effects. This would have at least given the jury some baseline to judge Petitioner's actions and to bolster his testimony.

Thus, Defense Counsel, with no reasonable tactical advantage to be gained, completely abandoned his client's only and highly viable defense.

In Petitioner's case, there was no "strategic" or "tactical" decision to avoid a particular defense.

## IV

## THE PRELIMINARY EXAMINATION

Petitioner takes no position regarding the Preliminary Examination other than to say that: (1) it in no way is evidence of Defense Counsel's effectiveness at trial (2) if it shows anything, it shows that the issue of Petitioner's mental state and why he acted the way he did was already in the mind of Counsel.

12

## V

## THE TRIAL ATTORNEY DID NOT PROVIDE ADEQUATE PROFESSIONAL SERVICES DURING THE TRIAL

The People seem to feel that Mr. Peckham's determination of what was relevant and not shows he was effective. Petitioner disagrees. The lifestyle of that apartment in general and the victim in particular was relevant to show the effect they had on Petitioner's actions the day in question.

The People point out that Mr. Peckham provided law on self-defense and imperfect self-defense. That is true. The problem is that shows that he was aware of the importance of the Petitioner's mental state at the time of the offense and did nothing about it.

It is also true that he made requests for specific jury instructions. The problem there is that he did NOT request Involuntary Manslaughter CALJIC 8.45 and 8.46. (Exhibit 8, pp.59-68)

The People state on page 16 that "Mr. Peckham arranged the evaluation of the petitioner, and presented testimony about the petitioner's vision problem as part of the imperfect self-defense claim of the petitioner."

Petitioner agrees with the People that he arranged for Petitioner to be evaluated by an ophthalmologist. The problem is that did he not go the logical and necessary one step further and have a mental health professional exam Petitioner to see what, if any, effects the stabbing in the eye had on Petitioner.

He did not even go a half step and have an expert testify about PSD in the abstract. This would have at least given the jury some reference as to the relevance and importance of the eye injury to Petitioner's defense. It was no so much that Petitioner had difficulty seeing as it was that being stabbed in the eye caused him to react when threatened.

13

Little Denial to People's Return on Petition for Writ of Habeas Corpus
SCE 198946 EHC 388

# VI

## PETITIONER'S DECLARATIONS ARE JUST AS RELIABLE AS THOSE OF ANYONE ELSE

The People seemingly ask this Court to reject Petitioner's Declaration and exhibits and attachments because it is he who made them.

Petitioner agrees that these statements may not be admissible as evidence at any subsequent hearing. He will testify under oath and be subject to cross-examination at the hearing.

Petitioner disagrees, however, with the People's position that they are unreliable because they are written to support Petitioner's claims. That does not make them unreliable. Mr. Peckham's Declaration was written to support the People's claim and he certainly has an interest in upholding his performance.

# VII

## THE MANSLAUGHTER INSTRUCTIONS WERE WOEFULLY INADEQUATE IN THAT NO INSTRUCTION ON INVOLUNTARY MANSLAUGHTER OR CALJIC 8.45 WAS GIVEN, REQUESTED AND IN FACT EXPLICITY REJECTED BY DEFENSE COUNSEL. THIS WAS INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner believes we should begin our discussion with the case cited by the People and attached as Exhibit 14. *People v. Blakely* (2000) 23 Cal.4th 82 does not stand for the proposition cited by the People on page 18. Looking at page 4 and 5 of Exhibit 14, it is obvious what the holding of the California Supreme Court was

> In his dissenting opinion in this case, Justice Mosk contends that a defendant who kills in unreasonable self-defense may sometimes be guilty of involuntary manslaughter. We have no quarrel with this view. We conclude only that a defendant who, *with the intent to kill or with conscious disregard for life*, unlawfully kills in unreasonable self-defense is guilty of voluntary manslaughter. *Id.* at 91

14

The People seem confused also about the effect if imperfect self-defense. A confusion that was shared by the Trial Court, the Prosecutor and, sadly, Defense Counsel. Justice Mosk, in his dissent in *Blakely* gives an excellent and correct synopsis of the law

> By its terms, the doctrine of imperfect self-defense, as we held in *Christian S.* and *Flannel*, prohibits an actor's "convict[ion] of" any "crime *greater than voluntary manslaughter.*" (*In re Christian S., supra,* 7 Cal.4ᵗʰ at p 771, italics added; see *People v. Flannel, supra,*25 Cal.3d at pp. 67.,674-680 (lead opn. of Tobriner *id.* at pp. 686-687 (conc. opn. of Richardson, J.).) It does not, however, mandate his conviction of voluntary manslaughter itself. The reason is easy to discern. *Id* at p 98.

Thus, the actions of Petitioner in light of his claim of imperfect self-defense, if believed by the jury, does not make him guilty of voluntary manslaughter per se. What it means is that the most he could have been convicted of was voluntary manslaughter. It certainly did not, as the People seem to suggest, preclude involuntary manslaughter.

In the discussions on jury instructions, as seen in People's Exhibit 12 pages 671 through 676, it is obvious that all parties have great confusion regarding the law of homicide in general and manslaughter in particular. Petitioner would once again point out that Defense Counsel specifically told the trial court he was not requesting involuntary manslaughter of intoxication as a defense. This was inexcusable.

The confusion of the parties is further reflected in pages that will be supplied by Petitioner as Exhibit A pages 697-709. It shows that this was the **first time** that the Prosecutor and trial court had ever dealt with homicide instructions of this type. (697-698). It also shows that Defense Counsel had a woefully inadequate understanding of the jury instructions required in a homicide case and the law of homicide.

Mr. Peckham in Exhibit 1 at page 2 says he has handled over 100 jury trials. One wonders as to how many have been homicides.

15

1   He also states that he has been a defense attorney for at least twenty years and

2   has a background in psychiatric defenses and has experience with them in other cases.

3   If so, why did he not raise it here?

4       There is nothing in Exhibit 1 to show that the failure to request CALJIC 8.45,

5   8.46 or any instruction on involuntary manslaughter was a tactical decision. There

6   could be none.

7       Under California law, involuntary manslaughter is an unlawful killing in which

8   the defendant does not harbor malice and does not intend to kill the victim. (*People v.*

9   *Broussard* (1977) 76 Cal.App.3d 193, 197; *People v. McManis* (1954) 122

10  Cal.App.2d 891, 898; *People v. Kelley* (1914) 24 Cal.App.54, 62.) California law

11  recognizes four theories of involuntary manslaughter, two of which are based on

12  statute and two of which are based on case law.

13      The two statutory theories of involuntary manslaughter are found in Penal

14  Code §192, subdivision (b). One of them is when the homicide occurs "in the

15  commission of an unlawful act, not amounting to a felony. . . ." (Ibid.) Under this

16  theory of involuntary manslaughter the unlawful act does not have to be a

17  misdemeanor that is inherently dangerous in the abstract, but rather one that is

18  dangerous under the circumstances of its commission in the case being tried and

19  which was committed intentionally and with criminal negligence. (*People v. Cox*

20  (2000) 23 Cal.4th 665, 670-676; *People v. Wells* (1996) 12 Cal.4th 979, 985-989.)

21  Criminal (or gross) negligence is negligence that is "aggravated, culpable, gross or

22  reckless, that is, the conduct of the accused must be such a departure from what would

23  be the conduct of an ordinarily prudent or careful man under the same circumstances

24  as to be incompatible with a proper regard for human life, or, in other words, a

25  disregard of human life or an indifference to consequences." (*People v. Penny* (1955)

16

44 Cal.2d 861, 879; citation and internal quotation marks omitted; accord, *People v. Sargent* (1999) 19 Cal.4th 1206, 1215.) Under this definition, the homicide is not the result of misadventure but is instead the natural and probable consequence of the defendant's act. (*People v. Penny*, supra, 44 Cal.2d at p. 880.)

The second statutorily-based theory of involuntary manslaughter is when the homicide occurs "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Penal Code §192, subd. (b).) The phrase "without due caution and circumspection" refers to criminal negligence of the same sort that is applicable in cases of involuntary manslaughter in the commission of an unlawful act not amounting to a felony. (*People v. Penny*, supra, 44 Cal.2d at pp. 869-880.)

The third theory of involuntary manslaughter is based on two cases -- People v. *Burroughs* (1984) 35 Cal.3d 824 and *People v. Morales* (1975) 49 Cal.App.3d 134. Under this theory a homicide is involuntary manslaughter if the homicide is unintentional, if it occurs during the commission of a noninherently dangerous felony and if that felony is committed without due caution and circumspection (i.e., with criminal negligence). (*People v. Burroughs*, supra, 35 Cal.3d at pp. 835-836; *People v. Morales*, supra, 49 Cal.App.3d at pp. 144-145.)

The fourth theory of involuntary manslaughter is based on *People v. Cameron* (1994) 30 Cal.App.4th 591. Under this theory, a homicide can be involuntary manslaughter even if it occurred during the commission of an inherently dangerous felony, such as assault with a deadly weapon, so long as malice and intent to kill are absent. (Id. at pp. 603-605.)

Involuntary manslaughter is, of course, a lesser included offense of murder. (*People v. Prettyman* (1996) 14 Cal.4th 248, 274; *In re McCartney* (1966) 64 Cal.2d

17

830, 831. This fact was seemingly lost on the Trial Court, the Prosecutor and Defense Counsel.

In Petitioner's case, it can be argued that all four of the above-described theories of involuntary manslaughter were factually applicable.

What we should look at carefully is the facts of the case, especially as they apply to the first and fourth theories above; are involuntary manslaughter during the commission of a misdemeanor that is dangerous under the circumstances and the fourth above-described theory that is based on *People v. Cameron.*

The homicide occurred when Petitioner stabbed the victim with a kitchen knife. A kitchen knife is not a deadly weapon as a matter of law since the ordinary use for which a knife is designed is not weapon-related. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1029.) In view of the nature of the knife and the manner in which it was used, the jury could have found that the knife was a deadly weapon and that Petitioner used it to commit an assault with a deadly weapon. (*Ibid.*) Alternatively, the jury could have found that Petitioner used the knife to commit a simple battery in order to get away from the victim.

The first approach supports an instruction on involuntary manslaughter under the theory set forth in *Cameron.* The second falls under the misdemeanor theory of involuntary manslaughter since the striking of the victim with the knife made the battery dangerous under the circumstances of the offense. Because both theories were supported by the evidence, Defense Counsel had a duty under *Breverman* to request the jury be instructed that a verdict of involuntary manslaughter could be returned even though Petitioner's conduct constituted an assault with a deadly weapon or misdemeanor battery. Petitioner submits that the failure to request instruction under both these theories was ineffective assistance of counsel under the requirement in

18

*Breverman* that juries be instructed on all factually applicable theories of a lesser included offense.

This ineffective assistance of counsel demands relief.

When a trial court fails to instruct on a lesser included offense or on a theory of such an offense, the error is evaluated under the standard of reversal found in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Breverman*, supra, 19 Cal.4th at pp. 164-178.) Under this standard, the conviction will be reversed if, after an examination of the entire cause, including the evidence, it appears reasonably probable the defendant would have obtained a more favorable outcome had the error not occurred. (Id. at p. 178.) Petitioner submits that his case meets this standard for reversal.

Thus if it is error for a trial court to fail to instruct, it is certainly ineffective assistance of counsel to allow the trial court to fail to do that and to, as here, even go so far as not request any instruction on involuntary manslaughter and to explicitly reject it.

The jury found Petitioner guilty of second degree murder. The court had instructed the jury on two theories of second degree murder -- murder with intent to kill (express malice -- see Penal Code §188) but without premeditation and deliberation and murder without an intent to kill but with implied malice, i.e., an act whose consequences are dangerous to life that was performed with knowledge of the danger and with a conscious disregard for life. (See Exhibit B pp. 106-107) Although we do not know for certain which theory of second degree murder the jury used as the basis for its verdict, the record strongly suggests the basis was murder with implied malice.

The line between implied malice that can be the basis for second degree

19

murder and the gross negligence that is an element of involuntary manslaughter is a fine one. "Implied malice contemplates a subjective awareness of a higher degree of risk than does gross negligence, and involves an element of wantonness which is absent in gross negligence." (*People v. Watson* (1981) 30 Cal.3d 290, 296.) In addition, courts apply a different test for the two. "A finding of gross negligence is made by applying an <u>objective</u> test: if a <u>reasonable person</u> in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such awareness. However, a finding of implied malice depends upon a determination that the defendant <u>actually appreciated</u> the risk involved, i.e., a <u>subjective</u> standard." (*Id.* at pp. 296-297, citations omitted, emphasis in original.)

In Petitioner's case, it was a close question whether his conduct involved an element of wantonness that goes beyond gross negligence or whether Petitioner actually appreciated the risk of death involved in his conduct. Under the version of events presented by Petitioner he was trying to get away from the victim and or protect himself when he struck him with the knife. A jury reasonably could conclude from this that Petitioner was acting in a panic and was not subjectively aware that the force he was using was such as to put the victim's life in danger. Instead, the jury reasonably could have found that Petitioner subjectively thought he was using only that amount of force that would let him get away, even though objectively the force he used was much greater. Petitioner submits that it is reasonably probable that the jury would have convicted him of involuntary manslaughter if they had been instructed on the theory of misdemeanor manslaughter and the theory found in *Cameron.*

The conclusion that the error was not harmless is not lessened by the fact that the jury rejected the theory of voluntary manslaughter on which they were instructed.. This is because there is an important factual difference between this theory and the

20

theory of voluntary manslaughter that the jury was instructed on.

Thus, given the circumstances of the offense, the jury most likely rejected the voluntary manslaughter verdict because the jury could not conclude that Petitioner's act fit the definition they received of imperfect self-defense. But it is reasonably probable that they would have found Petitioner's act constituted an assault with a deadly weapon or a battery, and reasonably probable that the jury would have found that Petitioner acted without malice and without an intent to kill.

CALJICS 8.45 and 8.46 are attached as Exhibit C.  It is obvious that they fit the fact scenario here. At the least they should have been requested.

Finally, a tactical reason should be explored here. When the jury was instructed on first and second degree murder and voluntary manslaughter, second degree murder was "the middle road." While no one knows with certainty that that is why the chose second degree murder; it is reasonable to assume that if hey had been given a further option of involuntary manslaughter, they could have chosen it or, at the least, voluntary manslaughter as their "middle road." This would be obvious to any reasonably competent trial attorney defending homicide cases.

## VIII

**THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION. HOWEVER, THERE WAS ALSO SUFFICIENT EVIDENCE TO REQUIRE REQUESTING AN INVOLUNTARY MANSLAUGHTER INSTRUCTION**

The People state that there was sufficient evidence to support convictions for murder. What the relevancy of this is to the claims of Petitioner is unclear. The issue before the court on this writ is effective assistance of counsel.

Petitioner concedes that here was sufficient evidence to find him guilty of Second Degree Murder. However, he must point out that there was abundant evidence

21

1    By which a jury could have found him guilty of involuntary manslaughter. The

2    problem is he never had that chance. His trial counsel's ignorance of the law of

3    homicide or his totally unacceptable tactical choice in not requesting any instruction

4    on involuntary manslaughter deprived him of that crucial defense.

5

6

7    ## CONCLUSION

8    The omission of the crucial involuntary manslaughter instruction(s) and any

9    expert evidence about PSD denied Petitioner a fair trial.

10    His testimony needed buttressing.

11    He deserved and had a right to have his actions considered by a jury as

12    possibly constituting involuntary manslaughter.

13    He did not get these crucial elements of his defense because his trial counsel

14    did not pursue them.

15

16    This was ineffective assistance of counsel.

17    This undermines faith in the outcome.

18    The relief should be granted.

19

20    Dated: November 18, 2003                    Respectfully Submitted

21

22

23                                            W. Allan Williams
                                             Attorney For Petitioner
24                                            LARRY JOHN LITTLE, Jr.

25

26

27

28

Little Denial to People's Return on Petition for Writ of Habeas Corpus
SCE 198946 EHC 388

# EXHIBIT A

## TRIAL TRANSCRIPT
## PAGES 697-709

### RELEVANT DISCUSSIONS
### REGARDING HOMICIDE
### INSTRUCTIONS

DEFENDANT BY HIS UNLAWFUL OR WRONGFUL CONDUCT CREATED THE CIRCUMSTANCES WHICH LEGALLY JUSTIFIED HIS ADVERSARY'S USE OF FORCE, ATTACK OR PURSUIT.

MR. PECKHAM: THROWING AN OBJECT AT HIM IS NOT JUSTIFICATION. WELL, I MEAN --

MS. STEIN: WELL, WE ALL GET TO MAKE ARGUMENTS IN THE MORNING.

THE COURT: SURE. I THINK IT'S NECESSARY AND SHOULD BE GIVEN. LET'S SEE. THAT'S 5.17.

AND WE SHOULD HAVE 8.50, DISTINCTION BETWEEN MANSLAUGHTER AND MURDER.

MS. STEIN: I'M SORRY. WHICH ONE ARE WE ON?

MR. PECKHAM: 8.50.

THE COURT: 8.50. WE HAD THAT EARLIER. YEAH, I DID. I HAD THE 8.50 BEFORE I GIVE THE 5.10.

MS. STEIN: SO YOU'VE MOVED IT AFTER 8.40?

THE COURT: DOESN'T THAT SEEM TO MAKE MORE SENSE TO YOU? I DON'T KNOW.

MS. STEIN: THAT'S FINE.

THE COURT: TO DISTINGUISH BETWEEN MURDER AND MANSLAUGHTER BEFORE YOU ACTUALLY GET TO THE DEFINITIONS OF SELF-DEFENSE, AND --

MR. PECKHAM: YES, IT DOES.

MS. STEIN: IT'S MY FIRST ATTEMPT AT PUTTING ONE OF THESE PACKETS TOGETHER, SO --

THE COURT: YEAH. I'VE NEVER DONE THIS.

MS. STEIN: THAT'S FINE.

THE COURT: I'VE ONLY DONE ONE OF THESE BEFORE. IT

1    WAS A FIRST DEGREE MURDER WHERE THE GUY EITHER COMMITTED

2    THE CRIME AND MURDERED THE GUY OR HE DIDN'T.  IT WAS A LOT

3    EASIER THAN --

4         MR. PECKHAM:  AN I.D. CASE?

5         THE COURT:  IT WAS AN I.D. CASE, ALTHOUGH THE

6    FINGERPRINTS PROBABLY DIDN'T HELP THE DEFENDANT.

7         OKAY.  SO -- AND WE HAVE 8.51.

8         MS. STEIN:  I THINK WE DECIDED THAT ONE DIDN'T APPLY.

9         THE COURT:  MURDER, MANSLAUGHTER, INVOL.

10        MS. STEIN:  BECAUSE IT DEALT WITH INVOL.

11        THE COURT:  OKAY.  THEN WE DELETED THE 4.20, 4.21,

12   4.21.1, 4.22.

13        MS. STEIN:  DOES COUNSEL WANT -- I KNOW WE DELETED IT

14   WITH REGARDS TO GETTING US TO AN INVOLUNTARY MANSLAUGHTER.

15   DOES COUNSEL WANT IT DELETED WITH REGARDS TO NEGATING

16   SPECIFIC INTENT?

17        MR. PECKHAM:  LET'S SEE.

18        THE COURT:  WELL, WHAT IS THE SPECIFIC INTENT?

19        MS. STEIN:  TO KILL FOR FIRST DEGREE OR EXPRESS MALICE

20   SECOND DEGREE.

21        THE COURT:  OKAY.  SO AND THEN AFTER 5.17, WE GET TO

22   8.70.  IS THAT WHERE WE ARE?

23        MS. STEIN:  WHAT ARE WE DOING ABOUT THESE VOLUNTARY

24   INTOXICATION INSTRUCTIONS?

25        MR. PECKHAM:  I DON'T THINK THERE'S ANY INVOLUNTARY

26   INTOXICATION.  IT WOULD BE NICE, BUT --

27        THE COURT:  LIKE I SAY, I HAVEN'T HEARD ANY EVIDENCE

28   TO SUPPORT THAT.  THE WITNESSES SAY, "WELL, HE'D BEEN

1  DRINKING," OR "3'D BEEN TAKING DOPE." THEN WE HAVE

2  MR. ROBERTS WHO CAME AND TOLD US THAT MR. RABATORE WAS A

3  LOT BETTER WHEN HE HAD TAKEN DOPE, BECAUSE IT KIND OF

4  CALMED HIM DOWN. AND YOU HEAR PEOPLE COME IN SAY, "WELL, I

5  ALWAYS HAVE AT LEAST FOUR OUNCES OF GIN IN THE MORNING. I

6  MEAN, THAT'S THE ONLY WAY I CAN GET GOING."

7      MR. PECKHAM:  I NEED MY COFFEE.

8      MS. STEIN:  SO 4.20, 4.21, AND 4.21.1 ARE OUT?

9      THE COURT:  CORRECT.

10     MS. STEIN:  AND 4.22?

11     THE COURT:  CORRECT. THEN I HAVE 8.70, DUTY OF JURY

12 AS TO DEGREE OF MURDER. DOUBT WHETHER FIRST OR SECOND

13 DEGREE MURDER, 8.71. AND THEN 8.72, DOUBT WHETHER MURDER

14 OR MANSLAUGHTER. AND THEN 8.74.

15     MS. STEIN:  WHAT ABOUT 8.73?

16     THE COURT:  DIDN'T THAT SEEM TO BE APPROPRIATE TO YOU?

17     MR. PECKHAM:  PROVOCATION.

18     THE COURT:  WHOOPS. I'M SORRY. I HAD TAKEN 8.73 OUT.

19     MR. PECKHAM:  YEAH, I THINK THAT'S --

20     THE COURT:  GETTING AHEAD OF MYSELF.

21     MS. STEIN:  THE ONLY CONFUSING THING ABOUT THAT IS --

22 AND I'M TALKING ABOUT 8.73.

23     THE COURT:  YEAH.

24     MS. STEIN:  IT SAYS, "IF THE EVIDENCE ESTABLISHES THAT

25 THERE WAS PROVOCATION WHICH PLAYED A PART IN INDUCING AN

26 UNLAWFUL KILLING OF A HUMAN BEING, BUT THE PROVOCATION WAS

27 NOT SUFFICIENT TO REDUCE THE HOMICIDE TO MANSLAUGHTER" --

28 THAT'S A THEORY OF MANSLAUGHTER THAT DEFENSE COUNSEL IS

1   CHOOSING NOT TO GO --

2       MR. PECKHAM:  YEAH.  I'M NOT REQUESTING 8.73.

3       MS. STEIN:  -- DOWN.

4       THE COURT:  IF YOU'RE NOT REQUESTING IT, WE DON'T NEED

5   TO GIVE IT.

6       MS. STEIN:  OKAY.  THAT ONE'S OUT?

7       THE COURT:  YES.

8                   AND YOU'VE NOT REQUESTED 8.73, MR. PECKHAM;

9   IS THAT CORRECT?

10      MR. PECKHAM:  THAT'S CORRECT.

11      MS. STEIN:  THE USE NOTE SAYS THERE'S NO REQUIREMENT

12  IT BE GIVEN SUA SPONTE.

13      THE COURT:  I SEE THAT.

14                  THEN I HAVE 8.74, UNANIMOUS AGREEMENT AS TO

15  OFFENSE, FIRST OR SECOND DEGREE MURDER OR MANSLAUGHTER.

16                  DO YOU HAVE THE VERDICT FORMS?

17      MS. STEIN:  THOSE ARE BEING PREPARED, YOUR HONOR.

18      THE COURT:  OKAY.

19      MS. STEIN:  I ASKED FOR INVOLUNTARY AS WELL, BECAUSE I

20  DIDN'T KNOW EXACTLY HOW THINGS WERE GOING TO GO THIS

21  AFTERNOON, BUT SHE'S PREPARING ONE FOR FIRST DEGREE --

22      THE COURT:  SECOND DEGREE, INVOLUNTARY.

23      MS. STEIN:  -- SECOND WITH A KNIFE AND VOL WITH A

24  KNIFE.  AND I'LL HAVE THIS FIRST THING IN THE MORNING FOR

25  EVERYONE.

26      THE COURT:  SO AS TO 8.74, I WILL STRIKE THE "HER,"

27  STRIKE THE "SHE," STRIKE THE "OR INVOLUNTARY."  AND

28  OTHERWISE, IT'S AS YOU SEE IT.  YES?

1      MS. STEIN:  YES.

2      THE COURT:  MR. PECKHAM?

3      MR. PECKHAM:  YES.

4      THE COURT:  OKAY.  THEN WE HAVE -- NOW WE'RE GOING TO

5 GET INTO THE ARGUMENT ABOUT THE 8.75.  PARTIAL VERDICT.  I

6 THINK THE PEOPLE HAD ONE FORM, AND I THINK YOU HAD ANOTHER

7 FORM.

8      MR. PECKHAM:  MY PROBLEM WITH THIS IS THAT IT MAKES

9 THEM GO THROUGH STEP, AFTER STEP, AFTER STEP, OF SAYING,

10 NO, NO, NO, NO, NO, WHEN IN FACT IF THEY COULD AGREE

11 UNANIMOUSLY THAT IT WAS SELF-DEFENSE.  IT PUTS SO MUCH

12 EMPHASIS ON THE DELIBERATION WITH RESPECT TO EACH STEP.  I

13 THINK THEY OUGHT TO BE ABLE TO COME TO A DECISION OF

14 SELF-DEFENSE.  THE SPECIAL VERDICT FORM, IF YOU FIND IN

15 FAVOR OF THE DEFENDANT THAT HE ACTED IN SELF-DEFENSE, THEN

16 HE'S NOT GUILTY.  INSTEAD OF SO MUCH EMPHASIS ON ALL OF THE

17 OTHER CRIMES THAT THEY HAVE TO GO THROUGH IN ORDER TO GET

18 DOWN TO SELF-DEFENSE.

19      THE COURT:  I'M LOOKING AT THE USE NOTE RIGHT NOW.

20      MR. PECKHAM:  OKAY.  SO THIS INDICATES SHOULDN'T WE

21 DELETE PARAGRAPH FOUR?

22      THE COURT:  WELL, WHAT -- WHAT SPECIFICALLY DID YOU

23 HAVE PREPARED?

24      MR. PECKHAM:  WELL, I THINK IT REFERS TO 17.10 AND 12.

25      THE COURT:  THAT'S BASICALLY THE PEOPLE VS. STONE

26 INSTRUCTION?

27      MR. PECKHAM:  YES.

28      THE COURT:  IF YOU ARE NOT SATISFIED BEYOND A

1   REASONABLE DOUBT THAT THE DEFENDANT IS GUILTY OF THE CRIME

2   CHARGED, YOU MAY NEVERTHELESS CONVICT HIM OF ANY LESSER

3   CRIME IF YOU ARE CONVINCED BEYOND A REASONABLE DOUBT THE

4   DEFENDANT'S GUILTY OF A LESSER CRIME.  THE CRIME OF MURDER

5   IN THE SECOND DEGREE IS LESSER TO THAT OF MURDER IN THE

6   FIRST DEGREE AS CHARGED IN COUNT ONE.

7            WELL, YOU KNOW, AS I SAY, I STILL THINK THAT

8   THE 8.75 IS MORE SPECIFIC THAN THE 17.10.  I DON'T REALLY

9   FIND IT THAT CONFUSING.  DO YOU?

10     MR. PECKHAM:  NO.  IT'S JUST -- IT JUST SEEMS TO ME --

11   IT SEEMS TO GIVE UNDUE EMPHASIS TO DOING IT IN ORDER AND IN

12   SOME WAY PREVENTING THE JURY FROM WHAT I THINK WOULD BE

13   ALLOWED IN 17.10, TO JUST DISCUSS IT.  YOU KNOW, IT SORT

14   OF, LIKE, PUTS THEM ON A PROGRAM.

15       THE COURT:  WELL, IT DOES TELL THEM THAT.  THAT ONE

16   THING THAT MIGHT BE HELPFUL IS FOR THEM TO LOOK AT ALL THE

17   CHARGES.

18       MR. PECKHAM:  YES.

19       THE COURT:  "YOU MAY FIND IT TO BE PRODUCTIVE TO

20   CONSIDER AND REACH TENTATIVE CONCLUSIONS ON ALL CHARGES ON

21   LESSER CRIMES BEFORE REACHING ANY FINAL VERDICT."

22       MR. PECKHAM:  AND THAT'S WHAT 17.10 SAYS AS WELL.

23       THE COURT:  RIGHT.

24       MR. PECKHAM:  TO ME, 17.10 IS SO MUCH CLEARER WHEN IT

25   SAYS, IF YOU CAN'T -- SECOND DEGREE IS A LESSER OF FIRST

26   AND MANSLAUGHTER IS A LESSER OF SECOND.  AND THERE'S ENOUGH

27   INSTRUCTIONS TO DEFINE FIRST AND SECOND AND MANSLAUGHTER

28   AND SELF-DEFENSE.

1   THIS PARAGRAPH SIX SAYS, "THE COURT CANNOT

2   ACCEPT A VERDICT OF GUILTY OF VOLUNTARY OR INVOLUNTARY

3   MANSLAUGHTER UNLESS THE JURY ALSO UNANIMOUSLY FINDS AND

4   RETURNS A SIGNED NOT GUILTY VERDICT FORM AS TO BOTH MURDER

5   OF THE FIRST AND MURDER OF THE SECOND DEGREE."

6       THE COURT:  YES.  UH-HUH.

7       MS. STEIN:  THAT'S THE LAW, ISN'T IT?

8       THE COURT:  I THOUGHT THAT WAS THE LAW.

9       MS. STEIN:  I THINK -- I AGREE WITH THE COURT IN THAT

10  I THINK THAT THIS ADDRESSES SOME SPECIFIC ISSUES THAT I

11  GUARANTEE WILL COME UP IF WE USE 17.10, BECAUSE THEY'RE

12  GOING TO START COMING BACK WITH, "WELL, CAN WE ACQUIT ON

13  THIS, AND NOT GUILTY ON THIS, BUT UNDECIDED ON THE SECOND?"

14  AND THEN IF THEY HAVE THIS INFORMATION BEFORE THEM, IT LAYS

15  OUT VERY CLEARLY THAT THEY CANNOT RETURN A GUILTY VERDICT

16  ON A LESSER INCLUDED CRIME, UNLESS THEY HAVE SIGNED NOT

17  GUILTY ON THE GREATER CRIMES CHARGED.

18      MR. PECKHAM:  SO WHAT IF THEY DEADLOCK ON THE GREATER

19  CRIMES CHARGED?

20      MS. STEIN:  THEN IT'S A MISTRIAL.

21      MR. PECKHAM:  BUT THEY FEEL THAT IT'S A LESSER CRIME?

22      MS. STEIN:  IT'S A MISTRIAL.  THEY HAVE TO VOTE

23  UNANIMOUSLY NOT GUILTY -- IN ORDER TO GET TO A VOLUNTARY

24  MANSLAUGHTER, THEY HAVE TO VOTE NOT GUILTY ON FIRST, AND

25  NOT GUILTY ON SECOND.

26      THE COURT:  THAT'S MY UNDERSTANDING OF THE LAW.

27      MS. STEIN:  THAT'S THE LAW.

28      THE COURT:  DO YOU HAVE SOME AUTHORITY?

1    MR. PECKHAM:  I CITED IN MY POINTS AND AUTHORITIES.

2    PEOPLE VS. BLAIR.

3    THE COURT:  I'VE NOT READ THAT CASE.  I SAW YOUR

4    REFERENCES TO VOLUNTARY MANSLAUGHTER IS A CRIME.  AND I --

5    LET'S SEE.

6    THE COURT REPORTER:  COULD I HAVE THE CASE REPEATED?

7    PEOPLE VS. --

8    MR. PECKHAM:  BLAIR.

9    THE COURT:  IT'S A 1987 CASE AT 191 CAL.APP. 3D, 832,

10   AT 839 ACCORDING TO COUNSEL'S POINTS AND AUTHORITIES.  AND

11   AS I SAY, I'VE NOT PULLED THAT.

12   WELL, I GUESS I'M GOING TO HAVE TO TAKE A

13   LOOK AT THE CASE.

14   HAVE YOU INCLUDED 17.10?  I DIDN'T -- YOU

15   JUST GAVE A NUMBER.  I DIDN'T SEE THE INSTRUCTION THERE.

16   MS. STEIN:  I MADE COPIES OF THAT INSTRUCTION FOR THE

17   COURT AND FOR COUNSEL.  I NOTICED IT WASN'T IN HIS PACKET

18   SO --

19   THE COURT:  OKAY.  WELL, LET'S GO BACK TO 8.75 HERE

20   FOR JUST A MOMENT.  THE USE NOTE TELLS US IF THIS

21   INSTRUCTION IS GIVEN PRIOR TO ANY ISSUES ON DEADLOCK, THAT

22   I SHOULD READ IT IN ITS ENTIRETY EXCEPT FOR BRACKETED

23   PARAGRAPH FOUR.  WOULD YOU UNDERSTAND THAT TO MEAN I DON'T

24   READ PARAGRAPH FOUR AND THEN SIMPLY RENUMBER, OR WHAT?

25   INSTRUCTION ONE TELLS US -- OR TELLS THE

26   JURY THAT IF THEY FIND HIM -- ALL 12 AGREE TO THE FIRST

27   DEGREE, THEY SIGN IT, AND THE CASE IS OVER.

28   IF THEY CAN'T, THEN THEY TELL US THAT.

1   THAT'S WHAT TWO IS ABOUT.

2           THREE THEN TELLS THEM THAT THE COURT CANNOT

3   ACCEPT A VERDICT OF GUILTY ON A SECOND DEGREE UNLESS THEY

4   ALL 12 AGREE THAT HE'S NOT GUILTY OF FIRST DEGREE.

5           THEN FOUR SAYS, IF YOU FIND HIM NOT GUILTY

6   OF COUNT ONE OF FIRST DEGREE BUT YOU CANNOT AGREE AS TO

7   MURDER OF THE SECOND DEGREE -- OKAY.  NOW, THAT SHOULD BE

8   STILL BE APPROPRIATE.  I THINK I HAVE TO READ FOUR.  AND

9   THEY'RE DEADLOCKED.  UNLESS --

10      MR. PECKHAM:  SO, IF THEY'RE DEADLOCKED, IF YOU GIVE

11  IT --

12      THE COURT:  IF THEY CAN'T FIND -- IF THEY FIND HIM NOT

13  GUILTY IN COUNT ONE, BUT THEY CAN'T AGREE ON COUNT TWO,

14  IT'S A DEADLOCKED CASE AND WE CAN GO DO IT AGAIN.

15      MR. PECKHAM:  RIGHT.  WELL --

16      THE COURT:  IF THEY ALL AGREE THAT HE'S NOT GUILTY OF

17  SECOND DEGREE, THEN THEY GET A CHANCE TO LOOK AT VOLUNTARY

18  MANSLAUGHTER.

19          AND IF THEY AGREE HE'S GUILTY OF VOLUNTARY

20  MANSLAUGHTER, THE CASE IS OVER.  IF THEY CAN'T AGREE,

21  AGAIN, IT'S HUNG AS TO VOLUNTARY, AND HE'S NOT GUILTY ON

22  FIRST DEGREE AND SECOND DEGREE.  AND THEY GET A CHOICE ON

23  TO RETRY THE VOLUNTARY MANSLAUGHTER.

24          ISN'T THAT HOW YOU WOULD CONSTRUE THIS?

25      MR. PECKHAM:  SO THE USE NOTE SAYS DON'T READ FOUR IF

26  THEY'RE DEADLOCKED OR DO READ FOUR IF THEY'RE DEADLOCKED?

27      THE COURT:  THE USE NOTES TELL US THIS IS SPECIFICALLY

28  DESIGNED FOR A HOMICIDE CASE.  IF IT'S ANY OTHER KIND OF A

1    CASE, THEN YOU CAN READ 1.710 AND 17.12 AND 17.49.  THE

2    JURY IS MERELY PRECLUDED FROM RETURNING A VERDICT ON A

3    LESSER OFFENSE WITHOUT ALSO RETURNING A VERDICT ON THE

4    GREATER OFFENSE.  AND I THINK THAT'S APPROPRIATE WITH

5    CURRENT LAW.  THAT WAY, IF THEY FIND HIM NOT GUILTY ON THE

6    MAJOR CHARGE OF THE FIRST DEGREE, THE PEOPLE CAN'T RETRY

7    HIM ON THE FIRST DEGREE.  IF THEY CAN'T AGREE ON THE SECOND

8    DEGREE, THEN THEY CAN RETRY HIM ON THE SECOND DEGREE.

9    BECAUSE HE'S ALREADY STILL IN JEOPARDY ON THE FIRST DEGREE,

10   BUT THE JURY CAN'T AGREE ON THE LESSER.

11        MR. PECKHAM:  AND IF THEY DEADLOCK ON FIRST AND SECOND

12   AND FIND HIM GUILTY OF MANSLAUGHTER, DOES THAT MEAN THEY

13   CAN RETRY HIM ON FIRST AND SECOND?

14        THE COURT:  NO.  IF THEY FIND HIM NOT GUILTY OF THE

15   FIRST DEGREE, THEY CAN'T DO IT AGAIN, BUT THEY'RE NOT

16   SUPPOSED TO GET TO THE VOLUNTARY UNTIL THEY MAKE A DECISION

17   ON THE SECOND DEGREE.

18        MS. STEIN:  A UNANIMOUS DECISION.

19        THE COURT:  THERE ARE LESSER INCLUDED OFFENSES.  I

20   MEAN, THEY'RE NOT SEPARATELY CHARGED OFFENSES.  IF THEY

21   WERE SEPARATELY CHARGED OFFENSES, YOU GOT A DIFFERENT

22   ARGUMENT.  WHERE THERE ARE LESSER INCLUDED OFFENSES, IN

23   ORDER TO GET TO THE LESSER, THEY'VE GOT TO AGREE THAT HE'S

24   NOT GUILTY OF THE GREATER.

25        MR. PECKHAM:  OKAY.  THAT'S TRUE.

26        THE COURT:  AND MY CONFUSION IS THAT AT THE TOP OF

27   PAGE 465, "IN THE EVENT 8.75 IS GIVEN AT THE INITIAL CHARGE

28   TO THE JURY," WHICH WE'RE TALKING ABOUT AND I PLAN ON

1    DOING, "DELETE BRACKETED PARAGRAPH FOUR."

2         MS. STEIN:  YOUR HONOR, I FIGURED IT OUT.  IT'S ON

3    PAGE 462, THE FOURTH PARAGRAPH ON 462.  "DISREGARD THE

4    INSTRUCTION PREVIOUSLY GIVEN" --

5         THE COURT:  OH, OH, OH, OH.  SURE.

6         MS. STEIN:  -- "PREVIOUSLY GIVEN, WHICH REQUIRES THAT

7    YOU RETURN THE ONE" --

8         THE COURT:  SURE.  SURE.  FAIR ENOUGH.

9         MS. STEIN:  --"VERDICT FORM."  THAT'S WHAT IT IS.

10   THAT MAKES SENSE.

11        THE COURT:  IT DOES MAKE SENSE.  IT'S PARAGRAPH FOUR,

12   NOT --

13        MS. STEIN:  NUMBER.

14        THE COURT:  -- NUMBER.

15        MS. STEIN:  THAT'S WHAT I WAS DOING TOO.

16        THE COURT:  DING.  IT'S LATE.  I DON'T KNOW.  I GUESS

17   I HAD NOTED THAT SHOULD BE DELETED.

18        MR. PECKHAM:  YES.

19        THE COURT:  YES.  OKAY.  I THINK WE'RE ALL ON THE SAME

20   PAGE.

21             OKAY.  SO THEN NEXT I HAVE 8.74, 8.75, AND

22   17.16, THE PERSONAL USE.  YES.  NOW, IS THIS WHERE WE

23   SHOULD HAVE THE 3.31?

24        MS. STEIN:  MENTAL STATE?

25        THE COURT:  MENTAL STATE.

26        MS. STEIN:  THAT'S 331.5.

27        THE COURT:  WELL, NOT THE SPECIFIC INTENT.  YOU'RE

28   SUPPOSED TO HAVE, AFTER WE GO THROUGH ALL THE SPECIFIC

1    INSTRUCTIONS --

2          MS. STEIN:  I HAVE 331.5.  IT'S AFTER 3.31.

3          THE COURT:  OKAY.  BEFORE WE GET TO THE --

4          MS. STEIN:  WE CAN PUT IT ANYWHERE, BUT IT IS COPIED

5    AND IN THERE SOMEWHERE.

6          THE COURT:  WHY DO WE NEED 331.5?  THE MENTAL STATE

7    THAT WE'RE TALKING ABOUT IS SPECIFIC INTENT TO KILL

8    SOMEBODY.  SO WHY IS THERE OTHER THAN THAT?

9          MR. PECKHAM:  THOSE INSTRUCTIONS FOR MURDER INCLUDE

10   THAT SPECIFIC INTENT.

11         MS. STEIN:  THEY DO.  IT SAYS THAT IN PLEA 3.31 AND

12   3.31.5 THAT THERE HAS BEEN TO BE A JOINT UNION OF ACT AND

13   SPECIFIC CRIMINAL INTENT.  AND THEN THERE'S A PARAGRAPH

14   THAT SAYS THE SPECIFIC CRIMINAL INTENT REQUIRED IS SET OUT

15   ELSEWHERE IN THESE INSTRUCTIONS.

16         THE COURT:  AND THAT'S SET OUT IN WHICH INSTRUCTIONS?

17         MS. STEIN:  IT'S SET OUT IN FIRST DEGREE MURDER.

18         THE COURT:  THAT'S 8.00.

19         MS. STEIN:  AROUND IT SHOULD BE SET OUT IN

20   UNPREMEDITATED MURDER OF THE SECOND DEGREE, 8.30.  AND IT'S

21   ALSO IN 8.11, WHICH EXPLAINS EXPRESS MALICE AFORETHOUGHT,

22   WHICH IS THE INTENT TO KILL.

23         THE COURT:  8.11 TALKS ABOUT "WHEN IT IS SHOWN THAT A

24   KILLING RESULTED IN THE INTENTIONAL DOING OF AN ACT WITH

25   EXPRESS OR IMPLIED MALICE, NO OTHER MENTAL STATE NEED BE

26   SHOWN TO ESTABLISH THE MENTAL STATE MALICE AFORETHOUGHT.

27              "THE MENTAL STATE CONSTITUTING MALICE

28   AFORETHOUGHT DOES NOT NECESSARILY REQUIRE ANY ILL WILL OR

709

1    HATRED OF THE PERSON KILLED.

2              "THE WORD AFORETHOUGHT DOES NOT IMPLY

3    DELIBERATION OR THE LAPSE OF CONSIDERABLE TIME.  IT ONLY

4    MEANS THE REQUIRED MENTAL STATE MUST PRECEDE RATHER THAN

5    FOLLOW THE ACT."

6         MS. STEIN:  WELL, AT THE TOP OF IT IT SAYS -- OKAY.

7    "MALICE MAY BE EITHER EXPRESS OR IMPLIED.  MALICE IS

8    EXPRESS WHEN THERE IS MANIFESTED AN INTENTION UNLAWFULLY TO

9    KILL A HUMAN BEING."

10        THE COURT:  CORRECT.

11        MS. STEIN:  SO IT'S LAID OUT THERE.  AND THEN IT

12   SHOULD BE LAID OUT IN 8.30, PERPETRATOR INTENDED UNLAWFULLY

13   TO KILL A HUMAN BEING.  AND THEN IT SHOULD BE LAID OUT IN

14   FIRST DEGREE.  SO IT'S KIND OF WEIRD, BECAUSE THE ONLY

15   GENERAL INTENT CRIMES ARE VOLUNTARY MANSLAUGHTER AND SECOND

16   DEGREE MURDER, KILLING RESULTING FROM UNLAWFUL ACT

17   DANGEROUS TO LIFE.  THE SPECIFIC INTENT CRIMES ARE

18   UNPREMEDITATED MURDER OF THE SECOND DEGREE AND FIRST DEGREE

19   MURDER.  SO THERE'S REALLY TWO KINDS OF SECOND DEGREE.  ONE

20   OF THEM IS GENERAL INTENT, ONE OF THEM IS SPECIFIC.

21        THE COURT:  WELL, WHY DON'T YOU WORK ON --

22        MS. STEIN:  OKAY.

23        THE COURT:  -- 3.31, AND 3.30.  VOLUNTARY MANSLAUGHTER

24   IS A GENERAL INTENT CRIME.  FIRST DEGREE MURDER IS A

25   SPECIFIC INTENT CRIME.  AND WOULDN'T SECOND DEGREE ALSO BE

26   A SPECIFIC INTENT?

27        MS. STEIN:  NO.

28        THE COURT:  NO?

# EXHIBIT B

## COURT TRANSCRIPT
## PAGES 106 -108

### SECOND DEGREE MURDER AND
### VOLUNTARY MANSLAUGHTER
### INSTRUCTIONS GIVEN

0106

CALJIC 8.30

UNPREMEDITATED MURDER
OF THE SECOND DEGREE

Murder of the second degree is ▓▓▓▓ the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation.

Exact copy of CALJIC No. 8.30, except adaptations.

CALJIC 8.31

## SECOND DEGREE MURDER--KILLING RESULTING FROM UNLAWFUL ACT DANGEROUS TO LIFE

Murder of the second degree is [also] the unlawful killing of a human being when:

1. The killing resulted from an intentional act,

2. The natural consequences of the act are dangerous to human life, and

3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being.

Exact copy of CALJIC No. 8.31, except adaptations.

CALJIC 8.40

VOLUNTARY MANSLAUGHTER--DEFINED

(Pen. Code, § 192, subd. (a))

Every person who unlawfully kills another human being without malice aforethought but with an intent to kill, is guilty of voluntary manslaughter in violation of Penal Code section 192, subdivision (a).

There is no malice aforethought if the killing occurred ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ [in the honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury].

In order to prove this crime, each of the following elements must be proved:

1.  A human being was killed;

2.  The killing was unlawful; and

3.  The killing was done with the intent to kill.

[A killing is unlawful, if it was [neither] [justifiable] [nor] [excusable].]

Exact copy of CALJIC No. 8.40, except adaptations.

# EXHIBIT C

## CALJIC 8.45 AND 8.46

## INVOLUNTARY MANSLAUGHTER INSTRUCTIONS

CALJIC 8.45 (2001 Revision)

INVOLUNTARY MANSLAUGHTER--DEFINED

(Pen. Code, § 192, subd. (b))

[Defendant is accused [in Count[s]            ] of
having committed the crime of involuntary manslaughter in
violation of section 192, subdivision (b) of the Penal
Code.]

Every person who unlawfully kills a human being,
[without malice aforethought,] [and] [without an intent to
kill, and without conscious disregard for human life,] is
guilty of the crime of involuntary manslaughter in
violation of Penal Code section 192, subdivision (b).

[There is no malice aforethought if the killing
occurred in the actual but unreasonable belief in the
necessity to defend oneself against imminent peril to life
or great bodily injury.]

[A killing in conscious disregard for human life
occurs when a killing results from an intentional act, the
natural consequences of which are dangerous to life, which
act was deliberately performed by a person who knows that
[his] [her] conduct endangers the life of another and who
acts with conscious disregard for human life.]

A killing is unlawful within the meaning of this instruction if it occurred:

1.  During the commission of an unlawful act [not amounting to a felony] which is dangerous to human life under the circumstances of its commission; or

2.  In the commission of an act, ordinarily lawful, which involves a high degree of risk of death or great bodily harm, without due caution and circumspection.

[An "unlawful act" [not amounting to a felony] consists of a violation of              Code section[s]

        .]

[The commission of an unlawful act, without due caution and circumspection, would necessarily be an act that was dangerous to human life in its commission.]

In order to prove this crime, each of the following elements must be proved:

1.  A human being was killed; and

2.  The killing was unlawful.


Exact copy of CALJIC No. 8.45, except adaptations.

CALJIC 8.46

DUE CAUTION AND CIRCUMSPECTION--DEFINED

The term "without due caution and circumspection" refers to [a] negligent act[s] which [is] [are] aggravated, reckless and flagrant and which [is] [are] such a departure from what would be the conduct of an ordinarily prudent, careful person under the same circumstances as to be contrary to a proper regard for [human life] [danger to human life] or to constitute indifference to the consequences of such act[s].  The facts must be such that the consequences of the negligent act[s] could reasonably have been foreseen.  It must also appear that the [death] [danger to human life] was not the result of inattention, mistaken judgment or misadventure, but the natural and probable result of an aggravated reckless or grossly negligent act.

Exact copy of CALJIC No. 8.46, except adaptations.

APPENDIX No. 2

# E X H I B I T    H

## DECLARATION OF KEN KIMPE RE: EVIDENCE WITHHELD AT TRIAL

I KEN KIMPE, DECLARE THAT:

I am a witness that was not located by, Larry Little Jr.s Lawyer or investigator and I am the declarant Herein.

I Ken Kimpe also known as Ted went to Joyce Roaches apartment with Mary Ross, a Number of times from 6-9-99 to 6-15-99.

On 6-13-99 a couple days before Eddie Rabatores Demise I witnesses Eddie Rabator threaten to get petitioner while he had a physical confrontation with his mother Joyce Roach because she was trying to kick him out of the apartment.

Again on 6-15-99 me and Mary Ross were at Joyces apartment minutes before Eddie Rabators Demise. and I wittnesses Eddie threaten to get petitioner any way he could while he was arguing with his mom Joyce about moving out of the apartment.

I Declare under penalty of Perjury under the laws of the state of California that the foregoing is true and correct. executed this 11th Day of January, 2006 In San Diego California. **EXHIBIT H**

Dated 1-11-2006

SGT. K. RYAN  _(signature)_

Witnessed By THAT THE I/M SIGNING THIS DOCUMENT WAS WHO HE SAID.

_(signature)_

Ken Kimpe

<u>DECLARATION AND PROOF OF SERVICE BY MAIL</u>

I, <u>Larry Little</u>, declare under the penalty of perjury that I am

over the age of 18 years, (    ) and not a party, or ( ✓ ) am a party to this action,

and reside in Solano County, at P.O. Box 4000, Cell # <u>8-211</u>) Vacaville, California.

95696-4000.

That on <u>June</u>, <u>10</u>, 200<u>8</u>. I submitted to custody officials

for inspection, sealing and depositing in the United States Mail, consistent with the

"Mailbox Rule"; Houston v. Lack, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988)

at the California State Prison-Solano, Vacaville, California. 95696-4000 a copy of the

attached hereof: Original Exhibits to petition

for writ of habeas corpus to United

States District court

in a fully prepaid envelope, addressed to: United States District

Court, Room 4290, 880

Front Street, San Diego

CA. 92101-8900.

I declare under the penalty of perjury that the foregoing is true and correct.

This declaration was executed on this <u>June</u>, <u>10</u>, 200<u>8</u>, at CSP-Solano,

Vacaville, California. 95696-4000.

<u>Larry John Little Jr.</u>

DECLARANT